UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-------------------------------------------------------X
RESHMA ABELL,

                        Plaintiff,

    -against-

PACIRA PHARMACEUTICALS, INC.,
DAVE STACK, individually and in his
capacity as Chief Executive Officer of
PACIRA PHARMACEUTICALS, INC.,
And RICH KAHR, PETER MURPHY,
DENNIS McLOUGHLIN, PAUL
CIAVOLELLA, GLENN REISER, JOYCE
DAVIS, and MATT LEHMANN, in their
capacities as employees of PACIRA
PHARMACEUTICALS, INC.

                        Defendants.
-------------------------------------------------------X

Civ. Action No.

**VERIFIED
COMPLAINT**

       COMES NOW Plaintiff Reshma Abell ("Abell" or "Plaintiff"), by and through her

undersigned counsel, The Law Offices of Neal Brickman, P.C., located at 420 Lexington

Avenue, Suite 2440, New York, New York, 10170, and as and for her complaint against

Defendants, Pacira Pharmaceuticals, Inc. ("Pacira"), Dave Stack, individually and in his capacity

as Chief Executive Officer of Pacira ("Stack"), and Rich Kahr ("Kahr"), Pete Murphy

("Murphy"), Dennis McLoughlin ("McLoughlin"), Paul Ciavolella ("Ciavolella"), Glenn Reiser

("Reiser"), Joyce Davis ("Davis"), and Matt Lehmann ("Lehmann," and, collectively,

"Defendants"), in their capacities as employees of Pacira, states and alleges as follows:

## NATURE OF THE ACTION

       This is an action for damages arising from the hostile work environment that Plaintiff

experienced at Pacira, Defendants' illegal discriminatory treatment of, retaliation against, and

1

termination of Plaintiff under the New Jersey Law Against Discrimination ("NJLAD," N.J.S.A. §§ 10:5-1 to 10:5-49), and the New Jersey Conscientious Employee Protection Act ("NJCEPA," N.J.S.A. §§ 34:19-1 to 34:19-8),  for which she seeks compensatory damages, punitive damages, the costs of this action, and reasonable attorneys' fees.  The factual basis for Plaintiff's claims, recounted in detail herein, includes a long history of discriminatory and retaliatory acts based, at least in part, on her sex and national origin, which ultimately led to her termination, after internally reporting various financial irregularities to, among others, Kahr, Murphy, McLoughlin, Ciavolella, Reiser, Davis, and Lehmann.

This action also arises out of, *inter alia*, Plaintiff's complaint under Section 922(a) of the Dodd Frank Wall Street Reform and Protection Act ("Dodd Frank," 15 U.S.C. § 78u-6(h)(1)(B)(i)) as a Whistleblower, filed September 14, 2018.

## JURISDICTION

Jurisdiction over the federal claims is invoked pursuant to 28 U.S.C. § 1331, in that these claims arise under the laws of the United States; pursuant to Section 922 of the Dodd Frank Act, 15 U.S.C. § 78u-6(h)(1)(B)(i)); pursuant to 28 U.S.C. § 1332, in that plaintiff and defendants are citizens of different states; and over the state law claims pursuant to the doctrine of pendent jurisdiction as codified in 28 U.S.C. § 1367.

## VENUE

This action is properly laid in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(1), because Defendants' principal offices are located in this District, and (b)(2), because a substantial part of the events and omissions giving rise to the claims occurred in this judicial District.

## PARTIES

1.      Abell is an individual citizen of the United States with a primary residence in the State of New York and a former employee of Pacira Pharmaceuticals. Abell is a female of Indian descent.

2.      Upon information and belief, at all times relevant hereto, defendant Pacira was and is a domestic corporation duly authorized to conduct business in the State of New Jersey and subject to the laws and statutes thereof.

3.      Upon information and belief, at all times relevant hereto, defendant Stack was and is the Chief Executive Officer of Pacira. Stack qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

4.      Upon information and belief, at all times relevant hereto, defendant Kahr was and is the Vice President of Human Resources at Pacira.  Kahr reports directly to Stack. Kahr qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

5.      Upon information and belief, at all times relevant hereto, defendant McLoughlin was Abell's supervisor, and reported directly to Stack, among others.  McLoughlin qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

6. Upon information and belief, at all times relevant hereto, defendant Ciavolella was Abell's supervisor, and Pacira's Senior Director of Business Analytics, Market Research and Operations, who reported directly to Stack, among others. Ciavolella qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

7. Upon information and belief, at all times relevant hereto, defendant Reiser was Abell's supervisor, and reported directly to Stack, among others. Reiser qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

8. Upon information and belief, defendant Davis was Pacira's Vice President of Strategic Alliance, and reported directly to Stack, among others. Davis qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because she participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of her ability to affect the terms and conditions of Abell's employment.

