# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
--------------------------------------------------------X
RESHMA ABELL,

                           Plaintiff,                  Civ. Action No.

      -against-                             **VERIFIED**
                                               **COMPLAINT**

PACIRA PHARMACEUTICALS, INC.,
DAVE STACK, individually and in his
capacity as Chief Executive Officer of
PACIRA PHARMACEUTICALS, INC.,
And RICH KAHR, PETER MURPHY,
DENNIS McLOUGHLIN, PAUL
CIAVOLELLA, GLENN REISER, JOYCE
DAVIS, and MATT LEHMANN, in their
capacities as employees of PACIRA
PHARMACEUTICALS, INC.

                          Defendants.
--------------------------------------------------------X

       COMES NOW Plaintiff Reshma Abell ("Abell" or "Plaintiff"), by and through her

undersigned counsel, The Law Offices of Neal Brickman, P.C., located at 420 Lexington

Avenue, Suite 2440, New York, New York, 10170, and as and for her complaint against

Defendants, Pacira Pharmaceuticals, Inc. ("Pacira"), Dave Stack, individually and in his capacity

as Chief Executive Officer of Pacira ("Stack"), and Rich Kahr ("Kahr"), Pete Murphy

("Murphy"), Dennis McLoughlin ("McLoughlin"), Paul Ciavolella ("Ciavolella"), Glenn Reiser

("Reiser"), Joyce Davis ("Davis"), and Matt Lehmann ("Lehmann," and, collectively,

"Defendants"), in their capacities as employees of Pacira, states and alleges as follows:

## NATURE OF THE ACTION

       This is an action for damages arising from the hostile work environment that Plaintiff

experienced at Pacira, Defendants' illegal discriminatory treatment of, retaliation against, and

termination of Plaintiff under the New Jersey Law Against Discrimination ("NJLAD," N.J.S.A.
§§ 10:5-1 to 10:5-49), and the New Jersey Conscientious Employee Protection Act ("NJCEPA,"
N.J.S.A. §§ 34:19-1 to 34:19-8), for which she seeks compensatory damages, punitive damages,
the costs of this action, and reasonable attorneys' fees. The factual basis for Plaintiff's claims,
recounted in detail herein, includes a long history of discriminatory and retaliatory acts based, at
least in part, on her sex and national origin, which ultimately led to her termination, after
internally reporting various financial irregularities to, among others, Kahr, Murphy, McLoughlin,
Ciavolella, Reiser, Davis, and Lehmann.

This action also arises out of, *inter alia*, Plaintiff's complaint under Section 922(a) of the
Dodd Frank Wall Street Reform and Protection Act ("Dodd Frank," 15 U.S.C. § 78u-
6(h)(1)(B)(i)) as a Whistleblower, filed September 14, 2018.

## JURISDICTION

Jurisdiction over the federal claims is invoked pursuant to 28 U.S.C. § 1331, in that these
claims arise under the laws of the United States; pursuant to Section 922 of the Dodd Frank Act,
15 U.S.C. § 78u-6(h)(1)(B)(i)); pursuant to 28 U.S.C. § 1332, in that plaintiff and defendants are
citizens of different states; and over the state law claims pursuant to the doctrine of pendent
jurisdiction as codified in 28 U.S.C. § 1367.

## VENUE

This action is properly laid in the District of New Jersey pursuant to 28 U.S.C. §
1391(b)(1), because Defendants' principal offices are located in this District, and (b)(2), because
a substantial part of the events and omissions giving rise to the claims occurred in this judicial
District.

## PARTIES

1.      Abell is an individual citizen of the United States with a primary residence in the State of New York and a former employee of Pacira Pharmaceuticals. Abell is a female of Indian descent.

2.      Upon information and belief, at all times relevant hereto, defendant Pacira was and is a domestic corporation duly authorized to conduct business in the State of New Jersey and subject to the laws and statutes thereof.

3.      Upon information and belief, at all times relevant hereto, defendant Stack was and is the Chief Executive Officer of Pacira. Stack qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

4.      Upon information and belief, at all times relevant hereto, defendant Kahr was and is the Vice President of Human Resources at Pacira.  Kahr reports directly to Stack. Kahr qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

5.      Upon information and belief, at all times relevant hereto, defendant McLoughlin was Abell's supervisor, and reported directly to Stack, among others.  McLoughlin qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

3

6.      Upon information and belief, at all times relevant hereto, defendant Ciavolella was Abell's supervisor, and Pacira's Senior Director of Business Analytics, Market Research and Operations, who reported directly to Stack, among others. Ciavolella qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

7.      Upon information and belief, at all times relevant hereto, defendant Reiser was Abell's supervisor, and reported directly to Stack, among others. Reiser qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

8.      Upon information and belief, defendant Davis was Pacira's Vice President of Strategic Alliance, and reported directly to Stack, among others. Davis qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because she participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of her ability to affect the terms and conditions of Abell's employment.

9.      Upon information and belief, defendant Matt Lehmann was Pacira's Senior Vice President of Commercial, and reported directly to Stack, among others. Lehmann qualifies as an "employer" for purposes of individual liability under the NJLAD and the NJCEPA because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case, and by virtue of his ability to affect the terms and conditions of Abell's employment.

## FACTUAL BACKGROUND

### Abell's Employment at Pacira Pharmaceuticals, Inc.

10.     Pacira Pharmaceuticals, Inc. (Pacira) is a specialty pharmaceutical company which makes a non-opiod analgesic for post-surgical pain control called Exparel.

11.     From May, 2014 through January, 2017, Abell worked for Pacira as a Surgical Account Specialist.  From January 2017 until March 14, 2018, Abell worked for Pacira as a Senior Surgical Account Specialist.

12.     At Pacira, Abell's job responsibilities as a Senior Surgical Account Specialist included, but were not limited to, the following: successfully promoting Exparel at all major hospitals in the five boroughs of New York City and in Westchester County, New York; growing and increasing the profitability of the pharmaceutical territory; and training and providing case coverage to anesthesiologists and surgeons in area hospitals in, *inter alia*, orthopedic, cardiovascular, podiatric, obstetrics/ gynecology, general surgery, colorectal, urology, oncology, plastics, and bariatric surgery departments.

13.     Abell's overall pay for this position was ultimately determined by Ciavolella, who, starting in 2014, made the decisions as to how and whether to cap Abell's – and other similarly situated employees' – incentive compensation.

14.     Abell was known at Pacira as a standout go-getter who regularly grew sales: by $2,363,920 between May and December 2014; by $4,462,750 in 2015; by $3,777,038 in 2016; and by $3,778,523 in 2017.  These statistics indicate that Abell outperformed similar and competing markets at twice the average growth, consistently and for four years in a row.

5

15.     In fact, Reiser and Murphy nicknamed Abell "Jordan," as in Michael Jordan, as of the end of 2016 – due to her unprecedented success as a senior representative in generating revenue, fostering relationships, and growing Pacira's book of business.

15.     Abell was so successful as a Senior Surgical Account Specialist that Pacira informed her that she was in line for a new position, Director of Post-Op Pain Management, and rewarded her with additional work without a commensurate bump in title or salary.

16.     From approximately February 2017 until March 14, 2018 termination, in addition to her Senior Surgical Account Specialist duties, Abell actually performed the "unofficial" role of Pacira's Director of Post-Op Pain Management.  These duties included, but were not limited to, developing and executing a national post-operative pain management training program; initiating and developing industry partnerships and strategic alliances with other pharmaceutical companies; launching "Field Block" training for anesthesia and various surgical services nation-wide; and creating a new specialty representative department, including recruiting, creating compensation and business plans, and executing territory designs.

17.     At Pacira, Abell was a dedicated, productive, and valuable employee who got along well with her colleagues and had no issues with her supervisor or others.  She always received positive performance evaluations and was generally respected by her coworkers for her experience and tenacity.

### A Pervasive Culture of Sexual Discrimination in a Male-Dominated Office

18.     Abell achieved these significant accomplishments, and consistently outperformed her peers, and met or exceeded her sales quotas despite an overtly hostile, male-dominated office where raunchy, sexually-based jokes and innuendo were the norm.

19.     It was business as usual for Abell to hear in a typical workday, in sum or substance, that the reason she was so successful was because she was "sleeping with her clients," or "blowing someone," or words to that effect.

20.     Abell performed her job so diligently that she won coveted positions in Pacira's Circle of Excellence and President's Club in 2015, 2016, and 2017 – yet the assumption was that she was only successful due to her sex, and her alleged willingness to exploit her sex, in obtaining new business.

21.     In addition, from at least February 2017, Abell was expected to do the work of two separate jobs, without additional compensation or official change in title, because she was required to be an accommodating female who was first and foremost a "team player."

22.     Abell was regularly the recipient of sexually charged comments, jokes, and innuendo – but she understood that she was not to go to Human Resources to complain about the sophomoric, inappropriate, and sexually demeaning commentary – because to do so would break some kind of industry 'code' among her male co-workers.

**Abell is Promised a Promotion, and is Summarily Terminated Instead**

23.     Starting in February 2017, Abell developed and executed a company-wide pilot program for Post-Operative Pain Management, approved by Reiser and Murphy.

24.     On or about August 22, 2017, Abell successfully presented this pilot program to Pacira's Alibaba team, a group which included, *inter alia*, Pacira's commercial upper and middle management, Chief Operating Officer, legal team, National Accounts department, and Medical Affairs department.

7

25.     Shortly thereafter, Abell met with Reiser and Murphy, and they agreed on a promotion and change of title for Abell from Senior Surgical Account Specialist to Director of Post-Operative Pain Management, with a concomitant raise – to be effective January 2, 2018.

26.     Reiser and Murphy repeatedly assured Abell that all was "on track" for her promotion, both the change of title and the corresponding raise in pay. However, Abell was also told by Reiser and Murphy that Stack had to officially "sign off" on the promotion, although they had already obtained his verbal approval.

27.     Abell had two meetings with Reiser regarding this promotion and title change in November and December of 2017.  The assurances that Abell's promotion was a "sure thing" kept coming.

28.     Abell tried, unsuccessfully, to meet with Murphy three separate times between January 2, 2018, and January 30, 2018, when there was no forthcoming announcement regarding her promotion.  Murphy cancelled each time.

29.     On January 31, 2018, Abell was finally able to meet with Murphy.  Abell asked Murphy when he would announce her promotion, and Murphy responded, in sum and substance, that it would happen when Stack "signed off."

30.     Abell then confirmed with Murphy that the promotion had already been verbally approved by Stack. Murphy then explained that that he still needed "official" approval.

31.     Abell then requested that Murphy obtain the approval by February 2, 2018, and he responded that we would need to "catch Stack in the right mood" due to his "explosive" temper.

32.     Abell then suggested that perhaps the promotion could be approved by February 10, 2018, in time for Pacira's National Sales Meeting ("NSM") which was scheduled from February 11 to February 15, 2018 in Florida.

8

33.     At the conclusion of the January 31, 2018 meeting, Murphy instructed Abell to "wait for his call within the next two weeks" so that Abell could go to the corporate office and present to Stack "if and when" he was in "good mood."

34.     Abell did not receive any calls from Murphy in that two week period.

35.     On February 10, 2018, Abell reached out to Murphy and Reiser and asked them to meet her upon their arrival at the NSM on February 11, 2018. They accepted, and on February 11, 2018, they met – Abell thought, to finalize the announcement for the Abell's director position so that she could begin interviewing some of the representatives who would take part in her pilot program while at the NSM.

36.     Instead, Murphy told Abell he needed more time due to a FDA Advisory Meeting that was scheduled on February 15, 2018, because Stack was preoccupied with preparing for that meeting, and might not be in the "right mood" until after then.

### Abell Opts Out of Optional "Women's Leadership Meeting" and is Excoriated for Attending "Men's" Golf Event Instead

37.     As part of the NSM, Pacira had scheduled a "Women's Leadership Meeting" from 6pm to 9:30pm on February 13, 2018. This meeting was explicitly designated as "optional."

38.     Abell knew about this event, and decided not to attend because there was another event scheduled at Top Golf at the same time which she preferred to attend.

39.     Abell was aware that while the "Women's Leadership Meeting" was discussing otherwise valuable topics like female empowerment in the workplace and maintaining a work-life balance, all of Pacira's male managers and decisionmakers in attendance at the NSM would be at the Top Golf event. Abell recognized this event as a professional networking opportunity that she believed she should attend.

9

40.     Specifically, Abell had been tasked by Murphy and Reiser with recruiting four new representatives for her new department.  In order to do that, Abell required one-on-one conversations with Pacira's four Regional Sales Directors, all of whom were to be present at the Top Golf event.

41.     The Top Golf event was, for Abell, the perfect opportunity to make these personal connections and recruit the best representative for her new team.

42.     In fact, as early as February 1, 2018, she had asked one of the schedulers of the event, Gio Vendemia ("Vendemia," Pacira's Vice President for the Midwestern Region), if she could attend the upcoming Top Golf event on February 13, 2018.  Vendemia had replied in the affirmative.

43.     Nevertheless, as she was preparing to leave for the Top Golf event with her male coworkers, another Regional Sales Director, Rob Rock ("Rock"), approached Abell, in a hostile and threatening manner, and said "you're not going."  Rock then followed this pronouncement with "it's a guy thing," "you should have asked permission," and other sexist comments.

44.     Abell responded by saying it was a company-sponsored event, and not a social event, and that she had already asked and received permission from Vendemia.

45.     Ultimately, the conversation ended in a yelling match on both sides, leaving Abell visibly distraught.  Upon information and belief, one of the several witnesses to this discriminatory and harassing exchange told Reiser in detail what had transpired moments before.

46.     Reiser had been present at the TopGolf event, but had not witnessed the interaction between Abell and Rock.

47.     Also present was Pacira's Area Director West, Vaughn Schouten. Schouten was the first supervisor Abell approached after the incident, because he had authority over Rock and Vendemia.

48.     Pacira employees Pat Nolan ("Nolan"), Ken Wolfe ("Wolfe"), Jim Macarelli ("Macarelli"), and Mike Corn ("Corn") witnessed the entire episode between Rock and Vendemia.

49.     Each of the above witnesses individually reported the incident between Abell and Rock, and Rock's completely inappropriate and discriminatory behavior, to Reiser.

50.     Reiser then left the immediate area to contact Kahr at Pacira's Human Resources department.

51.     Wolfe, Macarelli, Nolan, and Corn then accompanied Abell back to their hotel.

52.     Another of the witnesses, Nolan, then escorted Abell to her room.

53.     Upon information and belief, Reiser and Murphy began an "investigation" into the events on the morning of February 14, 2018.

54.     On February 21, 2018, Kahr called Abell as part of his investigation into the February 13, 2018 incident with Rock.

55.     On March 6, 2018, Abell spoke to Murphy regarding her upcoming appearance with Rock at the Miami Breast Surgery conference. Murphy instructed Abell to "stay away from everyone" and not be in the Pacira booth at the same time as Rock. Abell responded that she was a professional, and that she and Rock used to be friends and would be fine working together.

56.     On March 13, 2018, Abell was called by Kahr and Murphy. Abell was told that the investigation regarding Rock was "inconclusive," and there would be no disciplinary action taken.

11

## Abell is Told There is a Completely Unrelated, and Bogus, Employee Investigation Into Her Behavior at the NSM

57.     On the same phone call, Abell was also informed of a new and completely unrelated investigation into her behavior at the NSM.

58.     Specifically, Kahr told Abell that "someone" complained that they saw Abell "look at her phone for thirty minutes" during one of the NSM sessions, and it was a "kama sutra" website.

59.     Kahr asked if these vague allegations were true, and Abell said that yes, she did look at her phone, but for seconds rather than minutes.  Abell then explained that she had received a text from one of her physician clients on her personal phone, and that the text in question was neither pornographic nor offensive.

60.     Abell then offered to apologize to anyone she may have unintentionally offended, and told Kahr and Murphy that such an incident would never happen again.

61.     Abell further stated that was the last time she would open any texts or other items on her phone in front of her coworkers. Abell then described the "kama sutra" message that the physician had sent as related to her Indian culture, and offered to send it on to Kahr for his review.

62.     Kahr responded, "I'd rather you didn't," and said he would "investigate" and get back to Abell in a few days.

63.     The same day, a mere three hours later, Abell received a conference call invite for an 8am call on March 14, 2018.

64.     Kahr and Murphy were both present for the March 14, 2018 conference call. Kahr informed Abell that "the final decision to terminate her was concluded by the executive team" because she "did not meet the core values of the company."

65. Prior to this phone call, there were no warnings, discussions of a performance plan, probation or other steps taken. Abell was summarily terminated based on these vague and conclusory allegations – for alleged conduct that, had a man engaged in the same or similar behavior, would have gone completely unnoticed in Abell's workplace.

66. This termination was also, at least in part, in retaliation for Abell's repeated reporting of business irregularities at Pacira.

**Abell Noticed, and Reported Upon, Unlawful Business Irregularities at Pacira**

67. Soon after her hire, Abell noticed that at Pacira, there was a typical practice of providing monetary disbursements in the form of "grants" to obtain business and facility approvals. Pacira would provide "grants" to potentially high-revenue-generating hospital accounts based on volume (not patient type) to get their product included in the hospital's formulary and/or to encourage unwilling surgeons and anesthesiologists to use their product.

68. These "grants" were approved by Davis, the Vice President of Strategic Alliance, based on anticipated or potential sales. These sales were then reported and declared as revenue.

69. Abell observed, on a regular basis, that these grant amounts did not appear to be reported or offset against the declared revenue from these sales.

70. In addition, there were a number of accounts designated as "White Space," meaning that there were no Account Specialists or other Sales personnel dedicated to those accounts. These sales numbers were not reported or recorded in the daily sales reports.

71. When Abell repeatedly asked to see the White Space numbers on various accounts, she was informed by her supervisors that she was only allowed to view the sales numbers on her own accounts – even if she was asked to cover a White Space account.

72.     Specifically, Murphy told Abell that he would not share with, or otherwise disclose, these numbers to her.

73.     Abell also became aware that Pacira regularly allows Medical Affairs ("MA") staff, whom are legally only allowed to provide clinical medical information outside of the sales context, to work as sales liaisons generating revenue.

74.     For example, Pacira regularly allowed sales representatives to work with a MA liaison since at least 2012.

75.     However, pharmaceutical companies are required to keep MA and sales separate to avoid any conflicts between medical information providers and sales representatives. Pacira regularly ignored this distinction and allowed these non-sales and supposedly neutral MA employees to sell their product from their non-commission-based roles. Abell complained to her supervisors, and others, that Pacira's MA department functions as a disguised sales operation.

76.     Another irregularity Abell observed was that Pacira allowed its highly salaried, non-sales Marketing, National Accounts, Strategic Alliance (and MA) departments to directly sell to customers, and to work directly with the sales representatives in doing so. However, these non-sales departments are billed as Pacira's informative and clinical resource and support system. Pacira's operating budget makes it look as if these departments are all separate and discrete; in reality, Pacira allows their functions to co-mingle and overlap despite budgeting for each department separately.

77.     Abell also noticed that throughout the tenure of her employment, Pacira allowed staff from the same highly salaried, non-sales departments listed in ¶65, *supra*, to participate in incentive programs reserved for incentive-paid sales employees whose compensation is based on sales numbers and performance objectives.

14

78.     For example, Pacira allowed a group of these employees to participate in sales department "Circle of Excellence" ("COE") incentive and awards trips. This provides an inherent conflict between the resource and support functions of these departments and the incentive-based sales model.

79.     Abell brought this issue, which she saw as an ethical and compliance violation, to Murphy and Reiser. They told her, in sum and substance, that it was the executive office's decision and she should keep her mouth shut.

80.     In addition, Abell also learned that the majority of Pacira's Executive Team and Board of Directors are close personal friends of its Chief Executive Officer, David Stack. This nepotism is an issue because it ensures that David Stack remains in his position, as the group owns a significant quantity of equity holdings in Pacira and are therefore disincentivized from taking any action that could lower the share price or value of those holdings.

81.     This was another issue which Abell shared with various of Pacira's supervisors and officers – with Vice President of Sales (2012-2016) David Kaplan ("Kaplan") as early as 2014; with Murphy and Reiser repeatedly in 2016, 2017, and early 2018; and as late as the last week of February, 2018, with Pacira Board Member Mark Kronenfeld, MD ("Kronenfeld").

82.     Abell's understanding is that former Chief Operating Officer Scott Braunstein, resigned abruptly at the end of March, 2018, because he was not comfortable with, *inter alia*, Pacira's methods of computing revenue or generating sales figures.

83.     Since at least 2014, Abell noticed that Pacira's stock share prices decreased significantly. When Pacira initially offered its stock, it billed Exparel as the next new blockbuster drug on the market and relied on paid and sponsored studies. However, once Exparel was released, it became clear to the public that the product's effectiveness was largely

dependent on the vascularity of the individual patient. However, Abell realized that Pacira was aware of this issue with Exparel prior to selling its stock, and failed to disclose it, thus initially artificially inflating the price of Pacira's stock.

84.    Abell reported these irregularities, which she believed were securities law and/or ethical violations, at various times between at least May 2014 and her termination on March 14, 2018, to the following individuals: Chief Financial Officer (2008-2017) and President (2015-2017) James Scibetta ("Scibetta");  Kronenfeld; Kaplan; Vice President of Sales (2016-2017) Tom Sluby ("Sluby"); Chief Compliance Officer (2016) Bob Weiland ("Weiland"); and her immediate supervisors during the course of her employment, Murphy, McLoughlin, Ciavolella, Tanya Markvicka ("Markvicka"), and Reiser.

85.    Each time Abell made a report of these unlawful irregularities over the course of her employment, whether via email or in person, she was told, in sum and substance, 'to mind her own business,' to focus on her work, or was simply unanswered. In other words, Abell's concerns were rebuffed and ignored – just like the misogynistic and sexually charged commentary of her coworkers and supervisors, throughout her tenure at Pacira.

86.    When Abell was unjustifiably terminated on March 14, 2018, for allegedly engaging in conduct that did not meet Pacira's "core values," it was conveniently two weeks before the end of the first financial quarter – so that Abell was not entitled to her incentive or commission compensation for that quarter, stock awards, or stock options as an additional punishment for reporting the above irregularities.

87.    Abell also left Pacira with no severance pay, or any other benefits or compensation.

88.     The circumstances of Abell's unjustified termination have made it effectively impossible for Abell to secure permanent full-time employment in her field.

89.     Upon information and belief, Pacira has perpetuated a rumor, now generally known to other companies in her field, that Abell was terminated for sharing a sexually inappropriate website at a national sales meeting and engaging in unacceptable behavior and conduct inconsistent with Pacira's core values.

90.     The damage this has done to Abell's reputation within her industry – in which she is an expert, with an otherwise unblemished record – will take years to rebuild, if, and when, Abell is able to secure another comparable position at another company.

### Abell Files a Complaint with the SEC Office of the Whistleblower

91.     In or about August 2018, Abell prepared to report these irregularities to the relevant authorities.

92.     On September 14, 2018, Abell filed a complaint under Section 922(a) of Dodd Frank, 15 U.S.C. § 78u-6(h)(1)(B)(i) as a Whistleblower.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Sex Discrimination under New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5-1 to 10:5-49)

93.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "92" with the same force and effect as if fully set forth herein at length.

94.     Plaintiff was terminated from a hostile work environment where she was regularly and overtly discriminated against on the basis of her gender, female.

95.     The primary basis for the termination of Plaintiff was her sex.

96.     The NJLAD prohibits discrimination on the basis of sex.

17

97.     As a direct result of this discrimination, Plaintiff suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than $1,000,000 in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Sexual Harassment Hostile Work Environment under New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5-1 to 10:5-49)

98.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "97" with the same force and effect as if fully set forth herein at length.

99.     The NJLAD prohibits sexual harassment and a hostile work environment.

100.     A hostile work environment is a workplace so ridden with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive work environment.

101.     The environment at Pacira was such that a reasonable employee in Plaintiff's shoes would perceive it as hostile.

102.     As a direct result of this hostile work environment, Plaintiff suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than $1,000,000 in compensatory damages; the costs and disbursements of this action; all relevant interest; and any such other relief to Plaintiffs as this Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Retaliation under New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5-1 to 10:5-49)

103.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "102" with the same force and effect as if fully set forth herein at length.

104.     The NJLAD prohibits workplace discrimination, adverse employment decisions and disparate treatment in retaliation for the submission of a complaint alleging discrimination on the basis of gender.

105.     Directly after Plaintiff complained of discrimination, and in retaliation therefor, Defendants ratified and condoned Plaintiff's the discriminatory and hostile behavior by failing and refusing to stop that behavior, or to intervene in any way, to protect Plaintiff.

106.     Instead, Defendants ratified and condoned this discrimination and retaliation by terminating Plaintiff after crediting vague, conclusory, and ultimately pretextual allegations of conduct that Plaintiff purportedly did not meet Pacira's "core values."

107.     Unjustifiably terminating Plaintiff was the ultimate adverse employment action.

108.     There was no legitimate non-discriminatory basis for these adverse employment actions.

109.     As a direct result of this improper retaliation, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than $1,000,000 in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(NJ Conscientious Employee Protection Act ("NJCEPA"), N.J.S.A. §§ 34:19-1 to 34:19-8)**

110.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "109" with the same force and effect as if fully set forth herein at length.

111.     The NJCEPA prohibits the retaliatory termination of employees who disclose, or object to, certain actions that the employees reasonably believe are either illegal or in violation of public policy.

19

112.     Plaintiff reasonably believed that Pacira was violating a law, rule or regulation promulgated pursuant to law, or a clear mandate of public policy.

113.     Specifically, Pacira was violating 12 U.S.C. § 53 *et seq.*, the Dodd Frank Wall Street Reform and Consumer Protection Act, and various other securities laws, by engaging in these various business irregularities.

114.     Plaintiff performed a "whistle-blowing activity" by internally reporting her concerns to corporate officers Kahr, Kaplan, Weiland, Lehmann, and Murphy as well as her immediate supervisors during the course of her employment, McLoughlin, Ciavolella, Markvicka, and Reiser.

115.     Plaintiff was then terminated in whole or in part for her whistle-blowing activities.

116.     Specifically, because Plaintiff continually made internal report of various business irregularities and Dodd Frank violations, she was silenced by being summarily terminated.

117.     Termination is an adverse employment action.

118.     Plaintiff also performed a whistle-blowing activity by reporting to the SEC, in filing a complaint under Section 922(a) of Dodd Frank, 15 U.S.C. § 78u-6(h)(1)(B)(i), as a Whistleblower.

119.     As a direct result of this adverse employment action after engaging in a protected activity, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than $1,000,000 in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
**(Section § 922(a) of the Dodd Frank Wall Street Reform and Consumer Protection Act ("Dodd Frank")), 15 U.S.C. § 78u-6(h)(1)(B)(i)**

120.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "119" with the same force and effect as if fully set forth herein at length.

121.    Under Dodd Frank, 15 U.S.C. § 78u-6(h)(1)(B)(i), it is unlawful for an employer to discharge or retaliate against an employee for engaging in protected whistleblowing activities

122.    Plaintiff engaged in protected activity by internally reporting to corporate officers Kahr, Kaplan, Weiland, Lehmann, and Murphy as well as her immediate supervisors during the course of her employment, McLoughlin, Ciavolella, Markvicka, and Reiser.

123.    Specifically, Plaintiff reported to the corporate officers of Pacira, and supervisors named in ¶96 *supra*, numerous allegations of unlawful activity under Dodd Frank. See ¶¶ 66-72 *supra*.

124.    Pacira had actual knowledge of Plaintiff's reporting to the individuals named above, and thus engaging in the protected activity

125.    Pacira had already engaged in an adverse employment action by terminating Plaintiff, in whole or in part, in retaliation for her internal complaints, a protected activity.

126.    This adverse employment action was a result of Plaintiff engaging in protected activity.

127.    As a direct result of this adverse employment action after engaging in a protected activity, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than $1,000,000 in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## JURY DEMAND

128.     Plaintiff hereby demands a jury trial of all the facts and allegations set forth

herein under Fed. R. Civ. P. 38(b)(1) and 38(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

  a.     actual, compensatory, and statutory damages in an amount to be determined at

         trial;

  b.     punitive damages as allowed by law;

  c.     reasonable attorneys' fees as allowed by law;

  d.     an award of all costs;

  e.     any and all such further relief as this Court deems just and proper.


Dated: New York, New York
       November  6 , 2018


                              _____
                              Milena Pisano-McNally, Esq. (DNJ Bar ID: 013942012)
                              Neal Brickman, Esq.
                              The Law Offices of Neal Brickman, P.C.
                              Attorneys for Plaintiff
                              420 Lexington Avenue, Suite 2440
                              New York, New York 10170
                              (212) 986-6840

## VERIFICATION

State of New York   }
                        } ss.:
County of New York  }

      Reshma Abell, being duly sworn, deposes and says:

      I am the Plaintiff herein. I have read the foregoing Complaint, and know the contents

thereof. The same are true to my own knowledge, except as to matters alleged on information

and belief, and as to those matters, your affiant believes them to be true.

                                                  Reshma Abell

Sworn to before me this
2th day of November, 2018.

NOTARY PUBLIC

MILENA G. PISANO-MCNALLY
Notary Public, State of New York
Registration No. 02PI6286725
Qualified In Dutchess County
Commission Expires July 29, 2021

23

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **RESHMA ABELL,** | |
| *Plaintiffs*, | |
| **v.** | Civil Action No. 18-16509 |
| **PACIRA PHARMACEUTICALS, INC., DAVE STACK, individually and in his capacity as Chief Executive Officer of PACIRA PHARMACEUTICALS, INC., and RICH KAHR, PETER MURPHY, DENNIS McLOUGHLIN, PAUL CIAVOLELLA, GELNN REISER, JOYCE DAVIS and MATT LEHMANN, in their capacities as employees of PACIRA PHARMACEUTICALS, INC.,** *Defendants*. | ORDER |

This matter having come before the Court on Defendant Pacira Pharmaceuticals, Inc.'s ("Pacira") and Dave Stack's, Rick Kahr's, Peter Murphy's, Dennis McLoughlin's, Paul Ciavolella's, Glenn Reiser's, Joyce Davis's, and Matt Lehmann's (collectively, "Individual Defendants" and with Pacira, "Defendants"), Motion to Dismiss,[1] ECF No. 26;

and it appearing that Plaintiff Reshma Abell ("Abell" or "Plaintiff") opposes the motion, ECF No. 32;

---

[1] In considering a motion to dismiss under Rule 12(b)(6), the Court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the nonmoving party. Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). The facts alleged must be "more than mere labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

1

and it appearing that Plaintiff has alleged federal jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332;[2]

and it appearing that Plaintiff alleges discrimination on the basis of sex (Count 1), a hostile work environment (Count 2), and retaliation (Count 3), all in violation of the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. § 10:5-1 et seq., and one count of retaliatory discharge in violation of the New Jersey Conscientious Employee Protection Act ("NJCEPA"), N.J.S.A. § 34:19-1 et seq., (Count 4), both against Pacira and the Individual Defendants;[3]

and it appearing that Defendants seek to dismiss Count 1 (sex discrimination) on the grounds that Plaintiff admits that she was dismissed for a legitimate non-discriminatory reason, for "viewing sexually explicit material at a work conference," Def. Mem. at 13, ECF No. 26.1;

and it appearing that to withstand a motion to dismiss under the LAD, a plaintiff must allege sufficient factual allegations to support the prima facie elements of the claim, Connelly v. Lane Const. Corp., 809 F.3d 780, 789 (3d Cir. 2016); Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999);

and it appearing that to state a prima facie case of sex discrimination under the LAD, "a plaintiff must first establish that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination," Tourtellotte v. Eli Lilly & Co., 636 F. App'x 831, 842 (3d Cir. 2016);

---

[2] While Plaintiff has pled her citizenship and that of Pacira, she has not pled the citizenship of the Individual Defendants. She is directed to advise the Court of such citizenship by letter within 14 days.

[3] Plaintiff has dismissed Count 5, which alleges violations of the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pl. Mem. at 2 n. 1, ECF No. 32.

and it appearing that to state a claim for a hostile work environment under the LAD, "a plaintiff must show: (1) she suffered discrimination based on a protected class (e.g., gender); (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances," Reynolds v. Jersey City Dep't of Pub. Works, 2019 WL 117976, at *5 (D.N.J. Jan. 4, 2019);

and it appearing that in her Complaint, Plaintiff does not allege that she was terminated for viewing sexually explicit materials at a work conference;

and it appearing that Plaintiff has sufficiently alleged sex discrimination in Count 1 against Pacira insofar as she alleged that she belongs to a protected class (female), Compl. ¶ 1, that she was qualified for her position, id. ¶¶ 14-17, that she suffered an adverse employment action, (she was terminated), id. ¶¶ 64-65, and that the adverse action occurred under circumstances that could give rise to an inference of intentional discrimination, particularly the events surrounding the National Sales Meeting as described in her Complaint, id. ¶¶ 37-56;

and it appearing that Plaintiff has sufficiently alleged a hostile work environment against Pacira, insofar as she alleged that she suffered discrimination based on her gender, that the discrimination was severe and pervasive, in that she would hear sexually demeaning commentary in a "typical workday," id. ¶ 19, and that she "was regularly the recipient of sexually charged jokes, commentary and innuendo," id. ¶ 22, and that the discrimination detrimentally affected her as she was terminated on the basis of her gender, id. ¶¶ 64-65;

and it appearing that the Individual Defendants seek dismissal of the claims asserted against them in Counts 1 through 4;

and it appearing that to state a prima facie case of discrimination against individual defendants under the LAD, a plaintiff must plead sufficient facts to support that "'(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must

3

be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation,'" <u>Tarr v. Ciasulli</u>, 181 N.J. 70, 84, (2004) (quoting <u>Hurley v. Atl. City Police Dep't</u>, 174 F.3d 95, 127 (3d Cir. 1999));[4]

and it appearing that the same standard applies to determine individual liability in a hostile work environment claim, <u>Reynolds</u>, 2019 WL 117976, at *5;

and it appearing that under the LAD, "a harassing supervisor [may] be [held] individually liable for aiding and abetting the actionable conduct of his employer, when the challenged conduct is failing to stop the supervisor's own harassment," <u>Hurley</u>, 174 F.3d at 126;

and it appearing that Plaintiff has stated a claim under the LAD against Individual Defendants Kahr, Murphy, and Reiser, because she has alleged that each of these defendants was her supervisor, each was aware of their role in Pacira's cursory investigation into an altercation between Plaintiff and a male employee at the National Sales Meeting, and that each substantially assisted the principal violation by actually participating in it;

and it appearing that because Plaintiff has not alleged that Stack, McLaughlin, Ciavolella, Davis or Lehmann had any involvement in discriminating against Plaintiff on the basis of her sex, her claims under Count 1 as to these defendants are dismissed, without prejudice;

and it appearing that Plaintiff has not sufficiently alleged that any of the Individual Defendants aided and abetted the alleged hostile work environment and the claims against them in Count 2 are therefore dismissed, without prejudice;

---

[4] Courts assess five factors in determining whether an employee "substantially assisted" a violation of the LAD: "(1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time of the asserted harassment, (4) the supervisor's relations to the others, and (5) the state of mind of the supervisor." <u>Tarr</u>, 181 N.J. at 84 (quoting Restatement (Second) of Torts § 876(b) comment d).

and it appearing that Defendants next argue that Plaintiff has failed to state a claim for retaliation under the LAD against the Individual Defendants, Def. Mem. at 22;[5]

and it appearing that to "establish a prima facie case of discriminatory retaliation, plaintiffs must demonstrate that: (1) they engaged in a protected activity known by the employer; (2) *thereafter* their employer unlawfully retaliated against them; and (3) their participation in the protected activity caused the retaliation," Longo v. Purdue Pharma, L.P., 2014 WL 2800817, at *2 (D.N.J. June 19, 2014) (quoting Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629–30 (1995));

and it appearing that Plaintiff has alleged that she protested her exclusion from an event at the National Sales Meeting on account of her sex, Compl. ¶¶ 43-45, that other witnesses to that incident reported it to Reiser, id. ¶¶ 48-49, and that Reiser, Murphy and Kahr investigated the incident, id. ¶¶ 50, 55-56, and that Murphy and Kahr later called Plaintiff to inform her that not only would no action be taken against other Pacira employees arising from the National Sales Meeting, id., but that Plaintiff would be terminated, and thus she has stated a claim for retaliation in violation of the LAD against Pacira, and has further stated a claim for individual liability as against Reiser, Murphy and Kahr, as she has alleged that these individuals assisted the primary violation, were aware of their role in doing so, and knowingly and substantially assisted the violation by participating in it;

and it appearing that because Plaintiff has not alleged any facts that McLaughlin, Ciavolella, Davis or Lehmannn substantially participated in her termination in any way, she has failed to allege a claim for retaliation against them;

---

[5] Defendants do not independently seek dismissal of the LAD retaliation claim against Pacira beyond their argument that Plaintiff's Complaint pled that she was terminated for a legitimate non-discriminatory reason, which the Court has already rejected, supra.

and it appearing that although Plaintiff has alleged that Stack was a member of the executive team that approved Plaintiff's termination, Plaintiff has not alleged that Stack was aware of his role in the retaliatory conduct and therefore Count 3 is also dismissed as to him;

and it appearing that the Individual Defendants seek dismissal of Count 4 because Plaintiff failed to allege that they participated in an adverse employment action, Def. Mem. at 24-27;

and it appearing that to state a claim under NJCEPA, a plaintiff must allege (1) that she reasonably believed that her employer was violating either a law, rule or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) that she performed a whistle blowing activity; (3) that an adverse employment action was taken against the plaintiff; (4) and that a causal connection exists between the whistle blowing activity and the adverse employment action, Tonkinson v. Byrd, 2018 WL 1919829, at *4 (D.N.J. Apr. 24, 2018);

and it appearing that to state a claim for individual liability under NJCEPA, a Plaintiff must plead that defendants were individually involved in the conduct amounting to a violation, Michel v. Mainland Reg'l Sch. Dist., 2009 WL 2391293, at *3 (D.N.J. July 30, 2009), but at the pleading stage a plaintiff may allege that a group of defendants were involved in a decision to terminate the plaintiff, and that discovery will determine how each defendant was involved, Tonkinson, 2018 WL 1919829, at *4;

and it appearing that Plaintiff has alleged that she reasonably believed her employer was violating regulations governing revenue sharing between sales and medical employees, Compl. ¶¶ 73-79, revenue recognition rules, id. ¶¶ 67-72, and securities laws, id. ¶¶ 81-83, that she reported these violations, id. ¶¶ 84-85, and that she was terminated following her reports, id. ¶¶ 64-65, she has stated a claim under NJCEPA against Pacira;

and it appearing that Plaintiff has alleged she reported various allegedly unlawful conduct to Murphy, Reiser, McLoughlin, and Ciavolella prior to her termination, and therefore, at this stage, has stated a claim against them individually for violations of NJCEPA;[6]

and it appearing that while Plaintiff has further alleged that the final decision to terminate her employment was made by the "executive team," id. ¶ 64, there is no allegation that Stack was involved in the decision to terminate her, and Plaintiff therefore has not plausibly alleged that he is individually liable under NJCEPA;

and it appearing that Plaintiff's only allegations regarding Davis and Lehman are that they reported to Stack, id. ¶¶ 8-9, and that Davis was allegedly involved in unlawful conduct that Plaintiff reported, id. ¶ 68, but because she has not alleged that they were in any way involved in her termination, she has failed to state a claim under NJCEPA against these defendants;

IT IS on this 31st day of July, 2019,

**ORDERED** that, Defendants Motion to Dismiss is **DENIED** on all counts as against Pacira, but is **GRANTED** as to Count 1 against Stack, McLaughlin, Ciavolella, Davis and Lehmann, and further **GRANTED** as to Count 2 against all Individual Defendants, and further

---

[6] The text of NJCEPA precludes Plaintiff from asserting both an NJCEPA claim and a LAD retaliation claim, if the two claims "require[] the same proofs." Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 803 (3d Cir. 2010); see also N.J.S.A. § 34:19-8. This provision does not prevent Plaintiff from asserting both LAD retaliation claims and NJCEPA claims here because she pleads the two differently: her LAD retaliation claim is based on her reporting of the discriminatory treatment at the National Sales Meeting, while her NJCEPA claim is based on her numerous other reports of potentially unlawful business practices. Compare Compl. ¶¶ 104-08 (LAD retaliation claim based on reporting of discriminatory treatment at National Sales Meeting) with id. ¶¶ 110-15 (NJCEPA claim based on Plaintiff's reporting of various other alleged business irregularities).

**GRANTED** as to Count 3 against Stack, McLaughlin, Ciavolella, Davis and Lehmann, and further

**GRANTED** as to Count 4 against Stack, Davis and Lehmann.

/s/ *Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT 3

James J. Panzini, Esq. (Bar ID: 022101990)
Pooja Bhutani, Esq. (Bar ID #169592016)
JACKSON LEWIS P.C.
766 Shrewsbury Avenue, Suite 101
Tinton Falls, New Jersey 07724
(732) 532-6148
*ATTORNEYS FOR DEFENDANTS*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RESHMA ABELL, | : |
| | :    Civil Action No.: |
|       Plaintiff, | :    2:18-cv-16509-MCA-LDW |
| | : |
|       v. | : |
| | : |
| PACIRA PHARMACEUTICALS, INC., | : |
| DAVE STACK, individually and in his | :    **STIPULATION OF VOLUNTARY** |
| capacity as Chief Executive Officer of | :    **DISMISSAL PURSUANT TO F.R.C.P.** |
| PACIRA PHARMACEUTICALS, INC., | :    **41(a)(1)(A)(ii)** |
| and RICH KAHR, PETER MURPHY, | : |
| DENNIS McLOUGHLIN, PAUL | : |
| CIAVOLELLA, GLENN REISER, JOYCE | : |
| DAVIS AND MATT LEHMANN, in their | : |
| capacities as employees of PACIRA | : |
| PHARMACEUTICALS, INC., | : |
| | : |
|       Defendants. | : |

     **IT IS HEREBY STIPULATED AND AGREED** by and between Plaintiff

Reshma Abell and Defendants Pacira Pharmaceuticals, Inc., Rich Kahr, Peter Murphy, Dennis

McLoughlin, and Paul Ciavolella, through their undersigned counsel who are authorized to enter

this stipulation, that pursuant to Rule 41 of the Federal Rules of Civil Procedure, that this action

and all claims asserted against individual Defendants Dennis McLoughlin and Paul Ciavolella, are

hereby dismissed in their entirety, with prejudice, and without costs or attorneys' fees to any party.

LAW OFFICES OF NEAL BRICKMAN, P.C.
The GrayBar Building
420 Lexington Avenue, Suite 2811
New York, New York 10170
*Attorneys for Plaintiff*

*/s/ Jason A. Stewart*
Jason A. Stewart, Esq.
*Attorneys for Plaintiff*


Dated:  May 6, 2021

JACKSON LEWIS P.C.
766 Shrewsbury Avenue, Suite 101
Tinton Falls, New Jersey 07724
*Attorneys for Defendants*

*/s/ James J. Panzini*
James J. Panzini, Esq.
Pooja Bhutani, Esq.


Dated:  May 6, 2021

# EXHIBIT 4

Page 54

1    to what the target range and position, I am
2    pretty sure.
3          Q      So that would be information
4    that would be conveyed to, for example, the
5    recruiters?
6          A      Correct.
7          Q      Were you involved in the
8    interview process for Reshma Abell?
9          A      No.
10         Q      When was Reshma Abell hired?
11         A      I am not 100 percent certain
12   about that.
13         Q      Do you know who was involved in
14   the hiring process that hired Reshma Abell?
15         A      Not 100 percent about that
16   either.  My guess is on the HR side it probably
17   would have been a recruiter at HR and probably
18   the HR Business Partner that was with Pacira at
19   the time.
20         Q      Is an HR Business Partner, is
21   that a role within the HR Department?
22         A      It is.
23         Q      And back in 2014, who would have
24   been the HR Business Partner?
25         A      Her name was Leslie Hyman.

Page 55

1          Q      Does Leslie Hyman remain
2    employed with Pacira?
3          A      No.
4          Q      When did her employment come to
5    an end?
6          A      I am not -- off the top of my
7    head, can't confirm the specific date, it would
8    have been probably in the 2017 timeframe.
9          Q      Between 2014 and 2017, did
10   Leslie Hyman hold the same title of HR Business
11   Partner?
12         A      I joined the company in some
13   stage of 2014.  Prior to when I got there, they
14   were called HR Managers or HR Directors,
15   depending on which job you are talking about and
16   put a new organization design in place of which
17   those same -- those same jobs are referred to now
18   as HR Business Partners.
19         Q      So not including the time prior
20   to your employment at Pacira, but from then
21   forward, did Leslie Hyman maintain the same title
22   as HR Business Partner?
23         A      Correct.
24         Q      Mr. Kahr, your role within the
25   HR Department is what?

Page 56

1          A      HR Vice President.
2          Q      What are the duties and
3    responsibilities of the HR Vice President?
4          A      Basically to lead the HR
5    strategy for the company, to lead the team of HR
6    professionals that we have on the team.  And to
7    ensure that, you know, we support the business
8    strategy, that HR is aligned with the business
9    strategy.
10         Q      How many HR professionals are a
11   member of the HR Department?
12         A      As of today, 12.
13         Q      And back in the years between
14   2014 and 2018, was it approximately the same?
15         A      No, it's grown -- as our
16   business has grown, it's gotten larger.  When I
17   joined, it was roughly six.  So, yeah, it's -- we
18   have almost doubled in size, we have doubled in
19   size now.
20         Q      In addition to providing
21   leadership in terms of HR strategy, as HR Vice
22   President, do you have any other duties and
23   responsibilities?
24         A      Well, I think it all kind of for
25   me trails back to that.  I mean at the end of the

Page 57

1    day my primary responsibility is to ensure we are
2    putting HR strategies in place to help the
3    company succeed and meet the growth targets for
4    the organization.  Beyond that everything is
5    secondary.
6          Q      As part of your role as HR Vice
7    President, do you from time to time become
8    involved in the day-to-day affairs of the HR
9    Department?
10         A      Hopefully so but, you know, I
11   try not to get bogged down in the details but I
12   don't think I would be doing my job if I wasn't
13   pretty much in the loop in terms of some of the
14   key things going on in the company, yeah.
15         Q      So what would be some of the
16   duties and tasks that you would undertake in that
17   capacity?
18         A      I mean any of the folks working
19   for me right now, whether they are HR Business
20   Partners or center of excellence leaders, any of
21   the things going on in their area would be things
22   that would be things that I am probably involved
23   in, and, you know, have some say in.
24         Q      So are you at times involved in
25   the hiring process?



Page 58

1        A       At times, yeah, not in every
2    case, but in many cases, yes.
3        Q       And in the event where there is
4    complaints, are you at times involved in the
5    investigatory process?
6        A       Same answer, not in every case,
7    but in many cases, yes.
8        Q       And where there are adverse
9    employment actions taken against an employee, are
10   you involved at times in those circumstances?
11       A       At times.
12              MR. PANZINI:  Object to form.
13       Q       At times where there are
14   corrective actions taken against an employee, are
15   you at times involved in that process?
16       A       Same answer, at times.
17       Q       And has that been the same since
18   you were first employed in 2014 to present?
19       A       Yes.
20       Q       And what role, if any as HR Vice
21   President do you have with respect to employee
22   promotions?
23       A       As part of our year end
24   compensation process, all of our managers are
25   asked to go ahead and make recommendations around

Page 59

1    potential promotions.  Those get captured just
2    like the compensation recommendations, as part of
3    that whole process, they get captured in the
4    tool, the compensation tool, ultimately go
5    through the same level of approvals and roll up
6    to the final level of approval which would be,
7    you know, a combination of the executive team
8    leader for that area, myself and the CEO.  So I
9    would see an overall summary of promotions at the
10   end of the process.
11       Q       You used the phrase earlier an
12   off cycle adjustment and I just want to be clear,
13   what did you mean by an off cycle adjustment with
14   respect to compensation?
15       A       I mean as moves happen during
16   the year, if somebody moves from one area to
17   another, if there is a promotion as a result of
18   somebody taking an open position, that would be
19   what I would refer to as an off cycle.  It
20   wouldn't -- most promotions are managed at year
21   end but there are those odd cases where during
22   the year somebody moves to a higher level
23   position and they get promoted accordingly or,
24   you know, based on their performance, you know,
25   it's deemed that an adjustment should be made for

Page 60

1    whatever.
2        Q       So earlier you told us about a
3    review process whereby compensation
4    recommendations were made and promotions,
5    recommendations were made and that's done on an
6    annual basis with a roll up process.  Correct?
7        A       Correct.
8        Q       And then would it be changes or
9    adjustments that are made outside of that process
10   would be considered off cycle adjustments?
11       A       Correct.
12       Q       What is the process by which
13   Pacira goes into developing a new job description
14   or new role within the company?
15       A       Typically it would start with
16   the immediate supervisor or manager, you know, if
17   they want to advocate to fill a new position,
18   they would, you know, fill out a job description
19   and submit it through the review process for
20   approval with their immediate manager and
21   functional leadership and ultimately it goes into
22   a review process that, you know, goes into
23   headquarters but that's how it normally is
24   initiated.
25       Q       Is that ultimately signed off

Page 61

1    upon by the CEO of the company?
2        A       As a matter of fact, he does
3    review all open positions, whether they are
4    replacements or new positions, ultimately get
5    captured on a weekly basis and reviewed with him.
6    So yes, in our case, we are a smaller
7    organization, he does have final sign off on
8    filling any open positions.
9        Q       When you say final sign off, is
10   that mean upon his sign off, there is no further
11   sign offs that are required?
12       A       No.
13       Q       Does Pacira maintain a process
14   by which they set forth development plans for
15   their employees?
16       A       Development plans?
17       Q       Yes.
18       A       Yes.
19       Q       And what is the process with
20   respect to development plans?
21       A       Well, it's as simple as part of
22   the performance review process, you know, people
23   pull their objectives together, they get assessed
24   against those objectives and then at year end,
25   based on the outcomes from that performance

MAGNA
LEGAL SERVICES

Page 166

1    of John Park where there was a reported
2    occurrence at the national sales meeting, did the
3    HR representative that was present participate in
4    any fact finding concerning any complaints made
5    at that meeting?
6        A      No, I handled that myself.
7        Q      And what about with respect to
8    the complaints that arose out of the February
9    2018 national sales meeting, was there any -- HR
10   representatives other than yourself involved in
11   the investigation or fact finding process?
12       A      No.
13       Q      Did there come a point in time
14   that you were made aware of an -- of a certain
15   series of events that transpired at the national
16   sales meeting in February of 2018?
17              MR. PANZINI:  Object to form.
18   Go ahead.
19       A      Yes.
20       Q      And how were you first made
21   aware of the occurrences at the national -- at
22   the 2018 national sales meeting?
23       A      Actually I initially heard it
24   from Leslie who told me that a number of
25   senior leaders had come to her and voiced

Page 167

1    concerns around an issue down there.
2        Q      And what was it that Leslie told
3    you?
4        A      She told me that there was an
5    inappropriate conflict between Reshma and Rob
6    Rock.
7        Q      Did she provide you any details
8    concerning that conflict?
9        A      She -- she told me that that was
10   reported to her by both Glen Riser and Pete.  And
11   that, you know, there had been reportedly some
12   conflict or confrontation between the two of them
13   at the meeting, beyond that she didn't know much
14   more than that at the time.
15       Q      When in time was that report
16   made by Leslie to you?
17       A      Well, I don't remember exactly
18   without reviewing my records, I would say that it
19   was -- I think I heard about it on Monday night
20   and the meeting starts on I think Sunday night.
21   So it was literally a day into the meeting when
22   something happened.  I think, you know, the
23   events were on a Monday night, if I'm not
24   mistaken, could be wrong, it could be Tuesday but
25   I think it was Monday and I was made aware that

Page 168

1    evening that there was an issue.
2        Q      Were you made aware the evening
3    that the issue occurred?
4        A      Yes.
5        Q      And you were first made aware by
6    Leslie?
7        A      Yes.
8        Q      Were you made aware by email or
9    telephone or something else?
10       A      Both.
11       Q      After you were made aware by
12   Leslie about what occurred, were you also
13   informed by anybody else?
14       A      Well, I asked Leslie to have
15   Pete and Glen call me to provide me with more
16   specifics on the conflict.
17       Q      Did that call take place that
18   same evening?
19       A      No, I mean that I think happened
20   the following morning.
21       Q      What did you learn during that
22   call on the following morning?
23       A      Simply that Rob and Reshma
24   reportedly had a run in between each other that
25   reportedly started at the hotel when Rob

Page 169

1    members of his team were going to go over to an
2    event that they had planned at Top Golf, that
3    there was an ensuing conflict between the two of
4    them at Top Golf and that there was further
5    issues upon return to the hotel.
6        Q      At that point did you provide
7    either Pete or Glen with any instructions?
8        A      I asked them that, you know, if
9    I were to look into this, and we agreed that I
10   was the right person to do that since Leslie was
11   there and we needed somebody to do -- given the
12   fact that it involved a Region Business Director
13   or somebody more senior, I asked them to provide
14   me any facts or witnesses that could help, you
15   know, do an orderly investigation into what
16   happened and I think they, at least Glen turned
17   around and maybe sent me an email with some
18   people that he thought were present in all three
19   of those situations, that either he had witnessed
20   himself or heard from other people but it was a
21   list of, you know, other sales resources and some
22   other managers.
23       Q      Did you ask Pete or Glen to have
24   any conversations with anybody at the national
25   sales meeting concerning what transpired between

Page 190

1    would have been in the position to confirm to me
2    was there an issue between the two of them and if
3    so, what did they see and what did they hear.
4         Q     Was part of your investigation
5    looking into whether or not Reshma's gender
6    played any part in the conflict between Rob and
7    Reshma?
8         A     No.
9         Q     You didn't look into that at
10   all?
11        A     What was -- I don't understand
12   the question.
13        Q     So I'll ask it a little bit
14   differently.
15              As part of your investigation,
16   was there any focus paid on whether or not Rob
17   Rock's action and comments towards Reshma were in
18   anyway motivated by the fact that Reshma was a
19   woman?
20        A     You know, during my
21   investigation, first of all, I didn't get that
22   sense from talking to Reshma that that was the
23   basis for her complaint against him, it was his
24   inappropriate behavior and how he talked to her
25   and how he projected to her in front of other

Page 191

1    people.  That's what I got from Reshma, I didn't
2    get that he was in anyway harassing her based on
3    the fact she was a woman.
4         Q     What was it that you understood
5    from Reshma that Rob's words were conveying, what
6    were his words and actions conveying?
7         A     He was not professional.  I mean
8    I am -- I am summarizing the take away from what
9    she told me, basically said that he was over the
10   top, animated, unprofessional, and, you know, she
11   didn't deserve that behavior, especially from a
12   manager, that's the take away I had from my
13   conversation with Reshma.
14        Q     Was there any consideration paid
15   to the portion of the commentary made by Rob Rock
16   that Reshma should be attending the women's
17   leadership dinner?
18        MR. PANZINI:  Object to form but
19   go ahead.
20        A     I don't know if he ever told me
21   that.  You know, it clearly came up as part of
22   the investigation of why Reshma ended up going to
23   Top Golf and not -- is because she didn't want to
24   go to the women's event and she had reasons for
25   not doing that.  And there was no issue from my

Page 192

1    standpoint in that.
2         Q     Were there any issues from Rob
3    Rock's standpoint in Reshma doing that?
4         A     No, I think Rob's primary
5    concern was, again, I am paraphrasing, she
6    crashed his meeting with his guys when she wasn't
7    invited.
8         Q     And none of the women from Rob
9    Rock's team was present at the Top Golf event.
10   Correct?
11        A     I don't believe so but I'm not
12   100 percent certain, I don't believe there was
13   any other women there but I'm not 100 percent
14   certain of that.
15        Q     When you say it was Rob's event
16   with Rob's guys, are there certain individuals
17   you are referring to as Rob's guys?
18        A     His team.
19        Q     The males on his team?
20        A     Yeah, because the women were all
21   in the women's event.
22        Q     And the -- back in February of
23   2018 Rob Rock is a Regional Sales Director.
24   Correct?
25        A     Correct.

Page 193

1         Q     Regional Business Director?
2         A     Yes.
3         Q     And he's in the southeast
4    Florida region.  Correct?
5         A     Correct.
6         Q     Do you know how many Surgical
7    Account Specialists were members of his team?
8         A     I don't.
9         Q     Do you know if the -- if the
10   gender breakout between the number of members of
11   Rob Rock's team, how many were men, how many were
12   women?
13        A     I don't.
14        Q     Do you know how many Surgical
15   Account Specialists generally are assigned
16   underneath the Regional Business Director?
17        A     Eight to ten as a norm.
18        Q     Were you involved in anyway in
19   preparing the defendant's response to plaintiff's
20   first set of Interrogatories?
21        A     Can you please repeat that?
22        Q     Were you involved in, in the
23   course of this litigation, the plaintiff's served
24   a demand for a set of Interrogatories which were
25   required to be responded to.  Were you involved

MAGNA
LEGAL SERVICES

Page 226

```
 1     Q       And does Mr. Rock attach the
 2  same document that was sent to you on February 17
 3  to this email correspondence?
 4     A       Yes.
 5     Q       And within the body of the
 6  email, is there an indication that incidents were
 7  reported to Leslie Hyman on February 13 and on
 8  February 14?
 9     A       That was his, you know, his
10  statement, yeah.
11     Q       Do you have any reason to
12  believe that's inaccurate?
13     A       Well, I have every reason to
14  believe that not everything Rob said was
15  accurate, yeah.
16     Q       Did Leslie Hyman ever discuss
17  with you any complaint being made to her on
18  February 13 by Rob Rock concerning claims of
19  sexual harassment, hostile work environment or
20  bullying and that these claims were protected by
21  whistleblower laws?
22     A       Not to my knowledge, no.
23     Q       Who made the decision to
24  terminate Reshma Abell?
25     A       That was a collective decision
```

Page 227

```
 1  by legal and HR.
 2     Q       When you say collective decision
 3  by legal and HR, is there certain individuals
 4  that were involved in that decision making
 5  process?
 6     A       Yes.
 7     Q       Who were those individuals?
 8     A       Kristen Williams, Chief
 9  Administrative Officer, and Tony Malloy, our
10  Chief Legal Officer and myself.
11     Q       And what was the process by
12  which the determination to terminate Reshma was
13  arrived at?
14     A       Simply providing a summary of
15  the facts regarding the situation with Reshma
16  opening up an inappropriate site at the meeting,
17  the confirmation of such, her acknowledgement of
18  that and the fact that that behavior was
19  unwarranted and unacceptable in our environment,
20  in our culture, could not be tolerated.
21     Q       Were Reshma's comments
22  concerning the women's leadership meeting taken
23  into account in determining whether or not the
24  termination was appropriate?
25     A       What part of her words on the
```

Page 228

```
 1  women's leadership, the fact that she didn't go?
 2     Q       Any portion of what transpired
 3  concerning the women's leadership meeting?
 4     A       Well, they were made aware of
 5  the fact that the initial investigation into the
 6  incident between Rob and Reshma --
 7             MR. PANZINI:  Go ahead.
 8             MR. STEWART:  Just -- he's in
 9  the middle of an answer.
10             MR. PANZINI:  Yeah, well --
11  there is a privilege issue here, it's
12  communication with counsel.  So just -- he's
13  talking about his conversations, when I believe,
14  when he said they, with Anthony Malloy who is
15  in-house counsel and I believe Kristen Williams,
16  also in-house counsel that -- I am going to put a
17  -- those are privileged conversations.  So that's
18  what I wanted to put on record, that's why I
19  interrupted in the middle, I normally wouldn't do
20  that, you have sat through enough depositions
21  with me to understand that, but I thought he was
22  going into an area where he's talking about
23  privileged conversation between counsel and the
24  client regarding legal advice.
25     Q       What is Kristen Williamson's
```

Page 229

```
 1  title at Pacira?
 2     A       Chief Administrative Officer,
 3  legal and HR report to her.
 4     Q       What is Anthony Malloy's title
 5  at Pacira?
 6     A       He's Associate General Counsel,
 7  he's the chief -- doesn't have the chief legal
 8  officer title but he's the head of legal.
 9     Q       In the course of having
10  conversation with Kristen Williamson, were any
11  conversations held directly between yourself and
12  Kristen Williamson concerning the termination of
13  Reshma Abell?  The question was not about what
14  you were talking about, the question --
15             MR. PANZINI:  He's not asking
16  you what the conversation, what was said, but --
17     A       Did I have a conversation with
18  Kristen, yeah.
19     Q       Directly with just Kristen?
20     A       With what?
21     Q       Just with Kristen?
22     A       With Kristen and Tony.
23     Q       Did you ever have any
24  conversations with Kristen outside the presence
25  of Tony?
```

Page 230

```
1      A      No.
2      Q      How many conversations were
3   held?
4      A      One.
5      Q      How long did that conversation
6   last?
7      A      Half an hour.
8      Q      Was Kristen Williams provided an
9   opportunity to review your investigative notes
10  before your conversation?
11     A      She was sent those in advance,
12  yes.
13     Q      And what was the basis upon
14  which Reshma was ultimately terminated?
15     A      I thought you already asked that
16  question.
17     Q      Forgive me, we have been doing
18  this for awhile, if you can just give me an
19  answer?
20     A      Basis was that the behavior that
21  she exhibited at the national sales meeting with
22  opening up an inappropriate site that made others
23  feel uncomfortable at the meeting was not
24  something we could support in our culture and
25  that it was an egregious violation of our, you
```

Page 231

```
1   know, values and our, you know, anti-harassment
2   policy in our handbook.
3      Q      And was any consideration given
4   to Reshma's disciplinary history before making
5   that determination?
6      A      No.  Pretty sure she didn't have
7   any disciplinary history.
8      Q      That's the point.
9             Was there a specific policy
10  within the Employee Handbook pertaining to the
11  viewing of materials on personal cell phones?
12     A      No, I don't think there is
13  anything that specific in the handbook, no.
14     Q      At any point in time were you
15  made aware of any other individuals at the
16  national sales meeting viewing the same Kama
17  Sutra material?
18     A      No.
19     Q      At any point in time were you
20  ever made aware of any other individuals showing
21  other people the same Kama Sutra material that
22  Reshma was alleged to have been showing other
23  individuals?
24     A      No.
25     Q      Were you ever made aware that
```

Page 232

```
1   Michael Massicottee and Dave Heritage were also
2   viewing and sharing these same Kama Sutra
3   materials at the national sales meeting?
4      A      No, I don't know who those
5   individuals are.
6      Q      Did Roxanne Doherty provide you
7   specific details about what transpired in the
8   moments surrounding Reshma purportedly showing
9   Kama Sutra materials?
10     A      Ask that question again.
11     Q      Did Roxanne Doherty provide
12  specific details concerning the happenings around
13  Reshma viewing Kama Sutra materials at the
14  national sales matter meeting?
15     A      She said she was creating a
16  distraction among a number of sales employees and
17  was viewing an inappropriate website and asked
18  her to shut it down.
19     Q      Did you ask the name of those
20  other sales associates that were present?
21     A      She didn't recall.
22     Q      My question was a little bit
23  different, did you ask the name of --
24     A      I did, yeah.
25     Q      And the response you received
```

Page 233

```
1   was?
2      A      She couldn't recall who the
3   people were that were standing there.
4      Q      The women's leadership meeting
5   that occurred at the national sales meeting in
6   2018, do you know who planned that event?
7      A      I think it was Kristen Williams.
8   She's the -- basically the executive sponsor of
9   basically what they call Power which is the
10  women's, you know, basically a women's affinity
11  group at Pacira.
12     Q      Have there since been other
13  women's leadership meetings at subsequent
14  national sales meetings?
15     A      I am not 100 percent certain but
16  I believe there was at the last meeting, yes.
17     Q      And is that a program or a
18  meeting series which Kristen Williamson continues
19  to remain involved with?
20     A      Yes.
21     Q      Was Joyce Davis at all involved
22  in the 2018 national sales meeting?
23     A      I believe so but I am not 100
24  percent certain.  I mean she's a senior leader in
25  the organization and she normally does play some
```

MAGNA
LEGAL SERVICES

Page 238

1  A       As a record of who attended the
2  leadership team meeting?
3  Q       Yes, you do recognize what's
4  been marked as Plaintiff's 50?
5  A       You know, I vaguely remember it,
6  I don't --
7  Q       Have you seen this document
8  before today?
9  A       Probably at the time that it was
10 sent over to counsel, yeah, I don't know if I
11 looked at it close because I just assumed
12 whatever they pulled together here was an
13 accurate listing of who was there.
14 Q       And do you believe -- withdrawn.
15         Is Plaintiff's 50 a true and
16 accurate representation from your perspective of
17 the individuals who attended the women's
18 leadership meeting in the Pacira 2018 national
19 meeting?
20 A       I have no reason to dispute it
21 but I mean I am not 100 percent certain.  I mean
22 I wasn't part of pulling it together.
23 Q       Do you know who pulled it
24 together?
25 A       No, it probably would have been

Page 239

1  somebody, you know, in the sales organization
2  that was associated with that -- with that
3  dinner.
4  Q       Are you aware of -- withdrawn.
5          What were the -- what was the
6  determination made with respect to the outcome of
7  the investigation concerning Rob Rock and his
8  conduct at the 2018 national sales meeting?
9  A       With the incident that happened
10 between he and Reshma?
11 Q       However you want to describe it
12 to me.
13 A       No, I think there was no
14 conclusive information that I was able to get my
15 hands around that could confirm that, you know,
16 either one of them did anything that was -- that
17 would rise to a level of, you know, any form of
18 discipline so as far as we were concerned, you
19 know, the case was basically being set aside.
20 Q       And thereafter was Rob Rock
21 caused to be terminated by Pacira?
22 A       He was terminated, yes.
23 Q       For what reason?
24 A       Sorry?
25 Q       For what reason?

Page 240

1  A       Based on a further evaluation
2  into what transpired with him leaving the meeting
3  with out authorization, that decision by senior
4  leadership in sales was that he be terminated for
5  that because not receiving authorization to leave
6  the meeting.
7  Q       And who made the determination
8  with respect to Rob Rock's firing?
9  A       That would have been the head of
10 sales, Pete.
11 Q       Other than Pete Murphy, did
12 anybody else weigh in with respect to Rob Rock's
13 termination?
14 A       It would have been the same
15 folks that I mentioned to you earlier that are
16 involved in decisions like this, legal and HR,
17 the legal leadership and HR.  So I was part of
18 that decision making process as with Tony.
19 Q       Was Pete Murphy involved in the
20 decision making process of terminating Reshma?
21 A       No.
22 Q       Is Pete Murphy still employed by
23 Pacira?
24 A       No.
25 Q       How did Pete Murphy's employment

Page 241

1  come to end at Pacira?
2  A       He found another job.
3  Q       Did he resign his position at
4  Pacira?
5  A       He did.
6  Q       When was that?
7  A       I am going to say a year ago.
8  Not even that long ago, six, nine months ago,
9  maybe.
10 Q       Does Matt Lehmann remain
11 employed by Pacira?
12 A       No, he also is no longer with
13 the company.
14 Q       And what was Matt Lehmann's role
15 at Pacira?
16 A       At the time I believe he was --
17 I don't remember what his title was but he had
18 marketing, all of marketing and all of commercial
19 training, he did not have sales I don't believe
20 at that time.  So it was marketing, commercial
21 training and maybe the sales analytics function,
22 to the best of my recollection.
23 Q       I'd like to show you what we
24 will be marking as Plaintiff's 51 and here is a
25 copy for counsel.  This is Pacira1261 and 1262.

MAGNA
LEGAL SERVICES

Page 246

1    appealing to Scott because he probably had, you
2    know, previously had a quasi relationship with
3    Scott in some manner and hopes that Scott to help
4    him navigate through this is why he did it.
5    Because he sent several similar notes to several
6    people.
7          Q      And Plaintiff's 23, is this a
8    true and accurate representation of an email sent
9    from Scott Braunstein to yourself on February 15
10   of 2018?
11         A      Yeah, he sent it to me as an
12   FYI.
13         Q      Did you have any conversation
14   with Scott Braunstein concerning this email?
15         A      No, Scott was not involved in
16   this situation at all.  He got pulled it into it
17   obviously by Rob because Rob was looking for some
18   supporters but, I mean, Scott was not even
19   tangentially involved in this.
20                (Whereupon, Exhibit 53, Email
21   from Matt Lehman dated March 13, 2018, is
22   received and marked for Identification by the
23   reporter.)
24         Q      Do you recognize what's been
25   marked as Plaintiff's 53?

Page 247

1          A      Uh-huh, yes.
2          Q      And what do you recognize
3    Plaintiff's 53 to be?
4          A      Just that Rob sent a farewell
5    note to Matt about him being terminated and Matt
6    acknowledging to me that he got this note from
7    Rob and it sounds like both he and Kristen were
8    in the room with Rob.
9          Q      And where he's making reference
10   to being in the room with Rob, that's dating back
11   to the conversation that transpired following Rob
12   Rock leaving the sales meeting and returning.
13   Correct?
14         A      That's correct.
15         Q      And again Rob Rock within this
16   correspondence makes mention concerning
17   allegations that were made to Leslie Hyman on
18   February 13.  Correct?
19         A      Well, that's what he alleges,
20   but, you know, yeah.
21                MR. STEWART:  Subject to any
22   follow-up, I have no further questions.  Thanks
23   for your time today.
24                MR. PANZINI:  Just a couple.
25

Page 248

1    CROSS EXAMINATION BY MR. PANZINI:
2
3          Q      Mr. Kahr, in your capacity as
4    head of HR, would you generally be looped into
5    the creation of a new position at Pacira?
6          A      Yes, I would.
7          Q      Okay.
8          A      The process normally has, when
9    managers want to get approval for a new position,
10   they create a requisition, attach a job
11   description, it's submitted within the system and
12   it routes through successive managerial levels,
13   myself and the CEO.  They all need to approve it.
14         Q      Were you aware -- strike that.
15                Were you ever contacted
16   regarding the creation of a new position called
17   the Director of Postop Pain Management?
18         A      No.
19         Q      Would it be fair to say you
20   never saw any --
21         A      No requisition, no job
22   description, never got brought to my attention.
23                MR. PANZINI:  I have nothing
24   further.
25                THE VIDEOGRAPHER:  The time is

Page 249

1    now 5:17.  This will end this evening's
2    deposition.
3                (Whereupon, the deposition is
4    concluded at 5:18 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 5

Page 14

1    A.   I'm sorry.  Yes.
2    Q.   And were you part of the --
3  withdrawn.
4        Did you hire or were you
5  part of the hiring process that brought
6  Reshma onto the team?
7    A.   Yes.
8    Q.   And what did that process
9  entail, the hiring process?
10    A.   Conducting interviews,
11  working with recruiters to identify
12  potential employees.  And I conducted a
13  number of interviews, and ultimately --
14  you know, conducted interviews to
15  establish who would be the best fit
16  potentially.
17    Q.   And how did you first come
18  to become acquainted with Reshma?
19    A.   Through a recruiter who
20  provided me with her information.
21    Q.   And did you ultimately
22  interview Reshma?
23    A.   I did.
24    Q.   Do you know if you met with

MAGNA LEGAL SERVICES

Page 15

1  her on more than one occasion to
2  interview with her?
3    A.   I believe it was once.
4    Q.   Does the recruiting process
5  entail there being multiple interviews?
6    A.   Sometimes.
7    Q.   Do you have a recollection
8  of Reshma's hiring process and whether
9  she was interviewed on more than one
10  occasion?
11    A.   I don't recall.
12    Q.   When the decision was made
13  to move forward with Reshma as a
14  candidate, were there other stakeholders
15  that were involved that had approval of
16  her being hired or was the decision
17  ultimately yours?
18        MR. PANZINI:  Objection to
19  form.  But go ahead and answer.
20        THE WITNESS:  I believe at
21  the time there was -- there needed
22  to be an approval from my superior
23  in order to -- I don't know if --
24  yeah, there was definitely a

MAGNA LEGAL SERVICES

Page 16

1  sign-off with the area sales
2  manager above me.
3  BY MR. STEWART:
4    Q.   And back in 2014, who would
5  that have been?
6    A.   Dennis McLoughlin.
7    Q.   And what was his title at
8  the time?
9    A.   To the best of my
10  recollection, it was area sales -- area
11  sales director for the east.
12    Q.   And was that the position
13  that ultimately you were promoted into in
14  approximately July of 2017?
15    A.   Correct.
16    Q.   And from 2014 until 2017,
17  was Dennis McLoughlin the area sales
18  director above you for the entire time?
19    A.   To the best of my
20  recollection, yes.
21    Q.   During the time that you
22  were in the northeast regional manager
23  from when Reshma was hired until you were
24  promoted, did she report directly to you

MAGNA LEGAL SERVICES

Page 17

1  during that entire time?
2    A.   Yes.
3    Q.   Were you involved with a
4  process of preparing her -- withdrawn.
5        Did Pacira have a process
6  that -- a process for doing employee
7  reviews on an annual and biannual basis?
8    A.   Yes.
9    Q.   And were you involved with
10  the preparation of Reshma's biannual and
11  annual reviews from 2014 to 2017?
12    A.   Yes.
13    Q.   Was there anyone else that
14  would have been involved in that process?
15    A.   The area sales manager for
16  the east would be involved.
17    Q.   And that would have been
18  Dennis McLoughlin?
19    A.   Correct.
20    Q.   And when you were promoted
21  to area sales manager, did somebody come
22  and fill the role eventually of the
23  northeast regional manager?
24    A.   Yes.

MAGNA LEGAL SERVICES



Page 22

```
 1   withdrawn.
 2           Can you describe to me, I
 3   guess, what the circle of excellence and
 4   president's club is?
 5       A.   Circle of excellence club is
 6   a reward trip for the top -- I believe
 7   it's the top ten sales representatives
 8   from a performance perspective.  They
 9   were -- they received an award trip
10   annually.
11       Q.   And do you recall if Reshma
12   received or was honored in the circle of
13   excellence during the course of her
14   employment at Pacira?
15       A.   She was.
16       Q.   Do you know if she was
17   honored in that regard in each year that
18   she was employed there?
19       A.   I don't recall if it was
20   each year.  I know -- I believe it was
21   more than once.
22       Q.   Did Pacira -- during the
23   time that you were employed with Pacira,
24   did Pacira maintain any kind of leader
```

Page 23

```
 1   board, whether it's on a quarterly basis
 2   or an annual basis, reporting on the
 3   various results of either sales of units
 4   or growth of regions with respect to
 5   various sales reps?
 6       A.   Yes, there was a circle of
 7   excellence update that went out to the
 8   field that showed where the individual
 9   sales reps, or surgical account
10   specialists, where they sat during that
11   particular time of year, when it went
12   out.  I don't recall how often it went
13   out though.
14       Q.   And again, you would
15   say just -- I don't want to
16   mischaracterize your testimony, but
17   Reshma was among the tops on that leader
18   board; is that correct?
19       A.   Depending on the year, yes.
20       Q.   Did there ever come a point
21   in time where Reshma was nominated for a
22   promotion from -- or withdrawn.
23           Do you know what position
24   Reshma was initially hired in at?
```

Page 24

```
 1       A.   Surgical account specialist.
 2       Q.   And did there ever come a
 3   point in time where she was nominated for
 4   a promotion to the senior surgical
 5   account specialist position?
 6       A.   I don't recall specifically
 7   with her.
 8       Q.   Do you know if she ever
 9   received a promotion to senior surgical
10   account specialist?
11       A.   I believe she did, but I
12   don't know if it was under my direct --
13   if I was at the northeast regional
14   manager position at the time.
15       Q.   Other than the promotion
16   from surgical account specialist to
17   senior surgical account specialist, do
18   you know if Reshma was ever nominated for
19   any other positions?
20       A.   Not to my knowledge.
21       Q.   Are you aware of any
22   discussions concerning any development
23   programs for Reshma?
24       A.   Yes, Glenn Reiser, I
```

Page 25

```
 1   believe, when he became the area sales
 2   director, was working on a development
 3   program, development project -- I don't
 4   know the exact definition of it, or at
 5   least title of it -- development plan,
 6   development program for Reshma.
 7       Q.   And what did that program
 8   consist of?
 9       A.   Reshma proposed that she
10   would work outside of her immediate
11   territory to help colleagues expand their
12   anesthesia business and kind of teach
13   them how to be successful in the
14   anesthesia space, anesthesia market.
15       Q.   How was that proposal
16   received?
17       A.   I thought it was a good
18   idea.
19       Q.   And did it ultimately go --
20   did that proposal move forward?
21       A.   I'm not sure I understand
22   your question.
23       Q.   Well, what came of that
24   proposal?  Was there then -- was that the
```



Page 26

1  genesis that started the program, the
2  development program that Glenn was
3  working on with Reshma?
4       A.   Yes, I think she ultimately
5  went to Glenn with the idea, and he spoke
6  to me regarding it.  I don't recall if I
7  had a specific conversation at that time
8  with Reshma and Glenn.  But Reshma
9  proposed that she would start to do this
10 to see if -- kind of a proof of concept
11 idea to see if it would have an impact.
12 And that's it.
13      Q.   Would that proof of concept
14 be called a pilot program?
15      A.   That's another way to
16 characterize it, yes.
17      Q.   And did the pilot program --
18 what was the outcome of the pilot
19 program?
20           MR. PANZINI:  Object to
21      form.  Go ahead, you can answer.
22           THE WITNESS:  Could you
23      repeat that?
24 BY MR. STEWART:
MAGNA LEGAL SERVICES

Page 27

1       Q.   Sure.  The question was, you
2  know, what became of the pilot program?
3       A.   She worked with individuals,
4  colleagues, other surgical account
5  specialists.  To the best of my
6  recollection, it was in the surrounding
7  geographic areas to limit the travel
8  expenditure of her potentially, you know,
9  flying to the other coast, or things that
10 have nature from an expense perspective,
11 since it was a proof of concept pilot.
12 So I knew she did work with a couple of
13 individuals, I believe, in the northeast
14 and in the region, I believe it was
15 called, the mid-Atlantic area on
16 occasion.
17      Q.   Did the pilot program prove
18 to be successful?
19      A.   In certain areas, yes.
20      Q.   In which areas was the
21 program successful?
22      A.   To the best of my
23 recollection, I believe in the
24 Washington, DC area market.  But I don't
MAGNA LEGAL SERVICES

Page 28

1  specifically recall where else it was, to
2  use your term, successful.
3       Q.   Did there come a point in
4  the time where the pilot program came to
5  an end?
6       A.   I don't recall.
7       Q.   Was the pilot program
8  continuing on a forward basis from the
9  time Reshma was terminated?
10      A.   I believe it was.  You know,
11 Glenn was more involved with running kind
12 of the day-to-day pilot program than I
13 was.
14      Q.   Are you aware of there being
15 any discussions about the pilot program
16 evolving into a permanent role for
17 Reshma?
18      A.   Yes.
19      Q.   And what was the nature of
20 those discussions?
21      A.   Well, that was the genesis
22 around doing the pilot program -- I'll
23 just call it pilot program moving
24 forward -- was that her intention was to
MAGNA LEGAL SERVICES

Page 29

1  demonstrate that there was a need and
2  that this would be ultimately successful.
3  And if she could prove out that it indeed
4  was successful, that she -- her idea or
5  her proposal would be that she would be
6  promoted to, I believe, a director role,
7  where she would identify individuals in
8  the sales team that were also successful
9  in the anesthesia space or market.  And
10 that they would replicate what she was
11 doing during the pilot program in their
12 respective, I don't recall if it was
13 specific to their regions or if it was
14 specific to individuals that she would
15 identify to work -- that they would work
16 with on the sales team.
17      Q.   Was there a timeline for the
18 anticipated promotion into that director
19 role?
20      A.   I don't recall if there was
21 a specific timeline.  I believe -- I
22 don't recall when it actually started,
23 what time of years it started.  But I
24 think we were hoping to look at it for I
MAGNA LEGAL SERVICES



Page 126

```
 1   no concrete agreement, other than we
 2   would do a three- to six -- six-month
 3   plan.  I do know that we got -- or I got
 4   delayed, we got delayed in kind of
 5   presenting the plan, you know, for
 6   ultimate approval up to the executive
 7   team towards the end of the year.  So I
 8   think it definitely dragged -- you know,
 9   it took longer than we hoped for, or I
10   hoped for.  I know Reshma hoped for and
11   Glenn hoped for as far as getting -- you
12   know, understanding if it was working,
13   getting feedback from the reps, you know,
14   and then ultimately trying to get an
15   audience, you know, for approval from --
16   you know, from the executive group.
17        Q.   And so, that approval would
18   have been the approval necessary in order
19   for Reshma to assume the promotion and
20   title to the role of director of post-op
21   pain management?
22        A.   Correct.
23        Q.   And when you say the
24   executive team, is it one individual in
```

MAGNA LEGAL SERVICES

Page 127

```
 1   particular or was it multiple members of
 2   the executive team that a sign off or
 3   approval was still needed?
 4        A.   It was ultimately the CEO
 5   would have had to sign off on it, but we
 6   would have also had to get -- you know,
 7   but once that occurred, we would have had
 8   to, you know, work with human resources,
 9   you know, create a new position.  It
10   wasn't like she was moving into, you
11   know, an already listed position or
12   whatever you call it, as far as, you
13   know, it being a current job.  And then I
14   think probably legal as well, just to
15   make sure that it was -- you know, it was
16   also that it was a compliant position.
17   But Dave was ultimate -- David stack,
18   CEO, was the ultimate person I would have
19   had to -- I had to have gotten a sign off
20   from in order to create the position.
21        Q.   So was Dave Stack made aware
22   of the pilot program itself when it was
23   commenced or at some point during its
24   existence?
```

MAGNA LEGAL SERVICES

Page 128

```
 1        A.   I believe Dave became aware
 2   of it during -- at some point during the
 3   -- Dave became aware of what Reshma was
 4   doing.  Dave was not ultimately aware
 5   that she was seeking a, you know,
 6   promotionary role or we were going to,
 7   you know, put forth a plan for the new
 8   position in this kind of anesthesia team
 9   type thing, which Reshma had proposed.
10   But he was aware -- he was made aware
11   that she was working outside of her
12   territory helping others in the
13   anesthesia space.
14               - - -
15          (Whereupon, Exhibit
16        Plaintiff-19 was marked for
17        identification.)
18               - - -
19   BY MR. STEWART:
20        Q.   I'd like to show you what
21   we'll mark as Plaintiffs-19.
22          MR. PANZINI:  What's the
23        Bates on that, Jason?
24          MR. STEWART:  Pacira 001213.
```

MAGNA LEGAL SERVICES

Page 129

```
 1          MR. PANZINI:  1213.  It's
 2        just the one page, right?
 3          MR. STEWART:  This is a
 4        single page document, yes.
 5          MR. PANZINI:  Okay.
 6          THE WITNESS:  Yep, okay.
 7   BY MR. STEWART:
 8        Q.   And do you recognize this
 9   document that's been marked as
10   Plaintiffs-19?
11        A.   Yes.
12        Q.   What do you recognize
13   Plaintiffs-19 to be?
14        A.   It's an e-mail from -- a
15   response e-mail from myself to Matt
16   Lehmann, who was chief commercial
17   officer, I believe, or VP of marketing, I
18   don't remember what his title was at the
19   time.  No, it was VP of marketing.  With
20   a copy of Glenn Reiser around
21   clarification around TAP clarification.
22        Q.   And this was pertaining
23   to -- when they say TAP, are they -- TAP,
24   does that refer to Reshma's pilot
```

MAGNA LEGAL SERVICES

MAGNA
LEGAL SERVICES

Page 146

1      Q.   Do you recall when you
2  arrived, what date or what time you
3  arrived into Florida for that meeting?
4      A.   I don't know the specific
5  day, but it was definitely a day,
6  potentially two, prior to the meeting
7  officially starting.
8      Q.   And do recall when Reshma
9  arrived to that 2018 national sales
10  meeting?
11      A.   I believe she arrived on --
12  at some point just prior to the welcome
13  dinner on the 11th.
14      Q.   And when she arrived on the
15  11th, did there come an occasion where
16  you met with her in person along with
17  Glenn Reiser before the welcome dinner?
18      A.   Yes.
19      Q.   Where did that meeting take
20  place?
21      A.   The meeting took place at
22  her demand at the -- in the lobby of the
23  hotel shortly after she checked in at the
24  front desk.

Page 147

1      Q.   And what was discussed
2  during that meeting?
3      A.   She demanded a meeting for
4  Glenn and I to come down and speak to
5  her, you know, really as soon as
6  possible, right away, down in the lobby.
7  We met in the lobby area at a table.  She
8  came over to us with her luggage.  She
9  sat down, and she wanted to discuss the
10  plan to roll out the -- get in front of
11  Dave Stack to present her -- you know,
12  the pilot program, her business plan for
13  the position that we were trying to get
14  for her, the director of post-op pain, I
15  think it was called.
16      So we -- I'm sorry, did you
17  ask when that meeting took place and the
18  discussion around it?
19      Q.   Yes, exactly.
20      A.   Yes.  So she asked, you
21  know, when exactly were we going to meet
22  with Dave, you know, what's the plan.
23  And we reviewed the business plan that I
24  had already reviewed with her in person,

Page 148

1  and we made sure everything was good.
2  And we told her to have -- you know, have
3  her iPad on her or computer, so that if
4  we, you know, would find a good time but
5  also be prepared that we might have to --
6  you know, if we don't get a formal
7  sitdown, we might have to, you know, grab
8  Dave either in the hallway or at some
9  point and sit down with him and request
10  some time with him, which was not out of
11  the norm at those meetings, to present --
12  formally present the plan to him to get
13  sign off on it.
14      And then we all agreed that
15  that was a good plan.  And that we would
16  be opportunistic, and to get with him at
17  some point during the meeting, and that I
18  would also look and try to set up more of
19  a formal get together.  But be prepared
20  to do it on the fly, you know, duck into
21  a conference room or something, or step
22  out of a breakout, if I could get him,
23  you know, for ten minutes, half an hour.
24      And then as we wrapped up

Page 149

1  the meeting, we all agreed that that was
2  going to -- that we all would be ready,
3  and the last thing that, you know, I
4  communicated to Reshma, and Glenn did as
5  well, was we said, look, this your -- you
6  know, you're asking for a promotion,
7  you're asking for a leadership position,
8  you know, you've certainly improved and,
9  you know, the pilot program seems to be
10  going well from all accounts, but these
11  meetings are not where you do well.  You
12  historically misbehave, you historically
13  drink too much, and you historically have
14  some type of an HR issue at these
15  meetings.
16      So you need to do everything
17  you can to demonstrate and show that you
18  are a leader, and you are capable of
19  staying out of the fray, staying out of
20  the bar, staying out of misbehaving,
21  because you're now asking to be a leader
22  of the company.  And, you know, Glenn
23  went as far to say, if you feel like you
24  know, you're having a hard time

Page 150

```
1    controlling yourself, you're having a
2    hard time, you know, or someone is
3    getting under your skin, or if something
4    is not going well, you know, call me, we
5    can just, you know, grab five minutes and
6    talk through it.  But, you know, this is
7    it.
8           This is your -- you know,
9    this is your opportunity to change your
10   behavior from years past.  Pay attention
11   in the breakouts.  Be a leader in the
12   breakouts.  Don't get yourself in
13   trouble, don't drink, and don't get in
14   fights, and that'll set you up for, you
15   know, a very good potential of, you know,
16   sitting down with Dave.
17          And we gave her that advice
18   extremely sternly and extremely --
19   extremely caring, because we all invested
20   a lot of time in the pilot and in her,
21   for that matter.  And, you know, that was
22   our one ask, was that she conduct herself
23   as a leader and not get -- you know, not
24   behave the way she had in the past.  So
```

Page 151

```
1    we all agreed on that and we all went our
2    own separate ways.
3           Q.   From that point forward,
4    were there any -- withdrawn.
5           Moving forward into the
6    meeting, were there any issues reported
7    to you during the first day of the
8    national sales meeting concerning Reshma?
9           A.   I don't believe so.  I don't
10   recall.  I don't believe so.
11          Q.   And just turning your
12   attention to the agenda here, and the
13   date indicate, Tuesday, February 13th of
14   2018.  Listed on the agenda there's a
15   number of items there:  Breakfast,
16   meetings, lunch, meetings, night on own,
17   and women in leadership event.
18          What do you understand night
19   on own to mean in the context of this
20   document?
21          A.   You didn't have any Pacira
22   responsibility or required events, you
23   could sit in your hotel room, or you
24   could get dinner on your own, or you
```

Page 152

```
1    could get dinner with a group of friends,
2    get dinner with whoever you wanted to,
3    but there was no required events for you
4    to go to.
5           Q.   And what was the women
6    leadership event?
7           A.   Women leadership event was
8    an event hosted by Kristen Williams, who
9    is the chief administrative officer of
10   the company.  I believe this might have
11   been the second or third type of event
12   that she hosted, and she generally had a
13   kind of a keynote speaker.  I don't know
14   if this was a dinner event or if it was a
15   cocktail event.  But it was an
16   opportunity for females in the company to
17   gather and to listen to -- it actually --
18   yeah, it was an event for females in the
19   company to gather together.  And again, I
20   don't know if there was a speaker or if
21   it was just a cocktail hour, I don't
22   know.
23          Q.   Do you understand that this
24   event was explicit for female Pacira
```

Page 153

```
1    employees?
2           A.   I don't know if this
3    particular one was exclusive.  I have
4    attended one.  I did attend one in my
5    tenure at Pacira, but I don't know if
6    this -- I did not attend this one, and I
7    don't know if this was a female-only
8    event.
9           Q.   You had mentioned that you
10   believe there might have been prior
11   women-in-leadership-type events
12   coordinated by Kristen Williams.  When
13   would those have occurred, at prior sales
14   meetings or some other occasion?
15          A.   I believe at the national
16   sales meetings or the mid-year meetings.
17   There may have been.  Or that might have
18   been the first one.  I don't -- I believe
19   this was not the first one, but I could
20   be wrong.
21          Q.   Could there have been
22   subsequent ones in the years that
23   followed?
24          A.   Correct, yes.
```

1      Q.   And did you know that -- did
2   you understand the women in leadership
3   event to be a mandatory event, an
4   optional event or something else?
5      A.   Optional.
6      Q.   Was it an event which the
7   individuals were invited to?
8      A.   Yes.
9      Q.   Do you know if Reshma
10  declined the invitation to that event?
11     A.   I don't know.
12     Q.   Did she have any discussions
13  with you about whether or not the event
14  was optional or mandatory?
15     A.   I don't know if we had a
16  conversation before or after the event.
17  And it might have been at a different
18  meeting.  But I know she indicated to me
19  at some point that she was not going to
20  go a women's only event, didn't see the
21  value in it.
22     Q.   And from your standpoint,
23  was that problematic in any way?
24     A.   No, I didn't care.

1      Q.   Were you in any way involved
2   in planning the women's leadership event?
3      A.   No.
4      Q.   Did anyone discuss the
5   women's leadership meeting with you
6   before it took place?
7      A.   I don't believe so.
8      Q.   Did anyone discuss the
9   women's leadership meeting with you after
10  it took place?
11     A.   I think there were -- I
12  believe there were individuals.  I don't
13  recall who, but I believe I asked a
14  couple individuals how it was and what
15  was it like.  You know, was there a
16  speaker?  What did you guys do?  What did
17  you talk about?  Just general questions.
18     Q.   Do you have a recollection
19  of any of the feedback you might have
20  received?
21     A.   I believe there were some
22  that enjoyed it.  I believe there were
23  some that could have
24  take-it-or-leave-it-type opinions.

1      Q.   Did there come a point in
2   time when you learned about a scheduled
3   Topgolf event that was scheduled to take
4   place on Tuesday, February 13th of 2018?
5      A.   Yes, I believe I -- I
6   believe I was invited by Geo Van
7   Dellomini [ph], who was a regional
8   manager at the time.  I think he invited
9   me to go join his team, and I believe he
10  -- I believe the initial conversation
11  was, was it okay to do, and would I like
12  to join them.  And I said I would not be
13  able to join them, but certainly if they
14  want to do a team building event, that's
15  encouraged.
16     Q.   Did you understand that
17  event to be specific to any particular
18  region?
19     A.   I don't know if it was -- I
20  know it was his region, and I know it was
21  another region, I don't remember -- I
22  think it might have been Rob Rock's
23  region.  I don't recall specifically, but
24  I didn't -- you know, at the time I

1   didn't get too involved in the -- you
2   know, that was more Glenn's area as sales
3   directors purview to, you know, kind of
4   understand that people were doing things
5   on a regional basis, you know, who was
6   doing what.  I wasn't -- it wasn't fair
7   for me to attend one region's event and
8   not anothers.  So I just simply removed
9   myself from those events, and just was
10  visible during the general sessions.
11     Q.   Prior to the event, the
12  Topgolf event, were you aware of any of
13  the details of the event other than what
14  you've already spoken about?
15     A.   Not that I recall.
16     Q.   Do you know the number of
17  participants that were invited?
18     A.   No.
19     Q.   Did you understand the
20  business purpose of the Topgolf event to
21  generally be a team building event?
22     A.   Yes.
23     Q.   And it was Geo Van Dellomini
24  who planned the event?

1        MR. PANZINI:  Object to
2    form.
3        THE WITNESS:  I don't know
4    if it was him.  I believe he shot
5    me either an e-mail or phone call
6    asking me if it was okay that they
7    did a regional activity.
8    BY MR. STEWART:
9        Q.   And previously you testified
10   that you had authorized that, correct?
11       A.   Correct.
12       Q.   At some point in time did
13   you come to learn about an occurrence
14   that transpired between Reshma and Rob
15   Rock at that Topgolf event?
16       A.   Yes.  The next day there was
17   a -- Glenn Reiser had informed me that
18   there was an altercation, verbal
19   altercation, between Reshma and Rob Rock
20   about her attendance at the event.  And
21   that there was -- yeah, that there had
22   been a verbal altercation, a fight,
23   between the two of them at the event.
24       Q.   And you were made aware of

1    this by Glenn?
2        A.   I believe it was Glenn.  I
3    believe also -- I think Rob may have
4    texted me, but I don't specifically
5    recall.
6        Q.   And what was it that you
7    were -- or withdrawn.
8        Do you recall any of the
9    details that were conveyed to you
10   concerning this altercation?
11       A.   In the beginning Glenn had
12   communicated to me that there was an
13   altercation and that there was a fight
14   between her and Rob Rock at the Topgolf.
15   And that there was also an issue that
16   Reshma had come back and was, you know,
17   visibly upset at the bar area of the
18   hotel, and that dinner was -- I believe
19   an issue where there was a conversation
20   between Reshma and one of the marketing
21   people, who I think was trying to console
22   her.  And then, you know, we -- Glenn
23   had, I think, called human resources to
24   let them know this transpired.  And, you

1    know, Glenn was going to work with human
2    resources to, you know, communicate what
3    he thought had happen and human resources
4    was going to go, I guess, investigate the
5    circumstances around it.
6        Q.   Did you come -- did you
7    become involved in that investigation --
8    withdrawn.
9        Did you come to learn that
10   HR commenced an investigation in relation
11   to this incident?
12       A.   Yes.
13       Q.   Were you in any way involved
14   in that investigation?
15       A.   Not in that I was asking
16   people questions, more around I was kept
17   abreast of that Glenn was connecting the
18   dots of, you know, who was there, who
19   witnessed things.  He kept me abreast of
20   who was -- you know, had visibility to
21   it, who was involved.  And then I believe
22   he was communicating that to human
23   resources, so they could conduct their
24   investigation.

1        Q.   So was Glenn more hands-on
2    in terms of factfinding than you were
3    with respect to the occurrence?
4        A.   I don't -- well, I guess
5    factfinding from who was there, and
6    probably who was -- you know, what
7    transpired.  But more on the
8    investigation around -- yeah, more on
9    communicating to HR who was -- who was
10   witness to the events or party to the
11   events.
12       Q.   Did you ever come to learn
13   the specific details of, for example,
14   what was said between Rob Rock and Reshma
15   at the event?
16       A.   I had learned that -- or I
17   had understood that -- that Rob made a
18   comment or questioned why she was there.
19   That this was a regional type event, and
20   I think he made a comment -- again, this
21   is from what I heard -- about why she
22   wasn't at the women's only event, and
23   that's when things -- I believe things
24   got heated.  But I don't know once things

Page 174

1  promoted to, had you obtained the sign
2  off from the CEO?
3          MR. PANZINI:  Objection.
4          THE WITNESS:  That's our
5      idea, yeah.
6  BY MR. STEWART:
7      Q.   Was there any chance that
8  the position would have been announced at
9  the national sales meeting if the CEO has
10  given his approval?
11     A.   I don't know.  Potentially.
12     Q.   Would that have been a
13  decision for Dave Stack to make?
14     A.   Not necessarily.
15     Q.   Who would -- who could have
16  or who would have had the authority to
17  make that decision?
18     A.   To announce the position?
19     Q.   Yes.
20     A.   I could have made that
21  decision ultimately.
22     Q.   Were you ever able to gain
23  an audience with Dave Stack to discuss
24  the post -- director of post-op pain

MAGNA LEGAL SERVICES

Page 175

1  management position?
2      A.   No.
3      Q.   Why not?
4      A.   Because we had targeted the
5  national sales meeting to do it, that's
6  why we had the meeting with Reshma.  She
7  had the meeting.  You know, we sat down
8  the first night of the meeting or the
9  first afternoon of the meeting.  But then
10  the altercation occurred with Rob Rock,
11  and all of the events subsequent to that,
12  so that was the last thing I was going to
13  propose to Dave.
14          MR. STEWART:  If we don't
15      mind a quick break?
16              - - -
17          (Whereupon, a discussion was
18      held off the record.)
19              - - -
20          (Whereupon, Exhibit
21      Plaintiff-22 was marked for
22      identification.)
23              - - -
24  BY MR. STEWART:

MAGNA LEGAL SERVICES

Page 176

1      Q.   Mr. Murphy, I'd like to show
2  you what we're going to mark as
3  Plaintiffs-22.  This is a series of a
4  six-page document beginning Pacira 1236
5  through 1242.  And I'm going to draw your
6  -- I'll allow you to scroll through the
7  whole thing and read through it as you
8  like.  But before you do that, I want to
9  draw your attention to the portion where
10  I'll be asking you questions about.
11  There's an indication here at the bottom
12  of 1238, and additionally there's an
13  indication here up at the top of that
14  same page.
15          So just to kind of point you
16  in the right direction, I'll be happy to
17  scroll through it.  Just let me know.
18     A.   Can you --
19     Q.   Zoom in?
20     A.   No.  Is the order of this --
21     Q.   From the bottom up is
22  probably a more appropriate way to read
23  it, if you want to follow the chronology.
24     A.   Yes, if you don't mind.

MAGNA LEGAL SERVICES

Page 177

1      Q.   Not a problem.
2      A.   Okay.  Okay.  Okay.  Okay.
3  Okay.
4      Q.   And I'll represent to you,
5  portions of this is redundant, but I'll
6  scroll through and just let me know as
7  you move up.
8      A.   Okay.  Okay.  I think you
9  went through these, right.  Okay.
10     Q.   Yes, some of it is the same.
11     A.   Yep, okay.
12     Q.   The only thing different is
13  at the top here.
14     A.   Okay.
15     Q.   So do you recognize what has
16  been marked here as Plaintiffs-22?
17     A.   Yes.
18     Q.   And what do you recognize
19  this document to be?
20     A.   It was an e-mail exchange
21  between myself and Rob, and then it looks
22  like Rob and Glenn.
23     Q.   And so, just first drawing
24  your attention to the section at the very

MAGNA LEGAL SERVICES

Page 194

1    regarding the events.  I don't know if
2    that was before or after I sat down with
3    Rob though.  But I know I had a sit down
4    with Reshma and Glenn as well.
5        Q.    And what did you takeaway
6    from your conversation with Pat Nolan
7    regarding the events that transpired at
8    the Topgolf event?
9        A.    Nothing specific other than
10   he witnessed a, you know, heated
11   altercation verbally between the two of
12   them.  He didn't -- he couldn't hear the
13   content, other than he could tell that
14   there was a verbal exchange and that it
15   was heated, emotional and something had
16   happened.
17       Q.    And what about after your
18   conversation with Reshma, did you have
19   any takeaways concerning what transpired?
20       A.    She communicated, to the
21   best of my recollection, that Rob did not
22   welcome her to the event, and thought
23   that it was, you know, a regional event
24   only.  And that she was not included, nor

MAGNA LEGAL SERVICES

Page 195

1    invited.  And that she should have gone
2    to the women's in surgery event and not
3    been at their event.  And she was not
4    invited.  That it was capped.  There were
5    reservations made.  She never asked to be
6    invited.  And that's what Rob had
7    communicated to her, basically that she
8    was not welcomed at the event.
9        Q.    And what about after your
10   conversation with Glenn, did you form any
11   impressions about what occurred after
12   speaking with Glenn?
13       A.    No, because Glenn didn't
14   realize what was going on, what had
15   transpired either.  Glenn and I met with
16   Reshma together, so, you know, there was
17   no -- you know, there was no discussion
18   one way or the other of was somebody
19   telling the truth, not telling the truth.
20       Q.    Where did the conversation
21   with you, Glenn and Reshma take place?
22   Did that also take place at the hotel?
23       A.    It took place at the hotel
24   in one of the vacant breakout rooms next

MAGNA LEGAL SERVICES

Page 196

1    to the lobby.
2        Q.    And how long did that
3    conversation last?
4        A.    About -- to my recollection,
5    about 30 minutes, 45 minutes maybe.
6        Q.    Following those
7    conversations that you had with Reshma,
8    Rob and Pat Nolan, did you communicate
9    back to anyone within Pacira regarding
10   the occurrences?
11       A.    I know Glenn -- I know we
12   communicated with Rich Kahr about our
13   conversations with them, with both Rob
14   and Reshma.  As well as communicated to
15   him people that we had learned were also
16   witnesses to the altercation or issue.
17       Q.    Did you learn the name of
18   any other witnesses aside from Patrick
19   Nolan?
20       A.    I believe Ken Wolf was
21   named, and then I believe Sharon
22   McCarroll, who was in marketing, I
23   believe she and Reshma spoke to one
24   another after the altercation, when

MAGNA LEGAL SERVICES

Page 197

1    Reshma came back to the hotel and was
2    visibly upset.  I believe Sharon, you
3    know, pulled her aside to try and console
4    her and try to figure out what was going
5    on.  To the best of my recollection, I
6    think that transpired.
7        Q.    Once you spoke with Rich
8    Kahr, did you effectively handoff the
9    situation to HR or did you continue to
10   remain involved in the process?
11       MR. PANZINI:  Object to
12   form.  Go ahead.
13       THE WITNESS:  I remained --
14   well, we handed it off to Rich
15   Kahr, but he communicated that if
16   we had learned anything -- if we
17   did learn anything or any more
18   people during the event -- during,
19   you know, the next day or two,
20   please, you know, forward those
21   names on to him, which we did.  I
22   believe Roxanne Doherty was
23   someone we spoke to later on in
24   the day.

MAGNA LEGAL SERVICES

# EXHIBIT 6

# Sales Leadership – February 2018



PACIRA - 000104

# East Area Regions – February 2018



PACIRA - 000108

## East Area Regions – February 2018



PACIRA - 000109

# West Area Regions – February 2018



PACIRA - 000110

# EXHIBIT 7

Page 10

1  A.  Yes.  Mainly, it was a top-down approach to
2     customers.  Whereas, the bottom up would be account
3     managers like Reshma and working with surgeons and
4     anesthesiologists, my role tried to get to the
5     C-suites of hospitals and -- and systems to work
6     from a top-down approach with administration.
7  Q.  And what was the interplay between you as national
8     accounts director and Reshma as the surgical
9     account specialist?  Would she introduce you to
10    individuals?  Would she ride along with you to
11    hospitals?  Or something else?
12         MR. PANZINI:  Object to form.
13         Go ahead.
14  A.  We would -- a lot of -- a lot of that.  It was her
15     helping me gain access to folks that could get us
16     up to the C-suites, or if she had contacts directly
17     with administrators, putting us -- using that as an
18     introduction.
19  Q.  And as regional sales director, what was the nature
20     of the relationship between you and Reshma Abell?
21  A.  She was one of the reps that I worked with.  So at
22     that point, it was a direct relationship; she
23     reported to me.
24  Q.  And so she reported directly to you in her role as
25     surgical account specialist in your role as

Page 11

1     regional sales director?
2  A.  Correct.
3  Q.  In the course of that -- what was the duties and
4     responsibilities of a regional sales director?
5  A.  Was to work with the teams to receive sales goals
6     and coach and develop them.
7  Q.  As the national account director, how frequently
8     would you interface with Reshma?  Would you --
9  A.  It depends.  No set kind of frequency, but where
10     the business dictated it, then we would.
11  Q.  And how about as a regional sales director?
12  A.  That was more frequently.
13  Q.  Can you describe to me the duties and
14     responsibilities of an area sales director?
15  A.  Yes.  Similarly, but at a different level.  At that
16     point, the company split in half, east and west.
17     So I ran the eastern half of the country from a
18     sales perspective and worked with managers in a
19     similar fashion to receive sales goals and coach
20     and develop them and their team.
21  Q.  And in your position as the area -- the East area
22     sales director, did you supervise or oversee
23     Reshma?
24  A.  I'm sorry.  East area sales director?
25  Q.  Yes.

Page 12

1  A.  Okay.  So she had a manager that she directly
2     reported to.  But ultimately, you're still, from a
3     hierarchy standpoint, over the manager who she
4     reports to, as well.  So not a direct reporting in
5     to me, but through -- through a -- a front-line
6     manager.
7  Q.  Understood.  And who was that front-line manager?
8  A.  Roxanne Doherty.
9  Q.  And through your tenure at Pacira, did you form an
10     impression about Reshma Abell as an employee?
11  A.  Can you -- in what -- in what sense?
12  Q.  Can you speak to Reshma -- was Reshma a strong
13     performing employee as a surgical account
14     specialist?
15         MR. PANZINI:  Object to form.
16  A.  From a --
17         MR. PANZINI:  You can answer.  Just also, let
18     me -- Glenn, from time to time, I'm going to say
19     something called "Object to form."  I'm just
20     objecting to the form of the question.  You can go
21     ahead and answer it unless I specifically say to
22     you "Don't answer it," if it's a privilege issue or
23     something like that.  But 99 out of 100 times, I'm
24     just going to say "Object to form," but go ahead
25     and answer.

Page 13

1         THE WITNESS:  No worries.  I'll try to pause
2     more.  I'll try to pause better, as well.
3         Can you repeat the question, Jason?
4  Q.  (BY MR. STEWART)  Sure.  Absolutely.  So I'll ask
5     it a little bit differently.
6         In terms of while Reshma was your direct
7     report, did you form any impressions about her
8     performance as a surgical account specialist?
9  A.  From a sales perspective, she was generally a high
10     performer.
11  Q.  What do you mean by that?
12  A.  She most often exceeded her -- her sales goals.
13     She was a good salesperson.
14  Q.  And did you have occasion to go on field rides with
15     Reshma?
16  A.  Yes.
17  Q.  And did you form any impressions about her skills
18     in front of clients during these field rides?
19  A.  Similarly, yes, from a -- from a sales perspective.
20  Q.  During any of these field rides, did you ever have
21     any reason to believe that Reshma was acting
22     unprofessionally in front of clients?
23  A.  Not necessarily.  Well, to varying degrees, at
24     times she could be confrontational, what I observed
25     as confrontational with customers.



Page 26

1  specialist.
2  Q.  Presently you don't recall when that promotion
3      occurred?
4  A.  I do not.
5  Q.  Do you know if Reshma was nominated for promotion
6      on more than one occasion?
7  A.  I don't recall.
8  Q.  Let me show you what we'll be marking as
9      Plaintiff's 27.  Please just let me know when
10     you've had an opportunity to review this document
11     in full.  It is a single-page document,
12     Pacira-1005.
13 A.  Yes.
14 Q.  Have you had an opportunity to review in its
15     entirety what's been marked as Plaintiff's 27?
16 A.  Yes, I have.
17 Q.  And do you recognize the document that's marked as
18     Plaintiff's 27?
19 A.  I do.
20 Q.  What do you recognize that document to be?
21 A.  It's informing Reshma of a merit increase and a
22     promotion.
23 Q.  And does this refresh your recollection as to when
24     Reshma was promoted from surgical account
25     specialist to senior surgical account specialist?

Page 27

1  A.  Yes, it does.
2  Q.  And so when would the promotion have taken place?
3  A.  It was based on -- having read this now, it was
4      based -- it would have been based on 2016.  The
5      promotion went into effect 2017.
6  Q.  And Plaintiff's 27, is this a true and accurate
7      representation of the e-mail correspondence between
8      yourself and Reshma Abell on February 16th of 2017?
9  A.  Yes.
10 Q.  I'd like to draw your attention to the portion of
11     this document where it indicates "Attachments" and
12     then it says "Abell, Reshma_2016 Comp
13     Statement.pdf."  Do you see that?
14 A.  Yes.
15 Q.  Can you describe to me what that attachment would
16     have contained?
17 A.  Yes.  That would contain her comp statement that
18     she was awarded based on 2016.
19 Q.  And can you describe the comp statement?  Is it a
20     single page?  Multiple pages?  Something else?
21 A.  It's typically a page.  And it goes through any
22     merit increase and/or promotion that's awarded.
23 Q.  Is that a document that's prepared by human
24     resources or some other department?
25 A.  I'm not sure of the department, but it's a

Page 28

1  different department other than sales that puts it
2      together.
3  Q.  Do you know who would have provided you with that
4      PDF to attach on this e-mail?
5  A.  This one came to me from Peter Murphy.
6  Q.  In what role would Peter Murphy have been serving
7      in February of 2017?
8  A.  He would have been area sales director of the East.
9  Q.  Can you describe to me the process by which the
10     promotion nomination -- how that works?
11 A.  Yes.  I would put in -- it's at a -- a regional
12     sales director level where you nominate someone for
13     a promotion that's based on criteria that he or she
14     meets.  And that's submitted through your boss; in
15     my case, this instance, for Reshma and through Pete
16     Murphy.
17 Q.  Understood.  And who would have had authority to
18     approve -- or withdrawn.
19     Who would have had to approve that nomination
20     in order for the promotion to take effect?
21 A.  It goes through various checks and balances that go
22     all the way up through the executive leadership
23     team.
24 Q.  When you say "executive leadership team," are there
25     certain individuals which comprise that team?

Page 29

1  A.  There are.  Generally speaking, it would have went
2      from me to Pete, through the VP of sales;
3      potentially chief commercial officer, if there was
4      one at the time; and ultimately, I believe, as far
5      as I know, CEO even has ultimate -- at least -- I
6      don't know if -- ultimate checkoff or he would have
7      seen all the -- all the nominations.
8  Q.  As you sit here today, do you recall the amount of
9      compensation that was attached to the promotion
10     that Reshma received in 2017?
11 A.  Not that I can recall.
12 Q.  Do you know if that promotion came with any other
13     variable compensation benefits in addition to an
14     increase in salary?
15 A.  It may have, but not that I can recall offhand.
16 Q.  Following that -- withdrawn.
17     Do you know if this -- the CEO for Pacira is
18     Dave Stack, correct?
19 A.  Yes.
20 Q.  And do you know if Dave Stack signed off on
21     Reshma's promotion in 2017?
22 A.  I do not know.
23 Q.  Had you had -- in or around February of 2017, had
24     you had any conversations with Dave Stack regarding
25     Reshma Abell?



Page 30

1    A.  I don't recall.
2    Q.  Do you have a recollection of Dave Stack ever
3        making commentary to the effect that he wished
4        there were more sales reps like Reshma on the
5        staff?
6    A.  Not that I can recall.
7    Q.  Do you recall ever being told that he wished that
8        you could recreate or replicate Reshma?
9    A.  Not that I can recall.
10   Q.  At some point in time, was there discussions
11       between yourself and Reshma concerning a pilot
12       program?
13   A.  Yes.
14   Q.  And how did those discussions arise?
15   A.  They were part of her development planning process.
16   Q.  Do you know when the notion of a pilot program was
17       first raised?
18   A.  I don't recall exactly, but it would be after that
19       2017 promotion.
20   Q.  Do you know how far after?  Would it have been very
21       close in time or -- or something else?
22   A.  I'm not sure exactly when, but it was kind of a
23       next step after she got promoted.
24   Q.  I'd like to show you what we're going to be marking
25       as Plaintiff's 28.  This is a single-page document,

Page 31

1        Pacira-1008.  I'll ask that you read through this
2        document in entirety and let us know when you've
3        done so.
4    A.  I'm sorry.  Can I bother you just to zoom in one
5        more time, please?
6    Q.  No problem.
7        MR. STEWART:  And off the record.
8        (Recess taken 11:00 a.m. to 11:05 a.m.)
9        MR. STEWART:  So we'll go back on the record.
10   Q.  (BY MR. STEWART)  Mr. Reiser, I've asked you to
11       take a look at what's been marked as
12       Plaintiff's 28, which is a single-page document
13       Bates stamped Pacira-1008.
14       Have you had an opportunity to review this
15       document in its entirety?
16   A.  Yes.
17   Q.  And do you recognize Plaintiff's 28?
18   A.  Yes.
19   Q.  What do you recognize Plaintiff's 28 as?
20   A.  Reshma's proposed pilot concept.
21   Q.  And does this document refresh your recollection as
22       to when Reshma first raised the proposal concerning
23       her pilot program?
24   A.  Yes.
25   Q.  And when was that pilot first raised?

Page 32

1    A.  If my memory serves me right, it was around this
2        time.  It is documented February 17th of 2017.
3    Q.  So we just took a look at Plaintiff's 27, which was
4        an e-mail dated February 16th of 2017 which spoke
5        to Reshma's promotion.
6        This document is -- Plaintiff's 28 is dated
7        February 17th, the following day, correct?
8    A.  Yes.
9    Q.  And contained within this e-mail -- well,
10       withdrawn.
11       The e-mail that's been marked as
12       Plaintiff's 28, that was from Reshma to Peter
13       Murphy and yourself, correct?
14   A.  You cut out there.  I think you said from Reshma to
15       me?
16   Q.  To Peter Murphy and yourself, correct?
17   A.  Yes.
18   Q.  And is Plaintiff's 28 a true and accurate
19       representation of that e-mail sent from Reshma to
20       Peter and yourself on February 17th, 2017?
21   A.  As far as I know, yes.
22   Q.  Within the e-mail, there's reference made to a
23       conversation that took place on February 6th in
24       Nashville.  Do you see that in the e-mail?
25   A.  Yes.

Page 33

1    Q.  What -- withdrawn.
2        Had a national sales meeting taken place in
3        Nashville in 2017?
4    A.  Yes.
5    Q.  And would you have had occasion to be present at
6        that national sales meeting in February of 2017?
7    A.  Yes.
8    Q.  Was Reshma also present at that meeting?
9    A.  Yes.
10   Q.  And to your knowledge, was Peter Murphy present at
11       that national sales meeting in Nashville?
12   A.  Yes.
13   Q.  And do you recall having a conversation with Reshma
14       in Nashville at the national sales meeting
15       concerning her pilot program?
16   A.  Yes.
17   Q.  And what was discussed at that time?
18   A.  Similar to what she had here; what she was
19       looking -- how she was looking to carry out the
20       pilot.
21   Q.  And in the course of the conversation, did you and
22       Pete support the proposed pilot program?
23   A.  We did.
24   Q.  How did the proposed pilot program develop from
25       this proposal that was sent on February 7th, 2017?



Page 34

```
 1       What came next?
 2   A.  Yeah, that's where my memory goes a little bit
 3       gray.  I forget exactly the chronological order of
 4       how things transpired there, because to get the
 5       pilot lifted, it was a matter of timing, but I just
 6       don't -- I don't remember exactly what the timing
 7       was.
 8   Q.  Well, taking the timing aside, do you know what the
 9       next step was taken by -- by you, Reshma, or Pete
10       to further the pilot program?
11   A.  I remember -- I remember we needed to have
12       discussions with leadership to gain their approval.
13       I just don't remember exactly what the time frame
14       was.
15   Q.  I just had a couple of questions about some of the
16       acronyms contained within this e-mail.  I'd like to
17       draw your attention to Plaintiff's 28 and the
18       paragraph that begins with "This idea came about."
19       And there's the acronym "KOLs" on the second line.
20       Do you see that?
21   A.  Yes.
22   Q.  What does "KOLs" stand for?
23   A.  Key opinion leaders.
24   Q.  And is that a term of art?  Is that a term that you
25       use within the industry?
```

Page 35

```
 1   A.  Yes.
 2   Q.  And what does that mean?
 3   A.  Those are customers that are influencers.
 4   Q.  In the world of pharmaceutical sales, are there
 5       certain customers that have, I guess, the effect of
 6       influencing other customers nationwide?
 7   A.  Generally speaking, these are well-respected
 8       within -- within their specialty.  These are folks
 9       that are thought leaders.
10   Q.  The acronym "NASA," also contained in
11       Plaintiff's 28, can you describe to us what that
12       means or what that abbreviation represents?
13   A.  It represents our national account team.
14   Q.  At some point in time did you -- withdrawn.
15          Did Pacira have a process by which they put
16       together development plans?
17   A.  Yes.
18   Q.  And what is a development plan within the context
19       of Pacira?
20   A.  It's a plan to develop skills necessary to further
21       someone's career, whether that's in their current
22       role and/or for potential of other roles.
23   Q.  Did you play any part in putting together a
24       development plan with respect to Reshma Abell?
25   A.  Yes.
```

Page 36

```
 1   Q.  What was your role in that process?
 2   A.  As her manager, it was to co-create her development
 3       plan with her.
 4   Q.  And do you have a recollection of drafting or
 5       putting together a development plan for Reshma?
 6   A.  That I can remember, I do.  Yes.
 7   Q.  And do you know approximately when that development
 8       plan first -- was first drafted?
 9   A.  Not -- not with a particular time stamp, but it's
10       something we generally do with all the employees.
11   Q.  And just to follow up on that, are development
12       plans put together for every employee within
13       Pacira, or is it only at certain intervals when an
14       employee -- when it seems appropriate for a given
15       employee?
16   A.  No.  It's -- it's part of their -- their annual --
17       it's connected to -- it runs -- it runs in line
18       with the performance review, there's also a
19       development plan.
20   Q.  Are development plans done every year?
21   A.  Yes.
22   Q.  I'd like to show you what we're going to be marking
23       as Plaintiff's 29.  It's a two-page document,
24       Pacira 1081 and 1082.  The same as before, just let
25       me know when you've had an opportunity to review.
```

Page 37

```
 1   A.  I did.
 2   Q.  And the second page now.
 3   A.  Okay.  I'm at the "Pilot" with the bullet.  Okay.
 4   Q.  Have you had an opportunity to read Plaintiff's 29
 5       in its entirety?
 6   A.  Yes.
 7   Q.  Do you recognize what is marked as Plaintiff's 29?
 8   A.  Yes.
 9   Q.  What do you recognize Plaintiff's 29 to be?
10   A.  An e-mail between Pete and I, Pete Murphy and I.
11   Q.  And the second page of this exhibit, is that the
12       attachment from that e-mail, which is labeled as
13       "2017 Development Plan.docx"?
14   A.  As far as I can tell, yes.
15   Q.  And is Plaintiff's 29 a true and accurate
16       representation of the e-mail exchange between
17       yourself and Peter Murphy from April 18th of 2017?
18   A.  Yes.
19   Q.  And is the second page of this exhibit,
20       Plaintiff's 29, a true and accurate representation
21       of the attachment to that e-mail?
22   A.  Yes.
23   Q.  Just drawing your attention to the second page of
24       the exhibit.  First, a couple of questions about
25       the abbreviation at the top where it says "ST
```



Page 38

1    Area."
2         What does that "ST" abbreviation stand for
3    there?
4    A.  The "ST" would be soft tissue.
5    Q.  And in the context of this development plan, what
6    does -- "ST," or soft tissue "Area/National
7    Expert," what does that mean?
8    A.  In the reference of this document, it's describing
9    kind of her role -- what her role would be.
10   Q.  And did you author any portion of this development
11   plan?
12   A.  What do you mean by -- by "author"?
13   Q.  I mean did you -- did you draft or type some of the
14   words that are contained in here?  Did you prepare
15   this document in its entirety?  Or something else?
16   A.  Most of it came from Reshma, but I -- I helped put
17   some of it together, yes, or package it.
18   Q.  And did you review this document before it was
19   forwarded on to Pete Murphy?
20   A.  Yes.
21   Q.  And were you in support of this development plan
22   when you sent it to Pete Murphy?
23   A.  Yes.
24   Q.  Can you describe what the -- what the goal was or
25   what the development plan sought to accomplish?

Page 39

1         MR. PANZINI:  Object to form.
2         Go ahead.
3    A.  Yes.  It's in context to a time within the company
4    where a lot of our business was in orthopedics, and
5    we were trying to transition or take on or develop
6    more business in what's labeled here, soft tissue
7    and anesthesiology.
8    Q.  And how was the pilot program supposed to have
9    worked?
10        MR. PANZINI:  Object to form.
11        Go ahead.
12   A.  As it's stated here, she was going to be a resource
13   to take best practices that she developed in soft
14   tissue and bring others along and work with them in
15   their territories to do so.
16   Q.  After the development plan was put together, what
17   was the next step in the process of moving the
18   pilot program forward?
19   A.  The next step was gaining the green light from --
20   from leadership.
21   Q.  And when you say "leadership," are there certain
22   individuals that you're referring to?
23   A.  If my memory serves me right, this was at the time
24   where there was a group of -- of folks that were
25   exploring different things we could do.  This was

Page 40

1    one -- one of those things.  So it would -- it
2    would be Pete's boss as a -- as a starting point.
3    Q.  And so where you just indicated that the next step
4    would have been to gain the approval of leadership,
5    would Pete Murphy have been the first person on
6    that leadership -- on the list of leaders that
7    would have had to approve this moving forward?
8    A.  Yes.
9    Q.  And then, after obtaining Pete's endorsement, were
10   there other individuals that also would have had
11   to, to use your words, green light it to move
12   forward?
13   A.  Yes.
14   Q.  And who else, aside from Pete Murphy, would have
15   had to give the green light for the pilot program
16   to go forward?
17   A.  If my memory serves me right, I think ultimately
18   this went to Dave Stack even.
19   Q.  And do you recall, did Dave Stack authorize the
20   pilot program to go forward?
21   A.  If my memory serves me right, I think we were
22   nearing that point.  We were getting there.
23   Q.  Did the pilot program ever move forward such that
24   Reshma performed some of the tasks described in
25   this development plan?

Page 41

1    A.  As far as I can remember, I do recall there was one
2    or two or a couple of -- of field rides that she
3    did to do a proof of concept for this pilot.  That
4    part, yes.
5    Q.  Was it the design of this development plan that
6    Reshma would ultimately receive a promotion into a
7    new position if the pilot succeeded?
8    A.  As far as I can recall, potentially, yes.
9    Q.  And what would -- that position which Reshma sought
10   the promotion to, what would have been the title of
11   that position?
12   A.  That, I don't recall.
13   Q.  Do you have a recollection of discussing the
14   position of a director of post-op pain management?
15   A.  Not that I can recall.  I don't remember
16   specifically speaking of a title.
17   Q.  What is -- within Pacira, what is the Ali Baba
18   group?
19   A.  That was the group by its reference of -- it was a
20   group of -- I believe it was around 30 people, give
21   or take, that were invited to the Ali Baba group,
22   which was to determine how to move things forward,
23   of which this was one particular item that came
24   about.
25   Q.  Were you a member of the Ali Baba group?



Page 86

1  business plan.
2  Q.  And so the top header of the e-mail is from Reshma
3    to herself, but it's a forward of an e-mail from
4    February 4th, 2018, correct?
5  A.  Yes.
6  Q.  And as an attachment to that e-mail, there is a
7    PowerPoint slideshow, correct?
8  A.  Yes.
9  Q.  And before today, had you ever seen that PowerPoint
10   slideshow?
11  A.  I believe Pete shared it with me.  Yes.
12  Q.  And when you say "Pete," you're referring to Pete
13   Murphy, correct?
14  A.  Sorry.  Yes, Pete Murphy.
15  Q.  And what was the context in which Pete shared this
16   slideshow with you?
17  A.  It was at this point within this pilot that they
18   were looking to put something together formally in
19   terms of a position opportunity.  And it was at
20   that point where I was -- not purposely, but I was
21   kind of out of the loop, and it was something that
22   Pete was working more directly with Reshma on.
23  Q.  In terms of the timeline, would -- would this be
24   consistent with the e-mail where it's indicated
25   February 4th of 2018?  Is that your recollection of

Page 87

1  when you would have viewed this slideshow
2    presentation?
3  A.  Yes.
4  Q.  And it would have been around that time where the
5    development of the pilot program -- your role had
6    then been less and Pete was taking more of the lead
7    on that; is that fair?
8  A.  That's fair, yes.
9  Q.  And does -- Plaintiff's 21, does this refresh your
10   recollection about whether or not the title of
11   director of post-op pain management had ever been
12   discussed concerning Reshma's position?
13  A.  Yeah.  I think in this instance, that's why, 'cause
14   at that point, I was still -- you know, Pete came
15   to me probably as a second set of eyes and ears,
16   but they were working more directly.  But, yeah,
17   that's why it wasn't a recollection at that time.
18  Q.  And do you know what, if anything, was needed in
19   order for the pilot program to take the next steps
20   to finalize and formalize that title?
21     MR. PANZINI:  Object to form.
22     Go ahead.
23  A.  I'm not totally sure, but I think that was
24   something Pete was working on with -- with other --
25   other departments and/or Dave.  I don't -- I don't

Page 88

1  know exactly.
2  Q.  From your vantage point, there was certain
3    approvals that were still needed from the
4    leadership team?
5  A.  Yes.
6  Q.  And that would have included Dave Stack and you're
7    not sure exactly who else?
8  A.  I'm not sure, yes.
9  Q.  Do you recall, was there a -- withdrawn.
10     Did Pacira host a national sales meeting in
11   2018?
12  A.  Yes.
13  Q.  Do you know where that national sales meeting was
14   held?
15  A.  I got confused when you mentioned Nashville
16   earlier, so I forget where the 2018 was.  Might
17   have been Florida.
18  Q.  And do you remember the dates on which that
19   national sales meeting in 2018 was held?
20  A.  I'd have to look it up.
21  Q.  I'd like to show you a document that we marked at a
22   prior deposition as Plaintiff's 20.  This is an
23   eight-page document Bates stamped beginning
24   Pacira-001546.
25  A.  Yes.

Page 89

1  Q.  Does this document refresh your recollection with
2    respect to where the 2018 national sales meeting
3    was held?
4  A.  It does.
5  Q.  And it was in Orlando, Florida, correct?
6  A.  Correct.
7  Q.  And that meeting was held between February 11th,
8    2015 -- withdrawn.
9     The meeting was held between February 11th
10   and February 15th of 2018, correct?
11  A.  Correct.
12  Q.  Were you physically present at that meeting?
13  A.  Yes.
14  Q.  And do you recall when you first arrived in Orlando
15   for that meeting?
16  A.  I believe, to the best of my recollection, I would
17   have arrived earlier than the 11th.  So probably
18   that -- that Saturday, the 10th.
19  Q.  Did you have any -- withdrawn.
20     Within the context of the national sales
21   meeting, did you have any duties or
22   responsibilities or roles that you had to fulfill?
23  A.  Yes.
24  Q.  And what were some of the -- what were some of
25   those responsibilities that you had for the meeting



Page 90

```
1    specifically?
2    A.  Different -- lead on different workshops.  There
3        might have been times that, you know, there's --
4        you do so many of these, you confuse them at times.
5        But might have been speaking engagements on -- on
6        main stage, workshop facilitation, things of that
7        nature.
8    Q.  And I'd like to just give you a chance to scroll
9        through this national sales meeting agenda in
10       detail.  So I'll zoom in, and you can just let me
11       know to move through at your leisure.
12   A.  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.
13   Q.  So I'd like to draw your attention to the portion
14       of Plaintiff's 20 which focuses on the tentative
15       agenda at the bottom of 1546 and the top of 1547.
16           Do you recall having any meetings or
17       conversations with Reshma in Orlando, Florida,
18       before the welcome dinner at 6:30 p.m. on
19       February 11th, 2018?
20   A.  Yes.
21   Q.  And what do you recall?
22   A.  She, Pete, and I met in the lobby of the hotel
23       before anything officially started from the
24       meeting -- or the meeting agenda.
25   Q.  Do you know what date that meeting took place?
```

Page 91

```
1        Would that have been on the 11th?
2    A.  I believe it would have been on the 11th, yes.
3    Q.  Do you know approximately how long that meeting
4        lasted?
5    A.  I don't remember.  I'd say 15 minutes, maybe half
6        an hour.
7    Q.  Do you recall what was discussed during that
8        meeting?
9    A.  I'm sorry.  I didn't hear you.
10   Q.  Do you recall what was discussed during that
11       meeting?
12   A.  Yes.
13   Q.  And what do you -- what was discussed at the
14       meeting?
15   A.  She was -- Reshma wanted to discuss this pilot,
16       which there was already a plan in place for.  And
17       so Pete reinforced what that -- what that was.
18           And we also encouraged her to show her best
19       at this meeting, so attend all -- everything that
20       she's supposed to, get there on time, be engaged,
21       be positive; that, you know, she was very much on
22       display given that she was on the cusp of -- of
23       this new opportunity.  That was the general gist of
24       the meeting.
25   Q.  And when you said that there was a plan in place
```

Page 92

```
1        and that Pete reinforced it, what was that plan
2        you're referencing?
3    A.  That's where I -- you know, I was out of the loop a
4        little bit.  But we had talked about when -- and
5        I'm not even sure -- I think it was Dave, but who
6        he had to speak to to get this thing green lighted.
7    Q.  And when you say "this thing," you mean the
8        promotion to the new title of director of post-op
9        pain management, correct?
10   A.  I think so.  I think that's what they were looking
11       to do.
12   Q.  And was it your expect--- withdrawn.
13           Was it part of the plan that Reshma would
14       present the document we looked at at Plaintiff's 21
15       to Dave in order to explain to him the role that
16       she was seeking?
17   A.  I don't know if that would have been her or that
18       would have been Pete Murphy or both.
19   Q.  Was it your understanding that, upon receiving Dave
20       Stack's approval, that the position would be
21       finalized?
22   A.  As far as I know, yes; but, like, again I said, I
23       was somewhat disconnected at this point.
24   Q.  Referencing -- referring to the top of 1547 there,
25       which is the continuation of Tuesday,
```

Page 93

```
1    February 13th, 2018's, agenda.  There's an
2    indication regarding "Night on Own" next to a
3    bullet point.  And then there's an indication
4    "Women in Leadership Event."
5        What did you understand "Night on Own" to
6    mean on the agenda?
7    A.  That there wasn't -- there weren't any agenda items
8        for the night, so people could do as they see fit
9        if they're so inclined to.
10   Q.  And what did you understand the "Women in
11       Leadership Event" to mean in that agenda item?
12   A.  That was an event that was taking place that
13       Tuesday evening, as well.  And it was all around
14       women in leadership, empowerment, et cetera.
15   Q.  Did you attend the Women in Leadership Event?
16   A.  I did not.  I was working on -- I forget what it
17       was for the meeting.  Because I only remember this
18       'cause Vaughn and I, who was my counterpart out
19       West, were late to a dinner that we were going --
20       that we were going to because we had to finish some
21       stuff.
22           But we had some sort of debrief that
23       something happened at the meeting that we had to --
24       we had to do some work on one -- I forget which
25       agenda item it was, one of the workshops or
```



Page 94

1      something.
2  Q.  Do you know, was the women's leadership event a
3      by-invitation event or an open event, an optional
4      event, or something else?
5          MR. PANZINI:  Object to form.
6  A.  I believe it was optional.
7  Q.  You had mentioned earlier that you had
8      encouraged -- that you and Pete had encouraged
9      Reshma to attend what she was supposed to attend.
10     Was she -- was the women's leadership event one of
11     the things that Reshma was supposed to attend?
12 A.  I don't know that that -- I don't recall that event
13     being a mandatory one.
14 Q.  From your perspective of Reshma being on display
15     and being put up for a promotion, was it inferred
16     that she should have been attending this Women in
17     Leadership Event?
18 A.  Not that I can recall.
19 Q.  Do you know if Reshma, in fact, attended the Women
20     in Leadership Event?
21 A.  I'm not sure.  I don't think she did, or she didn't
22     attend the whole event.
23 Q.  Do you know who was in charge of or -- or --
24     withdrawn.
25         Do you know who put together the Women in

Page 95

1      Leadership Event?
2          MR. PANZINI:  Object to form.
3          Go ahead.
4  A.  I think the corporate sponsor for it was Kristin
5      Williams.
6  Q.  Was Joyce Davis involved in the coordination or
7      planning of the women's leadership event?
8  A.  She could have been.  I -- I don't remember.
9  Q.  At some point in time, were you made aware of an
10     event taking place at a Topgolf facility?
11 A.  Yes.
12 Q.  And that was happening during the national sales
13     meeting down in Florida in February of 2018?
14         MR. PANZINI:  Object to form.
15         THE WITNESS:  Can I still answer?
16         MR. PANZINI:  Yeah.  Go ahead.  I'm sorry.
17     Unless I tell you don't answer, just go ahead and
18     just answer.
19         THE WITNESS:  Got it.
20 A.  Yes, I am aware of a Topgolf event that a couple
21     regions were putting together.
22 Q.  Do you know why the Topgolf event is not listed on
23     the agenda here?
24 A.  It wasn't a -- yes.  It wasn't a formal event.
25     This was -- I believe that one happened that

Page 96

1      Tuesday night on your own.
2  Q.  Were you -- withdrawn.
3          Do you know who coordinated or put together
4      the Topgolf event?
5  A.  It was two regions.  One was Rob Rock.  And the
6      other, I believe, was Gio Vendemia.
7  Q.  And both of those regional directors would have
8      been under your purview as the area director,
9      correct?
10 A.  Yes.
11 Q.  Did these regional directors discuss the Topgolf
12     event with you before planning it?
13 A.  Yes.
14 Q.  When were you first approached or when were you
15     first made aware of their intent to plan this
16     event?
17 A.  If my memory serves me right, it was before the
18     meeting, because I don't know if -- I think it was
19     Gio that questioned -- because he had to make a
20     reservation for it, and it was on their own, so he
21     just wanted to make sure that this would be
22     something that people could use their -- their --
23     their -- that they could budget for within their
24     T&E.
25         (Court reporter requested clarification.)

Page 97

1          THE WITNESS:  Travel and expenses, just the
2      normal way they would budget a dinner.
3  Q.  (BY MR. STEWART)  Was permission sought from you so
4      that this event could be scheduled?
5  A.  I guess indirectly.  It wasn't -- it wasn't -- it
6      was more of a heads-up that this is something they
7      were planning.  And -- 'cause there wasn't any --
8      you know, I wouldn't tell them they could or
9      couldn't do something like that.
10         I think it was more from the standpoint of --
11     I guess the permission was around making sure it
12     fell within the guidelines of what people could
13     budget their travel and expenditures towards.  So
14     that, yes.
15 Q.  Were you made aware about the total number of
16     anticipated participants?
17 A.  I think I was in terms of -- 'cause whatever Gio
18     was talking about, there had to be a deposit.  And
19     so they had to guarantee a certain amount or
20     something like that.
21 Q.  And do you know how many people were -- planned to
22     attend the Topgolf event?
23 A.  I don't remember, but at least two regions' worth
24     of number, I'd say.  I don't know exactly, but I
25     mean, there were two regions that were doing it.



Page 98

1    That gives you a kind of a guesstimate.
2  Q.  Do you know if this event was planned as an invite
3    only event?
4  A.  No.  Not that I'm aware of.
5  Q.  Were you personally invited to attend the event?
6  A.  He asked -- I remember Gio asked me if I -- if I
7    wanted to go.  I told him I'd definitely stop by.
8    Now, the only -- it wasn't necessarily that I
9    remember an invite, but like I said, they had to
10   guarantee a certain amount of people going.  And
11   then there would be probably a limit of -- of how
12   many people it could have been or not based on
13   Topgolf.
14  Q.  At some point in time, did you arrive at the
15   Topgolf event?
16  A.  Yes.
17  Q.  Do you recall, did the event take place in the
18   afternoon, the evening, or something else?
19  A.  It was evening, dinnertime.
20  Q.  Do you know what time you arrived at the Topgolf
21   event?
22  A.  I don't remember exactly, but it was already going
23   on.
24  Q.  And so other Pacira employees were already present
25   at Topgolf when you arrived?

Page 99

1  A.  Yeah.  Like I mentioned earlier, my counterpart and
2    I had some stuff we had to do for the meeting, and
3    then we -- we went together late.
4  Q.  And did you take an Uber or a cab to the Topgolf
5    event?
6  A.  Yes.
7  Q.  And did you ride in the cab with your -- withdrawn.
8    Is your counterpart you're referring to, is
9    that the West area director, Vaughn Schouten?
10  A.  Yes.
11  Q.  And did you arrive in the cab at the same time as
12   Vaughn did?
13  A.  Yes.  We took the cab together.
14  Q.  Do you recall approximately how long you remained
15   at the Topgolf event for?
16  A.  I don't remember for exactly how long.  I'm
17   guessing hour, hour and a half.
18  Q.  Do you recall who you left the event with?
19  A.  I -- I don't -- I believe I left with Vaughn, but I
20   don't -- I don't remember for sure, but I -- I
21   think so.
22  Q.  And can you describe to me what Topgolf is?
23    MR. PANZINI:  Object to form.
24    But go ahead.
25  A.  Yeah.  It's a -- it's a -- kind of a golf driving

Page 100

1    range that has a gaming to it and targets.  And
2    they also have food and refreshments, as well.
3  Q.  And the facility that you had -- that the event
4    took place at in Florida, was it -- was it one
5    level, two levels, three levels, or something else
6    in terms of the number of floors that the facility
7    consisted of?
8  A.  It was at least -- there were two levels that I
9    remember.
10  Q.  Is the facility indoors or outdoors?
11  A.  Both.
12  Q.  At some point in time, did you come to learn about
13   an altercation between Reshma and Rob Rock that
14   transpired at the Topgolf event?
15  A.  I did.
16  Q.  And when was it that you -- withdrawn.
17    Were you present when that occurrence
18   transpired?
19  A.  No.  I believe I came in after it happened.
20  Q.  And how did you first come to learn of this
21   occurrence between Rob and Reshma?
22  A.  I'd gotten there and, if I remember correctly,
23   Reshma was seated at a table and she was
24   emotionally distraught.  So I -- if I remember
25   right, then I approached her to find out what --

Page 101

1    what was going on.
2  Q.  And what did Reshma tell you when you approached
3    her?
4  A.  This isn't verbatim; it's best as I can recall.
5    But she talked about how they were trying to
6    blackball her from coming here and she wasn't
7    invited and this is a guys only event.
8    And she got here and her and Rob had a fight.
9    And I forget exactly -- exactly what the fight was
10   around, but it -- I guess the context of it anyway
11   was her, in her mind, in her perception, that this
12   was some sort of guys only event.
13   And she did mention something to the effect
14   that he said, Shouldn't you be at the -- the Women
15   in Leadership Event, or something like that,
16   according to her.  I remember that.
17  Q.  Do you remember the other individuals -- the other
18   Pacira employees that were present at the Topgolf
19   event on that evening?
20  A.  They were mostly from both of those regions, but I
21   don't remember in particular everyone specifically
22   who might have been there.
23  Q.  Do you know if Rob Rock was there?
24  A.  Yes.
25  Q.  What about Isaac Smolko?



# EXHIBIT 8

# EMPLOYEE HANDBOOK



**January 2017**

PACIRA - 000283



# Table of Contents

Welcome to the Pacira
Pharmaceuticals, Inc.Team!.................................... 1

Introduction............................................ 3

Employment at Will..................................... 3

Code of Business Conduct and Ethics................ 4

Non-Retaliation and Hotline Policy............. 4

Equal Employment Opportunity.................... 5

Policy Against Sexual and Other Unlawful
Harassment............................................. 6

Definition of Prohibited Conduct................ 6

Sexual harassment....................... 6

Other unlawful harassment............. 7

Complaint Procedures................... 7

Prohibition against retaliation........... 8

Management responsibility............. 8

Americans with Disabilities Act.................. 9

Job Duties............................................ 9

Working Hours and Overtime Pay............. 10

Performance Appraisal ....................... 10

Merit Increases ......................... 10

Promotions and Transfers..................... 11

Payment of Wages.............................. 11

Personnel Records............................ 11

Employee References............................ 11

Open-Door Policy................................ 12

Employment of Relatives....................... 12

Employee Referral Award....................... 13

Reduction in Workforce......................... 13

Voluntary Separations........................... 13

Standards of Conduct........................... 14

Outside Employment........................... 15

Drug and Alcohol Policy......................... 16

Basis for the policy..................... 16

Drug and alcohol prohibitions..........16

Illegal drugs.................... 16

Medical marijuana............. 17

Legal drugs.................... 17

Alcohol......................... 17

Testing for drugs and alcohol........... 17

Employment applicants........ 17

Current employees............. 18

Employee Assistance............................ 18

Notification of Criminal Convictions........... 19

Discipline............................................ 19

Safety.............................................. 19

Personal Dress and Appearance............... 20

Confidentiality................................20

Company Property......................... 21

Personal Property..........................21

Use of Tobacco Products...................... 21

Parking........................................21

Conducting Personal Business................22

Bulletin Boards................................... 22

Internet and Email Use......................... 22

Social Media Policy.............................. 23

    Guidelines.................................... 23

       1.  Know and follow the rules............ 23
       2.  Be respectful............................. 24
       3.  Be honest and accurate............... 24

    Post only appropriate
    and respectful content..................... 24

    Using social media at work................ 25

    Media Contacts............................ 25

    For more information...................... 25

Attendance......................................... 26

On Call Pay (Non-exempt Employees)....... 27

Report in Pay................................... 28

Inclement Weather............................. 28

Holidays.......................................... 29

FTO Accrual...................................... 30

Leaves of Absence.............................. 31

    Family and Medical Leave Act..............31

    Reasons for and length of leave..........31

    Supplementation/substitution
    of paid leave............................... 33

    Intermittent/reduced-schedule leave ....33

    Reinstatement rights...................... 33

    Request for leave-notice of leave .......34

    Certification of leave...................... 34

    Benefits coverage during leave........... 35

    Return from leave........................ 35

    Failure to return from leave.............. 35

Discretionary Personal
Leave of Absence................................ 36

Military Leave.................................... 38

Bereavement Leave............................. 39

Jury Duty........................................ 39

Witness Duty.................................... 40

Inspections/Searches
of Company Property........................... 40

Searches......................................... 40

Security.......................................... 41

Solicitation, Distribution of
Literature and Political Advocacy............. 41

California Addendum............................ 42

About This California Addendum............. 42

Equal Employment Opportunity.............. 42

Policy Against Harassment.................... 42

Mobile Device Policy........................... 43

Family and Medical Leave Supplement........ 43

Pregnancy Disability Leave.................... 43

Reasonable Accommodations.................. 44

Voting Leave.................................... 44

School Activities................................ 45

Emergency Duty as Volunteer
Firefighter, Reserve Police Officer,
or Emergency Rescue Personnel.............. 45

Domestic Violence and
Sexual Assault Victim Leave................... 46

Leave of Victims of Violent Crimes........... 46

Military Visitation Leave....................... 46

Organ and Bone Marrow
Donation Leave................................. 47

Overtime......................................... 48

Meal and Rest Periods for Non-Exempt
Employees....................................... 48

CA FTO Accrual................................. 49

California Paid Sick Leave..................... 50

California Short Term Disability Insurance... 52



Common Language Policy.......................52

Paid Family Leave................................ 53

Literacy Assistance.............................. 53


New Jersey Addendum......................... 54

New Jersey Paid Family Leave Insurance...... 55

New Jersey Family Leave Act................... 56

    Amount of Leave........................... 57

    Reasons for Leave........................... 57

    Reduced Scheduled Intermittent Leave... 57

    Substitution of Paid Time Off............. 58

    Notify Pacira of your request
    Of New Jersey Family Leave................58

Pregnancy Accommodations....................58

New Jersey Short-Term Disability Benefits....59

Domestic Violence Leave in New Jersey........59

Acknowledgment of Receipt................... 62



# Welcome to the Pacira Pharmaceuticals, Inc., Team!

You have joined an organization that values teamwork, accountability and a passion for doing the right thing. We expect to succeed in our endeavors, and our environment supports and empowers employees to perform at their best. We encourage and applaud innovation, creativity and initiative. We walk our talk here.

At Pacira, we strive to create value efficiently through high-end, innovative products and knowledge of the acute care market, all within a culture that attracts hardworking and passionate people who are dedicated to serving our customers.

We hope that, as a new Pacira employee, you will find this Employee Handbook a useful tool. It has been designed to provide answers to many of your questions about our company policies and preferred behaviors.

If you have any questions or need additional clarification, please feel free to ask your manager or any member of the Human Resources team.

We are pleased to have you with us here at Pacira where we take care of our customers, we take care of each other and we have fun!

Dave Stack
Chief Executive Officer
Pacira Pharmaceuticals, Inc.

LEGAL125337580.3



Pacira Pharmaceuticals has a number of corporate policies that provide a framework of what employees can expect from the Company as well as what the Company expects from its employees.

This Employee Handbook ("Handbook") provides summaries of many of our policies in an easily understood, user-friendly way. The policies in this Handbook are guidelines only and are subject to change from time to time at the discretion of Pacira to address changes in the law or changing business needs. Additionally, this Handbook is not a contract for employment, either expressed or implied. It is our hope that this Handbook will serve as a resource to answer your questions about policy areas and serve as a guideline for the equitable implementation of benefits that many of these policies offer.

Of course, if you have any questions about these policies or anything contained in the Pacira Pharmaceuticals Handbook, please do not hesitate to contact your Human Resources representative for clarification.

We recognize that you have options regarding where you work – we are glad you have chosen to work for Pacira!

Rich Kahr
Vice President
Human Resources
Pacira Pharmaceuticals, Inc.

LEGAL125337580.3



## Introduction

This Handbook explains the Pacira Human Resources policies as well as the specific opportunities and responsibilities that exist for you within our company.  All previously issued Handbooks and any inconsistent policy statements – oral or written – are superseded by this Handbook.  The Company reserves the right, at any time, to revise, delete or add to any and all policies, procedures, work rules, or benefits stated in this Handbook. Any changes to this Handbook will be communicated to all employees so that employees will be aware of the new policies or procedures. No oral statement or representation can, in any way, change or alter the provision of this Handbook.

Nothing in this Handbook or in any other personnel document creates or is intended to create a contract, promise or representation of continued employment for any employee.  No supervisor or manager has any authority to enter into a contract of employment, expressed or implied, with any employee. Only the Chief Executive Officer (CEO) of the Company has the authority to enter into an employment agreement, and then only in writing. Any binding commitments regarding your employment being anything other than at will must be in writing and signed by the CEO of the Company.

Not all Company policies and procedures are set forth in this Handbook. These policies will be reasonably interpreted in light of our varied work schedules in our manufacturing operations. We have summarized many of the more important and significant policies here. If you have any questions or concerns about this Handbook or any other policy or procedure, please ask your manager or a member of the Human Resources team.

## Employment at Will

Employment at Pacira Pharmaceuticals is at will. This means that employment with the Company may be terminated for any or no reason, with or without cause or notice, at any time by you or the Company.

Changes that may occur during employment over time, such as performance evaluations, changes in compensation, receipt of bonuses, promotions or other changes, will not change the at-will nature of employment at Pacira Pharmaceuticals and will not create any implied promise of continuing employment. Nothing in the Handbook is meant to change the at-will nature of employment with the Company, which is and will remain at will.

3



## Code of Business Conduct and Ethics

Pacira Pharmaceuticals has adopted a Code of Business Conduct and Ethics (the "Code") to promote honest and ethical conduct, including fair dealing and the ethical handling of conflicts of interest; promote full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by the Company; promote compliance with applicable laws and governmental rules and regulations; ensure the protection of the Company's legitimate business interests, including corporate opportunities, assets and confidential information; and deter wrongdoing. All employees of the Company are expected to be familiar with the Code and to adhere to those principles and procedures set forth in the Code.

Any questions regarding how this Code should be interpreted or applied should be addressed to the employee's manager, the Compliance Department or the Vice President of Human Resources. Contact can also be made through our Confidential Hotline at 800-799-6371. Please refer to the Pacira Pharmaceuticals, Inc., Code of Business Conduct and Ethics for more detailed information.

## Non-Retaliation and Hotline Policy

Consistent with applicable laws and regulations, any employee who has a Good Faith belief that any other employee or representative of the Company has engaged in or is engaging in conduct that violates applicable law or any Company policies may report such conduct openly or anonymously without fear of retaliation.

- To act in "Good Faith" means that you have given specific information regarding an activity or practice that you reasonably believe to be a violation of law or Company policy and which is provided without malice or consideration of personal benefit.

- While complaints may be made anonymously, and no attempt will be made to identify the person who raised the issue, the Company cannot guarantee anonymity with regard to a Good Faith report of any violation, if there is an investigation.  Only the fewest number of people required to investigate and resolve an issue will be informed of the report and every effort will be made to keep it confidential, however, the Company cannot guarantee confidentiality, as the Company may need to disclose certain information in connection with any investigation, and as may be required by applicable law or regulation.

Employees should familiarize themselves with the Company's bulletin boards that may, in certain jurisdictions, include notices relating to protections available for reporting certain

**4**



occurrences concerning the workplace, including, for New Jersey employees, the Conscientious Employee Protection Act (CEPA).

Employees wishing to make a Good Faith report should notify a member of the Human Resources team, the Legal Department or the Executive Director of Compliance.  In addition, employees may make anonymous reports through our Confidential Hotline at 800-799-6371 or email ethics@pacira.com or compliance@pacira.com. Please note that while you have the right to make anonymous reports, doing so may deprive the Company of its best opportunity to fully investigate the report.

This Non-Retaliation and Hotline Policy is not intended to apply to complaints pertaining to sexual and other unlawful harassment. If you believe that you have been subjected to sexual or other unlawful harassment or have witnessed or otherwise become aware of such an incident, please follow the complaint procedure described in the Company's "Policy Against Sexual and Other Unlawful Harassment."

## Equal Employment Opportunity

The Company provides equal employment opportunities to all employees and applicants for employment without regard to race, color, national origin, ancestry, creed, religion, age, sex (including pregnancy), affectional or sexual orientation, gender identity or expression, disability or atypical hereditary cellular or blood trait, genetic information, marital status, civil union or domestic partner status, refusal to submit to a genetic test or make available the results of a genetic test to an employer, liability for service in the Armed Forces of the United States, veteran status, status as a Vietnam-era or special disabled veteran or any other characteristic protected under any applicable federal, state or local law.  It is the obligation of every employee to adhere to the spirit as well as the letter of these practices. This policy applies to all terms and conditions of employment including, without limitation, hiring, placement, promotion, termination, lay-off, recall, transfer, leaves of absence, compensation and training.

The Company will not tolerate discrimination and expressly prohibits any form of unlawful employee harassment based on race, color, national origin, ancestry, creed, religion, age, sex (including pregnancy), affectional or sexual orientation, gender identity or expression, disability or atypical hereditary cellular or blood trait, genetic information, marital status, civil union or domestic partner status, refusal to submit to a genetic test or make available the results of a genetic test to an employer, liability for service in the Armed Forces of the United States, veteran status, status as Vietnam-era or special disabled veteran or any other characteristic protected under any applicable federal, state or local law.  It is a condition of employment that employees cooperate in all of the Company's investigations, including those involving a

5



complaint of unlawful discrimination or harassment.  If you believe that you have been subjected to unlawful discrimination or harassment or have witnessed such an incident, please follow the procedures set forth in the Company's "Policy Against Sexual and Other Unlawful Harassment."

No retaliation will be taken against an employee who makes a good faith report of unlawful discrimination or harassment.

As is true with respect to all other Company policies, violation of this policy will result in disciplinary action, up to and including termination.

## Policy Against Sexual and Other Unlawful Harassment

The purpose of this policy is to maintain a workplace free from unlawful harassment of any kind (such as oral, written, visual or electronic) for any reason, including freedom from sexual harassment and freedom from other unlawful harassment on the basis of race, color, national origin, ancestry, creed, religion, age, sex (including pregnancy), affectional or sexual orientation, gender identity or expression, disability or atypical hereditary cellular or blood trait, genetic information, marital status, civil union or domestic partner status, refusal to submit to a genetic test or make available the results of a genetic test to an employer, liability for service in the Armed Forces of the United States, veteran status, status as a Vietnam-era or special disable veteran or any other characteristic protected under any applicable federal, state or local law. Without limitation, this policy governs conduct in the workplace (including all work-related travel) and at any other location where a Company-sponsored event takes place, as well as interactions between employees occurring during non-working hours.

Sexual and other unlawful harassment, whether committed by or against management or fellow employees, is strictly prohibited.  In addition, the Company will not tolerate sexual and other unlawful harassment committed by or against the Company's clients, customers, vendors or visitors.

## Definition of Prohibited Conduct

### Sexual harassment
Unwelcome sexual advances, requests for sexual favors and other verbal, physical or visual expressions of a sexual nature may constitute sexual harassment when:

**6**



a) Submission to or rejection of such advances, requests or conduct is made a term or condition of the individual's employment, either explicitly or implicitly;

b) Submission to or rejection of such advances, requests or conduct is used, either explicitly or implicitly, as a basis for employment or compensation decisions affecting the individual; or

c) Such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.

While it is difficult to define precisely what types of conduct might constitute sexual harassment, examples of prohibited behavior include, without limitation, unwelcome sexual advances, requests for sexual favors, obscene gestures, displaying sexually graphic materials, sending sexually explicit e-mail or voice mail and other unwelcome verbal or physical conduct of a sexual nature, such as uninvited touching or sexually related comments. Depending on the circumstance, such conduct also can include sexual or offensive conversation or jokes, comments about an employee's or another individual's physical appearance, conversation or teasing about one's own or someone else's sex life or other conduct directed toward a person because of his/her gender that is sufficiently severe or pervasive to create a hostile work environment.

## Other unlawful harassment

It also is difficult to define precisely what conduct constitutes "other unlawful harassment." However, prohibited conduct includes slurs or epithets, threats, derogatory comments, unwelcome jokes and teasing, touching and abuse and other kinds of verbal or physical conduct that is based on race, color, national origin, ancestry, creed, religion, color, national origin, age, sex (including pregnancy) , disability or atypical hereditary cellular or blood trait, genetic information, refusal to submit to a genetic test or make available the results of a genetic test to an employer, religions, affectional or sexual orientation, gender identity or expression, marital status, civil union or domestic partner status, military status or any other characteristic protected by applicable federal or state laws.

## Complaint procedures

If you believe that you have been subjected to sexual harassment or other unlawful harassment or have witnessed or otherwise become aware of such an incident, you should consider making it clear to the offender that such behavior is offensive, if you are comfortable in doing so. You must also immediately notify your supervisor or manager, the Vice President of Human

7



Resources, a member of the Human Resources team or any other member of senior management. Managers and supervisors who receive complaints of sexual harassment or other unlawful harassment from employees must report such complaints to the Vice President of Human Resources or a member of the Human Resources team.

A complaint of alleged sexual or other unlawful harassment will be investigated promptly. Failure to report complaints of unlawful harassment hampers the Company's ability to take necessary steps to remedy such situations. It is a condition of your employment that you cooperate with all Company investigations. The Company cannot guarantee confidentiality with regard to complaints of sexual or other unlawful harassment, as the Company may need to disclose certain information in connection with any investigation and corrective measures taken. Policy violations will result in appropriate disciplinary action, which may include termination of employment. The Company will adopt preventative and corrective actions to the extent warranted under the circumstances.

## Prohibition against retaliation

The Company prohibits any form of retaliation against individuals who, in good faith, report unwelcome conduct or who cooperate in the investigation of such reports in accordance with this policy. Conversely, a report made in bad faith will subject the reporting individual to corrective action, up to and including termination.

Alleged acts of retaliation should be reported immediately to your supervisor or manager, the Vice President of Human Resources, a member of the Human Resources team or any other member or senior management. Managers and supervisors who receive complaints of retaliation form employees must report such complaints to the Vice President of Human Resources or a member of the Human Resources team. Any form of retaliation in violation of this policy will result in disciplinary action, up to and including termination.

## Management responsibility

Each supervisor and manager is responsible for enforcing the Company's Policy Against Sexual and Other Unlawful Harassment and maintaining a work environment free from sexual and other unlawful harassment. This includes understanding the Company's Policy Against Sexual and Other Unlawful Harassment, reporting any complaint of harassment received from an employee to the appropriate Company representative, cooperating with investigations into reported allegations of sexual and other unlawful harassment and taking the necessary and appropriate action when such allegations are substantiated.

8

# EXHIBIT 9

All dates are in 'm/d/yyyy' format.
By User
UserID: Reshma.Abell
Include Completions for previous training versions
Current Completions
Include equivalent completions

| User Id | Last Name | First Name | Proficiency | Completed On | Training Code | Training Title | Course Version | Class Code | Training Type | Score | Training Status | Equivflag | Version Status | Completion Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/2/2014 09:19:06 AM UTC-04:00 | SLS-00040 | Pacira Incentive Compensation Plan 2013 | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/25/2014 01:53:24 PM UTC-04:00 | SLS-00031 | Convention Congress and Symposia Booth Communications | 1 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/25/2014 01:57:01 PM UTC-04:00 | SLS-00049 | 2014 Pacira's Incentive Compensation Plan | 1 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 09:59:59 AM UTC-04:00 | SLS-00045 | EXPAREL – Knowing the Knee – SALES | 1 | 1 | SLS | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 10:13:10 AM UTC-04:00 | SLS-00044 | EXPAREL – Surveying the Shoulder | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 10:42:27 AM UTC-04:00 | SLS-00046 | EXPAREL – Honing your Skills on the Hip – SALES | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 10:44:35 AM UTC-04:00 | SLS-00047 | EXPAREL – Calling in the Reinforcements – SALES | 1 | 1 | SLS | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 11:21:30 AM UTC-04:00 | PHSM11 | Physician Payment Sunshine Act | 1.1 | 1 | EFLEX | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 11:21:30 AM UTC-04:00 | PHSM11 | Physician Payment Sunshine Act | 2 | 1 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 11:25:22 AM UTC-04:00 | FIN-00002 | MedPro Attendee Lookup in Concur | 1 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 11:26:21 AM UTC-04:00 | REG-SOP-0029 | Obligation of All Employees to Report Adverse Events | 2 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 11:26:21 AM UTC-04:00 | PCV-SOP-0009 | Obligation of All Employees to Report Adverse Events | 3 | 1 | CD | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 11:27:22 AM UTC-04:00 | QAU-SOP-0012 | Handling of Product Complaints | 12 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 11:27:45 AM UTC-04:00 | REG-SOP-0028 | Processing of Medical Information Requests | 4 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 11:30:11 AM UTC-04:00 | HR-00001 | Pacira's Expense Reimbursement & Travel Policy | 1 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 11:49:03 AM UTC-04:00 | FIN-00001 | Pacira's Financial Policy Overview | 2 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 11:49:03 AM UTC-04:00 | FIN-00001 | Pacira's Financial Policy Overview | 3 | 1 | CD | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/26/2014 11:55:05 AM UTC-04:00 | HR-00002 | Pacira – General Employee Handbook | 1 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/27/2014 04:52:38 PM UTC-04:00 | PRIVACY02 | HIPAA and Privacy Guidelines for Pharmaceutical Sales Representatives | 2 | 1 | EFLEX | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/27/2014 04:52:38 PM UTC-04:00 | PRIVACY02 | HIPAA and Privacy Guidelines for Pharmaceutical Sales Representatives | 2.1 | 1 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/27/2014 11:29:10 PM UTC-04:00 | PHSM09 | Introduction to Pharmaceutical Compliance | 2 | 1 | CBT | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/27/2014 11:29:10 PM UTC-04:00 | PHSM09-MOB | Introduction to Pharmaceutical Compliance | 1 | 1 | SCORM | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/27/2014 11:29:10 PM UTC-04:00 | PHSM09 | Introduction to Pharmaceutical Compliance | 3 | 1 | EFLEX | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/27/2014 11:51:47 PM UTC-04:00 | PHSM01 | Basics of PhRMA Code | 2 | 1 | CBT | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/27/2014 11:51:47 PM UTC-04:00 | PHSM01-MOB | Basics of the PhRMA Code | 1 | 1 | SCORM | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/27/2014 11:51:47 PM UTC-04:00 | PHSM01 | Basics of the PhRMA Code | 3 | 1 | EFLEX | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:09:05 AM UTC-04:00 | COM-00003 | Off-Label Promotion | 1 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:14:07 AM UTC-04:00 | SLS-00014 | EXPAREL Product Training – Module 1 AAG Card | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:14:07 AM UTC-04:00 | SLS-00070 | EXPAREL – Module 2 Management of Postsurgical Pain: Introduction to Multimodal and Local Anesthesia | 1 | 1 | SLS | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:14:30 AM UTC-04:00 | SLS-00017 | EXPAREL Product Training – Module 2 Table Local Anethetics | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:21:09 AM UTC-04:00 | SLS-00018 | EXPAREL Product Training – Module 2 Table Opiods | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:22:24 AM UTC-04:00 | SLS-00015 | EXPAREL Product Training – Module 2 AAG Card | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:24:40 AM UTC-04:00 | SLS-00016 | EXPAREL Product Training – Module 3 AAG Card | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:33:41 AM UTC-04:00 | SLS-00019 | EXPAREL FAQs for Steadman Hawkins Revised | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:34:11 AM UTC-04:00 | SLS-00020 | iTap Training Presentation | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:34:56 AM UTC-04:00 | SLS-00021 | EXPAREL - TAP Infiltration sheet | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:35:29 AM UTC-04:00 | SLS-00022 | Initial Findings Using EXPAREL® via iTAP for Postsurgical Analgesia in Robotic Prostatectomy; Sternlicht, Shapiro, et. al. | 1 | 1 | SLS | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:35:54 AM UTC-04:00 | SLS-00023 | Retrospective Review of EXPAREL in iTAP Blocks in Hand-Assisted Nephrectomy and Colorectal Procedures; Kesha, Dunn & Hutchins | 1 | 1 | SLS | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:36:16 AM UTC-04:00 | SLS-00024 | TRANSVERSUS ABDOMINIS PLANE (TAP) BLOCK; Mukhatar | 1 | 1 | SLS | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 12:58:21 AM UTC-04:00 | SLS-00035 | EXPAREL Studying the Spine | 1 | 1 | SLS | QUALIFIED | Enabled | 0 | Effective | Non-Expired |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:00:26 AM UTC-04:00 | SLS-00048 | EXPAREL Reimbursement Guide Training | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:22 AM UTC-04:00 | SLS-00013 | EXPAREL Product Training Module 3 | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:22 AM UTC-04:00 | SLS-00069 | EXPAREL - Module 1 Introduction to Pain Management and the Hospital Setting | 1 | 1 | SLS | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:22 AM UTC-04:00 | SLS-00072 | EXPAREL - Module 4 Management of Postsurgical Pain: Therapeutic Landscape | 1 | 1 | SLS | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:22 AM UTC-04:00 | SLS-00073 | EXPAREL - Module 5 (Bupivacaine Liposome Injectable Suspension) | 1 | 1 | SLS | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:22 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 3 | 1 | EXAMC | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:22 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 4 | 1 | EXAMC | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:22 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 5 | 1 | EXAMC | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:51 AM UTC-04:00 | SLS-00073 | EXPAREL - Module 5 (Bupivacaine Liposome Injectable Suspension) | 2 | 1 | SLS | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:51 AM UTC-04:00 | SLS-00011 | EXPAREL Product Training Module 1 | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:51 AM UTC-04:00 | SLS-00069 | EXPAREL - Module 1 Introduction to Pain Management and the Hospital Setting | 1 | 1 | SLS | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:51 AM UTC-04:00 | SLS-00070 | EXPAREL - Module 2 Management of Postsurgical Pain: Introduction to Multimodal and Local Anesthesia | 1 | 1 | SLS | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:51 AM UTC-04:00 | SLS-00072 | EXPAREL - Module 4 Management of Postsurgical Pain: Therapeutic Landscape | 1 | 1 | SLS | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:51 AM UTC-04:00 | SLS-00073 | EXPAREL - Module 5 (Bupivacaine Liposome Injectable Suspension) | 1 | 1 | SLS | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:51 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 3 | 1 | EXAMC | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:51 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 4 | 1 | EXAMC | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:51 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 5 | 1 | EXAMC | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:06:51 AM UTC-04:00 | SLS-00073 | EXPAREL - Module 5 (Bupivacaine Liposome Injectable Suspension) | 2 | 1 | SLS | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:08:48 AM UTC-04:00 | SLS-00012 | EXPAREL Product Training Module 2 | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:08:48 AM UTC-04:00 | SLS-00069 | EXPAREL - Module 1 Introduction to Pain Management and the Hospital Setting | 1 | 1 | SLS | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:08:48 AM UTC-04:00 | SLS-00070 | EXPAREL - Module 2 Management of Postsurgical Pain: Introduction to Multimodal and Local Anesthesia | 1 | 1 | SLS | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:08:48 AM UTC-04:00 | SLS-00072 | EXPAREL - Module 4 Management of Postsurgical Pain: Therapeutic Landscape | 1 | 1 | SLS | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:08:48 AM UTC-04:00 | SLS-00073 | EXPAREL - Module 5 (Bupivacaine Liposome Injectable Suspension) | 1 | 1 | SLS | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:08:48 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 3 | 1 | EXAMC | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:08:48 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 4 | 1 | EXAMC | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:08:48 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 5 | 1 | EXAMC | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:08:48 AM UTC-04:00 | SLS-00073 | EXPAREL - Module 5 (Bupivacaine Liposome Injectable Suspension) | 2 | 1 | SLS | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:46:25 AM UTC-04:00 | PHSM07 | Interactions with Healthcare Professionals – Field | 1.2 | 1 | CBT | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 01:46:25 AM UTC-04:00 | PHSM07 | Interactions with Healthcare Professionals – Field | 2 | 1 | EFLEX | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 03:26:25 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 1 | 1 | EXAMC | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 03:26:25 AM UTC-04:00 | SLS-00051 | EXPAREL Product Training Certification | 1 | 1 | FORM | QUALIFIED | Disabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 03:26:25 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 2 | 1 | EXAMC | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 03:26:25 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 3 | 1 | EXAMC | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 03:26:25 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 4 | 1 | EXAMC | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/28/2014 03:26:25 AM UTC-04:00 | SLS-00050 | EXPAREL Product Training Exam | 5 | 1 | EXAMC | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/3/2014 08:27:01 PM UTC-04:00 | PCV-SOP-0009 | Obligation of All Employees to Report Adverse Events | 4 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/3/2014 08:27:01 PM UTC-04:00 | PCV-SOP-0009 | Obligation of All Employees to Report Adverse Events | 5 | 1 | CD | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/11/2014 09:58:58 AM UTC-04:00 | LAV08 | Sexual Harassment Awareness for Employees | 1.4 | 1 | CBT | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/11/2014 09:58:58 AM UTC-04:00 | LAV08 | Sexual Harassment Awareness for Employees | 2 | 1 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/11/2014 09:58:58 AM UTC-04:00 | LAV08 | Sexual Harassment Awareness for Employees | 2.1 | 1 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/11/2014 09:58:58 AM UTC-04:00 | LAV08 | Sexual Harassment Awareness for Employees | 2.2 | 1 | EFLEX | QUALIFIED | Disabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/14/2014 07:09:45 PM UTC-04:00 | SLS-00053 | Certification - Promotional and Non Promotional Items | 1 | 1 | CD | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 11/21/2014 11:47:22 AM UTC-05:00 | EHS09 | Bloodborne Pathogens — Healthcare Workers | 3 | 1 | CBT | QUALIFIED | Disabled | 0 | Retired | Non-Expired |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reshma.Abell | Abell | Reshma | QUALIFIED | 11/21/2014 11:47:22 AM UTC-05:00 | EHS09 | Bloodborne Pathogens — Healthcare Workers | 3.1 | 1 | EFLEX | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 12/2/2014 09:38:46 AM UTC-05:00 | SLS-00056 | Unrestricted IEXPAREL® Publications (Guidance for Field Teams) | 1 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 12/2/2014 09:39:06 AM UTC-05:00 | SLS-00058 | Medical Use OnlyEXPAREL® Publications (Guidance for Field Teams) | 1 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 12/2/2014 09:39:31 AM UTC-05:00 | SLS-00057 | Guidance for Field Teams (Guidance for Field Teams) | 1 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 12/2/2014 09:42:47 AM UTC-05:00 | SLS-00060 | Pacira Grant Policy | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 12/2/2014 09:43:13 AM UTC-05:00 | QAU-SOP-0012 | Handling of Product Complaints | 13 | 1 | CD | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 12/2/2014 09:43:13 AM UTC-05:00 | QAU-SOP-0012 | Handling of Product Complaints | 14 | 1 | CD | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 12/2/2014 09:43:13 AM UTC-05:00 | QAU-SOP-0012 | Handling of Product Complaints | 15 | 1 | CD | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 4/4/2015 07:53:32 AM UTC-04:00 | PCV-SOP-0009 | Obligation of All Employees to Report Safety Information | 6 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 4/4/2015 07:59:11 AM UTC-04:00 | SLS-00031 | Convention Congress and Symposia Booth Communications | 2 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/20/2015 01:16:23 PM UTC-04:00 | PHSM11 | Physician Payment Sunshine Act | 2 | 1 | EFLEX | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/20/2015 01:16:23 PM UTC-04:00 | PHSM11-ILC | to give historical completions for PHSM11 (Sunshine Act) | 1 | 1 | ILC | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/30/2015 10:15:11 AM UTC-04:00 | LAV21 | Harassment in the Workplace | 1.2 | 1 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/30/2015 10:15:11 AM UTC-04:00 | LAV21 | Harassment in the Workplace | 1.3 | 1 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/30/2015 10:15:11 AM UTC-04:00 | LAV21 | Harassment in the Workplace | 1.4 | 1 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/30/2015 10:15:11 AM UTC-04:00 | LAV21 | Harassment in the Workplace | 1.5 | 1 | EFLEX | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 6/9/2015 07:14:42 PM UTC-04:00 | HR-00002 | Pacira - General Employee Handbook | 2 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 6/10/2015 03:22:00 PM UTC-04:00 | LAV01 | Age Discrimination | 2.1 | 1 | CBT | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 6/10/2015 03:22:00 PM UTC-04:00 | LAV01 | Age Discrimination | 2.2 | 1 | EFLEX | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/9/2015 10:47:44 AM UTC-04:00 | SLS-00061 | 2015 Pacira's Incentive Compensation Plan | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/25/2015 09:05:11 PM UTC-04:00 | SLS-00064 | PACIRA EXPAREL® CLINICAL REPRINT WORK INSTRUCTIONS | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/25/2015 09:06:09 PM UTC-04:00 | SLS-00062 | Truthful and Non-Misleading Clarification | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 1/25/2016 10:22:39 AM UTC-05:00 | QAU-SOP-0012 | Handling of Product Complaints | 16 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/1/2016 09:58:21 AM UTC-05:00 | IT-00027 | Security Awareness Training | 1 | 1 | SCORM | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/11/2016 01:51:18 PM UTC-04:00 | IT-00026 | Creating Strong Passwords | 1 | 1 | SCORM | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/11/2016 03:45:44 PM UTC-04:00 | FIN-00002 | Expense Reimbursement and Proper Entry in Concur | 2 | 1 | CD | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 8/5/2016 01:39:39 PM UTC-04:00 | MED-SOP-0001 | Processing Medical Information Requests | 8 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/6/2016 04:43:11 AM UTC-04:00 | SLS-00076 | 2016 Pacira Incentive Compensation Plan | 2 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/6/2016 05:56:56 AM UTC-04:00 | PHSM11 | Physician Payment Sunshine Act | 3 | 1 | EFLEX | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/7/2016 07:27:55 AM UTC-04:00 | IT-00005 | IT End User Computing Policy Rev 003 | 3 | 1 | CD | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/19/2016 11:26:05 AM UTC-04:00 | SLS-00078 | EXPAREL – Third Molar Extraction Module | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/19/2016 11:26:05 AM UTC-04:00 | Module 12 - EXPAREL OMFS | Module 12 - EXPAREL Oral & Maxillofacial Surgery | 1 | 1 | PPT | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/19/2016 11:45:54 AM UTC-04:00 | HR-00006 | 2016 Objective Setting Guide | 1 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/19/2016 12:25:44 PM UTC-04:00 | ETHICS20 | E-Mail and Corporate Communications | 1 | 1 | EFLEX | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/19/2016 12:25:44 PM UTC-04:00 | RH0018 | Proper Use of Email and the Internet | 4 | 1 | SCORM | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/19/2016 12:26:21 PM UTC-04:00 | HR-00002 | Pacira - General Employee Handbook | 3 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 9/19/2016 12:45:16 PM UTC-04:00 | SLS-00079 | Operating Mechanism Guide | 1 | 1 | SLS | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 4/11/2017 09:46:41 AM UTC-04:00 | PCV-SOP-0009 | Obligation of All Employees to Report Safety Information | 7 | 1 | CD | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 4/11/2017 10:15:52 AM UTC-04:00 | LAV01 | Age Discrimination | 2.2 | 1 | EFLEX | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/25/2017 12:10:26 AM UTC-04:00 | PRIVACY02 | HIPAA and Privacy Guidelines for Pharmaceutical Sales Representatives | 2.1 | 2 | EFLEX | QUALIFIED | Disabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/25/2017 10:14:28 AM UTC-04:00 | HR-00001 | Pacira's Expense Reimbursement & Travel Policy | 3 | 2 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 5/25/2017 10:53:20 AM UTC-04:00 | LAV11 | Violence in the Workplace | 2 | 3 | EFLEX | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/3/2017 08:24:26 AM UTC-04:00 | SLS-00082 | 2017 Incentive Compensation Plan - SAS | 1 | 1 | SLS | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/3/2017 08:44:50 AM UTC-04:00 | LAV08 | Sexual Harassment Awareness for Employees | 2 | 2 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/3/2017 08:44:50 AM UTC-04:00 | LAV08 | Sexual Harassment Awareness for Employees | 2.1 | 2 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/3/2017 08:44:50 AM UTC-04:00 | LAV08 | Sexual Harassment Awareness for Employees | 2.2 | 2 | EFLEX | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/3/2017 09:07:23 AM UTC-04:00 | LAV21 | Harassment in the Workplace | 1.3 | 2 | EFLEX | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/3/2017 09:07:23 AM UTC-04:00 | LAV21 | Harassment in the Workplace | 1.4 | 2 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/3/2017 09:07:23 AM UTC-04:00 | LAV21 | Harassment in the Workplace | 1.5 | 2 | EFLEX | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/4/2017 11:03:15 AM UTC-04:00 | EHS09 | Bloodborne Pathogens — Healthcare Workers | 3.1 | 1 | EFLEX | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/5/2017 07:42:09 AM UTC-04:00 | LGL-00002 | Pacira's Insider Trading Policy | 1 | 3 | CD | QUALIFIED | Enabled | 0 | Effective | Non-Expired |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/5/2017 07:43:05 AM UTC-04:00 | LGL-00003 | Pacira's Disclosure Policy | 1 | 3 | CD | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/5/2017 08:12:49 AM UTC-04:00 | PHSM01 | Basics of the PhRMA Code | 3 | 3 | EFLEX | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/5/2017 08:53:39 AM UTC-04:00 | PHSM07 | Interactions with Healthcare Professionals – Field | 2 | 2 | EFLEX | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/10/2017 10:21:57 AM UTC-04:00 | PP-NP-US-0441 | Medical Information Overview | 1 | 1 | CBT | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/10/2017 11:21:38 AM UTC-04:00 | PRIVACY02 | HIPAA and Privacy Guidelines for Pharmaceutical Sales Representatives | 3 | 1 | CD | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/24/2017 07:17:36 AM UTC-04:00 | LGL-00001 | Pacira's Code of Business Conduct and Ethics | 1 | 3 | CD | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 7/24/2017 07:51:57 AM UTC-04:00 | ETHICS20 | E-Mail and Corporate Communications | 1 | 1 | EFLEX | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 8/16/2017 08:19:33 AM UTC-04:00 | PP-EX-US-2853 | The PiLLAR Study | 1 | 1 | PPT | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 8/16/2017 08:21:38 AM UTC-04:00 | QAU-SOP-0013 | Recall Procedure | 11 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 8/16/2017 08:22:16 AM UTC-04:00 | QAU-SOP-0013 | Recall, Market Withdrawal, and Corrections Procedure | 13 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 8/16/2017 08:22:59 AM UTC-04:00 | COM-00004 | PhRMA Code | 1 | 2 | CD | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/2/2017 12:15:49 PM UTC-04:00 | LAV08 | Sexual Harassment Awareness for Employees | 2 | 1 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/2/2017 12:15:49 PM UTC-04:00 | LAV09 | Sexual Harassment Awareness for Managers | 3 | 1 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/2/2017 12:15:49 PM UTC-04:00 | LAV09 | Sexual Harassment Awareness for Managers | 3.1 | 1 | EFLEX | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/2/2017 12:15:49 PM UTC-04:00 | LAV09 | Sexual Harassment Awareness for Managers | 3.2 | 1 | EFLEX | QUALIFIED | Enabled | 1 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/4/2017 08:14:41 AM UTC-04:00 | EH599 | SMART Goal Setting | 1.3 | 2 | CBT | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/4/2017 08:14:41 AM UTC-04:00 | EH599 | SMART Goal Setting | 1.4 | 2 | CBT | QUALIFIED | Disabled | 1 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/4/2017 08:49:53 AM UTC-04:00 | IT-00028 | Security Awareness Training | 1 | 1 | SCORM | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/4/2017 08:51:19 AM UTC-04:00 | ITS-POL-0003 | Information Technology End User Computing Policy | 1 | 1 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 10/4/2017 08:51:48 AM UTC-04:00 | My Team | MyTeam Dashboard Training for Managers | 3 | 1 | SCORM | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 11/8/2017 08:01:03 AM UTC-05:00 | LAV02 | Affirmative Action in the Workplace (for Employers) | 3 | 1 | EFLEX | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 12/14/2017 11:41:30 AM UTC-05:00 | HR-00002 | Pacira - General Employee Handbook | 4 | 2 | CD | QUALIFIED | Disabled | 0 | Retired | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 1/18/2018 08:57:44 AM UTC-05:00 | COM-00007 | Sales Personnel Field Compliance Manual | 1 | 3 | CD | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 1/19/2018 09:59:22 AM UTC-05:00 | COM-00005 | Executive Summary to Corporate Compliance Manual | 1 | 3 | CD | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 2/2/2018 11:33:53 AM UTC-05:00 | HR-00001 | Pacira's Expense Reimbursement & Travel Policy | 4 | 1 | CD | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 2/5/2018 03:43:01 PM UTC-05:00 | SLS-00089 | Module 5: Factors Influencing Choice of Anesthesia | 1 | 1 | SCORM | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 2/5/2018 04:04:16 PM UTC-05:00 | SLS-00087 | Module 3: Roles of Anesthesia Stakeholders | 1 | 1 | SCORM | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 2/5/2018 04:05:47 PM UTC-05:00 | SLS-00086 | Module 2: Practice Settings of Anesthesia Stakeholders | 1 | 1 | SCORM | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 2/10/2018 06:24:22 PM UTC-05:00 | SLS-00084 | Intro to Pharmacokinetics | 1 | 1 | SCORM | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 2/10/2018 06:36:16 PM UTC-05:00 | SLS-00083 | Ultrasound Basics | 1 | 1 | SCORM | QUALIFIED | Enabled | 0 | Effective | Non-Expired |
| Reshma.Abell | Abell | Reshma | QUALIFIED | 2/10/2018 06:45:41 PM UTC-05:00 | SLS-00085 | Module 1: Education/training of Anesthesia Stakeholders | 1 | 1 | SCORM | QUALIFIED | Enabled | 0 | Effective | Non-Expired |

# EXHIBIT 10

Page 10

1           A.      Mmm-hmm.

2           Q.      What was the subject matter of that

3    call?

4           A.      It was just investigating.  He said he

5    just needed to speak about the events, hear from me

6    what happened at the national sales meeting because

7    it was reported I guess by one of the superiors so he

8    wanted to just hear my version and that was what the

9    call was about.

10          Q.      How long did that call last?

11          A.      I think the first one was probably

12   15 minutes.

13          Q.      And during the call Mr. Kahr asked you

14   questions about events at the national sales meeting?

15          A.      Yes.

16          Q.      Did you have an opportunity to speak and

17   present any position that you may have had to Mr.

18   Kahr?

19          A.      Yes.

20          Q.      Did he cut you off in any manner?

21          A.      No.

22          Q.      And I'm sorry, I asked you this but how

23   long was that call you think?

24          A.      About 15 minutes I would say.  It's hard

25   to recall.

1   multiple, I said multiple as in what, 2, 10, 1,000,

2   help give me a number.  Like two people saw something

3   on your phone and they were offended by it.  I'm like

4   you mean on my personal phone?  They're like yeah.

5   Well, when did they see that?  You were on it for

6   30 minutes.  First of all, I hate my phone, there's

7   no way I would be on anything more than 30 minutes,

8   my attention span is like a goldfish.  Were you

9   looking at some content that has to do with

10  Kamasutra, I'm like yeah.  So what does that have to

11  do with anything?  Well, they were offended.  I was

12  like, yeah, but that's religious context, I don't

13  understand.  If I offended someone it was not my

14  intent can you please give me their name so I can

15  apologize?  He goes, well, no, we can't do that right

16  now we need to investigate.  I said Rich, well, do

17  you mind if I send you this so you can actually

18  understand what this is in context too because it's

19  not what you're making it seem and now I'm going to

20  get offended that you're calling it pornography, you

21  know what I mean?  He said no, no, I rather you not

22  do that.  I was like okay.

23          So basically you're opening an

24  investigation and not even want to see?  He goes no,

25  I prefer you not do that.  I'm was like okay, sorry

Page 16

1        A.     No, it was irrelevant at that point, it
2   didn't matter.
3        Q.     Do you keep a diary?
4        A.     No.  I used to keep a log of the people
5   I saw, the surgeons, conversations.  Not everyone of
6   them, if they were important I kept notes.
7        Q.     So the calls that we were just
8   discussing would you have put those in your log or
9   diary?
10       A.     No.  I didn't know I was going to be
11  fired the next day otherwise I would have.
12       Q.     Just focusing on that second call, at
13  that point I believe you said that Rich Kahr
14  indicated to you that there was an investigation open
15  regarding certain something you were reviewing on
16  your phone, correct?
17       A.     Mmm-hmm.
18       Q.     You have to say yes or no.
19       A.     Yes.
20       Q.     Did Mr. Kahr indicate to you what he had
21  done in regard to that investigation at that point?
22       A.     No.  He asked me were you looking at and
23  I said yes, I didn't lie.  I said, yes, it was
24  content that was somebody had sent me and it was just
25  about Kamasutra.  One of my -- one of my surgeons

Page 55

1  Resources, a member of the Human Resources team or

2  any other member of the senior management.

3          During your tenure at Pacira were you

4  ever subjected to sexual harassment?

5      A.    Yes.

6      Q.    And by whom?

7      A.    Too many.  I can't list at the moment.

8      Q.    It doesn't have to be a comprehensive

9  list, if you can start with some -- if you can

10 remember who subjected you to harass sexual

11 harassment?

12     A.    They still work there so I'm not

13 comfortable in doing that to their family.  And like

14 I said, I need people to pay taxes, they can't be

15 fired.  So I cannot right now.

16     Q.    All right well, I'm --

17     A.    I'm not comfortable.

18     Q.    You have to answer the question though.

19     A.    Yes, I have been.

20     Q.    Who?

21          MR. STEWART:  Are you asking for

22 specific instances or people?

23          MR. PANZINI:  Specific people.

24          MR. STEWART:  Names of people in the

25 past?

 1              MR. PANZINI:  Names of people.  Then I
 2    can break it down to particular incidents.
 3              MR. STEWART:  To the extent that you
 4    remember.
 5              THE WITNESS:  I clearly remember, I'm
 6    just not comfortable.
 7              MR. STEWART:  Some portion of this is
 8    not going to be comfortable.
 9         A.    So you want names, okay.  Do you want
10    all the names or do you want some?
11         Q.    Anything you can remember.  I'm asking
12    you if you were ever subjected to sexual harassment,
13    and you said you were and again, I'm confining when
14    you were at Pacira and you said you were.  And I
15    asked you about the names of the people that
16    subjected you to sexual harassment.  If you can give
17    me all the names that you can remember?
18         A.    Brandon, what's his last name, can I
19    look up his last name?
20         Q.    If you can remember it tell me, if not
21    you can just --
22              MR. STEWARD:  Are you referring to
23    Brandon Kristenon (phonetic)?
24              THE WITNESS:  Yes, Brandon -- no.  It
25    will come to me.

Page 58

1       A.      I remember all of their names.

2       Q.      Brandon, Justin, Jim?

3       A.      Yes.  Rob Rock.  And the others I'm not

4    comfortable saying.  Let's leave it for now.

5       Q.      Again, the purpose of this is not to

6    make you uncomfortable but unfortunately in these

7    procedures there's a little uncomfortableness that

8    might be required.  So let me just start with the

9    names you provided to this point.  So Brandon, what

10   did he -- was there one occasion where you believe he

11   sexually harassed you or more than one?

12      A.      It was more than one.  I usually give

13   them a warning after a second.

14      Q.      Can you tell me the first time what he

15   did or said?

16      A.      Well, because if we're going to talk

17   about what said that's another list.  As far as him,

18   he just put his hand under my skirt the first time.

19   The second time he grabbed me from the back.

20      Q.      When you said the first, was this one

21   occurrence or two different occurrences?

22      A.      Two different times.

23      Q.      And so we're talking about the first

24   time.  One --

25      A.      It was at a national sales meeting, not

```
                                            Page 61

 1          Q.      Correct?

 2          A.      Yes.

 3          Q.      And so once you told him at that point

 4   you told him if this happens again you were going to

 5   report HR?

 6          A.      Yes.

 7          Q.      Did any -- were there any further

 8   incidents with Brandon?

 9          A.      No.

10          Q.      Did you ultimately report this to HR?

11          A.      No.

12          Q.      Did you report to any other employee at

13   Pacira?

14          A.      No.

15          Q.      You didn't report it to your supervisor

16   or manager?

17          A.      No.

18          Q.      How about the vice-president of human

19   resources?

20          A.      No.

21          Q.      And you indicated no human resources

22   person?

23          A.      No.

24          Q.      And why didn't you report this to human

25   resources?
```

Page 62

```
 1        A.     Because it wasn't the first time and it
 2    wasn't going to be the last time.
 3        Q.     And by that you mean at Pacira in
 4    general?  Give me a little color to that.
 5        A.     At Pacira and in general, both.
 6        Q.     So that -- was that not the first time
 7    that a co-worker put his hand under your skirt?
 8        A.     Was that the first time?
 9        Q.     Yes.
10        A.     No.
11        Q.     Was it the first time at Pacira?
12        A.     No.
13        Q.     So when was the first time that occurred
14    at Pacira?
15        A.     First time it had occurred was we had
16    our meeting in, I want to say -- so I was hired in
17    May and then we had our national sales meeting in San
18    Diego in September or October.  We do two meetings a
19    year.  We do one national sales meeting earlier in
20    the year, the first quarter.  And another one we do
21    in the third quarter.  So probably September, not
22    October.
23        Q.     Who was the first person that did that
24    to you at Pacira?
25        A.     I'm not comfortable saying it.
```

Page 63

1     Q.    In order for us to understand the

2  brevity and the extent of your claims these are

3  things we need to know because you're indicating

4  that, you know, there was a certain culture within

5  the industry, and specifically at Pacira, so we're

6  going to need to know who we're talking about and

7  what we're talking about.  I'm not sure how else --

8         MR. PANZINI:  Jason, if you have any

9  suggestion?

10     Q.    Certainly it's a situation where the

11  claims in your complaint, you know, allege certain

12  activities occurred and you're seeking to be

13  compensated for those.  So I think we need to as

14  defendants and ultimately perhaps the courts going to

15  need to know or the jury is going to need to know

16  exactly who or what we're talking about.  To put an

17  allegation out there that it occurred and then not

18  provide the detail is not allowing us to fully --

19     A.    I'm not seeking compensation for people

20  touching me or not reporting them.  It's something

21  different.  It was my choice to stay quiet.  I don't

22  want anybody to get fired, that's why I kept so long

23  and quiet because like I said, my only agenda is

24  gainfully employed.  These people have families.  Not

25  everybody thinks that way but that's how I think and

Page 65

```
 1              So I'm just going to ask you again,
 2   other than the names you've provided to me so far
 3   were you sexual harassed?  And when I say that it can
 4   be verbal, it can be physical, anything that you
 5   constitute as sexual harassment by any other Pacira
 6   employees other than the names you've given me up to
 7   this point?
 8        A.     Yes.
 9        Q.     And by whom?
10        A.     There's so many to recall right now so
11   because it's been four years I was there and then
12   it's been a total of six years since I've seen most
13   of them.
14        Q.     Understood that there's been some time
15   that's elapsed since you were at Pacira but, you
16   know, if you can try to jog your memory and tell me
17   anybody else who you felt you were subject to sexual
18   harassment by or from?
19        A.     Not at this time.
20        Q.     I'm sorry, what?
21        A.     Not at this time.
22        Q.     Not at this time meaning, sorry, that
23   you can't recall any of the names?
24        A.     Yeah, because I'll research it, bring
25   them up on my phone or review them from the documents
```

Page 66

1    that I have.

2         Q.    Just so I'm clear then, you're telling

3    me other than the names you've given me to this point

4    there are other people at Pacira, I believe you said

5    numerous that you felt you were sexually harassed by

6    but at this point you can't recall any of their

7    names?

8         A.    Yeah, because there's so many.

9         Q.    Understood there's so many and I

10   understand it might not be comprehensive, there might

11   be a name you don't include, given there are so many.

12   Are there any other names you can remember at this

13   point as we sit here?

14        A.    Not at this time.

15        Q.    The incidents you discussed with Brandon

16   when you say they occurred at a national sales

17   meeting do you recall where was the national sales

18   meeting?

19        A.    Nashville.

20        Q.    What year was that, do you recall?

21        A.    I think it was 2016 or 2017.   It might

22   be one or the other.   I'd have to go back and check

23   my records.

24        Q.    After that time where you indicated to

25   Brandon that if you did anything similar you would go

Page 67

1   to HR, did he ever sexually harass you again?

2       A.      Not physically but verbally.

3       Q.      What did he do verbally?

4       A.      He would just walk by and say you look

5   so hot today or you look delicious or words like

6   that.

7       Q.      Did you ever ask him to stop that

8   behavior?

9       A.      No, I would just ignore him.  I was like

10  stop Brandon and I would just walk away.

11      Q.      And what about Justin Sherad?

12      A.      It was mostly verbal with him.

13      Q.      Mostly verbal meaning there was some

14  physical?

15      A.      No.  Every now and then we would see

16  each other, we would hug and the hands would go a

17  little too low, and I would be like all right, keep

18  your hands up.  And he would be like all right, all

19  right.  But verbally, yeah, he would make racial

20  comments, racist things he would say and being in

21  Florida he would have things to say about single

22  parents and just things in general that were like

23  offensive, a lot of judging.

24      Q.      At this point I'm confining more to --

25  we can get into the other areas, but more of a sexual

Page 68

```
 1    harassment that you suffered at the hands of these
 2    individuals.  So that's -- when it came to Justin
 3    Sherad you indicated that there were times where you
 4    would hug and his hands would be -- you indicated his
 5    hands would be too low, was that on one occasion or
 6    more than one occasion?
 7         A.     More than one.
 8         Q.     Do you recall the first time that
 9    happened with Justin?
10         A.     It's probably 2016, Nashville sales
11    meeting.
12         Q.     And you indicated to Justin that you
13    weren't comfortable with that behavior?
14         A.     Not directly.
15         Q.     And why not?
16         A.     I was extremely intimidated by all the
17    athletes that we have because these guys are big, he
18    was a professional baseball player, Isaac was a
19    football player.  Brandon was also football player,
20    nice and big and huge.  And it's kind of intimidating
21    in this environment, you know what I mean, and I'm a
22    little girl.  One, it was that.  Two, it's also a
23    very male dominated industry and it's a boys culture.
24    If you say anything you kind of get casted out.
25         Q.     So let me -- were you aware of any woman
```

Page 72

1      Q.     And she indicated to you she believed

2    she was retaliated against for reporting that

3    harassment?

4      A.     Yes.

5      Q.     Any other females that you're aware of

6    at Pacira that reported any type of sexual

7    harassment?

8      A.     I don't recall at this time.

9      Q.     Just so we're clear, you never reported

10   any sexual harassment about yourself?

11     A.     No.

12     Q.     Were you ever told by any employees at

13   Pacira that if you did report sexual harassment you

14   would be retaliated against?

15     A.     No.

16     Q.     So how did you come to the conclusion

17   that if you did report sexual harassment you would be

18   retaliated against?

19     A.     Because it's kind of understood in the

20   company, it's just the culture, it's more like a boys

21   club.  Women don't go on.  Maybe they do, I don't

22   know, so I can't say for sure but that's not

23   something that you claim.  It takes a while to

24   approve a really good rep, especially in this

25   position.  We have to jump through a lot of hoops to

Page 78

1        A.      No.

2        Q.      On page Bates stamp 0242 under complaint

3   received.  Second paragraph on page 0242 reads:  A

4   complaint of alleged sexual or other unlawful

5   harassment would be investigated promptly.  Failure

6   to report complaints of unlawful harassment hampers

7   the company's ability to take necessary steps to

8   remedy such situations.

9              Were you aware of that statement when

10  you decided not to report any of the sexual

11  harassment?

12       A.      Yes.  But these are words.

13       Q.      Did you realize that when you chose not

14  to record these incidents of sexual harassment that

15  the company couldn't do anything to help you?

16       A.      Yes.

17       Q.      Paragraph -- on 0242 that starts

18  prohibition against retaliation.  I'll read the first

19  paragraph into the record.  The company prohibits any

20  form of retaliation against individuals who, in good

21  faith, report unwelcome conduct or who cooperate in

22  the investigation of such reports in accordance with

23  this policy.  Conversely, a report made in bad faith

24  will subject reporting individual to corrective

25  action, up to and including termination.

Page 93

1    paragraph?

2         A.      No.

3         Q.      Were you aware of a Code of Business

4    Conduct and Ethics?

5         A.      No.

6         Q.      Second paragraph under that topic:  Any

7    questions regarding how this code should be

8    interpreted or applied should be addressed to the

9    employees's manager, the compliance department or the

10   vice-president of human resources.  Contact can also

11   be made through our confidential hotline at

12   800-799-6371.  Please prefer to the Pacira

13   Pharmaceuticals, Inc., Code of Business Conduct and

14   Ethics for more detailed information.

15               Were you aware of that particular

16   paragraph before today?

17        A.      No.

18        Q.      On the bottom middle of that page,

19   excuse me, under the topic of non-retaliation and

20   hotline policy, I'll read it:  Consistent with the

21   applicable laws and regulations, any employee who has

22   a good faith belief that any other employee or

23   representative of the company has engaged in or is

24   engaging in conduct that violates applicable law or

25   any company policies may report such conduct openly

Page 94

```
 1    or anonymously without fear of retaliation.
 2                    Were you familiar with that paragraph
 3    prior to today?
 4         A.    Not those words, but, yes, I've seen
 5    something like that before.  I think it was on the
 6    other page, 244.
 7         Q.    Again, when I say before today I'm
 8    talking about before today?
 9         A.    I was familiar with it, yes.
10         Q.    You were aware there was a way that you
11    could report either illegal --
12         A.    I didn't know about the hotline policy,
13    no.  All I knew was that yeah, every company has it
14    where it says you will not be retaliated against if
15    you complain to HR.  That I was aware of, hotline I
16    was not aware.
17         Q.    First bullet point under this says:  To
18    act in good faith means that you have given specific
19    information regarding an activity or practice that
20    you reasonably believe to be a violation of law or
21    company policy and which is provided without malice
22    or consideration of personal benefit.  Second bullet
23    point:  While complaints may be made anonymously, and
24    no attempt will be made to identify the person who
25    raised the issue, the company cannot guarantee
```

Page 99

1          A.      I don't recall.

2          Q.      While you were employed by Pacira were

3     you provided with a number of trainings?

4          A.      Yes.

5          Q.      And did those trainings include review

6     of the handbook?

7          A.      Yes, but I don't think it was under

8     compliance.  There's different kind of trainings.  We

9     have compliance training, there's e-learning which is

10    if there's new information about the product or label

11    change.  So there's different kinds of training we

12    have.

13         Q.      If you go on the first page about 18

14    lines down there's an entry from 5/26/14 at 11:55:05

15    under training code HR00002.  Says Pacira-general

16    employee handbook.   Do you recall at that point if

17    you reviewed the handbook?

18         A.      Oh, yes, because I signed it.

19         Q.      How about the next page, if you turn

20    that eight rows up from the bottom.  From 7/3/2014

21    obligation of all employees to report adverse events.

22    Do you recall if you were trained in that topic?

23         A.      Oh, yeah, that's serious stuff.  We have

24    to have the numbers and the hotlines in the field.

25    So that one, yes.

Page 100

1        Q.     How about two down from that under

2   10/11/14 sexual harassment awareness of employees.

3   Were you trained in that?

4        A.     Yes.

5        Q.     Next page, 12 lines down from the top

6   date 5/30/15, harassment in the workplace.  Were you

7   trained in that?

8        A.     Yes.

9        Q.     Four lines down from that 6/9/15 under

10  HR-00002, Pacira general handbook.  Were you trained

11  in that?

12       A.     Yes.  But like I said I signed it, I

13  didn't read it.

14       Q.     Were you provided an online copy of that

15  to review?

16       A.     Yeah, because before you sign they give

17  you the copy and you go at the end to sign.  The

18  general employee handbook is a lot more wordy and a

19  lot more I guess complicated for me to understand.

20  The harassment and workplace there are slides.  It's

21  a different kind of training.  Up here it shows up as

22  training, but the other ones you have 10 or 12 pages

23  and it's like slides and it's easier to read.  An

24  employee handbook, no time to read for three hours

25  otherwise I would never be in the field.  I mean, we

Page 101

1    don't have an office, right.
2         Q.    So 16 rows up from the bottom on that
3    same page under 9/19/16 again under HR00002, Pacira
4    general handbook.  Would you acknowledge reviewing
5    the handbook at that point?
6         A.    Like I said, I signed all the handbooks,
7    I never read them.  Too long, too wordy, just not
8    enough time.
9         Q.    And then seven rows down from that on
10   7/3/17 sexual harassment awareness employees
11   training.  Did you acknowledge that you attended that
12   training?
13        A.    Yes, and those I remember, like I said,
14   because they were slides.  So, yes, those I reviewed
15   and signed.
16        Q.    Underneath the three sexual harassment
17   awareness five rows up from the bottom, 7/3/17
18   harassment in the workplace.  Did you acknowledge
19   that training?
20        A.    Yes.
21        Q.    And then the last page which is 0032, 11
22   rows down on October 2, 2017 did you acknowledge
23   sexual harassment awareness training for employees?
24        A.    For managers, right?
25        Q.    First one is for employees.

Page 102

1          A.      Yes.

2          Q.      Did you acknowledge that?

3          A.      Yes.

4          Q.      And how about the sexual harassment

5   awareness for managers?

6          A.      Yes.

7          Q.      And then I believe it's seven rows down

8   from that on 12/14/17, again, under HR00002, did you

9   acknowledge reviewing the Pacira general employee

10  handbook?

11         A.      Yes.  I didn't review it but I signed

12  it.

13         Q.      So on at least four occasions you

14  acknowledge reviewing the handbook but you're saying

15  that you didn't review it on any of those occasions?

16         A.      No, but I signed them because they were

17  part of your compliance training.

18         Q.      Did you think it was important to

19  understand the policies of the company before

20  acknowledging that you read them?

21         A.      Yes.

22         Q.      But even though you thought it was

23  important to read them you didn't read them?

24         A.      Even if I read them I would be lying if

25  I said I understood every word in there because I

Page 104

1    So it's designed so that you can go a page at a time.

2    So I'll read the first couple lines and move on and I

3    attempted to read it anyway and it's like, what does

4    that mean, who was I going to call then, do I waste

5    time?  I could be in the field.  Do I sit there and

6    read this in my car or should I, you know, so it was

7    one of those, because I'm always in the field.

8           Q.    You're a highly educated person, you

9    didn't understand any of the paragraphs?

10          A.    So, I didn't say that, I didn't say I

11   didn't understand any of it.  I said I would be lying

12   if I said I understood everything in there.  Because

13   language in there some of it just doesn't make sense

14   and for me to try to comprehend that at the time at

15   the level -- because there are deadlines.  It's not

16   like you have a year to review.  If I did, yeah, I'll

17   take my sweet time and I'll sit there on a Christmas

18   Eve and read it but I'm a work alcoholic.  I work 20

19   something hours.  I'm always in the field.  I'm not

20   the type that goes golfing and fishing.  And so did I

21   understand the importance of it, yes, that's why I

22   signed it.  Did I understand it, all of it, no, no, I

23   can't.

24          Q.    Let me read on page 0241 I'm going to

25   read you under complaint procedures that paragraph

1    again.  If you believe that you've been subjected to

2    sexual harassment or other unlawful harassment or

3    have witnessed or otherwise become aware of such an

4    incident, you should consider making it clear to the

5    offender that such behavior is offensive, if you are

6    comfortable in doing so.  You also must immediately

7    notify a supervisor or manager, the vice-president of

8    human resources, a member of the human resources team

9    or any other member of senior management.  Did you

10   understand that paragraph?

11        A.    Yes, because that was part of my sexual

12   harassment training.  That I do remember reading, not

13   here, somewhere else.  So it's one of the other

14   training.

15        Q.    First paragraph on page 0242 under

16   prohibition against retaliation:  The company

17   prohibits any form of retaliation against individuals

18   who, in good faith, report unwelcome conduct or who

19   cooperate in the investigation of such reports in

20   accordance with this policy.  Conversely, a report

21   made in bad faith will subject the reporting

22   individual to corrective action, up to and including

23   termination.  Did you understand that paragraph?

24        A.    Yes.

25        Q.    Do you recall what paragraph you

```
                                              Page 106
 1    couldn't understand?

 2               MR. STEWART:  Note my objection.

 3         A.    No, there's so many pages.

 4         Q.    Just take D-6.  Just for the record,

 5    D-6, Pacira-0016.  Miss Abell, is that your signature

 6    on D-6?

 7         A.    Yes.

 8         Q.    And the date is 4/26/14?

 9         A.    Yes.

10         Q.    Is it your handwriting on top above

11    where it says print name above?

12         A.    Yes.

13         Q.    Do you recall signing this document?

14         A.    Yes.

15         Q.    And the three paragraphs acknowledging:

16    I have received and carefully read the code of

17    business conduct and ethics of Pacira

18    Pharmaceuticals, Inc., did you do that?

19         A.    The first time around I did, yes.

20         Q.    I understand the Code of Business

21    Conduct and Ethics?

22         A.    Yes.

23         Q.    I have complied and will continue to

24    comply with the business terms of the Code of

25    Business Conduct and Ethics.  All accurate?
```

1      A.     Yes.

2      Q.     Can you briefly explain to me what your

3  position was at Pacira, what did you do?

4      A.     I started out as -- are you asking how I

5  started or how I ended?

6      Q.     What did you start at?

7      A.     I started as a title called surgical

8  account specialist, SAS.

9      Q.     What did that job consist of?

10     A.     Many hats that you wear so from sales to

11  presentations to in-servicing,

12  nursing/residents/departments.  It's mostly I did --

13  all falls under the umbrella of education and once

14  it's done, speaking with pharmacy, getting a

15  formulary, discount and cost and billing and so on

16  and so forth.  And then after formulary training the

17  OR staff itself and surgeons and how to use the

18  product appropriately.  Sometimes they let you do a

19  trial, sometimes they don't.  And if there is a lack

20  of any clinical knowledge or information that's when

21  we contact our MSL's and we also act as liaison

22  between national accounts.  We have different

23  resources in the company.  If a rep is not able to

24  answer a question, not because of lack of knowledge

25  because of the compliance.  Reps can only do certain

Page 110

```
 1        Q.      Did you have any certain amount of days
 2   in the week that you needed to go to the office?
 3        A.      Office as in Parsippany?
 4        Q.      Yes.
 5        A.      Yes -- no, no, no because we are in the
 6   field.  We're called field reps.  We're in the field
 7   unless there's a required training and/or if you have
 8   an invitation or reason to go.  Otherwise, no, we all
 9   met twice a year as a whole company even though we
10   spoke with each other on the phone we only met
11   physically twice a year.
12        Q.      So there could be weeks that you
13   wouldn't go to the Parsippany office?
14        A.      Oh, yes.
15        Q.      So when you were hired at Pacira who was
16   your immediate supervisor?
17        A.      Peter Murphy.
18        Q.      Who did Peter report to, do you know?
19        A.      Dennis McLoughlin.
20        Q.      Who did Dennis report to?
21        A.      David Kaplan and Dave Stack.  He also
22   reported to Tanya Markvicka.  She's not there
23   anymore.
24        Q.      Dave Kaplan reported to Tanya also?
25        A.      Yes.  She was COO.
```

                                        Page 123

1    programs for me.

2           Q.     At some point you received a promotion?

3           A.     Yes.

4           Q.     And what did your title change to?

5           A.     It went from surgical accounts

6    specialist to senior account specialist, senior

7    surgical account specialist.

8           Q.     Instead of an SAS you were an SSAS?

9           A.     Yes.

10          Q.     Did that come with an increased

11   compensation?

12          A.     Yes, it was a year delayed.  That was

13   the other problem that Dennis and I had.  He's gone

14   to HR and spoken to them about it, I wasn't

15   comfortable enough to call HR to find out if he had

16   or not but it took over a year and half for him to do

17   because it came with a merit increase.  And even then

18   they could only give me one or the other increase.

19   So they only gave me merit increase for that but not

20   my annual review increase because you couldn't have

21   both.

22          Q.     But you received an increase, you just

23   couldn't receive both increases?

24          A.     Yes.  But the title change was supposed

25   to happen a year before it happened.  And they said

1   before.

2       Q.      So did your job functions change from an

3   SAS to SSAS?

4       A.      Yes, yes.  So it's basically because

5   before off the record everyone in the country would

6   call if they have issues with different specialties.

7   Now it was announced when you're a senior it's like

8   okay, just call her it's easier.  Once you have that

9   title that means you've been here long enough, you

10  know what you're doing, you have answers for

11  98 percent of things.  Not hundred but most of it.

12  And that's the person you would go to.  So it was

13  just -- that's all that changed with responsibility

14  because now you're managing and helping all your

15  peers.  Before you weren't required to but now you're

16  looked up to and required to.

17      Q.      Was the SSAS the position you had when

18  you were terminated from Pacira?

19      A.      On the books, yeah, but it wasn't the

20  title, the title change was supposed to happen 2nd of

21  January and it didn't happen.  Again, it's a pattern

22  here.  Signatures have to be done, and so on and so

23  forth.  So they would tell you one date but things

24  are always months behind because either somebody

25  dropped the ball or somebody is not in the right mood

Page 126

```
 1   or somebody is afraid to ask somebody to do this.
 2        Q.    But any job or title change couldn't be
 3   finalized until all the appropriate signatures
 4   were --
 5        A.    Yes, but I was already doing that job
 6   for over a year and a half.  I was doing more than
 7   senior SSAS stuff.
 8        Q.    How long were you -- when did you become
 9   an SSAS?
10        A.    You mean like officially on the business
11   cards?
12        Q.    Yes.
13        A.    I want to say 2016.  It was supposed to
14   happen 2015, but 2016.   What month, I don't know.
15   Whenever the reviews are, March maybe.
16        Q.    At some point subsequent to that was a
17   new position discussed with you?
18        A.    Which new position?
19        Q.    Any new position, was there a new
20   position that was discussed with you?
21              MR. STEWART:  After the 2016?
22        Q.    After you became the SSAS that's what
23   I'm saying, after that, at some point subsequent to
24   that a different, you know, position within Pacira?
25        A.    Yeah, we were always having discussions
```

Page 136

1         A.     Glenn and Pete.

2         Q.     Was that in writing anywhere?

3         A.     No.

4         Q.     Did Glenn or Pete ever tell you that

5   Dave Stack had approved of this position?

6         A.     Verbally, but they needed to get the

7   signature.

8         Q.     Did you understand they needed to get

9   the signature meant that this was not official, this

10   position was not official yet?

11         A.     Well, I was already doing that role for

12   over a year and a half.  So it was not official only

13   because they didn't announce it.  So I couldn't have

14   new business cards or I could not do the things that

15   a director level would do.  It was supposed to be

16   announced, that's what the national sales meeting

17   argument was about.  The meeting we had before the

18   national sales meeting started is why haven't you

19   received the signature yet, we're in February now.

20   And this argument had been going on for about five

21   weeks.

22         Q.     Were you told then that it was

23   officially approved at any point?

24         A.     Yes, because why else would we have

25   contacted people, all the reps and speak with each

Page 139

1   retro, my pay will be retro.  His signature will be

2   relevant to having my pay be retro.  That's what

3   you're worried about and I said no, but I still need

4   that change, my title change, it hasn't changed.  He

5   goes different rules apply when it comes to

6   compliance, that's why the title change was important

7   in writing for me.  I was already doing the job.

8        Q.     Just so I'm clear though, was it your

9   understanding that Dave Stack needed to officially

10  sign off on this new position for it to be an

11  official position?

12       A.     Yes.

13              MR. STEWART:  As of what time though?

14  She testified about this and her understanding is

15  that it shifted.  Do you understand what I'm saying?

16              MR. PANZINI:  No.  Maybe I can ask that.

17       Q.     Let me ask it this way, so January 2nd

18  came and went, do you believe the position was

19  officially yours?

20       A.     I knew that in June of 2017 it was mine,

21  that's why I invited them to go to the Alibaba

22  meeting in August.

23       Q.     So you assumed that in June of 2017 that

24  you were officially given this position?

25       A.     Yes, Alibaba meeting is only for

1      Q.     When did that occur?

2      A.     The title would be officially announced

3  on January 2nd.   It was never announced.

4      Q.     But did they tell you that prior to

5  January 2nd you were the director of post-op pain

6  management?

7      A.     Yes.  And the reason why is because

8  they're the ones who set up area calls with all the

9  managers on the west coast and the managers on the

10  east coast around November, maybe around Thanksgiving

11  time.  Here's Reshma, her title is going to be

12  changing and this is what she's going to be bringing

13  to the table so please have ex-amount of reps ready

14  that we can interview for this.  We're going to be

15  recruiting one rep from each region, and so on and so

16  forth.  And then we did the same call with the east

17  coast.  They were all aware of it that the shift was

18  coming in January.  That's why we prepped everybody

19  in November, December.

20      Q.     But that shift never officially came?

21      A.     No, because Rob Rock didn't like it.

22      Q.     Are you aware of Dave Stack ever putting

23  his signature approval on the director of post-op

24  pain management?

25      A.     No, that was supposed to happen that

Page 146

1    national sales meeting week.

2        Q.    But as far as you know that didn't

3    happen?

4        A.    No.

5        Q.    Was it your understanding that Dave

6    Stack needed to approve such a position in order for

7    it to exist?

8        A.    Well, yeah, he's a CEO.  He has to

9    approve every position.  So even when I was like I

10   said, senior SAS when you asked earlier there were

11   some signatures that were missing and I think it was

12   Tanya's signature missing at the time or somebody.

13   You had to get, again, I'm not aware of at what

14   capacity, but all the CEO, CFO, president, everybody

15   has to sign, right, approving, the board maybe, I

16   don't know if they do or not, compliance department.

17   So each department has their I guess signature on

18   different positions, that's my understanding.  So

19   when they said the only signature they were missing

20   was from Dave everything else had been approved then

21   there's no assumption, there's just when are we doing

22   this.  And relax, Reshma, your pay will be

23   retroactive by January 1st.

24       Q.    But they were clear they never had

25   Dave's signature, correct?

Page 149

1        A.      I already had my credentials because we

2    have to get them done in January, but I did not have

3    the announcement and they were supposed to make it in

4    front of the whole country.  So Pete's explanation to

5    me was it's better to do it in person, it looks

6    better than me sending an e-mail out, if we do it in

7    front of everybody because twice a year we get the

8    country together.  So January and later in the year.

9    I'm sorry, February and later in the year.  So he

10   felt that it would be better if he made an

11   announcement because that's where they usually do it.

12   Whenever there's big promotions and happenings they

13   announce it at national sales meeting so you can

14   congratulate each other and do your part.  So that

15   was my understanding that's what they were waiting

16   for.

17        Q.      As part of the 2018 sales meeting were

18   you invited to a national woman's event for this

19   year?

20        A.      Yes.

21        Q.      Did you know what the itinerary for that

22   event was?

23        A.      It was from 6:30 to 9:30.

24        Q.      And what was the -- do you know what

25   they were going to discuss?

1        A.      The content?

2        Q.      Yeah, content.

3        A.      No, it was about how to be a leader if

4    you're a woman in this industry and how you juggle

5    family and a job, that was my understanding.

6        Q.      Were you told that you were required to

7    attend that meeting?

8        A.      No.  It said in the e-mail that it was

9    optional.

10        Q.      Were you encouraged by anyone to attend

11    that meeting?

12        A.      It was not honoring the optional option.

13    So I called my boss, Roxy Dorothy at the time and I

14    said it's not allowing me to do it.  She goes oh, I

15    don't know. So I called the IT department and they

16    said they couldn't fix it either.  And then I called

17    Pete Murphy, it's saying optional, it's not letting

18    me do it, you know I can't be at that meeting, I have

19    to interview with these guys.  So he's like no, it's

20    okay.  And I forget who I spoke to and they manually

21    did it at headquarters and they opted me out of it.

22    I don't know who did it, but in any case that was

23    done in way back in January.  I think because you

24    have to respond to it by a certain deadline and my

25    response kept coming up as not, you know, that I

 1    was for everybody.  We always did one -- it was

 2    traditionally on that second night or third night we

 3    did something together as a country not as regions.

 4    First night we have the reception, it's optional, you

 5    can come or not come just to settle in, say hello to

 6    your teammates.  Second night you have regional

 7    dinner with another region perhaps or somebody on the

 8    west coast so you have like either one restaurant

 9    where they do that.  And then the third night they

10    get the whole country together you do like a team

11    building and/or something together each year.

12         Q.    So I think you testified --

13         A.    So this is the first year they didn't do

14    it, that's why I assumed we were all going to be

15    together.

16         Q.    Either Glenn or Gio you believe invited

17    you to the outing?

18         A.    They didn't invite me to the outing,

19    they just said, hey, we're going to be doing this

20    golfing thing and I was like, yeah, how can we be

21    doing both, they're doing the women's leadership

22    meeting.  No, that's just for women.  And I said, oh,

23    they're like and you have to go to that.  So I said

24    no it says optional, I looked at the form.

25         Q.    Did you understand or learn that this

Page 159

1  event was put together by certain regions?

2          A.      The women's leadership meeting?

3          Q.      No, I'm sorry, the Top Golf.

4          A.      No, because, like I said, when I worked

5  with other reps in different areas they're like I'm

6  going to Top Golf.  I'm like no, you're not, it's

7  only two regions.  They're like it's not for two

8  regions it's like Michael Gorso (phonetic) or the

9  California rep.  He's like I'm in California I'm

10  going, you coming?  I said, no, I think it's only for

11  like Gio's region and Rob Rock's region, why would

12  that be?  So then I found out from Tom Schneider that

13  he's going too and I guess Von is going so I was like

14  oh, so it's for everyone then.  I was like good, I'll

15  have everyone there, it will be perfect.

16          Q.      How many Pacira employees or personnel

17  were at the Top Golf event?

18          A.      I have no idea.

19          Q.      How were you aware that it was designed

20  to be for only certain regions?

21                  MR. STEWART:  Note my objection.  I

22  don't think that's what she testified to.  You can

23  answer it.

24          Q.      We can have it read back at some point

25  where she said during her conversations.  Were you

Page 160

1    ever made aware that the Top Golf event was only for

2    certain regions?

3          A.    Yes.

4          Q.    How did you learn that?

5          A.    Rob Rock told me it's only two regions

6    that's invited.

7          Q.    What two regions were they?

8          A.    They were Gio's and Rob Rock's region.

9          Q.    What regions are they?

10         A.    Gio is Pennsylvania and Rob Rock is

11   southeast Florida, Louisiana, all that, Atlanta,

12   Georgia.

13         Q.    Was anyone else from your region, any

14   other SAS or SSAS invited to the Top Golf outing?

15         A.    Yes, that's why I was confused because

16   Jim is like I'm going.  I'm not even in that region,

17   Jim -- I'm blanking out on his last name.  Jim was

18   from my region and he was there.

19         Q.    Anybody else from your region that went

20   to the Top Golf event?

21         A.    I don't recall because we were disbursed

22   all over the entire floor.  So you can only be

23   ex-amount of people per booth.

24         Q.    Anybody else from a region that wasn't

25   either Rob Rock's region or Gio's region?

Page 169

```
1    just going to leave.  And Mike Korn and Jim, four or

2    five other guys, really nice, just stay for a bit

3    we'll all go together.  Let's just finish this game,

4    you're already here, stay, do what you need to do.

5    At that I point I ended up staying with the guys that

6    I felt comfortable with that knew what I was there

7    for, that respected me and that loved the fact like,

8    let's just celebrate that you're going to be doing

9    this.  And they were happy with that.  Pat Nolan was

10   happy with that, Mike was happy for me.  Ken Wolfe

11   was happy for me, they're like this is great news.

12   And two new guys, I don't know their names because

13   they had just been hired.  So I said all right, I'll

14   stay until everybody on that team is gone.

15        Q.    And then you took Uber or taxi back to

16   the hotel?

17        A.    Yeah, but not by myself.  It was a

18   mini-van so I don't know how many people were in

19   there.

20        Q.    That conversation you had with Rob Rock

21   at the Top Golf, how long did that last?

22        A.    Maybe less than, I don't know, three,

23   four minutes.  It felt longer.

24        Q.    Did either one of you raise your voice

25   during that conversation?
```

Page 170

1          A.      Yes, we both did.

2          Q.      Did either one of you use profanity

3     during that conversation?

4          A.      Yes, we both did.

5          Q.      What did Rob say that had used

6     profanity?

7          A.      I don't understand what you don't

8     understand, we're fuckin friends and I'm on your

9     side.  I'm trying to tell you that.  I'm like but

10    your actions are saying otherwise and you were

11    visibly upset when we got here and you told me time

12    over and over again and I thought you were joking but

13    until I saw you tonight, the way you acted you

14    seriously didn't want me here.  I said last few weeks

15    oh, it's just a boy thing or it's this or that, I

16    thought you were joking because we joked around a lot

17    every time he called for advice we would joke around

18    about stuff.  So I never knew when he was serious or

19    when he wasn't.  This was serious.  So when he asked

20    he used that and I don't recall what other instances

21    or exact words, but I know that there were a couple

22    words.  It wasn't the whole conversation that way but

23    a couple times we did.

24         Q.      What profanity did you use during that

25    conversation?

1    entrance of the hotel is all the way to the right.

2    So when you enter the right-hand side is the bar, you

3    pass the bar and then there's the lounge area over

4    there, the circular table, it's a restaurant area

5    basically.

6          Q.    And then once you went up to your room

7    that night did you come back down later that night?

8          A.    No.

9          Q.    Next time you came back down was the

10   next morning?

11         A.    Yes.

12         Q.    That next morning did you see Rob Rock?

13         A.    No.

14         Q.    Did anyone from Pacira speak with you

15   about what happened the night before that next

16   morning?

17         A.    Yes.  Almost everybody passing by, woman

18   and everybody was like what happened last night.  So

19   at this point the word had spread.

20         Q.    And did you report any of this to HR?

21         A.    No.

22         Q.    Were you aware if anybody reported it?

23         A.    Yes, Glenn Reiser.

24         Q.    Did Glenn tell you they reported it to

25   HR?

Page 213

1    accomplishments, and consistently outperformed her

2    peers, and met or exceeded her sales quotas despite

3    an overtly hostile, male dominated office where

4    raunchy, sexually-based jokes and innuendo were the

5    norm.

6            So my question is, did you ever report

7    any of those sexually-based jokes and innuendos or

8    raunchy behavior to anyone within Pacira?

9        A.     No because the company wouldn't exist.

10       Q.     19:  It was business as usual for Abell

11   to hear in a typical workday, in sum or substance,

12   that the reason she was so successful was because she

13   was "sleeping with her clients," or "blowing

14   someone," or words to that effect.

15           Who said those things to you?

16       A.     Justin for sure.  This is now bringing

17   back all the memories so going back when he said, did

18   anybody offend you over the years and I said yeah,

19   many, many, times and these are the things.  So when

20   they were at a national sales meeting they're like

21   yeah, you're only doing well because you're probably

22   sleeping with your clients or blowing someone.  How

23   else can someone perform this consistently and this

24   aggressively.  The numbers I was producing were not

25   normal in the industry.  So that was the joke.  And I

1       Q.     And did he tell you in detail what the

2    -- did he mention Kamasutra?

3       A.     Yeah, he said the site was regarding

4    something called Kamasutra and he's like -- so first

5    he asked me, did you look at this on your phone?  I

6    said yes, I did.  And he said did you show it to

7    anyone?  I said no, absolutely not.  He said okay,

8    well, what happened?  Well, couple people passed by

9    and I was like how is that my fault they're peeking

10   and peering in my phone.  He's like it's still

11   offensive.  Yeah, I know the sexual harassment

12   classes were taken.  But I was like but it was on my

13   private phone and it wasn't in the presence of

14   anybody else around.  If they're passing by and

15   seeing this, again, how did I offend them, can I

16   apologize to them and he's like no at this point it's

17   an investigation, we haven't concluded yet.  So after

18   a couple days we'll know.

19      Q.     Did you have a work cell phone and a

20   private phone?

21      A.     No, just we use our own phone.

22      Q.     And Mr. Kahr indicated to you that two

23   people witnessed this?

24      A.     He said multiple.  I said define

25   multiple, is it two or a thousand.  He goes it was

Page 228

1    on there because it was a website.  It was my older

2    phone, as soon as you picked up the phone.  So then

3    when I went in I closed it out and then I checked my

4    text messages.  Like right now my camera goes on.  So

5    that's the second time it got turned on probably and

6    that was it.

7         Q.    So can you tell me how long you believe

8    the website was opened from the time you touched it

9    until the time you closed it out?

10        A.    I don't know but definitely less than

11   five minutes.  And I told that to Rich Kahr as well,

12   he asked me and I told him it was a few minutes but I

13   don't know the exact time.

14        Q.    I'm sorry, what did Roxy say when Mike

15   went to show it to her?

16        A.    He goes -- she went with her right arm,

17   she was facing us and she goes, you guys, stop it and

18   I was like give me my phone back.  So I took my phone

19   back.  I'm like sorry, sorry.  You guys, what are you

20   doing, you can't just -- because Mike is very, very

21   close to Roxy so he felt comfortable enough to show

22   it.

23        Q.    So other than Mike, Dave and Roxanne,

24   are you aware of any other employee of Pacira that

25   may have viewed any of the photos or text on your

Page 229

1    phone with regard to the Kamasutra?

2         A.    No, I'm not aware of it.

3         Q.    Did anyone at that time during the

4    meeting bring it to your attention that that was

5    inappropriate?

6         A.    Not one single person.

7         Q.    Did you take Roxy's hand wave and oh,

8    you guys, as meaning that she in any way disagreed?

9         A.    Of course, that's exactly how I reacted.

10   When I am treated that way that's exactly -- I'm

11   like, you guys, come on, just stop.  So I know --

12   like I don't know if most women do this but the body

13   language I can read it.  And I'm like oh, my God

14   because she saw it as sexual positions.  She saw it

15   as something else, not as what it was portraying.

16   She only looked at the pictures because Mike was

17   scrolling.  So that's all she saw.  I knew it the

18   second she saw it, that's why I took the phone away

19   and that was it.

20        Q.    Did you have any conversation with Roxy

21   about it?

22        A.    No, because she didn't bring it up and

23   I'm not the one who showed it.  Why would I have a

24   conversation?  Grant it, it was my phone and he took

25   it from me but I didn't say here Mike, show it to her

1    or stick it in her face.  I know how culturally

2    people can be uneducated.  I'm sensitive to cultures,

3    I knew this would not be perceived -- from her body

4    language that it won't be perceived the way my

5    perception was.  So I kind of knew she was

6    uncomfortable.  Not that she was offended, that's why

7    I took the phone away.  I know how I get when I'm

8    uncomfortable.

9         Q.    Did you believe she was uncomfortable

10   because it was depictions of sexual positions?

11        A.    I can't speak on her behalf because she

12   never said anything like that.  She was a very cool

13   manager.

14        Q.    Did you believe it was appropriate to

15   have a Kamasutra website opened on your phone during

16   a business meeting?

17        A.    We were on a break.  So it wasn't opened

18   during the business meeting.  I didn't go and Google

19   to find the site, somebody sent it to me.  I clicked

20   on it and it opened.  I knew it was coming from a

21   trusted source so I knew it wasn't a virus.  Plus it

22   was in a text message, it wasn't an e-mail.  So it

23   was not intended to harm anyone.  It was, again,

24   unintentional and I offered to apologize, either

25   written or personal in any way.  I was never not

Page 231

1    sorry, but I was never afforded the opportunity to

2    apologize.

3         Q.    And what were you -- if you were

4    afforded the opportunity what were you going to

5    apologize for?

6         A.    That I'm really sorry if I offended you.

7    However, to me it has a different culture I come from

8    and these are the names of the temples -- you don't

9    have to look at it -- that are around the world in

10   several different countries that have these hundred

11   positions carved out in all the stones of these

12   temples.  So what is offensive to you, I just want

13   you to understand where I'm coming from not where

14   you're coming from.  For me it's not what it is.

15        Q.    So you didn't find the website to be

16   offensive?

17        A.    And I still don't, no, it's cultural for

18   me and I don't flaunt it, for the record.

19        Q.    Did you understand how some would find

20   it offensive?

21        A.    Of course, that's why I offered to

22   apologize immediately the second I was made aware I

23   offered.   I wasn't given that opportunity.

24        Q.    Did you tell anyone at the meeting my

25   people invented sex?

1      A.      No, I said this guy -- I said the person

2  who sent it to me they were like he's saying my

3  people invented it.  How they interpreted it, I can't

4  control that, but I did say that.

5      Q.      I'm sorry?

6      A.      I said the person who sent it to me said

7  did your people invent this?  I said yes, my people

8  invented this.  That was my response.  So again,

9  reading this text somebody saying my people invented

10  it, that's where they got it.  So that was the length

11  of the conversation with Mike and Dave, or both.

12      Q.      Did you tell them about that exchange?

13      A.      Yeah, that's what I'm saying, they're

14  like why is he sending you that?  I said because my

15  people invented it, quote, unquote.

16      Q.      And then once you closed the website

17  when's the next time you were made aware that it was

18  an issue?

19      A.      I was never made aware of any of this

20  until March 13th, the first time I heard of this was

21  on March 13th.

22      Q.      And that's when Rich Kahr spoke to you?

23      A.      Yes.

24      Q.      And I believe you admitted to Rich that

25  you opened the website?

Page 263

```
 1    amazing.  But that's your incentive.  When they
 2    invite national accounts and when they invite people
 3    from medical affairs now you're commingling the
 4    incentive.  You cannot, those are salaried employees,
 5    we are incentive comp.  So there's two different
 6    departments.  If any of our competitors got wind of
 7    it -- so my concern was, I'm moving up in this
 8    company, eventually I'm going to be, I don't know,
 9    not just VP of sales, my goal was to be COO.  I have
10    to lay down the building blocks now.  I cannot have
11    people making mistakes like these and so when I'm
12    ready to take over I tank the company because of
13    these actions that are happening.  Do you see what I
14    mean?
15            So looking ten years ahead or five years
16    ahead my complaint to them, you guys -- and earlier
17    when you said how did they retaliate or
18    discriminated, because this company would tell me to
19    keep my mouth shut.  And it's like, but it's the
20    right thing to do.  Because everybody was in it for
21    short-term, I was in it for a long hall.  This is my
22    life's work.  I told them they need to either explain
23    this to me but they cannot be there with the
24    executive and the commercial team as an incentive
25    because they're not incentivize to win.  Why are they
```

 1    incentive.  The reps, every company has, again, I

 2    don't know if you can find one, I'll really

 3    appreciate it.  But I don't know any company in our

 4    industry that has invited all on the same trip as

 5    commercial.

 6          Q.     Understand that.  You said you're not

 7    aware of any companies that did that, but my question

 8    to you was, is that a violation of a rule or

 9    regulation?

10          A.     It is a violation of a rule in my mind

11    because it's a violation of a rule if worked with

12    this peril in the universal peril, now this is

13    completely gray.  My concern was five years down the

14    road if this comes back how will it look?  I needed

15    an explanation.  Who approved this?  How can they

16    approve this?  It's clear if anybody saw this and I

17    have enough investor friends in the industry to tell

18    me if they saw this, why are medical first people

19    going on a sales trip, this is a sales trip.  That

20    was the only concern.

21          Q.     You indicated that in your mind it was a

22    violation but my question was more, are you aware of

23    any law or regulation it violated?

24          A.     No, but I also have not ever seen this.

25    And our compliance it said you should not be

Page 289

```
 1   like no, I'm proud of you, don't go.  Some people
 2   were comfortable with it, others were upset about it.
 3   How come she's getting out of it and we're not.  And
 4   I said no, it's optional, you don't have to go.
 5   They're like no, we opted out no but there's not an
 6   option to say no and then when we spoke with our
 7   managers they said we hadn't responded and that we
 8   had to go.  It's not an optional meeting.  I'm like,
 9   it's an optional meeting.  And even Pete said guys,
10   it's an optional meeting.  He made it clear that it
11   was.  Apparently it wasn't so optional.
12        Q.    Were you aware if Rob Rock was
13   terminated from Pacira?
14        A.    He wasn't terminated.  Rich, I told you
15   I didn't want anybody fired.  No, he resigned on his
16   own will, and Pete Murphy was on that phone call on
17   March 13th when he said that.  Exact words were he
18   was not terminated.  He resigned on his own will.
19        Q.    Did you ever find out that he was
20   terminated?
21        A.    No.
22        Q.    As we sit here today you still don't
23   know?
24        A.    Jason said no, that's not true.  I think
25   there's some kind of mistake because he wasn't
```

# EXHIBIT 11

---

| From: | Rich Kahr [/O=SKYEPHARMA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=RICH KAHR2E4] |
|---|---|
| Sent: | Tuesday, February 06, 2018 5:51:49 PM |
| To: | Hassan Danesi; Stephen Marinaccio; Lisa Zhang; Erin Fitzpatrick; Daina Borteck; Julia Yang; Earl Adamy; Scott Braunstein; Roy Winston; Anita Walsh; James Nugent; Mary DiGiorgi; Lauren Riker; John Gallagher; Jason Gallagher; Kenneth Leslie; Robert Weiland; David J. Smith; Matt Lehmann; Leslie Hyman; Mary Beriont; Sharon Cohen; Ron Ellis; Susan Mesco; Richard Scranton; Barbara Koch; Charles Reinhart; Amber Sears; Michael Rozycki; Matthew Carangelo; Paul Maccaro; Vincent Yu; Yayra Tuprah; Beth Blumhoefer; Randall Pinchuk; Derek Lee; Dorothy Saewert; Thomas Cichon; Francine Giocondo; Sharon McCarroll; David Mitchell; Cindy Alvarado; John Bartolick; Chad Brightwell; Chris Borsa; Christal Rowe; Dan McKerracher; Emily Smith; Gio Vendemia; Glenn Reiser; Huston Ellis; Peter Murphy; Robert Rock; Roxanne Doherty; Thomas Schneider; Vaughn Schouten; Joyce Davis; Sharon McCarroll; Anita Walsh; Erin Fitzpatrick; Mary Beriont; Derek Lee; Christa D'Agnese; Tatyana Shuster; Kristin Rudisill; Matt Lehmann; Dennis McLoughlin; Karla Moore; Marissa Royer; Elise Bradley; Darrin Christiansen; Dave Dezan; Tricia Glenn; John Grigsby; Jeremy Horton; Vladimir Kharitonov; Chuck Laranjeira; Kathy Los; Bernie Morales; Ron Ortiz; Deanna Ryan; Ryan Shore; Jeremy Wenzel |
| CC: | Kristen Williams; Anthony Molloy; Dave Stack |
| Subject: | Sensitivity Training |
| Attachments: | Client Version of Sensitivity Training Pacira 02.05.2018.pptx |

Pacira Leaders,

Thank you for your recent participation in our Sensitivity Training and your support for providing a harassment free workplace at Pacira.  Attached is a PPT copy of the presentation led by Javier Garcia from Perkins Coie.

Please let me know if you have any follow-up questions on this material.

*Rich Kahr*

*Vice President, Human Resources*
*Pacira Pharmaceuticals*
5 Sylvan Way
Parsippany, NJ 07054
(973) 254-4341 Office
(848) 702-0512 Cell
rich.kahr@pacira.com

**CONFIDENTIAL**

000101766.00001

**CONFIDENTIAL**

000101767.00001

Pacira - 001454



PERKINSCOIe

COUNSEL TO GREAT COMPANIES

Perkins Coie LLP

Javier Garcia

Perkins Coie LLP

Pacira Pharmaceuticals Inc.

# Sensitivity Training

January 30, 2018

**CONFIDENTIAL**

000101767.00002

# Why Are You Here?

Pacira - 001455

perkinscoie

# Why are you here?

- Protect **you**

- Protect the Company

- Educate you to:
  - Recognize relevant issues
  - Understand your rights and responsibilities
  - Know your legal remedies

- Prevention

3  Perkins Coie LLP  |  PerkinsCoie.com



**CONFIDENTIAL**

000101767.00003

Pacira - 001456

**CONFIDENTIAL**

000101767 . 00004

Pacira - 001457

# Objectives in Plain English

- To keep Pacira Pharmaceuticals from getting sued

- To keep *you* from getting sued

- If someone does sue, to *win*



# Agenda

- Harassment and its Consequences
- Employer Responsibilities
- Preventing Harassment
- Responding to Harassment
- Liability

5   Perkins Coie LLP  |  PerkinsCoie.com

PerkinsCoie

**CONFIDENTIAL**

000101767.00005

Pacira - 001458

**CONFIDENTIAL**

000101767.00006

Pacira - 001459

# The Negative Consequences of Workplace Harassment

PERKINScoie

**CONFIDENTIAL**

000101767.00007

Pacira - 001460

# What are the Negative Consequences When Harassment Occurs in the Workplace?

- Morale

- Productivity

- Employee turnover

- Publicity

- Reputation

- Legal liability



**CONFIDENTIAL**

000101767.00008

Pacira - 001461

# What are an Employer's Obligations?

Ensure a workplace free of unlawful harassment

- Take all reasonable steps to prevent harassment
  - Written anti-harassment policy
  - Training for supervisors and managers
  - Clear message that harassment will not be tolerated

- Complaint procedure

- Prompt action

PERKINSCoie

**CONFIDENTIAL**

000101767.00009

Pacira - 001462

# Is the Risk Real?

YES!

- In the last year, a number of well-known companies have been sued or settled with the EEOC in connection with harassment claims.

- Some claims settled for over $500K

  - Jury verdicts are likely to be even higher!

PerkinsCoie

**CONFIDENTIAL**

000101767.00010

Pacira - 001463

# What is Harassment?

PerkinsCoie

**CONFIDENTIAL**

000101767.00011

Pacira - 001464

# Title VII/New Jersey Law

Title VII of the 1964 Civil Rights Act
- Makes certain employers responsible for preventing and stopping sexual harassment that occurs on the job
- Applies to private and most public employers, labor organizations, employment agencies, and joint employer-union apprenticeship programs with 15+ employees

New Jersey Law Against Discrimination
- Prohibits sexual harassment in employment
- Applies to private and public employers, employment agencies, labor organizations, state licensing boards, and state and local governments
- Unlike Title VII, provides protection for persons who provide services pursuant to a contract
- Anti-harassment rule applies to employers with <u>one</u> employee

PERKINSCOie

**CONFIDENTIAL**

000101767.00012

Pacira - 001465

# What is Sexual Harassment?

- Quid Pro Quo

- Hostile work environment

PERKINSCOIE

**CONFIDENTIAL**

000101767.00013

Pacira - 001466

# Hostile Work Environment

- Unlawful harassment is unwelcome conduct or behavior based on a protected characteristic which is sufficiently severe or pervasive to alter the terms and conditions of employment and such conduct has  the purpose or effect of interfering with the victim's work performance or  is hostile, offensive, or intimidating

- Reasonable person/"reasonable victim" standard

PERKINSCOie

**CONFIDENTIAL**

000101767.00014

Pacira - 001467

# Circumstances of Sexual Harassment

- The victim as well as the harasser may be a woman or a man

- The victim does not have to be of the opposite sex

- The harasser can be the victim's supervisor, an agent of the employee, a supervisor in another area, a co-worker, or a non-employee

- Unlawful sexual harassment may occur without economic injury to or discharge of the victim

- The harasser's conduct must be unwelcome

- Sexual attraction does <u>not</u> have to be the motivation

PERKINSCoie

000101767.00015

**CONFIDENTIAL**

Pacira - 001468

# Forms of Sexual Harassment

- Verbal or Written
    - Comments about clothing, personal behavior, or a person's body; sexual or sex-based jokes; requesting sexual favors or repeatedly asking a person out; sexual innuendoes; telling rumors about a person's personal or sexual life; threatening a person

- Visual
    - Posters, drawings, pictures, screensavers, or emails of a sexual nature

- Physical
    - Assault; impeding or blocking movement; inappropriate touching of a person or a person's clothing; kissing, hugging, patting, stroking

- Nonverbal
    - Looking up and down a person's body; derogatory gestures or facial expressions of a sexual nature; following a person

PERKINSCoie

# What About Compliments?

- Tone of voice/way you look

- Frequency

- Reference to body parts

**CONFIDENTIAL**

000101767.00017

Pacira - 001470

# Hostile Work Environment

True or False

- The test of whether an action or comment is hostile enough to create a hostile work environment is whether the person on the receiving end sincerely feels it is hostile.

PERKINScoie

**CONFIDENTIAL**

000101767.00018

# Hostile Work Environment

True or False

- Off-color jokes between friends at work do not violate the Company's anti-harassment policy because the joke-teller "knows that no one will be offended."

Pacira - 001471

PERKINSCOIE

**CONFIDENTIAL**

000101767.00019

Pacira - 001472

# Who Decides If The Environment Is Hostile?

True or False

- If a person laughs at your jokes, he or she cannot then complain about the jokes.

PERKINScoie

# Who Decides If The Environment Is Hostile?

It is impossible to know for certain if your conduct is welcome!

- Recipients of conduct will not always say or show that conduct is unwelcome

- "Unwelcomed or unwanted" conduct is determined not by what a person a person intends, but by what the other person <u>perceives</u>

- Alleged victims do not always complain right away or while employed

- Ultimately, a jury gets to decide

PerkinsCoie

**CONFIDENTIAL**

000101767.00020

Pacira - 001473

**CONFIDENTIAL**

000101767.00021

Pacira - 001474

# Hostile Work Environment

Factors considered:

- Frequency of the conduct

- Severity of the conduct

- Physically threatening or humiliating as opposed to an offensive utterance

- Interference with work performance

PERKINSCOIE

**CONFIDENTIAL**

000101767.00022

Pacira - 001475

# Hostile Work Environment

Example 1

- Kelly often expresses interest in dating a co-worker who is married, Mark. Mark refuses Kelly's advances and Kelly and other female co-workers make various vulgar comments about Mark's sexual preferences and ability. This caused Mark stress at work but he never sought treatment or counseling for the stress.

- Liable or not?

PERKINSCOIE

**CONFIDENTIAL**

000101767.00023

Pacira - 001476

# Hostile Work Environment

Example 2

- Mary has worked for A Corp. for 3 years.  At first, she joined in when her co-workers would have sexual discussions.  She herself would make sexual comments and lewd references.

- After a year, her supervisors allowed her co-workers to post sexually explicit pictures on their office walls.  Even though Mary had not been offended by the remarks, she believed that the pictures demeaned women.  She complained to her supervisor twice, but her supervisor refused to ask the employees to remove the pictures.

PERKINScoie

# Hostile Work Environment

Example 3

- Ani is a physician assistant. She claims she was repeatedly harassed by the doctors she worked with, including being stabbed with a needle and being called "stupid chick." She claims one doctor greeted her each morning by saying "I'm horny" and slapping her on the butt. She claims another doctor made disparaging comments about her Armenian ethnicity, asking her if she was a member of Al Qaeda.

- Ani filed at least 18 complaints with the Human Resources Dept. of the hospital. She was fired shortly after one of the complaints.

PERKINSCoie

**CONFIDENTIAL**

000101767 . 00024

Pacira - 001477

# When is Harassment Improper?

- Not all conduct that an employee might describe as harassment is illegal or in violation of Company policy.

- Only harassment based on certain protected characteristics is illegal and in violation of Company policy.

- Illegal harassment does not cover the equal opportunity harasser (a.k.a. a bully or a jerk).  This could still violate company policy, however.

PerkinsCoie

**CONFIDENTIAL**

000101767.00025

Pacira - 001478

# What are the Protected Characteristics?



**CONFIDENTIAL**

000101767.00026

Pacira - 001479

**CONFIDENTIAL**

000101767.00027

Pacira - 001480

# What are the Protected Characteristics under Federal Law?

- Race/color

- Sex (includes sexual harassment)

- National origin/ancestry/citizenship

- Religion

- Age

- Disability (physical or mental)

- Pregnancy/childbirth

- Genetic Information

PERKINSCoie

# What are the Protected Characteristics?

- Race / color
- National origin / ancestry / citizenship
- Sex (pregnancy, perceived pregnancy, childbirth, breastfeeding, or related medical conditions)
- Sexual orientation
- Gender identity/expression
- National origin/ancestry
- Religion (religious dress & grooming)
- Age

- Disability (physical or mental)
- Legally protected medical condition or information (e.g., cancer)
- Genetic information (e.g., diabetes)
- Creed
- Marital / domestic partner status
- Military status (active / veteran)

PerkinsCoie

**CONFIDENTIAL**

000101767.00028

Pacira - 001481

**CONFIDENTIAL**

000101767.00029

Pacira - 001482

# Avoiding Abusive Conduct, a.k.a., Bullying

- Conduct, with malice, that is
  - Hostile
  - Offensive, and
  - Unrelated to an employer's legitimate business interests.
- May include:
  - Verbal abuse
  - Threatening, intimidating, or humiliating actions
  - "Gratuitous" sabotage or undermining work performance
- Systematic vs. Single Occurrence

PERKINSCOIe

000101767.00030

**CONFIDENTIAL**

# Hostile Work Environment

True or False

- Making a joke about your own national origin does not violate the anti-harassment policy because self-deprecating humor is OK.

Pacira - 001483



# Hostile Work Environment

True or False

- If a person is offended by your conduct, he or she must inform you before they make a complaint.

PERKINSCOIE

**CONFIDENTIAL**

000101767.00031

Pacira - 001484

# Hostile Work Environment

## True or False

- Sending a joke by email or IM is OK  so long as you tell the recipient to delete it right away.

PerkinsCoie

**CONFIDENTIAL**

000101767.00032

Pacira - 001485

000101767.00033

**CONFIDENTIAL**

# Quid Pro Quo

- Tangible job benefits for submitting to sexual advances, or

- Tangible job detriment for refusing to submit to sexual advances

Pacira - 001486

Perkins coie

**CONFIDENTIAL**

000101767.00034

# Quid Pro Quo

Factors to consider:

- Whether the conduct was unwelcome

- Frequency is **_not_** a consideration

- Submission by the harassee does **_not_** prove the conduct was welcome

Pacira - 001487

PERKINS COIE

**CONFIDENTIAL**

000101767 - 00035

Pacira - 001488

# Quid Pro Quo

Example 4

- Ann alleges she lost a promotion for which she was qualified because the co-worker who obtained the promotion was engaged in a sexual relationship with their supervisor.  The relationship was consensual and the supervisor had never subjected Ann's co-worker or any other employee to unwelcome sexual advances.  Ann is genuinely offended by the supervisor's conduct.

PerkinsCOIE

**CONFIDENTIAL**

000101767.00036

Pacira - 001489

# Quid Pro Quo

Example 5

- Same as example 4, except in this case the relationship was not consensual.  Ann's supervisor regularly harassed the co-worker in front of other employees, demanded sexual favors as a condition for her promotion, and then audibly boasted about his "conquest."

PERKINSCOIE

**CONFIDENTIAL**

000101767.00037

Pacira - 001490

# Quid Pro Quo

Example 6

- Same as 4, except Ann's supervisor and other management personnel regularly solicited sexual favors from subordinate employees and offered job opportunities to those who complied.  Some of those employees willingly consented to the sexual requests and in turn received promotions and awards.  Others consented because they recognized that their opportunities for advancement would otherwise be limited.  Ann was not approached for sexual favors.

PerkinsCoie

**CONFIDENTIAL**

000101767.00038

Pacira - 001491

# Equal Opportunity Harassment???

- What if the alleged harasser treats everyone equally badly, and thus there is no harassment based on sex or other specific characteristic?

PERKINSCOIE

**CONFIDENTIAL**

0001101767.00039

# Who is Covered?

Pacira - 001492

perkinscoie

# Who is Covered?

True or False

- The harassment policy prevents harassment against co-workers and managers, but not if the harassment involves a vendor.

PERKINS coie

**CONFIDENTIAL**

000101767.00041

# Who is Covered?

Employees are protected from harassment by:

- Other employees (supervisors and co-workers)
- Vendors
- Customers
- Visitors
- Anyone who does business with the Company

**You as the supervisor have a *duty* to stop harassment of your staff, not just by employees, but by third parties as well.**

Pacira - 001494

PERKINScoie

**CONFIDENTIAL**

000101767.00042

# When Does Harassment Happen?

Pacira - 001495

PERKINS**COIE**

# When Does Harassment Happen?

- Your workstation?

- Conference room?

- Sales conference?

- Business travel?

- A bar on Friday night?

- Dinner at your house?

- Holiday party?

- On-line exchange on Facebook?

43   Perkins Coie LLP  |  PerkinsCoie.com

PerkinsCoie

**CONFIDENTIAL**

000101767 · 00043

Pacira · 001496

**CONFIDENTIAL**

000101767 - 00044

Pacira - 001497

# When Does Harassment Happen?

- At work

- Off premises, if work-related

- Events sponsored by the Company

- On-line

BOTTOM LINE:  Any time you are in contact with co-workers, act professionally.

PERKINScoie

**CONFIDENTIAL**

000101767.00045

Pacira - 001498

# When Does Harassment Happen?

## True or False

- Having too much to drink is an acceptable excuse for harassment that occurs outside of the workplace.

PERKINSCOIe

**CONFIDENTIAL**

000101767.00046

Pacira - 001499

# Who is Liable?

PerkinsCoie

# Who is Liable for Harassment or Retaliation?

The employer is:

- strictly liable for all equitable damages for harassment by a supervisor
  - Whether quid pro quo harassment or
  - hostile work environment harassment
- liable for harassment by a co-worker, vendor or customer, e.g. non-supervisor, if the employer knew or should have known and failed to take appropriate action

**CONFIDENTIAL**

000101767 - 00047

Pacira - 001500

PERKINScoie

# Who is Liable for Harassment or Retaliation?

## You could be PERSONALLY liable!!!



**CONFIDENTIAL**

000101767.00048

Pacira - 001501

**CONFIDENTIAL**

000101767.00049

Pacira - 001502

# Who is Liable for Harassment or Retaliation?

Individual personally liable for "aiding and abetting" harassment if:

(1) The person that you assist performs a wrongful act that causes an injury;

(2) You must be aware of your role as part of an overall wrongful activity at the time of providing the assistance; and

(3) You must knowingly and substantially assist the principal violation.

PERKINSCOIE

000101767.00050

**CONFIDENTIAL**

Pacira - 001503

# Remedies

- Back pay

- Front pay

- Reinstatement

- Emotional distress

- Punitive damages

- Attorneys' fees

PerkinsCoie

**CONFIDENTIAL**

000101767.00051

Pacira - 001504

# Preventing and Responding to Reports of Harassment

PERKINSCOIE

**CONFIDENTIAL**

000101767.00052

# Preventing and Responding to Reports of Harassment

- Comprehensive anti-harassment policies

- Effective communication of the policies

- Management and supervisory training

- Non-management employee training

- Effective complaint procedures

- Immediate and appropriate action when an employee complains

Pacira - 001505

PERKINSCOie

**CONFIDENTIAL**

000101767.00053

Pacira - 001506

# Preventing and Responding to Reports of Harassment

Appropriate proactive steps:

- Encourage employees to report harassment to management *before* it becomes severe or pervasive

- Designate more than one individual to take complaints

- Ensure individuals designated to take complaints are in accessible locations

- Instruct all supervisors to report complaints to appropriate officials

PERKINSCOIe

# What Are Your Obligations?

- A manager is copied on an off-color joke. What should the manager do?

**CONFIDENTIAL**

000101767.00054

Pacira - 001507

# What Are Your Obligations?

- A subordinate tells you informally over lunch that her coworker makes her feel uncomfortable.  She makes it clear that she is not making a complaint and asks you to keep it confidential.

**CONFIDENTIAL**

000101767.00055

Pacira - 001508

# What Are Your Obligations?

True or False

- Managers are not required to report either informal complaints of harassment or complaints in which the employee requests that nothing be done.

**CONFIDENTIAL**

000101767.00056

Pacira - 001509

PERKINSCOIe

**CONFIDENTIAL**

000101767.00057

Pacira - 001510

# What Are Your Obligations?

Obligation to report

- Complaints
- Inappropriate conduct
  - If you:
    - ✓ Hear it
    - ✓ See it
    - ✓ Hear about it

PERKINS coie

# What Do You Do if Someone Reports Inappropriate Conduct to You?

- ## Express appreciation
  - ### Thanks for bringing this to my attention

- ## Confirm organization's commitment
  - ### We take these issues seriously

- ## Confirm no retaliation
  - ### The Company does not tolerate retaliation

- ## Advise of next steps
  - ### I am going to report this to HR who will be in contact with you

- ## Immediately consult HR

58   Perkins Coie LLP  |  PerkinsCoie.com

PerkinsCoie

**CONFIDENTIAL**

000101767.00058

Pacira - 001511

**CONFIDENTIAL**

000101767.00059

Pacira - 001512

# What Do You Do if Someone Reports Inappropriate Conduct to you?

Don't

- ignore it

- judge credibility

- judge whether the conduct is harassment

- express opinions

- discuss with others

- investigate yourself

- promise confidentiality

PERKINScoie

# What Do You Do if Someone Reports Inappropriate Conduct to You?

Do not retaliate!

- Making a claim of discrimination or harassment or participating in an investigation

- Suffering "adverse employment action" as a result

**CONFIDENTIAL**

000101767.00060

Pacira - 001513

PERKINSCOIE

# What if Someone Accuses You of Inappropriate Conduct?

Again, do not retaliate! Report it!

- If it is reported to you, follow the steps we already discussed.

- Do not attempt to investigate the matter yourself

- Do not attempt to argue the merits

61   Perkins Coie LLP  |  PerkinsCoie.com

PERKINS COIE

**CONFIDENTIAL**

000101767.00061

Pacira - 001514

**CONFIDENTIAL**

000101767.00062

Pacira - 001515

# Reasonable Care in Preventing Harassment

◇

PERKINS COIE

# What Can You Do to Be Proactive in Preventing Harassment?

- Lead by example

- Confront and report inappropriate conduct

- Avoid jokes, words, gestures with sexual, racial or other inappropriate overtones

- Be careful with your emails, IMs, social media and texts

**CONFIDENTIAL**

000101767.00063

Pacira - 001516

PERKINSCOIE

# What Can You Do to Be Proactive in Preventing Harassment?

- Remind employees of the policy

- Encourage employees to report

- Be responsive to complaints

- Have an open door policy

- Remember that behavior at Company functions must remain professional

**CONFIDENTIAL**   000101767.00064

Pacira - 001517

PERKINSCoie

**CONFIDENTIAL**

000101767.00065

Pacira - 001518

# Affirmative Steps to Avoid Problems

- Be respectful of differences and different levels of sensitivity

- Comply with the Company's policy as it may be stricter than the law

- If someone complains, it is an issue, even if the conduct does not violate Company policy

PERKINSCOIE

# Questions and Examples

◇ ────────────────────────────────────────

**CONFIDENTIAL**

000101767.00066

Pacira - 001519

# The Crosswalk

 Appropriate Conduct.

 Risky Conduct.

 Inappropriate Conduct.



**CONFIDENTIAL**

000101767.00067

Pacira - 001520

**CONFIDENTIAL**

000101767.00068

Pacira - 001521

**John is so nervous after attending this harassment prevention training that he decides never to invite any female co-workers or subordinates out for dinner or drinks after work, and always to keep his office door open when he meets with female employees.**

PERKINScoie

**CONFIDENTIAL**

000101767.00069

Bennie says to Louise, "Go out with me, and I'll make sure you get that promotion."

Pacira - 001522

PERKINSCOIE

**CONFIDENTIAL**

000101767.00070

Pacira - 001523

**Ellen offers Bennie a massage to relax his shoulders because he has been working on the computer all day and seems tense.**

**CONFIDENTIAL**

000101767.00071

Pacira - 001524

**Sam is good friends with all of the people that she supervises.  She talks with them a lot about their personal lives, including graphic details of their dating experiences.**

PerkinsCoie

**CONFIDENTIAL**

000101767.00072

Pacira - 001525

**Julie told Max (who reports to her) that she put in a "good word" for him about an upcoming promotion.  She also said, "Stick with me and I will take you to  the top."**

PERKINSCOIE

**CONFIDENTIAL**

000101767.00073

Pacira - 001526

**Emily filed a complaint of sex harassment against Miles.  Andrea, a co-worker, tells Emily, "Don't bother hanging around us anymore.  You're just causing trouble for the rest of us women who work here!"**

PERKINSCOIE

**CONFIDENTIAL**

000101767.00074

Pacira - 001527

# John asks Sam out on a date to the movies.

000101767.00075

**CONFIDENTIAL**

Pacira - 001528

In the corner of her work station, Sabrina has placed a life size poster of Matthew McConaughey, shirtless. On her desk she puts up a picture of her boyfriend wearing a bathing suit and flexing his muscles.

**Michelle puts a posting on the Company's bulletin board in the kitchen about the "Sexiest Man at Work" contest.**

**CONFIDENTIAL**

000101767.00077

Pacira - 001530

# When some of the customers who are from the South meet Company employees, they give a full frontal hug and a kiss them on both cheeks.

PERKINSCOIE

**CONFIDENTIAL**

000101767.00078

Rory says to Lou, "You are really looking hot since you've lost all that weight!"

Pacira - 001531

PERKINScoie

**CONFIDENTIAL**

000101767.00079

Pacira - 001532

# While at dinner, a contractor invites three employees to a strip club, at the contractor's expense.

PERKINSCOIe

**CONFIDENTIAL**

000101767.00080

**A vendor tells Debbie, a Company staffer, that he's glad she is there and hands her his card with his cell number.**

Pacira - 001533

PERKINScoie

**CONFIDENTIAL**

000101767.00081

Pacira - 001534

**While on a break at a trade show, a vendor sends Debbie a text inviting her to a dinner away from the convention site and asks if she wants to share a cab.**

PERKINS COIE

**CONFIDENTIAL**

000101767.00082

Pacira - 001535

**While having drinks in a hotel lobby bar after trade conference events are over, a vendor puts his hand on Debbie's back.**

PERKINSCOIE

**CONFIDENTIAL**

000101767.00083

Pacira - 001536

# Susan, a vendor, sends a LinkedIn request to David, a Company employee.

**CONFIDENTIAL**

000101767.00084

Pacira - 001537

# Carrie, a Company employee, receives a Facebook "friend" request from John, a vendor.

PERKINSCOIE

**CONFIDENTIAL**

000101767.00085

Pacira - 001538

# Kathy, a Company employee, gets a text message from vendor Daniel along with a nude picture of Daniel and his hotel room number.

PERKINS COIE

**CONFIDENTIAL**

000101767.00086

Pacira - 001539

**Suzy had a consensual sexual relationship with Patrick, who reports to her. Patrick ends the relationship. Later, Suzy is promoted and is asked to pick her replacement.**

PERKINSCOIE

**CONFIDENTIAL**

000101767.00087

Pacira - 001540

**Joe, a long-time customer, sees Patti at a Company meeting. Joe asks Patti how she is, and she bursts into tears, telling him that she is going through a divorce.  To comfort her, Joe puts his arm around her shoulder and kisses her on the cheek.**

**CONFIDENTIAL**

000101767.00088

Pacira - 001541

# Alex, a Company manager, gives overall higher reviews to Company employees who are willing to go to parties and clubs with customers at conferences.

PERKINS COIE

**CONFIDENTIAL**

000101767.00089

Pacira - 001542

**Pam approaches her manager, Sheila, before an event, and tells her that she has been receiving sexual texts and calls from customer Thomas. Pam does not want to attend the event.**

PerkinsCoie

**\*\*CONFIDENTIAL\*\***

000101767.00090

# Thank you!

Pacira - 001543

**perkins**coie

# EXHIBIT 12

| | |
|---|---|
| **From:** | Reshma Abell [/O=SKYEPHARMA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=RESHMA ABELL430] |
| **Sent:** | Friday, February 17, 2017 2:54:18 PM |
| **To:** | Peter Murphy; Glenn Reiser |
| **Subject:** | Plan for Soft tissue growth |

Hi Pete, Hi Glenn,

How are you? Thank you again for my promotion to Sr. SAS. The purpose of this email is to summarize what we discussed on February 6th in Nashville.

As a Sr. SAS, I wanted to offer myself to my peers in their own territories to assist them in growing their soft tissue/anesthesia business. Keeping in mind our new goals from NSM last week, to concentrate on soft tissue, I think the timing couldn't be better. We're also going to be sharing ortho space with Depuy at the beginning of Q2 and by the end of the year, have them sell 100%. Our plan is to grow the soft tissue but most of our sales force is still facing issues with how and where to get all this business. It's wide open but to navigate through each system or each hospital is somewhat challenging. Our sales force is elite and intelligent enough to figure this out on their own, however, time is not the luxury we can afford this year. With hopes of NB launch next year, concentration on 3 calls per week on OMFS, getting Depuy up and ready by the end of the year, and conquering all that soft tissue business sitting out there, is not exactly ideal. However, if I can only help with one or two of these, I would like to do so. I owe this to our shareholders and my peers. As a Sr. SAS, I hope that your faith in me will make this a success.

This idea came about after having several SASs and RDs wanting to have a field rides with me. Although I have had many successful corporate, KOLs, NASA, training, sales, etc ride alongs in past couple of years, it makes sense to have me ride within their territory so that I can assist them with their own day to day challenges. It's wonderful to see me in my own territory do well but how are they taking this back into their own territory and applying it? It's more effective if they have their own peer work with them for a day or two to replicate (within their own comfort zone) what's already been successfully and consistently working for me. It's difficult enough to grow our business as it is unique, let alone trying to protect the existing business or recover the lost business. I'm not looking for a raise nor a cut in my quota. I will gladly and consistently deliver my number, however, you must consider this as an opportunity for me to grow professionally. I'm getting stale in my own skin & I need this opportunity.

All I'm asking is that you allow me to ride with 6-10 SAS in the country or just the EAST coast, with the permission of their RD, for the next 6 months. I also have names of the SASs who have asked me to assist them in their territories if that helps get things moving. If this pilot works, we'll be set for the NB launch next year and I can do this full time. If this pilot doesn't work, I'll still guarantee growth in each of those territories, while delivering & exceeding my own quota. Let me know your thoughts.

Reshma Abell
917-794-0227
Surgical Account Specialist, NY
Pacira Pharmaceuticals

000000121.00001

# EXHIBIT 13

Page 110

1      A.    She was -- in 2014, 2015 probably.
2  Maybe even before that.
3      Q.    What was her role or title there?
4      A.    She was an SAS, account specialist in --
5  I believe in North Carolina.
6      Q.    Would she have fallen under your purview
7  as the area director?
8      A.    Yes.
9      Q.    Are you aware of Joy Fischer making any
10  complaints to human resources?
11      A.    To what?
12      Q.    Generally.
13      A.    Not that I remember.  A lot of times
14  human resources doesn't share with us who is making a
15  complaint.
16      Q.    Was it ever brought to your attention
17  that any allegations of improper conduct by you with
18  respect to Joy Fisher were made?
19      A.    No.
20      Q.    Did you ever have any issues with Joy
21  Fisher as an employee?
22      A.    Well, we ended up terminating her.
23      Q.    For what reason was she terminated?
24      A.    There were performance issues, but
25  ultimately she was terminated for a compliance

Page 111

1  violation, which we have -- once that happens,
2  there's nothing sales management can do.
3      Q.    Do you recall what the compliance
4  violation was?
5      A.    I don't remember exactly what it was.
6  Kristen Rudisill was the RD and Joy Fisher was told
7  specifically not to do something with data.  It was
8  like data that wasn't approved by the company, and
9  she went ahead and had a meeting with the doctor and
10  shared all this off-label stuff that she wasn't
11  allowed to do and she was told not to do it
12  beforehand and went ahead and did it anyway.
13      And it was reported back to us through
14  DePui Synthes.  So it was a pretty legitimate chain
15  of evidence that went all the back and had multiple
16  people involved.
17      Q.    Are you aware if Joy Fisher ever made
18  any complaints about inappropriate conduct at Pacira?
19      A.    I don't remember any of them.
20      Q.    Specifically of a sexual nature?
21      A.    I don't know what you're talking about.
22      Q.    I'm only asking what you know.  I don't
23  know what you know or --
24      A.    I don't remember any.
25      Q.    Does Pacira conduct national sales

Page 112

1  meetings on a biannual basis?
2      A.    Normally annually.
3      Q.    Normally it's annual?
4      A.    Yeah.  There might be a regional in
5  between.
6      Q.    When are the national sales meetings
7  usually held?
8      A.    Usually like February.
9      Q.    Would you normally attend these national
10  sales meetings?
11      A.    Yes.
12      Q.    Does most of the company attend these
13  meetings?
14      A.    Most of the field team and marketing
15  would be there.  Some of the other support services.
16      Q.    When you say support services, are you
17  referring to medical affairs?
18      A.    Medical affairs, sales operations, IT,
19  you know, they would do a lot of, you know, upgrades
20  and things of that nature while they had everybody
21  there.
22      Human resources would be there.
23      We might be having some type of special
24  program within the company for benefits or things of
25  that nature.

Page 113

1      Q.    Did you ever present at any of these
2  national sales meetings?
3      A.    Yes.
4      Q.    Have you ever led some of the events?
5      A.    Yes.
6      Q.    What would be the types of topics upon
7  which you would speak at the national sales meeting?
8      A.    I don't know if I so much spoke a lot as
9  I facilitated or worked with, you know, the groups to
10  develop the selling skills or clinical knowledge,
11  whatever the topic might be.  I could be out
12  facilitating, providing a format for business plans,
13  things of that nature.
14      Q.    Generally, how long would the national
15  sales meetings last?  Couple of days?
16      A.    Couple of days.  Two to three days,
17  sometimes, depending on travel.
18      Q.    Every year, would you host them at
19  different locations?
20      A.    Yes.  We used to do that.  We don't do
21  that anymore.
22      Q.    You just have a fixed location that you
23  do it at the same place every year?
24      A.    That's our goal.
25      Q.    Where are they held now?

**MAGNA** ▶
LEGAL SERVICES

Page 114

1     A.    Tampa.
2     Q.    Were you present at the national sales
3  meeting that took place in 2018?
4     A.    Yes.
5     Q.    And do you recall where that was
6  located?
7     A.    That might have been Nashville. I don't
8  separate them by the years. I mean, I don't know the
9  year. There was Atlanta, Nashville. That's how I
10 remember them.
11    Q.    Do you recall there being a national
12 sales meeting in Orlando?
13    A.    Yes. Yes. That was Orlando. I'm
14 sorry.
15    Q.    So in 2018, in February of 2018, when
16 the national sales meeting took place, would you have
17 then been serving in the role of chief commercial
18 officer?
19    A.    No.
20    Q.    What role -- were you still in the
21 executive director position at that time?
22    A.    Yes.
23    Q.    When would your promotion to chief
24 commercial officer have taken place?
25    A.    Maybe September.

Page 115

1     Q.    Does Pacira ever use the national sales
2  meeting as an opportunity to announce promotions?
3     A.    Yes. Not all the time, but they've done
4  that in different formats.
5     Q.    And who puts together the agenda for
6  national sales meeting? Is that a committee, a
7  certain individual, something else?
8     A.    It's a committee and, you know,
9  everybody wants to have time at the national meeting,
10 and then they select the theme of the meeting and
11 what's going to be the major topics.
12    Q.    Are you involved in any way in the
13 planning process?
14    A.    I wasn't in that one outside of just
15 doing what we were doing for the DePui Synthes
16 partnership.
17    Q.    When were you first provided with the
18 agenda for the 2018 national sales meeting?
19          Would you have been given it in advance
20 of the meeting, at the meeting, or some other time?
21    A.    I was given it may be month in advance.
22 Prior to that, we ended up changing some things for
23 my area specifically, and we ended up adding a lab in
24 and some -- a lot of off-site training. We literally
25 had to get on a bus and go to a separate location.

Page 116

1     Q.    At some point in time, were you made
2  aware that a women's leadership meeting was scheduled
3  to take place during the course of the 2018 national
4  sales meeting?
5     A.    Yes.
6     Q.    Had Pacira ever hosted at any of its
7  prior national sales meeting a women's leadership
8  meeting?
9     A.    Not with the formality of this one.
10    Q.    So was this the first of its kind?
11    A.    Yeah, I think there were breakfast
12 meetings at past and working groups, but never a
13 large-scale program like that.
14    Q.    Did you have any involvement with
15 developing or planning the women's leadership
16 meeting?
17    A.    Not a whole lot. I mean, I advocated
18 for it early on. When they considered doing it, I
19 thought it was a great idea and I'm a big proponent
20 of it. I wasn't involved in the detailed planning.
21    Q.    Do you know who was?
22    A.    I believe probably Kristen Williams and
23 she had a small team involved in it.
24    Q.    What is Kristen Williams's role at
25 Pacira?

Page 117

1     A.    She is chief legal counsel.
2     Q.    Do you know if all of the Pacira
3  employees were invited to this women leadership
4  meeting?
5     A.    I don't remember if everyone was
6  invited. I know there was an invitation extended. I
7  don't know if everybody with sales operations there
8  and marketing maybe not have invited everybody.
9  They're different departments.
10    Q.    Do you recall being invited to the
11 meeting?
12    A.    I don't remember.
13    Q.    Did you understand the women's
14 leadership meeting to be an optional event?
15    A.    That was my understanding.
16    Q.    And do you have a recollection as to
17 whether or not the invitation were extended to just
18 females, just males, or to some combination?
19    A.    I knew I couldn't attend the event, so I
20 didn't really get involved with the interpretations.
21 I knew I had a prior commitment for a program, but I
22 didn't really pay attention to who was invited or
23 not.
24    Q.    What were you committed to do at that
25 time?

Page 178

1  officer; correct?
2      A.    Are you talking about now or back then?
3      Q.    Currently.
4      A.    Chief operating officer, chief clinical
5  officer, chief customer officer.  I don't know if
6  everybody's title are chief or VP, but I can only
7  think of four.
8      Q.    Are VPs -- does VP stand for vice
9  president?
10     A.    Yes.
11     Q.    Are vice presidents perceived to be on
12 the same level as the chief titled employees?
13     A.    I don't know all their levels.  They
14 could be.  It could be just a different....
15     Q.    At any point in time were you party to
16 any discussions about Reshma being promoted to a
17 director level position?
18     A.    No.
19     Q.    Have you ever heard or have you ever
20 been part of any conversations within Pacira
21 regarding the formation of a position for a director
22 of post-op pain management?
23     A.    No.
24     Q.    And have you ever heard that title
25 before used within Pacira?

Page 179

1      A.    No.
2      Q.    Have you ever heard the terminology the
3  Boys' Club used within Pacira?
4      A.    No.
5      Q.    Have you ever been told that any
6  certain, particular events were designated for guys
7  only or men only within Pacira?
8      A.    No.
9      Q.    When you were discussing the salary
10 grades and you told me there could be as many as 16
11 different grades, would the examples of 7EX, 8EX, or
12 9EX, would that be an example of certain pay grades
13 that Pacira assigns to different employees?
14     A.    It could be.
15     Q.    Are you familiar with that terminology?
16     A.    Yes.  Not so much the way you're
17 describing it.  But, yes, I think I know what you
18 mean.
19     Q.    How would you describe it?
20     A.    They would have a level, whether it's a
21 six or a seven, and EX would be they were an
22 executive in that level.
23     Q.    Understood.  And as executive director
24 of alliances, what level would that be?
25     A.    So I was moved up a couple of levels in

Page 180

1  my position.  I don't remember where I ended up.  It
2  could be a level 13.
3      Q.    As a chief titled position, what range
4  of levels are appropriately applied to those
5  positions?
6      A.    I don't know.  I mean, I don't sit there
7  and look at the HR levels for all the positions.
8      Q.    Are you currently at a level 13?
9      A.    I would have to go and look.  Honestly,
10 I don't know what my level is right now.  I know what
11 my job is and I go out and do it.
12     Q.    When you were promoted from executive
13 director of alliances to the chief commercial
14 officer, did that come with an increase in pay?
15     A.    I'm sorry, what was the question?
16     Q.    When you were promoted from executive
17 director of alliances to chief commercial officer,
18 did that come with an increase in pay?
19     A.    Yes.
20     Q.    Did that also come with a corresponding
21 increase of level?
22     A.    Yes.
23     Q.    And as a chief, holding a title with
24 chief, does that allow you the opportunity to hit the
25 highest level of pay within Pacira?

Page 181

1          MR. PANZINI:  Objection to form, but you
2  can answer.
3      A.    I don't know what the highest form is.
4  I would imagine -- I think the chief executive
5  officer would be higher.
6      Q.    Underneath the chief executive officer
7  would then be the remainder of the chief title
8  positions?
9      A.    Yes.
10         MR. STEWART:  I appreciate your time
11 here today.  I believe I'm finished.  Thank you for
12 your patience and for participating.
13         THE WITNESS:  Thank you.
14         MR. PANZINI:  All right.  I have just a
15 couple of quick follow-ups and I will be done, I
16 promise.  When you hear the word couple quick,
17 usually it's long.  But I honestly really mean that.
18 EXAMINATION BY
19 MR. PANZINI:
20     Q.    Did Reshma ever come to you directly to
21 report that she felt she was being discriminated
22 against based on her gender?
23     A.    No.
24     Q.    Did she ever tell you that she thought
25 the men were making more because they were men?



# EXHIBIT 14

**From:** Julie Longthorne <jlongthorne@westfieldgroupusa.com>
**Sent:** Wednesday, February 7, 2018 11:54 AM
**Subject:** Before You Go! 2018 Pacira National Meeting - Orlando, FL
**Attachments:** image003.emz; Before You Go - Pacira 2018 National Meeting.pdf



# Before You Go

## 2018 National Meeting
February 11 - 15, 2018

## Loews Sapphire Falls Resort
Orlando, FL

## FINAL MEETING CONFIRMATION

TENTATIVE AGENDA

**Sunday, February 11, 2018**
- Welcome Dinner at 6:30 PM

**Monday, February 12, 2018**
- Breakfast
- Meetings
- Lunch
- Meetings
- Regional Dine Arounds

**Tuesday, February 13, 2018**
- Breakfast
- Meetings

**CONFIDENTIAL**

- Lunch
- Meetings
- Night on Own
- Women in Leadership Event

**Wednesday, February 14, 2018**  
- Breakfast
- Meetings
- Lunch
- Meetings
- Awards Dinner

**Thursday, February 15, 2018**
- Breakfast
- Meetings
- Box Lunch
- Flight Departures after 2:00 PM

**Pacira appreciates that you will be traveling away from your loved one's this Valentine's Day. The gift selected during registration will be mailed to the recipient of your choice the week of February 12, 2018 courtesy of Pacira Pharmaceuticals.**

 **HOTEL INFORMATION**

**Loews Sapphire Falls Resort at Universal Orlando**
6601 Adventure Way
Orlando, FL 32819
Phone: (888) 430-4999

Pacira will cover the cost of your sleeping room and tax over the program dates of February 11 – 15, 2018. Upon check-in, you will be required to provide a credit card to cover any incidental charges that you may incur during your stay (i.e. room service, in-room movies, in-room internet, honor bar, laundry services, sundries, etc.).

Early arrivals or extended stays will be at the requesting guest's expense and will not be covered by Pacira unless special circumstances have been previously approved.

Please know additional room nights as well as the group rate, cannot be guaranteed and is subject to the hotel's availability.

Accommodations have been reserved for you based upon the information that you provided on your registration. If you have any questions or concerns regarding your arrival/departure dates, please notify **Julie Longthorne** immediately at **(973) 240-0180 x229** or via email at [jlongthorne@westfieldgroupusa.com](mailto:jlongthorne@westfieldgroupusa.com).

The Loews Sapphire Falls Resort is a smoke-free hotel and all guest rooms are non-smoking.

**Check-in and Check-out**

**CONFIDENTIAL**

Check-in time at the Loews Sapphire Falls Resort is 4:00 PM and check-out time is 11:00 AM. The Loews Sapphire Falls Resort will make reasonable efforts to accommodate early arrivals, however early check-in cannot be guaranteed.

## Guest Room Internet
Guest room Wi-Fi is complimentary for all meeting attendees staying at the Loews Sapphire Falls Resort.

## Parking
Parking at the hotel will be covered by Pacira over the dates of the program for local attendees driving to the meeting.

## Required Meeting Materials
Please make sure you bring your Pacira issued iPad and charger with you as you will be using it throughout the duration of the meeting. Please ensure to synchronize your iPad before arrival at the meeting.

Pacira - 001548                                                                    **CONFIDENTIAL**

 **HOTEL INFORMATION (cont.)**

**Hospitality Desk and On-Site Contact**
Upon arrival to the hotel, please stop by the Pacira Hospitality Desk in the Grand Caribbean Pre-Function East Foyer located on the Lobby Level to receive your welcome packet.

Please check the packet for any meeting updates. Please see the Westfield Group Program Staff at the Hospitality Desk should you have any questions or needs on-site during your stay.

The desk will remain open in the Grand Caribbean Pre-Function East Foyer throughout the duration of the meeting at the times listed below.

## HOSPITALITY DESK – DESK HOURS

| DATE | LOCATION | OPEN | CLOSE |
|---|---|---|---|
| Sunday, February 11 | Grand Caribbean Pre-Function East | 8:00 AM | 6:00 PM |
| Monday, February 12 | Grand Caribbean Pre-Function East | 6:30 AM | 5:00 PM |
| Tuesday, February 13 | Grand Caribbean Pre-Function East | 6:30 AM | 5:00 PM |
| Wednesday, February 14 | Grand Caribbean Pre-Function East | 6:30 AM | 5:00 PM |
| Thursday, February 15 | Grand Caribbean Pre-Function East | 6:30 AM | 2:00 PM |

**On-Site Support**
On-site IT support will be available.  If you should have any hardware or software issues with iPads or laptops there will be a drop off point and an opportunity to speak with a member of the IT team. **The IT team can be found in St. Croix 1 on the Lobby Level from Sunday, February 11th – Thursday, February 15th.**

**Fitness Center**
The Fitness Center is located on the 2nd Floor of the hotel and is open until 11:00 PM, seven days a week.

**Hotel Business Center**
The Hotel Business Center is located on the Lobby Level. Computer use is available 24 hours a day, seven days a week.

 # TRAVEL INFORMATION

All travel has been booked through Travel Leaders Corporate. You should have received your air itinerary through email. If you have any questions or are in need of another copy of your travel itinerary, please contact Travel Leaders Corporate below:

**Travel Leaders Corporate**
Open Week Days: Monday – Friday
Hours:  9:00 AM – 5:30 PM (EST)
Phone: (844) 485-2677

Please note that it is approximately a 20-minute drive from Orlando International Airport (MCO) to the Loews Sapphire Falls Resort.

## Departures
All flights should be scheduled to depart from Orlando International Airport (MCO) on Thursday, February 15, 2018.

Because of the current security procedures in place at most US airports, all ticketed passengers must present an official government–issued photo ID. **Starting January 22, 2018, travelers who do not have a license or identification card from a compliant state or a state that has been granted an extension will be asked to provide alternate acceptable identification.** If you cannot provide an acceptable form of identification, you will not be permitted through the security checkpoint.

For schedule updates and to see if your state is compliant, visit the DHS REAL ID schedule and enforcement brief. https://www.dhs.gov/real-id.

For domestic travel, it is recommended that you check in at least 2 hours prior to your scheduled departure time. Only ticketed passengers will be permitted beyond the security checkpoint into the gate areas. Please reconfirm your frequent flyer number directly with the airline agent upon checking in. Several airline carriers have enforced checked luggage fees.

**IMPORTANT: Please check with your airline carrier for up-to-date policies on checked luggage.**

**Please ensure that any checked luggage contains a luggage tag with your name, address, and telephone number. This will help us identify your luggage at the hotel.**

 ## GROUND TRANSPORTATION

Ground transportation will be provided by **Hello! Florida**. If you cannot locate your driver, please contact **Jarrod Fucci** at **(954) 643-6089**.

Upon arrival at the Orlando International Airport (MCO), please proceed to your designated baggage claim area, even if you have not checked luggage. Staff in purple polos will be holding a sign with the Pacira Logo. Drivers will be standing at the entry point from the terminals into baggage claim.

Attendees traveling outside of the meeting dates of Sunday, February 11th – Thursday, February 15th, will be responsible for arranging their own transportation to and from the airport.

### Arrival
Prearranged ground transportation will be provided from Orlando International Airport (MCO) to the Loews Sapphire Falls Resort on Sunday, February 11th.

### Departure
Return transportation to Orlando International Airport (MCO) from the Loews Sapphire Falls Resort will be provided at the conclusion of the meeting on Thursday, February 15th. A departure notice will be provided during the meeting with details regarding return transportation.

 ## GENERAL INFORMATION

### General Meeting Information
Name badges will be provided to you in your welcome packet, which you will receive on-site. You will be required to wear your name badge to all business sessions and planned meal functions so Meeting Staff may easily identify you.

As always, please be certain to protect your personal belongings (laptops, iPads, briefcases, pocketbooks, etc.) and do not leave them unattended. Please do not leave any personal property or company-related printed materials in the meeting rooms or hotel corridors. All materials that are left behind will be destroyed.

Meals will be provided for the group over the duration of the program dates. Meals are not reimbursable expenses when a group meal is provided as part of the meeting agenda. Pacira will reimburse for (1) one checked bag fee per flight.

### Weather
The weather in Orlando, FL for the month of February is a low of 52°F and a high of 74°F.

**CONFIDENTIAL**

 **MEETING ATTIRE**

| DAY TIME ATTIRE | |
|---|---|
| Sunday, February 11 | Casual (jeans permissible) |
| Monday, February 12 | Business Casual |
| Tuesday, February 13 | Business Casual |
| Wednesday, February 14 | Casual (jeans permissible) |
| Thursday, February 15 | Casual (jeans permissible) |

| EVENING ATTIRE | |
|---|---|
| Sunday, February 11 | Casual (jeans permissible) |
| Monday, February 12 | Casual (jeans permissible) |
| Tuesday, February 13 | Casual (jeans permissible) |
| Wednesday, February 14 | (Cocktail Attire) for Women and Business Attire for Men |
| Thursday, February 15 | Casual (jeans permissible) |

**Here is an attire guideline to help you plan for packing:**

**Business Casual Recommendations**

**Men:**
• Khaki, linen, gabardine or cotton dress slacks, neatly pressed
• Cotton long-sleeved button-down shirts, pressed, polo shirts with a collar
• Light Sweaters
• Sport Jackets optional
• Ties optional

**Women:**
• Khaki, linen, twill or cotton dress slacks, skirts or dresses, neatly pressed
• Blouses, light sweaters, twinsets, cardigans, polo/knit shirts
• Blazers optional

**Below is an attire guideline for the Awards Dinner on Wednesday, February 14th.**

**Semi-Formal (Cocktail Attire) Recommendations**

**Men:**
• Full Suit or Sport Coat
• Dress Slacks
• Business Shirt
• Tie

**Women:**
• Cocktail Dress
• Pants Suit
• Dress Suit

**CONFIDENTIAL**

# Looking forward to seeing you in Orlando!

If you have any questions regarding any of the information noted above, please notify **Julie Longthorne** immediately at **(973) 240-0180 x229** or via email at **jlongthorne@westfieldgroupusa.com**.

# EXHIBIT 15

| | First Name | Last Name | Email | Registration Status | Registered Date | Decline Note |
|---|---|---|---|---|---|---|
| **Pacira 2018 National Meeting - Women's Leadership Dinner** <br> **February 11 - 15, 2018** <br> **Loews Sapphire Falls Resort - Orlando, FL** | | | | | | |
| 1 | Lindsey | Adams | lindsey.adams@pacira.com | Accepted | 1/19 | |
| 2 | Nicole | Adams | nicole.adams@pacira.com | Accepted | 1/23 | |
| 3 | Cindy | Alvarado | cindy.alvarado@pacira.com | Accepted | 1/16 | |
| 4 | Meegan | Anderson | meegan.anderson@pacira.com | Accepted | 1/16 | |
| 5 | Alexis | Beckel | alexis.beckel@pacira.com | Accepted | 1/18 | |
| 6 | Julie | Berard | julie.berard@pacira.com | Accepted | 1/17 | |
| 7 | Mary | Beriont | mary.beriont@pacira.com | Accepted | 1/17 | |
| 8 | Monica | Birchmeier | Monica.Birchmeier@pacira.com | Accepted | 1/16 | |
| 9 | Shawn | Boykin | shawn.boykin@pacira.com | Accepted | 1/16 | |
| 10 | Nicole | Brandt-Young | nicole.brandt-young@pacira.com | Accepted | 1/17 | |
| 11 | Kasey | Chuisano | kchuisa1@its.jnj.com | Accepted | 1/22 | |
| 12 | Helene | Cissell | helene.cissell@pacira.com | Accepted | 1/18 | |
| 13 | Nikki | Cracknell | Nikki.Cracknell@pacira.com | Accepted | 1/18 | |
| 14 | Carrie | Crutchfield | carrie.crutchfield@pacira.com | Accepted | 1/18 | |
| 15 | Christa | D'Agnese | christa.dagnese@pacira.com | Accepted | 1/22 | |
| 16 | Joyce | Davis | joyce.davis@pacira.com | Accepted | 1/16 | |
| 17 | Stephanie | Davis | stephanie.davis@pacira.com | Accepted | 1/24 | |
| 18 | Laura | Day | laura.day@pacira.com | Accepted | 1/16 | |
| 19 | Rachel | Delauder | rdelaude@its.jnj.com | Accepted | 1/25 | |
| 20 | Christine | DiDonato | christine.didonato@pacira.com | Accepted | 1/23 | |
| 21 | Roxanne | Doherty | roxanne.doherty@pacira.com | Accepted | 1/16 | |
| 22 | Tracy | Dominguez | tracy.dominguez@pacira.com | Accepted | 1/17 | |
| 23 | Daphne | Durant | daphne.durant@pacira.com | Accepted | 1/18 | |
| 24 | Lani | Dvorak | lani.dvorak@pacira.com | Accepted | 1/16 | |
| 25 | Erin | Fitzpatrick | erin.fitzpatrick@pacira.com | Accepted | 1/16 | |
| 26 | Francine | Giocondo | Francine.giocondo@pacira.com | Accepted | 1/16 | |
| 27 | Melissa | Giordano | melissa.giordano@pacira.com | Accepted | 1/17 | |
| 28 | Madeline | Gooding | madeline.gooding@pacira.com | Accepted | 1/16 | |
| 29 | Kristy | Harlin | kristy.harlin@pacira.com | Accepted | 1/22 | |
| 30 | Jennifer | Hedden | jennifer.hedden@pacira.com | Accepted | 1/16 | |
| 31 | Jody | Hogan | jody.hogan@pacira.com | Accepted | 1/18 | |
| 32 | Elizabeth | Holland | liz.holland@pacira.com | Accepted | 1/21 | |
| 33 | Michelle | Jones | michelle.jones@pacira.com | Accepted | 1/22 | |

PACIRA - 000068

PACIRA - 000069

| 34 | Nancy | Kerrigan | nancy.kerrigan@pacira.com | Accepted | 1/16 | |
|----|-------|----------|---------------------------|----------|------|---|
| 35 | Gigi | Kisling | gigi.kisling@pacira.com | Accepted | 1/16 | |
| 36 | Brandi | Knepley | Brandi.Knepley@pacira.com | Accepted | 1/16 | |
| 37 | Kerry | Landtroop | kerry.landtroop@pacira.com | Accepted | 1/16 | |
| 38 | Christy | Lee | christy.lee@pacira.com | Accepted | 1/24 | |
| 39 | Jackie | Lu | jackie.lu@pacira.com | Accepted | 1/18 | |
| 40 | Lauren | Lynn | lauren.lynn@pacira.com | Accepted | 1/16 | |
| 41 | Sharon | McCarroll | Sharon.mccarroll@pacira.com | Accepted | 1/16 | |
| 42 | Nannette | McCollum | nannette.mccollum@pacira.com | Accepted | 1/16 | |
| 43 | Karin | McGarry | Karin.McGarry@pacira.com | Accepted | 1/17 | |
| 44 | Sally | Miller | sally.miller@pacira.com | Accepted | 1/23 | |
| 45 | Amy | Molitoris | amy.molitoris@pacira.com | Accepted | 1/23 | |
| 46 | Nicole | Nejeschleba | nicole.nejeschleba@pacira.com | Accepted | 1/18 | |
| 47 | Elizabeth | Norcross | elizabeth.norcross@pacira.com | Accepted | 1/18 | |
| 48 | Lizette | Pardo-Crespo | lizette.pardo-crespo@pacira.com | Accepted | 1/18 | |
| 49 | Janet | Poppe | janet.poppe@pacira.com | Accepted | 1/21 | |
| 50 | Danielle | Resseguet | danielle.resseguet@pacira.com | Accepted | 1/16 | |
| 51 | Deborah | Ross | deb.ross@pacira.com | Accepted | 1/22 | |
| 52 | Christal | Rowe | Christal.Rowe@pacira.com | Accepted | 1/17 | |
| 53 | Kristin | Rudisill | kristin.rudisill@pacira.com | Accepted | 1/16 | |
| 54 | Wendy | Runckel | wendy.runckel@pacira.com | Accepted | 1/17 | |
| 55 | Melissa | Ryan | melissa.ryan@pacira.com | Accepted | 1/16 | |
| 56 | Julie | Sarmanian | julie.sarmanian@pacira.com | Accepted | 1/16 | |
| 57 | Tatyana | Shuster | Tatyana.shuster@pacira.com | Accepted | 1/24 | |
| 58 | Emily | Smith | emily.smith@pacira.com | Accepted | 1/17 | |
| 59 | Abby | Solcoff | abby.solcoff@pacira.com | Accepted | 1/20 | |
| 60 | Ellen | Speier | ebspeier@yahoo.com | Accepted | 1/24 | |
| 61 | Jo | Stevenson | jo.stevenson@pacira.com | Accepted | 1/16 | |
| 62 | Lisa | Surbey | lisa.surbey@pacira.com | Accepted | 1/16 | |
| 63 | Kimberly | Sventy | kimberly.sventy@pacira.com | Accepted | 1/17 | |
| 64 | Gretchen | Tiede | gretchen.tiede@pacira.com | Accepted | 1/19 | |
| 65 | Mary Helen | Tran | maryhelen.tran@pacira.com | Accepted | 1/16 | |
| 66 | Kristen | Villano | kristen.villano@pacira.com | Accepted | 1/17 | |
| 67 | Joni | Walker | joni.walker@pacira.com | Accepted | 1/17 | |
| 68 | Anita | Walsh | anita.walsh@pacira.com | Accepted | 1/16 | |
| 69 | Fanta | Waterman | fanta.waterman@pacira.com | Accepted | 1/16 | |
| 70 | Nancy | Wells | nancy.wells@pacira.com | Accepted | 1/18 | |
| 71 | Tiffany | White | tiffany.white@pacira.com | Accepted | 1/25 | |

| 72 | Kristen | Williams | Kristen.Williams@pacira.com | Accepted | 1/16 | |
|----|---------|----------|------------------------------|----------|------|---|
| 73 | Catherine | Williamson | catherine.williamson@pacira.com | Accepted | 1/16 | |
| 74 | Ellen | Woolard | ellen.woolard@pacira.com | Accepted | 1/16 | |
| 1 | Melva | Covington | melva.covington@pacira.com | Cancelled | | |
| 2 | Leslie | Hyman | leslie.hyman@pacira.com | Cancelled | | |
| 3 | Reshma | Abell | reshma.abell@pacira.com | Decline | | |
| 4 | Linda | Hasty | linda.hasty@pacira.com | Decline | | I have a previous engagement. |
| 5 | Erica | Keane | erica.keane@pacira.com | Decline | | Will not be attending meeting. |
| 6 | Amber | Sears | amber.sears@pacira.com | Decline | | Not attending meeting |
| 7 | Linda | Sherman | linda.sherman@pacira.com | Decline | | I was trying to rearrange the dinner I had scheduled to another night while we were there. It was prearranged for our free night. |
| 8 | Cheryl | White | cheryl.white@pacira.com | Decline | | another obligation |
| 1 | Mindy | Edgar | medgar2@its.jnj.com | No Response | | |

PACIRA - 000070

# EXHIBIT 16

| | |
|---|---|
| **From:** | Glenn Reiser [/O=SKYEPHARMA/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=GLENNR] |
| **Sent:** | Tuesday, February 20, 2018 8:14:42 AM |
| **To:** | Rich Kahr |
| **Subject:** | RE: Incident at National Meeting |

Not sure if I mentioned on our Friday call, but in addition to Rob leaving the meeting/his team, he did not inform me (his direct manager) of the incident nor his meeting departure/resignation. Also, in regards to Reshma; Lance Noble approached Chris Borsa to give him feedback from Wednesday night that Reshma was using explicitly sexual language.

Thank you,
Glenn

-----Original Message-----
From: Glenn Reiser
Sent: Tuesday, February 20, 2018 7:01 AM
To: Rich Kahr
Subject: RE: Incident at National Meeting

Good morning Rich,

My apologies, Pat Nolan. I'll try you later AM to catch up.

Glenn

-----Original Message-----
From: Rich Kahr
Sent: Tuesday, February 20, 2018 6:59 AM
To: Glenn Reiser
Subject: RE: Incident at National Meeting

Hi Glenn,

Who is Pat that you referenced below?


Rich Kahr
Vice President, Human Resources
Pacira Pharmaceuticals
5 Sylvan Way
Parsippany, NJ 07054
(973) 254-4341 Office
(848) 702-0512 Cell
rich.kahr@pacira.com

-----Original Message-----
From: Rich Kahr
Sent: Thursday, February 15, 2018 11:25 AM
To: Glenn Reiser; Peter Murphy
Subject: RE: Incident at National Meeting

Thanks Glenn. I will follow-up with you guys next week.

-----Original Message-----
From: Glenn Reiser

 **CONFIDENTIAL**

Sent: Thursday, February 15, 2018 11:15 AM
To: Rich Kahr; Peter Murphy
Subject: Incident at National Meeting

Having issues logging in with my laptop so sending from phone:

1) Rob and Reshma at Hotel lobby waiting on transportation to Top Golf: From what I
understand Rob approached Reshma there and told her she she wasn't welcome to attend
the Top Golf event and it was closed invitation and she should be attending the
Women's Leadership forum instead (according to Reshma).  Isaac Smolko may have been
there.

2) At Top Golf: Reshma and Pat were hitting golf balls and Rob approached Reshma and
ended up in a heated discussion (confirmed by Pat).  Gio and his team were witness to
it: Ken Wolfe, Mike Corn.

3) In Hotel later: Pat escorted Reshma over to Roxanne Doherty based recognizing she
was seemingly still having a hard time from earlier.

Thank you,
Glenn

Sent from my iPhone

# EXHIBIT 17

**CONFIDENTIAL**

| | |
|---|---|
| **From:** | Scott Braunstein [/O=SKYEPHARMA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SCOTT BRAUNSTEIN0EE] |
| **Sent:** | Thursday, February 15, 2018 1:24:07 PM |
| **To:** | Rich Kahr |
| **CC:** | Peter Murphy |
| **Subject:** | Rob rock |

Rich, for clarity , thought it was best you had an email from rob to me yesterday am at 6 am.

Scott,
Tonight, as a couple of regions were leaving to go to TopGolf an SAS showed up staring, "I'm crashing your party!"  Which led me to ask, "Aren't you supposed to be attending the Women in Surgery dinner?"  The response was,
"F#%k that.  It's BS."
I walked away.  We all jumped in an Uber & we're off to TopGolf.  One of my team let me know that this SAS thought I was mad.  In response I spoke to them and said I was surprised, but not upset.  This was not received in the manner I had expected.  I was cursed, called a liar, and more.
Later, I received two calls from my team letting me know that this SAS was blowing me up to anyone in earshot.
It got worse as more more drinks were consumed.
Knowing this person and knowing their volatility, I expect to be pulled aside tomorrow.  I also know this SAS has bullied leadership in the past.  I dont expect to be allowed to present my side.
I want you to know you have my utmost respect.   I wish you all the best.

Like Douglas McArthur, I'm just going to fade away.

Vaya con dios

RRR


Scott Braunstein, MD
Chief Operating Officer
Pacira Pharmaceuticals, Inc
5 Sylvan Way, Suite 300
Parsippany, NJ 07054
(973)-254-4352
**Help Patients Find EXPAREL**
**Join the EXPAREL Surgeon Selector**
 Link:
https://surgeonselector.exparel.com/

000001017.00001

# EXHIBIT 18

| | |
|---|---|
| **From:** | Robert Rock <rockr082418@pacira.mail.onmicrosoft.com> |
| **Sent:** | Saturday, February 17, 2018 5:54 PM |
| **To:** | Rich Kahr |
| **Subject:** | RE: Call Next Week |
| **Attachments:** | Notes for Rich Kahr call.docx |

**From:** Rich Kahr
**Sent:** Saturday, February 17, 2018 2:51 PM
**To:** Robert Rock
**Subject:** Call Next Week

Hi Rob,

I have been made aware of an incident that occurred at the National Sales Meeting this week.  I would like to have a call with you next week to discuss what happened from your perspective.  I will need about 30 minutes of your time.  Can you give me some times on Tuesday and Wednesday that would work for you?  I will match those times up with my availability and confirm a time back to you.

Thank you.

*Rich Kahr*
*Vice President, Human Resources*
***Pacira Pharmaceuticals***
5 Sylvan Way
Parsippany, NJ 07054
(973) 254-4341 Office
(848) 702-0512 Cell
rich.kahr@pacira.com

Notes for Rich Kahr call

At NSM Train-the-trainer in Morristown, Glenn Reiser asked East RDs to consider using Reshma Abell for TAP education in our regions. She was doing a pilot as part of a development program. Steve Huddy took advantage of this offer and RA came to Mobile to work a few days with Steve. I then received a call from RA to debrief on the time she spent in the field with Steve. The first this she said to me was, "You would be so proud of me. I only picked up one guy while I was down there." I made to reply. Steve had already called me concerned that RA had "pissed off two anesthesiologist." He also mentioned that while they were out to eat the manager came to their table and asked RA to stop dropping the F-bomb. He was concerned that she was scheduled to come back to Mobile as a follow-up and he didn't think that was a good idea. He asked if he could cancel or postpone her follow-up trip.

During my debriefing call, the topic of the upcoming Miami Breast Conference was brought up by her. Glenn had asked me to invite her. I shared with Glenn that Dennis McLoughlin had a dust-up with RA at a previous MBC and I did not think that her attending was a good idea. RA said, "If my husband doesn't fuck me hard before I come down there, you may have to." During this call she also said she wasn't going to the Women in Surgery dinner. "Fuck that. It's Bullshit." I mentioned I thought the dinner was mandatory. She then said, "I'm going to TopGolf with you." My reply was, "Gio Vendemia and I have already paid for our regions, plus we invited Glenn Reiser and Vaughn Schouten. It's already booked." RA said, "You can't stop me. I'll pay for myself." No more was said about the MBC or TopGolf.

During a breakout exercise on TUE, RA said she had a surprise for me saying she "would give it to me in 3 hours." At 6:30pm (3 hours later), while loading up our teams to go to TopGolf, RA walked out to our Uber and said, "Surprise!" My only comment was, "I guess you're going to TopGolf" and helped her into the SUV. After maybe 30-45 minutes at TopGolf, Isaac Smolko pulled me to the side and said, "Reshma thinks you're mad at her. Can you tell her you're not." I said, "No problem." I walked over to RA and said, "I am not mad at you. You are welcome and please feel free to eat and have whatever you want to drink." Her reply was, "I thought we were friends. Just because I have tits doesn't mean I have to go to some bullshit dinner." She added, "If you had to come back to work after two c-sections, you'd know how it feels." This left me a little confused as far the relevancy. So I repeated, "You are welcome to anything to eat or drink. Please have fun." Those were the last words I spoke to her. I can assure you, I did not raise my voice, I did not curse, nor was there any physical contact. I just walked away.

I left at 9:30pm with Brian Willey, Matt Eck, and Steve Huddy. Upon arrival at the Loew's I went to bed. At 11:45 I received a call from Justin Sherrod telling me that RA was down in the bar "Mother-fucking me" and telling anybody that would listen, "I'm gonna get that Mother-fucker fired."

I spoke to Matt Lehmann and Kristen Williams about this the next morning.

From a personal perspective, I feel RA realized she surprised me and after realizing this (and after a few more drinks) projected her disappointment in herself towards me. I have seen the profanity and volatility from her before. I am not mad or even upset with her. There are behavioral issues that are beyond my abilities to assess, so I will leave it there.

Additional info:

RA comments to Isaac Smolko, "I like him.  We're both adults.  If we want to fuck, we can."

RA comments to Brian Willey and Seth Whaley, "Look at this Kama Sutra app on my phone.  I have been looking at this for the last 30 minutes.  You know Indians invented sex."  Both said they were really uncomfortable with this and asked if they should contact HR and I said they should contact Rich Kahr.

Chris Borsa informed me that Lance Noble had been approached by RA on TUE night and said, "I want you to fuck me with that big Midwestern cock."  Lance mentioned this to me the next morning.

Steve Huddy also asked who he should call to report RA's profanity during their field time.  I said he could report it formally to me or he should contact Rich Kahr.

# EXHIBIT 20

Page 26

```
 1   had been present at the events?
 2       A.  The next morning when we were at our --
 3   getting ready for our breakout session was when I
 4   heard she had been there, because Rob Rock had
 5   left the meeting.
 6       Q.  So who did you hear this from?
 7       A.  I believe it was Isaac, but when I sat
 8   down at the table that morning, everybody was kind
 9   of talking about it because Rob was gone.  And
10   everybody was going, Why is Rob gone, you know.
11   And Isaac said something and that's when he said
12   something, Well, Reshma showed up at Top Golf last
13   night and something happened between those two.
14       Q.  And did you come to learn anything further
15   about what happened between Rob Rock and Reshma at
16   the Top Golf event?
17       A.  I did, just only that they had a
18   disagreement and that it was something that Reshma
19   was very unhappy about and possibly going to HR,
20   is what I've been told, and that Rob left.  We
21   thought Rob left the meeting.
22       Q.  Did you observe any disagreement with
23   Reshma and Rob Rock at the Top Golf event?
24       A.  No.
25       Q.  Did anybody provide you an account of what
```

Page 27

```
 1   happened?
 2       A.  No.
 3       Q.  Was it unusual that Rob Rock had chosen to
 4   leave the national sales meeting that following
 5   morning?
 6       A.  Yes.
 7       Q.  Did any explanation -- was any explanation
 8   ever offered to you as to why he left?
 9       A.  No.
10       Q.  Did he at some point return back to the
11   meeting?
12       A.  He did.
13       Q.  Was any explanation offered as to why he
14   returned?
15       A.  No details.  They just said -- one of the
16   managers called him and said, Rob, come back.  I'm
17   trying to remember who our vice president was at
18   the time.  But whoever that was had called him and
19   said, you know, You need to come back to the
20   meeting, turned him around.
21       Q.  Did you ever have any conversations with
22   Rob Rock about what transpired between him and
23   Reshma?
24       A.  I did, but he didn't give me details as to
25   what happened.  He just said that we'd had a
```

Page 28

```
 1   disagreement, she was very upset and was trying to
 2   get him in trouble.  But he didn't give details as
 3   to what was said.
 4       Q.  And other than that, did you ever come to
 5   learn of anything further that transpired between
 6   Rob Rock and Reshma?
 7       A.  No.
 8       Q.  Through the course of the 2018 national
 9   sales meeting, do you recall having any
10   interactions with Reshma?
11       A.  I do.
12       Q.  Do you know how many interactions you
13   recall having?
14       A.  Just one.
15       Q.  And when did that interaction occur?
16       A.  It was following a breakout session, so
17   the end of a breakout session while we were
18   walking out of the room.
19       Q.  And which of the four days did this occur?
20       A.  I don't remember.  I don't remember the
21   exact day that was.  Maybe day two.
22       Q.  Do you know if it was before or after Rob
23   Rock left the sales meeting?
24       A.  I believe it was before.  It was before,
25   yeah, definitely.
```

Page 29

```
 1       Q.  And the interaction between you and Reshma
 2   that occurred, can you describe to me what
 3   transpired?
 4       A.  Yeah.  So Brian Wiley and I were walking
 5   out of the room, casual conversation.  And again,
 6   at these breakout sessions, you go out and get
 7   coffee, food, that type of thing.  But as we were
 8   congregating maybe 4, 5 feet outside the door,
 9   Reshma kind of came in between us and said, you
10   know, something along the lines of, These meetings
11   are so boring, this is the way I get through them,
12   and held out her phone and showed us -- like, she
13   started scrolling on her phone and it was pictures
14   of, like, Kama Sutra sexual positions.
15       Q.  So just walk me through the sequence of
16   events here.  You're sitting in a breakout
17   meeting; correct?
18       A.  Correct.
19       Q.  And how long had that breakout meeting
20   lasted for?
21       A.  An hour.
22       Q.  And you don't recall what day that
23   breakout meeting was taking place, do you?
24       A.  I don't.  I don't remember exactly.  We
25   had breakouts every day, lots of them.
```



MAGNA
LEGAL SERVICES

Page 30

1     Q.  And so this doesn't stand out in your mind
2  as to which breakout meeting this occurred
3  following?
4     A.  No.
5     Q.  Do you know who else was present at that
6  breakout meeting aside from yourself and Brian
7  Wiley?
8     A.  I'm 99 percent sure Matt Eck.
9     Q.  And do you have a recollection of the
10  subject matter that this breakout meeting
11  entailed?
12     A.  No.
13     Q.  This would have been one of many across
14  the course of --
15     A.  Yeah, I could remember sitting -- I mean,
16  I could remember lots of breakout sessions, but I
17  could never tell you which one happened at what
18  place and in terms of, like, what period of time
19  of the meeting it happened.  We have lots of
20  breakouts.
21     Q.  And these breakout meetings, do they take
22  place in conference rooms or ballrooms at a hotel?
23     A.  Yes.
24     Q.  And how many people are generally in each
25  of these breakout rooms?  Is it, you know, dozens?

Page 31

1  Is it hundreds?  How many, if you could?
2     A.  It's smaller than -- I would say usually
3  each breakout's somewhere 25, 30 people, maybe 20.
4     Q.  And approximately how long do the breakout
5  meetings last?
6     A.  An hour.
7     Q.  And then at the close of the hour, is
8  there a break that's provided to the participants
9  to use the rest room, grab food, something like
10  that?
11     A.  Yes.
12     Q.  And approximately how long are those
13  breaks between each meeting?
14     A.  Usually they're 10, 15 minutes.
15  Sometimes, if we're running behind, then it may be
16  shortened a little bit.
17     Q.  When you -- are there more than one
18  breakout room so that participants can go to
19  different breakout meetings during the course of
20  the day?
21     A.  Yes.  It's according to your schedule.
22     Q.  And as you exit out of these breakout
23  rooms, is there a central, like, congregating
24  corridor or meeting area where there's coffee
25  stations set up and the like?

Page 32

1     A.  Yeah, multiple.
2     Q.  And so, now, while you're walking with
3  Brian Wiley, how far, in terms of distance, is it
4  from the exit of the breakout room to that central
5  corridor area?
6     A.  It was -- we were 5 or 10 feet outside of
7  the room, so probably another 5 or 10 or 15 feet
8  away from a coffee -- you know, a coffee setup.
9  So we weren't in the mob but we were just right
10  outside the door.
11     Q.  And so before Reshma had made -- shown you
12  what you described to me just earlier, had you had
13  any conversations with her during the course of
14  the national sales meeting, Hello, nice to see
15  you, or anything of that nature?
16     A.  I can't remember.
17     Q.  Before Reshma had shown to me (sic) you
18  know, what you described earlier -- showed it to
19  you on her phone, do you have any recollection of
20  any conversation with her at all from that
21  national sales meeting?
22     A.  I do not.
23     Q.  And so what was the context by which you
24  started the conversation with you and Brian?
25     A.  So, she just kind of split Brian and I and

Page 33

1  started.  So Brian and I are walking out
2  side by side and then Reshma was in between us.
3  And she said, This is how I get through these
4  meetings.  So she was trying to be funny.
5     Q.  And how far apart were you and Brian
6  standing when this occurred?
7     A.  We were pretty close, like, I mean, you
8  know, a foot and a half.  She didn't have to push
9  us out of the way to get between us.
10     Q.  And when she got between you, did she --
11  did she reach her arm out?  Did she physically
12  step between you?  Or what -- how did she get
13  between you, as you described it?
14     A.  She -- I mean, she just slowly kind of
15  came between us and then stuck her hand out with
16  her phone.  And it was -- but it was low.  She
17  wasn't holding it high or anything.  It was low
18  and she said, This is how I get through this, and
19  she kind of directed Brian and my eyes down to
20  what she showed us.
21     Q.  So do you know what kind of phone she had?
22     A.  I do not.
23     Q.  Was it a smartphone of some sort?
24     A.  Yes.
25     Q.  And when she held this phone out between



Page 34

1  you, what did you observe on the screen?
2      A.  Kama Sutra, typical Kama Sutra pictures
3  where it's drawings of men and women in certain
4  positions, different sexual positions, and they're
5  typically atypical.
6      Q.  Before February of 2018, had you had any
7  experience or exposure with the Kama Sutra?
8      A.  Yes.
9      Q.  In what nature?
10     A.  I've seen it in books before.  I mean, do
11 you guys remember the movie "Scrooged" with Bill
12 Murray?  I mean, you know the book that he gets
13 his girlfriend?
14     Q.  So you knew it from pop culture
15 references?
16     A.  Yes, yes.
17     Q.  And when you saw what was shown to you on
18 the phone, did you immediately recognize what was
19 shown to you?
20     A.  Yes.
21     Q.  Can you describe to me what you saw on the
22 phone?
23     A.  I saw -- well, she scrolled -- there was
24 multiple positions, so --
25     Q.  Well, let's take it in steps, then.  When

Page 35

1  it was first put in front of you, right, was she
2  -- it stagnant or was it moving when it was first
3  put in front of you?
4      A.  It was stagnant.
5      Q.  And so that first screen that you saw in
6  that moment, what did you see?
7      A.  I just saw a sexual position, a little --
8  a drawing of a man and a woman in a certain sexual
9  position.
10     Q.  And would you describe these drawings as
11 cartoon drawings?  Images?  How would you describe
12 them?  Were these anatomically accurate, like
13 figurines?
14         MR. PANZINI:  Object to the form.
15     A.  More like figurines.  Like, they resemble
16 -- I think of Kama Sutra drawings as the same
17 almost every time I've seen them.  So the original
18 books, as you see like when I referred to
19 "Scrooged," there's drawings and you know it's a
20 man and a woman and they're put in sexual
21 positions.
22     Q.  (By Mr. Stewart)  Do you remember, were
23 there any colors applied to these figurines?  Were
24 they skin tone?  Were they a different color?
25 Something else?

Page 36

1      A.  I don't remember.
2      Q.  And for -- you then said at some point
3  Reshma began to scroll through the phone; correct?
4      A.  Yes, correct.
5      Q.  For approximately how long did she scroll
6  through the phone?
7      A.  I mean, ten seconds.
8      Q.  And in the ten seconds that she was
9  scrolling through the phone, how many figurines
10 were you able to observe?
11     A.  I probably saw eight or -- I -- eight or
12 ten in that time.  It doesn't take long to scroll.
13     Q.  So it was moving somewhat quickly when it
14 scrolled through?
15     A.  Yeah.
16     Q.  And it was apparent to you through that
17 viewing point that you were observing Kama Sutra
18 imaging?
19     A.  Yes.
20     Q.  How long did the entire interaction
21 between Reshma and yourself and Brian last for?
22     A.  I'd say 30 seconds, 20.  It could have
23 been 25 seconds, 20 seconds.
24     Q.  Fair to say somewhere between 20 and
25 30 seconds?

Page 37

1      A.  Yes.
2      Q.  And in addition to showing you what was on
3  the screen of her phone, did Reshma offer any
4  commentary?
5      A.  She did, yes.  She said, My people
6  invented this.
7      Q.  Did she say anything else beyond that?
8      A.  No.
9      Q.  Did you say anything to her in response?
10     A.  No.
11     Q.  After that 20-to-30-second interaction,
12 did you continue to walk in the same direction as
13 her?  Did you walk in different directions?  Or
14 what happened next?
15     A.  We walked in different directions.
16     Q.  At that time, did you make any commentary
17 to Reshma that -- to reflect the fact that you
18 thought this was somewhat inappropriate?
19     A.  No.
20     Q.  At the time, did you think it was
21 inappropriate that Reshma had showed you this
22 material?
23     A.  Yes.
24     Q.  And why did you feel that way?
25     A.  It was a -- it's a business setting.  It's



Page 38

```
 1      -- and also, Reshma -- I would think it was
 2   inappropriate if any female or male showed me that
 3   in a business setting when a manager could be
 4   standing behind us or -- it's just a very
 5   inappropriate time to show stuff like that.
 6      Q.  And, now, was -- what was shown to you,
 7   was it a website, was it an application, or
 8   something else?
 9      A.  I don't know.
10      Q.  And other than that single 20-to-30-second
11   interaction with Reshma at the 2018 national sales
12   meeting, did you have any other interactions with
13   her during that four-day period at the national
14   sales meeting?
15      A.  No.
16      Q.  And other than what you described to me at
17   the 2017 POA summer meeting, did you have any
18   other interaction with Reshma besides those two
19   occasions?
20      A.  I mean, besides just, like, seeing her
21   passing, no.
22      Q.  Are you aware of Reshma showing this Kama
23   Sutra material to any other individuals aside from
24   yourself?
25      A.  And Brian Wiley?  It was me and Brian
```

Page 39

```
 1   Wiley.
 2      Q.  You and --
 3      A.  Yeah, me and Brian were the ones that were
 4   standing there.
 5      Q.  Are you aware --
 6      A.  So either -- Matt Eck might have been, and
 7   again -- and I don't remember exactly -- I just
 8   know that Brian and I were right -- were right
 9   next to her.  She was showing us.  We were
10   standing -- you know, when she came in between us,
11   we were three people.
12      Q.  And so the question is, other than you and
13   Brian, are you aware of Reshma showing this to any
14   other individuals at the national sales meeting?
15      A.  No.  No.
16      Q.  And did you discuss this incident that
17   you've described here today with any Pacira
18   employees?
19      A.  I did.
20      Q.  And who among the Pacira employees did you
21   discuss this with?
22      A.  Steve Huddy, Isaac, Justin, who's now the
23   -- I can't remember his name -- Rob -
24      Q.  Justin Sherrod, is that who you're
25   referring to?
```

Page 40

```
 1      A.  Justin Sherrod, yes.
 2      Q.  I didn't mean to cut you off.  You said
 3   Rob, meaning Rob Rock?
 4      A.  Rob Rock, yes.
 5      Q.  Other than those four individuals, did you
 6   share this occurrence with any other Pacira
 7   employees?
 8      A.  After the fact.
 9          MR. PANZINI:  I'm sorry.  I was just going
10   to say after the meeting or ever?
11      Q.  (By Mr. Stewart) So I can break it up in
12   a temporal time basis here.  Focusing just while
13   at the meeting, other than describing the
14   occurrence to Steve Huddy, Isaac Smolko, Justin
15   Sherrod, and Rob Rock, did you talk about this
16   Kama Sutra material that Reshma showed you to
17   anyone else during the time while you were at the
18   national sales meeting?
19      A.  Not that I can remember, no.
20      Q.  And then the question -- same question but
21   with respect to any period of time after the
22   national sales meeting, did you discuss it with
23   any Pacira employees?
24      A.  Yes.
25      Q.  Who?
```

Page 41

```
 1      A.  Nicole Adams.
 2      Q.  And who is Nicole Adams?  What's her
 3   title?
 4      A.  I don't know what her title is now.  She
 5   was an account manager but has moved into
 6   different roles.
 7      Q.  And other than Nicole, anybody else?
 8      A.  I don't remember.
 9      Q.  Did you ever go to the human resource
10   department and make a complaint concerning Reshma
11   showing you Kama Sutra materials at the 2018
12   national sales meeting?
13      A.  I did, yes.
14      Q.  And to do that, did you have to describe
15   the incident to a Pacira employee?
16      A.  To Rich Kahr, yes.
17      Q.  And was that a --  Withdraw.
18          When you described the occurrence to Rich
19   Kahr, did you contact him or did he contact you,
20   or was it somebody else?
21      A.  I contacted him.
22      Q.  And when did you contact Rich Kahr?
23      A.  I can't remember the exact day, but it was
24   shortly after the meeting I sent him an email to
25   schedule a call.
```



Page 42

1    Q.   And would that email have come from your
2  Pacira email account?
3    A.   It did.
4    Q.   And did it go to Rich Kahr's Pacira email
5  account?
6    A.   It did.
7    Q.   And would that have been sent during the
8  month of February 2018?
9    A.   Yes.
10   Q.   And can you say, was it within a certain
11 period of time after the national sales meeting?
12   A.   It was probably within four days,
13 five days.
14   Q.   If you were to perform a search of your
15 emails, would you be able to locate that email
16 within your "Sent" mailbox?
17   A.   Yes.
18   Q.   So I'll follow up with counsel, but I will
19 ask that you provide a copy of that email
20 following the close of this deposition.
21   A.   Okay.
22   Q.   And after you emailed Rich Kahr, did a
23 telephone conversation transpire?
24   A.   It did.
25   Q.   And approximately how long did that phone

Page 43

1  call last?
2    A.   Five minutes.
3    Q.   And in the course of that five minutes,
4  what, if anything, did you say to Mr. Kahr?
5    A.   I just told him exactly what I saw happen
6  at the national sales meeting, so what Reshma
7  showed me and -- and, I mean, I just described it
8  as it happened, as I've told you.
9    Q.   Did you convey to Mr. Kahr that this
10 occurrence in any way made you feel unsafe or
11 uncomfortable?
12   A.   Yes.
13   Q.   And what specifically did you tell Mr.
14 Kahr?
15   A.   Just that it was offensive.
16   Q.   In what way?
17   A.   It was sexually inappropriate in the
18 workplace and was -- made me uncomfortable and it
19 was offensive.
20   Q.   And that was conveyed to Mr. Kahr that you
21 found that this was offensive material and it made
22 you feel uncomfortable?
23   A.   Correct.
24   Q.   What, if anything, did Mr. Kahr do to
25 address the complaint that you made?

Page 44

1    A.   I do not know what Rich Kahr did with that
2  information.
3    Q.   Were you ever contacted in any form to
4  follow up regarding your report?
5    A.   I was contacted afterwards.  There was
6  several people who were contacted about whether or
7  not they were present when Reshma and Rob had a
8  disagreement at Top Golf.  And I do not remember
9  who contacted me from HR.  Could have been Rich
10 Kahr, could have been somebody else.  I don't
11 remember.
12   Q.   So were you contacted by HR -- are you
13 saying you were contacted by HR to inquire as to
14 whether or not you observed anything at Top Golf?
15   A.   Yes.
16   Q.   And was that before or after you had made
17 your complaint to Rich Kahr about the content that
18 Reshma showed you?
19   A.   It was after.
20   Q.   And to your recollection, when you were
21 contacted about the Top Golf event, what, if
22 anything, did you tell the HR representative?
23   A.   That I was not -- I didn't know about what
24 happened between Rob and Reshma until the next
25 morning, so no, I had no -- I was not there, I was

Page 45

1  not there to witness anything that happened.
2    Q.   Do you know if Brian Wiley made any
3  complaints to HR concerning the material that
4  Reshma showed you?
5    A.   I do not.
6    Q.   Did you have any conversation with Brian
7  Wiley about what had transpired?
8    A.   I don't remember if I did.
9    Q.   Did you have -- you told us earlier that
10 you had conversations with Steve Huddy about what
11 had transpired.  What, if anything, did you tell
12 Steve?
13   A.   Exactly the same thing I told you, that
14 she showed us Kama Sutra poses.
15   Q.   And what, if anything, did he say in
16 response?
17   A.   I don't remember.
18   Q.   And what -- and the same question as with
19 respect to Isaac.  When you told him that she had
20 showed you this material, did he have any response
21 that you recall?
22   A.   Yeah.  He told me something -- a story
23 about something that Reshma had said to him that
24 was inappropriate.
25   Q.   What was that story?



# EXHIBIT 21

**Exhibit 21 is a Recording. This will be provided to the Court via USB**