9. Upon information and belief, defendant Matt Lehmann was Pacira's Senior Vice President of Commercial, and reported directly to Stack, among othera. Lehmann qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

## FACTUAL BACKGROUND

### Abell's Employment at Pacira Pharmaceuticals, Inc.

10.     Pacira Pharmaceuticals, Inc. (Pacira) is a specialty pharmaceutical company which makes a non-opiod analgesic for post-surgical pain control called Exparel.

11.     From May, 2014 through January, 2017, Abell worked for Pacira as a Surgical Account Specialist. From January 2017 until March 14, 2018, Abell worked for Pacira as a Senior Surgical Account Specialist.

12.     At Pacira, Abell's job responsibilities as a Senior Surgical Account Specialist included, but were not limited to, the following: successfully promoting Exparel at all major hospitals in the five boroughs of New York City and in Westchester County, New York; growing and increasing the profitability of the pharmaceutical territory; and training and providing case coverage to anesthesiologists and surgeons in area hospitals in, *inter alia*, orthopedic, cardiovascular, podiatric, obstetrics/ gynecology, general surgery, colorectal, urology, oncology, plastics, and bariatric surgery departments.

13.     Abell's overall pay for this position was ultimately determined by Ciavolella, who, starting in 2014, made the decisions as to how and whether to cap Abell's – and other similarly situated employees' – incentive compensation.

14.     Abell was known at Pacira as a standout go-getter who regularly grew sales: by $2,363,920 between May and December 2014; by $4,462,750 in 2015; by $3,777,038 in 2016; and by $3,778,523 in 2017. These statistics indicate that Abell outperformed similar and competing markets at twice the average growth, consistently and for four years in a row.

15.     In fact, Reiser and Murphy nicknamed Abell "Jordan," as in Michael Jordan, as of the end of 2016 – due to her unprecedented success as a senior representative in generating revenue, fostering relationships, and growing Pacira's book of business.

15.     Abell was so successful as a Senior Surgical Account Specialist that Pacira informed her that she was in line for a new position, Director of Post-Op Pain Management, and rewarded her with additional work without a commensurate bump in title or salary.

16.     From approximately February 2017 until March 14, 2018 termination, in addition to her Senior Surgical Account Specialist duties, Abell actually performed the "unofficial" role of Pacira's Director of Post-Op Pain Management.  These duties included, but were not limited to, developing and executing a national post-operative pain management training program; initiating and developing industry partnerships and strategic alliances with other pharmaceutical companies; launching "Field Block" training for anesthesia and various surgical services nation-wide; and creating a new specialty representative department, including recruiting, creating compensation and business plans, and executing territory designs.

17.     At Pacira, Abell was a dedicated, productive, and valuable employee who got along well with her colleagues and had no issues with her supervisor or others.  She always received positive performance evaluations and was generally respected by her coworkers for her experience and tenacity.

### A Pervasive Culture of Sexual Discrimination in a Male-Dominated Office

18.     Abell achieved these significant accomplishments, and consistently outperformed her peers, and met or exceeded her sales quotas despite an overtly hostile, male-dominated office where raunchy, sexually-based jokes and innuendo were the norm.

19.     It was business as usual for Abell to hear in a typical workday, in sum or substance, that the reason she was so successful was because she was "sleeping with her clients," or "blowing someone," or words to that effect.

20.     Abell performed her job so diligently that she won coveted positions in Pacira's Circle of Excellence and President's Club in 2015, 2016, and 2017 – yet the assumption was that she was only successful due to her sex, and her alleged willingness to exploit her sex, in obtaining new business.

21.     In addition, from at least February 2017, Abell was expected to do the work of two separate jobs, without additional compensation or official change in title, because she was required to be an accommodating female who was first and foremost a "team player."

22.     Abell was regularly the recipient of sexually charged comments, jokes, and innuendo – but she understood that she was not to go to Human Resources to complain about the sophomoric, inappropriate, and sexually demeaning commentary – because to do so would break some kind of industry 'code' among her male co-workers.

### Abell is Promised a Promotion, and is Summarily Terminated Instead

23.     Starting in February 2017, Abell developed and executed a company-wide pilot program for Post-Operative Pain Management, approved by Reiser and Murphy.

24.     On or about August 22, 2017, Abell successfully presented this pilot program to Pacira's Alibaba team, a group which included, *inter alia*, Pacira's commercial upper and middle management, Chief Operating Officer, legal team, National Accounts department, and Medical Affairs department.

25.     Shortly thereafter, Abell met with Reiser and Murphy, and they agreed on a promotion and change of title for Abell from Senior Surgical Account Specialist to Director of Post-Operative Pain Management, with a concomitant raise – to be effective January 2, 2018.

26.     Reiser and Murphy repeatedly assured Abell that all was "on track" for her promotion, both the change of title and the corresponding raise in pay. However, Abell was also told by Reiser and Murphy that Stack had to officially "sign off" on the promotion, although they had already obtained his verbal approval.

27.     Abell had two meetings with Reiser regarding this promotion and title change in November and December of 2017.  The assurances that Abell's promotion was a "sure thing" kept coming.

28.     Abell tried, unsuccessfully, to meet with Murphy three separate times between January 2, 2018, and January 30, 2018, when there was no forthcoming announcement regarding her promotion.  Murphy cancelled each time.

29.     On January 31, 2018, Abell was finally able to meet with Murphy.  Abell asked Murphy when he would announce her promotion, and Murphy responded, in sum and substance, that it would happen when Stack "signed off."

30.     Abell then confirmed with Murphy that the promotion had already been verbally approved by Stack. Murphy then explained that that he still needed "official" approval.

31.     Abell then requested that Murphy obtain the approval by February 2, 2018, and he responded that we would need to "catch Stack in the right mood" due to his "explosive" temper.

32.     Abell then suggested that perhaps the promotion could be approved by February 10, 2018, in time for Pacira's National Sales Meeting ("NSM") which was scheduled from February 11 to February 15, 2018 in Florida.

33.     At the conclusion of the January 31, 2018 meeting, Murphy instructed Abell to "wait for his call within the next two weeks" so that Abell could go to the corporate office and present to Stack "if and when" he was in "good mood."

34.     Abell did not receive any calls from Murphy in that two week period.

35.     On February 10, 2018, Abell reached out to Murphy and Reiser and asked them to meet her upon their arrival at the NSM on February 11, 2018.  They accepted, and on February 11, 2018, they met – Abell thought, to finalize the announcement for the Abell's director position so that she could begin interviewing some of the representatives who would take part in her pilot program while at the NSM.

36.     Instead, Murphy told Abell he needed more time due to a FDA Advisory Meeting that was scheduled on February 15, 2018, because Stack was preoccupied with preparing for that meeting, and might not be in the "right mood" until after then.

## Abell Opts Out of Optional "Women's Leadership Meeting" and is Excoriated for Attending "Men's" Golf Event Instead

37.     As part of the NSM, Pacira had scheduled a "Women's Leadership Meeting" from 6pm to 9:30pm on February 13, 2018.  This meeting was explicitly designated as "optional."

38.     Abell knew about this event, and decided not to attend because there was another event scheduled at Top Golf at the same time which she preferred to attend.

39.     Abell was aware that while the "Women's Leadership Meeting" was discussing otherwise valuable topics like female empowerment in the workplace and maintaining a work-life balance, all of Pacira's male managers and decisionmakers in attendance at the NSM would be at the Top Golf event.  Abell recognized this event as a professional networking opportunity that she believed she should attend.

40.     Specifically, Abell had been tasked by Murphy and Reiser with recruiting four new representatives for her new department.  In order to do that, Abell required one-on-one conversations with Pacira's four Regional Sales Directors, all of whom were to be present at the Top Golf event.

41.     The Top Golf event was, for Abell, the perfect opportunity to make these personal connections and recruit the best representative for her new team.

42.     In fact, as early as February 1, 2018, she had asked one of the schedulers of the event, Gio Vendemia ("Vendemia," Pacira's Vice President for the Midwestern Region), if she could attend the upcoming Top Golf event on February 13, 2018.  Vendemia had replied in the affirmative.

43.     Nevertheless, as she was preparing to leave for the Top Golf event with her male coworkers, another Regional Sales Director, Rob Rock ("Rock"), approached Abell, in a hostile and threatening manner, and said "you're not going."  Rock then followed this pronouncement with "it's a guy thing," "you should have asked permission," and other sexist comments.

44.     Abell responded by saying it was a company-sponsored event, and not a social event, and that she had already asked and received permission from Vendemia.

45.     Ultimately, the conversation ended in a yelling match on both sides, leaving Abell visibly distraught.  Upon information and belief, one of the several witnesses to this discriminatory and harassing exchange told Reiser in detail what had transpired moments before.

46.     Reiser had been present at the TopGolf event, but had not witnessed the interaction between Abell and Rock.

47.     Also present was Pacira's Area Director West, Vaughn Schouten.  Schouten was the first supervisor Abell approached after the incident, because he had authority over Rock and Vendemia.

48.     Pacira employees Pat Nolan ("Nolan"), Ken Wolfe ("Wolfe"), Jim Macarelli ("Macarelli"), and Mike Corn ("Corn") witnessed the entire episode between Rock and Vendemia.

49.     Each of the above witnesses individually reported the incident between Abell and Rock, and Rock's completely inappropriate and discriminatory behavior, to Reiser.

50.     Reiser then left the immediate area to contact Kahr at Pacira's Human Resources department.

51.     Wolfe, Macarelli, Nolan, and Corn then accompanied Abell back to their hotel.

52.     Another of the witnesses, Nolan, then escorted Abell to her room.

53.     Upon information and belief, Reiser and Murphy began an "investigation" into the events on the morning of February 14, 2018.

54.     On February 21, 2018, Kahr called Abell as part of his investigation into the February 13, 2018 incident with Rock.

55.     On March 6, 2018, Abell spoke to Murphy regarding her upcoming appearance with Rock at the Miami Breast Surgery conference.  Murphy instructed Abell to "stay away from everyone" and not be in the Pacira booth at the same time as Rock.  Abell responded that she was a professional, and that she and Rock used to be friends and would be fine working together.

56.     On March 13, 2018, Abell was called by Kahr and Murphy.  Abell was told that the investigation regarding Rock was "inconclusive," and there would be no disciplinary action taken.

## Abell is Told There is a Completely Unrelated, and Bogus, Employee Investigation Into Her Behavior at the NSM

57.     On the same phone call, Abell was also informed of a new and completely unrelated investigation into her behavior at the NSM.

58.     Specifically, Kahr told Abell that "someone" complained that they saw Abell "look at her phone for thirty minutes" during one of the NSM sessions, and it was a "kama sutra" website.

59.     Kahr asked if these vague allegations were true, and Abell said that yes, she did look at her phone, but for seconds rather than minutes.  Abell then explained that she had received a text from one of her physician clients on her personal phone, and that the text in question was neither pornographic nor offensive.

60.     Abell then offered to apologize to anyone she may have unintentionally offended, and told Kahr and Murphy that such an incident would never happen again.

61.     Abell further stated that was the last time she would open any texts or other items on her phone in front of her coworkers. Abell then described the "kama sutra" message that the physician had sent as related to her Indian culture, and offered to send it on to Kahr for his review.

62.     Kahr responded, "I'd rather you didn't," and said he would "investigate" and get back to Abell in a few days.

63.     The same day, a mere three hours later, Abell received a conference call invite for an 8am call on March 14, 2018.

64.     Kahr and Murphy were both present for the March 14, 2018 conference call. Kahr informed Abell that "the final decision to terminate her was concluded by the executive team" because she "did not meet the core values of the company."

65.     Prior to this phone call, there were no warnings, discussions of a performance plan, probation or other steps taken. Abell was summarily terminated based on these vague and conclusory allegations – for alleged conduct that, had a man engaged in the same or similar behavior, would have gone completely unnoticed in Abell's workplace.

66.     This termination was also, at least in part, in retaliation for Abell's repeated reporting of business irregularities at Pacira.

### Abell Noticed, and Reported Upon, Unlawful Business Irregularities at Pacira

67.     Soon after her hire, Abell noticed that at Pacira, there was a typical practice of providing monetary disbursements in the form of "grants" to obtain business and facility approvals.  Pacira would provide "grants" to potentially high-revenue-generating hospital accounts based on volume (not patient type) to get their product included in the hospital's formulary and/or to encourage unwilling surgeons and anesthesiologists to use their product.

68.     These "grants" were approved by Davis, the Vice President of Strategic Alliance, based on anticipated or potential sales.  These sales were then reported and declared as revenue.

69.     Abell observed, on a regular basis, that these grant amounts did not appear to be reported or offset against the declared revenue from these sales.

70.     In addition, there were a number of accounts designated as "White Space," meaning that there were no Account Specialists or other Sales personnel dedicated to those accounts.  These sales numbers were not reported or recorded in the daily sales reports.

71.     When Abell repeatedly asked to see the White Space numbers on various accounts, she was informed by her supervisors that she was only allowed to view the sales numbers on her own accounts – even if she was asked to cover a White Space account.

72.     Specifically, Murphy told Abell that he would not share with, or otherwise disclose, these numbers to her.

73.     Abell also became aware that Pacira regularly allows Medical Affairs ("MA") staff, whom are legally only allowed to provide clinical medical information outside of the sales context, to work as sales liaisons generating revenue.

74.     For example, Pacira regularly allowed sales representatives to work with a MA liaison since at least 2012.

75.     However, pharmaceutical companies are required to keep MA and sales separate to avoid any conflicts between medical information providers and sales representatives.  Pacira regularly ignored this distinction and allowed these non-sales and supposedly neutral MA employees to sell their product from their non-commission-based roles. Abell complained to her supervisors, and others, that Pacira's MA department functions as a disguised sales operation.

76.     Another irregularity Abell observed was that Pacira allowed its highly salaried, non-sales Marketing, National Accounts, Strategic Alliance (and MA) departments to directly sell to customers, and to work directly with the sales representatives in doing so.  However, these non-sales departments are billed as Pacira's informative and clinical resource and support system. Pacira's operating budget makes it look as if these departments are all separate and discrete; in reality, Pacira allows their functions to co-mingle and overlap despite budgeting for each department separately.

77.     Abell also noticed that throughout the tenure of her employment, Pacira allowed staff from the same highly salaried, non-sales departments listed in ¶65, *supra*, to participate in incentive programs reserved for incentive-paid sales employees whose compensation is based on sales numbers and performance objectives.

78.     For example, Pacira allowed a group of these employees to participate in sales department "Circle of Excellence" ("COE") incentive and awards trips.  This provides an inherent conflict between the resource and support functions of these departments and the incentive-based sales model.

79.     Abell brought this issue, which she saw as an ethical and compliance violation, to Murphy and Reiser.  They told her, in sum and substance, that it was the executive office's decision and she should keep her mouth shut.

80.     In addition, Abell also learned that the majority of Pacira's Executive Team and Board of Directors are close personal friends of its Chief Executive Officer, David Stack.  This nepotism is an issue because it ensures that David Stack remains in his position, as the group owns a significant quantity of equity holdings in Pacira and are therefore disincentivized from taking any action that could lower the share price or value of those holdings.

81.     This was another issue which Abell shared with various of Pacira's supervisors and officers – with Vice President of Sales (2012-2016) David Kaplan ("Kaplan") as early as 2014; with Murphy and Reiser repeatedly in 2016, 2017, and early 2018; and as late as the last week of February, 2018, with Pacira Board Member Mark Kronenfeld, MD ("Kronenfeld").

82.     Abell's understanding is that former Chief Operating Officer Scott Braunstein, resigned abruptly at the end of March, 2018, because he was not comfortable with, *inter alia*, Pacira's methods of computing revenue or generating sales figures.

83.     Since at least 2014, Abell noticed that Pacira's stock share prices decreased significantly.  When Pacira initially offered its stock, it billed Exparel as the next new blockbuster drug on the market and relied on paid and sponsored studies.  However, once Exparel was released, it became clear to the public that the product's effectiveness was largely

dependent on the vascularity of the individual patient.  However, Abell realized that Pacira was aware of this issue with Exparel prior to selling its stock, and failed to disclose it, thus initially artificially inflating the price of Pacira's stock.

84.     Abell reported these irregularities, which she believed were securities law and/or ethical violations, at various times between at least May 2014 and her termination on March 14, 2018, to the following individuals: Chief Financial Officer (2008-2017) and President (2015-2017) James Scibetta ("Scibetta");  Kronenfeld; Kaplan; Vice President of Sales (2016-2017) Tom Sluby ("Sluby"); Chief Compliance Officer (2016) Bob Weiland ("Weiland"); and her immediate supervisors during the course of her employment, Murphy, McLoughlin, Ciavolella, Tanya Markvicka ("Markvicka"), and Reiser.

85.     Each time Abell made a report of these unlawful irregularities over the course of her employment, whether via email or in person, she was told, in sum and substance, 'to mind her own business,' to focus on her work, or was simply unanswered. In other words, Abell's concerns were rebuffed and ignored – just like the misogynistic and sexually charged commentary of her coworkers and supervisors, throughout her tenure at Pacira.

86.     When Abell was unjustifiably terminated on March 14, 2018, for allegedly engaging in conduct that did not meet Pacira's "core values," it was conveniently two weeks before the end of the first financial quarter – so that Abell was not entitled to her incentive or commission compensation for that quarter, stock awards, or stock options as an additional punishment for reporting the above irregularities.

87.     Abell also left Pacira with no severance pay, or any other benefits or compensation.

88.     The circumstances of Abell's unjustified termination have made it effectively impossible for Abell to secure permanent full-time employment in her field.

89.     Upon information and belief, Pacira has perpetuated a rumor, now generally known to other companies in her field, that Abell was terminated for sharing a sexually inappropriate website at a national sales meeting and engaging in unacceptable behavior and conduct inconsistent with Pacira's core values.

90.     The damage this has done to Abell's reputation within her industry – in which she is an expert, with an otherwise unblemished record – will take years to rebuild, if, and when, Abell is able to secure another comparable position at another company.

### Abell Files a Complaint with the SEC Office of the Whistleblower

91.     In or about August 2018, Abell prepared to report these irregularities to the relevant authorities.

92.     On September 14, 2018, Abell filed a complaint under Section 922(a) of Dodd Frank, 15 U.S.C. § 78u-6(h)(1)(B)(i) as a Whistleblower.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (Sex Discrimination under New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5-1 to 10:5-49)

93.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "92" with the same force and effect as if fully set forth herein at length.

94.     Plaintiff was terminated from a hostile work environment where she was regularly and overtly discriminated against on the basis of her gender, female.

95.     The primary basis for the termination of Plaintiff was her sex.

96.     The NJLAD prohibits discrimination on the basis of sex.

97.     As a direct result of this discrimination, Plaintiff suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than $1,000,000 in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
**(Sexual Harassment Hostile Work Environment under New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5-1 to 10:5-49)**

98.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "97" with the same force and effect as if fully set forth herein at length.

99.     The NJLAD prohibits sexual harassment and a hostile work environment.

100.     A hostile work environment is a workplace so ridden with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive work environment.

101.     The environment at Pacira was such that a reasonable employee in Plaintiff's shoes would perceive it as hostile.

102.     As a direct result of this hostile work environment, Plaintiff suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than $1,000,000 in compensatory damages; the costs and disbursements of this action; all relevant interest; and any such other relief to Plaintiffs as this Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
**(Retaliation under New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5-1 to 10:5-49)**

103.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "102" with the same force and effect as if fully set forth herein at length.

104.     The NJLAD prohibits workplace discrimination, adverse employment decisions and disparate treatment in retaliation for the submission of a complaint alleging discrimination on the basis of gender.

105.     Directly after Plaintiff complained of discrimination, and in retaliation therefor, Defendants ratified and condoned Plaintiff's the discriminatory and hostile behavior by failing and refusing to stop that behavior, or to intervene in any way, to protect Plaintiff.

106.     Instead, Defendants ratified and condoned this discrimination and retaliation by terminating Plaintiff after crediting vague, conclusory, and ultimately pretextual allegations of conduct that Plaintiff purportedly did not meet Pacira's "core values."

107.     Unjustifiably terminating Plaintiff was the ultimate adverse employment action.

108.     There was no legitimate non-discriminatory basis for these adverse employment actions.

109.     As a direct result of this improper retaliation, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than $1,000,000 in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (NJ Conscientious Employee Protection Act ("NJCEPA"), N.J.S.A. §§ 34:19-1 to 34:19-8)

110.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "109" with the same force and effect as if fully set forth herein at length.

111.     The NJCEPA prohibits the retaliatory termination of employees who disclose, or object to, certain actions that the employees reasonably believe are either illegal or in violation of public policy.

112.    Plaintiff reasonably believed that Pacira was violating a law, rule or regulation promulgated pursuant to law, or a clear mandate of public policy.

113.    Specifically, Pacira was violating 12 U.S.C. § 53 *et seq.*, the Dodd Frank Wall Street Reform and Consumer Protection Act, and various other securities laws, by engaging in these various business irregularities.

114.    Plaintiff performed a "whistle-blowing activity" by internally reporting her concerns to corporate officers Kahr, Kaplan, Weiland, Lehmann, and Murphy as well as her immediate supervisors during the course of her employment, McLoughlin, Ciavolella, Markvicka, and Reiser.

115.    Plaintiff was then terminated in whole or in part for her whistle-blowing activities.

116.    Specifically, because Plaintiff continually made internal report of various business irregularities and Dodd Frank violations, she was silenced by being summarily terminated.

117.    Termination is an adverse employment action.

118.    Plaintiff also performed a whistle-blowing activity by reporting to the SEC, in filing a complaint under Section 922(a) of Dodd Frank, 15 U.S.C. § 78u-6(h)(1)(B)(i), as a Whistleblower.

119.    As a direct result of this adverse employment action after engaging in a protected activity, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than $1,000,000 in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Section § 922(a) of the Dodd Frank Wall Street Reform and Consumer Protection Act ("Dodd Frank")), 15 U.S.C. § 78u-6(h)(1)(B)(i)

120.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "119" with the same force and effect as if fully set forth herein at length.

121.    Under Dodd Frank, 15 U.S.C. § 78u-6(h)(1)(B)(i), it is unlawful for an employer to discharge or retaliate against an employee for engaging in protected whistleblowing activities

122.    Plaintiff engaged in protected activity by internally reporting to corporate officers Kahr, Kaplan, Weiland, Lehmann, and Murphy as well as her immediate supervisors during the course of her employment, McLoughlin, Ciavolella, Markvicka, and Reiser.

123.    Specifically, Plaintiff reported to the corporate officers of Pacira, and supervisors named in ¶96 *supra*, numerous allegations of unlawful activity under Dodd Frank. See ¶¶ 66-72 *supra.*

124.    Pacira had actual knowledge of Plaintiff's reporting to the individuals named above, and thus engaging in the protected activity

125.    Pacira had already engaged in an adverse employment action by terminating Plaintiff, in whole or in part, in retaliation for her internal complaints, a protected activity.

126.    This adverse employment action was a result of Plaintiff engaging in protected activity.

127.    As a direct result of this adverse employment action after engaging in a protected activity, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than $1,000,000 in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## JURY DEMAND

128.   Plaintiff hereby demands a jury trial of all the facts and allegations set forth herein under Fed. R. Civ. P. 38(b)(1) and 38(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

a.   actual, compensatory, and statutory damages in an amount to be determined at trial;

b.   punitive damages as allowed by law;

c.   reasonable attorneys' fees as allowed by law;

d.   an award of all costs;

e.   any and all such further relief as this Court deems just and proper.

Dated: New York, New York
      November 6, 2018

Milena Pisano-McNally, Esq. (DNJ Bar ID: 013942012)
Neal Brickman, Esq.
The Law Offices of Neal Brickman, P.C.
Attorneys for Plaintiff
420 Lexington Avenue, Suite 2440
New York, New York 10170
(212) 986-6840

22

## **VERIFICATION**

State of New York    }
                         } ss.:
County of New York  }

      Reshma Abell, being duly sworn, deposes and says:

      I am the Plaintiff herein.  I have read the foregoing Complaint, and know the contents

thereof.  The same are true to my own knowledge, except as to matters alleged on information

and belief, and as to those matters, your affiant believes them to be true.

                                          Reshma Abell

Sworn to before me this
_2_th day of November, 2018.

NOTARY PUBLIC

**MILENA G. PISANO-MCNALLY**
**Notary Public, State of New York**
**Registration No. 02PI6286725**
**Qualified in Dutchess County**
**Commission Expires July 29, 2021**