No *Shepard's* Signal™
As of: April 29, 2021 6:21 PM Z

## *Cohen v. Univ. of Med. & Dentistry of N.J.*

Superior Court of New Jersey, Appellate Division

December 3, 2013, Argued; December 30, 2013, Decided

DOCKET NO. A-1300-12T1

**Reporter**
2013 N.J. Super. Unpub. LEXIS 3054 *; 121 Fair Empl. Prac. Cas. (BNA) 674; 2013 WL 6839509

MARION COHEN, Plaintiff-Appellant, v. UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, Defendant-Respondent.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Prior History:** [*1] On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-5031-09.

## Core Terms

replaced, prima facie case, age discrimination, trial judge, renewed, summary judgment, discriminatory, certification, employees, pretext, younger

**Counsel:** Kevin Barber argued the cause for appellant (Niedweske Barber Hager, LLC, attorneys; Mr. Barber, on the brief).

M. Karen Thompson argued the cause for respondent (Norris, McLaughlin & Marcus, attorneys; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Kathryn J.H. Boardman, Deputy Attorney General, on the brief[1]).

**Judges:** Before Judges Fisher and Espinosa.

## Opinion

PER CURIAM

In this appeal, we consider the propriety of a summary judgment entered in favor of defendant University of Medicine and Dentistry of New Jersey dismissing plaintiff Marion Cohen's complaint, which alleged age discrimination in violation of the Law Against Discrimination (LAD), *N.J.S.A. 10:5-1 to -42*, in defendant's failure to renew her contract. Because the trial judge took a too mechanical approach in determining whether plaintiff presented a prima facie case of discrimination, we reverse.

I

The record reveals that plaintiff was hired by defendant in 1994 as an associate [*2] professor of anatomy and cell biology and injury sciences; plaintiff's husband, Dr. Stanley Cohen, became the chair of the pathology department at the same time. Plaintiff started on the tenure-track, but later switched to "coterminous-status," meaning she was engaged for short "fixed period[s]." Plaintiff entered into a three-year contract with defendant in 1997; this was followed by five consecutive one-year contracts, a two-year contract in 2006, and another one-year contract in 2008.

In November 2008, allegedly because of budgetary concerns, defendant's interim dean informed departments that all contract employees were to be

---

[1] Norris, McLaughlin & Marcus was substituted as counsel for respondent after original counsel, the Attorney General, filed respondent's brief on the merits.

Case 2:18-cv-16509-MCA-AME   Document 82-7   Filed 05/07/21   Page 2 of 144 PageID: 694

Page 2 of 4

2013 N.J. Super. Unpub. LEXIS 3054, *2

considered non-renewed unless there existed "sufficient justification" for renewal. On February 24, 2009, a few weeks after her sixty-ninth birthday, plaintiff was informed her contract would not be renewed and her employment terminated effective June 30, 2009.

Plaintiff commenced this age discrimination suit in June 2009. After a lengthy period of discovery, the trial judge granted defendant's summary judgment. Plaintiff appeals.

II

In this appeal, we apply the same standard the trial judge was required to apply, *W.J.A. v. D.A., 210 N.J. 229, 237-38, 43 A.3d 1148 (2012)*, and **[*3]** view the facts in the record in the light most favorable to the non-moving party — here plaintiff — to determine whether "the competent evidential materials . . . are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party," *Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995)*. The propriety of summary judgment must be considered in light of the familiar burden-shifting standard pronounced in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, which is applied in LAD actions, *Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447, 867 A.2d 1133 (2005)*.

*McDonnell Douglas* provides a method for proceeding where it is unlikely the aggrieved employee will have access to or ever obtain direct evidence — let alone "the proverbial smoking gun" — of an employer's discriminatory intent. *Zive, supra, 182 N.J. at 446-47* (internal citation omitted). When utilized, the *McDonnell Douglas* framework first imposes on the plaintiff the burden of presenting a prima facie case of age discrimination with evidence of four elements: (1) plaintiff was a member of a protected group; (2) plaintiff's job performance met the employer's **[*4]** legitimate expectations; (3) plaintiff was terminated or not renewed; and (4) plaintiff was replaced or the employer sought a replacement. *McDonnell Douglas, supra, 411 U.S. at 802, 93 S. Ct. at 1824, 36 L. Ed. 2d at 677-78*; *Zive, supra, 182 N.J. at 449-50*. When established, such a prima facie case gives rise to a presumption of unlawful discrimination. *Reynolds v. Palnut Co., 330 N.J. Super. 162, 167-68, 748 A.2d 1216 (App. Div. 2000)*. This burden is not intended to be onerous, otherwise plaintiffs would be prevented from "accessing the tools . . . necessary to even begin to assemble a case." *Zive, supra, 182 N.J. at 448*. See

also *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093-94, 67 L. Ed. 2d 207, 215 (1981)*.

Once the plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for [its] actions." *Zive, supra, 182 N.J. at 449*. And, if the employer provides such a reason, the plaintiff must then demonstrate why the articulated reason "was merely a pretext for discrimination." *Ibid.* Pretext may be demonstrated with evidence that "(1) a discriminatory reason more likely motivated the employer **[*5]** than the employer's proffered legitimate reason, or (2) the defendant's proffered explanation is 'unworthy of credence.'" *Reynolds, supra, 330 N.J. Super. at 168* (quoting *Burdine, supra, 450 U.S. at 256, 101 S. Ct. at 1095, 67 L. Ed. 2d at 217*).

Here, the trial judge based her ruling on the fourth element of the *McDonnell Douglas* prima facie case, concluding that plaintiff failed to present evidence that defendant sought to or in fact replaced plaintiff with "someone younger, or that in deciding which employees should not be renewed [defendant] disproportionately chose older people." Our review, thus, focuses on that fourth element, and we assume, as the trial judge apparently assumed, that the other three elements were satisfied.

The fourth element, as explained in *Bergen Commercial Bank v. Sisler, 157 N.J. 188, 213, 723 A.2d 944 (1999)* (quoting *Kelly v. Bally's Grand, Inc., 285 N.J. Super. 422, 429, 667 A.2d 355 (App. Div. 1995))*, may be satisfied by a showing of the plaintiff's replacement by "a candidate sufficiently younger to permit an inference of age discrimination." For example, had the sixty-nine-year-old plaintiff been replaced by a thirty-year-old, this element would have been satisfied. But, as our **[*6]** Supreme Court has made clear the fourth element, in an age discrimination case, is not governed by a "mechanistic application" of the ages of the relevant players because

> [s]eldom will a sixty-year-old be replaced by a person in the twenties. Rather the sixty-year-old will be replaced by a fifty-five-year-old, who, in turn, is succeeded by a person in the forties, who also will be replaced by a younger person.

> [*Bergen Commercial Bank, supra, 157 N.J. at 212-13* (quoting *McCorstin v. United States Steel Corp.,*

2013 N.J. Super. Unpub. LEXIS 3054, *6

*621 F.2d 749, 754 (5th Cir. 1980))*.[2]]

Here, the judge considered the fourth element by simply comparing the ages of plaintiff and her alleged replacements. In opposing summary judgment, plaintiff had submitted her husband's two certifications. The first asserted that plaintiff's "teaching responsibilities were performed by several Pathology Department employees, including Dr. Raphael Mannino." Although Dr. Mannino's age was not revealed in the certification, the judge mentioned during oral argument that she believed he was likely about sixty-six years old at the time of the motion, which was heard more than three years after the complaint was filed.[3] The second

---

[2] The Supreme Court has, in fact, held that *McDonnell Douglas*'s fourth element has no proper application in actions based on the Age Discrimination in Employment Act of 1967 (ADEA), *29 U.S.C.A. § 621 to § 634*, reasoning:

The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he lost out *because of his age*. Or to put the point more concretely, there can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40-year-old is replaced by a 39-year-old than when a 56-year-old is replaced by a 40-year-old. Because it lacks probative value, **[*7]** the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case.

[*O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312, 116 S. Ct. 1307, 1310, 134 L. Ed. 2d 433, 438 (1996)*.]

[3] During oral argument on August 6, 2012, the judge explained that she had examined "UMDNJ's website," which apparently disclosed Dr. **[*8]** Mannino received his bachelor's degree in 1967. From this the judge extrapolated that Dr. Mannino "would be about 66 years old today, so he's not significantly younger than the plaintiff." The judge improperly obtained and considered this "evidence." The factual record upon which summary judgment must rest is limited to the four corners of the parties' moving and opposing papers. *See, e.g., Sellers v. Schonfeld, 270 N.J. Super. 424, 428-29, 637 A.2d 529 (App. Div. 1993)*. Judges are not permitted to use the product of their own independent factual research in disposing of a motion for summary judgment. *Cf., Mazza v. Cavicchia, 15 N.J. 498, 514, 105 A.2d 545 (1954)* (recognizing that unless "the basic principle of the exclusiveness of the record" is observed, "the one who decides the case may stray at will from the record in reaching his decision" and, consequently, "the right to present evidence and to argue its significance" becomes meaningless); *Lazovitz v. Board of Adjust., Berkeley*

---

certification asserted that plaintiff's teaching responsibilities were also assumed by faculty members who were forty-seven, fifty, fifty-three and fifty-four years of age.

The judge explained her consideration of these factual assertions in the following way:

The [c]ourt finds that plaintiff has failed to make a prima facie case for age discrimination because she does not put forth any evidence suggesting that the non-renewal of her contract was motivated by a discriminatory animus. *See Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 76, 860 A.2d 945 (App. Div. 2004)* (affirming decision of summary judgment). Plaintiff points to no evidence, circumstantial or otherwise, suggesting a discriminatory motive. There is no evidence suggesting that plaintiff was replaced by someone younger, or that in deciding which employees should not be renewed UMDNJ disproportionately chose **[*10]** older people. Plaintiff presents a certification of Dr. Stanley Cohen (apparently plaintiff's husband), which includes information about what a valuable employee plaintiff was and how important her contribution was to UMDNJ. Dr. Stanley Cohen specifically points to a Dr. Mannino, who, Dr. Stanley Cohen certifies, received unsatisfactory evalua-tions and who took over at least some of the plaintiff's teaching responsibilities. How-ever, as plaintiff does not disclose Dr. Mannino's age, there is nothing in Dr. Cohen's certification to support a finding of age discrimination.

Plaintiff devotes much of her argument to identifying what she considers to be weaknesses in the defendant's explanation for why the plaintiff was not renewed, which plaintiff construes as demonstrating that the defendant's explanation of budget cuts was a pretext for age discrimination.

---

*Heights, 213 N.J. Super. 376, 382, 517 A.2d 486 (App. Div. 1986)* (finding permissible a judge's visit to a site of a proposed nursing home, but concluding the judge "could not go outside the record and base his ruling on facts gleaned from a personal **[*9]** inspection"). The judge here was obligated to consider whether there was or was not a triable factual issue by resorting to the record before her. That record actually provides the answer to the question that generated the judge's independent investigation. The birth dates of both plaintiff (February 14, 1940) and Dr. Manninno (January 28, 1947) were revealed in defendant's answers to interrogatories. Accordingly, the record required an assumption there was a seven-year difference in their ages.

Case 2:18-cv-16509-MCA-AME   Document 82-7   Filed 05/07/21   Page 4 of 144 PageID: 696

Page 4 of 4

2013 N.J. Super. Unpub. LEXIS 3054, *9

Even if the court were to agree that there were discrepancies, and that the discrepancies were relevant, they would be relevant to the issue of pretext, which is only addressed after plaintiff has presented a prima facie case. Plaintiff having failed to make the prima facie case, the issue of pretext is beside the point.

Even were **[*11]** we to agree the judge properly analyzed the fourth element by looking solely to the age of the alleged replacements, we would be required to conclude that their ages were sufficiently disparate from plaintiff's to permit a finding that the fourth element was satisfied. Our Supreme Court, in *Bergen Community Bank, supra, 157 N.J. at 218*, referred with approval to a decision of a federal court of appeals where it was held that to meet the fourth element the plaintiff

may point to a sufficient age difference between himself and his replacement such that a fact-finder can reasonably conclude that the employment decision was made on the basis of age. Nor is there any particular age difference that must be shown. *Different courts have held, for instance, that a five year difference can be sufficient, but that a one year difference cannot.*

[*Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir.)* (emphasis added; citations omitted), *cert. denied*, 515 U.S. 1159, 115 S. Ct. 2611, 132 L. Ed. 2d 854 (1995).[4]]

Here, plaintiff asserted she was replaced by faculty members anywhere from seven to twenty-two years younger. As a result, even the mechanical approach applied by the trial judge required a **[*12]** finding that plaintiff sustained the fourth element of her *McDonnell Douglas* prima facie case.

For future guidance, we would also observe that a comparison of the plaintiff's age with her alleged replacements' ages is not the sole means of generating an inference of age discrimination. The fourth element is "flexible" and "can be satisfied differently in differing factual scenarios," including:

actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, preferential treat-ment given to employees outside the protected class, and, in a corporate down-sizing, the systematic transfer of a discharged employee's duties to other emp-loyees, **[*13]** or a pattern of recommending the plaintiff for positions for which he or she is not qualified and failure to surface plaintiff's name for positions for which he or she is well-qualified. A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position, or, more generally, upon the timing or sequence of events leading to the plaintiff's termination.

[*Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996)*(citations omitted).]

III

In reviewing the record the parties placed before the trial judge, we conclude that plaintiff submitted enough evidence to survive summary judgment on the fourth element of the prima facie case - the only element the trial judge found was in doubt - and, for that reason alone, reverse. This holding, however, should not be interpreted as preventing resolution of this action through the summary judgment process upon a closer examination of the second and third stages of the *McDonnell Douglas* approach.

Reversed and remanded. We do not retain jurisdiction.

_____

[4] As noted earlier, the Supreme Court has concluded that the fourth element has no relevance in an ADEA case, *O'Connor, supra, 517 U.S. at 312, 116 S. Ct. at 1310, 134 L. Ed. 2d at 438*, obviating the need for examining the relevant individuals' ages. Plaintiff's action, however, is not based on the ADEA; in this LAD case we are obligated to apply *Bergen Community Bank*'s binding requirement that plaintiff show she was replaced by "a candidate sufficiently younger to permit an inference of age discrimination." *157 N.J. at 213*.

**End of Document**

✚ Positive
As of: April 29, 2021 6:24 PM Z

# *Chambers v. Heidelberg USA, Inc.*

United States District Court for the District of New Jersey

May 5, 2006, Decided

Civil No. 04-CV-583 (RBK)

**Reporter**
2006 U.S. Dist. LEXIS 32334 *; 2006 WL 1281308

RAYMOND CHAMBERS, Plaintiff, v. HEIDELBERG USA, Inc., Defendant.

**Subsequent History:** Motion denied by *Chambers v. Heidelberg USA, Inc., 2007 U.S. Dist. LEXIS 8349 (D.N.J., Feb. 5, 2007)*

## Core Terms

Declaration, complaints, alleges, paged, termination, harassment, training, summary judgment, customer, severe, email, racial discrimination, travel arrangements, prima facie case, pervasive, discriminatory discharge, retaliatory discharge, protected activity, training session, employees, job site, discriminatory, hostile, service technician, work performance, no evidence, complaining, genuine, decision to terminate, travel

## Case Summary

### Procedural Posture

Plaintiff former employee filed suit against defendant former employer alleging violations of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, and New Jersey's Law Against Discrimination, *N.J. Stat. Ann. § 10:5-1 et seq.* The employer moved for summary judgment.

### Overview

The employee alleged that the employer's actions unreasonably interfered with the employee's work performance and lead to an intimidating, hostile, and offensive work environment permeated with discriminatory intimidation so severe and pervasive as to alter the terms and conditions of the employee's employment. The court found that the employee never witnessed any manager or supervisor make any negative or derogatory comments regarding his race or any other employee's race during the period of his employment. The court also found that the employee failed to present any competent evidence to show that the allegations regarding his training, travel schedule, and communication issues were in any way connected to his race. Next, the employee alleged that he was unlawfully discharged because of his race and that there was a causal connection between his complaints about his supervisor in 2001 and 2002 and his subsequent termination in March 2003. The court found that regardless of the reason why the employee did not complain of racial discrimination prior to his discharge, there could be no claim for retaliatory discharge when the employee never engaged in a protected activity.

### Outcome
The employer's motion was granted.

## LexisNexis® Headnotes

2006 U.S. Dist. LEXIS 32334, *32334

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > General
Overview

**HN1**[↓] **Summary Judgment, Entitlement as Matter of Law**

Summary judgment is appropriate where the court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party.

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > General
Overview

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > General Overview

**HN2**[↓] **Summary Judgment, Entitlement as Matter of Law**

On a motion for summary judgment, the burden of establishing the nonexistence of a genuine issue is on the party moving for summary judgment. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Once the moving party satisfies this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Fed. R. Civ. P. 56(e)*. To do so, the nonmoving party must do more than simply show that there is some metaphysical doubt as to material facts.

Labor & Employment
Law > Discrimination > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

**HN3**[↓] **Labor & Employment Law, Discrimination**

In general, courts apply a similar analysis to discrimination claims brought pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, and New Jersey's Law Against Discrimination (NJLAD), *N.J. Stat. Ann. § 10:5-1 et seq.* Title VII and the NJLAD both prohibit employment discrimination because of race, color, religion, sex, or national origin.

Labor & Employment
Law > Discrimination > General Overview

**HN4**[↓] **Labor & Employment Law, Discrimination**

New Jersey's Law Against Discrimination prohibits employment discrimination on additional grounds including age, ancestry, marital status, and sexual orientation, among others. N.J. Stat. Ann. § 10-5:12.

Labor & Employment Law > ... > Racial
Harassment > Burdens of Proof > Employee
Burdens of Proof

Labor & Employment
Law > ... > Harassment > Racial
Harassment > Hostile Work Environment

**HN5**[↓] **Burdens of Proof, Employee Burdens of Proof**

To state a hostile work environment claim under Title VII, the plaintiff must show that (1) he suffered intentional discrimination because of his race; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected him; (4) the harassment would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. Similarly, when a plaintiff alleges racial harassment under New Jersey's Law Against Discrimination, he must demonstrate that the defendant's conduct (1) would not have occurred but for the employee's race, and the conduct was (2) severe or pervasive enough to make a (3) reasonable African-American believe that (4) the conditions of employment are altered and the working environment is hostile or abusive. In analyzing a hostile work environment claim, the court may consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Labor & Employment Law > ... > Racial Harassment > Burdens of Proof > Employee Burdens of Proof

Labor & Employment Law > ... > Harassment > Racial Harassment > Hostile Work Environment

**HN6[⤓] Burdens of Proof, Employee Burdens of Proof**

To establish the first prong of a hostile work environment based upon racial discrimination, a plaintiff must show that race is a substantial factor in the discrimination and that, if the plaintiff had been of another race, he would not have been treated in the same manner. Speculations, generalities, and gut feelings, however genuine, do not allow for an inference of discrimination to be drawn when they are not supported by specific facts.

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

**HN7[⤓] Summary Judgment, Supporting Materials**

Unsubstantiated speculation is insufficient to withstand summary judgment.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

**HN8[⤓] Burdens of Proof, Burden Shifting**

Where the plaintiff does not present direct evidence of discrimination, courts apply the three-step, McDonnell Douglas burden-shifting standard to both discriminatory discharge and retaliatory discharge claims. Under this burden shifting framework, a plaintiff must first establish a prima facie case of discrimination. A rebuttable presumption of unlawful discrimination arises if plaintiff presents this prima facie case. To rebut this presumption, the defendant must then set forth admissible evidence of a legitimate, non-discriminatory reason for the employment decision at issue. If the defendant produces evidence of a legitimate, non-discriminatory reason for the employment decision, the presumption of unlawfulness disappears. At that point, the plaintiff must prove by a preponderance of the evidence that the employer's articulated reason was not the real reason for the employment action, but rather was a mere pretext for discrimination. The plaintiff may prove pretext directly by demonstrating that a different reason more likely motivated the employer, or indirectly by demonstrating that the employer's articulated reason is not credible. In spite of these intermediate burden shifts within the discrimination standard, it is ultimately the plaintiff's burden to persuade the fact finder that the employer engaged in unlawful discrimination.

Labor & Employment Law > ... > Retaliation > Elements > General Overview

**HN9[⤓] Retaliation, Elements**

To establish a prima facie case of retaliatory discharge, a plaintiff must show that (1) he was engaged in a protected activity; (2) he was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge.

Labor & Employment Law > ... > Retaliation > Elements > Protected Activities

**HN10[⤓] Elements, Protected Activities**

With respect to the first element of a prima facie case of retaliatory discharge, the language of Title VII of the Civil Rights Act of 1964, and New Jersey's Law Against Discrimination (NJLAD) explains what constitutes a "protected activity." Specifically, § 704(a) of Title VII forbids an employer from discriminating against an employee because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. *42 U.S.C.S. § 2000e-3(a)*. The phrase "this subchapter" refers specifically to *42 U.S.C.S. §§ 2000e through*

2006 U.S. Dist. LEXIS 32334, *32334

*2000e-17*, which contain the provisions regarding an employee's rights when an employer has discriminated against him or her on the basis of race, color, sex, religion, or national origin. Consequently, a charge "under this subchapter" is a charge that alleges discrimination on the basis of one or more of those prohibited grounds. The NJLAD prohibits employment discrimination and retaliation against an employee for opposing a discriminatory practice which is based upon race, color, sex, religion, national origin, or a number of other listed factors. *N.J. Stat. Ann. § 10:5-12*.

Labor & Employment
Law > ... > Retaliation > Elements > Causation

**HN11**[⤓]   **Elements, Causation**

In the context of a retaliation claim, the mere fact that a discharge occurs subsequent to the lodging of a complaint is ordinarily insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.

Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > Discharges & Failures to Hire

**HN12**[⤓]   **Evidence, Burdens of Proof**

To establish a prima facie case of discriminatory discharge under Title VII, a plaintiff must show (1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was fired from that position; and (4) that the circumstances of the case give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class. Under New Jersey's Law Against Discrimination, the elements are substantially the same except that the fourth element requires a showing that the employer sought someone to perform the same work after Plaintiff was fired.

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden Shifting

**HN13**[⤓]   **Burdens of Proof, Burden Shifting**

The defendant bears a relatively light burden of production in rebutting a prima facie case of unlawful discharge. Specifically, defendant must only introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. Furthermore, the employer need not prove that the proffered reason actually motivated its behavior because the plaintiff always retains the ultimate burden of proving intentional discrimination.

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden Shifting

**HN14**[⤓]   **Burdens of Proof, Burden Shifting**

To meet the burden of pretext, a plaintiff must establish by a preponderance of the evidence that defendant's articulated reason was a mere pretext for discrimination. In particular, plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in defendant's proffered reasons for its termination decision that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. However, it is insufficient for defendant to show merely that the employer's decision was wrong or mistaken because the relevant issue is whether discriminatory animus motivated the defendant, not whether the defendant is wise, shrewd, prudent, or competent.

**Counsel:  [*1]**  For RAYMOND CHAMBERS, Plaintiff: WILLIAM B. HILDEBRAND, LAW OFFICES OF WILLIAM B. HILDEBRAND, CHERRY HILL, NJ.

For HEIDELBERG U.S., Defendant: ROBERT B. NUSSBAUM, SAIBER, SCHLESINGER, SATZ & GOLDSTEIN, LLC, NEWARK, NJ.

**Judges:** Robert B. Kugler, United States District Judge.

2006 U.S. Dist. LEXIS 32334, *1

**Opinion by:** Robert B. Kugler

# Opinion

**KUGLER,** United States District Judge:

This matter comes before the Court on a motion for summary judgment by Defendant Heidelberg USA, Inc. on all claims in Plaintiff Raymond Chambers' Complaint. The Complaint alleges that, during the course of Plaintiff's employment, the Defendant subjected him to racial discrimination and ultimately terminated his employment in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. §§ 2000e et seq.*, and New Jersey's Law Against Discrimination ("NJLAD"), *N.J. Stat. Ann. § 10:5-1 et seq.* In its motion for summary judgment, Defendant asserts that Plaintiff has not provided any evidence of racial discrimination to support his claims. For the reasons set forth below, this Court will grant Defendant's motion.

## I. BACKGROUND

Defendant Heidelberg USA, **[*2]** Inc.("Heidelberg") sells and services large commercial printing and graphic arts equipment. (Def. Facts P 1.) [1] Plaintiff Raymond Chambers is a black male who was employed by Heidelberg as a Field Service Dryer Technician from March 28, 1999 until March 31, 2003. (Compl. P 2.) As Heidelberg's employee, Chambers performed startup and service work on the dryer component of Heidelberg's equipment at customer job sites. (Pl. Dep. 62-66, 86-88.) He would travel from his home in New Jersey to customer sites and then report back to a service department located in Nashville, Tennessee. (Pl. Dep. 64-66.)

Over the course of his employment, Chambers worked under three direct supervisors in a group of approximately ten to twelve Field Service Technicians. (Pl. Dep. 82-88.) Gary Mitchler ("Mitchler") was his direct supervisor **[*3]** from March 1999 until approximately October 2000; Eric Sucha ("Sucha") was

his supervisor from October 2000 until approximately August 2002; and Geoffrey Adamson ("Adamson") was his supervisor from approximately August 2002 until March 2003. (Pl. Dep. 66-67, 82-85.)

Chambers asserts that he had many problems with Sucha during the time that Sucha supervised him, and he further claims that there have been similar disagreements between Sucha and a white service technician named Chuck Sowers. (Compl. P 17; Pl. Dep. 189-193). Specifically, Chambers alleges that Sucha harassed and discriminated against him by (1) denying him a cell phone, (2) excessively paging him, (3) failing to send him to a training class, and (4) controlling some of his travel arrangements, which Chambers asserts were purposely inconvenient. (Compl. PP 18-20).

First, with regard to the training issues, Chambers' alleges that shortly after Sucha became his supervisor, Chambers was the only individual in his group who was not sent to a training class dealing with the burner component of Heidelberg's dryers. (Compl. P 18). By contrast, Sucha claims that there were two other Service Technicians, both white males, who **[*4]** also never attended the training session. (Sucha Declaration, P 4.)

Second, Chambers claims that Sucha made major changes to his already established travel arrangements, which made traveling very inconvenient for Chambers. (Compl. P 20; Pl. Opp. at 12). Sucha, however, states that in an effort to control costs, Heidelberg requested that managers take a more active role in making travel arrangements for employees in their various groups. (Sucha Declaration, P 6). Moreover, Section 2B of the Heidelberg policy handbook grants managers the authority to make travel arrangements by stating that, "The technician will make travel arrangements for each job assignment, unless the supervisor decides to complete these himself/herself." (See Pl. Dep. 215).

Third, Chambers alleges that Sucha paged him excessively and that other employees received cell phones to replace their pagers before Chambers did. In particular, Chambers states that he was paged four to five times daily and, on information and belief, he claims that most team members were only paged once. (Compl. P 24). In response, Sucha explains that he rolled out cell phones to replace pagers until every Service Technician received **[*5]** a cell phone. (Sucha Declaration, P 5). Sucha also argues that he paged all of the Service Technicians who reported to him, and

---

[1] Because the Plaintiff failed to provide a proper statement of material facts pursuant to *Local Rule 56.1*, the majority of facts come from Defendant's statement of facts and the corresponding exhibits.

2006 U.S. Dist. LEXIS 32334, *5

further, that he only paged Chambers when necessary to accomplish business purposes. (Sucha Declaration, P 5.)

Based upon these issues, Chambers lodged complaints about Sucha to Heidelberg's human resources department, but he never claimed that he was being discriminated against based on his race. (See Pl. Dep. 187-193). Chambers also admits that he never witnessed any Heidelberg manager or supervisor make any negative or derogatory comments about his race or any other employee's race. (Pl. Dep. 219-220). Furthermore, on May 24, 2002, Chambers allegedly left a voice mail for human resources manager, Alicia Stignani, stating that he was not complaining that there was any form of discrimination. (See Exhibit 27 to Pl. Dep.) Plaintiff subsequently deposed that he did not use the phrase "racial discrimination" because he feared retaliation, even though he had never witnessed any other person suffer retaliation. (Pl. Dep. 185-187). Chambers also admitted that his interactions with Sucha were minimal after August 2002 and that his alleged mistreatment ended [*6] after Sucha no longer served as his supervisor. (Pl. Dep. 85, 163).

On March 31, 2003, Chambers' acting supervisor, Geoffrey Adamson, terminated Chambers. (See Adamson Declaration, P 7; Pl Dep. 220-226). Adamson stated that, in March 2003, he received a number of complaints regarding Chambers' performance and attitude at customer job sites. (Adamson Declaration, P 7.) In particular, Adamson received a report from Bram Thijseen, a Technical Support Coordinator with Quebecor, one of Heidelberg's customers. The report stated that Chambers left a Quebecor job site before the equipment was operating properly and it further explained that Quebecor was not satisfied with Chambers' work performance on the job. (Adamson Declaration, P 6.) Adamson also received a report from Sucha which indicated that Chambers told a customer representative that a software upgrade recommended by Heidelberg was a "waste of time" and would be unhelpful to the customer. (Adamson Declaration, P 6.) Finally, Adamson received an e-mail report on March 26, 2003 from Heidelberg's manager of press installations, Gene Cain. The email stated that Chambers informed a representative of one of Heidelberg's customers [*7] that a piece of Heidelberg equipment was not properly engineered, even though Chambers did not have the authority or expertise to make that kind of assessment. (Adamson Declaration, P 6; Exhibit 1 to Adamson Declaration.) Gene Cain also reported similar problems with Chambers' performance

at Publication Printing, another Heidelberg customer. Cain noted that Publication Printing advised Cain that it did not want Chambers back at its plant under any condition. (Adamson Declaration P 6; Exhibit 1 to Adamson Declaration.)

Chambers asserts that Sucha and his white co-workers were the persons responsible for leveling numerous charges against him. (Pl. Opp. P 13). He claims that he was not allowed to review and defend himself against these charges and that Heidelberg was "building a paper trail against him by ambush." (Pl. Opp. P 13.) In defense of his actions at the Quebecor job site, Chambers alleges that when he encountered a problem with the gas train assembly installation on the job site, he took it upon himself to rewire the gas train assembly, which he claims demonstrated economical efficiency and problem solving skills. (Pl. Compl. PP 21, 22).

Additionally, Chambers alleges that [*8] Adamson consulted with Sucha and/or Spencer Mieras ("Mieras"), the head of the Service Department, in making the decision to terminate Chambers. (Pl. Opp. PP 2-3). Adamson, however, contends that Mieras and Sucha were not involved in the decision-making process. (Adamson Declaration, P 7). Adamson claims that he only discussed his decision with his supervisor, Bill Stack, and Heidelberg's human resources department. (Adamson Declaration, P 7.) Adamson also asserts that race did not play any part in his decision to terminate Chambers. (Adamson Declaration, P 7.)

After his termination, Chambers filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 23, 2003. (Exhibit 19 to Pl. Dep.) The EEOC dismissed the charge stating that, based upon its investigation, it was unable to conclude that the information obtained established any violation of the relevant civil rights statutes. (Exhibit 29 to Pl. Dep.) The dismissal notice also granted Chambers the right to file a lawsuit, under federal law, in federal or state court.

Thereafter, on February 11, 2004, Chambers filed his Complaint in this Court. Heidelberg then filed the present motion for summary [*9] judgment on November 3, 2005. Chambers' filed an opposition brief on December 5, 2005 and Heidelberg replied on December 12, 2005. [2] The Court will address the

---

[2] Defendant requests that this Court dismiss Plaintiff's opposition because it was filed out of time under **Local Rule 7.1(d)**. After filing the late opposition, Plaintiff's attorney submitted a letter to this Court explaining that the opposition

parties' arguments in turn.

## II. STANDARD OF REVIEW

HN1[↑] Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue [*10] as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 330, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

HN2[↑] The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Celotex, 477 U.S. at 330*. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id. at 331*. Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. To do so, the nonmoving party must "do more than simply show [*11] that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*.

## III. DISCUSSION

HN3[↑] In general, courts apply a similar analysis to discrimination claims brought pursuant to Title VII and the NJLAD. *Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 277 n.7 (3d Cir. 2001)* (observing that "any plaintiff who has fulfilled a Title VII prima facie case will have also shown the elements required by the NJLAD."); *Cortes v. Univ. Of Med. &*

---

was filed late because her father was hospitalized in Jackson, Mississippi and she needed to make several trips to Jackson to see him. Chambers could have received an automatic 14 day extension to file the opposition if Chambers' attorney would have submitted a timely letter to the Court as well as to Defendant. *See* **L. Civ. R. 7.1(d)(5)**. Despite her failure to do so, this Court will, in the interest of completeness, consider Plaintiff's untimely opposition.

*Dentistry of New Jersey, 391 F. Supp. 2d 298, 311 (D.N.J. 2005)*. Title VII and the NJLAD both prohibit employment discrimination because of race, color, religion, sex, or national origin. [3] Under both of these statutes, Chambers alleges that Heidelberg created a hostile work environment and ultimately discharged him for discriminatory and retaliatory purposes.

## [*12] A. Hostile Work Environment Claim

The Complaint alleges that Defendant's actions "unreasonably interfered with plaintiff's work performance and lead to an intimidating, hostile, and offensive work environment permeated with discriminatory intimidation so severe and pervasive as to alter the terms and conditions of plaintiff's employment." (Compl. P 30.) HN5[↑] To state a hostile work environment claim under Title VII, the plaintiff must show that (1) he suffered intentional discrimination because of his race; (2) the harassment was severe or pervasive; [4] (3) the harassment detrimentally affected him; (4) the harassment would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. *Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)*. Similarly, when a plaintiff alleges racial harassment under the NJLAD, he must demonstrate that the defendant's conduct (1) would not have occurred but for the employee's race, and the conduct was (2) severe or

---

[3] HN4[↑] The NJLAD also prohibits employment discrimination on additional grounds including age, ancestry, marital status, and sexual orientation, among others. *See* N.J. Stat. Ann. § 10-5:12.

[4] The Third Circuit has previously stated that the discrimination must be "pervasive and regular." *See e.g., Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001)*; *West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995)*; *Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)*. However, in *Jensen,* the Third Circuit recognized that the United States Supreme Court's test requires only that the harassment be "severe or pervasive" not "pervasive and regular." *Jensen, 435 F.3d at 449 n.3* (citing *Pa. State Police v. Suders, 542 U.S. 129, 133, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)*; *Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)*; *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*; *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)*). Because the distinction is significant and the Supreme Court's determination controls, this Court will use the "severe or pervasive" test. *See id.*

pervasive enough to make a (3) reasonable African-American believe that (4) the conditions of employment are altered and the working environment is hostile **[*13]** or abusive. *Caver v. City of Trenton, 420 F.3d 243, 262-63 (3d Cir. 2005)* (citing *Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685, 688-89 (N.J. 1998))*. In analyzing a hostile work environment claim, the Court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*.

**[*14]**   1. Discrimination Because of Race

Chambers alleges that Heidelberg harassed him because he is black. *HN6[↑]* To establish the first prong of a hostile work environment based upon racial discrimination, a plaintiff must show that race is a substantial factor in the discrimination and that, if the plaintiff had been of another race, he would not have been treated in the same manner. See *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996)*. Speculations, generalities, and gut feelings, however genuine, do not allow for an inference of discrimination to be drawn when they are not supported by specific facts. *Little v. State of New York, 1998 U.S. Dist. LEXIS 21797, No. 96 CV 5132, 1998 WL 306545, at *6 (E.D.N.Y. June 8, 1998)*; see *Hargrave v. County of Atlantic, 262 F. Supp. 2d 393, 419 (D.N.J. 2003)* (noting that despite plaintiff's conclusory allegation of racial harassment, there was nothing about the alleged misconduct that would support an inference of racial animus or hostility toward the plaintiff).

As a preliminary matter, the Court notes that Chambers never witnessed any Heidelberg manager or supervisor make any negative or derogatory comments **[*15]** regarding his race or any other employee's race during the period of his employment. (See Pl. Dep. 219-220.) In other words, although Chambers does not allege any overt acts of racial animus, the Court must still evaluate whether the Defendant created a hostile work environment (because of Plaintiff's race) through facially neutral mistreatment of the Plaintiff. See *Cardenas v. Massey, 269 F.3d 251, 262 (3d Cir. 2001)* (recognizing that "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim"); *Hargrave, 262 F. Supp. 2d at 412* (noting that

"in order to constitute racial harassment, the subject comments or behavior need not be overtly racial in nature").

Nevertheless, even considering the alleged instances of facially neutral mistreatment, Chambers has not demonstrated that race was a factor in the way that he was treated. The Plaintiff has utterly failed to present any competent evidence to show that the allegations regarding his **[*16]** training, travel schedule, and communication issues are in any way connected to his race.

First, with respect to the allegation that Chambers was the only member of his group not sent to the Eclipse training session, Chambers sets forth no evidence whatsoever to demonstrate the truth of that assertion. During his deposition, Chambers admitted that he had no personal knowledge of whether any other technicians in his group did not go to the training. (See Pl. Dep. 174-179.) Rather than investigating the issue, Chambers chose not to conduct any discovery on this issue or any other issue raised in the Complaint. (See Def. Mem. at 13-14.) By contrast, Heidelberg presented evidence which shows that white technicians were likewise not sent to that same training session. (See Sucha Declaration, P 4.) Bill Ellis and James Carroll, both white males in Chambers' group, never attended an Eclipse training session. (Id.) In his declaration, [5] Sucha explains that Ray Gitzendanner, an employee who reported to Sucha, made arrangements for Service Technician Training at Eclipse Combustion in Rockford, Illinois. (Id.) Gitzendanner, and two other Service Technicians attended the **[*17]** initial training session at Rockford. Those two technicians who attended along with Gitzendanner had more seniority than Chambers and lived within driving distances of the training location. (Id.) Because there was negative feedback regarding the effectiveness of the initial training session, no further Eclipse training was ever conducted. (Id.) On these facts, there is nothing to suggest that the decision not to send Chambers to the Eclipse training was motivated by racial animus or hostility.

Second, Chambers claims that his white co-workers did not experience the inconvenient travel arrangements that he experienced under Sucha's supervision;

_____

[5] The Defendant presented sworn declarations of several individuals named in the Complaint. Because the Plaintiff never sought to depose anyone (or otherwise obtain discovery from these individuals), the Defendant could not elicit the same information via cross-examination during a deposition.

however, Chambers presents nothing more than an allegation "on information [*18] and belief" to support that claim. (See Pl. Opp. at 12.) Such HN7[↑] unsubstantiated speculation is insufficient to withstand summary judgment. Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (citing Celotex, 477 U.S. at 325). Conversely, Heidelberg presented Sucha's sworn declaration, which explains that, in an effort to curb costs, the company requested that he and other managers take a more active role in making travel arrangements for the employees in their groups, and that Sucha, therefore, became more involved in making travel arrangements for Chambers and other white technicians under his supervision. (Sucha Declaration, P 6.) Because there is absolutely no record evidence to refute Sucha's explanation, Chambers has failed to raise a genuine issue of fact regarding the motivation behind Sucha's involvement in Chambers' travel schedule.

Third, with regard to Chambers' assertion that Sucha excessively paged him and did not promptly provide him with a cell phone, the evidence Chambers presents on these issues does not support a finding of discrimination based on race. Chambers' opposition states that in the spring of 2001, Sucha's [*19] supervisor allegedly directed Sucha to "cease the excessive paging." (Pl. Opp. at 13.) Chambers goes on to allege that although Sucha did temporarily stop the purportedly excessive paging, Sucha allegedly resumed the practice after he received a new supervisor. (Pl. Opp. at 13.) In support of these contentions, Chambers cites to his own affirmation, which merely states that Sucha excessively paged Chambers and that "based on information and belief, Mr. Sucha never paged any of [his] coworkers excessively." (Pl. Declaration, attached as Exhibit 6 to Pl. Opp.) Again, the Court notes that at this stage in the proceedings, it is insufficient to rely merely upon "information and belief" to prove a claim or preclude summary judgment. In addition, Chambers cites to an email that he drafted in the spring of 2001 to support the claim that Sucha excessively paged him even after Sucha's supervisor allegedly directed Sucha to stop the excessive paging in the spring of 2001. (See Pl. Opp. at 13; Email attached to Pl. Opp. at Exhibit 6.) However, that email lists a series of events related to Chambers' job assignments in March 2001, but it does not in any clear way indicate that Sucha had [*20] been excessively paging the Plaintiff. Not only that, but an email written *in* the spring of 2001 is not evidence that Sucha excessively paged Chambers *after* the spring of 2001. Moreover, Heidelberg presented evidence that Sucha only paged Chambers when necessary to

achieve a business purpose, and further, that Sucha often paged all of the employees under his supervision as part of his job. (Sucha Declaration, P 5.) Therefore, based on the relevant evidence before the Court, the Plaintiff has failed to present a genuine issue of material fact regarding whether he was excessively paged, and if so, whether the reason for that excess was Plaintiff's race.

In addition, the Court notes that Chambers never alleged racial discrimination when he lodged complaints about Sucha to Heidelberg's human resources department. In fact, Chambers apparently left a voice mail for human resources manager, Alicia Stignani, specifically stating that he was not complaining of any form of discrimination. (See Exhibit 21 to Pl. Dep.) Moreover, in his complaints to human resources, Chambers provided information identifying white employees who allegedly had similar problems with Sucha. For instance, [*21] in a January 10, 2002 email to human resources, Chambers states "There have been disagreement [sic] with Mr. Sucha and other service Techs." (See Exhibit 21 to Pl. Dep.) Later, Chambers deposed that the "other service Techs" mentioned in the email referred to a white employee named Chuck Sowers, who allegedly was also "very unhappy" with Sucha. (Pl. Dep. 189-93.) Similarly, in an April 21, 2002 email to human resources, Chambers forwarded a work report regarding a white Service Technician and stated that it was "an example of what is going on with this group." (See Exhibit 23 to Pl. Dep.) In other words, Chambers' own complaints tend to show that he would not have been treated differently if he had been white.

Overall, aside from his mere speculation and conclusory allegations, Chambers has not provided any competent evidence that might lead a reasonable fact finder to believe that race was a factor in the treatment he received from the Defendant. Even considering the allegations regarding Plaintiff's travel, training, and communications issues as a whole, the record is devoid of any evidence to show that the treatment Chambers received was due to his race. As a result, [*22] the Court will grant Defendant's motion for summary judgment on Plaintiff's hostile work environment claims under the NJLAD and Title VII. However, as an alternative basis for this holding, the Court will also analyze whether the alleged harassment was severe or pervasive enough to constitute an actionable hostile work environment claim.

2. Severe or Pervasive Harassment

2006 U.S. Dist. LEXIS 32334, *22

To be actionable under Title VII and the NJLAD, any alleged harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment. *Weston v. Pennsylvania, 251 F. 3d 420, 426 (3d Cir. 2001)*. The requirement contains both a subjective and objective component. *Jensen, 435 F.3d at 451* (citing *Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998))*. That is, the alleged harassment must be so severe or pervasive that it not only detrimentally affects the plaintiff, but would also detrimentally affect a reasonable person of plaintiff's race in the same position. Id. As mentioned above, the factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically **[*23]** threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993))*. No single factor is dispositive as the inquiry must focus on the totality of the circumstances. *Id. at 451-52*.

In this case, Chambers' complaints do not amount to severe or pervasive harassment. The alleged harassment consists of the following: (1) Sucha's failure to send Chambers to a training session held in Illinois, (2) Sucha's alleged "excessive" paging of Chambers, and (3) Sucha's intervention in Chambers' work-related travel arrangements. With respect to the training issue, the record shows that two local employees who lived in Illinois were sent to that training session and reported back to Heidelberg that the training was not particularly useful. (See Sucha Declaration, P 4.) Other Service Technicians in Chambers' group, including white employees, were similarly not sent to this one-time training session. (Id.) There is no evidence that Chambers was not sent to any other training sessions, nor is there any evidence that this one failure **[*24]** to attend the Eclipse training had any effect whatsoever on Chambers' employment. Likewise, although Chambers alleges that Sucha excessively paged him and intervened in his travel arrangements on a regular basis, there is no evidence to support the alleged severity or regularity of that conduct. Rather, the evidence demonstrates that Sucha occasionally intervened in the travel arrangements of all of his subordinates pursuant to a company directive requesting that he do so to control expenses. (See Sucha Declaration, P 6.) Moreover, Sucha declared that he paged all of the employees in his group as that was the main form of communication he had with his traveling employees. (Sucha Declaration, P 5.) Because Chambers and his

co-workers constantly traveled and did not all physically report to a central location on a regular basis, communication by way of pager or telephone appears to be an integral part of Chambers' employment. In other words, not only does Chambers fail to present any evidence that Sucha's paging and involvement in his travel arrangements was severe and pervasive, but even if it did occur on a regular basis, there is no evidence to suggest that, in the context of Plaintiff's **[*25]** employment, he suffered any detrimental effect, or that a reasonable black employee in his position would have been detrimentally affected.

In his opposition papers, Chambers also alleges that Defendant harassed him by not providing him with copies of a letter and an email, written by other Heidelberg employees, which complained of Chambers' job performance. (See Pl. Opp. at 12.) Paul Northrup wrote the letter in question on July 10, 2001, and in it he explained that Chambers had been purposely unhelpful and withheld information at a customer job site. (See Exhibit 13 to Pl. Dep.) Gene Cain wrote the email at issue on March 26, 2003, and in it he (1) complained that Chambers told a customer that a piece of Heidelberg equipment was incorrectly designed, and (2) explained that a different customer told Cain that it did not want Chambers back at its job site under any conditions. (See Exhibit 2 to Adamson Declaration.) Chambers alleges that he should have been provided a copy of these documents so that he could "review, address, or defend" himself with respect to the complaints in those documents. (Pl. Opp. at 12.) However, Chambers was given an opportunity to defend himself **[*26]** with respect to the incident discussed in the July 10, 2001 letter during a disciplinary meeting held on September 5, 2001. (See Def. Facts PP 14-19.) Moreover, in June 2002, Chambers received a copy of a final warning regarding his disciplinary issues, after a meeting with Sucha and Mieras on June 12, 2002. (Def. Facts P 20; Exhibit 17 to Pl. Dep.; Exhibit 2 to Adamson Declaration.) The written warning clearly states that ". . . this is your **final warning.** If management receives additional complaints about your performance during an installation or from others in the organization about your ability and willingness to work and get along with other personnel, your employment with Heidelberg will be terminated." (Exhibit 17 to Pl. Dep.; Exhibit 2 to Adamson Declaration.)(emphasis in original). Thereafter, Chambers' supervisor received the March 26, 2003 email from Gene Cain, as well as other complaints regarding Chambers' performance. (Adamson Declaration, PP 6-7.) As a result, Chambers was terminated. (Id.) Based on these undisputed facts,

there is no evidence to suggest that (1) Chambers was not on notice after June 2002 that any further complaints about him would [*27] result in termination without further consultation, or (2) that Defendant suffered "pervasive harassment" merely because he did not receive a copy of the July 11, 2001 letter or the March 26, 2003 email. (See Pl. Opp. at 12.)

Overall, in examining the totality of the circumstances, a reasonable fact finder could not conclude that Chambers was subject to any racially-motivated harassment that was severe or pervasive enough to alter the conditions of his employment or create an abusive environment. Because Chambers' opposition does little more than re-allege the factually unsupported allegations contained in his pleadings, Chambers has not established the existence of a genuine issue of material fact that would defeat Defendant's motion for summary judgment on his hostile working environment claims under Title VII and the NJLAD. Accordingly, as an alternative to the grounds analyzed above in section III.A., the Court will grant Defendant's motion for summary judgment as to the hostile working environment claims on the basis that Chambers has not presented any evidence to suggest that the alleged misconduct constituted severe or pervasive harassment sufficient to maintain an actionable [*28] claim.

## B. Retaliatory/Discriminatory Discharge Claims

Chambers alleges that he was unlawfully discharged because of his race and that there is a causal connection between his complaints about Sucha in 2001 and 2002 and his subsequent termination in March 2003. In response, Heidelberg claims that Chambers' discriminatory and retaliatory discharge claims both fail as a matter of law. First, Heidelberg contends that Chambers has not provided any direct or circumstantial evidence to demonstrate that Adamson harbored any racial animus to support his discriminatory discharge claim. Second, Heidelberg argues that Chambers did not engage in any protected activity before his discharge because he never lodged any complaint of race discrimination against Sucha or anyone else prior to filing his charge with the EEOC. Third, Heidelberg claims that there is no evidence of a causal connection between the work-related complaints that Chambers did lodge against Sucha and his later discharge by Adamson.

In cases like these, *HN8*[⬆] where the plaintiff does not present direct evidence of discrimination, courts apply

the three-step, burden-shifting standard, outlined in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973),* [*29] to both discriminatory discharge and retaliatory discharge claims. See *Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).* Under this burden shifting framework, a plaintiff must first establish a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* (citing *St. Mary's Center v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).* A rebuttable presumption of unlawful discrimination arises if plaintiff presents this prima facie case. *Bergen Commercial Bank v. Sisler, 157 N.J. 188, 723 A. 2d 944, 955 (N.J. 1999)* (citing *Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).* To rebut this presumption, the defendant must then set forth admissible evidence of a legitimate, non-discriminatory reason for the employment decision at issue. Id. If the defendant produces evidence of a legitimate, non-discriminatory reason for the employment decision, the presumption of unlawfulness disappears. Id. (citing *Hicks, 509 U.S. at 507-08*). At that point, the plaintiff must prove by a preponderance of the evidence that the employer's articulated reason [*30] was not the real reason for the employment action, but rather was a mere pretext for discrimination. Id. The plaintiff may prove pretext directly by demonstrating that a different reason more likely motivated the employer, or indirectly by demonstrating that the employer's articulated reason is not credible. Id. In spite of these intermediate burden shifts within the discrimination standard, it is ultimately the plaintiff's burden to persuade the fact finder that the employer engaged in unlawful discrimination. Id.; *Reeves, 530 U.S. at 143*; *Burdine, 450 U.S. at 253*.

### 1. Retaliatory Discharge

*HN9*[⬆] ] To establish a prima facie case of retaliatory discharge, Chambers must show that (1) he was engaged in a protected activity; (2) he was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge. *Woodson, 109 F.3d at 920* (citing *Quiroga v. Hasbro, Inc., 934 F. 2d 497, 501 (3d Cir. 1991)*; *Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)*; *Reyes v. McDonald Pontiac GMC Truck, Inc., 997 F. Supp. 614, 619 (D.N.J. 1998).* [*31]

*HN10*[⬆] ] With respect to the first element of a prima facie case of retaliatory discharge, the language of Title VII and the NJLAD explains what constitutes a

"protected activity." Specifically, § 704(a) of Title VII forbids an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The phrase "this subchapter" refers specifically to 42 U.S.C. §§ 2000e through 2000e-17, which contain the provisions regarding an employee's rights when an employer has discriminated against him or her on the basis of race, color, sex, religion, or national origin. See Slagle v. County of Clarion, 435 F. 3d 262, 267 (3d Cir. 2006). Consequently, a charge "under this subchapter" is a charge that alleges discrimination on the basis of one or more of those prohibited grounds. Id. Similarly, the NJLAD prohibits employment discrimination and retaliation against an [*32] employee for opposing a discriminatory practice which is based upon race, color, sex, religion, national origin, or a number of other listed factors. See N.J. Stat. Ann. § 10:5-12. Therefore, in order to have engaged in a protected activity under Title VII or the NJLAD, Chambers must show that his complaints about Sucha's conduct amounted to allegations of discrimination on the basis of race, color, sex, religion, national origin, or some other statutorily enumerated basis.

Chambers now complains that the Defendant discriminated against him based on his race; however, Chambers never once alleged racial discrimination while he was employed by Heidelberg. None of Chambers' complaints to human resources regarding Sucha mentions or even insinuates that Chambers was complaining of racial discrimination. (See Def. Exhibits 20-23.) In fact, Chambers apparently made a point of calling the human resources department to clarify specifically that he was not alleging any form of discrimination in his complaints against Sucha. (See Def. Exhibit 27.) Moreover, Chambers deposed that he did not at any time mention to the human resources department or Heidelberg's [*33] management that he considered the complaints he lodged against Sucha to be based on his race. (Pl. Dep. 185-86, 188.) Now, Chambers argues that the reason he did not complain of racial discrimination while he was employed by Heidelberg is because he feared retaliation. [6] However,

this fear does not obviate the requirement for protected activity under Title VII and the NJLAD. In other words, regardless of the reason why Chambers did not complain of racial discrimination prior to his discharge, there can be no claim for retaliatory discharge when Chambers never engaged in a protected activity. See Reyes, 997 F. Supp. at 619 ("[P]laintiff is unable to show that she was engaged in a protected activity, and she can not satisfy the prima facie elements of a retaliatory discharge claim."). Chambers cannot claim he was discharged in retaliation for complaining of racial discrimination when the record shows that Chambers never made any such complaints of racial discrimination prior to his termination. See Vilchock v. Proctor & Gamble Paper Products Co., 868 F. Supp. 659, 667 (M.D. Pa. 1993) ("As the Plaintiff admittedly did not file or complain of any discriminatory [*34] practices prior to his discharge, Plaintiff can in no way claim the Defendant retaliated against him for something he did not do."). As a result, Chambers cannot demonstrate that he engaged in a protected activity, which is the first element of a prima facie case of retaliatory discharge.

Moreover, Chambers has also failed to present any evidence to support the second and third elements of a retaliatory discharge claim. That is, Chambers has provided no evidence indicating a causal link between Adamson's decision to terminate Chambers and Chambers' complaints against Sucha. By contrast, Adamson's sworn declaration indicates that (1) he did not consult Sucha at all regarding his decision to terminate Chambers, and that (2) Chambers' race played no part whatsoever in [*35] Adamson's decision to terminate his employment. Rather, Adamson terminated Chambers because of a series of complaints regarding Chambers' work performance in March 2003. (Adamson Declaration, PP 6, 7.) HN11[↑] The mere fact that a discharge occurs subsequent to the lodging of a complaint is ordinarily insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events. [7] Christman v. Cigas Machine Shop, Inc., 293 F. Supp. 2d 538, 544 (E.D. Pa. 2003) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)). Therefore, even if Chambers had presented evidence that he engaged in a protected activity, he has still failed to present any evidence to establish a causal

---

[6] Although Chambers now claims that he feared retaliation, he deposed that he never saw or heard of any Heidelberg employee who was retaliated against and further that he knew

of Heidelberg's no harassment policy. (See Pl. Dep. 71-72, 184-186.)

[7] In this case, over a year had passed from the time Plaintiff lodged complaints about Sucha until his subsequent termination. (See Def. Facts. PP 6, 22.)

connection between any protected activity and the alleged retaliatory termination.

Altogether, Chambers has failed **[*36]** to present sufficient evidence to support any of the elements of a prima facie case of retaliatory discharge. Therefore, the Court need not examine the next steps under the McDonnell Douglas burden-shifting test. Rather, the Court will grant the Defendant's motion for summary judgment as to Plaintiff's retaliatory discharge claims under Title VII and the NJLAD.

## 2. Discriminatory Discharge

**HN12**[↑] To establish a prima facie case of discriminatory discharge under Title VII, Chambers must show (1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was fired from that position; and (4) that the circumstances of the case give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class. See *Jones v. School Dist. of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999)*; *Waldron v. SL Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995)*. Under the NJLAD, the elements are substantially the same except that the fourth element requires a showing that "the employer sought someone to perform the same work" after Plaintiff was fired. See *Zive v. Stanley Roberts, Inc., 182 N.J. 436, 867 A.2d 1133, [*37] (N.J. 2005)*. Neither party disputes that Chambers is a member of a protected class, was qualified for his position, and was fired from his position. Therefore, the analysis of Chambers' discriminatory discharge claim will focus on the fourth element of a prima facie case.

Chambers has not established the fourth prong of a prima facie case of discriminatory discharge because he has not shown circumstances that give rise to an inference of unlawful discrimination, nor has he shown that Heidelberg sought to replace him with someone else after his termination. See *Jones, 198 F.3d at 411*; *Waldron, 56 F.3d at 494*; *Zive, 867 A.2d at 1145*. Here, Chambers alleges that the charges that were made against him regarding his work performance were baseless. (Pl. Opp. at 9.) Chambers appears to argue that these allegedly baseless charges coupled with his complaints about his former supervisor, Sucha, would lead a reasonable person to infer that he suffered unlawful discrimination when Defendant terminated his employment. (See Pl. Opp. 9-10, 16.) Notably, Plaintiff has not demonstrated that Heidelberg sought anyone to fill his position, much less **[*38]** a person outside of the

protected class, nor has he presented evidence to show that the claims against him were baseless or that his complaints against Sucha had anything to do with his discharge. Although the Court is doubtful that Plaintiff has demonstrated a prima facie case of discriminatory discharge on these facts, the Court will nevertheless continue with the McDonnell Douglas burden-shifting analysis because the Plaintiff's burden at this stage is not an onerous one. See *Marzano v. Computer Science Corp., 91 F.3d 497, 508 (3d Cir. 1996)* (noting that "the initial burden is not intended to be onerous").

Likewise, **HN13**[↑] the Defendant bears a relatively light burden of production in rebutting a prima facie case of unlawful discharge. *Fuentes v. Perskie, 32 F. 3d 759, 763 (3d Cir. 1994)*. Specifically, Defendant must only introduce evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* (citing *Hicks, 509 U.S. at 509*.) Furthermore, the employer need not prove that the proffered reason actually motivated its behavior because the plaintiff **[*39]** always retains the ultimate burden of proving intentional discrimination. Id. (citing *Burdine, 450 U.S. at 253, 254, 256)*.

In this case, Heidelberg has met its burden of production in rebutting Chambers' claim of discriminatory discharge by providing evidence that Adamson terminated Chambers because he received several complaints regarding Chambers' job performance and uncooperative attitude at customer job sites. (See Adamson Declaration, PP 6, 7.) Because poor work performance is a legitimate, nondiscriminatory reason for terminating Chambers' employment, the burden of production shifts back to the Plaintiff.

**HN14**[↑] To meet that burden, Chambers must establish by a preponderance of the evidence that Defendant's articulated reason was a mere pretext for discrimination. *Fuentes, 32 F.2d at 763*. In particular, Chambers must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Heidelberg's proffered reasons for its termination decision that "a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. **[*40]** " *Id. at 766* (citations omitted). However, it is insufficient for Chambers to show merely that the employer's decision was wrong or mistaken because the relevant issue is "whether discriminatory animus motivated the defendant, not

whether the defendant is wise, shrewd, prudent, or competent." Id. (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 531, 533 (3d Cir. 1992); *Villanueva v. Wellesley College, 930 F.2d 124, 131 (1st Cir. 1991))*.

Chambers appears to make two arguments to show pretext; however, he has provided virtually no evidence to support his contention that Heidelberg's termination decision was motivated by discriminatory animus. First, Chambers alleges that his work performance was satisfactory and that the charges made against him were baseless. (See Pl. Opp. at 9, 16.) Although he presents minimal evidence to support that assertion, the inquiry itself is irrelevant to the Court's analysis. Whether Heidelberg's decision to terminate Chambers was correct, wise, or prudent is beyond the scope of the Court's inquiry because the relevant question is whether the termination decision was motivated by **[*41]** racial animus. See *Fuentes, 32 F.2d at 766*. Second, Chambers argues that an email from a customer to Adamson and Sucha, which expresses dissatisfaction with Heidelberg's service on a software upgrade and requests that Chambers return to the customer job site to set up a motor, somehow demonstrates that Adamson's reason for terminating Chambers was a pretext for racial discrimination. [8] (See Pl. Opp. at 15-16.) Again, even if Adamson had been incorrect in assessing Chambers' job performance, that error alone would not mean that Chambers should prevail on a discriminatory discharge claim. Without any specific evidence tending to show that race played any part in Adamson's decision to terminate Chambers, the Plaintiff cannot demonstrate that the proffered reason for his termination was a pretense for unlawful discrimination. Accordingly, the Court will grant the Defendant's motion for summary judgment as to Chambers' discriminatory discharge claims under Title VII and the NJLAD.

### [*42] IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment as to all claims in Plaintiff's Complaint. The accompanying Order shall issue today.

Dated: 5-05-06

s/ Robert B. Kugler

---

[8] The Court notes that the copy of this email attached to Plaintiff's Opposition is not authenticated in any way.

United States District Judge

### ORDER

THIS MATTER having come before the Court upon motion by Defendant Heidelberg USA, Inc. for summary judgment on all claims in Plaintiff's Complaint; and the Court having considered the moving papers, the opposition thereto; and for the reasons expressed in this Opinion issued this date;

IT IS HEREBY **ORDERED** that Defendant's motion is **GRANTED.**

Dated: 5-05-06

s/ Robert B. Kugler

United States District Judge

---

**End of Document**

 Positive
As of: April 29, 2021 6:25 PM Z

# *Hoist v. New Jersey*

United States District Court for the District of New Jersey

August 13, 2015, Decided; August 13, 2015, Filed

Civil Action No. 12-5370 (FLW)(LHG)

**Reporter**
2015 U.S. Dist. LEXIS 106527 *; 2015 WL 4773275

DONIELLE T. HOIST, Plaintiff, v. STATE OF NEW JERSEY, et al., Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Affirmed by *Hoist v. New Jersey, 2016 U.S. App. LEXIS 2777 (3d Cir. N.J., Feb. 18, 2016)*

**Prior History:** *Hoist v. New Jersey, 2013 U.S. Dist. LEXIS 140164 (D.N.J., Sept. 30, 2013)*

## Core Terms

co-workers, altercation, termination, workplace, workplace violence, adverse employment action, yelling, complaints, disciplined, retaliation, discriminatory, employees, hostile work environment, REMOVAL, Notice, prima facie case, summary judgment motion, summary judgment, allegations, union representative, race discrimination, harassment, asserts, genuine, staff, electronic communication, gender discrimination, protected activity, hearing officer, circumstances

**Counsel:** [*1] DONIELLE T. HOIST, Plaintiff, Pro se, MORRISVILLE, PA.

For STATE OF NEW JERSEY, DEPT. OF

ENVIRONMENTAL OF PROTECTION AGENCY, DEBRA EWALT, ROSANNE ROSSI, VERONICA KIRKHAM, KAREN SONDEJ, MATTHEW COEFER, WAYNE GRENNIER, DOES, Defendants: KATHRYN ELIZABETH DURAN, LEAD ATTORNEY, STATE OF NEW JERSEY, OFFICE OF THE ATTORNEY GENERAL, TRENTON, NJ.

**Judges:** FREDA L. WOLFSON, United States District Judge.

**Opinion by:** FREDA L. WOLFSON

## Opinion

**WOLFSON, District Judge:**

*Pro se* Plaintiff Donielle Hoist ("Plaintiff" or "Hoist") was employed by Defendant the New Jersey Department of Environmental Protection ("DEP," or, with the State of New Jersey, "Defendants") until April 2011, at which time she was allegedly terminated for "conduct unbecoming an employee" after an altercation involving a coworker. Plaintiff instituted this suit against Defendants, alleging that her termination was based upon race and gender discrimination, and retaliation for engaging in protected employment activity, in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et. seq.* Before the Court are motions for summary judgment brought by Defendants and Plaintiff.[1] Also before the Court are three motions to

---

[1] Plaintiff has also moved for an extension of time to file her summary judgment motion. [ECF No. 71.] This motion is

compel certain documents from Defendants. For the reasons **[*2]** set forth herein, the Court DENIES the motions to compel, GRANTS Defendants' motion in its entirety and DENIES Plaintiff's motion for summary judgment.

## I. Background

The following facts are undisputed unless otherwise noted. Hoist is an African American female who, at all times relevant to this action, was employed by the DEP as a Senior Clerk Typist in the Office of Record Access ("OPRA"). *See* Defendants' Statement of Uncontested Material Facts ("DSUMF") ¶ 8. Hoist was directly supervised by Evelyn Molder, an African American female who formerly was the Supervisor of Operations at OPRA, and Wayne Grennier, a Caucasian male who is the Supervisor of Operations at OPRA. Molder and Grennier were supervised by Matthew Coefer ("Coefer"), a Caucasian male who is the Chief Records Custodian at OPRA. *Id.* at ¶ 9.

Plaintiff Hoist's Workplace Violence Complaints

On March 3, 2007, Sandra Remboske filed a Workplace Violence Complaint against Hoist alleging that Hoist got very close to her, pointed **[*3]** a finger in her face, and began yelling profanity. *See* Certification of Kathryn E. Duran ("Duran Cert.") Ex. C at HOIST.LR.REMOVAL 0047-52. Ms. Remboske's Workplace Violence Complaint was substantiated and Plaintiff was issued a record of counseling on March 30, 2007. *Id.* at 0045.

On March 4, 2010, Coefer filed a Workplace Violence Complaint against Hoist on behalf of the "Office of the Records Access Staff," which consisted of Kristina Clayton, Trisha Bibji, Ms. Remboske, Mike Williams, Evelyn Molder, Anne Hartnagel, and Maria Cantres. The Complaint describes Hoist's allegedly poor treatment of the other members of the OPRA staff, including "nasty verbal & written correspondence, mannerisms, and body language." Duran Cert. Ex. D at HOIST.COEFER 0064. In general, Coefer was told by the other members of the staff that Hoist was "nasty to staff, disrespectful, does not take ownership of mistakes, not approachable, and sometimes blames others for work errors." *Id.* at 0062, 0063, 0064. Coefer filed this Complaint upon the instruction of the Office of Labor Relations (the "OLR"),

who advised Coefer to fill out the form after Coefer informed them that he was collectively approached by the staff members regarding Hoist and **[*4]** the alleged hostile work environment created by Hoist. Duran Cert. Ex. E at HOIST.COEFER 0189.

Ms. Clayton, a Caucasian female and co-worker of Hoist, also filed a Workplace Violence Complaint against Hoist on March 4, 2010. Ms. Clayton alleged that Hoist addressed the OPRA staff with "nasty verbal and written correspondence, mannerisms and body language." Duran Cert. Ex. F at HOIST.WPV.CPMP 0069-70. The OLR found that the incident did not constitute violence in the workplace, but served Hoist with a written warning reminding her that she must conduct herself "in a courteous and professional manner at all times with both co-workers and [her] manager." Duran Cert. Ex. G at HOIST.LR.REMOVAL 0041. The OLR warned Hoist that future incidents of inappropriate behavior may result in disciplinary action. *Id.*

On March 23, 2010, Hoist verbally complained to Coefer about several incidents where Ms. Clayton was allegedly making rude gestures and acting unprofessionally towards Hoist. *See* Duran Cert. Ex. H at HOIST.WPV.COMP 0028; Deposition of Donielle Hoist ("Hoist Dep.") at 39-41, 51:9-19. Hoist alleges that Coefer did not take action in response to these complaints, and instead filed a Workplace **[*5]** Violence Complaint on behalf of Ms. Clayton against Hoist. On May 4, 2010, Hoist filed a Counter-Workplace Violence Complaint against Ms. Clayton alleging the same incidents she verbally reported to Coefer, and against Coefer for failing to take any action based on her verbal complaint to him on March 23, 2010. *See* Duran Cert. Ex. H. Hoist testified that this Complaint was a Counter-Workplace Violence Complaint to the ones previously made against her on March 4, 2010, by Ms. Clayton and Coefer on behalf of certain OPRA staff members. *See* Hoist Dep. 42:7-25.

After an investigation into Hoist's Workplace Violence Complaint against Ms. Clayton and Coefer, the OLR determined that the incidents relating to Ms. Clayton alleged by Hoist did not constitute violence in the workplace, but did create a hostile work environment. The OLR served Ms. Clayton with a written warning, and reminded Ms. Clayton to conduct herself in a courteous and professional manner in the future or else she may be subject to disciplinary action. Duran Cert. Ex. I at HOIST.WPV.COMP 0001. The findings, therefore, in both Ms. Clayton's and Hoist's Workplace Violence Complaints were the same, and thus, the

---

granted, and Plaintiff's later-filed motion for summary judgment will be considered timely.

action taken [*6] in regard to both Hoist and Ms. Clayton was the same. *Compare* Duran Cert. Ex. I, *with* Duran Cert. Ex. G.

The determination letter sent to Coefer reminded him that as a manager he needed to better address these types of incidents with staff and that his meeting with the OLR would serve as counseling. *See id.* at HOIST.WPV.COMP 0022. Coefer disputed the determination letter findings, and responded that he did address the incident with both Hoist and Ms. Clayton individually, as he believed a meeting between the three of them would be inappropriate while OLR was still investigating the Workplace Violence Complaint against Hoist. *See* Duran Cert. Ex. J.


Record of Counseling in September 2010

On September 15, 2010, Hoist arrived at work at 9:30 a.m. and, after learning that she would be the only employee working the first desk that day, used "inappropriate, obscene, and offensive language" and slammed objects on her desk. *See* Duran Cert. Ex. M. Ms. Clayton relayed her observation of the incident to Coefer in an electronic communication on September 20, 2011. According to Ms. Clayton, Hoist stated, "Fuck this why am [sic] always left alone, I am tired of this, People always wondering what Donielle [*7] doing [sic] but no one else is checked, I am considerate to everyone I even came in today even though I was sick, think I am playing I am leaving early today." *Id.* at Ex. N, at HOIST.LR.REMOVAL 0077. Hoist was issued a Record of Counseling for this incident on September 21, 2010. *Id.* at Ex. M. Hoist confirmed that she "reacted poorly" and did in fact have a negative reaction and slammed items on her desk. Hoist denies, however, that she used offensive language. Hoist Dep. 78:15-23. Other emails from co-workers present during the incident confirm both the incident and assert that Hoist used offensive language. Duran Cert. Ex. N, at HOIST.LR.REMOVAL 0077-79.


One-Day Suspension in November 2010

On November 29, 2010, Coefer assigned Hoist a priority task to take checks down to the mail room. Hoist walked into Coefer's office and informed him that she would not take the checks down until "all the processes are completed." When questioned what additional steps were needed, Hoist told Coefer that he should know, said she was taking a break, walked out of his office,

and refused to return to the office when Coefer requested she do so. *See id.* at Ex. K. Hoist confirmed that this was the substance [*8] of the encounter. Hoist Dep. 58:8-29. Hoist was disciplined for insubordination and received a one-day suspension. Duran Cert. Ex. K. Hoist testified that she appealed this discipline but the appeal was still pending when she was terminated. Hoist Dep. 56:19-57:4.

Hoist believes that this constitutes "disparate treatment" because on March 18, 2010, Doug Daniels and Coefer were having a closed-door meeting when Mr. Daniels threw open the door and stormed out of the office, yelling. Mr. Coefer asked him to come back but he refused. Hoist does not believe that Mr. Daniels was ever disciplined. *Id.* at 54-55. Mr. Daniels is an African-American male, who worked for site remediation, whom Coefer supervised at the time of the incident. *Id.* at 52:13-55:14. Coefer affirms that he did not treat Hoist differently from Mr. Daniels or any other individual. *See* Certification of Matthew Coefer ("Coefer Cert.") ¶ 3, *located at* Duran Cert. Ex. L.


Other Incidents with No Record of Discipline

In November 2010, Hoist was the safe-keeper and in charge of logging all the money and checks that were received in the OPRA office. The safe was located in Hoist's cubicle area. *See* Hoist Dep. 34:20-23. On November 5, 2010, Hoist [*9] arrived at the office to find that the safe in her cubicle was opened and that the contents of the safe had been removed. Hoist was concerned that the contents had been stolen and that she would be blamed. *See id.* at 35. She testified that, at the time of the incident, only she and Coefer had keys to the safe. *See id.* at 34: 23-25. She further testified that she saw Coefer in the office for a short period that morning, despite the fact that he was scheduled to be on vacation. *Id.* at 35:7-10. She then learned that the contents of the safe were fine and in the possession of her supervisor, Mr. Grennier. *Id.* at 35:11-13. She was never blamed for anything being missing from the safe and was never disciplined regarding the contents allegedly being removed from the safe on November 5, 2010. *Id.* at 37:14-25. Following this incident, Hoist asked to be removed from safe duty. This request was approved. *See id.* at 34:2-8.

On November 16, 2010, Coefer called Hoist into this office to speak with her about a visitor who was left unattended in the lobby. Hoist testified that she attempted to assist the individual and followed

procedure. She further testified that she was unable to help the visitor because he "was [*10] not of a concern to the office." Hoist Dep. 94-98. Because Hoist feared that Coefer was going to discipline her for her failure to assist the visitor, she terminated the meeting and called her union representative. *Id.* at 95-98:4. Hoist's union sent an electronic communication to Coefer regarding the incident and Coefer explained that he did not intend to discipline Hoist for the incident, but merely wanted to talk to her about it and discuss how such a situation should be handled. Duran Cert. Ex. O. While Hoist testified that she had been disciplined for the incident, *see* Hoist Dep. 98:5-7, there is no record of Plaintiff being disciplined, and the OLR and Coefer affirmed that she had not been disciplined. *See* Certification of Jason Strapp ("Strapp Cert.") ¶ 2, *located at* Duran Cert. Ex. L; Coefer Cert. ¶ 2

On December 7, 2010, Hoist alleges that she was called into Coefer's office regarding her failure to respond to an inquiry Coefer had previously made of her regarding a "requestor." When she pulled up the request in the system, she found that the request was still being processed so she determined that it was a program technician's job to address and contact the requestor. Because Hoist believed [*11] it was not in her job description to contact the requestor, she did not do so. *See* Hoist Dep. 105:21-106:12. Coefer, however, informed Hoist that he only wanted to know the specific documents the requestor was looking for from their office. *Id.* at 106:13-20. Hoist was never disciplined for this incident. *Id.* at 108:9-17.

Request to Change Working Hours

On June 3, 2010, Hoist requested to change her working hours. *See* Hoist Dep. 69:24-70:11. She testified that her request was denied, but that she believed a Caucasian female co-worker was permitted to change her hours on the same day she requested a change. *See Id.* 69:13-21, 70:23-25, 71:1-24. An electronic communication between Hoist and Grennier on June 3, 2010, however, shows Hoist's request to change her hours was actually approved. *See* Duran Cert. Ex. X.

Plaintiff's Engagement in Supportive Services

As a result of the OLR's investigation and findings regarding the Workplace Violence Complaints that Hoist had filed in May 2010, the OLR offered Hoist supportive

services. Initially, she was offered a meeting to discuss the workplace issues with OLR, her union representative, and Coefer. Plaintiff, however, refused to attend such a meeting, [*12] explaining that "things have arisen that [have] brought on more stressors." Duran Cert. Ex. T. The OLR, therefore, offered to schedule an appointment for Hoist to see a psychologist, Dr. Lawrence Straus, as an alternative supportive service. *See id.*

Plaintiff eventually met with Dr. Straus on October 5, 2010. During her consultation with Dr. Straus, Hoist stated that she feels that Coefer "shows favoritism to others and that he picks on her." Duran Cert. Ex. U, at HOIST.LR.REMOVAL 0096. Hoist also stated that she feels Coefer is inconsistent with her approach with her, and that she needs Coefer "to be more understanding . . . I'm different." *Id.* She stated that she is not sociable at work, and that Coefer should accept that she can be withdrawn. She told Dr. Straus that she gets emotional easily, and that she finds it "hard to talk civilized when I'm upset," which is why she avoided meeting with Coefer. *Id.* She also stated that she was afraid of getting angry in the workplace, which is why she avoids discussions. *See id.*

Dr. Straus reported that their discussion "looked at her personal issues and what causes her to become emotional and then shut down," as well as "how she can build tolerance [*13] for emotional situations; cope with 'feeling boxed in,' and how not to 'run' from situations." *Id.* at 0097. Dr. Straus recommended that Hoist seek counseling to deal with these issues, and that Hoist agreed to meet with Coefer, but that she wants them to be more understanding of her. *Id.* With regard to Coefer, Dr. Straus stated that "it would help if Coefer could be more understanding of her triggers, more patient, and more sensitive. And if there is any kind of double standard in his managing style (rather than this is Hoist's sensitivity and misperception here), then that should be addressed." *Id.* Dr. Straus also reported that he believed Coefer would benefit from a discussion with him regarding how to work with Plaintiff. *Id.* Dr. Straus then met with Coefer on December 1, 2010, to discuss how to better work with Hoist and understand her triggers. *See* Duran Cert. at Ex. V.

Plaintiff's Attempts to Transfer

Around the time that Hoist filed her Workplace Violence Complaint against Ms. Clayton and Coefer, she applied for a lateral transfer out of OPRA, but the transfer was

never completed. Hoist Dep. 112-14. Specifically, Hoist applied for a transfer in the "lateral mobility process," and was given **[\*14]** equal consideration with all other employees requesting a transfer. Id.; see also Duran Cert. Ex. Q. During this time, Hoist's union also requested that Hoist be transferred out of OPRA due to the environment of the workplace. See Hoist Dep. 112:24-113. This was not the first time Hoist had tried to tried to transfer; rather, Hoist testified that she had been attempting to transfer out of OPRA since 2009. See Second Deposition of Donielle Hoist ("Hoist Second Dep.") 29:3-18.

Coefer tried to help Hoist in her request to transfer. He sent an electronic communication to Magdelena Padilla, a Human Resources employee, on September 21, 2010, requesting information regarding how to help Hoist transfer from the OPRA office because Hoist was unhappy in the office "for quite some time." Duran Cert. Ex. Q at HOIST.GRENNIER 0150. In November 2010, Coefer sent an electronic communication to Debra Ewalt, the Director of Human Resources, requesting that Hoist receive expedited consideration for her request for a lateral transfer to another office. Coefer explained that he believed expedited consideration to be necessary because Hoist was extremely unhappy in OPRA, and her unhappiness was "appearing **[\*15]** more and more in her daily behaviors and affecting her moods and the moods of her coworkers." Id. at HOIST.GRENNIER 0148. Coefer expressed that he was "worried that she will be disciplinary issues or the creation of a hostile work environment if she continues to remain in the office." Id. In her response, Ms. Ewalt explained that she had no authority to expedite the process, but that Hoist's request for a transfer would be given "equal consideration." Id. Neither management nor Hoist's union ever told Hoist that she would be transferred; rather, Hoist had simply made the request.

On January 20, 2011, Hoist was removed from work by her private psychiatrist, Dr. Wyoming Ye, due to major depressive disorder and "unfavorable working environment." Hoist Dep. 119:16-21; Hoist Second Dep. 31-33. Hoist testified that she was scheduled to return to work on February 22, 2010, but Dr. Ye took her out of work again because she had not been transferred. See Hoist Dep. 111:5-20. Hoist testified that she returned to work against her doctor's orders on March 22, 2011, because she could no longer afford to be out of work without pay. Id. at 111:21-112:8. In March 2011, Hoist sent a letter to Coefer **[\*16]** asking to "reset the clock" so that they could all work together again. Hoist conveyed that she wished to "eliminate all the

unprofessionalism" in the office, and have the office instead focus on getting their jobs done. Id. at 115:5-116:22; see also Duran Cert. Ex. R.

After Hoist sent this letter, she was contacted on April 13, 2011, via electronic correspondence from Veronica Kirkham, an employee of the OLR, who attempted to set up a meeting with Hoist and her union representative to discuss reducing the pending one-day suspension from the November 29, 2010 incident to an official reprimand. See Duran Cert. Ex. S, at HOIST 299-300. While Hoist initially agreed to this meet, she later changed her mind and cancelled the meeting. Id. at 299.

2010 Performance Evaluation

In 2010, Hoist received her performance evaluation ("PES"), which evaluated her performance as a senior clerk typist. As part of the PES, she received an interim evaluation and a final evaluation. Hoist was rated by her immediate supervisor, Evelyn Molder, an African-American female. See Duran Cert. Ex. W; see also Hoist Dep. 85:2-12. Coefer reviewed the PES. See Duran Cert. Ex. W, at HOIST LR. PES. 11-1-10-000007. Overall, Hoist **[\*17]** received a "Satisfactory" evaluation. Duran Cert. Ex. W, at HOIST LR. PES. 11-1-10-000008, 0000014. In her PES, however, Hoist received a failing grade in "Organizational Citizenship," which relates to the "[e]xtent to which employee contributes to a productive and harmonious working environment by acting in a respectful manner towards people in the workplace." Id. at 000006. In the section of the interim PES relating to justifications for the PES evaluation, the report explained: "Donielle is an efficient worker who completes her assigned tasks. She supports the Department with being compliant with OPRA. Donielle must be more respective and courteous to fellow co-workers and staff when dealing with them on different issues or 'bad days.'" Id. at 000008.

On April 30, 2010, after receiving her PES interim report, Hoist wrote an addendum to the PES. In this addendum, she states that the "comments and accusations" about her in the PES relate to her personality, which is different from others in her work area. Id. at 000010. She states that she is more private than her co-workers, and "may seem withdrawn to them at times." Id. She states that others "going through a lesser ordeal than [she] . . . will get a more favorable and understanding **[\*18]** treatment." Id. She states that she believes "in respect to get respect," and that she has not been respected by her colleagues, and that her

supervisors have not helped with their intervention. *Id.* at 000011. Hoist states that it "seems that there is an attack on me from my supervisor, as well as a demeaning of character continually on my [PES]," which she thinks could hurt other job opportunities for her. *Id.* She states that her supervisor has filed a complaint against her based on comments from her coworkers about "said disrespect," but that the OLR found that she did not act "in violation of the any said or unjust reasons made by my immediate supervisor...or the respected persons involved." *Id.* She states that her supervisor still makes comments about her behavior. *Id.*

On May 3, 2010, Coefer responded to her addendum, and explained that he decided to give Hoist an unsatisfactory score in "Organizational Citizenship," and the "Justification for Interim Evaluation" because of "the episode this period where 37% of the Office of Record Access employees were tired of the treatment they receive from [Hoist]" and that he was required to submit a complaint to the OLR "[b]ased on their expression of a 'Hostile **[*19]** Work Environment.'" *Id.* at 000013. On November 15, 2010, Coefer redacted his response to Hoist's addendum to remove the language referencing the Workplace Violence Complaint that he submitted. *Id.* at HOIST.PERS. 0193.

On December 13, 2010, Hoist filed a Union Grievance against Grennier, alleging a violation of the Union contract because of her 2010 PES. While some of the language that she disagreed with was taken out—specifically, the language referencing the hostile work environment—Hoist still disagreed with some of the wording in the PES. *See* Hoist Dep. 102:23-103:11. Hoist had a meeting with her union representative and Grennier on or about November 23, 2010, at which she felt Grennier did not treat her "with respect and common dignity" as required under the union contract. *Id.* at 103:22-25. Hoist filed the grievance against Grennier because of "his manner in which he handled and addressed me and my union representative" in this meeting, and that she felt like he was "challenging" her and her union representative during the meeting. *See id.* at 101:17-23; 104:14-22.

Record of Counseling in January 2011

On January 3, 2011, Hoist sent an electronic communication to Grennier, her immediate supervisor, **[*20]** informing him that she would be taking her half-hour lunch break at 4:00 p.m. and leaving for the day. *See* Duran Cert. Ex. Y. Hoist sent this

electronic communication at 4:00 p.m., and then immediately left for the day. Hoist Dep. 62:4-16. In doing so, Hoist was in violation of DEP's Policy and Procedure No. 2.20, Section V, paragraph 2(d) & 2(f), which mandates that that an employee may not modify his or her work schedule without supervisor approval. *See* Duran Cert. Ex. Y, at HOIST LR 00001. On January 4, 2011, Hoist received a Record of Counseling for leaving work early the day before without prior approval. *See id.*

Incident on April 21, 2011

On April 20, 2011, Hoist left work early. Her supervisor, Grennier, approved her leaving early. *See id.* at 120:25-121:6. The next day, on April 21, 2011, Hoist received an electronic communication from a co-worker, which stated that Ms. Clayton had inquired about Hoist's whereabouts after Hoist had left early the day before. *See id.* at 120-21. Hoist went over to Ms. Clayton's cubicle area to question her about her inquiry. Hoist testified that she asked Ms. Clayton, "Are you Matthew J. Coefer or Wayne Grennier?" *Id.* at 122:7-10. She states that Ms. Clayton replied **[*21]** that Hoist documented what she did with her day. Hoist then testified that she told Ms. Clayton that if she kept "this up" she would file another hostile work environment claim against her. *Id.* at 122:11-20. According to Hoist, Ms. Clayton then called her a "bitch," to which Hoist responded, "If you see a bitch, slap a bitch." *Id.* at 122:21-123:20. Hoist testified that she repeated this several times. *Id.* Hoist testified, "People just don't call people bitches and just — it's just too derogatory, so it's a slang term that we use . . . ." *Id.* at 127:7-11. She explained that the term "means that if you use a bitch, you smack a bitch, meaning you just don't say that unless you're going to maybe get physical . . . ." *Id.* at 128:8-11.

Due to the altercation, security was called. Hoist and Ms. Clayton both gave statements to the police. In her written statement, Ms. Clayton asserts that Hoist questioned her about her inquiry regarding Hoist's early departure from work the day prior. Ms. Clayton confirmed that she did so, and states that Hoist then threatened to have her social security card erased and called her a "snitch." Ms. Clayton states that she then told Hoist that she was "nothing **[*22]** but a bitch," at which point Hoist screamed in Ms. Clayton's face, "If you see a bitch, slap a bitch." Ms. Clayton screamed back at Hoist to "get out of my face," at which point they were separated. *See* Duran Cert. Ex. Z, at HOIST.LR.REMOVAL 0061.

Numerous witnesses confirmed that Hoist yelled at Ms. Clayton. *See* Duran Cert. Ex. AA. One co-worker stated that Hoist approached Ms. Clayton, and that she heard Hoist mention Ms. Clayton's social security card, that Ms. Clayton then called Hoist "the B... word," and that Hoist then "got in [Ms. Clayton's] face, they were yelling at each other." This coworker stated that she believed it would have escalated into a physical altercation if they were not separated. *See* Duran Cert. Ex. Z, at HOIST.LR.REMOVAL 0064. Another co-worker stated that Ms. Clayton called Hoist a "bitch," that Hoist then kept yelling, "If you see a bitch, slap a bitch," that Ms. Clayton was sitting and Hoist was standing and yelling in her fact. *Id.* at 0066-67. Another co-worker stated that she was bringing a visitor to their area when she heard both women yelling, and that Hoist was leaning in towards Ms. Clayton. *Id.* at 0068. A visitor to the office that morning stated that Hoist "appeared very **[*23]** aggressive and invasive of the personal space of [Ms. Clayton (at one point she was approximately six inches away)," and that she expected the situation to get physical. *Id.* at HOIST.LR.DISCOVERY.REMOVAL 000003. Grennier reported that he heard Hoist and Ms. Clayton yelling back and forth from his cubicle, and that Hoist was leaning in towards Ms. Clayton, who was yelling to "get out of my face." *Id.* at HOIST.LR.REMOVAL 0069-70.

Criminal charges were not filed as both declined to press charges. *See* Hoist Dep. 124:16-125:4. Mr. Grennier advised both Hoist and Ms. Clayton that they could go home if they so wished. *See* Hoist Dep. 124:6-9; *see also* Duran Cert. Ex. Z at HOIST.LR.REMOVAL 0069. Later, Deborah Figueroa, a representative of the OLR who was handling the incident, advised Grennier that Hoist may leave and Ms. Clayton should stay unless she wanted to leave. *See* Duran Cert. Ex. Z at HOIST.LR.REMOVAL 0069. Hoist went home and Ms. Clayton stayed at the office. According to Hoist, before she was able to leave, Ms. Figueroa approached Hoist and told Hoist to come with her. Hoist refused to go without her union representative. Hoist then called her union representative, who told her not **[*24]** to go with Ms. Figueroa and to go home like Mr. Grennier suggested. *See* Hoist Dep. 124:14-126:13.

On April 29, 2011, Hoist received an Amended Preliminary Notice of Disciplinary Action and the Hearing Officer's Pre-Suspension Hearing Report, informing her that she was suspended immediately without pay because of the April 21 incident with Ms. Clayton. *See* Duran Cert. Ex. AA. At the pre-suspension hearing, the hearing officer determined that the following

took place: (1) Hoist initiated the exchange by approaching Ms. Clayton; (2) Hoist called Ms. Clayton a "snitch" and threatened to "erase" her social security card; (3) Ms. Clayton asked Hoist if she was threatening her, to which Hoist replied she was. At that point, Ms. Clayton first used the term "bitch" while referring to Ms. Hoist; (4) Hoist leaned in to Ms. Clayton's personal space and yelled, "If you see a bitch, smack a bitch" several times, essentially inviting her to physically retaliate; (5) Ms. Clayton yelled several times for Hoist to get out of her face; (6) several co-workers and outside venders witnessed the exchange; (7) the state police were called because it was feared that the altercation would progress to physical **[*25]** violence; and (8) they were separated and Ms. Hoist was told to go home. *Id.* at HOIST.LR.REMOVAL 0005. Based on these findings, the hearing office decided to uphold the Department's request to immediately suspend Hoist without pay, pending her disciplinary hearing, because "the level of tension remains very high between Ms. Hoist and Ms. Clayton, and it is possible that Ms. Hoist may again react/behave in a threatening and unacceptable manner towards Ms. Clayton." *Id.*

Hoist's disciplinary hearing was held on July 6, 2011, and her removal was upheld. *See* Duran Cert. Ex. BB. Upon the conclusion of the hearing, the hearing office determined, based on the testimony and evidence presented, that Hoist's conduct had violated *N.J.A.C. 4A:2-2.3(a)(6)*, for conduct unbecoming of a public employee, and recommended that Hoist be terminated. *See id.* at HOIST.LR.REMOVAL 0124-25. Specifically, the hearing officer found that there was no evidence that Ms. Clayton had made an issue of Hoist leaving early the day prior, and that Ms. Clayton's inquiry as to Hoist's whereabouts was not inappropriate. The hearing officer found that Hoist instigated the altercation by walking over to Ms. Clayton and calling her a "snitch" as she **[*26]** approached her. *Id.* at 0125. While the hearing officer found that Ms. Clayton's conduct was also inappropriate, the officer concluded that Hoist should have reported the incident to OLR and walked away. Rather, the hearing officer found that Hoist approached Ms. Clayton while she was sitting, and then proceeded to repeatedly yell, within inches of Ms. Clayton's ear, "see a bitch, slap a bitch," which could have potentially provoked Ms. Clayton into a physical confrontation. *Id.* The hearing officer concluded: "Ms. Hoist tends to blame others for her behavior and needs to take responsibility [for] the consequences of her actions." *Id.*

By correspondence dated July 28, 2011, Debra Ewalt,

the Director of Human Resources, informed Hoist that the hearing officer's report was upheld, and she was officially terminated as of April 27, 2011. *See id.* at 0131. As a result of the April 21, 2011 incident, Ms. Clayton received a written warning for her use of language during the altercation. *See* Strapp Cert. ¶ 3.

## II. Standard of Review

*Federal Rule of Civil Procedure 56(a)* provides that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." **[\*27]** *Fed. R. Civ. P. 56(a)*. The substantive law identifies which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Williams v. Borough of West Chester, 891 F.2d 458, 459-60 (3d Cir. 1989)*

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986)*. The Court will not "weigh the evidence and determine the truth of the matter" but will determine whether a genuine issue necessitates a trial. *Anderson, 477 U.S. at 249*. While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Id. at 250*. If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be no genuine issue of material fact, since a complete failure of proof concerning an essential element of the nonmoving **[\*28]** party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 n.5 (3d Cir. 1992)* (internal quotation marks omitted). If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of N. Am., 974 F.2d 1358, 1363 (3d Cir. 1992)*.

## III. Discussion

Both Hoist and Defendants have moved for summary judgment on Plaintiff's claims. In her Third Amended Complaint ("TAC"),[2] Plaintiff brings six counts: "race/gender discrimination"; "wrongful termination"; "retaliation"; "hostile work environment"; "harassment"; and "disparate treatment." Because Hoist clearly states in her TAC that these claims are being brought under Title VII, *see* TAC at 2, the Court analyzes them as such when considering these summary judgment motions.

### A. Motions to Compel

Before turning to the pending motions for summary judgment, the Court take a moment to address Plaintiff's pending motions to compel. [*See* ECF Nos. 72, 73, and 79.] Two of the documents **[\*29]** that Plaintiff moves to compel as part of her Motions, a memorandum prepared by Matthew J. Coefer ("the Coefer Memo") and a letter prepared by Rosanne Rossi ("the Rossi Letter"), *see* Pl's Br. 1-2, ECF No. 72; Pl.'s Br. 1-2, ECF No. 73, appear to have been produced. Defendants concede they inadvertently withheld the Coefer Memo from production and they committed to immediately provide it. *See* Defs.' Opp. Br. 2, ECF No. 74. Defendants assert that the Rossi Letter was already produced, and was in fact attached as an exhibit to their Motion for Summary Judgment. *Id.* Plaintiff's request for relief as to both the Coefer Memo and the Rossi Letter is therefore denied as moot.

Plaintiff also seeks an email from Dr. Lawrence Straus ("Straus Email") insofar as it pertains to her. *See* Pl.'s Br. 1, ECF No. 72. Defendants object that the Straus Email is confidential and does not relate to Plaintiff, but rather deals with treatment of Matthew Coeffer. *See* Defs.' Opp. 2, ECF No. 74. The Court finds that the Stauffer Email has been properly withheld based on confidentiality and lack of relevance, and denies this request.

Plaintiff's Third Motion to Compel seeks certain communications regarding Plaintiff's **[\*30]** complaints between the various offices of the DEP and a senator. *See* Pl.'s Br. 2, ECF No.79. Defendants confirm there

---

[2] While Plaintiff's initial Complaint was against the State of New Jersey, the DEP, Debra Ewalt, Rosanne Rossi, Veronica Kirkham, Karen Sondej, Matthew Coefer, and Wayne Grennier, her TAC names only the State of New Jersey and the DEP.

are no responsive documents. *See* Defs.' Opp. Br. 2, ECF No. 81. Accordingly, the Court denies Plaintiff's request.

Finally, Plaintiff seeks documents related to employee complaints as to various DEP personnel. Defendants oppose this application on a number of grounds, including that the request was not made during the discovery period or raised during the parties' meet and confer process, that the documents are not relevant, and that they include privileged and confidential records. *Id.* Despite nearly seven months for discovery and a direct order to meet and confer, Plaintiff failed to request this information. At this point it is simply too late; the Court denies Plaintiff's request for employee complaints. Accordingly, Plaintiffs' three motions are denied.

### B. Alleged Tort Claims

In her moving papers, Plaintiff indicates the possibility of causes of action other than those arising under Title VII; in particular, she makes mention of various other tort claims, including intentional infliction of emotional distress and defamation. Even if Plaintiff did intend to bring such **[*31]** tort claims—which are not alleged in her TAC—such claims must be dismissed because Hoist has not complied with the New Jersey Tort Claims Act, *N.J. Stat. Ann. § 59:1-1, et seq.* Under New Jersey law, tort actions against public entities and public employees are governed by the Tort Claims Act, which requires persons who have claims against public entities or their employees to provide notice to the parties within ninety days of accrual of such claims. See *N.J. Stat. Ann. § 59:8-8.* Leave to file a late Notice of Claim may be obtained only by motion and for good cause shown within one year of the date of the accrual of the claim. *See id. § 59:8-9.* After this one year period has expired, the court lacks jurisdiction to permit the filing of an untimely Notice of Claim. *See Iaconianni v. New Jersey Turnpike Authority, 236 N.J. Super. 294, 298, 565 A.2d 1084 (App. Div. 1989).* The filing of a civil complaint is not a substitute for filing a Notice of Claim, even if the complaint was filed within the 90-day or one-year period. *See Guzman v. City of Perth Amboy, 214 N.J. Super. 167, 171-72, 518 A.2d 758 (App. Div. 1986).* In other words, failure to satisfy the notice requirements of the Tort Claim Act is an absolute bar to recover against a public entity or its employees. *See N.J. Stat. Ann. § 59:8-9.*

Here, because Hoist's references to intentional infliction of emotional distress and defamation sound in state tort

law, Hoist was required to file a Notice of Claim. **[*32]** *See, e.g., Velez v. City of Jersey City, 180 N.J. 284, 293, 850 A.2d 1238 (2004)* (holding that the Tort Claims Act's notice requirements apply to both negligent and intentional torts). Hoist does not deny that she failed to file a TCA notice; rather, she requests the Court to allow her to "make that appropriate correction." See Pl.'s Reply Br. at 3. The Court, however, lacks jurisdiction to permit Hoist to file an untimely Notice of Claim. All of the alleged events concluded by July 28, 2011, when Hoist was given official notice of her termination as of April 27, 2011. Therefore, at the latest, Hoist was required to file her Notice within 90 days of July 28, 2011—a period that expired nearly four years ago. Likewise expired is the one-year period to seek leave to file a late notice of claim. Therefore, Hoist's failure to satisfy the notice requirements of the Tort Claims Act bars any of her alleged tort claims against Defendants. Accordingly, to the extent that Hoist intended to bring such claims, they must be dismissed.

### C. Race and Gender Discriminations Claims under Title VII

Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. *See 42 U.S.C. § 2000e-2.* A claim of race or gender discrimination under Title VII uses **[*33]** the burden shifting framework established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1974).* Under that framework, a plaintiff has the burden of establishing a prima facie case of discrimination by proving (1) that he or she is a member of a protected class; (2) that he or she suffered some form of adverse employment action; (3) under circumstances giving rise to an inference of unlawful discrimination. *Carter v. Midway Slots & Simulcast, 511 F. App'x 125, 128 (3d Cir. 2013)* (citing *Goosby v. Johnson & Johnson Med., 228 F.3d 313, 318 (3d Cir. 2000); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999)).* "However, the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Serv., 352 F.3d 789, 797-98 (3d Cir. 2003)* (citing *Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996)).*

If the plaintiff succeeds in establishing a prima facie case, then the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.*

*1994)*. If the defendant makes such a showing, the plaintiff must then demonstrate by a preponderance of the evidence that the stated nondiscriminatory rationale was "merely a pretext for discrimination, and not the real motivation for the unfavorable job action." *Sarullo, 352 F.3d at 797* (citing *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981))*.

### 1. Gender Discrimination Claim

Before the Court turns to the merits of Hoist's gender discrimination claim under Title VII, it must ensure that Hoist exhausted all required administrative remedies before bringing her **[*34]** claim. *See Robinson v. Dalton, 107 F.3d 1018, 1020 (3d Cir. 1997)* ("It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief."). With regard to employment discrimination claims, *42 U.S.C. § 2000e-5* provides that a plaintiff must file a timely Charge of Discrimination with the EEOC before filing a lawsuit. A plaintiff must then wait for the EEOC to complete its investigation of the charge and issue a right-to-sue letter before the complainant can initiate a private action. *See Burgh v. Borough Council, 251 F.3d 465, 470 (3d Cir.2001)* (describing the administrative process for discrimination claims).

After the discrimination charge is filed, "the scope of a resulting private civil action in the district court is defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination . . . ." *Barzanty v. Verizon PA, Inc., 361 F. App'x 411, 414 (3d Cir. 2010)* (quoting *Hicks v. ABT Assoc., Inc., 572 F.2d 960, 966 (3d Cir.1978)); see also Antol v. Perry, 82 F.3d 1291, 1296 (3d Cir. 1996)* (dismissing gender discrimination claim where it did not fall within the scope of the initial administrative charge filed with the EEOC). This liberal construction helps ensure that potentially aggrieved plaintiffs are not foreclosed from bringing a claim due to unreasonable or incomplete investigation by the EEOC. *Hicks, 572 F.2d at 966*. The Third Circuit has explained that this **[*35]** scope is not necessarily limited by a complainant's "failure to check a box on an EEOC Charge Form," but rather works to "prevent a plaintiff from 'greatly expanding an investigation simply by alleging new and different facts when she is contacted by the Commission following her charge.'" *Barzanty, 361 F. App'x at 414* (quoting *Hicks, 572 F.2d at 967*). In particular, a charge based on discrimination against one protected class does not encompass other classes merely because the

investigation would reveal that the plaintiff is a member of both of those classes. *Antol, 82 F.3d at 1296*.

Interpreting Hoist's EEOC charge liberally, her gender discrimination claim was not within the scope of the charge.[3] Plaintiff's charge provides no hint that her termination, or any other adverse employment action, was the result of her gender. When viewed generously, the Form 5 Charge of Discrimination identifies only allegations of race discrimination, retaliation, and hostile work environment. Hoist provided no facts that suggest gender discrimination and, while not determinative, did not check the box indicating her charge was based on her sex. There is nothing within the descriptive paragraphs that would lead the EEOC to assume that there was a gender claim, particularly **[*36]** since two of the four people that Hoist names as subjecting her to discrimination are females. Hoist specifically and repeatedly states that her discrimination is based on "bullying, harassment, favoritism by race and retaliation," and that she has "been discriminated against because of my race (Black) and retaliation . . . ." Duran Cert. Ex. A at HOIST.EEO.0008. There is no language within the Charge that could be construed as being analogous to a claim for gender discrimination. *Compare Anjelino v. New York Times Co., 200 F.3d 73, 94-95 (3d Cir. 1999)* (finding that a hostile work environment claim could proceed where the initial EEOC charge alleged that the plaintiff was subject to an "abusive atmosphere," because such a phrase is interchangeable with "hostile work environment"). Accordingly, it is not reasonable to expect an investigation into her charge to cover such a claim, nor could Defendants reasonably expect to be sued for such a claim. Therefore, Hoist did not exhaust her administrative remedies with respect to her gender

---

[3] Plaintiff's charge included the following language:

> I began my employment in October 2004, in the position of Clerk Typist. Sometime later I was placed in the position of **[*37]** Clerk Typist.

> During the court of my employment[,] I have complained about harassment from certain supervisory and managerial employees. In April 2011, I was suspended without pay. On July 28, 2011, I was discharged.

> I believe that I have been discriminated against because of my race (Black) and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

Duran Cert. Ex. A.

discrimination claim,[4] and it must be dismissed.

## 2. Race Discrimination Claim

The Court, therefore, turns towards Hoist's racial discrimination claim under Title VII. Defendants have moved for summary judgment on her claims, arguing that she has failed to establish a prima facie case for race discrimination; alternatively, Defendants have asserted that, even if Plaintiff has established a prima facie [*38] case of racial discrimination, she has failed to establish that their nondiscriminatory reason for the unfavorable employment decision was pretextual.

### a. Prima Facie Case

It is undisputed that Hoist, an African-American, has established the first prong of the prima facie case for race discrimination. Defendants, however, contest the next two prongs for the majority of the allegedly discriminatory incidents asserted by Hoist, arguing that Hoist has either failed to establish that she suffered an adverse employment action from these incidents and that any actual adverse employment action that occurred fails to raise an inference of discriminatory animus. The Court now turns to these arguments.

In order to establish to a claim of racial discrimination, an adverse employment action must be "sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' or to 'deprive or tend to deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.'" *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296-97 (3d Cir. 1997)*, *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)* (quoting *42 U.S.C. § 2000e-2(a)(1)* and *(2)*). Not every "insult, slight, or unpleasantness gives rise to a valid Title VII claim." *Id. at 1297*.

As to the third [*39] factor, a plaintiff may establish an inference of discrimination "in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other

---

[4] This claim appears to relate in large part to the incident where Plaintiff received a one-day suspension for insubordination after she refused to complete a priority task for Coefer in November 2010. Plaintiff asserts that she was unfairly punished because a male co-worker, Mr. Daniels, acted insubordinately in March 2010 and was not, to her knowledge, punished. The Court, however, lacks jurisdiction to hear this claim for the above-mentioned reasons.

employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus." *Golod v. Bank of Am. Corp., 403 F. App'x 699, 703 (3d Cir. 2010)* (citing *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511-12, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002))*. "More specifically, when presenting comparator evidence, on summary judgment, a plaintiff must prove that she is 'similarly situated' to her comparators and that these employees have been treated differently or favorably by their employer." *Houston v. Dialysis Clinic, Inc., Civ. Action No.: 13-4461(FLW), 2015 U.S. Dist. LEXIS 83151, at *12 (D.N.J. June 26, 2015)* (citing *Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003)*; *Andy v. UPS, 2003 U.S. Dist. LEXIS 25193, at *33 (E.D. Pa. Oct. 28, 2003)*; *Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998))*. To be "similarly situated," a comparator must be "similar in all relevant respects," including with regards to "the requirements, duties and responsibilities of the respective jobs." *Id. at *12* (internal quotation marks and citations omitted). Importantly, "the acts of non-minority employees must be of 'comparable seriousness' if the failure to discharge those employees is being proffered as proof of discriminatory intent." *Taylor v. Procter & Gamble Dover Wipes, 184 F. Supp. 2d 402, 410 (D. Del. 2002)*, aff'd, *53 F. App'x 649 (3d Cir. 2002)* (citing *McDonnell Douglas, 411 U.S. at 804*); *see also Houston, 2015 U.S. Dist. LEXIS 83151, at *13* (explaining that a plaintiff must demonstrate that "the acts of the similarly situated employees were of a comparable [*40] seriousness'" in order to raise an inference of discrimination based on comparator evidence); *Dill v. Runyon, Civil Action No. 96-3584, 1997 U.S. Dist. LEXIS 4355, at *12 (E.D. Pa. Apr. 2, 1997)* ("To be deemed 'similarly situated,' the individuals with whom a plaintiff seeks to be compared must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'") (quoting *Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994)* (quoting *Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992))*.

In her TAC, and throughout her moving papers, Hoist has pointed to a series of events which she asserts substantiates her claims for race discrimination. Hoist, however, has failed to provide sufficient evidence to establish a prima facie case for the majority of these incidences. It is not disputed that Hoist's termination constituted an adverse employment action; however, other than this termination, the incidents that Hoist is relying on largely fail to qualify as adverse employment actions under the law. For example, there are several

incidences where there was no action taken by the Defendants with regard to Plaintiff at all, and certainly no action that could constitute a significant change in Hoist's employment status. Specifically, with regard to the November 5, 2010 safe deposit box incident [*41] and the November 16, 2010 lobby incident involving a visitor Hoist failed to assist, Hoist was never disciplined—either formally or informally—for these events. Rather, Hoist testified that she was just concerned that something could have happened; this concern, however, does not constitute an adverse employment action. Similarly, Hoist has asserted that her request to change her working hours was denied while a Caucasian female co-worker's request was approved, indicating a disparate impact. Hoist's request, however, was approved; even if it had been denied, such a denial would not constitute an adverse employment action as it would not materially change her working conditions.

There are also several incidences in which Plaintiff was reprimanded or disciplined, but the resulting effect did not change Hoist's employment status or condition in such a way to appropriately be considered an adverse employment action. For example, with regard to the Workplace Violence Complaints filed against her in March 2010, the OLR's investigation determined that Plaintiff failed to conduct herself appropriately in the workplace and therefore proceeded to give her a written warning, reminding Hoist to [*42] conduct herself in a "courteous and professional manner." Likewise, Hoist received a Record of Counseling for leaving work early without prior approval on January 4, 2011.[5] These reprimands, however, did not result in Hoist having her hours or type of work changed, or result in Hoist either receiving a decrease in wages or being denied a pay raise or promotion. Accordingly, they "did not effect a material change in the terms and conditions of her employment," and do not qualify as adverse employment actions. *Urey v. Grove City College, 94 F. App'x 79, 81 (3d Cir. 2004)*; *see also Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. Pa. 2001)*

———————————————

[5] Hoist does not dispute this incident, but rather asserts that it was disparate impact because she and the rest of her office had, on prior occasions, been allowed to utilize their lunch period at 4:00 p.m. This Record of Counseling [*43] was based on Plaintiff's violation of a DEP policy, as she did not wait for supervisory approval before leaving early. Therefore, there was a valid and legitimate business reason for this Record of Counseling, even if it could be considered an adverse employment action.

(finding that written reprimands did not constitute an adverse employment action where the plaintiff failed to show "that these written reprimands affected the terms or conditions of his employment"); *Heuschkel v. McCulley, Civil Action No. 05-5312(NLH), 2008 U.S. Dist. LEXIS 22143, at *12 (D.N.J. Mar. 19, 2008)* (finding that a written reprimand did not constitute an adverse employment action on the basis that such reprimand "could" be used in future progressive discipline because it did not actually materially change her employment terms or conditions).

Similarly, Plaintiff's 2010 PES report does not constitute an adverse employment action. Plaintiff asserts that a comment within the PES, in which Coefer justified why Hoist did not pass the "Organizational Citizenship" category, to be discriminatory. She also asserts that Coefer's reference to the Workplace Violence Complaints filed against Hoist in his addendum was improper because the Complaint had been found unsupported.[6] Hoist, however, received an overall rating of "Satisfactory" on her PES, and the comment did not deprive Hoist of any employment opportunities, or otherwise affect her status as an employee. Hoist has only made the unsupported statement that the PES, which states that Plaintiff is an efficient worker but should be "more respective [sic] and courteous to fellow co-workers and staff," could have been used to hurt her chances of getting other job opportunities. There is no claim or evidence that it [*44] did affect her chances of being promoted or receiving a raise, and Hoist does not claim that the PES was used as a basis for progressive discipline. Therefore, the PES does not constitute an adverse employment action. *See Heuschkel, 2008 U.S. Dist. LEXIS 22143, at *12*. Correspondingly, Hoist's allegations that she was bullied during her meeting with Grennier and her union representative to discuss the PES does not constitute an adverse employment action. Hoist's claims, in which her supervisor "challenged" the

———————————————

[6] It should also be noted that Coefer's addendum was a response to Hoist's response to her Interim PES, as it was Hoist herself that initially references the Workplace Violence Complaints filed in the OLA. Coefer merely states that he filed the Complaint on behalf of his staff, who had approached him about Hoist's treatment. It is illogical to claim that Coefer was being discriminatory by responding to the Complaints that Hoist herself first referenced. Further, Coefer later redacted the portion of his addendum that referenced the Workplace Violence Complaints, [*45] meaning that the offending comments were removed and never made part of Plaintiff's official personnel file. These comments, therefore, could not affect the terms, conditions, or status of Plaintiff's employment.

allegations of Hoist and her union representative during the meeting, fail to indicate any change to her employment terms or conditions as a result of this meeting.

More troublesome for Plaintiff, however, is the lack of evidence purporting to establish an inference of race discrimination. "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Sarullo, 352 F.3d at 798* (quotation and citation omitted). For example, Plaintiff has asserted that management's failure to transfer her out of OPRA constituted discrimination. Plaintiff, however, has failed to produce any evidence indicating that her denial of transfer had anything to do with her race. Rather, Plaintiff applied for a transfer in the "lateral mobility process," and was given equal consideration with all other employees who requested a transfer. Additionally, Coefer attempted to help Plaintiff in her request to transfer by reaching out twice to Human Resources. The second time he reached out to Human Resources, he sent an electronic communication to Ms. Ewalt, who is the **[*46]** Director of the Office of Human Resources, requesting that Hoist receive expedited consideration for her request for a lateral transfer. He was told, however, that Hoist's request would be given "equal consideration" with the other employees. It is also notable that Plaintiff had been trying to transfer out of OPRA since 2009, before the incidences of purported discrimination occurred. Plaintiff, therefore, has failed to establish that the denial of her transfer had any connection with her race.

Hoist has also pointed to the 2010 Workplace Violence Complaints as examples of disparate impact, because she, an African-American, was disciplined, while Ms. Clayton, a Caucasian, was not disciplined. However, the record shows that the findings in both Ms. Clayton's and Hoist's Workplace Violence Complaints were substantially the same. After conducting an investigation, the OLR found neither Complaint to be substantiated, reminded both Hoist and Ms. Clayton to conduct themselves in a "courteous and professional manner," and stated that the letter served as a written warning for both. Therefore, the same exact remedial action was taken in regard to both Workplace Violence Complaints; accordingly, **[*47]** Hoist has failed to establish she was treated any differently from Ms. Clayton because of her race.

Likewise, Hoist has alleged that she was discriminated against because she was not asked to join a training

session regarding a new process for handling money in the office by Coefer. Rather, she alleges that Coefer invited three other employees, two of whom are Caucasian and one of whom is Hispanic. This event, however, occurred after Hoist had requested to be removed of her safe-keeper responsibilities—a request which was granted by management. Accordingly, there can be no causal connection between Hoist's race and her exclusion from this training session.

Plaintiff's sole remaining basis for her race discrimination claim is her suspension and ultimate termination.[7] As these are clearly adverse employment actions, the only real issue of contention relates to whether they raise an inference of discriminatory animus. In that regard, Plaintiff attempts to establish an inference of discrimination through purportedly favorable treatment of a similarly situated employee, to wit, Ms. Clayton. Specifically, Plaintiff asserts that Ms. Clayton was a female Caucasian co-worker of hers, who was also **[*48]** supervised by Coefer and Grennier. After the altercation between Ms. Clayton and herself on April 21, 2011, Hoist asserts that the non-termination of Ms. Clayton shows discriminatory intent on the part of Defendants.

After reviewing the evidence as it relates to the "comparator" raised by Plaintiff, the Court concludes that Ms. Clayton's circumstances are not sufficiently similar to Plaintiff's circumstances so as to create an inference that Plaintiff was terminated as a result of racial discrimination. Notably, while Ms. Clayton was obviously an active participant in the April 21 altercation, she was accused of misconduct that is not of comparable seriousness to the misconduct attributed to Plaintiff in this case. With regard to the April 21 altercation, Hoist was determined to have been the instigator in the altercation and that she could have provoked a physical confrontation by yelling, "If you see a bitch, slap a bitch," within inches of Ms. Clayton's face. Eye witnesses to the incident, **[*49]** including a visitor to the office, corroborated that Hoist was the aggressor, that she leaned into Ms. Clayton's personal space, and that she repeatedly kept yelling, "If you see a bitch, slap a bitch" at Ms. Clayton. Hoist herself

---

[7] Because the suspension was without pay, it is an adverse employment action. *See Jones v. SEPTA, No. 14-3814, 796 F.3d 323, 2015 U.S. App. LEXIS 14094, at *8-9 (3d Cir. Aug. 12, 2015)* (explaining that, while a paid suspension cannot constitute an adverse employment action, a suspension without pay does).

testified that she yelling the aforementioned phrase repeatedly, and that she initiated the altercation by confronting Ms. Clayton in her cubicle, and that she stood over Ms. Clayton yelling while Ms. Clayton remained seated. While Ms. Clayton clearly played a role in the altercation—specifically, Ms. Clayton called Hoist a "bitch" and kept yelling at Hoist to get out of her face—the differences in Hoist's conduct and Ms. Clayton's conduct in the altercation distinguishes Defendant's treatment of them for it. *See Jones, 796 F.3d 323, 2015 U.S. App. LEXIS 14094, at \*9-10* (finding that a "materially different" distinction between the misconduct of an employee in a protected class and an employee outside that class precludes an inference that the treatment of the employee in the protected class was motivated by discrimination).

Because of Hoist's role as the aggressor of the incident and because Hoist could have provoked Ms. Clayton into a physical confrontation by yelling in her face, Defendants determined that Hoist **[*50]** had violated the Employee Code of Conduct by engaging in conduct unbecoming of a public employee, and decided termination was appropriate. Ms. Clayton was likewise disciplined, but because of her lesser role, was given a written warning for her use of language. Therefore, based on these circumstances, Ms. Clayton is not similarly situated to Plaintiff, because her conduct and involvement in the altercation were clearly different than that of Hoist. These differences are what ultimately justify the different penalties that the DEP ultimately imposed on the two women. *See Opsatnik v. Norfolk Southern Corp., 335 F. App'x 220, 223 (3d Cir. Pa. 2009)* (explaining that a similarly situated employee must be shown to have "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them" (quoting *Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)).* In other words, because the acts of Ms. Clayton, the non-minority employee, were not of "comparable seriousness" to Plaintiff's conduct, the failure to discharge Ms. Clayton does not establish proof of discriminatory intent by Defendants. *McDonnell Douglas, 411 U.S. at 804; see also Opsatnik, 335 F. App'x at 223*.

In sum, Plaintiff has failed to establish a prima facie case of discrimination. The majority of the asserted incidents do not constitute **[*51]** adverse employment action for the purposes of a Title VII discrimination analysis. Plaintiff has failed to proffer any evidence that establishes that the few incidents that could be

considered an adverse employment action occurred under circumstances that allow for an inference of discrimination. While Plaintiff has attempted to show an inference of racial discrimination with regard to the circumstances giving rise to her termination through comparator evidence, the co-worker that Plaintiff has compared herself to is not sufficiently situated to Plaintiff to treat her as a comparator and raise an inference of discrimination. Nonetheless, even assuming Hoist could establish a prima facie case of discrimination, she has failed to rebut Defendants' legitimate business reason for her termination.

b. *Burden Shifting*

As discussed, if a plaintiff succeeds in establishing a prima facie case for race discrimination, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination. If a plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory **[*52]** reason for the employee's termination. *See Sarullo, 352 F.3d at 799*. As the Third Circuit has noted, this burden is "relatively light" and does not oblige the employer to prove that it was actually motivated by the tendered reason. *Fuentes, 32 F.3d at 763*.

Here, Defendants proffer that they terminated Plaintiff based on a legitimate business reason; specifically, they terminated Plaintiff following the April 21, 2011 altercation with Ms. Clayton because they determined that Hoist instigated the altercation, was the aggressor in the altercation, and could have provoked Ms. Clayton into a physical altercation by yelling, "If you see a bitch, slap a bitch," several times within inches of Ms. Clayton's face. Such conduct was found to violate *N.J. A.C. 4A:2-2.3(a)(6)*, as it qualified as conduct unbecoming of a public employee. Based on this violation of the DEP Employee Code of Conduct, the DEP decided to terminate Plaintiff. As Defendants have satisfied their burden of establishing a legitimate, non-discriminatory reason for Plaintiff, the burden now shifts to Plaintiff to show that Defendants' proffered nondiscriminatory reasons are, in actuality, a pretext for invidious race discrimination.

At the summary judgment stage, there are two ways in which a plaintiff **[*53]** may demonstrate pretext. "First, the plaintiff may point to evidence in the record that would cause a reasonable juror to disbelieve the employer's articulated legitimate non-discriminatory reason, thereby creating a genuine dispute of material

fact as to the credibility of that reason." *Burton v. Teleflex Inc., 707 F.3d 417, 430 (3d Cir. 2013).* Alternatively, the plaintiff may survive summary judgment by tendering evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes, 32 F.3d at 762; Burton, 707 F.3d at 430-31* ("[T]he plaintiff may also defeat summary judgment by pointing to evidence that indicates that the employer acted with discriminatory animus."). It is not enough for the plaintiff to "simply show that the employer's decision was wrong or mistaken"; rather, the plaintiff "must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Ross v. Gilhuly, 755 F.3d 185, 194 n.13 (3d Cir. 2014)* (alteration in original) (quoting *Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 331 (3d Cir. 1995)).*

In order to establish pretext, Plaintiff **[*54]** alleges that Ms. Clayton was the instigator, and that Ms. Clayton called Plaintiff a "bitch" during the altercation. Plaintiff, it appears, hopes to show that Defendants inconsistently apportioned punishments by giving her, a minority, a much harsher punishment than Ms. Clayton, a non-minority co-worker. The record, however, fails to support this argument. The hearing officers at both Plaintiff's pre-suspension hearing and her disciplinary hearing determined that Hoist was the instigator of the altercation, and that she was the more aggressive party. Both hearing officers also found that Hoist essentially invited Ms. Clayton to physically retaliate against her by invading her personal space and yelling, "If you see a bitch, smack a bitch" several times. These determinations were based on significant evidence that was corroborated by numerous witnesses to the incident, including some outside parties. Hoist herself has admitted that she went into Ms. Clayton's cubicle to confront her regarding her alleged inquiries into Plaintiff's whereabouts the prior day. She also admits that she stood over Ms. Clayton, yelling the aforementioned phrase at her.

It appears that Hoist feels that, because **[*55]** Ms. Clayton allegedly inquired about her whereabouts, Ms. Clayton instigated the altercation. The hearing officer, however, found that Ms. Clayton's inquiry about Plaintiff's whereabouts was not inappropriate because

the front desk of the OPRA office had to be manned at all times. Once management relayed that Hoist was given permission to leave, there is no evidence that Ms. Clayton made an issue about it. It was, rather, Plaintiff who initiated the altercation by deciding to confront Ms. Clayton the next day about her inquiry, and then proceeded to escalate the altercation by standing over Ms. Clayton and yelling at her in a way that could provoke a physical confrontation. Plaintiff not only engaged in this action in front of her coworkers, but also did this in front of visitors to the office.

While Plaintiff asserts that Ms. Clayton was unpunished for this incident, this is not true. Ms. Clayton received a written warning for her use of language during this altercation. And while Ms. Clayton was clearly involved in the altercation, her behavior is not comparable to Plaintiff's conduct during the altercation, as discussed earlier. Ms. Clayton did not approach Hoist with the intention **[*56]** to start a verbal or physical altercation, she remained seated at all times during the altercation, and she never threated Hoist.

Overall, without proof that someone similarly situated was treated more favorably, Hoist is left only with her subjective belief that race played a role in the DEP's employment decisions. She presents no discriminatory statements by Defendants, or evidence of discriminatory motive to support her allegations. She has offered no rebuttal to DEP's proffered (conduct-related) reason for terminating her employment, other than her feeling that she was treated unfairly. Hoist, however, has corroborated the essence of the incident that led to her termination, and the Court will not second guess DEP's intolerance for Hoist's actions, which were clearly inappropriate for the office place. Plaintiff has offered no other evidence that could plausibly establish pretext, nor did the Court find any such evidence in its review of the record. Overall, Hoist's "subjective belief that race played a role in these employment decisions . . . is not sufficient to establish an inference of discrimination." *Groeber v. Friedman & Schuman, P.C., 555 F. App'x 133, 135 (3d Cir. 2014).* Accordingly, Plaintiff has failed to show there is any genuine issue of **[*57]** material fact that Defendants' proffered reason for terminating Plaintiff was a pretext for a racially discriminatory purpose. Thus, summary judgment is granted in favor of Defendants on Plaintiff's Title VII race discrimination claim.

**D. Retaliation Claim Under Title VII**

2015 U.S. Dist. LEXIS 106527, *57

In her TAC, Plaintiff claims that she was retaliated against for making complaints about her work environment. To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: "(1) she engaged in a protected activity under Title VII; (2) the employer took an adverse action against her; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action." *Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 320 (3d Cir. 2008)*. Critically for this case, the first element of a Title VII retaliation claim protects only "those who oppose discrimination made unlawful by Title VII." *Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir.2006)*; *see also Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 134 (3d Cir. 2006)* ("Title VII's anti-retaliation provisions protect employees who participate in Title VII's statutory processes or who otherwise oppose employment practices made illegal by Title VII."). Accordingly, "[n]ot every complaint or report entitles its author to protection from retaliation under Title VII." *Davis v. City of Newark, 417 Fed. Appx. 201, 202-03 (3d Cir. 2011)* (citing *Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)* (noting **[*58]** that Title VII does not "set forth a general civility code for the American workplace" (internal quotation marks omitted))). Rather, "only complaints about discrimination prohibited by Title VII - that is, discrimination on the basis of race, color, religion, sex, or national origin, *42 U.S.C. § 2000e-2*-constitute 'protected activity.' Thus, for a complaint to amount to 'protected activity,' it must implicate an employment practice made illegal by Title VII." *Id.* (internal citation omitted) (citing *Curay-Cramer, 450 F.3d at 135*). Because Title VII is not a code for general civility, "a general complaint of unfair treatment does not translate into a charge of [retaliation]." *Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)*; *see also Burlington N. & Santa Fe Ry., 548 U.S. at 68*.

Accordingly, the Third Circuit has held that an employee did not engage in protected activity under Title VII where the employee wrote a letter to the human resources department "complain[ing] about unfair treatment in general and express[ing] his dissatisfaction about the fact that someone else was awarded the position" because the employee did not "explicitly or implicitly allege" that the alleged unfairness was due to his membership in a protected category under Title VII. *See Barber, 68 F.3d at 702*. Likewise, the Third Circuit has found that an employee who alleges "a long history of **[*59]** what he perceives to be differential treatment by his supervisors" does not sufficiently establish that the employee engaged in "protected activity" under Title VII. *See Ferra v. Potter, 324 F. App'x 189, 192 (3d Cir. 2009)*.

In support of her claim, Plaintiff has failed to offer any evidence or proof that she engaged in protected activity that caused DEP to retaliate against her. In her TAC and moving papers, Plaintiff has offered up a series of events that she asserts establishes retaliation under Title VII. For example, she states that her co-workers and supervisors made defamatory statements against her and harassed her, that her supervisors punished her more severely than her co-workers, that Coefer inappropriately referenced the Workplace Violence Complaint filed against her in the 2010 PES, and that she was denied a transfer despite the "unhealthy work environment."[8] *See* Pl.'s Br. at 11-12. These allegations, however, do not relate to any protected activity that Plaintiff engaged in, for which the DEP retaliated against her.

After reviewing the record, the Court cannot find a single complaint Plaintiff made—whether informal or formal—concerning an employment practice that she found to be discriminatory towards her because of her race. Rather, even viewing the record in the most favorable light to Hoist, Plaintiff's complaints to her supervisors and to management only show a general feeling of unfair treatment by her supervisors and her co-workers. As in *Barber*, there is no explicit or implicit allegation that this unfairness stems from a discriminatory animus. It is not enough that Plaintiff complained about a history of differential treatment by her supervisors and an uncivil work environment, *see Davis, 417 Fed. Appx. at 203*; *Ferra, 324 F. App'x at 192*; unless Hoist linked these complaints to an employment practice prohibited under Title VII, **[*61]** she did not engage in protected activity for the purposes of retaliation. Even when construing all facts and logical inferences in favor of Plaintiff, she has failed to show any issue of material fact as to her

---

[8] Plaintiff has alleged elsewhere that Coefer filed the March 2010 Workplace Violence Complaint against her as retaliation after she verbally complained about the environment in the workplace, particularly as it **[*60]** related to Ms. Clayton's behavior towards her. The record, however, does not support this contention. The March 2010 Workplace Violence Complaint had already been filed by Coefer before Hoist verbally complained to him, so his Complaint could not have been retaliatory. Further, and significantly for Title VII purposes, Plaintiff's verbal complaints do not reference any conduct that reflects a discriminatory animus.

retaliation claim.[9] Accordingly, judgment must be entered for Defendants on Plaintiff's Title VII retaliation claim.

## E. Hostile Work Environment Claim under Title VII

Finally, Plaintiff has brought a claim for hostile work environment under Title VII. In order to establish a hostile work environment claim under Title VII, Plaintiff must show that (1) she suffered intentional discrimination because of her race; (2) the discrimination was pervasive and regular; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of [*62] the same protected class in her position; and (5) there is a basis for vicarious liability. *See Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001)* (citing *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996))*.

"The threshold issue in a Title VII hostile work environment claim is whether the plaintiff has 'produced evidence of intentional discrimination based on' her race." *Sanchez v. Tricorp Amusements, Inc., Civil Action No. 08-4554 (FLW), 2010 U.S. Dist. LEXIS 125287, at *34 (D.N.J. Nov. 29, 2010)* (quoting *Waite v. Blair, Inc., 937 F. Supp. 460, 468 (W.D.Pa.1995))*. It is well-established that Title VII does not mandate a "general civility code" in the workplace, and ordinary tribulations of the workplace do not, by themselves, support a hostile work environment claim. *See Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*. Indeed, "[t]he mere fact that a work environment may prove to be intolerable to a particular employee does not necessarily implicate Title VII, since the civil rights laws do not guarantee a working environment free of stress." *Waite, 937 F. Supp. at 468* (citing *T. Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)*, *cert. denied*, 475 U.S. 1082, 106 S. Ct. 1461, 89 L. Ed. 2d 718 (1986)). Rather, Title VII protects an employee from racial discrimination in the workplace, which includes freedom from a racially-

hostile work environment. If the workplace is unpleasant, or even revolting, for any reason other than hostility generated because on account of an employee's membership in a protected class under Title VII, then the hostile environment fails to implicate a federal claim. "In short, personality conflicts between employees are not [*63] the business of the federal courts." *Id.* (quoting *Vore v. Indiana Bell Tel. Co., Inc., 32 F.3d 1161, 1162 (7th Cir. 1994))*; *see also Fichter v. AMG Res. Corp., 528 F. App'x 225, 231 (3d Cir. 2013)* ("Title VII does not guarantee a utopian workplace." (internal quotation marks omitted)).

Upon examination of Hoist's list of complaints, the Court must conclude that, while the incidents Hoist experienced may have been personally upsetting or offensive to her, Hoist has failed to demonstrate a discriminatory animus. Plaintiff's complaints concern allegations that she started receiving poor evaluations; that she started to be disciplined for things while her co-workers were "merely overlooked" for doing similar things; that her co-workers and supervisors treated her inconsiderately and/or disrespectfully and said "defamatory" things about her; that her supervisors did not take her seriously and/or did not address her complaints; and that she was not transferred. After reviewing the record, there is simply no evidence of discriminatory treatment in these assertions aside from the fact that Hoist happens to be African-American. Plaintiff has not provided any evidence that anyone in the workplace mentioned her race, called her derogatory names based on her race, or even referenced her race. *See Watkins v. Nabisco Biscuit Co., 224 F. Supp. 2d 852, 865 (D.N.J. 2002)* (dismissing claim based upon [*64] failure to produce any evidence "that the facially neutral conduct of [plaintiff's] supervisors and co-workers masked a discriminatory intent"). In her own complaints, she only references her frustrations with her workplace because of personality conflicts she was having with her co-workers and her supervisors. Indeed, when Plaintiff met with Dr. Straus about her issues in the workplace, she only spoke of certain personality issues she had with Coefer, and how she felt he was not understanding of her because she behaves socially differently than her fellow co-workers. She never once mentioned any feelings that this alleged conflict was based on any sort of discrimination.

Plaintiff has cited to the results of the investigation into her May 2010 Workplace Violence Complaint, in which the OLR concluded that, while the incidents within the Complaint did not constitute workplace violence, they did create a hostile work environment. Plaintiff argues

---

[9] A retaliation claim is subject to the same burden-shifting analysis applied in Title VII discrimination claims. *See Moore, 461 F.3d at 342*. Accordingly, judgment would still be entered in favor of Defendants even had Plaintiff established that she engaged in a protected activity because, as discussed in Section III.C, Plaintiff has failed to establish that Defendants' proffered, non-discriminatory reason for her termination was actually a pretext.

that this shows that this letter shows that her claim has merit, because the OLR "admitted" that she was a victim of a hostile work environment. *See* Pl.'s Br. at 15. This argument, however, misconstrues the OLR's investigation and resulting determination. **[\*65]** Plaintiff, in her Workplace Violence Complaint, complained of generalized workplace violence, relating to her issues with Ms. Clayton and her impression that Coefer was not addressing her complaints. There is no reference, either implicitly or explicitly, to any discriminatory animus in her complaint, or in the OLR's findings.[10] While the OLR found that there was a hostile work environment, this finding only dealt with the personality conflicts occurring in the office of which Plaintiff complained. Title VII simply is not implicated by such complaints of personality conflicts between employees, or by an unhappy working environment for an employee. *See Jensen v. Potter, 435 F.3d 444, 451 (3d Cir. 2006)* ("The statute prohibits severe or pervasive harassment; it does not mandate a happy workplace."). Accordingly, the OLR's determination of a hostile work environment based on its investigation into Plaintiff's Workplace Violence Complaint fails to create an issue of material fact as to Plaintiff's Title VII claim for hostile work environment.

Moreover, even assuming Hoist could establish that she suffered intentional discrimination because of her race, her hostile work environment claim would still fail because it is clear that the incidents she has identified do not constitute the kind of severe or pervasive harassment required by Title VII. *See Harris, 510 U.S. at 21-22*. Such harassment exists when the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)* (internal quotation marks and citation omitted). This conduct must be so severe or pervasive as to create an *objectively* hostile work environment. *See Weston, 251 F.3d at 426*. Because

_____

[10] It is also notable that the OLR does not investigate claims of discrimination based on an individual's status in a protected category. Rather, such investigations are within the province of DEP's Equal **[\*66]** Employment Office ("EEO"). If, during the court of the OLR's investigation, Plaintiff had alleged that the conduct she was experiencing from her co-workers was due to her race and/or gender, the matter would have been referred to the EEO. *See* Certification of Melanie L. Armstrong ("Armstrong Cert.") ¶¶ 2, 4.

Title VII does not mandate the existence of a copasetic workplace, evidence of "[o]ccasional insults, teasing, or episodic instances of ridicule are not enough [because] they do not **[\*67]** 'permeate' the workplace and change the very nature of the plaintiff's employment." *Jensen, 435 F.3d at 451*. In determining whether harassment is sufficiently severe or pervasive to give rise to a Title VII action, the Court is mindful that it must look at all the surrounding circumstances, "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See Harris, 510 U.S. at 23*.

When applying these principles here, the Court is compelled to conclude that no reasonable jury could find that Hoist experienced racial harassment so severe or pervasive that it "alter[ed] the conditions of [her] employment and create[d] an abusive environment." *Jensen, 435 F.3d at 451*. While Hoist may have been offended by the way she was treated by her co-workers and frustrated by the way management treated her, the harassment she asserts she feels was not particularly frequent, and certainly was not physically threatening or humiliating. Rather, it appears that Hoist's sometimes extreme reactions to incidences in the workplace were, at times, unreasonable and a result of her (self-described) tendency to become emotional and **[\*68]** angry in the workplace. Indeed, it is hard to conceive how the alleged harassment could have had any real interference with her work performance. In short, all of the alleged incidents, taken together and viewed in the light most favorable to Hoist, fail to establish that the workplace at OPRA was "permeated with discriminatory intimidation, ridicule, and insult" such that the nature of Hoist's employment was changed. *Morgan, 536 U.S. at 116*.

Overall, Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*. Plaintiff has failed to show a single incident of such discriminatory conduct. Therefore, the Court finds insufficient evidence on this record to create a genuine issue as to whether Plaintiff suffered intentionally discriminatory treatment, much less discrimination which was pervasive and regular. Given these crucial deficiencies, Hoist's hostile environment claim cannot survive summary judgment. Accordingly, the Court will

enter judgment for Defendants on this claim.

## IV. <u>Conclusion</u>

For the aforementioned reasons, Plaintiff's **[*69]** three Motions to Compel are denied. Plaintiff's Motion for an Extension of Time to file a summary judgment motion is granted, and Plaintiff's Motion for Summary Judgment is denied in its entirety. Defendants' Motion for Summary Judgment is granted. An appropriate order accompanies this Opinion.

/s/ Freda L. Wolfson

FREDA L. WOLFSON, U.S.D.J.

Dated: August 13, 2015

## ORDER

WOLFSON, District Judge.

THIS MATTER having been opened to the Court by Kathryn Elizabeth Duran, Esq., counsel for Defendants New Jersey Department of Environmental Protection and the State of New Jersey (collectively, the "Defendants"), on a motion for summary judgment; it appearing that pro se Plaintiff Donielle T. Hoist ("Plaintiff"), has moved for an extension of time to file her summary judgment motion, has opposed the motion by way of filing a motion for summary judgment on all claims, and has moved the Court to compel Defendants to produce certain documents; it appearing that Defendants have opposed Plaintiff's three motions to compel; the Court having considered the parties' submissions in connection with the motion pursuant to *Fed. R. Civ. P. 78*, for the reasons set forth in the Opinion filed on even date, and for good cause shown, **[*70]**

**IT IS**, on this 13th day of August, 2015,

**ORDERED** that Plaintiff's Motion for an Extension of Time [ECF No. 71] is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Motions to Compel [ECF Nos. 72, 73, 79] are **DENIED**; and it is further

**ORDERED** that Plaintiff's Motion for Summary Judgment is **DENIED** in its entirety; and it is finally

**ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** in its entirety. Accordingly, judgment shall be entered in Defendants' favor and this matter is closed.

/s/ Freda L. Wolfson

FREDA L. WOLFSON, U.S.D.J.

End of Document

Pooja Bhutani

 Positive
As of: April 29, 2021 6:26 PM Z

# *Delbridge v. Acme Food Corp.*

United States District Court for the District of New Jersey

January 13, 2010, Decided; January 14, 2010, Filed

Civil Action No. 08-4821

**Reporter**
2010 U.S. Dist. LEXIS 2789 *; 2010 WL 148803

Re: Delbridge v. Acme Food Corp. and Robert George

**Prior History:** *Delbridge v. Acme Food Corp., 2008 U.S. Dist. LEXIS 101151 (D.N.J., Dec. 15, 2008)*

## Core Terms

terminated, coupon, alleges, arbitrator, employees, amended complaint, interview, transactions, register, summary judgment motion, arbitral decision, summary judgment, pretext, rights, facie, card, tape

**Counsel:** **[*1]** MOSES DELBRIDGE, <u>Plaintiff,</u> Pro se, BAYONNE, NJ.

For **ACME FOOD CORP., ROBERT GEORGE, <u>Defendants:</u> KELLY LYNN BANNISTER,** *LEAD ATTORNEY,* BUCHANAN INGERSOLL & ROONEY PC, PHILADELPHIA, PA.

**Judges:** WILLIAM J. MARTINI, UNITED STATES DISTRICT JUDGE.

**Opinion by:** WILLIAM J. MARTINI

## Opinion

**LETTER OPINION**

Dear Litigants:

This matter comes before the Court on Defendants' Motion for Summary Judgment seeking dismissal of the Amended Complaint, pursuant to *Fed. R. Civ. P. 56*. There was no oral argument. *Fed. R. Civ. P. 78*. For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED** and the Amended Complaint is dismissed.

### I. BACKGROUND

Defendant Acme Food Corp. ("Acme") operates retail grocery stores in several U.S. states including New Jersey. (Declaration of Jennifer Schwarz ("Schwarz Decl.") P 2). Defendant Robert George ("George") is Acme's Manager of Loss Prevention. (Declaration of Joseph Mastalski ("Mastalski Decl." P 2)). *Pro se* plaintiff Moses Delbridge ("Plaintiff" or "Delbridge"), who is African-American and was 18 years old at the start of this litigation, was employed at Acme's grocery store in Jersey City, New Jersey, from July 2004 until he was terminated in late September 2006. He was employed **[*2]** first as a clerk, performing bagging and checking duties, and was eventually promoted to a customer service representative position. (Schwarz Decl. Exs. F-G; Declaration of Carl Luthke ("Luthke Decl.") P 3; Delbridge Dep. Tr. 14:10-24, 26:25-29:5). During the entirety of his employment with Acme, Plaintiff was a member of the United Food and Commercial Workers Local 1245 (the "Union"). (Schwarz Decl. P 4; Delbridge Dep. Tr. 25:2-19).

Acme maintains an "Honesty and Accuracy" policy, to which all employees are subject. (Luthke Decl. P 4, Ex. A., at D00148). The policy prohibits coupon fraud and conspiring with any other employee to commit coupon

fraud or otherwise violate company policy. Coupon fraud includes using the same coupon more than once. (Luthke Decl. P 4, Ex. A., at D00148). Plaintiff was aware of the policy and received training in which he learned that it was improper to use a coupon more than once. (Delbridge Dep. Tr. 21:13-21, 23:2-24:5, 60:25-61:3).

In September 2006, Acme employees initiated an investigation into coupon fraud at the Jersey City store. (Mastalski Decl. PP 4-5). On September 26, 2006, Defendant George viewed surveillance tapes in connection with the investigation. **[*3]** A tape from September 3, 2006 showed Plaintiff engaging in several register transactions at a cash register assigned to employee Ashley Thomas ("Thomas"). (Mastalski Decl. P 5; Delbridge Dep. Tr. 38:9-14, 39:17-21). Recording technology used by Acme and installed on all registers confirms that the employee card used for these transactions belonged to Plaintiff and that the same coupon was used more than once for these transactions, in violation of company policy. (Delbridge Dep. Tr. 35:18-36:6; Mastalski Decl. P6, Exs. A-D). Plaintiff concedes that his employee card was used for these transactions, and that it was used with his knowledge and consent. (Delbridge Dep. Tr. 38:3-8, 39:13-40:4, 44:19-45:4.) However, Plaintiff asserts that it was Thomas who committed the coupon fraud, without his knowledge. (Pl. Opp. Br. at 21). Indeed, he argues that the surveillance tape shows that he was standing next to Thomas and her register while she used his card, but that he was staring out the window and not paying attention to Thomas or what she was doing with his card at her register. (*Id.*). The tape was not provided during discovery and is not available. Defendants assert that it was not preserved **[*4]** due to a technological glitch; Plaintiff alleges that Defendants deliberately destroyed it because it vindicated Plaintiff. (Pl. Opp. Br. at 25).

After viewing the tapes, George interviewed Plaintiff with respect to the September 3 transactions. Although Plaintiff alleges that he requested to have a union representative attend his interview, no representative was made available or provided to him. (Delbridge Dep. Tr. 41:13-42:3). During the interview, Plaintiff was shown the surveillance video. (Delbridge Dep. Tr. 36:11-17). Plaintiff also wrote out a statement acknowledging responsibility for the misuse of the coupons and signed a promissory note agreeing to repay $ 14.00 to the store. (Delbridge Dep. Tr. 40:5-41:2, 64:4-17; Mastalski Decl. P 11, Ex. G). Plaintiff now states that he was coerced into writing the statement and that George

doctored the date on promissory note. (Pl. Opp. Br. at 12, 23-24). He does not convincingly explain how the alleged altering of the date furthered the coupon fraud allegations against him. After the interview, Plaintiff was suspended. (Delbridge Dep. Tr. 40:25-41:2).

The results of the investigation were reviewed by Joseph Mastalski and Carl Luthke ("Luthke"), **[*5]** Acme's Associate Relations Manager. (Mastalski Decl. P 12, Luthke Decl. P 6). Based upon the review, Luthke made the decision to terminate Plaintiff. (Luthke Decl. PP 8-9). Additional employees who were also allegedly involved in the coupon fraud and policy violation were terminated at the same time. (Delbridge Decl. 48:19-49:2; Luthke Decl. P 12; Schwarz Decl. P 10, Ex. E). These additional terminated employees had previously self-identified themselves in personnel documents as black, white, and Hispanic. (Schwarz Decl. P 12, Ex. E; Luthke Decl. P 10).

After his involuntary termination, Plaintiff filed a grievance with the Union. (Delbridge Dep. Tr. 68:24-69:1). On April 20, 2007, a grievance meeting was held and attended by Plaintiff, Union officials, George, and other Acme employees. (Delbridge Dep. Tr. 70:14-71:10; Luthke Decl. P 14, Ex. E). The grievance was denied. (Delbridge Dep. Tr. 70:14-71:10; Luthke Decl. P 14, Ex. E). The Union then appealed the denial of the grievance to arbitration. The arbitration hearing took place on April 22, 2008. (Delbridge Dep. Tr. 77:25-78:22; Declaration of Kelly L. Bannister ("Bannister Declaration") Ex. E). The arbitrator subsequently issued **[*6]** an opinion, finding that Plaintiff was not credible and that there existed just cause to terminate Plaintiff. (Delbridge Dep. Tr. 104:25-105:16; Bannister Decl. Ex. E).

On August 6, 2008, Plaintiff filed a Complaint against Acme and George in New Jersey Superior Court, Hudson County. (Docket Entry No. 1). Defendants removed the case to federal court. (Docket Entry No. 1). Defendant George filed a motion to dismiss in October 2008, which was granted in part, but Plaintiff was given the opportunity to file an amended complaint. (Docket Entry No. 18). Plaintiff filed the Amended Complaint on January 17, 2009. (Docket Entry No. 21). The Amended Complaint does not appear to contain some of the allegations from the original complaint that were not dismissed, so given Plaintiff's *pro se* status, the Court will consider the Amended Complaint to incorporate the portions of the first Complaint that were not dismissed.

Plaintiff's Amended Complaint alleges that Acme

terminated his employment, not because of the coupon fraud, but because Plaintiff is black and Acme wanted to terminate as many black employees as possible before the statutory minimum wage increased in October 2006. (Amended Complaint **[*7]** PP 3-4). Plaintiff alleges that Defendants violated his rights pursuant to *NLRB v. Weingarten, 420 U.S. 251, 95 S. Ct. 959, 43 L. Ed. 2d 171 (1974)* and the *Fourth*, *Fifth*, and *Fourteenth Amendments to the U.S. Constitution*, that he was wrongfully terminated, that he was discriminated against on the basis of his race in violation of the New Jersey Law Against Discrimination, *N.J.S.A. § 10:5-1 et seq.* ("NJLAD"), and Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* ("Title VII"), and that the arbitration decision upholding his termination should be vacated. Presently before the Court is Defendants' Motion for Summary Judgment or, in the alternative, for dismissal pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim for which relief can be granted.

## II. ANALYSIS

### A. Standard of Review

Summary judgment eliminates unfounded claims without resorting to a costly and lengthy trial. *See Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. However, a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled **[*8]** to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *See Celotex Corp., 477 U.S. at 323*. A litigant may discharge this burden by exposing "the absence of evidence to support the nonmoving party's case." *Id. at 325*. In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)*.

Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*;

*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The substantive law determines which facts are material. *Id. at 248*. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

### B. Plaintiff's Claim Pursuant to *NLRB v. Weingarten*

Plaintiff alleges that Defendants violated his **[*9]** "civil rights pursuant to the *Weingarten* rights." The Supreme Court's decision in *NLRB v. Weingarten, 420 U.S. 251, 95 S. Ct. 959, 43 L. Ed. 2d 171 (1974)*, entitles employees who are union members to union representation during investigatory interviews. *NLRB v. Weingarten, 420 U.S. 251, 95 S. Ct. 959, 43 L. Ed. 2d 171*. However, it is well settled that the National Labor Relations Board ("NLRB") has exclusive jurisdiction over all actions pertaining to alleged unfair labor practices. *See Voilas v. Gen Motors Corp., 170 F.3d 367, 378 (3d Cir. 1999)* (finding that causes of action related to prohibited and unfair labor practices are preempted by the NLRB's exclusive jurisdiction). Therefore, this claim is preempted and not properly before this Court. It must be dismissed as a matter of law.

### C. Plaintiff's Constitutional Claims

Plaintiff next alleges that Defendants' conduct violated his civil rights with respect to the *Fourth*, *Fifth*, and *Fourteenth Amendments to the U.S. Constitution*. However, to state a valid claim for damages pursuant to the *Fifth* and *Fourteenth Amendments*, the alleged misconduct must have been committed a party acting under color of state law. *See Rendell-Baker v. Kohn, 457 U.S. 830, 837, 102 S. Ct. 2764, 73 L. Ed. 2d 418* (stating that the "*Fourteenth Amendment*" . **[*10]** . applies to acts of the states, not to acts of private persons or entities"); *see also Balazinski v. Webster Lines, 2009 U.S. Dist. LEXIS 23809, 2009 WL 799285, *3* (finding that there is no cause of action for alleged violations of the *Fifth* or *Fourteenth Amendments* committed by private actors, "no matter how discriminatory or wrongful" the conduct). Similarly, claims brought under the *Fourth Amendment* are not sustainable where the alleged violator is not a state actor. *See Jevic v. Coca Cola Bottling Co. of N.Y., Inc.* (finding that the *Fourth Amendment* only covers the conduct of state actors). Simply stated, there is no cause of action for alleged violations of these Amendments by private actors.

Here, Defendant Acme is an operator of retail grocery stores and Defendant George is Acme's employee. Plaintiff has made no allegations that either Acme or George are state actors or that they engaged in any of the alleged misconduct while acting under color of state law. Nor is there any record evidence to this effect. Therefore, these claims must be dismissed as a matter of law.

## D. Plaintiff's Wrongful Termination Claim

Plaintiff alleges that he was wrongfully terminated on the basis of his race and because Defendant **[*11]** Acme wanted to discharge black employees before the minimum wage increased in October 2006. This claim therefore appears to allege wrongful discharge in violation of public policy. However, New Jersey courts have routinely held that common law claims for wrongful discharge in violation of public policy are preempted when a statutory remedy exists under the NJLAD. _Santiago v. City of Vineland, 107 F. Supp. 2d 512, 567 (D.N.J. 2000)_. Therefore, Plaintiff's wrongful termination claims based on race must be asserted exclusively pursuant to the NJLAD. The duplicative common law claim must be dismissed.

## E. Plaintiff's Statutory Race Discrimination Claims (NJLAD and Title VII)

Plaintiff alleges race discrimination under both Title VII and the NJLAD. Both claims can be addressed together, as the standard framework for analyzing such claims is the same under both the federal and the state statute. _Hood v. Pfizer, Inc., 2009 U.S. App. LEXIS 8062, 2009 WL 1019993, *2 (3d Cir.)_; _Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447, 867 A.2d 1133 (2005)_.

In order for Plaintiff to establish a prima facie claim of racial discrimination, he must demonstrate that (1) he is a member of a protected group, (2) he was reasonably performing his job, (3) **[*12]** he suffered an adverse employment action such as termination, and (4) defendant employer sought someone else to perform his job. See _Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410-411(3d Cir. 1999)_; _Zive, 182 N.J. at 450_. After the plaintiff successfully demonstrates a prima facie case, the burden shifts to the defendant employer to articulate a "legitimate, non-discriminatory reason" for the adverse employment action. _McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)_; _Stanziale v. Jargowsky, 200 F.3d_

_101, 105 (3d Cir. 2000)_. If the defendant employer meets this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reasons offered by the defendants are mere pretext for discrimination. _McDonnell Douglas, 411 U.S. at 804-805_; _Buchanan v. Pennsylvania, 47 Fed. Appx. 117, 118 (3d Cir. 2002)_.

Here, Plaintiff may well have established a prima facie case of racial discrimination. However, establishing a prima facie case is not difficult, and in this situation has little bearing on the ultimate disposition of Plaintiff's claims. See _Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1993)_ (finding that because **[*13]** "the prima facie case is easily made out, it is rarely the focus of the ultimate disagreement"). Defendants have articulated a legitimate and non-discriminatory reason for the termination, namely Plaintiff's violation of Acme's honesty policy with respect to coupon fraud. Plaintiff has not provided any evidence showing that the coupon fraud accusations were a mere pretext for discharging him based upon racial animus. Moreover, of the other employees fired for coupon fraud, at least one was Hispanic and at least one was white. In addition, of the employees hired to replace Plaintiff and the others fired for coupon fraud, at least some were black. (Schwarz Decl. P 9, Ex. E.)

In his opposition brief, Plaintiff makes much of his allegations that the coupon fraud investigation and subsequent investigatory interview process were not conducted in an entirely thorough or organized manner. Specifically, in support of his claim of racial discrimination, he alleges that Defendants destroyed the videotape that would have vindicated him, improperly denied his request to have union representation during his interview, and forced him to write a statement with which he did not agree. While these allegations, **[*14]** if substantiated, may be regrettable or indicative of poor management on Acme's part, Plaintiff provides no evidence to support them.

More importantly, even if these allegations were true, they are irrelevant. The Third Circuit has routinely held that "pretext is not shown by evidence that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." _Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005)_. To overcome Defendants' proffered legitimate and non-discriminatory reason for the termination, Plaintiff would have to demonstrate not only that the reason was wrong but that

it was so plainly wrong it could not have possibly been the employer's real reason. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). Here, Defendants conducted a legitimate investigation into Plaintiff's participation in coupon fraud. The investigation yielded uncontroverted evidence that Plaintiff's employee card had been used in transactions during which coupons had been used more than once, among other findings. Defendants based their decision **[*15]** to terminate Plaintiff on these findings. Even if their decision was wrong, mistaken, or hastily made, they had a good faith basis for making it.

In addition, whether or not Plaintiff was terminated for just cause was the central question at issue during the arbitration. In that proceeding, the arbitrator concluded that Plaintiff's termination was for just cause. Specifically, the arbitrator found that there was "nothing in this record indicating that the Employer's investigation was tainted or unfair in any material respect or that his treatment of [Plaintiff] was discriminatory or selective." New Jersey courts have held that an arbitrator's decision that a party was discharged for just cause weighs against finding that a proffered legitimate reason was mere pretext. *Mersmann v. Continental Airlines, Inc., 2006 N.J. Super. Unpub. LEXIS 393, 2006 WL 507842, *4 (N.J. Super. App. Div.).* With nothing in the record to suggest that Defendants' proffered legitimate reason for the employment decision was pretext, these claims must be dismissed as well.

### F. Plaintiff's Argument that the Arbitration Decision Should be Vacated

District courts give tremendous discretion to an arbitrator's decision in a labor dispute, in large part **[*16]** because the decision to use arbitration for dispute resolution was made in advance by the parties when they entered into heavily negotiated collective bargaining agreements. *Citgo Asphalt Refining Co. v. Paper, Allied-Indus., Chem. and Energy Workers Int'l Union Local No. 2-991, 385 F.3d 809, 815 (3d Cir. 2004).* To give district courts full blown powers of judicial review would thus be substituting the courts' views for the bargained-upon views of the arbitrator. *Id.* Therefore, for a court to deny enforcement of an award, there must be absolutely no record support whatsoever. *United Food & Commercial Workers Union, Local 464A v. Foodtown, Inc., 2006 U.S. Dist. LEXIS 21091, 2006 WL 932061, *2 (D.N.J.).*

Here, the arbitrator had ample evidence to support its

decision, namely the documentary evidence of the register transactions. The arbitrator also explored whether Plaintiff had actually requested a union representative at the interview and the circumstances under which his statement came to be written. The arbitrator found that Plaintiff was not credible. Moreover, Plaintiff has provided no evidence at all supporting vacatur of the arbitration decision. Therefore, Plaintiff cannot meet his burden for vacatur and **[*17]** this claim fails as well.

### III. CONCLUSION

For the reasons stated above, the Court finds that there are no genuinely disputed material facts that would preclude entry of summary judgment in favor of Defendants. Therefore, Defendants' Motion for Summary Judgment is **GRANTED** and Plaintiff's Amended Complaint is **DISMISSED.**

/s/ William J. Martini

**WILLIAM J. MARTINI, U.S.D.J.**

*End of Document*

No *Shepard's* Signal™
As of: April 29, 2021 6:27 PM Z

## *Solis v. Sher*

Superior Court of New Jersey, Appellate Division

October 31, 2011, Submitted; December 5, 2011, Decided

DOCKET NO. A-3251-10T3

**Reporter**
2011 N.J. Super. Unpub. LEXIS 2939 *; 114 Fair Empl. Prac. Cas. (BNA) 20

ROSE SOLIS, Plaintiff-Appellant, vs. JAY SHER, DDS, Defendant-Respondent.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Prior History:** [*1] On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-7032-09.

## Core Terms

patient, termination, pregnancy, pregnant, maternity leave, proffered, dental hygienist

**Counsel:** Joseph H. Neiman, attorney for appellant.

Javerbaum, Wurgaft, Hicks, Kahn, Wikstrom and Sinins, attorneys for respondent (Gary E. Roth, of counsel and on the brief).

**Judges:** Before Judges Parrillo and Skillman.

## Opinion

PER CURIAM

Plaintiff Rose Solis appeals the summary judgment dismissal of her adverse employment action based on pregnancy discrimination. We affirm.

The facts viewed most favorably to plaintiff, *Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995)*, are as follows. For a twenty-one month period beginning February 10, 2006 and ending November 9, 2007, plaintiff was employed as a dental hygienist by Jay Sher, DDS, LLC, a dental practice solely owned by defendant Jay Sher. Plaintiff married shortly after commencement of her employment and around May 2007, learned she had become pregnant. At the time of her discharge, she was in her eighth month of pregnancy.

On the day she was terminated, two patients complained about plaintiff's work performance and, according to defendant, these complaints were the "last straw" leading to his decision to fire her. Two days earlier, on November 5, 2007, [*2] defendant was obliged to re-treat another patient at no charge "due to plaintiff's inferior work[,]" as he had done only one month before. These re-treatments followed a number of other patient complaints expressing dissatisfaction with plaintiff's demeanor and her teeth cleaning services. Among the deficiencies cited by defendant were plaintiff's "failing to give oral hygiene instruction to patients, leaving teenagers and children alone in the chair, [and] failing to sharpen her instruments . . . ."

In addition to patient complaints, staff members criticized plaintiff's general lack of professionalism. According to defendant's financial coordinator:

[Plaintiff] would bring patients to my desk after completing her treatment and 'slap' the patient's chart on my desk, turn to the patient and say 'see ya' in the most unprofessional way. . . .

[Plaintiff] was trained to pass the patient off to me and to explain the importance of the next visit, but

2011 N.J. Super. Unpub. LEXIS 2939, *2

this was rarely if ever done.

One Saturday morning I had a mild altercation with [plaintiff]. While walking away from me and about to enter her operatory with a patient waiting in her chair, [plaintiff] called me a 'bitch' loud enough so that I **[*3]** heard it while sitting at my desk approximately 20 feet away.

. . . .

I observed that our cancellation rate for hygiene appointments during [plaintiff's] employment tenure was quite high.

. . . .

Several of our patients spoke to me directly and threatened to leave the practice solely because they were unhappy with [plaintiff].

Defendant discussed her job performance with plaintiff in a series of meetings and informal discussions wherein he attempted to explain what was expected of her. Although plaintiff characterizes these reviews as favorable, defendant's contemporaneous handwritten notes of these meetings documented some of the problems he claims persisted throughout her employment. These problems became serious enough that in January 2007, four months before he learned of plaintiff's pregnancy, defendant ran an on-line advertisement with NJJobs.com for a dental hygienist to replace plaintiff, but no one responded.

Despite concerns over plaintiff's attitude and work performance, defendant nevertheless hoped she would improve and actually expected her to return to work after her maternity leave of absence. In fact, when plaintiff first advised defendant she was pregnant in May 2007, defendant **[*4]** and his wife Geri, who was also his office manager, suggested that in scheduling maternity leave, plaintiff accumulate her vacation time in the event she needed to take days off should the baby get sick. This expectation on the part of defendant appeared consistent with his treatment of other staff members who had become pregnant during their tenure with his dental practice. One employee, Marcia Rigillo, had two pregnancy leaves while employed with defendant, and her position was held for her each time. Rigillo ultimately resigned toward the end of her second maternity leave to accept a significantly higher paying job after defendant declined to match her other offer. Olga Stack decided not to return to work after giving birth; however, defendant made it clear to her that she was welcomed back and that her job was available if she wanted to return.

According to plaintiff, however, these experiences made defendant less tolerant of pregnant employees. When defendant first met her husband in May 2006, shortly after their marriage, defendant remarked, "remember no babies, children are overrated." Also, upon learning plaintiff was pregnant sometime in May 2007, defendant's wife supposedly **[*5]** said "congratulations Mom, now I'm going to kill you." And when scheduling plaintiff's maternity leave, defendant and his wife mentioned to plaintiff previous problems with hygienists on maternity leave who never returned to work despite assurances to the contrary.

A few months after plaintiff's termination, defendant hired a new dental hygienist in February 2008. On August 25, 2009, plaintiff filed the instant complaint against defendant alleging wrongful termination because of pregnancy discrimination in violation of the New Jersey Law against Discrimination, *N.J.S.A. 10-5-1 to -42* (LAD). Following defendant's answer and discovery, defendant moved for summary judgment, which the trial judge granted, reasoning:

> Perhaps the most telling proofs that Solis' termination was the unfortunately timed culmination of what Sher perceived to be poor job performance were that (a) Sher ran an online advertisement on NJJOBS.com for a dental hygienist to replace Solis before she became pregnant and (b) the termination occurred one month after Sher had to re-treat a patient at no charge due to Solis' inferior work, two days after Sher had to re-treat a second patient at no charge due to Solis' work, **[*6]** and the same day as two patients complained of Solis' work. It is simply not possible for Solis to raise an inference that Sher's legitimate and non-discriminatory reasons were fabricated or that he terminated her because of her pregnancy. Summary judgment is mandated.

We agree and affirm substantially for the reasons stated by the motion judge in his written decision of February 15, 2011. We add only the following comments.

Under the framework articulated in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973),* which has been adopted in New Jersey to prove disparate treatment under the LAD, *Viscik v. Fowler Equip. Co., 173 N.J. 1, 13-14, 800 A.2d 826 (2002),* plaintiff, by all accounts, established a prima facie case of discrimination. Equally undisputed, defendant proffered a legitimate non-discriminatory reason for plaintiff's termination, namely poor job

Case 2:18-cv-16509-MCA-AME   Document 82-7   Filed 05/07/21   Page 45 of 144 PageID: 737

Page 3 of 3

2011 N.J. Super. Unpub. LEXIS 2939, *6

performance. *See Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 600, 538 A.2d 794 (1988)*. The issue, therefore, comes down to whether or not there is sufficient evidence in the record from which a reasonable factfinder could conclude that the proffered reason for termination was a pretext for discrimination and not the true **[*7]** reason for the employment decision. *See Zive v. Stanley Roberts, Inc., 182 N.J. 436, 449, 867 A.2d 1133 (2005); see also Nini v. Mercer County Community College, 406 N.J. Super. 547, 555, 968 A.2d 739 (App. Div. 2009), aff'd, 202 N.J. 98, 995 A.2d 1094 (2010)*. In other words, we must decide whether, viewing the evidential materials most favorably to plaintiff, together with all reasonable inferences favoring plaintiff, a rational factfinder could find that defendant's proffered reason for terminating plaintiff (poor job performance) was a pretext for the alleged true reason, intentional discrimination because plaintiff was pregnant, *Bergen Commercial Bank v. Sisler, 157 N.J. 188, 211, 723 A.2d 944 (1999)*, and thus whether the wrongful motive "'was more likely than not a motivating or determinative cause of the employer's action.'" *Zive, supra, 182 N.J. at 455-56* (quoting *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994))*. In short, is the employer's proffered non-discriminatory reason unworthy of belief? *Bergen Commercial Bank, supra, 157 N.J. at 211*.

Plaintiff has offered nothing to discredit defendant's proffered reason for her discharge by demonstrating either "weakness, implausibilities, inconsistencies, incoherences, or contradictions" in **[*8]** defendant's proofs, including the many certifications of patients and staff consistently attesting to plaintiff's poor work performance. *DeWees v. RCN Corp., 380 N.J. Super. 511, 528, 883 A.2d 387 (App. Div. 2005)*. Nor is there any proof of disparate treatment or that prior dental hygienists who became pregnant while in defendant's employ were terminated, let alone because of their pregnancy. Just the opposite, the only other hygienists who became pregnant while so employed were asked to return, one of whom actually took two maternity leaves during the course of their employment. Moreover, the comments ascribed to defendant and his wife about plaintiff's pregnancy were, as properly found by the motion judge, "jocular in nature" and, in any event, insufficient to establish a genuinely disputed material fact as to defendant's true motivation.

A plaintiff is required to do more than merely "challenge" a defendant's articulated reason for the discharge; she must satisfy her burden of presenting competent evidence that would permit a rational fact-finder to conclude the proffered reason for discharge was false.

Here, plaintiff has failed to meet that burden. Her proofs, quite simply, amount to no more than **[*9]** her own self-serving perception that her performance was satisfactory. Yet such assertions, without supporting evidence, are "clearly insufficient to create a question of material fact for purposes of a summary judgment motion." *Martin v. Rutgers Cas. Ins. Co., 346 N.J. Super. 320, 323, 787 A.2d 948 (App. Div. 2002); see also Brae Asset Fund, L.P. v. Newman, 327 N.J. Super. 129, 134, 742 A.2d 986 (App. Div. 1999)*. Nor can satisfactory performance be reasonably inferred from any delay in her termination, such as plaintiff suggests, since defendant's forbearance in firing plaintiff has been otherwise credibly explained and remains unchallenged.

It is by now well-settled that the LAD "does not prevent the termination or change of employment of any person who 'is unable to perform adequately the duties of employment, nor [does it] preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards.'" *Zive, supra, 182 N.J. at 446* (quoting *N.J.S.A. 10:5-2.1*); *see also Viscik, supra, 173 N.J. at 13*. That is, the LAD "acknowledges the authority of employers to manage their own businesses." *Ibid*. Here, affording plaintiff all favorable inferences, there is simply **[*10]** no evidence from which a reasonable jury could conclude that defendant's non-discriminatory reason for terminating plaintiff is unworthy of belief or that her pregnancy was the motivating factor in defendant's employment decision.

Affirmed.

---

**End of Document**

 Neutral
As of: April 29, 2021 6:31 PM Z

## *Attanasio v. Plainfield Country Club*

Superior Court of New Jersey, Appellate Division

November 17, 2008, Argued; June 18, 2009, Decided

DOCKET NO. A-1629-07T3

**Reporter**

2009 N.J. Super. Unpub. LEXIS 1592 *; 2009 WL 1686527

FRANCINE ATTANASIO and MARIE STONE, Plaintiffs-Appellants, v. PLAINFIELD COUNTRY CLUB and MANNY F. GUGLIUZZA, Manager and Individually, Defendants-Respondents.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY RULE 1:36-3 FOR CITATION OF UNPUBLISHED OPINIONS.

**Prior History: [\*1]** On appeal from Superior Court of New Jersey, Law Division, Civil Part, Middlesex County, L-5815-05.

## Core Terms

Banquet, elimination, employees, termination, positions, pretext, reasons, infer, discriminatory intent, non-discriminatory, recommended, food and beverage, severance package, insubordination, circumstantial, plaintiffs', age discrimination, summary judgment, motivating, proffered, typing, staff, summary judgment motion, proffered reason, rational jury, defendants', factfinder, retire, salary, hire

**Counsel:** Patricia Breuninger argued the cause for appellant (Breuninger & Fellman and Bramnick, Rodriguez, Mitterhoff, Grabas & Woodruff, attorneys; Ms. Breuninger, and Stephanie A. Mitterhoff, of counsel and on the briefs).

William T. Connell argued the cause for respondent, Plainfield Country Club (Dwyer Connell & Lisbona, attorneys; Mr. Connell, on the brief).

Marion B. Johnson argued the cause for respondent, Manny F. Gugliuzza (Drinker Biddle & Reath, L.L.P., attorneys; Ms. Johnson, on the brief).

**Judges:** Before Judges Carchman, R. B. Coleman and Simonelli.

## Opinion

PER CURIAM

Plaintiffs Francine Attanasio (Attanasio) and Marie Stone (Stone) appeal from the summary judgment dismissal of their age discrimination complaint against defendants Plainfield Country Club (PCC) and Manny F. Gugliuzza (Gugliuzza). We affirm.

The facts are derived from evidence submitted by the parties in support of, and in opposition to, the summary judgment motion, viewed in a light most favorable to plaintiffs. *Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995)*. PCC is a private golf and country club located in Edison. Attanasio, **[\*2]** born December 22, 1946, and Stone, born November 17, 1928, were at-will employees for many years.

Attanasio, was the Assistant Manager from 2002 until June 20, 2005. [1]  Her duties included booking and

---

[1] Attanasio began her employment with PCC in 1988 as a waitress. She received promotions and eventually became the

running banquets, parties and events, hiring and training staff, supervising food and beverage operations, and acting as a liaison with the kitchen staff. Attanasio earned approximately $ 82,000 per year at the time her employment terminated.

Stone was PCC's Executive Secretary from 1976 until April 13, 2005. Her duties included the General Manager's correspondence and typing, typing for the Board of Directors (Board) and committee members, and typing of banquet documents and contracts. She was also responsible for general office duties and filing. She earned approximately $ 47,000 at the time her employment terminated.

At all times relevant to this matter, Gugliuzza was PCC's General Manager and plaintiffs' direct supervisor. He was responsible for PCC's overall management and day-to-day operations. All department heads reported to him.

There is no dispute  [*3] that throughout the 2003 golf season, PCC experienced a substantial loss of operating income due to inclement weather and a general economic downturn in the golf club industry. Also, from December 2003 to December 2004, PCC experienced a substantial loss in banquet revenues, for which Attanasio was responsible. Facing an economic crisis in 2004, the Board directed Gugliuzza to develop a proposal to restructure the club's organization and to reduce operating expenses. In connection with that undertaking, the Board ordered Gugliuzza to review personnel, salaries, expenses and general costs in all departments and to submit cost-cutting recommendations. Also, the Board decided to substantially increase dues and annual membership fees, locker room and locker fees, and driving and practice range fees.

Gugliuzza examined PCC's organizational structure and determined, among other things, that banquet revenues had to be increased. Thus, he determined that the Assistant Manager position would be eliminated and the duties of that position would be divided among two employees: a Banquet Manager and a Food and Beverage Manager. This division of duties would enable the Banquet Manager to focus solely  [*4] on increasing banquet revenues. The Banquet Manager's duties would include some of the former Assistant Manager's banquet duties, except a la carte functions (meaning general member dining), supervising the ordering of food and beverages, and assigning personnel to

banquet functions, which the Food and Beverage Manager would assume. Gugliuzza would also assume some of the former Assistant Manager duties.

After a lengthy review spanning several months, which included numerous meetings with the Board's Executive Committee, Gugliuzza recommended the following:

1. eliminate the Assistant Manager and Executive Secretary positions;
2. eliminate other positions and offer employees alternative, lower-paying positions.
3. reduce the overall head count in the kitchen;
4. eliminate kitchen positions by attrition;
5. reduce the hours assigned to the wait staff;
6. close the club for longer periods of time;
7. examine the overall full-time equivalents employed as wait staff;
8. carefully monitor the costs of greens and greens staff;
9. lease certain pieces of equipment rather than purchasing them; and

Gugliuzza recommended eliminating Stone's position because PCC could function without an Executive Secretary.  [*5] Evidence indicated that over the course of her employment, Stone's ability to perform her job duties became limited. Although PCC provided her specific training to become adept at computer and e-mail use, she allegedly was unable to acquire the requisite skills. As a result, in 2001, PCC hired an Administrative Assistant, Dina Werb-Picchione (Werb-Picchione), to assume some of Stone's typing duties and other functions. After initially assuming Stone's typing duties, Werb-Picchione eventually assumed work from every department. By 2005, many employees gave all their typing work to Werb-Picchione, who was then forty years old.

The Board approved Gugliuzza's recommendations, recognizing that they were the "result of an accumulation of study and investigation and the input of various members and committees throughout [PCC.]" As for Stone, because PCC did not need two secretaries, the Board decided to retain Werb-Picchione as Administrative Assistant because she was qualified to do the job, and gave her a hourly salary increase to $ 21.75. The Board eliminated Stone's position "for cost reduction purposes and not for performance reasons[,]" and "because [her position] was no longer economically  [*6] feasible." It offered Stone a severance package or a demotion to part-time phone receptionist, a position PCC would create for her at a salary of $ 10 per hour.

---

Assistant Manager in 2002.

2009 N.J. Super. Unpub. LEXIS 1592, *6

Gugliuzza recommended eliminating Attanasio's position because other employees could assume that position's duties and responsibilities. He also recommended Attanasio's termination because he believed that she would become insubordinate if offered a lower-paying position. However, instead of terminating Attanasio, in recognition of her years of service, the Board offered her a severance package or the Banquet Manager position, with a $ 56,000 yearly salary. PCC would promote Matt Tolomeo, then age twenty-six, from Snack Bar Manager to Food and Beverage Manager, with a yearly salary increase to $ 54,000. [2] The Board concluded that the combination of Tolomeo's degree in restaurant and hotel management from Johnson and Wales University, his country club management skills, and his stellar performance at PCC, along with Attanasio's practical knowledge and experience, would serve as a good concentration of efforts. Tolomeo would concentrate on food and beverages, and Attanasio would concentrate on banquets.

In her new position, Attanasio would now have to punch a time clock and report to Tolomeo about staffing needs for banquets. She also was no longer permitted to go home during working hours to feed her dog, which she had done for many years.

On or about April 12 and 13, 2005, Gugliuzza met separately with Attanasio and Stone and advised them that PCC was eliminating their respective positions for financial reasons. Attanasio was offered the Banquet Manager position; Stone was offered the phone receptionist position; both were offered the alternative severance package. In response, Attanasio said, "This is not business. This is personal." She then expressed her disapproval to the Board's Vice President. After deliberating extensively, the Board concluded that the offers to Attanasio and Stone were fair.

Attanasio accepted the Banquet Manager position. The Board understood that she did so voluntarily and would properly and professionally perform her job. However, problems with Attanasio's job performance and treatment of other employees, including Gugliuzza and Tolomeo, began almost immediately thereafter. A co-worker described her conduct as "venomous." As [*8] a result, on April 28, 2005, PCC's President, Stan Kosierowski, met with Attanasio and warned her that her conduct would not be tolerated. Kosierowski confirmed this warning in a May 6, 2005 letter to Attanasio as

follows, in relevant part:

You have made it clear that you are upset regarding management's decision to eliminate your job. I informed you that this was not a personal issue; it was a part of a business decision we had to make. The Board of Trustees made cost discipline one of our primary objectives for 2005, and we could not continue to experience the shortfall of previous years. We set the expectation for management to reduce our overall G & A costs to the benchmark levels of other country clubs, while maintaining a high level of membership services.

[Gugliuzza] is responsible for managing the costs and making decisions how best to achieve our budget objectives. As a result, your job as Assistant Manager was eliminated. Even so, given your long service to the club, we wanted to provide you with an employment option, and accordingly we offered you the position of Banquet Manager.

You had a choice, to take the position we had made available to you, or leave, at which time you [*9] would receive a severance package that was additional to our established benefit program, again, in consideration of your service to the club.

You chose to take the position of Banquet Manager, and we were happy you chose to stay at [PCC].

Since you have returned there have been several instances in which you have demonstrated behavior that we cannot tolerate. These include not working together with other members of the staff, and making inappropriate comments about management. This is unacceptable behavior. At our meeting I told you I was not going to go back and investigate the incidents, rather I wanted to make clear our expectations moving forward, so you understood what was expected of you.

We expect you to work together with other employees, and not make inappropriate comments about employees, management, members, or board members. Any future incidents will result in your termination.

. . . .

[PCC] has always maintained a positive work environment for our employees, and we hold to our culture of being fair to everyone. Eliminating your former position was a difficult business decision, but it was one that had to be made.

Also, in a May 18, 2005 e-mail, Gugliuzza advised Attanasio that [*10] he needed to see immediate and

---

[2] Tolomeo earned an hourly [*7] wage prior to his promotion.

Case 2:18-cv-16509-MCA-AME  Document 82-7  Filed 05/07/21  Page 49 of 144 PageID: 741

Page 4 of 8

2009 N.J. Super. Unpub. LEXIS 1592, *10

major improvement in her job performance.

PCC held its Annual Member-Guest tournament in June 2005. By tradition, PCC provided a buffet upon completion of the Thursday practice round. Attanasio knew that PCC's policy permitted members to eat wherever they preferred. However, when a member asked her if he could eat in the men's grill room, she responded, "I'm really sorry. If it was up to me, I would let you but [Gugliuzza] is a fucking asshole and he said nobody can eat back here[.]" The member became irate and began screaming, cursing and yelling. Kathy Eskin, a floor supervisor, overheard Attanasio's comment and told the member, "that's not true. You absolutely can eat back here. That's always been policy here[.]" Attanasio said to Eskin, "Please don't say anything to [Gugliuzza]. Don't tell anybody what I said[.]" Eskin warned Attanasio that she would lose her job if she continued this behavior. Eskin reported the incident to Gugliuzza and told him to "[g]o back there and calm them down." Gugliuzza did so and informed the member that he could eat in the men's grill.

During this same event, Attanasio allegedly told two newly hired waitresses that if they **[*11]** wanted to make large tips in a particular room of the club, they needed to "[j]ust prance . . . around like a piece of meat[.]" The two waitresses complained to Tolomeo and told him what Attanasio had said. Tolomeo then informed Gugliuzza, who determined that Attanasio was insubordinate and had used unacceptable language. [3]

On June 10, 2005, Attanasio was suspended indefinitely without pay. She was terminated for insubordination on or about June 20, 2005. Nevertheless, PCC offered her another severance package, which she declined. Instead, she filed a complaint, alleging age and gender discrimination. [4] After Attanasio's termination, PCC continued to operate without an Assistant Manager. Tolomeo continued as Food and Beverage Manager.

As for Stone, she declined the phone receptionist position and the severance package and resigned. After she left PCC, other employees assumed some of her duties, and PCC implemented **[*12]** an automated telephone system to cover her phone duties. After

Stone's resignation, PCC continued operating without an Executive Secretary. Stone filed a complaint alleging age discrimination based, in part, on Gugliuzza asking her several times when she was going to retire.

Plaintiffs alleged in their complaint that they were among the three oldest employees whose positions were eliminated [5] and that after plaintiffs' terminations much younger employees assumed their job duties. Stone also claimed that Gugliuzza asked her several times when she was going to retire. Plaintiffs also alleged that Gugliuzza was an aider and abettor because he recommended eliminating their positions, which the Board accepted, and because he knew that plaintiffs were PCC's oldest employees when he made the recommendations.

Defendants filed summary judgment motions. The motion judge granted Gugliuzza's motion, finding that he did not violate the LAD. The judge also granted summary judgment to defendants as to Stone, finding that she failed to show that PCC's reasons for eliminating her position were pretext and that age was more **[*13]** likely than not the motivation or determinative cause.

The judge also granted summary judgment as to Attanasio's gender discrimination claim but denied it as to her age discrimination claim, finding sufficient indirect evidence indicating age discrimination. However, after reconsideration, the judge granted summary judgment as to Attanasio's age discrimination claim. In a written opinion, the judge concluded that:

> There is no [direct or indirect] evidence here that Ms. Attanasio's age played any role in elimination of the Assistant Manager position, her hire as Banquet Manager, or her termination of employment. That ultimate termination is justified by defendant's reasonably held belief that Ms. Attanasio was being, at best, inefficient and, at worst insubordinate.
>
> The question is not whether the reasonably held belief was right or wrong, but whether any evidence, direct or circumstantial, shows that the reason offered was a pretext for Ms. Attanasio's termination based on age. *See Ezold v. Wolf, Block, Shorr and Solis-Cohen, 983 F.2d 509 (3d Cir. 1992).* Nothing presented to the court shows either that the economic reasons articulated by the

---

[3] Attanasio claims that one of the waitresses denied making the statement and would testify at trial. However, **Rule 1:6-6** and **Rule 4:46-5(a)** required Attanasio to submit a certification from this witness, which she did not do.

[4] Attanasio has abandoned her gender discrimination claim.

---

[5] PCC also terminated Duke DeCarlo, an eighty-year-old, long-time greens worker.

Case 2:18-cv-16509-MCA-AME   Document 82-7   Filed 05/07/21   Page 50 of 144 PageID: 742

Page 5 of 8

2009 N.J. Super. Unpub. LEXIS 1592, *13

defendant were untrue or exaggerated, on the **[\*14]** one hand, or that Ms. Attanasio's age was more likely than not a motivating or determinative factor in defendant's decision. *Cf. El-Sioufi [v. St. Peter's University Hospital, 382 N.J. Super. 145, 173, 887 A.2d 1170 (App. Div. 1995)]; Josey v. John R. Hollingsworth Co., 996 F.2d 632, 638 (3d Cir. 1993)*.

. . .

This court is not satisfied that Ms. Attanasio has shown that the reasons offered by defendant . . . are merely a pretext for discrimination. *El-Sioufi, supra, [382 N.J. Super.] at 171*.

We use the same standard as the trial court when reviewing a summary judgment motion. *Jolley v. Marquess, 393 N.J. Super. 255, 267, 923 A.2d 264 (App. Div. 2007); Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167, 704 A.2d 597 (App. Div.)*, certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). The motion judge must determine whether the evidence, "when viewed in the light most favorable to the non-moving party," is "sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995)*. Rule 4:46-2(c) requires a court to grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together **[\*15]** with affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment as a matter of law." *R. 4:46-2(c); Brill, supra, 142 N.J. at 528-29*. If there is no genuine issue of fact, we must then decide whether the lower court's ruling on the law was correct. *See Prudential, supra, 307 N.J. Super. at 167*. Applying these standards, we continue our analysis.

In New Jersey, "[a]ll persons shall have the opportunity to obtain employment . . . without discrimination because of . . . age . . . subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right." *N.J.S.A. 10:5-4*. Furthermore:

It shall be an unlawful employment practice, or . . . an unlawful discrimination: a. For an employer, because of . . . age . . . to refuse to hire or employ or to bar or to discharge or require to retire . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]

[*N.J.S.A. 10:5-12a*.]

Generally, "an employer can legally discharge an employee without violating employment **[\*16]** discrimination statutes 'for good reason, bad reason, or no reason at all,' as long as there is no intentional discrimination." *Maiorino v. Schering-Plough Corp., 302 N.J. Super. 323, 345, 695 A.2d 353 (App. Div.)* (quoting *Walker v. A T & T Techs., 995 F.2d 846, 850 (8th Cir. 1993))*, certif. denied, 152 N.J. 189, 704 A.2d 19 (1997). Employers thus may generally manage their business as they see fit, and "are entitled to consider the long-term potential of employees when making business decisions." *Young v. Hobart W. Group, 385 N.J. Super. 448, 463, 897 A.2d 1063 (2005)*; *see also Viscik v. Fowler Equip. Co., 173 N.J. 1, 13, 800 A.2d 826 (2002)*. "Hence, '[t]here is no princip[le] of law that requires that a business' decision be popular with employees. As long as the decision is not based on unlawful age discrimination, 'the courts have no business telling [companies] . . . how to make personnel decisions, which may be objectively or subjectively based.'" *Maiorino, supra, 302 N.J. Super. at 345-46* (quoting *Walker v. AT&T Technologies, 995 F.2d 846, 850 (8th Cir. 1993))*.

An employee alleging discrimination must first establish a prima facie case. *Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447-50, 867 A.2d 1133 (2005)*. In the absence of direct evidence of **[\*17]** discrimination, the plaintiff's claims must be analyzed under the burden shifting paradigm established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. *See also Zive, supra, 182 N.J. at 447; Bergen Commercial Bank v. Sisler, 157 N.J. 188, 209-10, 723 A.2d 944 (1999)*.

Where there is no direct evidence of discrimination, the plaintiff-employee must first establish a prima facie case by showing that: (1) she was in a protected class; (2) she was performing her job at a level that met the employer's legitimate expectations; (3) she was nevertheless discharged; and (4) the employer sought someone else to perform the same work after she left.

[*DeWees v. RCN Corp., 380 N.J. Super. 511, 523, 883 A.2d 387 (App. Div. 2005)* (citing *Mogull v. CB Commercial Real Estate Group, Inc., 162 N.J. 449, 462, 744 A.2d 1186 (2000))*.]

*See also Zive, supra, 182 N.J. at 450; Young, supra, 385 N.J. Super. at 458*.

2009 N.J. Super. Unpub. LEXIS 1592, *17

In an age discrimination case, "[t]he focal question is not necessarily how old or young the claimant or [her] replacement was, but rather whether the claimant's age, in any significant way, 'made a difference' in the treatment [s]he was accorded by his employer." *Petrusky v. Maxfli Dunlop Sports Corp., 342 N.J. Super. 77, 82, 775 A.2d 723 (App. Div. 2001)*. **[*18]** Under the LAD, the plaintiff must "'show that the prohibited consideration[, age,] played a role in the decision making process and that it had a determinative influence on the outcome of that process.'" *Bergen Commercial, supra, 157 N.J. at 207* (quoting *Maiorino, 302 N.J. Super. at 344*).

If the plaintiff can establish a prima facie case, that "creates a presumption of discrimination. The burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for plaintiff's discharge." *DeWees, supra, 380 N.J. Super. at 523* (citing *Mogull, supra, 162 N.J. at 462*; *Bergen Commercial Bank, supra, 157 N.J. at 210*); *see also Zive, supra, 182 N.J. at 449*. "[T]he defendant's burden is only to introduce sufficient evidence to create a genuine factual issue concerning the existence of a legitimate justification for the action." *Massarsky v. Gen. Motors Corp., 706 F.2d 111, 118 (3d Cir.)* (citing *Croker v. Boeing Co., 662 F.2d 975, 991 (3d Cir. 1981)*), *cert. denied, 464 U.S. 937, 104 S. Ct. 348, 78 L. Ed. 2d 314 (1983)*. The defendant-employer is not required to prove that the non-discriminatory reason it produces actually motivated its behavior because throughout the burden-shifting **[*19]** analysis, the ultimate burden of persuasion to prove intentional disparate treatment lies with the plaintiff-employee. *Maiorino, supra, 302 N.J. Super. at 347*. The employer's burden is one of production, not of persuasion. *Greenberg v. Camden County Vocational & Tech. Schools, 310 N.J. Super. 189, 199, 708 A.2d 460 (App. Div. 1998)*.

"Once the employer produces evidence of a legitimate reason for the discharge, the presumption of discrimination disappears, and the burden shifts back to plaintiff to prove that the employer's reasons were a pretext for discrimination." *DeWees, supra, 380 N.J. Super. at 523-24* (citing *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 2751-52, 125 L. Ed. 2d 407, 422 (1993))*; *see also Zive, supra, 182 N.J. at 449*. It is important to note that the employee's personal disagreement with the employer's determination of its needs or assessment of the employee's performance is insufficient to prove pretext, as is the employee's subjective disagreement (or conclusory statement) in raising an issue regarding the employer's credibility.

*Pepe v. Rival Co., 85 F. Supp. 2d 349, 379 (D.N.J. 1999)*, *aff'd, 254 F.3d 1078 (3d. Cir. 2001)*; *Retter v. Georgia Gulf Corp., 755 F. Supp. 637 (D.N.J. 1991)*, **[*20]** *aff'd, 975 F.2d 1551 (3d Cir. 1992)*; *Swider v. HALO Indus., 134 F. Supp. 2d 607 (D.N.J. 2001)*. "The ultimate burden of proof always remains with the plaintiff." *DeWees, supra, 380 N.J. Super. at 524* (citing *St. Mary's, supra, 509 U.S. at 518, 113 S. Ct. at 2753, 125 L. Ed. 2d at 423*).

"'[T]o prove pretext . . . a plaintiff must do more than simply show that the employer's [proffered legitimate, non-discriminatory] reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent.'" *El-Sioufi, supra, 382 N.J. Super. at 173* (quoting *Viscik, supra, 173 N.J. at 14 (2002))*. The plaintiff

must submit evidence that either casts sufficient doubt upon the employer's proffered legitimate reason so that a factfinder could reasonably conclude it was fabricated, or that allows the factfinder to infer that discrimination was more likely than not the motivating or determinative cause of the termination decision.

[*Ibid.* (quoting *Svarnas v. AT&T Commc'ns, 326 N.J. Super. 59, 82, 740 A.2d 662 (App. Div. 1999))*.]

"To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at **[*21]** issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)*. Rather, the plaintiff must submit evidence to "allow a factfinder to reasonably infer" that the employer's articulated, nondiscriminatory reason "was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id. at 764*.

Here, plaintiffs contend that age was the reason PCC eliminated their positions. Defendants counter that economic necessity was the reason, and that PCC terminated Attanasio for insubordination. Citing *Murray v. Newark Housing Authority, 311 N.J. Super. 163, 709 A.2d 340 (Law Div. 1998)*, plaintiffs respond that even if economic necessity was the reason, defendants failed to meet the additional requirement that they proffer a legitimate, nondiscriminatory reasons for selecting them instead of Tolomeo and Werb-Picchione, who assumed their duties.

Case 2:18-cv-16509-MCA-AME   Document 82-7   Filed 05/07/21   Page 52 of 144 PageID: 744

Page 7 of 8

2009 N.J. Super. Unpub. LEXIS 1592, *21

Plaintiffs misapply *Murray*. There, budgetary considerations required the lay-off of provisional employees. *Id. at 176*. The employer randomly selected plaintiffs, who were three out of **[*22]** six provisional employees, without explaining the means by which it made the selection. *Ibid*. Here, PCC did not randomly select plaintiffs' positions for elimination. It made the selection only after reviewing and accepting Gugliuzza's long-term reorganization and cost-cutting study. Also, PCC fully explained the means by which it made its decision to eliminate plaintiffs' positions and to retain Tolomeo and Werb-Picchione. Accordingly, we are satisfied that defendants have met the additional requirement *Murray* imposed.

The question then is whether plaintiffs have created a genuine issue of material facts that defendants' proffered reason for eliminating their positions was pretext, and that age discrimination was more likely than not a motivating or determinative cause. Plaintiffs contend that their circumstantial evidence permits an inference that age motivated the decision to eliminate their positions. We disagree.

"The Third Circuit . . . established the standard, on a motion for summary judgment, for determining whether a plaintiff alleging discrimination has produced sufficient evidence to rebut the employer's alleged legitimate reason for its adverse action[,]" which New Jersey **[*23]** has "adopted and consistently applied[.]" *DeWees, supra, 380 N.J. Super. at 527-28* (citing *Fuentes, 32 F.3d 761-62*). The *Fuentes* court held that a plaintiff may defeat a summary judgment motion "by *either* (1) discrediting the proffered reasons, either circumstantially or directly, or (2) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes, 32 F.3d at 764*.

As to the first means of proof, the *Fuentes* court explained that:

the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' . . . and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'

[*Id. at 765* (internal citations omitted).]

Even affording plaintiffs all favorable inferences, and considering their circumstantial evidence, based upon our careful review of the record we are satisfied that no rational juror could possibly infer discriminatory intent in the elimination **[*24]** of their positions. For instance, plaintiffs rely heavily on the fact that they were two of PCC's oldest employees when PCC eliminated their positions and were each replaced by persons significantly younger. Furthermore, Stone contends that questions about when she planned to retire circumstantially permit one to infer discriminatory intent and that management was looking to eventually terminate her for a younger employee. Also, plaintiffs believe that defendants' denial that the elimination of their positions was in any way related to job performance, and failure to undertake any comparison of job skills between Attanasio and Tolomeo, permit a jury to infer discriminatory intent.

These facts and plaintiffs' arguments would be persuasive had there been *any* indication of discriminatory intent prior to the elimination of their positions. However, in the absence of such facts, and in light of the overwhelming evidence of PCC's struggling business, conceded even by plaintiffs, combined with evidence of Attanasio's insubordination and Stone's inability to adequately perform her job duties, no rational juror could infer that plaintiffs were unfairly targeted simply because of their age. The **[*25]** inquiry "must concern pretext, and is not an independent assessment of how we might evaluate and treat a loyal employee." *Healy v. N.Y. Life Ins. Co., 860 F.2d 1209, 1216 (3d Cir. 1988)* (citing *Thornbrough v. Columbus and Greenville R.R. Co., 760 F.2d 633, 647 (5th Cir. 1985))*, *cert. denied*, 490 U.S. 1098, 109 S. Ct. 2449, 104 L. Ed. 2d 1004 (1989).

Further, even if it could be inferred that Gugliuzza was "grooming" Tolomeo to advance in the organization and to eventually take Attanasio's job, there is no evidence that he did so because of Attanasio's age. Rather, Gugliuzza was focusing on the position, not the person, in his decision to eliminate Attanasio's position, and on PCC's organizational and cost-cutting needs. If PCC truly sought to terminate Attanasio because of her age, it would have simply done so initially rather than offer her a new position.

Contrary to plaintiffs' belief, the trial judge did not "weigh" any evidence presented on the motion. Rather, he correctly determined that viewing the evidence in a light most favorable to them, no rational jury could infer discriminatory intent in light of the evidence presented.

2009 N.J. Super. Unpub. LEXIS 1592, *25

Other than Gugliuzza's comments made to Stone about **[*26]** when she planned to retire, she has proffered no evidence from which a rational juror could reasonably infer that defendants' proffered reason was pretext and that more likely than not age was a motivating factor behind the elimination of her position. Conversely, it is undisputed that PCC's serious financial crisis forced cost reductions.

Likewise, Attanasio has proffered no evidence of discriminatory intent prior to being offered the Banquet Manager position or the severance package. There is no evidence demonstrating discriminatory intent or animus relating to age on PCC's or Gugliuzza's part. At most, Attanasio has alleged circumstantial evidence of age discrimination because a significantly younger employee, Tolomeo, assumed some of her Assistant Manager duties. However, this is a weak inference in light of Tolomeo's background and experience in food and restaurant management and in light of defendants' initial decision to split Attanasio's duties between her and Tolomeo rather than terminate her. Evidence shows that prior to her the elimination of her Assistant manager position, Attanasio could not increase banquet revenues, for which she was responsible'.

Finally, evidence of **[*27]** Attanasio's conduct following her acceptance of the Banquet Manager position could reasonably be viewed by a rational jury as insubordination, and thus, nondiscriminatory grounds upon which PCC terminated her. Plaintiffs have the burden to cast doubt on defendants' legitimate non-discriminatory reasons, and without having put forth some evidence to do so, we will not disturb an otherwise valid business decision. *Ezold, supra, 983 F.2d at 527.*

Having concluded that summary judgment was properly granted, we need not address plaintiffs' remaining contention that the judge erroneously dismissed Gugliuzza as an aider and abettor under *N.J.S.A. 10:5-12(e)*. *R. 2:11-3(e)(1)(E)*.

Affirmed.

---

End of Document

 Positive
As of: April 29, 2021 6:33 PM Z

## Ali v. Woodbridge Twp. Sch. Dist.

United States District Court for the District of New Jersey

April 30, 2019, Decided; April 30, 2019, Filed

Civil Action No. 17-2210

**Reporter**
2019 U.S. Dist. LEXIS 72877 *; 2019 WL 1930754

JASON MOSTAFA ALI, Plaintiff, v. WOODBRIDGE TOWNSHIP SCHOOL DISTRICT, et al., Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Affirmed by *Ali v. Woodbridge Twp. Sch. Dist., 2020 U.S. App. LEXIS 12906 (3d Cir., Apr. 22, 2020)*

## Core Terms

termination, alleges, teacher, comments, links, classroom, reasons, hostile work environment, defamation, Holocaust, articles, entitled to summary judgment, summary judgment motion, posting, Counts, notice, rights, false light, remarks, agrees, work environment, anti-Semitic, meetings, religion, defamatory statement, non-discriminatory, articulated, Deposition, defamatory, hostile

**Counsel: [*1]** For JASON MOSTAFA ALI, Plaintiff: DAYNA R. KATZ, LEAD ATTORNEY, DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis, Lehrer, Warren, NJ; NICHOLAS F. POMPELIO, DIFRANCESCO BATEMAN, WARREN, NJ.

For WOODBRIDGE TOWNSHIP SCHOOL DISTRICT, WOODBRIDGE BOARD OF EDUCATION, GLENN LOTTMAN, individually and in his official capacity as Principal, ROBERT ZEGA, individually and in his official

capacity as Superintendent of Schools, Defendants: ARI D. SCHNEIDER, LEAD ATTORNEY, The Busch Law Group LLC, Metuchen, NJ; ERIC L. HARRISON, LEAD ATTORNEY, METHFESSEL & WERBEL, ESQS., EDISON, NJ; LESLIE ANNE KOCH, LEAD ATTORNEY, METHFESSEL & WERBEL, EDISON, NJ.

**Judges:** Hon. Madeline Cox Arleo, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Madeline Cox Arleo

## Opinion

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of a Motion for Summary Judgment filed by Defendants Woodbridge Township Board of Education, Woodbridge Township School District (collectively, "Woodbridge" or the "District"), Superintendent Robert Zega ("Zega"), and Principal Glenn Lottman ("Lottman" or when referenced collectively with Woodbridge and Zega, "Defendants"), against Plaintiff Jason Mostafa Ali ("Ali" or "Plaintiff"). ECF No. 25. Plaintiff opposes **[*2]** the Motion. ECF No. 28. For the reasons set forth below, the Motion is **GRANTED IN PART** and **DENIED IN PART**. The sole surviving claim is remanded to the New Jersey Superior Court for lack of subject-matter jurisdiction.

**I. BACKGROUND**

2019 U.S. Dist. LEXIS 72877, *2

This employment dispute raises the question of whether a teacher can be terminated for allowing access to repugnant, anti-Semitic, and inflammatory media as part of a high school history lesson on the terrorist attacks that occurred on September 11, 2001. Plaintiff alleges that Defendants unlawfully terminated his employment because of his race and religion. Plaintiff further alleges that Defendants failed to provide him with sufficient notice of his rights in connection with his termination under the Open Public Meetings Act and the Consolidated Omnibus Budget Reconciliation Act.

Plaintiff also alleges that Defendants made defamatory statements in violation of the common law and Plaintiff's due process rights, and asserts claims for violation of his *First Amendment* rights to Freedom of Speech and Academic Freedom.

**A. Facts**

**1. Plaintiff's Employment at Woodbridge**

Plaintiff was employed as a non-tenured history teacher at Woodbridge High School from September 2015 to September **[*3]** 2016. Defendants' *Local Rule 56.1* Statement of Material Facts ("SOMF")[1] at ¶¶ 2, 6, 58, 69. Plaintiff is of Egyptian descent. Id. ¶ 7. He identifies as a nonpracticing Muslim. Id.

Defendant Glenn Lottman is the principal of Woodbridge High School. Id. ¶ 4. Defendant Robert Zega is the Superintendent of Schools for the Woodbridge Township School District. Id. ¶ 5. Plaintiff knew both Lottman and Zega prior to his employment with the Woodbridge Township School District. See id. ¶¶ 9-12, 14. Plaintiff had previously worked as a substitute teacher at a Woodbridge elementary school where Zega worked as the principal. Deposition of Jason Ali, Jan. 9, 2018 ("Ali Dep., Day 1") at 21:12-22:7 (ECF No. 25.6 at

56-57).[2] Zega provided a letter of recommendation in support of Plaintiff's application for employment with the Keansburg School District, where Plaintiff ultimately worked as a tenured high school teacher. Id. at 21:12-22:1 (ECF No. 25.6 at 56-57); SOMF ¶ 18. He was employed by Keansburg from 2011 to 2015. Ali Dep., Day 1 at 23:10-18 (ECF No. 25.6 at 58).

After Plaintiff applied for a full-time teaching position at Woodbridge High School, he interviewed with Principal Lottman **[*4]** and History Department Supervisor Matthew Connelly ("Connelly"). SOMF ¶ 15. Superintendent Zega subsequently recommended Plaintiff for hire to the Board of Education. Id. ¶ 17. Plaintiff believes—and Woodbridge acknowledges—that both Lottman and Zega knew Plaintiff was Egyptian before he was hired by the District. Id. ¶ 13; Defs.' Br. at 5 (ECF No. 25.3 at 12).

**2. Plaintiff's Holocaust Instruction**

During Plaintiff's first year of employment at Woodbridge, Connelly received internal complaints about Plaintiff's instruction on the Holocaust. SOMF ¶¶ 21, 24. One English teacher advised Connelly that "her students were questioning historical accounts of the Holocaust, opining that 'Hitler didn't hate the Jews,' [and] that statistics on the death counts were 'exaggerated.'" Id. ¶ 24. The English teacher advised Connelly that the students received this information from Plaintiff. Id.

Discovery revealed that many of Plaintiff's students submitted written assignments embracing theories of Holocaust denial. In a vocabulary assignment, one student wrote: "Adolf Hitler was the leader of Germany. He is looked at as a bad guy but in reality brought Germany out of its great depression." Id. ¶ 29. In **[*5]** an essay, another student expressed the following beliefs:

> I think that what they claim happened in the concentration camps did not really happen. I highly doubt that everyday [sic] Jews were burned. I doubt that they were whipped and beat for nothing at all. What I do believe however is that they had a much easier and more enjoyable life in the camps. Even though they were not at home, they felt like they were.

---

[1] Facts derived from the SOMF are undisputed unless otherwise noted. Moreover, where facts in a party's statement are supported by evidence in the record and denied by the opposing party without citation to conflicting evidence, the Court deems such facts undisputed. See *Fed. R. Civ. P. 56(e)(2)-(3)*; *Carita v. Mon Cheri Bridals, LLC, 10-2517, 2012 U.S. Dist. LEXIS 87472, 2012 WL 2401985, at *3 (D.N.J. June 25, 2012)*.

[2] The Court notes that the exhibits contained in Defendants' submission are nearly illegible and directs counsel to screen all future submissions for clarity and legibility.

2019 U.S. Dist. LEXIS 72877, *5

Id. ¶ 33. When asked whether this was an "appropriate conclusion" for a student to reach, Plaintiff answered, "Yes." Deposition of Jason Ali, Feb. 2, 2018 ("Ali Dep., Day 2") 117:2-13 (ECF No. 25.6 at 308). Counsel then asked whether it was "okay for 14-year-old girls to think that the camps were a jolly place and they were better off there than being at home." Id. at 119:23-25 (ECF No. 25.6 at 308). Plaintiff responded, "It's appropriate for a 14-year-old girl to do her research on her own and form opinions." Id. at 120:6-8 (ECF No. 25.6 at 308). An excerpt from a class assignment that a student had submitted to Plaintiff provided:

> Hitler had the plan that saved Germany, which does not make any sense as to why everyone still labels him as this monster. They tell you that Hitler [*6] invaded countries for no reason. They will never tell you, however, that those countries like Poland that he invaded for no reason had been controlling Germany and slaughtering innocent Germans.

Id. at 114:9-21 (ECF No. 25.6 at 307). When asked whether he was "proud that [the student] came to these conclusions," Plaintiff testified, "Yes, absolutely, because that means she would have spent a lot of time doing research to come up with these inferences based on the information she was given." Id. at 115:9-14 (ECF No. 25.6 at 307).

Another student wrote an essay entitled, "A Gas Chamber Full of Lies" about the film "Adolf Hitler: The Greatest Story Never Told." SOMF ¶ 30. The student wrote:

> I have been taught that the Holocaust was a time were [sic] Hitler chose to brutally abuse, take advantage of, and murder Jews, for absolutely no reason at all. We have all been taught that the Holocaust was a time of hate, and that Hitler used the gifts he possessed for absolute evil, but is that really the case? Did the Jews not crash Germany's economy on more than one occasion? Did they not criticize Christianity because it was not what they believed? Did the Jewish Zionists themselves not introduce [*7] a whole world of people to pornography? Did they not allow even the people of youngest ages to take up drugs and alcohol causing addictions that led to nothing but they did as they ripped away what they were providing the people with in the first place? Is the death of the Jews completely justified? No, because nobody deserves to die, regardless what they've done. But are their deaths really completely unjustified either?

Id. at ¶ 30; id. at Exhibit Q, WBOE 633 (ECF No. 25.6 at 537). Plaintiff permitted the student author to read that paper aloud in class. Id. ¶ 31. When asked whether he "t[aught] [his students] to question the facts as to whether Hitler chose to brutally abuse, take advantage, starve and murder Jews for absolutely no reason at all," Plaintiff responded that he "t[aught] [his] students to question everything." Ali Dep., Day 2 98:3-8 (ECF No. 25.6 at 303). When asked whether he "encouraged" his students to "come to different views than the traditional understanding of what World War II and the Holocaust and Hitler were about," Plaintiff responded "Yeah, it's called debate." Id. at 102:17-103:1 (ECF No. 25.6 at 304).

### 3. 9/11 Lesson Plan

In accordance with instructions from [*8] the High School's History Department, Plaintiff prepared and presented a lesson on the terrorist attacks that occurred on September 11, 2001 ("9/11"). SOMF ¶¶ 36-37. Plaintiff's September 2016 lesson plan directed the students to: "Analyze the abstract of official 9/11 commission. Analyze the recently released 28 pages of the 9/11 commission report as well as the Saudi Intelligence Report translated by MEMRI. [Middle Eastern Media Research Institute]." Id. ¶ 39.[3] History Department Supervisor Connelly approved the lesson plan and attached a note that read: "As previously discussed, please be certain to provide nonpartisan view of 9/11 with equal weight given to conventional accounts." Id. ¶ 40. In connection with the lesson, Plaintiff also posted links to outside articles from the MEMRI website on a school-sponsored website. Id. ¶ 41. The articles were entitled, "Article in Saudi Daily:

_____

[3] In connection with an earlier assignment involving the 9/11 terrorist attacks, one of Plaintiff's students sent Plaintiff an e-mail articulating the following "personal conclusion[s]:" "that jet fuel does not burn at a high enough temperature to melt steel," Ali Dep., Day 2 at 51:10-15 (ECF No. 25.6 at 291), and that the planning of 9/11 "[h]ad to do with the gathering of government officials and terrorists," id. at 51:18-52:3 (ECF No. 25.6 at 291). The student's e-mail to Plaintiff expressed her belief that "the story of 9/11 is completely different than the one we've been told." Id. at 54:12-14. When asked whether Plaintiff took steps to correct or to clarify the student's understanding of the events that occurred on September 11, 2001, he testified that he did not recall discussing what her feelings were, but, "if [he] would say anything, [he] would say to continue doing research." Id. at 55:10-56:3 (ECF No. 25.6 at 292).

2019 U.S. Dist. LEXIS 72877, *8

U.S. Planned, Carried Out 9/11 Attacks—But Blames Others for Them" and "Egyptian Daily: U.S. Planning 9/11 Style Attack Using ISIS in Early 2015—Like it Did Using Al-Qaeda in 2001." Id. ¶¶ 42-43. The MEMRI articles that were linked to Plaintiff's school webpage contained links to other articles and video [*9] clips, including one link that read: "Saudi Scholar Abdailah Al-Yahya: The Jews are Like a Cancer, Woe to the World if they Become Strong." Id. ¶ 45.

On September 28, 2016, a television reporter questioned Plaintiff Lottman about the MEMRI links Plaintiff posted in connection with his September 2016 lesson plan on 9/11. Id. ¶ 46. When the same news station questioned Superintendent Zega about the articles, he advised that "swift action" had been taken to remove the links. Id. ¶ 61. He further indicated that the District would undertake an investigation and that, if warranted based on the outcome of the investigation, "the teacher [would] be disciplined severely." Id. With respect to the links, Zega also opined: "It's upsetting . . . that somebody would do this. It's upsetting that somebody would, especially a teacher, would distribute this message. It is . . . absolutely not something that the District agrees with in any way." Id. ¶ 62.

### 4. Termination of Plaintiff's Employment

On September 28, 2016, Lottman called Plaintiff to his office. Id. ¶ 47. He directed Plaintiff to remove the MEMRI links from the school website. Id. Lottman further instructed Plaintiff to go home for [*10] the day and to report to Superintendent Zega's office the following morning. Id. ¶ 48.

The next morning, Defendant Zega questioned Plaintiff about the articles in the presence of Defendant Lottman and History Department Supervisor Connelly. Id. ¶ 49. Based on the information obtained at that meeting, Zega made the decision to terminate plaintiff's employment. Zega's decision rested primarily on the MEMRI link that appeared in Plaintiff's lesson plan materials entitled: "Jews are Like a Cancer, Woe to the World if they Become Strong." See Deposition of Robert Zega, April 18, 2018 ("Zega Dep.") at 63:16-65:3 (ECF No. 25.6 at 351); 66:25-70:3 (ECF No. 25.6 at 352-53); 88:24-90:25 (ECF No. 25.6 at 357-58). Zega also considered the fact that Plaintiff "never apologized," "never said it was a mistake," and "never said he wouldn't do it again." Id. at 91[4]:19-23 (ECF No. 25.6 at 358). Zega testified that

Plaintiff's responses during the meeting gave him "no reason . . . to believe that if [Plaintiff] went back to the classroom he wouldn't continue to do it." Id. at 65:1-3 (ECF No. 25.6 at 351). Plaintiff concedes that he did not apologize for posting the links at issue, Ali Dep., Day 1 at 195:8-196:15 [*11] (ECF No. 25.6 at 230-31), and has expressed that he had "no reason to apologize" for posting materials that linked to the article entitled "Jews are Like a Cancer," id. at 196:9-15 (ECF No. 256 at 231).[5] To a lesser extent, Zega also considered the complaints made by other teachers about his students embrace of Holocaust denial, which the students attributed to his classroom instruction. See Zega Dep. at 79:4-83:15 (ECF No. 25.6 at 355-56).

Plaintiff was given a letter at the end of the meeting, which advised that his employment was terminated effective that day—September 29, 2016.[6] Id. ¶¶ 51, 58. The Board of Education approved Plaintiff's termination at its next meeting. Id. ¶ 69. On October 28, 2016, the District's Employee Benefits Insurance Specialist mailed a letter to Plaintiff's home address, which indicated that Plaintiff's health benefits had been extended through November 30, 2016 and provided information relating to Plaintiff's right to COBRA continuation coverage. Id. ¶ 70. Plaintiff claims that he never received the letter. Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("RSOMF") ¶ 70.

### 5. Alleged Discriminatory Remarks

Plaintiff alleges that Defendant Lottman made disparaging comments about Plaintiff's ethnicity throughout the duration of his employment with

_____

92.

[5] Plaintiff's account of the meeting was also consistent with Zega's insofar as he testified that he attempted to explain the legitimacy of the articles he posted on the school's website. Id. at 198:20-199:13 (ECF No. 25.6 at 234).

[6] Plaintiff's termination letter states:

> As a summary of this morning's meeting between you, the [*12] Principal of Woodbridge High School, Glenn Lottman, and the Vice Principal of Woodbridge High School, Matthew Connelly, and myself, certain allegations of a serious nature have been made against you and ultimately corroborated. Therefore, you are hereby terminated from your position as a teacher for the Woodbridge Township School District, effective today, Thursday, September 29, 2016.

Termination letter (ECF No. 25.6 at 366).

_____

[4] Page 91 is mislabeled in the deposition transcript as page

Woodbridge. Plaintiff alleges that Lottman referred to Plaintiff as "Mufasa" or "Mufasa Ali" on multiple occasions, which Plaintiff believes to be a satirical reference to his middle name, Mostafa, and to a character from the Lion King. SOMF ¶ 63. Plaintiff also alleges that Lottman once asked "whether they had computers in Egypt" when Plaintiff was having a problem with the technology in his classroom, id. ¶ 64, and that he greeted Plaintiff on two occasions by saying, "Hey Arabia Nights," Ali Dep., Day 1 at 88:5-8 (ECF No. 25.6 at 123), and "Hey, Big Egypt," id. at 94:7-14 (ECF No. 25.6 at 129). Plaintiff further alleges that he [*13] heard rumors about other teachers characterizing him as "anti-Semitic," "unpatriotic," and a "conspiracy theorist." Id. at 124:11-16 (ECF No. 25.6 at 159); 133:15-134:4 (ECF No. 25.6 at 168-69)

Plaintiff also claims that school officials made disparaging comments about his ethnicity during the meetings that occurred on September 28 and 29 of 2016, the date of Plaintiff's termination and the day before. He alleges that, when addressing the MEMRI articles, Defendant Lottman said, "Figures, the Arab." Id. at 175:21-24 (ECF No. 25.6 at 210). Plaintiff further claims that Defendant Zega asked Plaintiff if he could "see how someone with [his] Arab . . . and . . . Muslim [background] who puts up [these] links on a [school-sponsored website] can be considered offensive." Id. at 197:2-6 (ECF No. 25.6 at 232). Plaintiff alleges that Zega also asked Plaintiff if he was "harboring terrorism" in his classroom, id. at 197:14-17 (ECF No. 25.6 at 232), and told Plaintiff that the District does not need a "Middle Eastern perspective," id. at 204:4-8 (ECF No. 25.6 at 239). Defendants deny that they made these statements.

**B. Procedural History**

On March 13, 2017, Plaintiff filed a fifteen-count Complaint [*14] against Defendants in New Jersey Superior Court. Complaint (ECF No. 1.1). Plaintiff's Complaint alleged violations of: (1) the *New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, et seq.*, ("NJLAD") on the basis of race, id. ¶¶ 64-69; (2) NJLAD on the basis of religion and creed, id. ¶¶ 70-75; (3) NJLAD on the basis of perceived religion, id. ¶¶ 76-81; (4) NJLAD on the basis of aiding and abetting other violations of NJLAD, id. ¶¶ 82-86; (5) NJLAD on the basis of creating a hostile work environment, id. ¶¶ 87-90; (6) Plaintiff's Weingarten rights, *NLRB v. Weingarten, 420 U.S. 251, 95 S. Ct. 959, 43 L. Ed. 2d 171 (1975)*, id. ¶¶ 91-94; (7) the *New Jersey Open*

*Public Meetings Act, N.J.S.A. § 10:4-6, et seq.* ("OPMA"), id. ¶¶ 95-99; (8) common law defamation, id. ¶¶ 100-107; (9) common law libel, id. ¶¶ 108-113; (10) common law false light and invasion of privacy, id. ¶¶ 114-121; (11) *42 U.S.C. § 1983* for defamatory statements made in violation of the *Fourteenth Amendment of the U.S. Constitution*, id. ¶¶ 122-131; (12) *42 U.S.C. § 1983* for retaliation in violation of Plaintiff's Right to Freedom of Speech pursuant to the *First Amendment of the U.S. Constitution*, id. ¶¶ 132-140; (13) *42 U.S.C. § 1983* for retaliation in violation of Plaintiff's Right to Academic Freedom pursuant to the *First Amendment of the U.S. Constitution*, id. ¶¶141-149; (14) *42 U.S.C. § 1981* for discrimination on the basis of Plaintiff's race, id. ¶¶ 150-157; (15) the Consolidated Omnibus Budget Reconciliation Act, 19 U.S.C. § 1161, et seq. ("COBRA"), [*15] id. ¶¶ 158-162.

On April 3, 2017, Defendants removed the action to federal court. ECF No. 1. Defendants subsequently moved to dismiss Counts Six and Fifteen of Plaintiff's Complaint. ECF No. 3. This Court granted Defendants' Motion as to Count Six, and denied the Motion as to Count Fifteen. ECF No. 11. Currently pending before the Court is Defendants' Motion for Summary Judgment as to all remaining claims. ECF No. 25.

**II. LEGAL STANDARD**

Pursuant to *Fed. R. Civ. P. 56(c)*, a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988)*. All facts and inferences must be construed in the light most favorable to the non-moving party. *Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994)*.

**III. ANALYSIS**

2019 U.S. Dist. LEXIS 72877, *15

## A. Discrimination Claims

### 1. NJLAD (Counts One, Two, and Three) and *42 U.S.C. § 1981* (Count Fourteen)

Plaintiff argues that Defendants violated the NJLAD and/or *42 U.S.C. § 1981* by terminating his employment **[*16]** on the basis of his race, religion, or perceived religion. Defendants submit that they are entitled to summary judgment on these claims because Plaintiff fails to establish that Defendants' legitimate, non-discriminatory reasons for the District's employment decision were pretextual. The Court agrees.

The NJLAD prohibits employers from discriminating against their employees on the basis of race, creed, color, and national origin, among other things. *N.J.S.A. § 10:5-12(a)*. *42 U.S.C. § 1981* likewise prohibits employment discrimination on the basis of "race, ancestry, and ethnic characteristics." *Wesley v. Palace Rehab. & Care Ctr., L.L.C., 3 F. Supp. 3d 221, 228 (D.N.J. 2014)* (internal quotation marks omitted). Claims asserted under both the NJLAD and *42 U.S.C. § 1981* are subject to the McDonnell Douglas burden-shifting framework. See *Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 546, 70 A.3d 602 (2013)* ("All [NJLAD] claims are evaluated in accordance with the United State Supreme Court's burden-shifting mechanism.") (citing *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973));* accord *Wesley, 3. F. Supp. 3d at 230-31* ("Claims brought under *§ 1981* and the NJLAD are analyzed using the same evidentiary schemes."). Under this framework, a plaintiff must first establish a prima facie case of unlawful action by the employer, *McDonnell Douglas, 411 U.S. at 802*, by establishing: (1) that he is a member of a protected class; (2) that he was qualified for the position in question; (3) that he suffered **[*17]** an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination. *Houston v. Dialysis Clinic, Inc., 13-4461, 2015 U.S. Dist. LEXIS 83151, 2015 WL 3935104 (D.N.J. June 26, 2015)* (addressing prima facie elements of race discrimination claims under NJLAD and *§ 1981*); see *Tisby v. Camden Cty. Corr. Facility, 448 N.J. Super. 241, 248, 152 A.3d 975 (App. Div. 2017)* (addressing prima facie elements of religious discrimination claim under the NJLAD).

If the plaintiff meets this initial burden, the burden shifts to the defendant, who must articulate legitimate, non-discriminatory reasons for its employment decision. *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 526, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*; *Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)*. Once the employer meets its burden of articulating a legitimate, non-discriminatory reason, the burden again shifts to the employee to present evidence from which a factfinder could infer that the proffered reasons were pretextual. *Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999)*.

Assuming Plaintiff can establish a prima facie case,[7] the Court turns to the second inquiry of the *McDonnell Douglas* burden-shifting framework: whether Defendants have articulated a legitimate, non-discriminatory reason for the termination of Plaintiff's employment. The Court finds that they have. Plaintiff was terminated on the immediate heels of his posting links on a school-sponsored webpage which contained content that was disparaging and hateful toward members **[*18]** of the Jewish faith. One article Plaintiff posted contained a link entitled, "The Jews are Like a Cancer, Woe to the World if they Become Strong." Although the anti-Semitic article was not directly linked to Plaintiff's school-sponsored webpage, it was visible and accessible through the materials Plaintiff provided to his students. To make matters worse, when confronted at the September 29, 2016 meeting, Plaintiff did not apologize, but instead attempted to defend the legitimacy of the source. Zega concluded that he could not return Plaintiff to a classroom with confidence that the conduct would not be repeated. These were serious, corroborated allegations which required termination. The Court is satisfied that Defendants have presented a legitimate, non-discriminatory reason for Plaintiff's termination.

To withstand summary judgment, Plaintiff must demonstrate pretext by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Defendants'] . . . articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the . . . action." *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)*; see also **[*19]** *St. Mary's Honor Ctr., 509 U.S. at 519* ("It is not enough . . . to dis believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."). A plaintiff bears the burden

---

[7] Although Defendants dispute whether Plaintiff has established a prima facie case, the Court will assume satisfaction of all four elements for the purpose of this Motion.

of proving pretext by a preponderance of the evidence. *Wesley, 3 F. Sup. 3d at 231*. Here, Plaintiff submits that "Defendants['] . . . various and contradictory reasons" for Plaintiff's termination support the conclusion that their proffered reasons were pretext for discrimination. Pl.'s Br. at 14 (ECF No. 28 at 21). Plaintiff argues that Defendants' refusal to consider his explanation, or to conduct their own research, about the qualifications and legitimacy of the MEMRI organization further supports that the reasons proffered for Plaintiff's termination were pretextual. Id. at 15 (ECF No. 28 at 22). The Court disagrees.

Plaintiff has failed to point to any evidence upon which to disbelieve Defendants' articulated reason. The reason is consistent and clear. Plaintiff provided students access to a repugnant, hateful, and inflammatory resource, without any sense of regret or apology. This is a legitimate ground for termination. The law does not require the school board to "conduct their own research" about such an offensively-titled link before doing [*20] so. And Zega's decision to terminate based on his concern that Plaintiff might repeat his error was reasonable and legitimate, especially given previous complaints by other teachers. These were serious concerns about students advancing theories of Holocaust denial based on what they learned in Plaintiff's classroom—a point plaintiff did not deny later in discovery. And although Plaintiff points to disparaging comments made by Lottman and Zega, these comments are insufficient to demonstrate that discrimination was a motivating cause for his termination when viewed against the fact that both Lottman and Zega were aware of his national origin and religious affiliation before hiring him just one year earlier.

In sum, the Court finds that Defendants' proffered reasons—dissemination, through official school channels, of materials containing links to anti-Semitic media, coupled with an undisputed lack of remorse for same conduct[8], and a history of allowing holocaust

---

[8] Plaintiff argues, in part, that summary judgment is inappropriate because he disputes certain facts underlying the District's termination decision, i.e., whether Connelly had previously warned Plaintiff about "teaching an unconventional view of 'sensitive content.'" See SOMF ¶ 25; RSOMF ¶ 25; Pl.'s Br. at 17 (ECF No. 28 at 24). However, the District's primary reasons for terminating Plaintiff's employment—the action of posting links that contained anti-Semitic references and Plaintiff's response when confronted with that allegation—are undisputed, as noted above. The Court finds these

denial theories to permeate his classroom—are legitimate, non-discriminatory reasons supporting the District's adverse employment decision. Plaintiff fails to cast doubt on those reasons. Thus, Plaintiff has not presented any evidence [*21] that could persuade a reasonable jury that Defendants' rationale was merely pretext and that racial or religious discrimination more likely than not played a role in the District's employment decision. Accordingly, Defendants are entitled to summary judgment as to Counts One, Two, Three, and Fourteen.

## 2. NJLAD—Hostile Work Environment (Count Five)

Plaintiff contends that Defendants also violated the NJLAD by subjecting him to a hostile work environment. Defendants maintain that they are entitled to summary judgment on this claim because Plaintiff has failed to establish that he was subjected to pervasive harassment due to his race, religion, or perceived religion. The Court agrees.

To establish a hostile work environment claim, the plaintiff must show that: (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability. *Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)*; see also *Sgro v. Bloomberg L.P., 331 F. App'x 932, 941 (3d Cir. 2009)* ("New Jersey courts treat hostile work environment claims under the NJLAD [*22] the same as the Supreme Court treats hostile work environment claims under Title VII."). In determining whether a work environment is hostile, courts must "consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mandel, 706 F.3d at 168* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993))*. Significantly, "offhanded comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005)* (internal

---

reasons sufficient to defeat Plaintiff's discrimination claim, and accordingly deems any factual disputes concerning ancillary reasons for the District's termination decision to be immaterial.

quotation marks omitted).

Here, Plaintiff alleges that comments made by Lottman while Plaintiff was employed by Woodbridge created a hostile work environment. In support of his claim, Plaintiff alleges that Lottman made the following five[9] remarks prior to the events surrounding Plaintiff's termination. Pl.'s Br. at 25 (ECF No. 18 at 32). On one occasion, Lottman greeted Plaintiff by saying, "Hey, Arabia Nights." Ali Dep., Day 1 at 87:12-88:8 (ECF No. 25.6 at 122-23). One another single occasion, Lottman greeted Plaintiff by saying, "Hey, Big Egypt." Id. at 94:7-24 (ECF No. 25.6 at 129). During **[*23]** an in-class evaluation, Lottman once asked Plaintiff whether they "have computers in Egypt" when Plaintiff was experiencing technological difficulty in his classroom. Id. at 97:8-22 (ECF No. 25.6 at 132). When another teacher watched Plaintiff's students while he used the restroom, Lottman told that teacher, "you can't trust anybody with the last name Ali these days." Deposition of Patricia Pascucci, December 12, 2017 ("Pascucci Dep.) at 38:9-25 (ECF No. 28.11 at 12). Lottman "often times" referred to Plaintiff as "Mufasa" or "Mufasa Ali." Ali Dep., Day 1 at 88:20-89:2 (ECF No. 25.6 at 123-24). All of these alleged remarks, with the exception of Lottman referring to Plaintiff as "Mufasa," are alleged to have been isolated occurrences. Plaintiff never complained to his superiors or to any union representative about these comments. SOMF ¶ 67. When asked at his deposition why he did not complain, he responded, "I'm a big boy. As long as I'm getting my paycheck every two weeks, I could deal with words." Id. ¶ 68.

Plaintiff also alleges that Lottman and Zega's comments during the meetings that precipitated his termination created a hostile work environment. Plaintiff alleges that Lottman said, "Figures, the **[*24]** Arab," after reading the words "Middle East" from the MEMRI website. Ali Dep., Day 1 at 175:21-24 (ECF No. 25.6 at 210). He alleges that Zega made the following discriminatory comments during their September 29, 2016 meeting. Pl.'s Br. at 25 (ECF No. 28 at 32). Zega called Plaintiff anti-Semitic. Ali Dep., Day 1 at 190:7-9 (ECF No. 25.6 at 225). He asked Plaintiff whether he was "harboring

terrorism" in his classroom. Id. at 197:14-17 (ECF No. 25.6 at 232). He told Plaintiff, "we don't want your kind in this district." Id. at 209:15-19 (ECF No. 25.6 at 244). Zega called Plaintiff "an obvious racist, bigoted conspiracy theorist." Id. at 210:9-10 (ECF No. 25.6 at 245).

Based on the allegations summarized above, no reasonable factfinder could conclude that the alleged discrimination was severe, pervasive, or regular. Plaintiff points to just five remarks over the course of an entire year to support the conclusion that he was subjected to a hostile work environment. While Lottman's comments are inappropriate if true, they fail to rise to the level necessary to establish a hostile work environment. Because Plaintiff alleges only a few isolated remarks rather than a pattern of discriminatory **[*25]** comments, he must demonstrate that the remarks were "extremely derogatory." See _Nuness v. Simon & Schuster, Inc., 325 F. Supp. 3d 535, 550 (D.N.J. 2018)_ (internal quotation marks omitted). Plaintiff has failed to do so.

None of Lottman's comments were physically threatening. Lottman's greetings, "Hey, Big Egypt" and "Hey, Arabia Nights," his inquiry about whether they "had computers in Egypt," and his comment that "you can't trust anyone with the last name Ali these days," while inappropriate, do not rise to the level of unreasonably interfering with an employee's work environment. Cf. _Ahmed v. Interstate Mgmt. Co., 11-683, 2012 U.S. Dist. LEXIS 103512, 2012 WL 3038523, at *17 (D.N.J. July 25, 2012)_ (finding co-workers' use of ethnic epithets, including references to Plaintiff as "Indian," "terrorist," and "Arab," while certainly "offensive and inappropriate," did not form basis for hostile work environment where plaintiff did not report the conduct). Finally, Lottman's alleged reference to Plaintiff's middle name, Mostafa, as "Mufasa," although inappropriate and unprofessional, does not appear to be related to Plaintiff's racial or religious identity. Viewed together, the Court finds the frequency and severity of the conduct alleged to be relatively minimal. Compare _Streater v. City of Camden Fire Dep't, 567 F. Supp. 2d 667, 674 (D.N.J. 2008)_ (finding sufficient evidence of pervasiveness where defendants **[*26]** "regularly made jokes with racial themes" and "threatening comments with offensive racial content") and _Nuness, 325 F. Supp. 3d at 546-550_ (concluding reasonable factfinder could find hostile work environment where "abusive coworker called [Plaintiff] a contraction of the N-word and pig") with _McKinnon v. Gonzales, 642 F. Supp. 2d 410, 423 (D.N.J. 2009)_ (finding "the brief collection of unfriendly comments" insufficient to rise to the level of pervasive

---

[9] Plaintiff also alleges that Lottman "would say," "look out for the Egyptian," but does not specify whether this occurred on more than one occasion. Compl. ¶ 13 (ECF No. 1.1 at 11). Plaintiff fails to cite any underlying evidence to substantiate this claim, citing only to his Complaint. Because discovery has concluded and has apparently failed to produce any evidence to support this allegation, the Court will not consider it.

hostility). Moreover, the fact that Plaintiff never reported the comments to a union representative or a member of the District's administration supports the conclusion that the remarks did not unreasonably interfere with his work performance.

The same analysis applies to the remarks Lottman and Zega made during the meetings leading up to Plaintiff's termination. Zega's alleged statements characterizing Plaintiff as "anti-Semitic" and "an obvious racist, bigoted conspiracy theorist" are general insults that do not directly relate to Plaintiff's racial or religious identity. Plaintiff alleges that Lottman and Zega made disparaging comments at the termination meeting when discussing Plaintiff's decision to include articles containing repugnant anti-Semitic content on his school webpage. The alleged comments—"Figures, the Arab," **[*27]** "we don't want your kind in this district," and Zega's inquiry about whether Plaintiff was "harboring terrorism" in his classroom—while inappropriate, do not rise to the level of creating a hostile work environment for the reasons articulated above. None of the comments are physically threatening or had the potential to unreasonably interfere with Plaintiff's work performance.

Accordingly, no reasonably jury could conclude that Plaintiff was the victim of a hostile work environment. Defendants' Motion for Summary Judgment is granted as to Count Five.

### 3. NJLAD—Aiding and Abetting (Count Four)

The NJLAD imposes liability upon individual defendants who aid and abet an employer's NJLAD violations. *N.J.S.A. § 10:5-12(e)*. An employee may be held liable for aiding and abetting under the NJLAD if a plaintiff establishes the following elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Taylor v. Lincare, Inc., 15-6284, 2016 U.S. Dist. LEXIS 91924, 2016 WL 3849852, at *7 (D.N.J. July 15, 2016)* (internal quotation marks **[*28]** omitted). A violation of the NJLAD on the basis of aiding and abetting must be predicated on an underlying NJLAD violation. *See id.* at 21-22 ("Therefore, because Plaintiff's underlying causes of action fail, there can be no claim for aiding and abetting in violation of the NJLAD.") (internal quotation marks omitted). Because

the Court has granted summary judgment as to all other NJLAD Counts, Defendants are likewise entitled to summary judgment as to Count Four.

### B. Defamatory Statements

Plaintiff claims that Zega made statements to the press that defamed Plaintiff. Defendants submit that they are entitled to summary judgment on Plaintiff's defamation claims because the statements are non-defamatory as a matter of law. The Court agrees.

On September 28, 2016, Defendant Zega was interviewed by a television news station. Zega made the following statements, which Plaintiff claims are "false and defamatory." Pl.'s Br. at 30 (ECF No. 28 at 37). In reference to the MEMRI articles, Zega stated: "It's upsetting . . . that somebody would do this. It's upsetting that somebody would, especially a teacher, would distribute this message. It is . . . absolutely not something that the District agrees with in any **[*29]** way." SOMF ¶ 62. Zega also stated that the District took "swift action" to remove the links and that the teacher would be "disciplined severely," if warranted, following an investigation. Id. ¶ 61. At the end of the news report, Zega was asked whether there is "any excuse for something like this." Zega responded, "No. No, there is not." Video Recording, Exhibit J to ECF No. 25.

### 1. State Law Claims—Defamation (Count Eight); Libel (Count Nine); and False Light/Invasion of Privacy (Count Ten)

To establish defamation under New Jersey law, a plaintiff must demonstrate that the defendant: (1) made a false and defamatory statement concerning the plaintiff; (2) communicated the statement to a third party; and (3) had a sufficient degree of fault. *Cruz v. HSBC, 10-135, 2010 U.S. Dist. LEXIS 75197, 2010 WL 2989987, at *2 (D.N.J. July 26, 2010)*. A defamatory statement "is one that subjects an individual to contempt or ridicule, one that harms a person's reputation by lowering the community's estimation of him or by deterring others from wanting to associate or deal with him." *Petro-Lubricant Testing Labs., Inc. v. Adelman, 233 N.J. 236, 253, 184 A.3d 457 (2018)*. Courts consider a challenged statement's content, verifiability, and context in determining whether it has a defamatory meaning. *Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 585, 969 A.2d 1097 (2009)*. As part of that inquiry, statements of opinion are not defamatory. **[*30]**

*DeAngelis v. Hill, 180 N.J. 1, 14, 847 A.2d 1261 (2004)*. New Jersey's defamation law "generally does not distinguish between actionable conduct in print or electronic form." *Petro-Lubricant, 233 N.J. at 252*; see *W.J.A. v. D.A., 210 N.J. 229, 238-39, 43 A.3d 1148 (2012)* ("A defamatory statement may consist of libel or slander.")

Here, Plaintiff points to three statements he alleges to be defamatory. First, Zega's statement that "[i]t's upsetting that somebody would . . . distribute this message" and that the disseminated materials are "not something that the District agrees with in any way" are matters of opinion. They are not actionable false statements of fact. Second, Zega's statement that there is "no excuse" for posting the MEMRI articles likewise expresses a non-actionable opinion. See *Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 168, 735 A.2d 1129 (1999)* ("If a statement could be construed as either fact or opinion, a Defendant should not be held liable."). Finally, Zega's statement that the District took "swift action" to remove the links and that "the teacher [would] be disciplined severely" if warranted following an investigation are non-defamatory because they are not false. Plaintiff does not argue otherwise.

In order to state a claim for False Light under New Jersey law, a plaintiff must demonstrate that: (1) "the false light in which the other was placed would be highly offensive **[*31]** to a reasonable person"; and (2) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *DeAngelis, 180 N.J. at 19*. Plaintiff is unable to state a claim for false light for the same reasons expressed above. See *Edelman v. Croonquist, 09-1938, 2010 U.S. Dist. LEXIS 43399, 2010 WL 1816180, at *7 (D.N.J. May 4, 2010)* ("The tort of false light requires 'that the published material contain a false portrayal . . . . Opinion statements . . . are generally not capable of proof of truth or falsity."); *Arista Records, Inc. v. Flea World, Inc., 356 F. Supp. 2d 411, 425 (D.N.J. 2005)* ("[O]pinions cannot form the basis of a claim for false light or defamation.").

Accordingly, Defendants are entitled to summary judgment on Counts Eight, Nine, and Ten.

## 2. *42 U.S.C. § 1983*—Defamation (Count Eleven)

Plaintiff argues that Zega's allegedly defamatory statements deprived him of his "liberty interest in his reputation." Pl.'s Br. at 33 (ECF No. 28 at 40). In order to prevail on a claim under *§ 1983*, a plaintiff must prove that "his constitutional rights were violated by someone acting under color of state law." See *Rodriguez v. Fajardo, 06-4996, 2007 U.S. Dist. LEXIS 48217, 2007 WL 1959254, at *7 (D.N.J. July 3, 2007)*. Courts in this district have recognized that it is "well-settled that 'reputation alone is not an interest protected by the *Due Process Clause*,' and that 'defamation is actionable under *42 U.S.C. § 1983* only if it occurs in the course of or is accompanied **[*32]** by a change or extinguishment of a right or status guaranteed by state law or the Constitution.'" *Stolinski v. Pennypacker, 07-3174, 2008 U.S. Dist. LEXIS 106368, 2008 WL 5136945, at *11 (D.N.J. Dec. 4, 2008)* (quoting *Clark v. Twp. of Falls, 890 F.2d 611, 619 (3d Cir. 1989))*. As a result, the Third Circuit has rejected "claims for simple defamation under *§ 1983*." See *Rivera v. Zweigle, Civ. No. 13-3024, 2014 U.S. Dist. LEXIS 170580, at *13-14 n.3 (D.N.J. Dec. 9, 2014)*.

Here, Plaintiff alleges that "Defendant Zega created and disseminated a false and defamatory impression about Plaintiff in connection with his termination, thus, depriving Plaintiff of a protected liberty interest in his reputation." Compl. ¶ 126 (ECF No. 1.1). Alleging a "claim for simple defamation" and loss of nothing more than the liberty interest in his reputation, Plaintiff's claim falls squarely into the type of case prohibited by the case law in this district. The Court grants Defendants' Motion for Summary Judgment as to Count Eleven.

## C. *First Amendment* Claims (Counts Twelve and Thirteen)

Plaintiff alleges that Defendants violated his rights to free speech and academic freedom rights under the *First Amendment of the United States Constitution*. Defendants submit that they are entitled to summary judgment on these claims because Plaintiff has failed to demonstrate that the speech at issue was protected. The Court agrees.

In order to establish a *First Amendment* retaliation claim, a public employee must demonstrate that: (1) "his [activity] is protected by the *First Amendment*"; **[*33]** and (2) "the [activity] was a substantial or motivating factor in the alleged retaliatory action." *Falco v. Zimmer, 17-3396, 767 Fed. Appx. 288, 2019 U.S. App. LEXIS 10744, 2019 WL 1569564, at *6 (3d Cir. Apr. 11, 2019)*. Speech must involve "a matter of public concern" to qualify as protected speech. *Hashem v. Hunterdon*

*County, 15-8585, 2016 U.S. Dist. LEXIS 134055, 2016 WL 5539590, at *19 (D.N.J. Sept. 29, 2016)*. Matters of public concern arise from speech that relates to "political, social, or other concerns to the community." Id. (quoting *Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001))*. The Third Circuit has consistently held that there are "recognized limitations upon free speech" in the educational setting. *Brown v. Armenti, 247 F.3d 69, 74 (3d Cir. 2001)*; see *Edwards v. Cal. Univ. of Penn., 156 F.3d 488, 491 (3d Cir. 1998)* ("[A] public university professor does not have a *First Amendment* right to decide what will be taught in the classroom."). A teacher's in-class conduct is not protected speech. Id. (delineating "in the classroom" conduct as that which falls into the category of "[t]he four essential freedoms that constitute academic freedom[, which] have been described as a university's freedom to choose who may teach, what may be taught, how it shall be taught, and who may be admitted to study"); *Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172, 1176 (3d Cir. 1990)* (citing *Clark v. Holmes, 474 F.2d 928 (7th Cir. 1972)*, in which the Seventh Circuit issued a per curiam opinion upholding a school district's decision to terminate a teacher whose biology classes contained too much discussion of sex).

In Plaintiff's free speech claim, **[*34]** he alleges that he "engaged in activity protected by the *First Amendment* when he posted, on the school's public portal, alternative views on the cause of the September 11, 2001 attacks." Compl. ¶ 135. Plaintiff asserts identical allegations in support of his academic freedom claim. However, the District, not Plaintiff, has the ultimate right to decide what will be taught in the classroom. See *Brown, 247 F.3d at 74*; *Edwards, 156 F.3d at 491* (finding no right to use certain educational materials in the classroom). Accordingly, Plaintiff has failed to demonstrate that posting the MEMRI links on the school-sponsored website constitutes protected speech. Defendants are entitled to summary judgment on Counts Twelve and Thirteen.

### D. Consolidated Omnibus Budget Reconciliation Act

In Count Fifteen, Plaintiff alleges that Defendants violated COBRA by failing to "provide Plaintiff with the COBRA Election Notice notifying him of the COBRA Health Benefits Program." Compl. ¶ 160. Defendants submit that they are entitled to summary judgment because they sent a notice to Plaintiff's last known address. The Court agrees.

COBRA provides that an employer's plan administrator must provide notice to employees of their COBRA rights upon the occurrence of a qualifying **[*35]** event, such as termination of employment. *29 U.S.C. § 1166(a)*. Courts in this district have ruled that mailing a notice to an employee's last known address constitutes a good faith attempt at COBRA compliance. *McGoldrick v. TruePosition, Inc., 623 F. Supp. 2d 619, 633 (D.N.J. 2009)* (noting COBRA Congressional Congress Committee's expressed intention that "notice by mail to the qualified beneficiary's last known address to be adequate"); *Vanderhoof v. Life Extension Inst., 988 F. Supp. 507, 518 (D.N.J. 1997)* (same). The employer is not required to prove that the notice was received. *McGoldrick, 623 F. Supp. 2d at 633*.

Here, Plaintiff argues that Defendants violated COBRA because he never received a notice. However, Defendants submitted a Certification from the District's benefits and insurance specialist indicating that she mailed a letter advising Plaintiff of his rights under COBRA on October 28, 2016. Certification of Nancy Alberici ¶ 2 (ECF No. 25.6 at 599). She certified that she sent the letter via regular mail to the home address maintained on file. Id. ¶ 3. The letter, dated October 28, 2016, is attached to the Certification. ECF No. 25.6 at 602. Defendants have met their burden of demonstrating a good faith effort to notify Plaintiff of his rights in accordance with COBRA. The Court grants summary judgment as to Count Fifteen.

### E. Open Public Meetings Act

The Court has **[*36]** granted summary judgment as to all Federal claims in the instant matter. The remaining claim alleges violation of the OPMA on the basis of the District's failure to provide Plaintiff with a *Rice* notice prior to the Board of Education meeting at which the Board voted to terminate Plaintiff's employment. In the interests of judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over the sole surviving state law claim. See *Bringa v. Roque, 13-3296, 2015 U.S. Dist. LEXIS 24116, 2015 WL 857884, at *5 (D.N.J. Feb. 27, 2015)* ("*Section 1367* provides that 'district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.'"). Defendants' Motion for Summary Judgment is denied as to Count Seven. Count Seven is remanded to the New Jersey Superior Court.

**IV. Conclusion**

For the reasons set forth herein, Defendants' Motion for Summary Judgment, ECF No. 25, is **GRANTED IN PART** and **DENIED IN PART**. Count Seven is hereby **REMANDED** to the New Jersey Superior Court. The remaining claims are **DISMISSED** and the case is **CLOSED**.

Dated: April 30, 2019

*/s/ Madeline Cox Arleo*

**Hon. Madeline Cox Arleo**

**United States District Judge**


**ORDER**

**THIS MATTER** comes before the Court **[*37]** by way of a Motion for Summary Judgment, ECF No. 25, filed by Defendants Woodbridge Township Board of Education, Woodbridge Township School District (collectively, "Woodbridge" or the "District"), Superintendent Robert Zega ("Zega"), and Principal Glenn Lottman ("Lottman" or when referenced collectively with Woodbridge and Zega, "Defendants"), against Plaintiff Jason Mostafa Ali ("Ali" or "Plaintiff");

and for the reasons set forth in the accompanying Opinion;

**IT IS** on this 30th day of April, 2019;

**ORDERED** that Defendants' Motion for Summary Judgment is **DENIED** as to Count Seven and **GRANTED** as to all other Counts; and it is further

**ORDERED** that Count Seven is remanded to the New Jersey Superior Court; and it is further

**ORDERED** that the case is hereby **CLOSED**.

*/s Madeline Cox Arleo*

Hon. Madeline Cox Arleo

**UNITED STATES DISTRICT JUDGE**

---

**End of Document**

 Positive
As of: April 29, 2021 6:34 PM Z

# *Ahmed v. Interstate Mgmt. Co.*

United States District Court for the District of New Jersey

July 25, 2012, Decided; July 25, 2012, Filed

Civil Case No. 11-683 (FSH) (PS)

**Reporter**
2012 U.S. Dist. LEXIS 103512 *; 2012 WL 3038523

KOBIR AHMED, Plaintiff, v. INTERSTATE
MANAGEMENT COMPANY, Defendant.

**Notice:** NOT FOR PUBLICATION

## Core Terms

termination, employees, summary judgment, reasonable
jury, complaints, hotel, retaliation, prima facie case,
pretext, discriminatory, protected activity, undisputed,
proffered, coworkers, reasons, shifts, hostile work
environment claim, non discriminatory reason, hostile
work environment, workplace violence, pervasive,
comments, severe, statement of reasons, rate of pay,
articulated, retaliatory, conditions, pretextual, bartender

## Case Summary

### Overview

In this NJLAD action, defendant was granted summary
judgment because defendant's proffered justification for
plaintiff's termination was plaintiff's involvement in a
physical altercation with a hotel guest in violation of
defendant's workplace violence policy and defendant
was within its discretion to terminate plaintiff while
retaining the other employees, particularly given the
undisputed factual differences between plaintiff's actions
and the actions of the other employees.

### Outcome

Defendant's motion granted. Plaintiff's motion denied.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Summary
Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > General
Overview

Civil Procedure > ... > Summary
Judgment > Supporting Materials > General
Overview

*HN1*[⤓] **Summary Judgment, Evidentiary
Considerations**

Pursuant to *Fed. R. Civ. P. 56(c)*, a motion for summary
judgment will be granted if the pleadings, depositions,
answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law.
In other words, summary judgment may be granted only
if there exists no genuine issue of material fact that
would permit a reasonable jury to find for the nonmoving
party. All facts and inferences must be construed in the
light most favorable to the non-moving party. The
judge's function is not to weigh the evidence and
determine the truth of the matter, but to determine

2012 U.S. Dist. LEXIS 103512, *103512

whether there is a genuine issue for trial. Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

### HN2[↓] Summary Judgment, Entitlement as Matter of Law

The party seeking summary judgment always bears the initial burden of production. This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden. Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

### HN3[↓] Summary Judgment, Entitlement as Matter of Law

To avoid summary judgment, the nonmoving party must then demonstrate facts supporting each element for which it bears the burden, and it must establish the existence of a genuine issue of material fact justifying trial. The nonmoving party must do more than simply show that there is some metaphysical doubt as to material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Further, summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.

Labor & Employment Law > Discrimination > Actionable Discrimination

### HN4[↓] Discrimination, Actionable Discrimination

The New Jersey Law Against Discrimination provides that it is unlawful for an employer, because of the race, creed, color, or national origin of any individual to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. _N.J. Stat. Ann. § 10:5-12(a)._

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

### HN5[↓] Summary Judgment, Burdens of Proof

On a motion for summary judgment on an New Jersey Law Against Discrimination claim without direct evidence of discrimination, the court applies the McDonnell Douglas burden-shifting framework. Thus, the plaintiff must first establish a prima facie case of discrimination by showing that: (1) he belongs to a protected class; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for the termination. If the defendant articulates a legitimate, nondiscriminatory reason, the burden returns to the plaintiff to show that the defendant's proffered reason or reasons are pretextual.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

### HN6[↓] Burdens of Proof, Burden Shifting

Assuming arguendo that a plaintiff has established a prima facie case of discrimination, the burden of production shifts to defendant to introduce evidence

which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. The employer need not prove that the tendered reason actually motivated its behavior.

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden Shifting

**HN7**[⤓] **Burdens of Proof, Burden Shifting**

Violence in the workplace is clearly a legitimate, nondiscriminatory reason for terminating an employee.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > ... > Disparate Treatment > Evidence > Circumstantial & Direct Evidence

**HN8**[⤓] **Summary Judgment, Burdens of Proof**

On a motion for summary judgment where the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. In other words, the evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext). The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden Shifting

**HN9**[⤓] **Burdens of Proof, Burden Shifting**

For employees to serve as comparators, they must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it. In comparing the two incidents, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action.

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden Shifting

**HN10**[⤓] **Burdens of Proof, Burden Shifting**

In an employment discrimination action, while identification of one or two comparators may be sufficient at the prima facie stage of analysis, it is not sufficient at the pretext phase.

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden Shifting

**HN11**[⤓] **Burdens of Proof, Burden Shifting**

In an employment discrimination action, plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.

Labor & Employment
Law > Discrimination > Retaliation > Burdens of Proof

Labor & Employment
Law > ... > Retaliation > Elements > General Overview

**HN12**[⤓] **Retaliation, Burdens of Proof**

The New Jersey Law Against Discrimination (NJLAD) provides that it is unlawful for any person to take reprisals against any person because that person has opposed any practices or acts forbidden under the NJLAD or because that person has filed a complaint. *N.J. Stat. Ann. § 10:5-12(d).* On an NJLAD retaliation claim, the court applies the McDonnell Douglas burden-shifting framework. Thus, for a claim of retaliation, a plaintiff must show that: (1) he or she engaged in protected conduct known to the defendant; (2) he or she was subjected to an adverse employment decision; and (3) there was a causal link between the protected activity and the adverse decision. If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the action. If the defendant articulates a legitimate, non-retaliatory reason, the burden returns to the plaintiff to demonstrate that a retaliatory intent motivated the defendants.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

**HN13[↓] Summary Judgment, Burdens of Proof**

To obtain summary judgment in its favor on a retaliation claim, the employer must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the employer's decisionmaking process and (2) that it had a determinative effect on the outcome of that process. This may be accomplished by establishing the plaintiff's inability to raise a genuine issue of material fact as to either: (1) one or more elements of the plaintiff's prima facie case or, (2) if the employer offers a legitimate non-retaliatory reason for the adverse employment action, whether the employer's proffered explanation was a pretext for retaliation.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

Labor & Employment Law > ... > Retaliation > Elements > General Overview

**HN14[↓] Summary Judgment, Burdens of Proof**

At the summary judgment stage, a plaintiff meets his initial burden if he shows that the proffered evidence, looked at as a whole suffices to raise the inference of a causal connection between protected activity and an adverse employment action. In this context, protected activity includes opposing any practice made unlawful by the New Jersey Law Against Discrimination or when an individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation regarding discrimination against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such an individual's protected characteristic. With respect to a causal link, courts have focused on the temporal proximity between the employee's protected activity and the adverse employment action, but where there is a lack of temporal proximity, circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference. Thus, if the temporal proximity is not so close as to be unduly suggestive of retaliation, timing plus other evidence may be an appropriate test.

Labor & Employment Law > ... > Retaliation > Elements > Protected Activities

**HN15[↓] Elements, Protected Activities**

A fear of retaliation does not obviate the requirement for protected activity.

Labor & Employment Law > ... > Retaliation > Elements > Protected Activities

**HN16[↓] Elements, Protected Activities**

Complaints of preferential treatment based upon a personal relationship are not protected under the New Jersey Law Against Discrimination and thus cannot provide a basis for relief.

Labor & Employment Law > ... > Racial Harassment > Burdens of Proof > General Overview

Labor & Employment Law > ... > Harassment > Racial Harassment > Hostile Work Environment

*HN17*[⤓] **Racial Harassment, Burdens of Proof**

To establish a New Jersey Law Against Discrimination claim for hostile work environment, a plaintiff must show that the complained-of conduct (1) would not have occurred but for the employee's protected characteristic; and it was (2) severe or pervasive enough to make a (3) reasonable person in plaintiff's protected class believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > ... > Harassment > Racial Harassment > Statute of Limitations

*HN18*[⤓] **Statute of Limitations, Time Limitations**

The statute of limitations for hostile work environment claims under the New Jersey Law Against Discrimination is two years.

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > ... > Harassment > Racial Harassment > Statute of Limitations

*HN19*[⤓] **Statute of Limitations, Time Limitations**

The continuing violations theory, which allows a claim to proceed if one of a series of acts, which together created the hostile environment occurred within the statutory period.

Labor & Employment Law > ... > Racial Harassment > Employer Liability > Harassment by Supervisors

*HN20*[⤓] **Employer Liability, Harassment by Supervisors**

For an employer to be liable for a hostile work environment, a plaintiff must show that the offending conduct was done by a supervisor who was acting as the defendant's agent under traditional agency principles. The mere title of manager or supervisor does not by itself suffice to impute that employee's knowledge or actions to the employer. Rather, whether an individual constitutes a supervisor for the purposes of imputing liability on the defendant employer depends on whether the plaintiff believed that the offending employee had the authority to negatively affect the plaintiff's working life, such as the power to terminate and demote the plaintiff, to affect compensation, and to control work functions.

Labor & Employment Law > ... > Burdens of Proof > Standards of Proof > Pervasive & Severe Standards

*HN21*[⤓] **Standards of Proof, Pervasive & Severe Standards**

When evaluating the severity or pervasiveness requirement of a hostile work environment claim, a court examines all the circumstances such as frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The conduct itself is what must be severe or pervasive, not the impact on the plaintiff or the work atmosphere.

Labor & Employment Law > ... > Racial Harassment > Burdens of Proof > General Overview

Labor & Employment Law > ... > Harassment > Racial Harassment > Hostile Work Environment

*HN22*[⤓] **Racial Harassment, Burdens of Proof**

A plaintiff need not prove evidence of actual change in working conditions to demonstrate a hostile work environment.

Labor & Employment

Law > ... > Harassment > Racial
Harassment > Defenses

**HN23[⤓]** **Racial Harassment, Defenses**

Although the mere presence of anti-harassment policies
does not prove an absence of negligence, effective
preventative mechanisms demonstrate some evidence
of due care by the employer. To avoid liability, the
policies cannot merely be present but must be backed
up by consistent practice. A company will be less apt to
be liable for a hostile work environment claim if it has
policies reflecting a lack of tolerance for harassment
such as periodic publication to workers of its anti-
harassment policy; an effective and practical grievance
process; and training sessions for workers, supervisors,
and managers about how to recognize and eradicate
unlawful harassment.

Labor & Employment
Law > ... > Harassment > Racial
Harassment > Defenses

**HN24[⤓]** **Racial Harassment, Defenses**

In the context of a hostile work environment claim, an
employer should not be held responsible when its
employee unreasonably failed to take advantage of any
preventative or corrective opportunities provided by the
employer.

**Counsel:** **[*1]** For PAMELA B. NADEL, Mediator:
PAMELA BETH NADEL, NEWARK, NJ.

For KOBIR AHMED, Plaintiff: MICHAEL J.P. SCHEWE,
SCHEWELAW, LLC, NEWARK, NJ.

For INTERSTATE MANAGEMENT COMPANY, LLC,
Defendant: HOWARD MARK WEXLER, LEAD
ATTORNEY, SEYFARTH SHAW LLP, NEW YORK, NY;
DOUGLAS BRIAN LIPSKY, Bronson Lipsky LLP, NEW
YORK, NY.

**Judges:** Hon. Faith S. Hochberg, United States District
Judge.

**Opinion by:** Faith S. Hochberg

# Opinion

## HOCHBERG, District Judge:

This matter comes before the Court upon cross-motions
for summary judgment pursuant to *Fed. R. Civ. P. 56*.
The Court has reviewed the submissions of the parties
and considered the motions without oral argument
pursuant to *Fed. R. Civ. P. 78*.

## I. BACKGROUND

### A. Procedural History

On October 15, 2010, plaintiff Kobir Ahmed ("Plaintiff")
filed a Complaint against Sheraton Mahwah Hotel and
ITT Sheraton Corporation in the New Jersey Superior
Court, Essex County. (Complaint, Ex. A to Not. of
Removal, Feb. 7, 2011, ECF No. 1.) On February 4,
2011, after the case was transferred to Passaic County,
Plaintiff filed an Amended Complaint substituting
defendant Interstate Management Company, LLC
("Defendant") for the original named defendants. (Am.
Compl., Ex. B. to Not. of Removal.) The Amended
Complaint **[*2]** set forth two causes of action: (1) sex,
race, color, religion and national origin discrimination
under the New Jersey Law Against Discrimination
("NJLAD"); and (2) retaliation under the NJLAD. (*Id.*)
Both parties also explicitly note a separate claim for
hostile work environment in the legal issues section of
the Final Pretrial Order and in their cross-motions for
summary judgment. [1] (Final Pretrial Order 43; Mot. Br.
20, Mar. 14, 2012, ECF No. 43; Opp'n Br. Apr. 23, 2012,

---

[1] Although the Amended Complaint does not set forth a
separate cause of action for hostile work environment under
the NJLAD, it alleges that Defendant "allowed and condoned a
workplace ridden with discriminatory intimidation, ridicule and
insult that was so severe and pervasive as to alter the
conditions of Mr. Ahmed's employment; and which created an
abusive and hostile work environment." (*Id.* ¶ 28.)

Pooja Bhutani

ECF No. 56.)

On February 7, 2011, Defendant removed the action to this Court pursuant to 28 U.S.C. § 1441, based upon diversity of citizenship under 28 U.S.C. § 1332(a)(1). (Not. of Removal 2.) On March 14, 2011, Defendant filed its Answer to the Amended Complaint. (Answer, Mar. 14, 2011, ECF No. 14.) Discovery has been **[*3]** completed and the Final Pretrial Order has been entered. (Final Pretrial Order, Apr. 18, 2012, ECF No. 58.)

On March 14, 2012, Defendant filed a Motion for Summary Judgment as to all claims in the Amended Complaint, (Mot. for Summ. J., Mar. 14, 2012, ECF No. 42), along with a memorandum in support, (Mot. Br.), a Statement of Material Facts pursuant to *L. Civ. R. 56.1*, (56.1 Statement, Mar. 14, 2012, ECF No. 44), and supporting Declarations of Howard Wexler, (Wexler Decl., Mar. 14, 2012, ECF No. 45), and Jeanette Rodriguez-Herrera, (Rodriguez-Herrera Decl., Mar. 14, 2012, ECF No. 46). [2]

## B. Factual History[3]

Plaintiff is a Bangladeshi male and practicing Muslim. (Final Pretrial Order 3.) Defendant owns and operates the Sheraton Hotel in Mahwah, New Jersey, where Plaintiff was hired in or about October 1998. (*Id.*) Helen Johnston, a Human Resources department employee, interviewed Plaintiff and was involved in the decision to

hire him. (*Id.*) At the time of Plaintiff's termination, his immediate supervisor was August Widito, the restaurant manager. (56.1 Statement ¶ 9; 56.1 Counterstatement ¶ 9.) His second level supervisor was Bob Trata, the food and beverage director. Kevin Wolford was the general manager of the hotel. (*Id.*)

In 2002, Plaintiff took an approved leave **[*5]** of absence to travel to Bangladesh. (Final Pretrial Order 4.) Plaintiff was scheduled to return to work from his trip on August 12, 2002, but did not return until three to four weeks later. (*Id.*) Because Plaintiff did not return as scheduled, his employment was terminated. Defendant immediately rehired him when he again reported to work, but he lost the seniority he had obtained between 1998 and 2002. (*Id.*)

## 1. Encounters with Co-workers

Plaintiff had encounters with several coworkers during his employment that had ethnic overtones; he reported two incidents to Human Resources but not others. Specifically, in 2002 or 2003, Plaintiff provided a statement that Jerry Thompson, another employee, had made an inappropriate remark toward Plaintiff, calling him "Indian." (*Id.* 6; Pl. Dep. 102:19-23; 110:15-24, Ex. E to Schewe Supp. Decl.) Johnston was informed of the incident, and Thompson received a verbal warning and did not refer to Plaintiff as "Indian" again. (Final Pretrial Order 6; Pl. Dep. 102:19-25; 110:15-24.) In 2007 or 2008, David Hortado, a cook, yelled at Plaintiff and called him "Indian" after Plaintiff cursed at Hortado. (Pl. Dep. 129:17-131:21.) After the incident, food and beverage **[*6]** director Bob Trata and the head chef took Plaintiff and Hortado to the chef's office and made them shake hands; Hortado received a verbal warning. (Pl. Dep. 131:11-21; 131:25-132:5.) At various times during Plaintiff's employment, plaintiff contends that bartender Mark Conca, beverage manager and nightclub manager Thomas Floody, and head bartender Spike McNamara called Plaintiff a "terrorist" and "Arab," but Plaintiff never complained about those incidents and instead tried to ignore it or change the subject. (Pl. Dep. 87:23, 103:19-104:17, 109:17-110:10, 129:12, Ex. C to Wexler Decl.; Floody Dep. 35:3-6, Ex. G to Schewe Supp. Decl.) Plaintiff asked Johnston to change his name tag to be less indicative of his Muslim faith; that request was denied. (Pl. Dep. 101:22-102:1.)

## 2. Complaints about Work Assignments and Pay

---

[2] On April 23, 2012, Plaintiff filed a memorandum in opposition to Defendant's motion and in support of his cross-motion for summary judgment, accompanied by a Counterstatement of Material Facts pursuant to **L. Civ. R. 56.1** and a supporting Declaration of Michael Schewe. (Opp'n Br.) Plaintiff separately filed the Cross-Motion for Summary Judgment on April 25, 2012. (Cross-Mot., Apr. 25, 2012, ECF No. 59.) On May 11, 2012, Defendant filed a reply memorandum in further support of its motion for summary judgment and opposition to Plaintiff's cross-motion for summary judgment. (Reply Br., May 11, 2012, ECF No. **[*4]** 60.) On May 24, 2012, the Court entered an Order requiring Plaintiff to file copies of all pages of deposition transcripts upon which he relies in his Opposition Brief and Counterstatement of Material Facts. (Order, May 24, 2012, ECF No. 61.) On May 29, 2012, Plaintiff submitted a supplemental Declaration attaching the transcript pages. (Schewe Supp. Decl., May 29, 2012, ECF No. 62.)

[3] For purposes of Defendant's motion for summary judgment, all disputed facts are viewed in a light most favorable to Plaintiff.

Plaintiff also complained about work assignments. Specifically, Plaintiff testified that he complained to restaurant manager August Widito when Spike McNamara assigned preferential shifts to a woman named Libra. (Pl. Dep. 126:13-129:13.) On another occasion, after getting into an argument with food and beverage manager Trata, Trata told Widito to remove Plaintiff from the **[*7]** schedule so that he would not be assigned to work a preferential banquet shift and would instead work in the dining room. (Pl. Dep. 29:14-30: 25, 133:3-7, 134:16-23.) Plaintiff also testified that he complained about his pay. (Pl. Dep. 29:20-31:2.) Specifically, at an unidentified time, another employee, chief engineer Nestor Mena changed Plaintiff's pay rate in the computer system. Plaintiff reported the incident, Mena was required to correct the pay rate and apologize, and Plaintiff was compensated for the discrepancy in pay. (Pl. Dep. 135:16-136:21.)

Plaintiff also claims that he was required to perform duties outside his ordinary job responsibilities such as bringing ice for the bartender when he was working at room service, taking room service orders when he was working in the restaurant, handling noise complaints and other security issues, and bringing batteries to the hotel rooms. (Pl. Dep. 119:11-121.13; 160:22-163:7.) Plaintiff contends that he was asked to perform tasks outside his job description more frequently than white or Hispanic employees. (Pl. Dep. 120:21-121:13.) Plaintiff also claims that beverage and nightclub manager Floody asked Plaintiff to tie Floody's shoelaces. **[*8]** (Pl. Dep. 160:22-163:7.)

Plaintiff also alleges that the other Muslim and darker-skinned employees were forced out of the hotel after September 11, 2001. (Pl. Dep. 101:19-21; 105:23-106:18.) Plaintiff claims that: (1) Defendant stopped using the Bangladeshi employment agency and switched to an agency with "white looking" Polish employees, (Pl. Dep. 108:5-109:11); (2) he and other Bangladeshi employees were required to work at positions beneath their level, such as busboy instead of waiter, on holidays, (Pl. Dep. 105:2-106:18; 123:10-125:3); (3) Bangladeshi employees were not given preferential shifts, (Pl. Dep. 106:3-18); (4) lighter-skinned employees were kept in positions where they would be more visible to guests, (Pl. Dep. 125:4-7); and (5) another Bangladeshi employee was forced to perform tasks such as throwing salt outside on a snow day and cleaning a supervisor's car. (Pl. Dep. 106:20-23; 118:6-119:10.)

## 3. Incident With a Guest

On or about July 18, 2009, hotel guest Aaron Gross ordered a sandwich from the hotel bar, where Plaintiff was working as a bartender. (Final Pretrial Order 4.) Plaintiff delivered the sandwich to Gross in the Sheraton Link, a computer facility available **[*9]** to hotel guests. (Id.) Plaintiff explained to Gross that eating was not permitted in the Sheraton Link, and Gross responded that he would not eat there and was just going to check his email. (Id.) When Plaintiff returned a short time later, he discovered that Gross was eating his sandwich in the Sheraton Link and again told Gross that eating was not permitted. (Id.) Gross insisted that he be permitted to finish his sandwich, and a dispute ensued, during which Plaintiff alleges that Gross acted in a "very aggressive" manner, cursed, and hit Plaintiff on the left wrist with a leather billfold. (Id.; 56.1 Statement ¶¶ 20, 21; 56.1 Counterstatement ¶¶ 20, 21.) While both Gross and Plaintiff were attempting to speak with restaurant manager Widito, Plaintiff alleges that Gross referred to him as a "bastard" and pointed at him. (Final Pretrial Order 4.) Plaintiff screamed "don't curse me" and "I'm not going to take any more crap from you" and then used two hands to push Gross away. (Id.) Widito then directed Plaintiff to Human Resources, where Johnston asked Plaintiff to go home for the day pursuant to hotel policy. (Id.) Plaintiff was placed on suspension while Defendant investigated these **[*10]** events (the "Gross incident"). (Id.)

After the incident, Gross filed a report with the Mahwah Police Department, and Plaintiff subsequently filed his own report. (Id. 5.) Gross also filed a civil suit against the hotel and received a financial settlement. (Id.) Defendant conducted an investigation into the Gross incident and took written statements from Plaintiff, Widito, and Gross. (Id.) Johnston and the hotel's general manager, Wolford, together made the decision to terminate Plaintiff's employment. (Id.) Approximately five days after the incident, on or about July 23, 2009, Plaintiff met with Johnston and Wolford, who together informed Plaintiff that his employment was terminated for violation of the hotel's Workplace Violence Policy, which provides, in relevant part:

> Interstate expressly prohibits any acts or threats of violence by any Interstate associate . . . in or around Interstate facilities, or elsewhere, at any time. Interstate also prohibits any acts or threats of violence against guests, vendors, visitors or other persons on Interstate property at any time or while they are engaged in business with or on behalf of Interstate.

(*Id.* 3, 5.) The Workplace Violence Policy states **[*11]** that "[i]f the Company determines that workplace violence has occurred, the Company will take appropriate corrective action and may impose discipline on offending associates, up to and including termination." (56.1 Statement ¶ 3; 56.1 Counterstatement ¶ 3.)

## 4. Comparator Incident

Plaintiff presented evidence of another episode of workplace violence that had a different outcome for the employees involved. On or about November 29, 2008, Plaintiff was working as a bartender at the hotel and served hotel guest Jay Zaretsky. (Final Pretrial Order 5.) Plaintiff witnessed an inebriated Zaretsky behaving inappropriately by offering champagne to two female guests, touching those guests, and trying to lean on their chests. (*Id.*) Plaintiff called security and was directed to stop serving Zaretsky alcohol. (*Id.* 5-6.) Zaretsky became angry, knocked over glass pitchers, demanded to see a manager, and went to the hotel's front desk. (*Id.* 6.) At the front desk, Zaretsky shouted obscenities at Floody and lunged to swing at him. (*Id.*; Conca Dep. 23, 28-33, Ex. F to Schewe Supp. Decl.; Floody Dep. 55-58, Ex. G to Schewe Supp. Decl.) Floody, Conca, and/or David Martorano then took Zaretsky to the ground **[*12]** and restrained him. (Final Pretrial Order 6; Conca Dep. 23, 28-33; Floody Dep. 55-58.) The Mahwah Police Department responded to the incident and arrested Zaretsky. (Final Pretrial Order 6.) Floody, Conca, and Mortorano were not disciplined in connection with these events (the "Zaretsky incident"). (*Id.*)

## II. LEGAL STANDARD

*HN1*[↑] Pursuant to *Fed. R. Civ. P. 56(c)*, a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Celotex v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In other words, "[s]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp., 843 F.2d 139, 143 (3d Cir. 1988)*. All facts and

inferences must be construed in the light most favorable to the non-moving party. *Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994)*. The judge's function is not to weigh **[*13]** the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson, 477 U.S. at 249*. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 860 (3d Cir. 1990)*.

*HN2*[↑] The party seeking summary judgment always bears the initial burden of production. *Celotex, 477 U.S. at 323*. This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden. *Id. at 322-23*. Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

*HN3*[↑] To avoid summary judgment, the nonmoving party must then demonstrate facts supporting each element for which it bears the burden, and it must establish the existence of a "genuine issue of material fact" justifying trial. *Miller, 843 F.2d at 143*; **[*14]** *accord Celotex, 477 U.S. at 324*. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id. at 587* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968))*. Further, summary judgment may be granted if the nonmoving party's "evidence is merely colorable or is not significantly probative." *Anderson, 477 U.S. at 249-50* (citations omitted).

## III. DISCUSSION

### A. Employment Discrimination

*HN4*[↑] The NJLAD provides that it is unlawful "[f]or an

employer, because of the race, creed, color, [or] national origin . . . of any individual . . . to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . ." *N.J.S.A. 10:5-12(a).* **HN5**[⬆] On a motion for summary judgment on an NJLAD discrimination claim without direct evidence of discrimination, the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* **[*15]** See *Jakimas v. Hoffmann-LaRoche, Inc., 485 F.3d 770, 788 (3d Cir. 2007).* Thus, the plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) he belongs to a protected class; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999); Taylor v. Amcor Flexibles Inc., 669 F. Supp. 2d 501, 506 (D.N.J. 2009).* If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the termination. *McDonnell Douglas, 411 U.S. at 802; see also Taylor, 669 F. Supp. 2d at 506.* If the defendant articulates a legitimate, nondiscriminatory reason, the burden returns to the plaintiff to show that the defendant's proffered reason or reasons are pretextual. *McDonnell Douglas, 411 U.S. at 804-05; Taylor, 669 F. Supp. 2d at 506.*

## 1. *Prima Facie* Case

Defendant **[*16]** does not dispute that the first three elements of the *prima facie* case are satisfied; namely, that Plaintiff belongs to a number of protected classes, that Plaintiff was performing his job at an acceptable level, and that Plaintiff suffered an adverse employment action. (Final Pretrial Order 3-4; 56.1 Statement ¶¶ 5, 14, 15, 32, 33.) Defendant does, however, dispute whether there exists a material issue of fact as to the fourth element, namely that similarly situated employees who are not members of the protected classes were not subjected to termination or that the adverse employment action otherwise occurred under circumstances giving rise to an inference of discrimination. (Mot. Br. 6-10.) The Court need not decide whether there exists an issue of material fact as to whether Plaintiff's termination occurred under circumstances giving rise to an

inference of discrimination because even if a reasonable jury could conclude that Plaintiff has established a *prima facie* case, no reasonable jury could find Defendant lacked a legitimate, nondiscriminatory reason for Plaintiff's termination or that Defendant's proffered reason is pretextual.

## 2. Legitimate, Nondiscriminatory Reason

**HN6**[⬆] Assuming **[*17]** *arguendo* that Plaintiff has established a *prima facie* case, the burden of production shifts to Defendant to introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)* (citing *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).* "The employer need not prove that the tendered reason *actually* motivated its behavior . . . ." *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981))* (emphasis in original).

Defendant's proffered justification for Plaintiff's termination is Plaintiff's involvement in a physical altercation with a hotel guest in violation of Defendant's Workplace Violence Policy. (56.1 Statement ¶ 32; Mot. Br. 10.) It is undisputed that such an altercation occurred, (56.1 Statement ¶ 23; 56.1 Counterstatement ¶ 23), and such violence or even the threat of violence constitutes a legitimate, nondiscriminatory reason for termination. *See Exantus v. Harbor Bar & Brasserie Rest., 386 F. App'x 352, 355 (3d Cir. 2010)* (stating that **HN7**[⬆] "violence in the workplace is clearly a legitimate, nondiscriminatory reason for terminating **[*18]** an employee"); *see also Holland v. Macerich, Civ. No. 09-914, 2011 U.S. Dist. LEXIS 149657, 2011 WL 6934969, at *4 (D.N.J. Dec. 29, 2011)* (finding "argumentative and threatening behavior" a legitimate justification under the NJLAD). Consequently, Defendant has met its burden of articulating a legitimate, nondiscriminatory reason for Plaintiff's termination, and the burden returns to Plaintiff to show that the stated reason is pretextual.

## 3. Pretext

**HN8**[⬆] On a motion for summary judgment where

the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for

its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Fuentes, 32 F.3d at 764* (citations omitted). In other words, the "evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually **[*19]** motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (citations omitted and emphasis in original); *see also Swider v. Ha-Lo Indus., Inc., 134 F. Supp. 2d 607, 627 (D.N.J. 2001)*. The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes, 32 F.3d at 765* (internal quotation marks and citations omitted; emphasis and alteration in original).

Plaintiff argues that Defendant's stated reason for Plaintiff's termination is pretextual because: (1) similarly situated employees outside Plaintiff's protected classes retained their jobs, while Plaintiff's employment was terminated, (Opp'n Br. 15); and (2) other events show an ongoing effort to "force out the Bangladeshi employees." (*Id.* 15-18.)

**a. Comparators**

As to Defendant's treatment of similarly situated employees, Plaintiff argues that his treatment following the Gross incident was different from the treatment of Conca, **[*20]** Floody, and Martorano following the Zaretsky incident. It is undisputed that Plaintiff was terminated while Conca, Floody, and Martorano retained their jobs. (Final Pretrial Order 6.) The facts of the Gross and Zaretsky incidents, however, are insufficiently comparable for a reasonable jury to find Plaintiff "similarly situated" to Conca, Floody, and Martorano. *HN9*[⬆] For Conca, Floody, and Martorano to serve as comparators, they "must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or

their employer's treatment of them for it." *Davis v. City of Phila. Water Dep't, 57 F. App'x 90, 92 (3d Cir. 2003)* (internal quotation marks and citation omitted). In comparing the two incidents, the "focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 359 (3d Cir. 1999)* (citation omitted).

Viewing the record in the light most favorable to the Plaintiff, the facts of the Gross and Zaretsky incidents differ too significantly for a reasonable jury to consider Conca, Floody, or Martorano valid comparators. First, it is **[*21]** undisputed that Zaretsky was intoxicated while Gross was not. (56.1 Statement ¶ 53; 56.1 Counterstatement ¶ 53.) Second, it is undisputed that Zaretsky had been physically destructive and had verbally and physically harassed other hotel guests, while Gross had not. (56.1 Statement ¶¶ 20, 37, 39; 56.1 Counterstatement ¶¶ 20, 37, 39.) Third, although Plaintiff notes that Conca's and Floody's recollections of the Zaretsky incident differ in some respects, it is undisputed that Zaretsky initiated physical contact with Conca, Floody, and possibly Martorano; in contrast, although Gross allegedly hit Plaintiff on the wrist with a leather billfold while in the Sheraton Link, (Final Pretrial Order 4; 56.1 Statement ¶¶ 20, 21; 56.1 Counterstatement ¶¶ 20, 21), it is undisputed that at a separate location thereafter, Plaintiff initiated physical contact with Gross. (56.1 Statement ¶¶ 22, 23, 45, 49; 56.1 Counterstatement ¶¶ 22, 23, 45, 49.) Fourth, it is undisputed that Conca, Floody, and possibly Martorano merely restrained Zaretsky by bringing him to the ground and holding him there until the police arrived; at a minimum, Plaintiff pushed Gross. [4] (56.1 Statement ¶¶ 23, 45, 49; 56.1 Counterstatement **[*22]** ¶¶ 23, 45, 49.) Fifth, it is undisputed that the Mahwah Police Department subsequently arrested Zaretsky for his conduct; Gross was not arrested and in fact, subsequently filed a police report as a complainant and a civil complaint against the hotel. (56.1 Statement ¶ 35, 53; 56.1 Counterstatement ¶ 35, 53.) Given these undisputed facts concerning each of the incidents and the significant differences between them, these two

---

[4] Other evidence in the record suggests that Plaintiff may have punched Gross in the face. (56.1 Statement ¶¶ 29-31; 56.1 Counterstatement ¶¶ 29-31.) The Court assumes to be true the facts more favorable to Plaintiff, namely that Plaintiff pushed Gross rather than punched him. Nonetheless, the Court finds a push or a shove insufficiently similar to restraint of an inebriated leering or groping guest to render Conca, Floody, or Martorano valid comparators.

2 of 20

encounters cannot be described as substantially similar.

Plaintiff repeatedly argues that Defendant's Workplace Violence Policy "contains no exceptions," (*see, e.g.*, Opp'n Br. 10, 11, 13), and thus insists that Defendant executed the policy "in a preferential and discriminatory way" by terminating Plaintiff while **[*23]** retaining Conca, Floody, and Martorano. (*Id.* 14.) To the contrary, the policy states that "[i]f the Company determines that workplace violence has occurred, the Company will take appropriate corrective action and *may* impose discipline on offending associates, *up to* and including termination." (56.1 Statement ¶ 3; 56.1 Counterstatement ¶ 3 (emphasis added).) The plain text of the policy gives Defendant's managers the discretion to assess instances of workplace violence on an individual basis and impose appropriate discipline. Thus, Plaintiff's insistence that Defendant had no choice but to terminate Conca, Floody, and Martorano pursuant to the policy is meritless. Defendant was within its discretion to terminate Plaintiff while retaining the other employees, particularly given the undisputed factual differences between Plaintiff's actions and the actions of Conca, Floody, and Martorano. *See Greenawalt v. Clarion Cty., 459 F. App'x 165, 168-69 (3d Cir. 2012)* (affirming grant of summary judgment, in part for failure to present evidence of pretext, because the employer defendant "was well **[*24]** within its discretion in treating [the employee plaintiff's] case differently than those of his comparators" and agreeing with the District Court that the employer's determination that the plaintiff "committed a sufficiently egregious offense worthy of termination was such that a fact-finder could not reasonably infer that [his] termination was a post hoc fabrication, or that [his protected characteristics] motivated" the termination); *Dunlap v. Merritt Hospitality, Civ. No. 08-2019, 2009 U.S. Dist. LEXIS 22195, 2009 WL 737372, at *6-7 (E.D. Pa. Mar. 18, 2009)* (granting summary judgment, in part for failure to present evidence of pretext, where one hotel employee "was an active aggressor" while his proffered comparator "wrestled an individual to the ground"); *see also Gazarov v. Diocese of Erie, 80 F. App'x 202, 206 (3d Cir. 2003)* (affirming grant of summary judgment because even where the plaintiff "assert[s] a subjective belief that another's behavior is more serious, . . . unless it is the *same* conduct as the plaintiff's, the supposedly more serious act by the comparator is irrelevant") (emphasis in original).

Moreover, *HN10*[⬆] "[w]hile identification of one or two comparators may be sufficient at the prima facie stage **[*25]** of analysis, it is not sufficient at the pretext

phase." *Ray v. Pinnacle Health Hospitals, Inc., 416 F. App'x 157, 164 (3d Cir. 2010)* (citing *Simpson v. Kay Jewelers, 142 F.3d 639, 645-46 (3d Cir. 1998)).* Thus, even if Conca, Floody, and/or Martorano were valid comparators, Plaintiff would need to offer additional evidence that could lead a jury to conclude that the stated reason for his termination is pretextual to sustain his burden under the *McDonnell Douglas* framework. He has failed to do so.

**b. Past Treatment**

The other events in the workplace that Plaintiff described do not provide facts from which a reasonable jury could infer that the proffered reason for the termination was pretextual. Plaintiff argues that events beyond the Zaretsky incident demonstrate an ongoing effort to "force out the Bangladeshi employees," (Opp'n Br. 15-18), and show that Defendant's stated reason for Plaintiff's termination is pretextual. (*Id.* 33.) In essence, Plaintiff argues that after September 11, 2001, Defendant began a "crusade" to force out certain employees, that Plaintiff's termination was consistent with that "crusade," and that evidence of Plaintiff's past treatment at work could lead a reasonable **[*26]** jury to conclude that ethnicity, not Plaintiff's altercation with a guest, caused his termination. (*Id.* 2.) Specifically, Plaintiff points to portions of his own deposition describing instances in which: (1) other hotel employees used racial epithets like "Arab," "Indian," or "terrorist," (*id.* 16 (citing Pl. Dep. 102:19-20; 109:17-110:14; 110:19-21; 117:10-118:5); (2) Plaintiff was required to perform duties outside his ordinary job responsibilities, (*id.* (citing Pl. Dep. 119:10-121:3; 143:10-24; 160:22-163:7)); (3) Bangladeshi employees were given undesirable positions and/or schedules, (*id.* 16 (citing Pl. Dep. *passim*)); (4) Plaintiff was denied permission to use a "fake" name, (*id.* 17 (citing Pl. Dep. 101:13-102:4)); (5) another hotel employee changed Plaintiff's pay rate in the hotel system, (*id.* 17 (citing Pl. Dep. 135:4-136:10)); and (6) Plaintiff was terminated after failing to return to work after a 2002 vacation to Bangladesh, but was rehired with a loss of his accumulated seniority when he returned to work two or three weeks later. (*id.* 18 (citing Pl. Dep. 40:20-41:13).

Accepting all of these allegations as true, they nonetheless do not provide a sufficient basis upon which **[*27]** a reasonable jury could infer that the Gross incident was a "*post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes, 32 F.3d at 764*. Plaintiff's argument would require a jury to

conclude that for nearly eight years, from September 11, 2001, until July 18, 2009, Defendant attempted to force Plaintiff out of his job, all the while giving Plaintiff positive performance reviews and recommending him for other positions. (56.1 Statement ¶ 14; 56.1 Counterstatement ¶ 14; Ex. F to Wexler Decl. (describing Plaintiff in 2002 as a "flexible" and "multi-talented" employee with "excellent" or "good" ratings in all but one category—leadership); Ex. G to Wexler Decl. (describing Plaintiff in 2003 as a "very good" and "dependable" employee who "meets standard" in all categories); Ex. H. to Wexler Decl. (recommending Plaintiff for employment in 2004 and stating that he "has always come up to the task at hand"); Ex. I to Wexler Decl. (recommending Plaintiff for employment in 2004 as "an asset to our company as a capable employee and a hard worker"); Ex. J to Wexler Decl. (recommending Plaintiff for employment in 2008 as "a valuable full-time associate in excellent [*28] standing").) The duration of Plaintiff's employment, his positive reviews, and the nature of his physical encounter with Gross make implausible the notion that Defendant used the Gross incident as a pretext. See *Brokenbaugh v. Exel Logistics N. Am., Inc., 174 F. App'x 39, 46 (3d Cir. 2006)* (stating that if the "managers had been burdened with the discriminatory animuses [the plaintiff] claims, one would expect that he would have been terminated long before").

Plaintiff's argument would also require a jury to conclude that when Johnston and Wolford terminated Plaintiff a mere five days after the Gross incident, they were motivated not by the facts of the incident, but by their preexisting discriminatory animus dating back eight years. That conclusion would be plainly inconsistent with Plaintiff's admission that "[a]s a result of the [Gross incident] investigation, and in reliance on the witness statements collected, Johnston and Wolford together made the decision to terminate Plaintiff's employment *because* his conduct was a clear violation of the Workplace Violence Policy." (56.1 Statement ¶ 32; 56.1 Counterstatement ¶ 32 (emphasis added).) That admission underscores Plaintiff's inability [*29] to meet his burden of proving that the Gross incident was a pretext for his termination.

Moreover, Johnston and Wolford made their decision after reviewing witness statements indicating that Plaintiff punched Gross in the face. (56.1 Statement ¶¶ 29-30; 56.1 Counterstatement ¶¶ 29-30.) Even if those witness statements were inaccurate, Defendant's representatives reasonably relied upon them in making the termination decision. That Johnston's and Wolford's

reliance may have been misplaced is not a sufficient ground to find that Plaintiff's termination was discriminatory. See *Zangara v. Somerset Med. Ctr., No. L-1039-08, 2011 N.J. Super. Unpub. LEXIS 2529, 2011 WL 4577335, at *13 (N.J. Super. App. Div. Oct. 5, 2011)* (stating that **HN11**[↑] "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent") (quoting *Fuentes, 32 F.3d at 765*).

Consequently, no reasonable jury could conclude, on the basis of Plaintiff's prior treatment at work, that Defendant concocted the reason for Plaintiff's termination after the fact or that the Gross incident did not cause [*30] Defendant to terminate Plaintiff. Thus, even assuming that Plaintiff had been able to establish a *prima facie* case of discriminatory termination under the NJLAD, Defendant has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination and Plaintiff has failed to meet his burden to show that the stated reason was pretextual. Because no reasonable jury could conclude, even viewing the facts in a light most favorable to Plaintiff, that the Gross incident was a pretext for Plaintiff's termination, summary judgment is granted for Defendant as to Count One.

## B. Retaliation

**HN12**[↑] The NJLAD provides that it is unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint." *N.J.S.A. 10:5-12(d)*. On an NJLAD retaliation claim, the Court applies the *McDonnell Douglas* burden-shifting framework. S*ee Cottrell v. Good Wheels, 458 F. App'x 98, 100-01 (3d Cir. 2012)*; *Sgro v. Bloomberg L.P., 331 F. App'x 932, 937 (3d Cir. 2009)*. Thus, for a claim of retaliation, "a plaintiff must show that: (1) he or she engaged in protected conduct known to the defendant; (2) he [*31] or she was subjected to an adverse employment decision; and (3) there was a 'causal link' between the protected activity and the adverse decision." *Marrero v. Camden Cty. Bd. of Social Serv., 164 F. Supp. 2d 455, 472-73 (D.N.J. 2001)*; *see also Cottrell, 458 F. App'x at 100*; *Victor v. State, 203 N.J. 383, 409, 4 A.3d 126 (2010)*. If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to "articulate a 'legitimate, non-retaliatory reason for the action.'" *Marrero, 164 F. Supp. 2d at 473* (quoting

*Shepherd v. Hunterdon Developmental Ctr., 336 N.J. Super. 395, 418, 765 A.2d 217 (App. Div. 2001))*. If the defendant articulates a legitimate, non-retaliatory reason, the burden returns to the plaintiff to "demonstrate that a retaliatory intent motivated the defendants." *Id.* (citing *Shepherd, 336 N.J. Super. at 418*).

Thus, *HN13*[↑] to obtain summary judgment in its favor, "the employer must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the employer's decisionmaking process *and* (2) that it had a determinative effect on the outcome of that process." *Krouse v. American Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997)* (emphasis **[*32]** added). According to *Krouse*,

> this may be accomplished by establishing the plaintiff's inability to raise a genuine issue of material fact as to either: (1) one or more elements of the plaintiff's prima facie case or, (2) if the employer offers a legitimate non-retaliatory reason for the adverse employment action, whether the employer's proffered explanation was a pretext for retaliation.

*Id.* (citations omitted).

## 1. *Prima Facie* Case

*HN14*[↑] At the summary judgment stage, a plaintiff meets his initial burden if he shows that "the proffered evidence, looked at as a whole . . . suffice[s] to raise the inference" of a causal connection between protected activity and an adverse employment action. *Kachmar v. SunGard Data Sys. Inc., 109 F.3d 173, 177 (3d Cir. 1997)*. In this context, protected activity includes "oppos[ing] any practice made unlawful by [LAD]" or when an individual "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" regarding "discrimination against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such an individual's [protected characteristic]." *Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995)* **[*33]** (citations omitted); *see also Fabrikant v. Arthur J. Gallagher & Co. et al., No. L-4417-04, 2008 N.J. Super. Unpub. LEXIS 3057, 2008 WL 281690 at *7-8 (N.J. Super Ct. App. Div. Feb. 4, 2008)*. With respect to a causal link, courts have "focused on the temporal proximity between the employee's protected activity and the adverse employment action," but "where there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference." *Kachmar, 109 F.3d at 177* (quoting *Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993))*. Thus, if "the temporal proximity is not so close as to be unduly suggestive" of retaliation, "timing plus other evidence may be an appropriate test." *Williams v. Philadelphia Housing Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004)* (internal quotation marks and citations omitted).

Plaintiff's entire argument concerning a *prima facie* case of retaliation contains two citations to the record. The first is a citation to paragraphs 14 and 15 of Defendant's 56.1 Statement, which state that Plaintiff received positive reviews and letters of recommendation. (Opp'n Br. 20 (citing 56.1 Statement ¶¶ 14, **[*34]** 15).) That Plaintiff received positive reviews and letters of recommendation after lodging one or more complaints about his coworkers' actions weighs *against* an inference that Plaintiff's eventual termination was retaliatory. *See Elmiry v. Wachovia Corp., Civ. No. 04-3621, 2007 U.S. Dist. LEXIS 84919, 2007 WL 4117260, at *12 (D.N.J. Nov. 16, 2007)* (granting summary judgment as to a retaliation claim where "[n]o conduct of [the plaintiff's supervisor] in the interim suggests any animus. In fact, plaintiff got a positive annual review, receiving a 'Meets Expectations' overall rating subsequent to the incident.").

The second is a citation to page 149 of Plaintiff's deposition transcript, (Opp'n Br. 19), which reads:

> Q. You said you didn't want to complain to Human Resources or to any of your supervisors because you were afraid you're going to be fired, correct?
> A. Correct.
> Q. But the one time that you did get Human Resources involved with Helen Johnston, you know, with Jerry Thompson nothing bad happened to you?
> A. No.
> Q. So, I want to understand why do you believe you were going to be fired if you did complain to Human Resources?
>
> A. Because the other people you, like, they call me names. They call me names, they call me **[*35]** terrorists every week. So, how many times do you think I should go over there and tell them. Every time they call me you terrorists, so I should go over there and tell them. I don't think so because how many times somebody going to hear me then

saying the same thing over and over. So this is why I just kept it inside to myself.

Q. But you didn't even tell them once?

A. No.

(Pl. Dep. 148:24-149:21.) On this record, which reflects just one complaint to Human Resources, there is no factual basis to support Plaintiff's argument that he made "*constant* complaints of discrimination over his decade of employment with the Sheraton [that] were the catalyst leading to his termination." (Opp'n Br. 20 (emphasis added).)

Looking beyond these two citations, a review of the entire record shows two other complaints and responses thereto, namely that: (1) in around 2007 or 2008, Hortado yelled at Plaintiff and called him "Indian" after Plaintiff cursed at Hortado, (Pl. Dep. 129:17-131:21); after the incident, Food and Beverage Director Trata and the chef took the two of them to the chef's office and made them shake hands, and Hortado received a verbal warning, (Pl. Dep. 131:11-21, 131:25-132:5); and (2) **[*36]** at an unidentified time chief engineer Mena changed Plaintiff's pay rate in the computer system but once Plaintiff reported the incident to Human Resources, Mena was forced to correct the pay rate and apologize to Plaintiff and Plaintiff was compensated for the week that he reported the error. (Pl. Dep. 135:6-136:21). Thus, after each complaint to a supervisor, once in 2002 or 2003, once in 2007 or 2008, and once at an unidentified time, management reprimanded the offending employee and the offending conduct ceased, (*see* Pl. Dep. 102:23-25, 131:11-21, 131:25-132:5), and there is no evidence to show Plaintiff was negatively impacted as a result of his complaints.

Plaintiff also testified that Conca, Floody and McNamara called him a "terrorist" and "Arab" a "lot of times" but he never complained to anyone and instead tried to ignore the comments or change the subject because he thought such complaints would be futile or because he feared retaliation. (Pl. Dep. 103:19-104:17, 109:17-110:10.) Such *HN15*[↑] a fear "does not obviate the requirement for protected activity." *Chambers v. Heidelberg USA, Inc., Civ. No. 04-583, 2006 U.S. Dist. LEXIS 32334, 2006 WL 1281308, at \*10 (D.N.J. May 5, 2006)* (finding that the plaintiff had **[*37]** not engaged in protected activity when he never complained of discrimination prior to his termination even though he alleged his failure to report was based on fear of retaliation). Additionally, while Plaintiff alleges he feared he would be fired for complaining, he admits that no one told him such action was a possibility and his earlier

complaints about ethnic remarks were addressed without repercussion. (Pl. Dep. 147:24-149:21.) *See Chambers, 2006 U.S. Dist. LEXIS 32334, 2006 WL 1281308, at \*10 n.6* (finding lack of protected activity when plaintiff contended he feared retaliation but admitted he did not know of any prior incidents of retaliation and knew of his employer's anti-harassment policy).

Plaintiff further testified that he complained to Widito when McNamara gave a woman named Libra the best shifts based on McNamara's personal relationship with her (Pl. Dep. 126:13-129:13). *HN16*[↑] Complaints of preferential treatment based upon a personal relationship are not protected under NJLAD and thus cannot provide a basis for relief. *See Stewart v. Cty. of Hudson, No. L-3579-07, 2011 N.J. Super. Unpub. LEXIS 1965, 2011 WL 2935042 at \*11 (N.J. Super Ct. App. Div. July 22, 2011)* (citation omitted) (finding that although plaintiff submitted complaints, since **[*38]** they were not "couched in terms of LAD based membership," there was no protected activity); *Sunkett v. Misci, 183 F. Supp. 2d 691, 719 (D.N.J. 2002)*; *Dungee v. Northeast Foods, Inc., 940 F. Supp. 682, 689 (D.N.J. 1996)*.

As a whole, the record shows that Plaintiff complained sporadically about treatment by his coworkers between 2002 and 2008. Plaintiff was terminated at least a year after the last instance of protected activity he cites, but merely five days after the Gross incident Defendant cites as the sole reason for Plaintiff's termination. There are thus no facts upon which a reasonable jury could find temporal proximity between Plaintiff's protected activity and his termination. *See Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004)* (finding a lapse of two months between protected activity and employment action not "unduly suggestive" of retaliation); *Levins v. Braccia, No. L-2980-06, 2009 N.J. Super. Unpub. LEXIS 1473, 2009 WL 1658610, at \*7 (N.J. Super. App. Div. June 16, 2009)* (finding a lapse of four months between confrontation with supervisor and termination insufficient to support causal connection).

The absence of facts upon which temporal proximity could be found weighs against **[*39]** an inference of causal connection, and Plaintiff here has not demonstrated the "pattern of antagonism" necessary to support such an inference when no temporal proximity exists. *Kachman, 109 F.3d at 177*. The record shows that management almost always responded to Plaintiff's complaints and caused the objectionable conduct to

cease, [5] that the managers did not engage in the objectionable conduct about which he complained, and that Plaintiff received positive reviews after complaining. Rather than a pattern of antagonism, the record demonstrates that Defendant's managers took steps to remedy issues Plaintiff raised by imposing discipline on intolerant employees. Thus, no reasonable jury could conclude, on the record presented, that retaliatory animus played a role in Defendant's decisionmaking process *or* that retaliatory animus had a determinative effect on the outcome of that process. The only reasonable inference is that Plaintiff was terminated, five days after the Gross incident, for his involvement in that incident. Consequently, Plaintiff has failed to meet his burden to establish a *prima facie* case of retaliation.

### 2. Legitimate, Non-retaliatory Reason

For the reasons discussed in Section III.A.2 *supra*, Defendant has articulated a legitimate reason for Plaintiff's termination that is neither discriminatory nor retaliatory—his physical altercation with a hotel guest, Aaron Gross. Thus, even if Plaintiff had established a *prima facie* case of retaliation, the burden would return to Plaintiff to show that a reasonable jury could conclude that a retaliatory intent motivated Defendant.

### 3. Pretext

In arguing that Defendant's stated reason for termination is a pretext for retaliation, Plaintiff merely incorporates by reference his argument that the stated reason for termination is a pretext for discrimination. For the reasons discussed in Sections III.A.3 and III.B.1 *supra*, no reasonable jury could conclude, on the evidence [*41] presented, that Defendant's stated reason for Plaintiff's termination is a pretext for retaliation. Plaintiff has not provided evidence that a similarly situated comparator was treated differently, nor is Plaintiff's treatment at work indicative of retaliatory motive. Even after he complained, he received positive performance evaluations and so much time passed between his last

---

[5] Plaintiff testified that he requested to change his name tag to [*40] be less indicative of his Muslim faith, and that request was denied. (Pl. Dep. 101:22-102:1.) Plaintiff does not, however, identify any other instance in which a request to change a name tag was granted. While not a complaint about a particular person's behavior, this is the only instance in the record where Plaintiff allegedly sought relief from hotel management and that relief was denied.

complaint and termination that no reasonable jury could conclude this termination was because of his complaints and not his physical contact with Gross. Thus, even if Plaintiff had established a *prima facie* case of retaliation, summary judgment for Defendant is appropriate because Defendant has articulated a legitimate, non-retaliatory reason for Plaintiff's termination that Plaintiff has failed to rebut. Consequently, summary judgment is granted for Defendant as to Count Two.

### C. Hostile Work Environment

*HN17*[↑] To establish an NJLAD claim for hostile work environment, the plaintiff must show that "the complained-of conduct (1) would not have occurred but for the employee's [protected characteristic]; and it was (2) severe or pervasive enough to make a (3) reasonable [person in plaintiff's protected class] believe that [*42] (4) the conditions of employment are altered and the working environment is hostile or abusive." *Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 114 (3d Cir. 1999)* (citing *Lehmann v. Toys R Us, Inc., 132 N.J. 587, 603-04, 626 A.2d 445 (1993))*.

Viewing the relevant facts in the light most favorable to Plaintiff, the record shows that: (1) Defendant hired Plaintiff around October 1998, (Final Pretrial Order 3); (2) in 2002, Plaintiff was terminated when he failed to return to work as scheduled from his approved leave of absence, (*id.* 4); (3) Plaintiff was immediately rehired when he eventually reported to work but lost the seniority he had accrued between 1998 and 2002, (*id.*); (4) in 2002 or 2003, Plaintiff complained to Human Resources that Thompson had called Plaintiff "Indian," (*id* 6); (5) Thompson was given a verbal warning and did not refer to Plaintiff as "Indian" again, (*id.*); (6) bartender Conca, beverage and nightclub manager Floody, head bartender McNamara, and cook Hortado, none of whom were Plaintiff's manager or supervisor at the time of his termination, (56.1 Statement ¶9, 56.1 Counterstatement ¶9), referred to him as "Indian," "terrorist," and "Arab" over the course of his employment, [*43] (56.1 Statement ¶¶ 54-60; 56.1 Counterstatement ¶¶ 54-60), but he never complained to anyone about these comments, (Pl. Dep. 103:19-104:17, 109:17-110;10, 147:21-149:21); (7) in 2007 or 2008, cook Hortado yelled at Plaintiff and called him "Indian" after Plaintiff cursed at Hortado, and Hortado subsequently received a verbal warning, (Pl. Dep. 131:11-21; 131:25-132:5); and (8) after getting into an argument with his second level supervisor Trata, Trata told Plaintiff's immediate supervisor, Widito, to remove Plaintiff from the banquet

schedule. (Pl. Dep. 29:14-30: 25, 133:3-7, 134:16-23.)

Plaintiff also testified: (1) that the other Muslim and darker-skinned employees were forced out of the hotel after September 11, 2001, (Pl. Dep. 101:19-21; 105:23-106:18); (2) that he requested a name tag that did not contain his last name so that it would not be as obvious that he was Muslim, but the request was denied, (Pl. Dep. 101:23-102:1); (3) that Bangladeshi employees were forced out because they were not given preferential shifts, (Pl. Dep. 105:2-106:18); (4) that another Bangladeshi employee was forced to perform tasks such as throwing salt outside on a snow day and cleaning a supervisor's **[*44]** car because he was Bangladeshi, (Pl. Dep. 106:20-23; 118:6-119:10); (5) that Defendant stopped using the Bangladeshi employment agency and switched to an agency with "white looking" employees, (Pl. Dep. 108:5-109:11); (6) that Plaintiff was asked to perform tasks outside his job responsibilities more frequently than white or Hispanic employees, (Pl. Dep. 119:11-121:13; 160:24-163:7); (7) that white and Hispanic employees were given better shifts, (Pl. Dep. 121:14-123:9); and (8) that Plaintiff and other Bangladeshi employees were required to work at positions beneath their level, such as busboy instead of waiter, on holidays, (Pl. Dep. 123:10-125:6); (9) that lighter-skinned employees were kept in positions where they would be more visible to guests, (Pl. Dep. 125:4-7); and (10) that chief engineer Mena changed Plaintiff's pay rate in the computer system, but when Plaintiff reported the incident to Human Resources, Mena was forced to correct the pay rate and apologize to Plaintiff. (Pl. Dep. 135:6-136:10, 137:1.)

These allegations do not provide a sufficient basis upon which a reasonable jury could find Defendant liable to Plaintiff for his hostile work environment claim because: (1) **[*45]** much of the alleged conduct is time-barred and thus not actionable, and Plaintiff has not established that the "continuing violation" exception to the statute of limitations applies; (2) Plaintiff has not demonstrated that Defendant can be held vicariously liable for the conduct of Plaintiff's coworkers; (3) the alleged conduct is insufficiently severe or pervasive; and (4) Plaintiff has not shown the conditions of his employment were altered.

## 1. Time Barred Complaints

*HN18*[⬆] The statute of limitations for hostile work environment claims under the NJLAD is two years. *See Helmi, No. L-2398-06, 2010 N.J. Super. Unpub. LEXIS 2863, 2010 WL 4861443 at *4 (N.J. Super. Ct. App. Div. Dec. 1, 2010)* (citing *Montells v. Haynes, 133 N.J. 282, 292, 627 A.2d 654 (1993))*. As discussed above, the bulk of Plaintiff's complaints concern his treatment by coworkers between 2002 and 2008. (*See* Pl. Dep. 29:14-30:25, 102:19-23, 110:15-24, 126:13-128:23, 129:17-131:21.) Thus, the ability to bring claims based upon the bulk of those incidents lapsed before he filed his Complaint on October 15, 2010.

Further, contrary to Plaintiff's arguments, his complaints do not fall within *HN19*[⬆] the continuing violations theory, which allows a claim to proceed if one of a "series of acts, **[*46]** which together created the hostile environment" occurred within the statutory period. *Helmi, 2010 N.J. Super. Unpub. LEXIS 2863, 2010 WL 4861443 at *4*. Here, Plaintiff failed to show a relationship between the alleged conduct that occurred before the statute of limitations and that which occurred within the statutory period. *See 2010 N.J. Super. Unpub. LEXIS 2863, [WL] at *5* (finding no continuing violation where the plaintiff was unable to show the incidents were "consistent, persistent, or unrelenting throughout this time" but rather were "isolated and infrequent"). With the exception of Plaintiff's allegation that Hortado called him names during an argument which possibly occurred in 2008,[6] potentially within the two-year statutory period, Plaintiff fails to identify dates, or even years, that the alleged events—the name calling, denial of his request for a different name tag, assignment of unfavorable shifts and job assignments on holidays, requests to do jobs outside his responsibilities, use of a different employment agency, keeping lighter-skinned employees in more visible positions, and Mena changing his pay rate— occurred. (56.1 Statement ¶¶ 54-60.) **[*47]** Further, the incidents that were actually brought to management's attention were addressed and thus, undercut a reasonable juror's ability to find pervasive discrimination throughout Plaintiff's employment. Accordingly, as Plaintiff has failed to provide evidence upon which a reasonable juror could find that many of the events upon which he relies to establish a hostile work environment claim fall within the statutory limitations period and he has not presented sufficient facts from which a reasonable jury could find a continuing violation, his hostile work environment claim fails.

---

[6] Plaintiff alleges this incident occurred in either 2007 or 2008. (56.1 Statement ¶ 60; Pl. Dep. 131:11-132:5.)

## 2. Vicarious Liability

**HN20**[⬆] For an employer to be liable for a hostile work environment, a plaintiff must show that the offending conduct was done by a "supervisor who was acting as the defendant's agent under traditional agency principles." *Entrot v. BASF Corp., 359 N.J. Super. 162, 171, 819 A.2d 447 (App. Div. 2003)*. The "mere title of manager or supervisor does not by itself suffice to impute that employee's knowledge or actions to the employer." *Cavuoti v. NJ Transit Corp., 161 N.J. 107, 123, 735 A.2d 548 (1999)* (internal quotations **[*48]** and citations omitted). Rather, whether an individual constitutes a supervisor for the purposes of imputing liability on the defendant employer depends on whether the plaintiff believed that the offending employee had the authority to negatively affect the plaintiff's working life, such as the power to terminate and demote the plaintiff, to affect compensation, and to control work functions. *Entrot, 359 N.J. Super. at 181*. Plaintiff's supervisors at the time of his termination were Widito, Trata, and Wolford, none of whom Plaintiff alleges made discriminatory remarks. (56.1 Statement ¶ 9; 56.1 Counterstatement ¶ 9.) Moreover, there is no evidence in the record from which a reasonable jury could find that Conca, Floody, McNamara, or Hortado, the individuals who are alleged to have repeatedly used racial epithets, had the ability to terminate or demote Plaintiff or affect his pay or work duties. Although Floody is identified as the beverage and nightclub manager, the fact that he had that title, without more, fails to demonstrate he had the authority to hire, fire, discipline, or control Plaintiff's wages, hours, or working conditions such that Defendant would be liable for the offensive **[*49]** name calling Plaintiff attributes to him. *See Cavuoti, 161 N.J. at 123-24* (citing *Ulrich v. K-Mart Corp., 858 F. Supp. 1087, 1093 (D. Kan. 1994)* and *Hunter v. Countryside Assoc. for the Handicapped, Inc., 723 F. Supp. 1277, 1278 (N.D. Ill. 1989))*. Thus, a reasonable jury could not find that these individuals were Plaintiff's supervisors or that Defendant would be liable for their conduct. Had the record showed that the statements were made within the statute of limitations and had the record showed that these individuals were Plaintiff's supervisors, the outcome may have been different. *See Cutler v. Dorn, 196 N.J. 419, 440, 955 A.2d 917 (2008)* (finding a supervisor's degrading comments about the plaintiff's faith and ancestry directly aimed at plaintiff may be a basis to hold the employer liable for hostile work environment). As Plaintiff's supervisors did not make the derogatory comments and as he attributed the remarks only to his co-workers, Defendant is not liable to Plaintiff for the creation of a hostile work environment under traditional agency principles.

## 3. Severity or Pervasiveness

**HN21**[⬆] When evaluating the severity or pervasiveness requirement of a hostile work environment claim, a court examines **[*50]** all the circumstances such as "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Heitzman v. Monmouth Cnty., 321 N.J. Super. 133, 147-48, 728 A.2d 297 (1999)* (holding "sporadic" and "casual" comments that did not physically threaten, humiliate or alter the plaintiff's "work performance" were not severe or pervasive); *see also Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005)*; *Harris v. Forklift Sys. Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*. The conduct itself is what must be severe or pervasive, not the impact on the plaintiff or the work atmosphere. *Lehmann, 132 N.J. at 606*.

Although it is unclear from the record how often Plaintiff's coworkers used ethnic epithets, the references to Plaintiff as "Indian," "terrorist," and "Arab," are certainly offensive and inappropriate, and show "lack of racial or ethnic sensitivity." *Russo v. Ryerson, Civ. No. 01-CV-4458 JLL, 2006 U.S. Dist. LEXIS 10447, 2006 WL 477006 at *15 (D.N.J. Feb. 27, 2006)* (finding a supervisor's use of the word "ginzo", "while discourteous" was not sufficient to meet the severity and pervasive requirement **[*51]** of the NJLAD.) *see also Fabrikant, 2008 N.J. Super. Unpub. LEXIS 3057, 2008 WL 281690 at *6* (citing *Heitzman, 321 N.J. Super. at 147*) (stating that an anti-employment discrimination law is not meant to be "a general civility code for conduct in the workplace") (internal quotation marks omitted). It is undisputed that Plaintiff never told management about these remarks and that, when he brought problems he encountered to management, his complaints were addressed. The sole request he made that was denied involved his request to change or omit portions of his name on his name tag. Nothing in the record sheds light on why the request was denied, but it is logical to infer that an employer requires name tags so that its guests can identify employees they encounter. Furthermore, encouraging employees to conceal their ethnicity or religion could in fact be viewed as inconsistent with an equal employment opportunity workplace. Moreover,

Plaintiff's request would not have addressed the attitude of Plaintiff's coworkers who already knew his name and would not have addressed the conduct about which he now complains. Thus, the denial of this request does not provide a basis for the employer to be found to have hosted a hostile work **[\*52]** environment.

As to the matters concerning work assignments, Plaintiff's own testimony shows that he did not view decisions about assignments as being based on his ethnic background. Rather, he testified that they were based on a personal relationship between the person making the assignments and the person who received them. (Pl. Dep. 126:13-129:13.) Thus, protected characteristics were not "the cause of the harassment, [which] is the defining element of a hostile work environment claim." _Fabrikant, 2008 N.J. Super. Unpub. LEXIS 3057, 2008 WL 281690 at \*6_ (internal quotation marks and citations omitted). Moreover, even assuming he was asked to perform tasks outside his job responsibilities, such as bringing ice for the bartender when he was working at room service, taking room service orders when he was working in the restaurant, handling noise complaints and other security issues, and bringing batteries to the hotel rooms, none of these tasks was inherently demeaning, (_see_ Pl. Dep. 119:11-121.13;  160:22-163:7), and he was positively recognized for his good work and attitude, including his flexibility, (Ex. F to Wexler Decl.), dependability, (Ex. G to Wexler Decl.), hard work, (Ex. I to Wexler Decl.), and rising to the **[\*53]** task at hand. (Ex. H. to Wexler Decl.) The single episode he described that could be viewed as demeaning, namely being asked to tie Floody's shoelaces, if true, was obnoxious, but Floody's behavior does not provide a basis to conclude that Defendant maintained a hostile work environment. (_See_ Pl. Dep. 160:22-163:7.) To the contrary, Plaintiff admitted that he was "embarrassed to tell anybody" about that incident, and Defendant therefore did not receive notice of Floody's conduct. (Pl. Dep. 161:3-5.) and comments described in the record rose to the requisite level of severity or pervasiveness.

## 4. Altered Conditions of Employment

Although _HN22_[⬆] a plaintiff need not prove "evidence of actual change in working conditions" to demonstrate a hostile work environment, _Taylor v. Metzger, 152 N.J. 490, 505, 706 A.2d 685 (1998)_, here Plaintiff's failure to produce evidence showing the complained of actions altered his conditions of employment further undermines his hostile work environment claim. _See  id. at 508_

(finding that although demonstration of a change in conditions was not required, a rational factfinder could believe that working conditions were altered when following a supervisor's racist remark, other employees  **[\*54]** "acted coolly" toward the plaintiff and "created the impression that they had been told to stay away from her"). Plaintiff does not allege that the behavior or events he described altered his supervisors' views of him and in fact, he continued to receive positive evaluations and recommendations for other positions until his termination. (56.1 Statement ¶¶ 14-15; 56.1 Counterstatement ¶¶ 14-15.) Accordingly, Plaintiff fails to demonstrate the conditions of his employment were altered based on the comments and incidents he described.

## 5. Anti-Discrimination Policies

Additionally, Defendant had effective preventive and remedial measures in place to address complaints of discrimination, which weighs against a finding of liability. _HN23_[⬆] Although the mere presence of anti-harassment policies does not prove an absence of negligence, "effective preventative mechanisms" demonstrate "some evidence of due care" by the employer. _Lehmann, 132 N.J. at 621_. To avoid liability, the policies cannot merely be present but must be "backed up by consistent practice." _Id_. A company will be less apt to be liable for a hostile work environment claim if it has "policies reflecting a lack of tolerance for harassment"  **[\*55]** such as "periodic publication to workers of its anti-harassment policy; an effective and practical grievance process; and training sessions for workers, supervisors, and managers about how to recognize and eradicate unlawful harassment." _Cavuoti, 161 N.J. at 121_.

Here, Defendant had a published policy against discrimination that Plaintiff acknowledged that he received. (56.1 Statement ¶¶ 2, 4; 56.1 Counterstatement ¶¶ 2, 4.) Further, as discussed in Section III.B.1 _supra_, Defendant demonstrated that it did not tolerate harassment by responding to Plaintiff's complaints against Thompson, Hortado, and Mena. Although Plaintiff alleges that other employees also made discriminatory comments, Plaintiff admits he did not report them and thus, Defendant did not know about these comments and could not take action. _See Burlington Indus. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)_ (holding _HN24_[⬆]) an employer should not be held responsible when its employee "unreasonably failed to take advantage of any

2012 U.S. Dist. LEXIS 103512, *55

preventative or corrective opportunities provided by the employer"). As Defendant had effective anti-harassment policies in place and responded to complaints brought to its attention, a reasonable jury could not **[*56]** find Defendant liable on a hostile work environment claim based on allegedly discriminatory comments made by his coworkers that Plaintiff did not report.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted and Plaintiff's Cross-Motion for Summary Judgment is denied. An appropriate order will issue.

*/s/ Faith S. Hochberg*

**Hon. Faith S. Hochberg, U.S.D.J.**

---

End of Document

Pooja Bhutani

 Cited
As of: May 7, 2021 8:28 PM Z

## *Ciecka v. Cooper Health Sys.*

United States District Court for the District of New Jersey

February 14, 2017, Decided; February 14, 2017, Filed

Civil Action No. 15-4075 (JBS/KMW)

**Reporter**
2017 U.S. Dist. LEXIS 20539 *; 2017 WL 656727

MICHAEL CIECKA, Plaintiff, v. THE COOPER HEALTH SYSTEM, Defendant.

## Core Terms

technologists, operating room, termination, summary judgment, retaliation, performance evaluation, age discrimination, competency, parties, reasons, staff, Radiology, skills, non discriminatory reason, protected activity, Deposition, assigned, comments, hostile work environment, discriminatory, disputes, expectations, complaints, progress, severe, cases, hostile work environment claim, adverse employment action, summary judgment motion, material fact

**Counsel:** **[*1]** For Plaintiff: Ari R. Karpf, Esq., Julia W. Clark, Esq., Karpf Karpf & Cerutti PC., Bensalem, PA.

For Defendant: Christine P. O'Hearn, Esq., Brown & Connery, LLP, Westmont, NJ.

**Judges:** HONORABLE JEROME B. SIMANDLE, Chief United States District Judge.

**Opinion by:** JEROME B. SIMANDLE

## Opinion

**SIMANDLE, Chief Judge**:

## I. INTRODUCTION

In this employment discrimination case, Plaintiff Michael Ciecka alleges that he was wrongfully terminated from his position as a radiology technologist with Defendant The Cooper Health System because of his age. Plaintiff avers that he was subjected to age discrimination, retaliation, and a hostile work environment in violation of the *Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.*, and the *New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq.* The Cooper Health System now moves before this Court for summary judgment on all of Plaintiff's claims. For the reasons that follow, the Court will grant in part and deny in part Cooper's motion.

## II. BACKGROUND

Plaintiff Michael Ciecka ("Plaintiff") was employed as a full-time radiology technologist by The Cooper Health System ("Cooper") from January 24, 2000 until his termination on December 11, 2014. (Deposition of Michael Ciecka ("Ciecka Dep.") [Exhibit A to Certification of **[*2]** Christine P. O'Hearn ("O'Hearn Cert.")] at 41:21, 295:22-25.) Plaintiff was 52 years old at the time of his termination. (Id. at 11:10-12.) At that time, only four or five staff technologists at Cooper were older than Plaintiff, in a group of about 45 employees. (Id. at 81:6-84:8.)

Radiology Technologists at Cooper

Radiology technologists at Cooper are responsible for performing diagnostic radiographic procedures, placing patient testing orders, completing necessary paperwork and logs, and maintaining competency in a variety of

clinical settings, including the operating room, emergency room, trauma, general, portable, and fluoroscopy. (Ciecka Dep. at 61:13-62:8; see also Radiology Technologist Job Description [Ex. B to O'Hearn Cert.].) Most staff technologists rotate through the different departments, and work is assigned by weekly schedules. (Deposition of Cindy Alessandrini [Ex. C to O'Hearn Cert.] at 15:6-18.) A few technologists are assigned exclusively to the operating room and are apparently held to a higher standard of competency than those who merely rotate through. (Deposition of Ron Colna ("Colna Dep.") [Ex. D to O'Hearn Cert.] at 134:8-18.) Day-to-day, cases in the operating [*3] room are assigned by a schedule set in the morning, subject to change if emergency cases came in. (Id. at 49:4-51:7.) The parties dispute how much control staff technologists have over the cases and procedures they perform. (Compare Defendant's Statement of Material Facts ("Def. SMF") ¶ 71 with Plaintiff's Statement of Material Facts ("Pl. SMF") ¶ 71, ¶¶ 170-176.)

There are two pieces of equipment in particular that technologists use at Cooper: the O-arm and the C-arm. (Ciecka Dep. at 137:2-138:9; see also Cooper University Radiology Job Specific Responsibilities and Competency Review [Ex. F to O'Hearn Cert.].) Both pieces of equipment have been used in Cooper's operating room since at least 2010, and the competencies and requirements for operation did not change during the course of Plaintiff's employment. (Deposition of Andrea Mullison [Ex. K to Plaintiff's Statement of Material Facts ("Pl. SMF")] at 36:15-37:2.)

Technologists' equipment skills are evaluated during their initial 3-month probation. (Deposition of Joseph LeBender ("LeBender Dep.") [Ex. H to O'Hearn Cert.] at 25:9-20.) Once a technologist passes probation, he is presumed to be competent in all of the required equipment [*4] and clinical departments. (Id.) Thereafter, technologists are reviewed annually by their supervisors, with a focus on a different skill each year. (Id. at 24:19-25:8.) The Cooper Performance Evaluation form provides space to give employees a "core value rating" and an "overall evaluation" on a scale of "does not meet expectations (1)" to "outstanding (5)," along with comments from their supervisor. (See Performance Evaluation Forms Dated 2010 through 2014 [Ex. M, N, O, P & Q to O'Hearn Cert.]; see also Performance Evaluations [Ex. F & S to Pl. SMF].) Those employees rated "needs improvement" or "does not meet expectations" require an Action Plan for Improvement of Employee Performance, detailing a description of the supervisor's concerns, a plan for improvement, and a

progress review. (See id.) Employees are rated on a 5-point scale on core values including excellence in service, ownership, integrity, innovation, teamwork, and respect; their job-specific responsibilities and competencies are also rated on a 5-point scale, for customer service/patient care, policy and procedure compliance, miscellaneous duties, radiation safety, workflow and patient care, image QC and improvement, area [*5] competency, and computer skills. (See id.) The Performance Evaluation form also provides space for the supervisor to identify specific skills enhancement, training, and education an employee should undertake to improve job performance and set some goals and objectives for the employee's next year. (See id.) Performance evaluations are signed by the employee and his or her manager, who may or may not be the "evaluator" listed on the form. (See id.)

The staff technologists at Cooper are overseen by two lead technologists; for most of the duration of Plaintiff's employment, they were Ronald Colna and Joseph LeBender. (LeBender Dep. at 27:7-18.) Mr. Colna was promoted to the head of the department in the fall of 2014 and replaced by Cindy Alessandrini. (Id. at 27:11-12, 28:18-22.) Both lead technologists have the same responsibilities over the staff technologists and divide their authority between day and night shifts. (Id. at 27:24-28:12.) Because Plaintiff routinely worked day shifts, he reported to Mr. Colna until the fall of 2014, when Mr. LeBender took over the day shift lead position. (Id. at 31:13-24.)

Cooper has a "progressive" disciplinary policy by which an employee is issued a [*6] verbal and written warnings before suspension before termination. (Id. at 29:3-5, 30:12-23.) A lead technologist alone does not have the authority to terminate an employee without input from a "director level or higher." (Id. at 29:24-30:5.)

Plaintiff's Performance Until June 2014

The parties dispute how to describe Plaintiff's job performance as a radiation technologist before June 2014. Mr. Colna testified that he noticed as early as 2006 that Plaintiff avoided complex and invasive cases, and that physicians and other staff had been complaining to him about Plaintiff for years. (Colna Dep. at 63:16-66:12; see also Deposition of Matthew Harrington ("Harrington Dep.") [Ex. G to O'Hearn Cert.] at 52:3-53:2.) The parties dispute if and how Plaintiff was ever made aware of these complaints. (Compare Def. SMF ¶ 35 with Pl. SMF ¶ 25.) It is undisputed that

Plaintiff was subjected to some disciplinary actions between 2009 and 2012 unrelated to the issues that allegedly gave rise to his 2014 Performance Improvement Plan. (See Discipline Forms [Ex. I, J, K, & L to O'Hearn Cert.].)

However, Plaintiff points out that his performance evaluations were strong, and he enjoyed a close personal relationship [*7] with Mr. Colna. Specifically, Plaintiff's performance was overall rated "exceeds expectations" in both 2013 and 2014, and he was given mostly or completely scores of 4 out of 5 for his competency in operating room technology and for all "core values and actions." (See Plaintiff's 2014 Performance Evaluation and Plaintiff's 2013 Performance Evaluation.) None of the issues raised in the 2014 Performance Improvement Plan were ever raised in his previous performance evaluations. (Colna Dep. at 107:21-108:6.)

The June 2014 Grievance and Written Complaint

The crux of Plaintiff's claims is that the circumstances of his employment changed drastically after events that occurred in June of 2014. On June 5, 2014, Plaintiff received a written warning for using offensive language in a conversation about a co-worker. (Progressive Discipline Form dated June 5, 2014 [Ex. R to O'Hearn Cert.].) He filed a grievance challenging the warning on June 9, 2014. (Grievance dated June 9, 2014 [Ex. U to O'Hearn Cert.]; see also Ciecka Dep. at 178:21-179:1.)

That same day, Plaintiff sent a separate letter to Cooper's Human Resources Department. (Complaint [Exhibit Y to O'Hearn Cert.].) Plaintiff told Human Resources [*8] that Mr. LeBender, his "immediate supervisor" had "made references about [his] age" while discussing the incident that gave rise to his June 5 warning. (Id.) He confided that "I can't help but feel as though Joe LeBender has me now in 'his crosshairs,' and I fear that my position here is in jeopardy . . . ." (Id.) Jill Melchiorre in Human Resources acknowledged Plaintiff's discrimination complaint and met with him on July 9, 2014 to discuss it. (Deposition of Jill Melchiorre ("Melchiorre Dep.") [Ex. AA to O'Hearn Cert.] at 22:5-15; see also Notes from Ms. Melchiorre [Ex. H to Pl. SMF].) Ms. Melchiorre discussed the complaint with Mr. LeBender in July and he admitted to commenting on Plaintiff's age, although he claimed such comments were in the context of "counseling Mr. Ciecka on performance issues." (Melchiorre Dep. at 35:2-37:13; see also LeBender Dep. at 73:8-74:6.) As Plaintiff points

out, Mr. LeBender presented an inconsistent timeline in his recollection of these events, seeming to confuse his June comments with Plaintiff's August Performance Improvement Plan. (See Pl. SMF ¶ 49.) The parties dispute whether any other members of the management team - especially Mr. Colna - knew [*9] about Plaintiff's discrimination complaint. (Compare Def. SMF ¶¶ 52-53 with Pl. SMF ¶¶ 52-53.) The parties also dispute whether Mr. LeBender's age-related comments were an isolated incident or whether, as Plaintiff testified, he made comments about other employees and continued to do so during Plaintiff's Performance Improvement Plan. (Ciecka Dep. at 87:1-89:5.)

The 2014 Performance Improvement Plan

A few weeks later, an incident in the operating room apparently led to management taking concrete action against Plaintiff, although the parties dispute what exactly happened. (Compare Def. SMF ¶¶ 56-63 with Pl. SMF ¶¶ 56-63.) Cooper alleges that Plaintiff created a "patient safety issue" by asking an inexperienced recent graduate, Ryan DeLucas, to cover an O-arm procedure in the operating room that Plaintiff was supposed to take over from Matthew Harrington, one of the radiology technologists primarily assigned to the operating room. (Harrington Dep. at 90:23-92:5.) Apparently, Plaintiff told Mr. DeLucas that he didn't know how to use the O-arm. (Email string between Ryan DeLucas and Ron Colna [Ex. CC to O'Hearn Cert.]; see also Colna Dep. at 101:4-18.) Mr. Harrington had to walk Mr. DeLucas [*10] through the procedure and immediately called Mr. Colna because he "felt what Mike did was unsafe." (Harrington Dep. at 94:7-24.) Plaintiff asserts that he only instructed Mr. DeLucas to take that case because the operating room was short-staffed at the time and Plaintiff had to go handle another case, that he did not know that this particular case was an O-arm case, and that he never told Mr. DeLucas that he did not know how to use the O-arm. (Ciecka Dep. at 206:13-208:5.)

Mr. Colna asserts that he decided to put Plaintiff on a Performance Improvement Plan ("the PIP" or "the Plan") because of this incident. (Colna Dep. at 100:23-101:3, 111:9-13.) He testified that the decision to place Plaintiff on a PIP after that incident was a joint decision between him, Mr. LeBender, Ms. Alessandrini, and Human Resources and that he drafted the Plan himself. (Id.)

According to documentation on the PIP, Plaintiff "struggled with maintaining a level of competency in the

OR and other Diagnostic Imaging areas." (See PIP [Ex. DD to O'Hearn Cert.].) According the Plan, the management team was concerned that Plaintiff did "not have the confidence level or skill set to work independently" with the O-arm [*11] and that "[i]t has been documented that [Plaintiff] appears to get confused and is unable to perform basic Task" with the C-arm. (Id.) The Plan directed that Plaintiff would be assigned to the Operating Room and to "closely work with" one of the designated OR technologists in order to familiarize himself with the equipment, that Plaintiff and all other technologists would be required to attend a workshop on the O-arm, and that Plaintiff would meet regularly with a member of the Management Team to evaluate his progress, with the goal of "improving his clinical skills and as a result increase his level of self-confidence." (Id.) Plaintiff had to fill out daily log sheets to track what procedures he worked on during his PIP and meet regularly with Mr. Colna to review his progress. (Ciecka Dep. at 103:3-20, 218:5-18.) The parties dispute whether Mr. Colna alone, or Mr. Colna and Mr. LeBender together, were responsible for monitoring Plaintiff's progress on the PIP. (Compare Def. SMF ¶¶ 75, 77 with Pl. SMF ¶¶ 75, 77.) The PIP was originally scheduled to be in place from August 14, 2014 through October 17, 2014, but it was extended to November 7, 2014. (Melchiorre Dep. at 62:7-21.)

The parties [*12] further dispute how Plaintiff performed under the PIP. According to Cooper, Plaintiff continued to avoid O-arm procedures and showed no initiative in trying to gain exposure to new types of cases. (Harrington Dep. at 66:6-68:3.) Mr. Harrington and Andrea Mullison, another technologist assigned primarily to the operating room, both told Mr. Colna that they did not think Plaintiff was improving during his PIP and that he seemed nervous in the operating room. (See Harrington Dep. at 73:24-6; Mullison Dep. at 89:16-90:8, 141:3-8.) Ms. Alessandrini testified that she, too, had the opportunity to observe Plaintiff in the operating room during his PIP and that he could not use the O-arm and had difficulty with the C-arm. (Alessandrini Dep. at 44:21-46:11, 52:5-53:19.) It appears that Plaintiff did not attend training sessions held by Ms. Mullison for all of the staff technologists on the O-arm. (Mullison Dep. at 118:2-22.) Physicians complained about Plaintiff's performance and apparently stated that they did not want him working on their cases. (Harrington Dep. at 76:7-20, 99:5-100:8, 113:7-13; Certifications from Drs. Bussey, Graf, Yocom, Dolch, and Mashru [Ex. KK, MM, OO, PP, and QQ to [*13] O'Hearn Cert.].) It is undisputed that Plaintiff met with Mr. Colna three times during the PIP, but Plaintiff

disputes the accuracy of Mr. Colna's notes indicating that Plaintiff was not improving. (Compare Def. SMF ¶ 103 with Pl. SMF ¶ 103.)

Plaintiff asserts that he was forced to adhere to rules "that no one else had to adhere to" under his PIP, despite the fact that his issues with the O-arm and C-arm were common among all staff technologists besides the technologists assigned primarily to the operating room. (Ciecka Dep. at 98:1-3; Harrington Dep. at 79:8-11; Mullison Dep. at 23:4-24:11, 92:22-93:4; Colna Dep. at 55:6-58:2.) Furthermore, Plaintiff denies that he struggled with O-arm and C-arm procedures during his PIP, and asserts that Mr. Harrington, Ms. Mullison, and Ms. Alessandrini did not spend sufficient time with him in the operating room to have the opportunity to realistically evaluate his skills because he was usually in the operating room alone. (Ciecka Dep. at 209:10-17, 213:20-214:18, 320:25-231:4; Harrington Dep. at 74:17-21.) In fact, he believes that he was not properly supported by the lead technologists during his PIP. (See Pl. SMF ¶ 91.) He also asserts that it [*14] was very common for physicians to complain about all of the radiology technologists except for the ones permanently assigned to the operating room. (Mullison Dep. at 26:20-28:23.) Finally, Plaintiff also notes that he had no control over the assignments he took in the operating room and that he did actually attend one of Ms. Mullison's training sessions. (Ciecka Dep. at 217:4-15.)

### The November 2014 EEOC Complaint

Plaintiff filed a charge of discrimination with the EEOC on November 18, 2014 alleging age discrimination due to Mr. LeBender's comments and his treatment under the PIP. (Charge [Ex. RR to O'Hearn Cert.].) It is undisputed that he never told anyone at Cooper that he filed the EEOC charge.

### The December 2014 Termination

Plaintiff was terminated on December 11, 2014, at his last meeting with Mr. Colna under the PIP. (Ciecka Dep. at 295:22-25.) Mr. Colna and Ms. Alessandrini were present, and it is undisputed that Human Resources approved of the decision to terminate. (Colna Dep. at 144:15-21; Melchiorre Dep. at 69:8-14.) Plaintiff believes that Mr. LeBender, although not present at the meeting, was part of the decision to terminate his employment. (Colna Dep. at 138:4-139:7; Defendant's [*15] Answers to Plaintiff's First Set of

Interrogatories [Ex. M to Pl. SMF] at No. 3.) According to Mr. Colna, Plaintiff was fired for failing to improve under the PIP. (Id. at 135:1-138:10; see also Performance Plan Improvement Time Line for Michael Ciecka [Ex. TT to O'Hearn Cert.].) Mr. Colna relied on complaints from physicians and feedback from Mr. Harrington, Ms. Mullison, and Ms. Alessandrini, that "[Plaintiff] was still unable to perform to the standard expectations that we hold for all technologists" in coming to the decision that "the only other option we [had] at this point [was] to terminate." (Colna Dep. at 145:1-146:4.)

Plaintiff filed this two-count action against Cooper on June 16, 2015, bringing claims for age discrimination, retaliation, and hostile work environment work environment pursuant to the ADEA and NJLAD. [Docket Item 1.] After the parties exchanged discovery, Cooper filed the instant motion for summary judgment. [Docket Item 28.] The motion is now fully briefed and the Court will decide without holding oral argument pursuant to Fed. R. Civ. P. 78.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute [*16] as to any material fact" such that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Disputes over irrelevant or unnecessary facts, however, fail to preclude the entry of summary judgment. Id. Conclusory, self-serving submissions cannot alone withstand a motion for summary judgment. Gonzalez v. Sec'y of Dept. of Homeland Sec, 678 F.3d 254, 263 (3d Cir. 2012) (internal citations omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, here the Plaintiff, and must provide that party the benefit of all reasonable inferences. Scott v. Harris, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014). However, any such inferences "must flow directly from admissible evidence [,]" because "'an inference based upon [] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" Halsey, 750 F.3d at 287 (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir. 1990); citing Anderson, 477 U.S. at 255).

## IV. DISCUSSION [*17]

The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., prohibits discrimination in employment with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). Under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq., an employer may not discriminate or take any unlawful employment practice "because of . . . age." N.J.S.A. 10:5-12(a). Both statutes also make it unlawful for an employer to retaliate against any employee who opposes any discriminatory employment practice, files a complaint, or participates in an investigation, proceeding, or litigation. 29 U.S.C. § 623(d); N.J.S.A. 10:5-12(d). Since claims under the ADEA and NJLAD utilize the same analytical framework, the Court will discuss the state and federal claims together. Turner v. Schering-Plough Corp., 901 F.2d 335, 341 (3d Cir. 1990).

## A. Defendant Is Not Entitled to Summary Judgment on Plaintiff's Age Discrimination Claims

Counts I and II of the Complaint allege age discrimination in violation of the ADEA and NJLAD. Liability for discrimination "depends on whether the protected trait (under the ADEA age) actually motivated the employer's decision." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993). A plaintiff must show that his "age was the 'but-for' cause of the employer's adverse action." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009) It is not enough to show that age was a "motivating [*18] factor" in the employers' decision; age must have a "determinative influence." Id. at 176 (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993)).

The burden shifting framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)* applies to discrimination claims under the ADEA. *Turner, 901 F.2d at 341-42*. The McDonnell Douglas analysis proceeds in three stages. First, the plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas, 411 U.S. at 802*. In an age discrimination case, a discharged employee must show "(1) that he belongs to the protected class, i.e., is older than forty; (2) was qualified by training and experience for the job from which he was discharged; and (3) was replaced by a person sufficiently younger to permit an inference of age discrimination." *Turner, 901 F.2d at 342* (citing *Sorba v. Penn. Drilling Co., 821 F.2d 200, 202 (3d Cir. 1987))*. The burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the plaintiff's termination. Id. If defendant does this, the burden shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones v. School Dist. Of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999)*. Although this burden of production shifts from party to party, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff **[*19]** remains at all times with the plaintiff." Id.

The parties assume, and the Court will as well, that Plaintiff has presented sufficient evidence to establish a prima facie case for age discrimination. Cooper argues that it is entitled to summary judgment because it presents a legitimate, nondiscriminatory reason for Plaintiff's termination which he cannot rebut as pretext for discriminatory animus. Plaintiff, in turn, argues that summary judgment is inappropriate because he can point to evidence in the record showing that he was placed on the PIP because he complained about Mr. LeBender's age-related comments and that he was held to disproportionate standards under the PIP because Mr. LeBender was a primary decisionmaker in Cooper's employment actions. This motion requires the Court to decide whether Plaintiff has adduced evidence from which a reasonable factfinder could conclude that he could carry his burden at the third stage of the McDonnell Douglas analysis. For the following reasons, the Court finds that he has come forward with evidence raising a genuine dispute of material fact and will deny Defendant's motion for summary judgment on the age discrimination claim.

**1. Cooper's legitimate, [*20] nondiscriminatory**

**reason for Plaintiff's Termination**

Consistent with the second step of the McDonnell Douglas analysis, Cooper presents a legitimate, nondiscriminatory reason for Plaintiff's termination. The second step "does not require that the employer prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action. Instead, the employer must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons." *Willis v. UPMC Children's Hospital of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015)*. Cooper has plainly made this showing, taking the position that Plaintiff was terminated for failure to improve his performance under the PIP.

As a staff technologist at Cooper, Plaintiff was expected to achieve and maintain competence in the two pieces of equipment that technologists use in the operating room during surgery: the O-arm and the C-arm. (Ciecka Dep. at 137:2-138:9; see also Cooper University Radiology Job Specific Responsibilities and Competency Review.) Cooper contends that Mr. Colna placed Plaintiff on a PIP effective August 14, 2014 due to concerns that he had "struggled with maintaining a level of competency in the OR and other Diagnostic Imaging areas." **[*21]** (See PIP [Ex. DD to O'Hearn Cert.].) According to the Plan, the management team was concerned that Plaintiff did "not have the confidence level or skill set to work independently" with the O-arm and that "[i]t has been documented that [Plaintiff] appears to get confused and is unable to perform basic Task" with the C-arm. (Id.) The Plan directed that Plaintiff would be assigned to the Operating Room and to "closely work with" one of the designated OR technologists in order to familiarize himself with the equipment, that Plaintiff and all other technologists would be required to attend a workshop on the O-arm, and that Plaintiff would meet regularly with a member of the Management Team to evaluate his progress, with the goal of "improving his clinical skills and as a result increase his level of self-confidence." (Id.)

Mr. Colna testified at his deposition that he had received verbal complaints from physicians and lead technologists in the operating room about Plaintiff's performance and his willingness to take on invasive cases in the spring of 2014, but that the situation "came to a head" in August 2014 when Plaintiff created a "patient safety issue" by asking an inexperienced recent graduate **[*22]** to cover an O-arm procedure in the operating room "because [he] don't know how to do

this." (Colna Dep. at 87:14-88:16, 101:6-102:22.) Mr. Colna testified that the decision to place Plaintiff on a PIP after that incident was a joint decision between him, Mr. LeBender, Ms. Alessandrini, and Human Resources and that he drafted the Plan himself. (Id. at 100:23-101:3, 111:9-13.)

Cooper takes the position that Plaintiff's termination was warranted because his performance did not improve as required under the PIP, despite extending the time period for which the Plan was in place from October 2014 until December 2014. (Colna Dep. at 145:1-146:4, 147:11-148:22.) Mr. Colna relied on complaints from physicians and feedback from the designated OR technologists during the PIP about Plaintiff's performance and confidence with the O-arm and C-arm, and input from Ms. Alessandrini, one of the lead technologists, that "[Plaintiff] was still unable to perform to the standard expectations that we hold for all technologists" in coming to the decision that "the only other option we [had] at this point [was] to terminate." (Id. at 145:1-146:4; see also Harrington Dep. at 76:7-20, 99:5-100:8, 113:7-13 (recalling **[*23]** complaints from Dr. Yocon, Dr. Graf, and Dr. Mashru); Certifications from Drs. Bussey, Graf, Yocom, Dolch, and Mashru [Ex. KK, MM, OO, PP, and QQ to O'Hearn Cert.].) The Court is satisfied that Cooper has adequately carried its burden at the second step of the _McDonnell Douglas_ analysis.

## 2. Plaintiff's Rebuttal

Plaintiff concedes that this is a legitimate, nondiscriminatory reason for his termination, but maintains that summary judgment is not warranted because factual disputes remain over whether the PIP was pretext for Mr. LeBender's discriminatory animus, and whether he was held to a different standard than other staff technologists at Cooper. The Court will deny Cooper's motion for summary judgment on Plaintiff's age discrimination claim because he has pointed to inconsistencies in the record regarding Cooper's rationale for placing him on the PIP and terminating his employment, and circumstantial evidence that age discrimination was the motivating reason.

The Third Circuit has explained that a plaintiff may defeat summary judgment at the third step of the McDonnell Douglas analysis "by pointing to some evidence, direct or circumstantial, from which a factfinder would reasonably either: **[*24]** (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was

more likely than not a motivating or determinative cause of the employer's actions." _Jones, 198 F.3d at 413_. Only at trial is a plaintiff in an employment discrimination case required to "convince the finder of fact both that the reason was false, and that discrimination was the real reason." _St. Mary's Honor Ctr. V. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)_ (emphasis in original); see also _Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992)_ (same). "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." _Shaner v. Synthes, 204 F.3d 494, 501 (3d Cir. 2000)_ (quoting _Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994))_.

Plaintiff has successfully pointed to numerous issues in the record to rebut Cooper's stated legitimate, nondiscriminatory reason for his termination. First, Plaintiff has provided testimony from Mr. Colna that he was aware of the complaints about Plaintiff's **[*25]** O-arm and C-arm skills and leadership and teamwork abilities identified in the PIP for some time before Plaintiff was placed on the PIP, and yet never identified them in a performance evaluation. (See Colna Dep. at 65:5-43, 87:14-90:11, 107:21-109:1). This contradicts other evidence in the record, by which Plaintiff has shown that his employment evaluations were positive in the time leading up to the PIP, before he made his age discrimination complaint. Specifically, Plaintiff's performance was overall rated "exceeds expectations" in both 2013 and 2014, and he was given mostly or completely scores of 4 out of 5 for his competency in operating room technology and for "core values and actions." (See Plaintiff's 2014 Performance Evaluation [Ex. F to Pl. SMF] and Plaintiff's 2013 Performance Evaluation [Ex. S to Pl. SMF]). Additionally, Plaintiff has also offered evidence that he was treated differently from other staff radiology technologists; apparently many technologists, most of whom were younger than Plaintiff, had the same deficiencies with the operating room equipment as he did, and yet no others were put on a PIP or otherwise disciplined. (See Harrington Dep. at 78:11-79:11; Colna **[*26]** Dep. at 133:7-134:24; Mullison Dep. at 106:14-109:5; Ciecka Dep. at 81:6-84:8.)

2017 U.S. Dist. LEXIS 20539, *26

Finally, Plaintiff argues that there are factual disputes surrounding some of Cooper's assertions. Specifically, Plaintiff disputes the statement that physicians had complained about Plaintiff's performance for years, offering testimony from one of the permanent operating room technologists that she had never heard complaints about Plaintiff before the summer of 2014. (Mullison Dep. at 57:1-58:2.) Additionally, Plaintiff disputes Cooper's recounting of the allegedly precipitating incident in the operating room: Plaintiff testified at his deposition that he asked the graduate to cover the O-arm procedure, before knowing the type of procedure that it was, because there were two simultaneous procedures happening in the operating room; that he offered to take the one that was scheduled to last longer; and that he never told the graduate that he didn't know how to work the O-arm. (See Ciecka Dep. at 206:17-209:9.) Although Plaintiff will have to contend at trial with the fact that the primary decisionmakers in his case were also all over 40, if all reasonable inferences are extended in **[\*27]** favor of Plaintiff, a reasonable jury could believe Plaintiff's theory that his performance issues were manufactured by management as pretext for age discrimination. These material factual disputes and "inconsistencies . . . and contradictions" in Cooper's stated reason for Plaintiff's termination preclude the entry of summary judgment on this claim.

**B. Defendant Is Not Entitled to Summary Judgment on Plaintiff's Retaliation Claims**

Counts I and II also allege that Cooper retaliated against Plaintiff for engaging in protected activity under the ADEA and NJLAD by reporting age-based discrimination. Both statutes make it unlawful for an employer to retaliate against any employee who opposes any discriminatory employment practice, files a complaint, or participates in an investigation, proceeding, or litigation. *29 U.S.C. § 623(d)*; *N.J.S.A. 10:5-12(d)*.

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims under the ADEA and NJLAD. *Daniels v. School Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015)*. To state a prima facie case for retaliation, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity **[\*28]** and the employer's adverse action." Id. (citing *Marra v. Phila.*

*Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)*; see also *Battaglia v. United Parcel Service, Inc., 214 N.J. 518, 70 A.3d 602, 619 (N.J. 2013)* (same). The employer may then present a legitimate, non-retaliatory reason for having taken the adverse employment action, which the plaintiff can then rebut as pretext. Id.

At this point, it is undisputed that Plaintiff engaged in protected activity by submitting a written complaint of age discrimination to Cooper's Human Resources Department on June 9, 2014.[1] Similarly, both parties assume that Plaintiff was subjected to two adverse employment actions: being placed on a PIP in August of 2014 and his termination on December 11, 2014.[2] Where Plaintiff and Cooper disagree is whether Plaintiff can demonstrate a causal connection between his June complaint of discrimination and his adverse employment actions.

Cooper argues that Plaintiff cannot prove causation because he cannot show that the sole decisionmaker, Mr. Colna, was aware of Plaintiff's discrimination complaint. Of course, an employer cannot retaliate against an employee if the employer's decisionmaker did not know of the employee's protected activity. *Moore v. City of Philadelphia, 461 F.3d 331, 351 (3d Cir. 2006)*. Nevertheless, Plaintiff has pointed to evidence in the record showing that Mr. Colna was not the sole decisionmaker who **[\*29]** put Plaintiff on a PIP in August and terminated his employment in December. According to Plaintiff, the decision to place him on a PIP was a joint decision between Mr. Colna, Mr. LeBender, Ms. Alessandrini, and Human Resources, and the decision to terminate his employment was made by Mr. Colna with input from Mr. LeBender and Ms. Alessandrini and with the approval of Human Resources. (Colna Dep. at 100:23-101:3, 111:9-13, 138:20-140:18.) From this, a reasonable factfinder could infer that the decision to take adverse employment

--------

[1] As Cooper points out in its moving papers, Plaintiff also engaged in protected activity by filing an EEOC Complaint in November 2014. However, because Plaintiff's arguments focus solely on his June complaint to Human Resources, the Court will not consider whether there is a causal link between Plaintiff's EEOC Complaint and termination.

[2] Cooper would have this Court read Plaintiff's Opposition Brief to mean that he has abandoned his claim that the PIP is an adverse employment action. (Reply at 3, discussing Opp'n at 29.) The Court rejects this interpretation of Plaintiff's Brief and will consider whether a causal connection exists between Plaintiff's complaint and both purported adverse employment actions.

actions against Plaintiff was made, at least in part, by someone with knowledge of his protected activity. Accordingly, factual disputes preclude the summary judgment on this basis.

The Third Circuit has described three ways to establish causation in a retaliation case: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism couple with timing to establish a causal link," or, in the absence of that proof, (3) "the plaintiff must show that from 'the evidence gleaned from the entire record as a whole' the trier of fact should infer causation." *Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)*.

The crux of Plaintiff's argument **[*30]** is that his position changed dramatically between the spring and summer of 2014, and that the only difference was his discrimination complaint in June. Plaintiff points to his positive performance reviews and close relationship with Mr. Colna prior to his protected activity on the one hand, and the sudden change to a PIP with "unrealistic goals" and no support, and higher expectations of performance placed on him than on other technologists who struggled with the same operating room equipment, on the other, to lead to the inference that his protected activity was the reason he was placed on the PIP and "set up to fail." (See Opp. at 35-36.) "[C]ircumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees [may] give rise to an inference of causation when considered as a whole." *Marra v. Philadelphia Housing Authority, 497 F.3d 286, 302 (3d Cir. 2007)* (discussing *Farrell 206 F.3d at 280-81*). The Court is satisfied that Plaintiff has made a prima facie showing for his retaliation claim, and for the reasons discussed above, has presented enough evidence to rebut Cooper's legitimate, nondiscriminatory reason as pretext.

It would be improper for the Court to enter summary judgment at the present time on this claim. There is enough **[*31]** material in the record, viewed in the light most favorable to Plaintiff, for a jury to infer that retaliation caused Plaintiff to be placed on a PIP and terminated. A jury could choose to read between the lines and link the few weeks between Plaintiff's discrimination complaint and PIP with the "inconsistencies . . . and contradictions" in Cooper's changing assessment of Plaintiff's job performance to conclude that Cooper unlawfully retaliated against him for making a complaint of age discrimination. For these reasons, the Court will deny Cooper's summary judgment motion on this claim.

## C. Defendant Is Entitled to Summary Judgment on Plaintiff's Hostile Work Environment Claims

Finally, Counts I and II also allege that Plaintiff was subjected to a hostile work environment at Cooper after making his complaint of discrimination against Mr. LeBender, in violation of the ADEA and the NJLAD.[3]

A hostile work environment is one which is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of [his] employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)* (internal quotation marks omitted). To prevail on a hostile work **[*32]** environment claim, a plaintiff must establish that "(1) he suffered intentional discrimination because of his [age]; (2) the discrimination was pervasive or regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005)* (internal quotation marks omitted); see also *Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685, 688-89 (N.J. 1998)* (holding that a hostile work environment claim under NJLAD requires a plaintiff to demonstrate "that the defendant's conduct (1) would not have occurred but for the employee's [protected status]; and [that the conduct] was (2) severe or pervasive enough to make a (3) reasonable [person of the same protected class] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.")

Under both statutes, whether conduct is severe or pervasive depends on the "totality of the circumstances." *Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)*; see also *Taylor, 706 A.2d at 692* ("Severity and workplace hostility are measured by surrounding circumstances"). The circumstances to be considered "may include the frequency of the discriminatory conduct; its severity;

---

[3] The Complaint also alleges "Age-based Hostile Work Environment" in violation of the ADEA and NJLAD, but the Court deems those claims abandoned because Plaintiff's opposition brief addresses only his claims for a hostile work environment in retaliation for his discrimination complaint.

whether it is physically threatening or humiliating, or a mere **[*33]** offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*; *Cutler v. Dorn, 196 N.J. 419, 955 A.2d 917, 925 (N.J. 2008)* (same). While "offhanded comments, and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment claim, *Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*, the cumulative impact of incidents which individually would be insufficiently severe may create a hostile work environment. *Cutler, 955 A.2d at 925*; see also *Andrews, 895 F.d at 1484* ("a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.")

In this case, Plaintiff avers that being placed on a PIP despite prior positive work performance evaluations and having his work closely monitored under the PIP constitutes his a hostile work environment. Cooper takes the position that summary judgment is proper because this conduct was not severe or pervasive conduct so as to constitute a hostile work environment. The Court agrees. "[I]t is well-settled that being closely supervised or watched does not constitute an adverse employment action that can support a [hostile work environment claim], and that having one's work micromanaged may be unpleasant but does not give rise to a hostile environment claim." *McKinnon v. Gonzales, 642 F. Supp. 2d 410, 423 (D.N.J. 2009)* (internal citations omitted); see also *Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 803 A.2d 611, 626 (N.J. 2002)* ("Similarly, **[*34]** without more, an employer's filing of a disciplinary action cannot form the basis of a LAD complaint."). Without evidence of further discriminatory conduct, there is no basis from which a jury could reasonably identify sufficiently serious, pervasive, offensive and humiliating conduct rising to the level of a hostile work environment. The Court will grant Cooper's motion for summary judgment on this claim.

## V. CONCLUSION

An accompanying Order will be entered.

**February 14, 2017**

Date

**/s/ Jerome B. Simandle**

JEROME B. SIMANDLE

Chief U.S. District Judge

## ORDER

This matter having come before the Court on Defendant The Cooper Health System's motion for summary judgment [Docket Item 28]; the Court having considered the submissions of the parties; for the reasons explained in the Opinion of today's date; and for good cause shown;

IT IS this **14th** day of **February, 2017**, hereby

ORDERED that Defendant's motion for summary judgment [Docket Item 28] is **GRANTED IN PART AND DENIED IN PART**; and it is further

ORDERED that summary judgment is **GRANTED** as to Plaintiff's hostile work environment claims; and it is further

ORDERED that summary judgment is **DENIED** as to Plaintiff's age discrimination and retaliation claims. **[*35]**

**/s/ Jerome B. Simandle**

JEROME B. SIMANDLE

Chief U.S. District Judge

---

**End of Document**

 Positive
As of: April 29, 2021 6:36 PM Z

## *Houston v. Dialysis Clinic, Inc.*

United States District Court for the District of New Jersey

June 26, 2015, Decided; June 26, 2015, Filed

Civ. Action No.: 13-4461(FLW)

**Reporter**
2015 U.S. Dist. LEXIS 83151 *; 2015 WL 3935104

KELLY HOUSTON, Plaintiff, v. DIALYSIS CLINIC, INC., d/b/a DCI and RHONDA BICHARD, Defendants.

**Notice:** NOT FOR PUBLICATION

## Core Terms

termination, pretext, similarly situated, disability, infraction, employees, disciplined, retaliation, patient, email, temporal proximity, prima facie case, reasons, disciplinary action, summary judgment, violations, scheduled, race discrimination, discriminatory, complaints, suspension, nurses, verbal, warned, adverse employment action, panic attack, clinic, summary judgment motion, employment decision, written warning

**Counsel: [*1]** For KELLY HOUSTON, Plaintiff: ARI R. KARPF, JEREMY M. CERUTTI, LEAD ATTORNEYS, JULIA W. CLARK, MARK THOMAS SOTTILE, KARPF, KARPF & CERUTTI, P.C., BENSALEM, PA.

For DIALYSIS CLINIC, INC., doing business as DCI, RHONDA RICHARD, Defendants: SHARON P. MARGELLO, LEAD ATTORNEY, JOCELYN ANNISE MERCED, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC, MORRISTOWN, NJ.

**Judges:** Freda L. Wolfson, United States District Judge.

**Opinion by:** Freda L. Wolfson

## Opinion

**WOLFSON, District Judge:**

Plaintiff Kelly Houston ("Plaintiff" or "Houston"), a registered nurse, was employed by Defendants Dialysis Clinic, Inc. ("DCI") from February 2013 until June 2013, at which time she was allegedly terminated for poor job performance, a decision made in part by her manager, defendant Rhonda Bichard ("Bichard").[1] Plaintiff instituted this suit against Defendants, alleging that her termination was based upon race and disability discrimination, and retaliation for engaging in protected employment activity, in violation of *42 U.S.C.S. § 1981* and New Jersey Law Against Discrimination ("NJLAD"). In the instant matter, Defendants move for summary judgment on all claims. For the reasons set forth herein, the Court **GRANTS** Defendants' motion in its entirety.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Houston was a hired as a staff nurse at DCI's North Brunswick dialysis clinic commencing on February 18, 2013, and terminated on June 19, 2013. Defendants' Statement of Undisputed Fact ("Def. Statements"), ¶ 1. During the entire four months of employment, Houston was in her probationary period. *See* Pl. Dep., pp. 23-24, 30-32. Upon her hiring, Houston was supervised by Lois LaManna, who was the clinic manager, and other

---

[1] DCI and Bichard will **[*2]** be collectively refer to as "Defendants."

charge nurses, including, Bichard and Noreen Rick. Plaintiff's Statement of Undisputed Fact ("Pl. Statements"), ¶ 7. In June 2013, Bichard became the clinic manager and continued to supervise Houston. As a manager, Bichard reported to Katchy Bivens, DCI's director of nursing. *Id.* at ¶ 8. Because of her supervisory role, Bichard had the authority to issue verbal and written discipline to nurses, as well as to recommend an employee's termination. *Id.* at ¶¶ 10-11.

DCI is a nonprofit health care company that provides dialysis treatment to patients with diseases that impede kidney function. Def. Statements, ¶ 4. Nurses at DCI, including Houston, assist the dialysis **[*3]** process, which cleanses a patient's blood through use of a machine, also known as a dialyzer. *See Id.* at ¶ 5. Because the dialyzer is in contact with the patient's blood, the risk of infections is significant; as such, DCI requires its nurses to wear personal protective equipment, such as gloves, for prevention purposes. *Id.* at ¶ 8.

On or about April 8, 2013, when Houston was first scheduled to work without a preceptor, Houston cleaned a dialysis machine improperly. *See* Pl. Dep., pp. 96-97. According to Plaintiff, this incident was merely a learning "situation," and indeed, Houston was not disciplined for this infraction. *Id.* Additionally, on May 25, 2013, Rick reported in an email to Bichard and LaManna that Rick had a conflict with Houston and a Patient Care Technician ("PCT"), Herby Vilus, when Rick confronted them over their failure to properly sanitize the dialysis machines after patient treatments. *See* Rick Dep., pp. 15-17. DCI did not discipline Houston or Vilus at that time, beyond the informal, verbal correction from Rick. Def. Statement, ¶ 12. As to this incident, Houston testified that she does not remember that it occurred. *See* Pl. Dep., p. 97.

On June 13, 2013, Bichard received **[*4]** reports that Houston had begun a patient's treatment without properly verifying the correct dialyzer. Def. Statements, ¶ 13; *see* Pl. Statements, ¶ 51. According to Bichard, when she approached the patient area to investigate, she saw Houston cannulating a patient (i.e., beginning treatment of dialysis by placing a heavy needle into the patient's fistula) without wearing protective gloves, which violated DCI's safety protocols. Def. Statements, ¶ 14. Bichard testified that when she instructed Houston to use her gloves, Houston placed her "ungloved hand" in a box of gloves without first washing her hands. *Id.* While Plaintiff does not dispute that she failed to properly verify the dialyzer, *see* Pl. Dep., pp. 50-51,

Houston testified that she did not remember that Bichard approached her regarding the failure to use gloves. *Id.* at p. 54 ("I don't remember that happening."). According to Defendants, both were serious infractions that violated DCI's policy. Def. Statement, ¶ 15.

Thereafter, on the same day, Bichard met with Houston to issue Houston a written warning for the violations and, at the same time, suspended Houston for one day, and extended Houston's probationary period for an additional 90 days, **[*5]** along with the implementation of a Plan of Correction. *Id.* at ¶ 18 According to Bichard, she consulted with her boss, Bivens and Susan Davis, the corporate Associate Director of Human Resources, for guidance as to how to address the violations and the proper level of discipline. *Id.* at ¶ 17. Bichard scheduled to meet with Houston on June 17, 2013, regarding the Plan of Correction. *See Id.* at ¶ 19. However, prior to that meeting, Houston emailed a written complaint to Bichard and Dan Wattson, DCI's Human Resources Director, stating that she believed the disciplinary action taken by Bichard — the written warning and the subsequent suspension — were racially motivated. *Id.; see* Pl. Dep., pp. 77-78. In her email, Houston based her belief on two assertions: (1) that she was being disciplined for failing to adhere to dialyzer protocols when two Caucasian nurses had not been disciplined after a similar incident; and (2) that, while she enjoyed her job, Rick had made derogatory and condescending remarks to her on the clinic floor in front of patients and staff, which Houston believed were directed exclusively toward African-American staff members. Def. Statements, ¶ 20; Pl. Response to Def. **[*6]** Statements ("Pl. Res."), ¶ 20. Notwithstanding Houston's email, DCI proceeded with its planned suspension and other corrective actions. Def. Statements, ¶ 21.

On June 17, 2013, Bichard met with Houston with respect to the one-day suspension, and warned Houston that any subsequent violation of DCI policy and procedure would result in termination of employment.[2] *Id.* at ¶ 22; Pl. Res., ¶ 22. On June 19, 2013, Plaintiff did not report to work. Def. Statement, ¶ 23. According to Defendants, Houston was considered a "no-call/no-show" because Houston failed to call work at any time before the start of her shift (5:30 a.m.) to inform her

_____

[2] On June 18, 2013, Houston worked a full shift; however, staff members complained to Bichard that Houston was uncommunicative. Bichard Dep., pp. 103-04. When Bichard spoke to Houston regarding the complaints, Houston blamed other employees for being verbally "abusive" because of her race. *See* Pl. Dep., pp. 68-69, 72-73.

2015 U.S. Dist. LEXIS 83151, *6

supervisor that she would be absent. *See* Bichard Dep., pp. 63, 197, 229. DCI considered such an infraction a serious violation of policy because missing work for a staff nurse placed a significant burden on the clinic and could cause delays in patient treatment. *See* Def. Statement, ¶ 24; Pl. Res., ¶ 24 ("Ms. Houston admits that failing to follow proper call out procedures and/or being a no-call/no show can cause delays in treatment . . . ."). Bichard testified that a charge nurse called Houston at 5:47 a.m., but Houston did not answer; Bichard personally reached **[*7]** out to Houston at 7:39 a.m., well after Houston's shift started. According to Bichard, Houston advised Bichard that she was unaware that she was scheduled to work that day, was not around, and would have to get back in touch; Bichard testified that Houston hurried off the telephone call. Bichard Dep., pp. 203-204, 213. However, according to Houston, she repeatedly attempted to contact her supervisors between 5:30 a.m. and 7:00 a.m., via her cell and home phones, to inform DCI's personnel that she was experiencing severe panic attacks, a chronic disorder. Pl. Statement, ¶ 82. Houston's attempts were unsuccessful because, according to Houston, her calls went directly to DCI's message center as no one was working.[3] *See Id.* at ¶ 88.

At 8:02 a.m., on the same day, Houston sent an email to Bichard explaining that Houston would not be coming to work, was not feeling well, was "scheduled for serious tests today" and would be bringing a doctor's note later. *See* Pl. Dep., pp. 44, 47; Pl. Res., ¶ 28. Importantly, Houston's email did not mention that she was experiencing panic attacks or that she had called the clinic before receiving Bichard's call at 7:39 a.m. *See* Pl. Dep., p. 44. After receiving Houston's email, Bichard consulted with Denis Redman, Human Resource personnel, to seek guidance on whether she could terminate Houston's employment based on the call-out policy and other performance violations. *See* Bichard Dep., pp. 213-15. Redman advised Bichard to inform Houston not to come to work the next day, and to contact Redman if Houston had any questions. *See* Redman Dep., pp. 73-74. Redman further sought approval from Dan Watson, DCI's Human Resource

Director, to terminate Houston's employment, *see Id.* at pp. 61-62. Watson approved **[*9]** the termination based on a review of Houston's disciplinary history. *See* Watson Dep., pp. 14, 18-19, 23. In a call later that same day - June 19, 2013 — Houston contacted Redman and admitted that she was not sure whether she was scheduled to work that day. *See* Pl. Res. To Defs' Request for Admissions; Redman Dep., p. 79; Pl. Resp., ¶ 33 (admitted that Houston was not sure whether she was scheduled to work on June 19, 2013).

Because of her termination, Plaintiff brought this discrimination suit against Defendants. In her two-count Complaint, Plaintiff asserts a cause of action under *§ 1981* against DCI and Bichard for race discrimination and retaliation. Compl., ¶¶ 27-30. In Count Two, Plaintiff accuses both defendants of race and disability discrimination, as well as retaliation, in violation of the NJLAD. Defendants move for summary judgment on these claims.

**DISCUSSION**

**I. Standard of Review**

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. *See Fed R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Brooks v. Kyler, 204 F.3d 102, 105 n.5 (3d Cir. 2000)* (citing *Fed R. Civ. P. 56(c)*). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving party. *See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 305 (3d Cir. 1999)*. Once the moving party has satisfied this initial burden, the opposing **[*10]** party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996)*.

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. *See Fed. R. Civ. P. 56(e)*; *Anderson, 477 U.S. at 249*. In conducting a review of

---

[3] Defendants claim that Houston did not make any calls to DCI on the morning of June 19, 2013, because both the telephone records of the clinic and **[*8]** Houston's personal cell phone do not reflect any calls made by Houston to the clinic prior to the start of Houston's shift or at any time before Bichard contacted Houston. *See* Def. Statements, ¶¶ 26-28.

Pooja Bhutani

2015 U.S. Dist. LEXIS 83151, *10

the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. See *Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986)*. Accordingly, it is not the court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. See *Brooks, 204 F.3d at 105 n.5* (citing *Anderson, 477 U.S. at 249*).

## II. § 1981 and NJLAD— Race Discrimination

### A. *Prima Facie* Case

Discrimination claims brought under *§ 1981*[4] and the NJLAD are analyzed according to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)* and *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*. *Davis v. City of Newark, 285 Fed. Appx. 899, 903 (3d Cir. 2010)*; see *Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999)* ("Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim"); *Bergen Commercial Bank v. Sisler, 157 N.J. 188, 194, 723 A.2d 944 (1999)* (citations omitted) (finding that a claim of employment **[*11]** discrimination under Title VII, *Section 1981* or NJLAD be analyzed under the same standard).

To establish a *prima facie* case of discrimination, the plaintiff must prove that (1) she belongs to a protected class; (2) that she was qualified for the position; (3) that she suffered an adverse employment action; (4) and the adverse action occurred under circumstances that give rise to an inference of discrimination. *Davis, 285 Fed. Appx. at 903*; *Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410-12 (3d Cir. 1999)*; see *Burdine, 450 U.S.*

---

[4] Title VII and *§ 1981* both provide private remedies for racial discrimination by private employers in employment decisions and practices. See *Young v. International Telephone & Telegraph Co., 438 F.2d 757 (3d Cir. 1971)*. In that regard, "[t]he elements of a *§ 1981* claim are identical to the elements of a Title VII employment discrimination claim." *McCarty v. Marple Twp. Ambulance Corps, 869 F. Supp. 2d 638, 643 n.3 (E.D. Pa. 2012)* (citing *Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009)*). Thus, Plaintiff's *§ 1981* claims will be analyzed under Title VII jurisprudence.

*at 253-54 & n. 6*, *McDonnell Douglas, 411 U.S. at 802*. In order to establish to a claim of racial discrimination, an adverse employment action must be "sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' or to 'deprive or tend to deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.'" *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296-97 (3d Cir. 1997)*, *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)* (quoting *42 U.S.C. § 2000e-2(a)(1)* and *(2)*). Not every "insult, slight, or unpleasantness gives rise to a valid **[*12]** Title VII claim." *Id. at 1297*.

As to the third factor, an inference of discrimination could be supported in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by supervisors suggesting racial animus. See *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511-12, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*; *Golod v. Bank of Am. Corp., 403 Fed. Appx. 699, 703 n. 2 (3d Cir. 2010)*. More specifically, when presenting comparator evidence, on summary judgment, a plaintiff must prove that she is "similarly situated" to her comparators and that these employees have been treated differently or favorably by their employer. See *Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003)*; *Andy v. UPS, 2003 U.S. Dist. LEXIS 25193, at *33 (E.D. Pa. Oct. 28, 2003)*; *Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998))*. Significantly, "[s]imilarly situated" means "similar 'in all relevant respects.'" *Id.* (quoting *Singh v. Wal-Mart Stores, Inc., 1999 U.S. Dist. LEXIS 8531, at *19 (E.D. Pa. June 10, 1999))*; see *Kline v. Kansas City, Mo., Fire Dept., 175 F.3d 660, 670-71 (8th Cir. 1999)*; see also *Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)* (plaintiff must show he was "similar in all of the relevant aspects" to persons allegedly receiving preferential treatment); *Holifield v. Reno, 115 F.3d 1555, 1563 (11th Cir. 1997)*("in all aspects"); *Shumway v. United Parcel Service, 118 F.3d 60, 64 (2d Cir. 1997)* ("similarly situated in all material respects"); *Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989)* ("in all relevant aspects"). This includes similarities between the requirements, duties and responsibilities of the respective jobs, and also similarity of the conduct (or misconduct) in which each employee engaged. *Dill v. Runyon, 1997 U.S. Dist. LEXIS 4355, at *12 (E.D. Pa. 1997)* ("To be deemed 'similarly situated,' the individuals with whom a plaintiff seeks to be compared **[*13]** must

'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.") (quoting *Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994)*; *Williams v. Bala Ret. & Nursing Ctr., 2007 U.S. Dist. LEXIS 64593, at *12-13 (E.D. Pa. Aug. 31, 2007)*.

In sum, in order to raise an inference of discrimination based on comparator evidence, a plaintiff must demonstrate that: (1) the acts of the similarly situated employees were of a "comparable seriousness," *McDonnell Douglas, 411 U.S. at 804*; and (2) the employment decision must have been made by the same supervisors. *Taylor v. Procter & Gamble Dover Wipes, 184 F. Supp. 2d 402, 410 (D. Del. 2002)*, aff'd, *53 Fed. Appx. 649 (3d Cir. 2002)*; *Taylor v. Div. of State Police, 2004 U.S. Dist. LEXIS 11121, at *14 (D. Del. Jun. 15, 2004)*.

In this case, I note at the outset that Defendants do not challenge the sufficiency of Plaintiff's evidence with respect to the first three factors; that is, 1) Plaintiff is a member of a protected class (African American); 2) Plaintiff was qualified as a nurse; and 3) Plaintiff suffered an adverse employment action because she was terminated by Defendants in June 2013. Instead, Defendants center their argument on whether Plaintiff has sufficiently established the last factor of her *prima facie* case — an inference of racial discrimination. Indeed, Defendants contend that Plaintiff' has not raised a genuine issue of material fact that her disciplinary actions -- i.e., warning, suspension and termination **[*14]** — were racially motivated. In response, Plaintiff submits that she was disciplined by Defendants more harshly than her white counterparts who engaged in the same or similar conduct. In that regard, Plaintiff attempts to establish an inference of discrimination through purportedly favorable treatment of similarly situated employees,[5] which include: Mary Norris, Susie Kwok, Stephanie Rotundo, Susan Hairston, Natalie Baskina, Noreen Rick, Mary O'Connor, Herby Vilus, and Crystal Garvin. However, I do not find that Plaintiff has met her burden of showing that these employees were similarly situated, and thus fails to establish a *prima facie* case of discrimination. I will turn

─────────────────

[5] Notably, to demonstrate an inference of discrimination, Plaintiff relies solely on comparator evidence; in that regard, Plaintiff has not proffered any evidence of direct discrimination or other similar acts of racial discrimination by Defendants. *See Golod, 403 Fed. Appx. at 703 n.2*.

to each of these employees.[6]

First, **[*15]** Plaintiff points to Mary Norris, a Caucasian nurse who worked in the North Brunswick location. *See* Pl. Dep., p. 55. According to Plaintiff, Norris was employed by DCI at the same time as Plaintiff, and therefore, Norris reported to both LaManna and Bichard. *Id.* at p. 57. According to her employment record, Norris was disciplined for violating Defendants' safety policies and procedures five times from May 2013 to September 2013. Most of these infractions, however, were not similar in nature to Plaintiff's violations. For example, in August 2013, Norris was issued a written warning because she failed to record results of pH meter readings; management warned Norris that she must comply with DCI's documentation policy. *See* Norris' Written Warning dated August 21, 2013. In September 2013, because Norris committed the same infraction, she was suspended.[7] *See* Norris' Suspension dated September, 3, 2013. In fact, Norris was suspended twice in a five-month period. *See* Norris' Suspension dated July 2, 2013. While Plaintiff argues that one of the infractions committed by Norris was failing to follow certain dialyzer procedures — similar to Plaintiff's infraction — Norris was disciplined by Bichard. Contrary **[*16]** to Plaintiff's assertion, Norris was treated no differently than Plaintiff during her employment; Norris was warned verbally and by writing multiple times, which ultimately led to her suspensions. More importantly, while Norris was not terminated, she was also never disciplined for committing a no call/no show,[8]

─────────────────

[6] Plaintiff argues that the determination of whether individuals are apt comparators is a jury question. However, a court may properly grant summary judgment where no reasonable jury could find the individuals are similarly situated. *See McDonald v. Village of Winnetka, 371 F.3d 992, 1002 (7th Cir. 2004)*; *Red v. Potter, 211 Fed. Appx. 82, 84 (3d Cir. 2006)*.

[7] Norris resigned following her suspension in September 2013. *See* Def. Statement, ¶ 107.

[8] As an ancillary matter, I address Plaintiff's argument that she was not a "no call/no show." Plaintiff maintains that the proffered reason for her termination, i.e., no call/no show, was suspect. Houston insists that on June 19, 2013, she called DCI numerous times from **[*17]** her cell and home phones between 5:30 a.m. and 7:30 a.m., but no one was at work and the phone calls went to a "loop." *See* Pl. Dep., p. 37, 39. Plaintiff claims that she was having a panic attack and therefore, could not have gone to work. Eventually, however, Plaintiff asserts that she reached an unidentified employee and explained to that employee that she could not come to

the primary reason why Plaintiff was terminated. Therefore, based on her circumstances, I do not find that Norris was similarly situated to Plaintiff, because "the acts of the non-minority employee, [Norris], were [not] of a "comparable seriousness." *McDonnell Douglas, 411 U.S. at 804*; *Livingston v. Borough of Edgewood, 430 Fed. Appx. 172, 177 (3d Cir. 2011)*(finding that similarly situated individuals are those "in circumstances of comparable seriousness"); *Opsatnik v. Norfolk Southern Corp., 335 Fed. Appx. 220, 223 (3d Cir. 2009)* ("while similarly situated does not mean identically situated, purported comparators must have committed offenses of comparable seriousness." (citations and quotations omitted)).

Next, Plaintiff contends that Susie Kwok committed three violations of safety protocols, but was only issued three verbal warnings and she was not terminated. First and foremost, Kwok is not a similarly situated non-minority employee; she is a minority. *See Johnson v. Diamond State Port Corp., 50 Fed. Appx. 554, 556 (3d Cir. 2002)* ("Johnson had failed to establish a *prima facie* case of discrimination because he had not shown that similarly-situated *non-minority* employees received light duty." (emphasis added)); *Miller v. Del. Tech. & Cmty. College, 2013 U.S. Dist. LEXIS 62113, at *47 (D. Del. May 1, 2013)*; *Diaz v. Donahoe, 2013 U.S. Dist. LEXIS 1767, at *1-2 (D.N.J. Jan 4, 2013)* ("[t]he key inquiries for the Court are whether Plaintiff has adduced

---

work due to a medical condition. *See* Pl. Dep., p. 39. Defendants strenuously dispute Plaintiff's self-serving statements in this regard. Indeed, both the phone records of DCI and Plaintiff's cell phone reveal that Plaintiff never called DCI. *See* Def. Response to Pl. Counter-Statement of Material Facts, ¶ 83. Rather, the first communication on the morning of June 19, 2013, was a phone call from Bichard to Plaintiff at 7:39 a.m. Even more damning, Plaintiff admitted to Bichard and Redman that she was not aware that she was scheduled to work on June 19, 2013. Given that explanation, it is inconsistent for Plaintiff to testify that she purportedly called out of work, but yet admitted that she was unaware of her scheduled shift. As such, because of Plaintiff's inconsistent statements and documentary evidence to the **[*18]** contrary, on a summary judgment motion, I need not credit Plaintiff's self-serving statements during her deposition; it is not sufficient to defeat summary judgment. *See DeGroat v. Power Logistics, 118 Fed. Appx. 575, 576 (3d Cir. 2004)*; *Coast Auto. Group, Ltd. v. VW Credit, Inc., 34 Fed. Appx. 818, 822 (3d Cir. 2002)* ("inconsistent statements could not be used to create material issues of fact sufficient to preclude summary judgment."); *Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009)* ("Conclusory, self-serving [statements] are insufficient to withstand a motion for summary judgment.")(citations omitted)). *See also, infra.*

admissible evidence from which the finder of fact could reasonably conclude that she was treated differently from 'similarly situated' non-minority employees for her discrimination claims . . . ."). And, unlike Plaintiff, Kwok never committed a "no call/no **[*19]** show" infraction. Therefore, based on these reasons, Kwok is not similarly situated to Plaintiff.

As an example of Defendants' favorable treatment of non-minorities regarding "no call/no shows," Plaintiff points to Stephanie Rotundo, who was a nurse working at the North Brunswick facility and supervised by Bichard. Plaintiff cites to Rotundo's written discipline for not appearing at work for a scheduled shift. *See* Rotundo's Written Warning dated January 30, 2014. One important distinction, however, is that Rotundo was verbally warned for calling out of work to a charge nurse rather than her supervisor; she did, however, make this call well *prior* to her shift. This distinction is critical because Plaintiff was terminated for *not calling* and abandoning her shift.

Similarly, Plaintiff's comparison of her disciplinary actions to those of Susuan Hairston is inapt. Hairston was verbally warned regarding a needle prick that Hairston herself sustained for failing to follow DCI's policy on safety as to the caregiver employee, not patient care. Regardless, the requested inference based on Hairston's sole disciplinary action is not reasonable because, unlike Plaintiff, who committed three separate **[*20]** infractions, Bichard indicated that Hairston would be terminated if she were to commit another similar infraction. *See Id.* Likewise, Natalie Baskina is not similarly situated to Plaintiff because Baskina received counseling for only one infraction related to changing of gloves between patients, rather than three separate ones, as Plaintiff received. *See* Baskina's Verbal Warning dated June 26, 2012.

Finally, Rick stands on a different footing than Plaintiff because, while Rick was a nurse at the Clinic, she was also part of management as a charge nurse. *See, e.g., Hanzer v. Mentor Network, 610 Fed. Appx. 121, 2015 U.S. App. LEXIS 7350, at *7-8 (3d Cir. May 4, 2015)*("the Program Manager position is an entirely different position than the Program Support Coordinator position. Thus, they were not similarly situated employees."); *Mandel v. M & Q Packaging Corp., 706 F.3d 157, 170 (3d Cir. 2013)* (observing that employees with higher levels of education and different positions are not similarly situated); *Ade v. Kidspeace Corp., 401 Fed Appx. 697, 705 (3d Cir. 2010)* (finding that employees that hold different positions are not similarly

situated).[9] More importantly, Plaintiff makes general assertions, without any evidence, that certain complaints were made against Rick and no disciplinary action was taken against Rick for those complaints. Other than her conclusory accusations, Plaintiff does not identify when or [*21] by whom those complaints were made, nor does she describe those complaints; thus, no comparison can be drawn between Rick's alleged "issues" and those underlying Plaintiff's disciplinary action, such that they can be analyzed under the similarly situated prong for § 1981 purposes.

Having made those determinations, however, the Court recognizes that a few of those employees, such as Baskina and Rotundo, have ostensibly committed violations of DCI's policy that are generally similar in nature to those committed by Plaintiff; thus, the question whether those nurses are appropriate comparators to Plaintiff is a closer call. That being said, I do not find that any of the co-workers Plaintiff identifies on this motion are similarly situated to Plaintiff under § 1981, because those employees have not committed a combination of violations, particularly the severe infraction of failing to call out of work, that would be sufficient to treat [*22] them as comparators and raise an inference of discrimination. Nonetheless, even assuming Plaintiff could establish a *prima facie* case of discrimination, she has failed to rebut Defendants' legitimate business reason for her termination.

B. *Burden Shifting*

If a plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination. *Gerard v. Bridge Capital (USVI), LLC, 282 Fed. Appx. 969, 972 (3d Cir. 2008)*. "The employer satisfies its burden of production by introducing evidence which . . . would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)*. As the Third Circuit has noted, this burden is "relatively light" and "[t]he employer need not prove that the tendered reason actually motivated its behavior. . . ." *Id.*

If the employer is able to articulate such a reason, "the

plaintiff must then show that the proffered reason was a pretext for a racially discriminatory decision." *Id.* To show pretext, the plaintiff's evidence must either "(1) cast[] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; [*23] or (2) allow[] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes, 32 F.3d at 762*; *Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 198 (3d Cir. 2015)*. The plaintiff "cannot simply show that the employer's decision was wrong or mistaken" but rather "must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Ross v. Gilhuly, 755 F.3d 185, 194 n.13 (3d Cir. 2014)* (alteration in original) (quoting *Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 331 (3d Cir. 1995))*.

Here, as a legitimate business reason, Defendants proffer that Plaintiff committed serious infractions that supported Plaintiff's written warning, suspension and her eventual termination. To carry her burden, Plaintiff offers various reasons why Defendants' decision to discipline was pretextual. First, Plaintiff claims that Bichard exhibited antagonistic behavior after Plaintiff complained of race discrimination in emails sent to Bichard. Such behavior, Plaintiff explained, made her feel that her work environment had become "tense" and "angry." And, Plaintiff, without [*24] any evidence other than her own subjective impression, attributes that antagonism to her race. However, as the Third Circuit has clearly held, a plaintiff's "subjective belief that race played a role in [her] employment decisions . . . is not sufficient to establish [pretext]." *Groeber v. Friedman & Schuman, P.C., 555 Fed. Appx. 133, 135 (3d Cir. 2014)*; *Tucker v. Thomas Jefferson Univ., 484 Fed. Appx. 710, 712 (3d Cir. 2012)* ("the subjective belief that race played a part in his firing is insufficient."); *McDonnaugh v. Teva Specialty Pharms., LLC, 2011 U.S. Dist. LEXIS 98638 at *16-17 (E.D. Pa. Aug. 31, 2011)* (finding that plaintiff's "subjective belief that race played a role in an employment decision is insufficient to establish an inference of discrimination . . . ."). Simply stated, the fact that Plaintiff felt that management was hostile towards her because she complained of race discrimination cannot, alone, be a basis to find pretext.

---

[9] Based on this line of reasoning, Plaintiff's attempt at comparing herself to Mary O'Connor, Herby Vilus and Crystal Garvin are not appropriate because, as Plaintiff concedes, these employees are patient care technicians and not nurses. *See* Pl. Opposition Br. at p. 19.

Next, Plaintiff suggests that only after she complained about race discrimination, did Bichard suddenly subject Plaintiff to harsh disciplinary actions, i.e., written warning and suspension. In that connection, Plaintiff argues that a jury can find that this is evidence of pretext. Plaintiff's position is suspect for two reasons. First, as I have noted earlier in this Opinion, Plaintiff was suspended for failing to observe DCI's patient safety protocols, which, Plaintiff, herself, identified as **[*25]** serious. *See* Pl. Dep., p. 54-55, 83. Therefore, the fact that Plaintiff was disciplined for those serious infractions undermines her argument that Bichard's decision to suspend her were somehow pretextual. *See, e.g.,* *Barker v. Boeing Co., 21 F. Supp. 3d 417, 426 (E.D. Pa. 2014)* ("under either a pretext or mixed-motive framework. Boeing fired the plaintiffs for what it deemed a serious act . . . ; there is no evidence that Boeing was motivated in any way by discriminatory animus." (internal quotations and citations omitted)); *Ogilvie v. Northern Valley EMS, Inc., 2008 U.S. Dist. LEXIS 87913, at *28-29 (E.D. Pa. Oct. 30, 2008)* (rejecting plaintiff's argument of pretext when "Defendant has presented credible evidence that [plaintiff] committed a serious infraction."); *Taylor, 2004 U.S. Dist. LEXIS 11121 at *22* (finding no pretext when plaintiff's employment was terminated because of serious charges related to his abuse of the public trust).

Moreover, while Plaintiff was not formally disciplined, she was counseled by Defendants for safety violations on at least one occasion -- prior to Plaintiff submitting any complaints of racial discrimination. Indeed, Plaintiff acknowledged that she was instructed to clean the dialyzer differently because "we were doing something wrong." Pl. Dep., p. 96. While Rick had complained about a performance issue relating to **[*26]** Plaintiff in late May 2013, after Plaintiff had complained of racial discrimination, that complaint from Rick was never administratively pursued by Bichard, was not sent for further review, and was not used as a basis for issuing discipline to Plaintiff. Therefore, no reasonable trier of fact can find that Bichard's decision to discipline Plaintiff for two serious safety infractions was based on a racial animus.

Lastly, Plaintiff argues that the fact that Defendants did not follow DCI's own progressive disciplinary policy is evidence of pretext. Viewing the facts in Plaintiff's favor, even if the Court were to assume that the disciplinary policy was not strictly followed, did occur, "'the mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent

or that the substantive reasons given by the employer for its employment decision were pretextual.'" *Maull v. Div. of State Police, 39 Fed. Appx. 769, 774 (3d Cir. 2010)* (quoting *Randle v. City of Aurora, 69 F.3d 441, 454 (10th Cir. 1995))*. Indeed, simply pointing to violations is inadequate without "evidence that white [nurses] were treated differently by Defendants with respect to these policies." *Id.* (quoting *English v. Colorado Department of Corrections, 248 F.3d 1002, 1009 (10th Cir. 2001))* (noting that while "evidence that the defendant acted **[*27]** contrary to an unwritten policy or contrary to company practice" may show pretext, a plaintiff relying on such a violation must "provide evidence that [s]he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness").

Here, it is not enough that Plaintiff accuses Defendants of failing to follow DCI policy, but rather, Plaintiff has to present sufficient evidence to show that other similarly situated white nurses in DCI were disciplined differently than Plaintiff such that it would raise an impermissible inference of discrimination and show pretext in the reasons given by Defendants for their actions. But, as I have found, *supra*, Plaintiff has failed to establish that Defendants treated similarly situated white nurses more favorably. Thus, without proof, "[Plaintiff] is left only with her subjective belief that race played a role in [Defendants'] employment decisions. She presents no discriminatory statements by [Defendants] or evidence of discriminatory motive to support her allegations." *Groeber, 555 Fed. Appx at 135*; *Rodriguez v. AMTRAK, 532 Fed. Appx. 152, 153 (3d Cir 2013)*("[a] plaintiff's subjective belief that race played a role in an employment decision is not sufficient to establish an inference of discrimination. **[*28]** However, discrimination may be inferred by showing that the employer treated a similarly situated employee outside of the plaintiff's class more favorably.").[10]

---

[10] Plaintiff argues that Bichard acted suspiciously at the time of Plaintiff's termination by refusing to immediately inform upper management of Plaintiff's purported medical reason for missing her scheduled shift. And, Plaintiff finds it suspect that Bichard asked Rick to forward a particular email regarding an infraction that Plaintiff had committed, but for which no investigation was undertaken. Plaintiff submits that Bichard's conduct in this regard is evidence of pretext. However, these assertions, couched as evidence, are merely Plaintiff's own speculations. Indeed, these statements are conclusory and not sufficient to demonstrate pretext. *See Kautz v. Met-Pro Corp., 412 F.3d 463, 471-73 (3d Cir. 2005 )*; *Wolpert v. Albert Labs, 817 F. Supp. 2d 424, 436 (D.N.J. 2011)*; *Malloy v. Intercall,*

Accordingly, I find that Plaintiff has failed **[*29]** to show there is any genuine issue of material fact that Defendants' proffered reasons for subjecting Plaintiff to disciplinary actions, including termination, were a pretext for a racially discriminatory purpose. Thus, summary judgment is granted in favor of DCI on Plaintiff's *§ 1981* and NJLAD discrimination claims.

### C. *Individual Liability*

As to Plaintiff's NJLAD claim against Bichard, because Plaintiff's claim for race discrimination against DCI, her employer, fails, there can be no claim for aiding and abetting by Bichard in violation of the NJLAD. *Ivan v. County of Middlesex, 595 F. Supp. 2d 425, 463 (D.N.J. 2009)* ("[F]or a defendant to be individually liable for aiding and abetting, the employer must also be liable under the LAD. It is not the act of discrimination but rather the failure in the employer's response that an aider and abettor is charged with assisting.").

To establish a *§ 1981* claim against Bichard individually, Plaintiff here, must show: (1) that she belongs to a racial minority; (2) an intent to discriminate on the basis of race on the part of the defendant; (3) discrimination concerning one or more of the activities enumerated in *§ 1981*. *See e.g., Estate of Oliva v. N.J., Dep't of Law & Pub. Safety, Div. of State Police, 604 F.3d 788, 797 (3d Cir. 2010)*. The Third Circuit has held that "[i]f individuals are personally involved in the discrimination against the [plaintiff], **[*30]** and if they intentionally caused [an infringement of rights protected by *Section 1981*], or if they authorized, directed, or participated in the alleged discriminatory conduct, they may be held liable." *Al-Khazraji v. Saint Francis Coll., 784 F.2d 505, 518 (3d Cir. 1986)*; *see also Johnson v. Res. for Human Dev., Inc., 843 F. Supp. 974, 978 (E.D. Pa. 1994)*; *Santiago v. City of Vineland, 107 F. Supp. 2d 512, 541 (D.N.J. 2000)*.

However, as I have discussed at length, *supra*, Plaintiff has failed to present any genuine issue of material fact as to intentional discrimination on the part of DCI or

---

*Inc., 2010 U.S. Dist. LEXIS 136808, at *50 (D.N.J. 2010)* ("Ms. Malloy has simply presented no evidence, beyond her speculation, that age played any role in the decisions leading up to her . . . termination."); *Boyd v. Citizens Bank of Pa., Inc., 2014 U.S. Dist. LEXIS 70210, at * 62 (W.D. Pa. 2014)* ("Plaintiff does not, however, point to any evidence, beyond her own conclusory and speculative suspicions. . . "); *Connolly v. Mitsui O.S.K. Lines (Am.), Inc., 2009 U.S. Dist. LEXIS 86195, at *11-12 (D.N.J. 2009)* ("Speculation, however, is not sufficient to demonstrate pretext.").

Bichard. Thus, Bichard cannot be held individually liable under *§ 1981*. *See Miller v. Thomas Jefferson Univ. Hosp., 908 F. Supp. 2d 639, 649 (E.D. Pa. 2012)*. According, Defendants' motion for summary judgment as to Plaintiff's race discrimination claims under both *§ 1981* and NJLAD is granted as to defendants DCI and Bichard.

### III. § 1981 and NJLAD — Retaliation

The Supreme Court has held that *Section 1981* encompasses retaliation claims. *CBOCS W., Inc. v. Humphries, 553 U.S. 442, 457, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008)*. To establish a *prima facie* claim for retaliation under *§ 1981*, the plaintiff must prove three elements:

> (1) the employee engaged in a protected employee activity;
> (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and
> (3) a causal link exists between the employee's protected activity and the employer's adverse action.

*Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007)*; *Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 286 (3d Cir. 2001)*; *White v. Cleary, 513 Fed. Appx. 224, 228 (3d Cir. 2013)*. Retaliation claims raised under the NJLAD are analyzed under the same framework applicable to *§ 1981* cases, such that they may be considered **[*31]** together. *See Kant v. Seton Hall Univ., 289 Fed. Appx. 564, 567 (3d Cir. 2008)*; *Didier v. Dow Jones, 2014 U.S. Dist. LEXIS 114289, *21 n.21 (D.N.J. Aug. 18, 2014)*.

If a plaintiff satisfies the first *McDonnell Douglas* requirement and establishes a *prima facie* case of retaliation, then an inference of discriminatory motive arises, shifting the burden to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Miller v. Del. Prob. & Parole, 41 Fed. Appx. 581, 584 (3d Cir. 2002)*; *Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)*. "If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Krouse, 126 F.3d at 500-01*. "The plaintiff must prove that retaliatory animus played a role in the employer's decision-making process and that it had a determinative effect on the outcome of that process. The burden of

2015 U.S. Dist. LEXIS 83151, *31

proof remains at all times with the plaintiff." *Id.*

In this case, Plaintiff alleges that she was subjected to disciplinary actions by Defendants because she made verbal and written complaints of racial bias to management. Defendants have conceded that Plaintiff may establish a *prima facie* case of retaliation. Def. Brief in Support, p. 18. Indeed, Plaintiff claims that her termination or other disciplinary actions were taken in retaliation for her complaints of **[*32]** race discrimination, and given the temporal proximity between Plaintiff's termination and her complaints, I find that Plaintiff has satisfied her burden of demonstrating a *prima facie* case of retaliation. As I have find herein, Defendants have articulated a legitimate non-discriminatory reasons for Plaintiff's termination. However, Plaintiff has failed to carry her burden of establishing pretext.

In proving pretext, Plaintiff relies on identical arguments made in support of her discrimination claims, *supra*, and I have rejected those contentions. See Pl. Opp. Br., pp. 17-19. Thus, I need not address them here, again. I will comment on one additional argument related to pretext that Plaintiff has advanced in the context of her retaliation claim. Plaintiff insists that because she was terminated within one day of her final complaint of racial bias, this "extremely close temporal proximity between her race discrimination complaints and her termination is unusually suggestive of retaliation and is persuasive evidence of pretext." Pl. Opp. Br., p. 17. As I have explained above, on June 18, 2013, Plaintiff verbally complained to Bichard regarding how LaManna "yelled at her" on the floor in **[*33]** front of other employees and patients. Moreover, Plaintiff expressed that she was subjected to this type of treatment because of her race. One day later, Plaintiff was terminated.

I do not find Plaintiff's position convincing. Plaintiff's argument is based on a temporal proximity of the day between her final complaint to Bichard and her termination. However, "inferring a causal relationship between the protected activity and the adverse action is not logical when the two are separated by an intervening event that independently . . . caused the adverse action." *Mizusawa v. United States Dep't of Labor, 524 Fed. Appx. 443, 448 (10th Cir. 2013)*; *see Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 894 (3d Cir. 1993)*; *Kachmar v. Sungard Data Sys., 109 F.3d 173, 179 (3d Cir. 1997)*; *Kuhn v. Washtenaw County, 709 F.3d 612, 628 (6th Cir. 2013)* ("an intervening legitimate reason to take an adverse employment action dispels an inference of retaliation

based on temporal proximity." (citations and quotations omitted)); *Sanders v. Sailormen, Inc., 506 Fed. Appx. 303, 304 (5th Cir. 2013)*; *Coszalter v. City of Salem, 320 F.3d 968, 977 (9th Cir. 2003)* (finding that temporal proximity must be considered with regard to its factual setting, such as intervening events). Here, there was an intervening event that must be taken into consideration in determining whether the temporal proximity raised by Plaintiff is suggestive of pretext. Indeed, Plaintiff's no call/no show, which occurred on June 19, 2013 — the day of Plaintiff's termination — after other infractions, was the reason why she was terminated. **[*34]** In fact, Plaintiff had been warned by Bichard that if Plaintiff were to commit another infraction, she would be terminated. This event, thus, broke the causal link that could otherwise be inferred from temporal proximity.

Even if the intervening event had not occurred, Plaintiff cannot rely solely on temporal proximity to show pretext. *See El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010)* (holding that while temporal proximity alone may be sufficient to satisfy a plaintiff's *prima facie* burden, that "temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext."); *Sanderson v. N.Y. State Elec. & Gas Corp., 560 Fed. Appx. 88, 94 (2d Cir. 2014)* ("Apart from temporal proximity, Sanderson offers no evidence that NYSEG's reliance on her insubordination as the reason for her discharge was a pretext for retaliation. Accordingly, the district court also properly granted summary judgment on plaintiff's claim of retaliation."); *Carlson v. Township of Lower Alloways Creek, 452 Fed. Appx. 95, 101-02 (3d Cir. 2011)* (finding that mere temporal proximity, absent any evidence of retaliatory intent, is insufficient to demonstrate pretext); *Ritenour v. Tenn. Dep't of Human Servs., 497 Fed. Appx. 521, 533 n. 10 (6th Cir. 2012)*; *Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1066 (10th Cir. 2009)* (finding that temporal proximity alone is not sufficient to defeat summary judgment by showing that the employer's proffered reason is actually pretext for retaliation). Similarly, on the facts here, I find that Plaintiff **[*35]** has failed to show pretext.

Furthermore, as to retaliation claims against Bichard, as I have stated earlier, under *§ 1981*, individuals including "directors, officers, and employees of a corporation may become personally liable when they intentionally cause an infringement of rights protected by *§ 1981*." *Al-Khazraji, 784 F.2d at 518*. Individuals that "are personally involved in the discrimination," and intentionally caused, authorized, directed, or participated in the discriminatory conduct may be held

liable. *Id.* Similarly, the NJLAD's anti-retaliation provision deems it unlawful for "any person to take reprisals against any person because that person has opposed any practices or acts" that the NJLAD prohibits. *N.J.S.A. 10:5-12(d)*; *see Hargrave v. Cnty. of Atl., 262 F.Supp. 2d 393, 436 (D.N.J. 2003)* ("Thus, [the NJLAD anti-retaliation] provisions, like the provisions establishing liability for those employees who 'aid' and 'abet' an employer's unlawful employment practices, expressly contemplate direct liability for individual supervisory employees.").

Here, for the same reasons delineated above, I do not find that Plaintiff has raised any triable issue as to intentional discrimination on the part of Bichard to defeat summary judgment. Accordingly, Plaintiff's retaliation claims against Bichard are dismissed. **[*36]**

## IV. NJLAD — Disability Discrimination and Retaliation

The NJLAD prohibits employment discrimination based on a disability or a perceived disability. *N.J. Stat. Ann. § 10:5-4.1*; *see Victor v. State, 203 N.J. 383, 410, 4 A.3d 126 (2010)*; *Myers v. AT & T, 380 N.J. Super. 443, 452, 882 A.2d 961 (App. Div. 2005)*. In order to establish a *prima facie* case of discrimination under NJLAD, a plaintiff must prove that 1) she was a member of a protected class, 2) she was qualified for the job, 3) she was terminated, and 4) the position was filled with a person of similar qualifications. *See Viscik v. Fowler Equip. Co., 173 N.J. 1, 10, 800 A.2d 826 (2002)*; *Swiatek v. Bemis Co., 542 Fed. Appx. 183, 186 (3d Cir. 2013).*[11] As a threshold question, a plaintiff must show that the employer knew of the disability. *Jones v. UPS, 214 F.3d 402, 406 (3d Cir. 2000)*; *Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996)* ("the plaintiff must demonstrate that the defendant employer knew of the disability to state a *prima facie* case"); *Fulton v. Johnson & Johnson Pharm. Research & Development, LLC, 2008 U.S. Dist. LEXIS 14163, at *58 (D.N.J. Feb. 26, 2008)*.

---

[11] "New Jersey courts generally interpret the LAD by reliance upon [the construction of] analogous federal antidiscrimination statutes." *Conchewski v. Camden County, 2014 U.S. Dist. LEXIS 37130, at *36 (D.N.J. Mar. 21, 2014)*(citations omitted). Accordingly, it is appropriate to analyze an NJLAD disability discrimination claim by applying the 3-part test employed to analyze claims under the federal Americans with Disabilities Act. *See Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 70 (3d Cir. 2006)*.

Here, Plaintiff maintains that she has been suffering from anxiety and panic attacks for several years. In that regard, Plaintiff claims, albeit without any record evidence, that Defendants terminated her within **[*37]** hours of disclosing this medical condition. However, assuming *arguendo* that Plaintiff has a disability,[12] Plaintiff's NJLAD claims fail because Plaintiff has not shown that Defendants had knowledge of her disability.

There is no dispute that prior to June 19, 2013, when Plaintiff failed to appear for her scheduled shift, Plaintiff never told Defendants the history of her anxiety or panic attacks while employed at DCI. Indeed, Plaintiff conceded this point during her deposition:

> Q: Before [June 19, 2013], had you told any manager at DCI that you had a history of anxiety and panic attacks?
> A: No, I did not, sure.
> Q: Had you ever missed work at DCI due to anxiety or panic attacks at DCI?
> A: No, sir.

Pl. Dep., p. 90. Rather, Plaintiff argues that she disclosed her conditions to Bichard over the phone in the morning of June 19, 2013, when Plaintiff explained her absence from work.

Notwithstanding Plaintiff's statement in this regard, none of the documentary evidence or other testimony corroborate Plaintiff's version of events. According to Bichard, Bichard called Plaintiff **[*38]** around 7:40 a.m. on the morning of June 19, 2013, to inquire why Plaintiff was not at her scheduled shift. Bichard Dep., p. 203. Bichard testified that Plaintiff told her that "she didn't know she was supposed to be at work . . . or she had forgotten and that was [a] mistake." *Id.* Importantly, Plaintiff informed Bichard that "she would have to get back to [Bichard]" regarding whether she would come to work later in the day, and Plaintiff did not mention that she was experiencing any medical issues. *Id.*, p. 203-04. Thereafter, Plaintiff sent an email to Bichard at 8:02 a.m., writing the following:

> I will not be coming to work today. I am not feeling well and I am scheduled for very serious tests today that I need to have. I will either bring a copy of my physician's note or fax it in stating when he will be releasing me to come back to work.

Houston Email dated June 19, 2014. Tellingly, Plaintiff did not indicate that she was suffering from anxiety or panic attacks or any specific type of illness. A general

---

[12] Importantly, I make no findings that Plaintiff's panic attacks and/or anxiety could qualify her as disabled under the NJLAD.

2015 U.S. Dist. LEXIS 83151, *38

expression of "not feeling well" does not suffice to put an employer on notice that a plaintiff has a disability. *See Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89-90 (1st Cir. 2012)* ("NLI executives were not on notice that the symptoms Jones described in his **[*39]** e-mail were caused by a disability."); *King v. Permanente Med. Group, Inc., 2013 U.S. Dist. LEXIS 134388, at *22 (E.D. Cal. Sep. 19, 2013)* ("And while knowledge of the disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the only reasonable interpretation of the known facts." (citations and quotations omitted)); *Conant v. City of Hibbing, 271 F.3d 782, 786 (8th Cir. 2006)* (finding that an "employer's knowledge of impairment without more does not amount to a disability" (citations and quotation omitted)); *Aucutt v. Six Flags Over Mid-America, 85 F.3d 1311, 1320 (8th Cir. 1996)* (stating that "fact that [employer] was aware of [plaintiff's] medical problems is insufficient to establish that [employer] 'regarded' him as disabled.").

Further, Plaintiff sent another email on June 19, 2013, to Bichard. In it, Plaintiff states that her "doctor's note [is] taking me out of work until June 26, 2013. He will re-evaluate me on June 26th to see if I am physically able to return and has informed me he will adjust the date according to my physical well-being." Houston Email dated June 19, 2013. Again, Plaintiff did not explain or inform Defendants that she had any specific disability, or worst yet, Plaintiff did not disclose any other pertinent facts from which one can regard Plaintiff as disabled. Even more compellingly, Plaintiff's note from her doctor, **[*40]** attached to her email, only indicates that Plaintiff was under a doctor's care at Capital Health from June 19, 2013 to June 26, 2013. *See* Doctor's Note dated June 19, 2013. Nowhere does the note mention any symptoms or disabilities.

Absent any evidence that Plaintiff put Defendants on notice of her alleged disability, i.e., suffering from panic attacks and anxiety, Plaintiff's own self-serving testimony during her deposition cannot defeat summary judgment, as no reasonable jury could find that Defendants were aware of Plaintiff's purported disability. *See Gonzalez v. Sec'y of Dep't of Homeland Sec., 678 F.3d 254, 263 (3d Cir. 2012)* ("[C]onclusory, self-serving affidavits [and testimony] are insufficient to withstand a motion for summary judgment . . . . In this case, Gonzalez's own, sworn statements are insufficient to survive summary judgment."); *Irving v. Chester Water Auth., 439 Fed. Appx. 125, 127 (3d Cir. 2011)*; *Jordan v. Cicchi, 2014 U.S. Dist. LEXIS 67380, 2014 WL 2009089, at *2 (D.N.J. May 16, 2014)* ("the issue is not

whether Plaintiff has relied solely on his own testimony to challenge [a summary judgment motion], but whether Plaintiff's testimony, when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit Plaintiff's testimony, despite its self-serving nature."); *Johnson v. MetLife Bank, N.A., 883 F.Supp.2d 542, 549 (E.D. Pa. 2012)*; *Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)* ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable **[*41]** jury could believe it, a court should not adopt that version of facts for the purposes of ruling on a motion for summary judgment."); *Irving v. Chester Water Auth., 439 F. App'x 125, 127 (3d Cir. 2011)* (holding that "self-serving deposition testimony is insufficient to raise a genuine issue of material fact."); *Synthes, Inc. v. Emerge Med., Inc., 25 F. Supp. 3d 617, 672 (E.D. Pa. 2014)*(same); *Danois v. i3 Archive, Inc., 2013 U.S. Dist. LEXIS 98105, at *28-29 (E.D. Pa. Jul. 12, 2013)* (finding that plaintiffs' reliance on their self-serving deposition testimony cannot create an issue of fact on summary judgment since "the Third Circuit has extended to deposition testimony the principle that conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." (quotations and citations omitted)).

Accordingly, Plaintiff has failed to demonstrate a *prima facie* case of disability discrimination or retaliation; her claims under the NJLAD in this regard are dismissed as to both DCI and Bichard.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED**.

Dated: June 26, 2015

/s/ Freda L. Wolfson

Freda L. Wolfson

United States District Judge

 Positive
As of: April 29, 2021 6:37 PM Z

## *Malloy v. Intercall, Inc.*

United States District Court for the District of New Jersey

December 28, 2010, Decided; December 28, 2010, Filed

Civil Action No.: 08-01182 (JLL)

**Reporter**
2010 U.S. Dist. LEXIS 136808 *; 2010 WL 5441658

RUTH ANN MALLOY, Plaintiff, v. INTERCALL, INC., JOHN DOES (1-10) and ABC CORP. (1-10), Defendant(s).

**Notice:** NOT FOR PUBLICATION

## Core Terms

terminated, territory, email, transferred, assigned, younger, undisputed, argues, consultants, geographic, at-will, sales, asserts, Reply, hired, medical leave, employees, acquisition, responded, video, designated territory, summary judgment, pretext, reasons, train, existing client, sales associate, retaliation, outrageous, managed

**Counsel:** **[*1]** For RUTH ANN MALLOY, Plaintiff: SERENE MARY HENNION, LEAD ATTORNEY, JOHNSON, MURPHY, HUBNER, MCKEON, WUBBENHORST, BUCCO & APPELT, RIVERDALE, NJ.

For INTERCALL, INC., a Subsidiary of West Corp., Defendant: BRUCE S. ROSEN, MCCUSKER, ANSELMI, ROSEN, CARVELLI & WALSH, PC, FLORHAM PARK, NJ.

**Judges:** JOSE L. LINARES, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JOSE L. LINARES

## Opinion

**LINARES**, District Judge.

This matter comes before the Court on: (1) a motion for partial summary judgment filed by Plaintiff Ruth Ann Malloy; (2) a motion to strike Plaintiff's expert Peter Crain, Ph.D, filed by Defendant Intercall, Inc. ("Intercall"); (3) a motion to strike Plaintiff's expert Stephen Levison, Ph.D, filed by Intercall and (4) a motion for summary judgment filed Intercall. The Court has considered the submissions in support of and in opposition to the motions and decides the matter without oral argument pursuant to *Rule 78 of the Federal Rules of Civil Procedure*. For the reasons discussed below, Ms. Malloy's motion for partial summary judgment is denied, Intercall's motion for summary judgment is granted, and Intercall's motions to strike Ms. Malloy's experts are denied as moot.

### I. BACKGROUND

Prior to 2005, Ms. Malloy worked in the **[*2]** Wayne, New Jersey, sales office of ECI, a telephone and video conferencing company. (Pl.'s Stmt. of Undisputed Mat'l Facts in Supp. of Mot. for Partial Summ. J. [hereinafter "Malloy's SOF"] ¶ 11.) She had worked at ECI since 1994. (Id.) At the beginning of 2005, ECI was bought by Intercall. (Id. ¶ 13.) Thus, as of this acquisition date, Ms. Malloy technically worked for Intercall. But, until August 1, 2005, Ms. Malloy continued reporting to her ECI supervisor, Greg Mills. (Decl. of Serene M.Hennion, Esq. in Opp'n to Def.'s Mot. for Summ. J. [hereinafter

"Hennion Decl."], Ex. G., Dep. of Jay McCarthy, dated Nov. 5, 2009, Tr. 78:14-23.

As part of its process to determine which ECI employees it wanted to retain, Intercall managers interviewed former ECI employees. (Malloy's SOF ¶ 17; Def.'s Responsive Stmt. of Mat'l Facts and Supplemental Stmt. of Facts Not in Dispute [hereinafter "Intercall's RSOF"] ¶ 17.) Ms. Malloy was interviewed in Intercall's Wayne, New Jersey office by Marty Dunne and Kim McLachlan. (Malloy's SOF ¶ 15.) At the time of the interview, Mr. Dunne was Intercall's Vice President of Sales and Ms. McLachlan was a sales manager. (Id. ¶ 16.) Ms. McLachlan in turn supervised **[*3]** another sales manager, Patti Paczkowski. (Id. ¶ 19.) Intercall "terminated most of the ECI sales representatives," but decided that it wished to retain Ms. Malloy as a sales manager. (Id.; Intercall's RSOF ¶ 19.) Ms. Malloy was to continue working in Wayne, New Jersey, and would be reporting to Ms. Paczkowski. (Intercall's RSOF ¶ 19.)

On July 13, 2005, Ms. Malloy emailed Ms. Paczkowski regarding her "impressions . . . of the scope of [her] position within the Intercall organization in general and under [Ms. Paczkowski's] direction in particular." (Cert. of Gary J. Chester, Esq., in Supp. of Pl.'s Mot. for Partial Summ. J. [hereafter "Chester Cert."], Ex. F, email from Ms. Malloy to Ms. Paczkowski, dated July 13, 2005.) Ms. Packowski responded to the email by providing responses in bold to the queries posed by Ms. Malloy. The questions and answers are as follows:

1. Ability to keep existing base of business. **YES.**

2. Ability to keep working existing prospects base for future close. **We will choose 10-15 of your top prospects. In addition, you will also be assigned a designated territory.**

3. Ability to retain my office in Wayne, NJ. **YES.**

4. Report to Patti Paczkowski and to report to the Parsippany **[*4]** Office for weekly status meetings (Thursdays). When traveling on business or during inclement weather in the winter I can call into the weekly status meeting. **YES. You will need to change your schedule a bit however . . . .**

5. While I work from home from 7:30 to 8:30 am, I will be into the office at 9 am and unless workload warrents (sic) it will leave at 5PM. **YES...our hours are 8:00-5:00 . . . .**

6. I will be permitted to continue to work as a Senior National Sales Manager . . . . **Your new title will be Senior Meeting Consultant.**

7. I have applied under West's career application. **Thank you!**

8. My salary and compensation will remain the same. **YES.**

9. Certain accounts such as ABA/ABACLE; and Southern Company's will be reviewed for possible relief. **We will review. Unable to commit on relief possibilities at this time.**

If there's anything I forgot please advise as to your consent to the above.

(Id.) This arrangement—allowing Ms. Malloy to keep her existing accounts which were spread throughout the country—was not in line with Intercall's business model. Intercall's businesses model provided that accounts should be serviced in the geographic region where the company being serviced is located. **[*5]** (Malloy's SOF ¶ 50; Intercall's Stmt. of Facts Not in Dispute [hereinafter "Intercall's SOF"] ¶ 4.) Ms. Malloy understood that her arrangement would be an exception to the general policy. (Malloy's SOF ¶ 50.)

As part of her continuing employment with Intercall, Ms. Malloy received Intercall's policy manual. (Decl. of Amy Dashiell and Vol. 1 of Exs. in Supp. of Def.'s Reply to Pl.'s Add'l Disputed Mat'l Facts [hereinafter "Dashiell Decl."], Ex. A, Malloy Dep., dated Apr. 6, 2009, Tr. 346:16-347:24; Intercall's RSOF ¶ 26.) She testified that she read the manual "front to back." (Malloy Dep. Tr. 347:25-348:8.) In particular, Ms. Malloy acknowledges that her employment at Intercall was at-will. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. [hereinafter "Malloy Opp'n"], at 43 ("Plaintiff is an at-will employee.")

On August 1, 2005, Ms. Malloy stopped reporting to Mr. Mills and started reporting to Ms. Paczkowski. Although Intercall in general agreed to allow Ms. Malloy to keep her existing client base, some of her accounts were transferred to other locations. For example, prior to September 2005, Wellpoint, Sony and PMI were transferred to the national accounts office or to the offices **[*6]** in the geographic region where those companies are located. (Dashiell Decl., Ex. A., Malloy Dep. Tr. 208:22-209:4; Br. in Supp. of Def.'s Mot. for Summ. J. [hereinafter "Intercall's Summ. J. Br."], at 16 & n.8.) Then, on October 13, 2005, Mr. Dunne sent an email to Ms. Paczkowski and Ms. McLachlan regarding Ms. Malloy's accounts. He stated:

2010 U.S. Dist. LEXIS 136808, *6

Guys . . . let's agree that by Jan 1, [Plaintiff] should begin transitioning her acquisition activity that is outside of her designated territory to local MCs. Does that make sense? If not, where does it not makes sense? Thoughts.

(Chester Cert., Ex. H, email from Mr. Dunne, dated Oct. 13, 2005.) Ms. Paczkowski responded:

I agree that the majority of her accounts should be moved locally to the appropriate territory. I agree that this makes most sense for the company.

However, the problem is that we committed in writing to keep all existing accounts under [Plaintiff]. She has called me out several times already regarding this commitment. To transition these accounts will guarantee her departure.

At this point, I am trying to decipher if her leaving would be best OR if her leaving would guarantee a huge loss in revenue based on her existing client relationships. [*7] (She has lead me to believe that this is the case.)

Marty [Dunne], please allow me to November 15th before committing to [transfer her accounts].

(Id.) Mr. Dunne responded: "Okay." (Id.) Although Mr. Dunne testified that he wanted Ms. Malloy's accounts transitioned before January of 2006 because of his belief that they would be "better managed by local representatives" (Malloy's SOF ¶ 41), it is undisputed that Ms. Malloy's accounts were not transferred at that time.

Also in October of 2005, Intercall acquired other companies including Sprint Conferencing and Raindance Conferencing. (Intercall's Reply to Pl.'s Add'l Disputed Mat'l Facts [hereinafter "Intercall's Reply SOF"] ¶ 4.) Ms. Paczkowski did not assign any accounts from these acquisitions to Ms. Malloy. (Id.) However, it is undisputed that "other sales consultants who reported to Paczkowski received accounts from the acquisitions." (Id.) It is also undisputed that all of the other sales consultant who reported to Ms. Paczkowski were younger than Ms. Malloy. (Id. ¶ 5.) Ms. Malloy complained to Ms. Paczkowski about not being assigned any of the new accounts. Ms. Paczkowski replied:

[I]n respect to the ECI and Sprint accounts, you [*8] have one of the largest revenue bases in the office. I held back transferring over new revenue to

you based on how much responsibility you already manage. [T]his revenue would be considered as "moved" not "new," so as a result your quota would have increased even more.

(Id. ¶ 6; Intercall's SOF ¶67.)

On November 2, 2005, Ms. Malloy provided her October revenue numbers to Ms. Paczkowski. (Intercall's RSOF ¶ 59.) Ms. Paczkowski responded by email that she was concerned about the numbers because it appeared that Ms. Malloy would not be meeting her targets. (Id.)

Several weeks later, at the end of November, Ms. Malloy was hospitalized with a perforated ulcer. (Intercall's RSOF ¶ 60.) On December 6, 2005, Ms. Paczkowski was informed by Maribell Santiago, an Intercall Employee Relations Coordinator, that Ms. Malloy "probably won't be able to return [to work] until February 2006." (Dashiell Decl., Ex. B., email from Ms. Santiago to Ms. Paczkowski, Dec. 6, 2005 (marked as Santiago Ex. 5).) Three days after receiving notice that Ms. Malloy's medical leave would be for an extended period of time, Ms. Paczkowski emailed another Intercall employee, Taryn Stinson, about transferring Ms. Malloy's accounts [*9] that were not within the territory managed by Ms. Paczkowski to the geographic areas where the companies were located. Ms. Paczkowski wrote:

I have been given the go-ahead to move all of Ruthann's accounts to where they belong according to geography. Once I receive the list of account, city and state[.] I would love to start transitioning them immediately. Is this something that you can help me with?

(Chester Cert., Ex. L, email exchange between Ms. Stinson and Ms. Paczkowski, dated December 9, 2005.) Ms. Stinson responded, providing a list of Ms. Malloy's accounts and identifying "the appropriate ICall rep code based on zip codes." (Id.) Ms. Packzowski responded:

Please see the attached. All companies from Tab 1 should be moved ASAP! I pulled off all accounts based in NJ, NY and CT (within my territory scope) and placed on Tab 2 — Ruthann will be keeping these accounts. . . .

(Id.) As a result, Ms. Malloy's accounts, not located in NJ, NY, or CT, were transferred to other Intercall sales managers. (See also Malloy's SOF ¶ 47.)

Ms. Malloy returned from medical leave on February 17,

2010 U.S. Dist. LEXIS 136808, *9

2006. (Id. ¶ 48.) At this time, Ms. Pazckowski informed her that all of her accounts located outside of New **[*10]** York, New Jersey, and Connecticut had been transferred. (Id.) Ms. Malloy requested that she be given a designated geographic territory in Ms. Paczkowski's area. In approximately September 2006, Ms. Malloy was assigned Western Connecticut as her geographic territory. (Intercall's Reply SOF ¶¶ 19 & n.1, 25; Pl.'s Stmt. of Add'l Material Facts, submitted in opposition to Intercall's MSJ [hereinafter "Malloy's Add'l SOF"] ¶ 26.) In late 2006, Intercall assigned another person to this territory. (Intercall's Reply SOF ¶ 26) Intercall did not inform Ms. Malloy that it had placed another person in this territory. (Id.)

In late November 2006, Ms. Malloy acknowledges that she was continuing to not meet the sales target numbers set by Intercall. (Dashiell Decl., Ex. A, Malloy Dep. Tr. 431:17-432:12.) As a result, she was given a Performance Improvement Notice ("PIN"), which required her "to improve her performance no later than February 28, 2007. (Malloy's SOF ¶ 52; Intercall's SOF ¶ 50; Intercall's RSOF ¶ 65.) Ms. Malloy does not dispute that she was failing to meet her targets, rather, she asserts that she was set up to fail because she was given an area that was a "joke" and numbers to call **[*11]** on that were "bogus." (Intercall's Reply SOF ¶ 27; Malloy's Response to Stmt. of Facts [hereinafter "Malloy's RSOF"] ¶ 16.)

On January 8, 2007, Gwen Stallins, an Intercall Employee Relations Director, sent an email to Mr. Dunne recommending that Ms. Malloy be terminated. Ms. Stallins wrote:

> I wanted to give you a heads up [and] solicit any comments you might have on this. Patty Paczkowski and Kim McLachlan contacted me again today concerning serious performance issues with Ruthann Malloy. Ruthann is currently on a Step III PIN for these issues, and is showing no improvement. I am going to recommend termination of her employment before the PIN expires.
>
> Ruthann has on occasion indicated that she would file discrimination charges . . . against us if we termed her, but I believe that we are in a good position at this time to either defeat the charges or minimize the damages based on clearly documented performance failures. Absent any objection from you, we wish to proceed in the next day or two. Appreciate any feedback.

(Chester Cert., Ex. K.) Mr. Dunne responded to Ms

Stallins by telling her that he "supported [her] decision on this." (Id.) Ms. Stallins then wrote to Ms. Paczkowski, copying **[*12]** Ms. McLachlan, stating: "Patty — we have the green light from Marty [Dunne] . . . ." (Id.) Ms. Paczkowski thanked Ms. Stallins and told her that, before Ms. Malloy was actually terminated, Ms. Paczkowski "first need[ed] to prepare [some] documents." (Id.)

Three days after this exchange, on January 11, 2007, a Saturday Night Live clip regarding sexual harassment in the workplace was shown during a video conference presented by the Boston sales office. (Intercall's Reply SOF ¶ 40.) Ms. Malloy watched the video and claims that it was offensive to her. (Id.) She immediately complained to Ms. Paczkowski. (Intercall's SOF ¶ 54.) It is undisputed that Ms. Paczkowski responded by email, apologizing to Ms. Malloy and telling her that she would forward the complaint to Ms. McLachlan. (Id.) It is also undisputed that the manager responsible for airing the clip was reprimanded by Ms. McLachlan. (Id.)

Ms. Malloy was terminated on January 23, 2007. (Intercall's RSOF ¶ 55.) Around January 30, 2007, Ms. Malloy suffered a massive stroke. (Malloy's Add'l SOF ¶ 46.) Ms. Malloy presently claims that she was discriminated against by Intercall, that Intercall wrongfully terminated her, and that Intercall's **[*13]** actions caused her stroke.

## II. LEGAL STANDARD

A court shall grant summary judgment under *Rule 56(c) of the Federal Rules of Civil Procedure* "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party first must show that no genuine issue of material fact exists. See *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. *Id. at 324*. The non-moving party must offer specific facts that establish a genuine issue of material fact and may not simply rely on unsupported assertions, bare allegations, or speculation. See *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999)*. Also, the Court must consider all facts presented and the reasonable inferences drawn from them in the light most favorable to the non-moving party. See *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)*.

### III. SUMMARY JUDGMENT MOTIONS

Ms. Malloy moves for partial summary judgment on her breach **[\*14]** of contract claim. Intercall moves for summary judgment as to each of Ms. Malloy's claims: (1) breach of express and implied contract, (2) age discrimination in violation of NJLAD, (3) retaliation in violation of NJLAD, and (4) intentional infliction of emotional distress.[1]

### A. Breach of Contract Claims

To establish a claim for breach of contract under New Jersey law, a plaintiff must show: 1) the existence of a contract, 2) a material breach of the contract by the defendant, and 3) damages resulting from the breach. See *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 421 F. Supp. 2d 831, 833 (D.N.J. 2006),* aff'd, *482 F.3d 247 (3d Cir. 2007).* Ms. Malloy asserts that the following email exchange represents a contract between her and Intercall regarding the terms of her employment.

> Hello Patti, as indicated in our conversation today, I just wanted to outline what my impressions are of the scope of my position within the Intercall organization in general and under your direction in particular.
>
> 1. Ability to keep existing **[\*15]** base of business. **YES.**
>
> 2. Ability to keep working existing prospects base for future close. **We will choose 10-15 of your top prospects. In addition, you will also be assigned a designated territory.**
>
> 3. Ability to retain my office in Wayne, NJ. **YES.**
>
> 4. Report to Patti Paczkowski and to report to the Parsippany Office for weekly status meetings (Thursdays). When traveling on business or during inclement weather in the winter I can call into the weekly status meeting. **YES. You will need to change your schedule a bit however . . . .**
>
> 5. While I work from home from 7:30 to 8:30 am, I will be into the office at 9 am and unless workload

warrents (sic) it will leave at 5PM. **YES...our hours are 8:00-5:00 . . . .**

> 6. I will be permitted to continue to work as a Senior National Sales Manager . . . . **Your new title will be Senior Meeting Consultant.**
>
> 7. I have applied under West's career application. **Thank you!**
>
> 8. My salary and compensation will remain the same. **YES.**
>
> 9. Certain accounts such as ABA/ABACLE; and Southern Company's will be reviewed for possible relief. **We will review. Unable to commit on relief possibilities at this time.**
>
> If **[\*16]** there's anything I forgot please advise as to your consent to the above.

(Chester Cert., Ex. F, email from Plaintiff to Ms. Paczkowski, dated July 13, 2005.) Ms. Malloy asserts that this email exchange between Ms. Paczkowski and her represents a contract between her and Intercall regarding the terms of her employment. In particular, Ms. Malloy argues that, in the email, Intercall agreed: (1) that she could keep her existing client base; (2) that she could prospect her top accounts and farm accounts across the country, and (3) that she would be assigned a specific geographic territory. (See Malloy's SOF ¶ 24; Malloy Opp'n, at 44.)

On the other hand, Intercall argues that the email relied on by Ms. Malloy is not an enforceable contract of employment conditions because Ms. Malloy was an at-will employee, because the terms are too vague, and because there was no consideration for any of the alleged promises. Additionally, Intercall argues that, even if there was a contract, Ms. Malloy did not perform under it, and that she has not established any damages.

1. <u>Existence of a Contract</u>

Ms. Malloy admits that she was an at-will employee, and that, as such, Intercall could terminate her at any time. **[\*17]** (Malloy Opp'n, at 43 ("Plaintiff is an at-will employee.") Additionally, Intercall's employee manual, which Ms. Malloy admits to reading, clearly stated the at-will nature of her employment. The manual reads:

> **Employment at Will**
>
> Your employment with Intercall is a voluntary one and is subject to termination by you or Intercall at

---

[1] Intercall asserts that Ms. Malloy is no longer pursuing her CEPA claim (Intercall's Summ. J. Br., at 2 n.1); Ms. Malloy did not dispute this statement in her brief.

will, with or without notice, at any time. Nothing in these policies will be interpreted to be in conflict with or to eliminate in any way the employment at will status of Intercall employees.

This policy of employment-at-will may not be modified by any officer or employee and shall not be modified in any publication or document. The only exception to this policy is a written employment agreement approved at the discretion of the President or the Board of Directors, whichever is applicable.

These personnel policies are not intended to be a contract of employment or a legal document.

(Intercall's SOF ¶ 17; Malloy's RSOF ¶ 17.) Ms. Malloy, however, argues that this fact is irrelevant. She argues that, under New Jersey law,[2] at-will employees may enter contracts governing certain aspects of the employment relationship. She argues that the email between her and Ms. **[*18]** Paczkowski, on behalf of Intercall, was just such an express contract. She states: "The fact that [she] was [an] at-will employee did nothing to alter the fact that the parties had an agreement governing certain aspects of the employment relationship; nor does it alter Intercall's obligation to act in good faith with respect to the terms contained in the agreement." (Malloy Opp'n, at 43.)

"In New Jersey, an employer may fire an employee for good reason, bad reason, or no reason at all under the employment-at-will doctrine." _Wade v. Kessler Inst., 172 N.J. 327, 798 A.2d 1251, 1258 (N.J. 2002)_. Thus, "[a]n employment relationship remains terminable at the will of either an employer or employee, unless **[*19]** an agreement exists that provides otherwise." Id. Here, it is undisputed that Ms. Malloy was an at-will employee; Ms. Malloy does not claim that there was a contract between her and Intercall that altered this relationship. Rather, she argues that a contract existed between her and Intercall that governed certain aspects of her employment.

_____

[2] The parties both apply New Jersey law to Ms. Malloy's claims. Although normally this Court must apply New Jersey's choice of law rules to determine what law should apply for each claim, see _Warriner v. Stanton, 475 F.3d 497, 499-500 (3d Cir.2007)_, such an analysis is unnecessary where there is agreement as to the law, and there is no reason to question this choice. Ms. Malloy's was employed by Intercall in New Jersey, and most, if not all, of the actions from which her claims arise occurred in New Jersey.

The Court agrees with Ms. Malloy that, under New Jersey law, at-will employees may enter contracts with their employers regarding certain terms of their employment other than the duration of the employment. See _Nolan v. Control Data Corp., 243 N.J. Super. 420, 579 A.2d 1252, 1257 (N.J. Super. App. Div. 1990)_ (finding that the plaintiff, an at-will employee, and employer had an enforceable agreement regarding the payment of past commissions). But, for a contract to exist, the agreement must still meet the ordinary requirements for the formation of a contract. For instance, "[a] contract arises from offer and acceptance, and must be sufficiently definite so that the performance to be rendered by each party can be ascertained with reasonable certainty." _Baer v. Chase, 392 F.3d 609, 618-19 (3d Cir. 2004)_ (alteration in original; internal quotations omitted); see also _Shebar v. Sanyo Bus. Sys. Corp., 111 N.J. 276, 544 A.2d 377, 381 (N.J. 1988)_;

Intercall **[*20]** argues that, because Ms. Malloy was an at-will employee, it had the right to _prospectively_ change the nature of her employment. It also argues that, even if it could in general be bound by contract from changing future aspects of an employee's employment, the email at issue was too vague to create any binding obligation to Ms. Malloy.

The email at issue was exchanged on July 13, 2005. There is no dispute that, upon her transition to reporting to Ms. Paczkowski on August 1, 2005, Ms. Paczkowski did what she agreed in her email. In her motion for partial summary judgment, Ms. Malloy states:

> [Intercall] did, at least temporarily, comply with the conditions reflected in Plaintiff's July 13, 2005 email. Defendant hired Ms. Malloy as a Senior Meeting Consultant, compensated her at her previous rate of compensation, allowed her to work from the old ECI office in Wayne, New Jersey (rather than Ms. Paczkowski's office in Parsippany), and officially, albeit briefly, allowed Plaintiff to keep most of her national accounts.

(Br. in Supp. of Pl.'s Mot. for Partial Summ. J. [hereinafter "Malloy's Summ. J. Br."], at 25.) Thus, Ms. Malloy appears to be claiming that Intercall breached her "contract" **[*21]** by not permitting her to keep her existing client base indefinitely, by not letting her prospect her top accounts and farm accounts throughout the country, and by not giving her a designated _geographic_ territory.

First, the email explicitly limits Ms. Malloy's ability to "keep working [her] existing prospects base for [the]

future." Also, the email not only limits this request, but also leaves the parameters of this aspect of Ms. Malloy's employment open. Aside from any other argument, this provision is clearly too vague to form the basis of an obligation by Intercall.

With respect to Ms. Malloy's claim that Intercall agreed to assign her a specific *geographic* territory, the email does not even contain such an agreement. Instead, Ms. Paczkowski states that Ms. Malloy would be assigned a designated territory. Ms. Paczkowski testified that Ms. Malloy's designated territory was

> Q: ...What was Ruthann Malloy's designated territory in October of 2005?
>
> A. I believe her territory at that time consisted of her accounts, her prospect accounts that she was pursuing, as well as areas that were local to my jurisdiction that I could say to her, you can go here. For example, I remember her having account **[*22]** in Roseland, New Jersey, which should have fallen underneath another one of my reps, but she had that area.
>
> Q. Did she have a designated geographical territory in which to prospect accounts?
>
> A. She had her top prospects that she would have listed out, and she had her base of business.
>
> Q. Okay. So that's a type of territory but not a geographical territory per se?
>
> A. Exactly.

(Intercall's SOF ¶ 16 (quoting Ms. Paczkowski's deposition).) Ms. Malloy's actions support this testimony. Although she complained about various Intercall actions, she did not request a specific *geographic* territory until March 2005, after the majority of her ECI had been transferred to other sales associates. Additionally, Ms. Malloy's own arguments demonstrate that this provision, even if otherwise, enforceable, is too vague to form an enforceable contractual right. Although Ms. Malloy focuses in various places on the lack of a having a specific geographic territory assigned, in other places she merely complains of the failure to assign a "workable" territory. Additionally, even if the term "designated territory" were not deemed to be too vague, there are sufficient other boundaries around this alleged promise. There **[*23]** is no indication when such a territory must be assigned, how long she must be permitted to work the territory before, or if, it could be

changed. Thus, the Court finds that this statement in the email also is insufficient to create a binding obligation for Intercall.

The real dispute, however, involves the statement by Ms. Paczkowski that Ms. Malloy would be permitted to keep her existing client base. Because it is undisputed that Ms. Malloy was permitted to keep her base initially, the Court presumes that Ms. Malloy's claim is that the email created a contract which prevented Intercall from ever changing Ms. Malloy's client base. In other words, Ms. Malloy appears to argue that this email meant that she was entitled to keep her existing client base indefinitely regardless of any other factor. Ms. Malloy has not cited to, and this Court cannot find, a case that has held that an employer could not *prospectively* change the terms of an at-will employee's employment. *Nolan*, heavily relied on by Ms. Malloy, held that an employer could not *retroactively* change an agreement as to a term of employment compensation "at any time and for any reason whatever"; it said nothing about prospective **[*24]** changes to the employment. *579 A.2d at 1258*.

Intercall argues had right to change Plaintiff's work conditions at any time. It argues that it would make no sense if it could terminate Ms. Malloy's employment at any time, but could not change other aspects of her future employment based on changed circumstances. Courts have held that, under New Jersey law, an employer's right to change the terms of an at-will employee's terms of employment "includes the right to impose new requirements on the employee." *Mita v. Chubb Computer Servs., Inc., 337 N.J. Super. 517, 767 A.2d 989, 994 (N.J. Super. Ct. App. Div. 2001)*. Courts in other states have reached a similar conclusion regarding at-will employees. See, e.g., *Green v. Edward J. Bettinger Co., 608 F. Supp. 35, 41-42 (E.D. Pa. 1984)*, aff'd, *791 F.2d 917 (3rd Cir. 1986)* ("The undoubted right to terminate an at-will contract necessarily includes the right to insist upon changes in the compensation arrangements as a condition of continued employment."); *Cotter v. Desert Palace, Inc., 880 F.2d 1142, 1145 (9th Cir. 1989)* (holding that an employee contract claim based on a change in the tip sharing policy failed because "[a]n employer privileged to terminate an employee **[*25]** at any time necessarily enjoys the lesser privilege of imposing prospective changes in the conditions of employment").

Intercall further argues that this is particularly true where, as here, the alleged agreement contains no duration and where the employee manual provides that

2010 U.S. Dist. LEXIS 136808, *25

the at-will nature of the employment may not be altered except by written agreement approved by the President or Board of Directors. See *Mita, 767 A.2d at 994-95* ("Where an employee manual clearly and unequivocally provides the exclusive means by which an employment-at-will relationship can be altered, we perceive no sound jurisprudential or public policy reason prohibiting enforcement."). The Court agrees that it would not makes sense if Ms. Malloy's at-will arrangement could not be changed except by written agreement approved by the President or Board of Directors, but that severe limitations could be placed on Intercall's ability to adjust her client base indefinitely based merely on an email agreement by a local sales manager.

"Additionally, the duration of [a] contract is . . . an essential term and therefore any agreement must be sufficiently definitive to allow a court to determine the agreed upon length **[*26]** of the contractual relationship." *Baer, 392 F.3d at 619*. The email plainly provides no duration related to any of the alleged agreements; in fact, Ms. Malloy appears to argue that Intercall agreed to indefinitely maintain her initial working arrangement. Thus, the Court also agrees that Ms. Malloy's argument fails because no time limit is provided in the email.

In summary, Ms. Malloy acknowledges that she initially began working for Ms. Paczkowski according to the parameters set forth in the July 13 email. She acknowledges that she was an at-will employee. It is also undisputed that the bulk of her non-local accounts were not transferred until December 2005, while she was out on extended medical leave. Yet, Ms. Malloy argues that, based on the bare statements outlining a new position in the July 13 email alone, Intercall was barred from ever changing her existing client base for any reason whatsoever. Such an argument does not have support in New Jersey law.

Because this Court finds that no contract existed between Ms. Malloy and Intercall barring Intercall from prospectively changing the aspects of Ms. Malloy's employment, it need not reach Intercall's other arguments related to lack **[*27]** of consideration, performance, or damages. Summary judgment in favor of Intercall on Ms. Malloy's breach of contract claim is granted; Ms. Malloy's motion for partial summary judgment on the contract claim is denied.

2. Breach of Implied Covenant of Good Faith and Fair Dealing

"In the absence of a contract, there is no implied

covenant of good faith and fair dealing." *Nolan, 579 A.2d at 1257*. Therefore, because this Court has found that no contract existed between Ms. Malloy and Intercall, Ms. Malloy's claim for a breach of the implied covenant of good faith and fair dealing fails. Summary judgment on this claim is granted in favor of Intercall.

3. Compensatory Damages and Worker's Compensation Bar

Because this Court has granted summary judgment in favor of Intercall on Ms. Malloy's breach of contract claims, it need not reach Intercall's additional arguments related to Ms. Malloy may seek compensatory damages of back or front pay and whether her claim for damages caused by her ulcer and stroke are barred by New Jersey's Worker's Compensation Act.

**B. NJLAD Age Discrimination Claim**

Ms. Malloy alleges that, based on her age, "Dunne, McLachlan and Paczkowski conspired over a period of two years **[*28]** to systematically strip [her] of her ECI accounts, transfer those accounts to younger workers, and then terminate her." (Am. Compl. ¶2; see also Malloy's SOF ¶ 59.) Specifically, Ms. Malloy alleges that Intercall discriminated against her in the following ways:

  1. Transferring the majority of [her] accounts to younger, less qualified sales consultants;

  2. Requiring [her] to train the younger, less qualified sales consultants before transferring her accounts;

  3. Failing to provide Plaintiff with new accounts after Intercall acquisitions as it did all of its younger sales consultants;

  4. Failing to assist Plaintiff with managing her accounts while she was on medical leave as it had its younger sales consultants;

  5. Failing to provide Plaintiff with a designated territory, as it had its younger sales consultant;

  6. Placing [a] much younger employee in Plaintiff's territory that she was finally given in September/October of 2006;

  7. Falsely placing Plaintiff on a Performance Improvement Plan; and

  8. Falsely terminating Plaintiff for poor performance.

(Malloy's Opp'n, at 21.) On the other hand, Intercall

asserts that age was not a factor in any employment decision related to Ms. Malloy, including **[*29]** those decisions related to the assignment and handling of her accounts.

In determining if summary judgment is appropriate for a NJLAD discrimination claim, courts use a three step process. "First, the plaintiff carries the burden of establishing, by a preponderance of the evidence, the elements of a prima facie case of discrimination." *Greenberg v. Camden County Vocational and Technical Schs., 310 N.J. Super. 189, 708 A.2d 460, 465 (N.J. Super. Ct. App. Div. 1998)* (citing *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973))*; *Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009).*[3] The elements comprising a prima facie case for discrimination under NJLAD are that: "(1) plaintiff belongs to a protected class; (2) she was performing her job at a level that met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment actions." *El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 887 A.2d 1170, 1182 (N.J. Super. Ct. App. Div. 2005)*; *Sarullo v. USPS, 352 F.3d 789, 797 & n.6 (3d Cir. 2003)*. In an age discrimination case, "[t]he focal question is . . . whether the claimant's *age*, in any significant **[*30]** way, made a difference in the treatment he was accorded by his employer." *Petrusky v. Maxfli Dunlop Sports Corp., 342 N.J. Super. 77, 775 A.2d 723, 726 (N.J. Super. Ct. App. Div. 2001)* (emphasis added) (internal quotations omitted). Thus, courts interpreting the ADEA have held that an employer is not prohibited "from making an employment decision on the basis of higher salaries, increased benefits, pension status, or claims for medical expenses even though these characteristics are often correlated with an employee's age." *Broaddus v. Fla. Power Corp., 145 F.3d 1283, 1287 (11th Cir.1998)* (citing *Hazen Paper Co. v. Biggins, 507 U.S. 604, 611, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993))*; see also *Kelly v. Moser, Patterson and Sheridan, LLP, 348 Fed. Appx. 746, 749 (3d Cir. Oct. 9, 2009)* (unpublished opinion)

---

[3] In interpreting the NJLAD, courts look to federal law, such as the Age Discrimination In Employment Act ("ADEA") for guidance. See *Waldron v. SL Indus., Inc., 849 F. Supp. 996, 1000 (D.N.J.1994)*, rev'd on other grounds, *56 F.3d 491 (3d Cir.1995)* ("Age discrimination **[*31]** claims under the [NJ]LAD and the ADEA are governed by the same standards."); see also *Bergen Commer. Bank v. Sisler, 157 N.J. 188, 723 A.2d 944, 949 (N.J. 1999)* (citing Waldron).

(citing Hazen). In other words, for age discrimination cases, it is *age* discrimination alone that is prohibited. *Broaddus, 145 F.3d at 1287* (citing *Hazen, 507 U.S. at 611*).

After an employee has established a prima facie case, "the burden then shifts to the employer to rebut the presumption of discrimination by either establishing the reasonableness of the otherwise discriminatory act or by articulating a legitimate, nondiscriminatory reason for the employment action." *Greenberg, 708 A.2d at 465*; see also *Smith, 589 F.3d at 690*. If the employer is able to articulate such a reason, the plaintiff must then show that the proffered reason was a pretext for a discriminatory decision. *Smith, 589 F.3d at 690*; *Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 299-300 (3d Cir. 2004)* (applying McDonnell Douglas framework to NJLAD claim). To demonstrate that the proffered reasons are pretextual, a

> plaintiff generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating **[*32]** or determinative cause of the adverse employment action.

*Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994)*. But, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id. at 765*; see also *Abramson v. William Paterson Coll., 260 F.3d 265, 283 (3d Cir. 2001)*; see also *Silvestre v. Bell Atlantic, 973 F. Supp. 475, 483 (D.N.J. 1997)* ("[A] plaintiff's disagreement with a defendant's evaluation of his performance, or the plaintiff's own perception of his performance, does not demonstrate pretext under the McDonnell Douglas framework."). Instead, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes, 32 F.3d at 765* (alteration in original; citations and internal quotations omitted); see also **[*33]** *Abramson, 260 F.3d at 283*; *Taylor v. Amcor Flexibles, Inc., 669 F. Supp. 2d 501, 507-511 (D.N.J. 2009)*.

Additionally, in an age discrimination case where a plaintiff was both hired and fired while over 40, there is a presumption against age discrimination as a motivating factor for termination. See *Young v. Hobart West Group, 385 N.J. Super. 448, 897 A.2d 1063, 1070 (N.J. Super. Ct. App. Div. 2005)* ("Courts have rejected age discrimination claims when a plaintiff was both hired and fired while a member of the protected age group."); *Lowe v. J.B. Hunt Transport, Inc., 963 F.2d 173, 174-75 (8th Cir.1992)* ("It is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that the company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later."); *Thomasian v. N.J. Inst. of Tech., No. 08-2218, 2010 U.S. Dist. LEXIS 24911, 2010 WL 1032653, at *5 (D.N.J. Mar. 16, 2010)*. Such a presumption is particularly appropriate where the same individuals hired and fired the plaintiff, and the lapse between the hiring and firing is not very long. See *Thomasian, 2010 U.S. Dist. LEXIS 24911, 2010 WL 1032653, at *5*; see also *Proud v. Stone, 945 F.2d 796, 798 (4th Cir.1991)*.

Here, Ms. Malloy was fifty-seven **[*34]** years old when she was hired. She was hired by Mr. Dunne, with input from Ms. McLachlan, and she was terminated approximately two years later by Mr. Dunne. (See Intercall's SOF ¶¶ 11, 55-56.) Ms. Malloy has made no allegations that Mr. Dunne, Ms. McLachlan, or Ms.Paczkowski ever made derogatory remarks to her about her age or generally commented negatively about older workers. (Intercall's SOF ¶ 68.) Ms. Malloy has only testified that three Intercall employees, who were not responsible for decisions about her employment, made a few "stray remarks." (Id.) Ms. Malloy also has not disputed that, for the two years she was working at Intercall under Ms. Paczkowski, Ms. McLachlan, and Mr. Dunne, she was one of the highest paid sales consultants. And, as discussed in the prior section, Ms. Malloy does not dispute that she was an at-will employee who could have been terminated at any time. With this general background, the Court turns to Ms. Malloy's specific complaints.

1. Transferring of Accounts

Ms. Malloy asserts that Intercall discriminated against her by "[t]ransferring the majority of [her] accounts to younger, less qualified sales consultants." The key facts related to this claim are **[*35]** not disputed. It is undisputed that Intercall's general business model provides for the servicing of accounts by the Intercall office in the region where the account is located, except for certain national accounts which are handled by a national accounts group. It is also undisputed that when Ms. Malloy was retained by Intercall in July 2005 she was permitted, at least initially, to continue servicing her accounts which were located across the country despite this being contrary to Intercall's normal business model. It is also undisputed that prior to the December 2005 transfer of accounts at issue that certain of Ms. Malloy's accounts were transferred to the national accounts group or to other regional offices where the companies were located. (See Intercall's Summ. J. Br., at 16-17; Intercall's Summ. J. Reply, at 3 n. 3, 4.) It is undisputed that the majority of Ms. Malloy's accounts were transferred to younger sales associates. But, it is also undisputed that most sales associates at Intercall were younger than Ms. Malloy when she was hired and when her accounts were transferred. Even if these facts are sufficient to state a prima facie case age discrimination case, Ms. Malloy **[*36]** has not submitted any evidence to support a finding that Intercall's proffered reason for the transfer was a pretext for discrimination.

Intercall asserts that the accounts were transferred because the unique arrangement with Ms. Malloy was not working out to its satisfaction, and because Ms. Malloy's extended medical absence exacerbated the difficulties with maintaining her accounts from the New Jersey office. To support her argument that these reasons are merely pretext for discrimination Ms. Malloy primarily focuses on the timing of events and mere speculation (which is based significantly on mischaracterizations of the evidence produced).

Ms. Malloy asserts that pretext is clear here because within ninety days of the July 13 email, Mr. Dunne "ordered" that the majority of her accounts be transferred. (See Malloy's SOF ¶ 39.) First, as noted in the particular statement by Ms. Malloy (other statements assert different time periods), Mr. Dunne's email was sent three months after the original agreement that Ms. Malloy could keep her existing client base. Second, Mr. Dunne's email plainly was not ordering the transferring of Ms. Malloy's accounts on October 13, 2005. Instead, Mr. Dunne **[*37]** suggested that the accounts be transferred as of January 1, 2006 and asked for comments. Ms. Paczkowski agreed that moving the accounts made sense for the company, but asked for more time "before committing" to a transfer. Mr. Dunne agreed to the additional time. Regardless of whether Mr. Dunne may have wanted or thought it best that the accounts be transferred, it is undisputed that the accounts were not transferred at that time.

Before there was much of an opportunity for Ms.

Paczkowski or Mr. Dunne to take further action in the ordinary course of business, Ms. Malloy went out on medical leave on November 24, 2005. There is no evidence that the accounts were transferred at that time. Ms. Malloy asserts, however, that the decision to move the accounts was made before Ms. Paczkowski knew that Ms. Malloy would be out for an extended period of time. Thus, she argues, Ms. Paczkowski's stated reason that, in part, the accounts were too burdensome to manage from New Jersey while she was on leave is pretextual. Again, this assertion is not supported by the evidence. The evidence shows that Ms. Malloy's non-New Jersey, New York, and Connecticut accounts were transferred three days *after* Ms.  **[*38]** Paczkowski was informed by human resources that Ms. Malloy would be out on extended medical leave. Ms. Paczkowski testified:

> The underlying reason why the accounts were moved was that the ECI selling model did not fit with the Intercall selling model, meaning that Ruthann had wanted to hold on to her accounts regardless of location, and it was something that was allowed for her to do, but when she had gone on leave, and I believe her leave was for an extended period of time, it became very cumbersome to manage not only a base of business in addition to my own responsibilities, but a base of business which I could not visit locally. They were all over the place, and that in hand with the fact that the accounts were under a lot of attention and a lot of scrutiny because the revenue trend was on a decline, the decision was made to move them.

(Intercall's Summ. J. Br., at 13-14.) Ms. Malloy asserts that a transfer because of medical leave was "unusual." She asserts that another sales consultant on Paczkowski's team had gone on medical leave, and Ms. Paczkowski managed the account in his absence. (Intercall's SOF ¶ 66) But, Ms. Malloy presented no evidence regarding the duration of his leave,  **[*39]** the person's age, and the size or type of his accounts." (Id.) Intercall has certified that "unlike Plaintiff's accounts which were dispersed across the country, the account of the sales consultant cited in Plaintiff's example—Maersk—was headquartered in New Jersey, Paczkowski's territory." (Id.) In other words, Ms. Malloy has offered no evidence of someone similarly situated who was treated differently. In fact, part of the challenge with Ms. Malloy's claims is that she initially sought and was given special treatment. Thus, her situation was in many respects unique; she cannot now simply point to

the different treatment as evidence of discrimination.

More  **[*40]** importantly, all the evidence submitted indicates that the accounts were transferred without reference to the age of the transferee sales personnel. Ms. Malloy simply relies on the fact that the sales personnel to whom the accounts were transferred likely were younger, because most sales associates were younger, to support her argument. She argues that because Mr. Dunne was aware that most sales associates were younger than her, he must have known the people to whom the accounts were transferred were younger. But, Ms. Malloy testified:

> [I]t was my understanding and I may be wrong, but it was my understanding that the way these accounts were moved, they were bundled under me. Okay. They then, Marty moved them to individual sales offices. In other words, if it was the ABA, the ABA was moved to the Chicago office because that's where their headquarters was.

(Intercall's SOF ¶ 34 (quoting Ms. Malloy's deposition).) This statement is consistent with the emails between Ms. Paczkowski and Ms. Stinson where the "the appropriate ICall rep code [was identified] based on *zip codes*." (Chester Cert., Ex. L (emphasis added).) In a situation like the one presented here, where the plaintiff was hired  **[*41]** while in a protected class and most sales associates are younger than her, and there is no other evidence indicating that age was a factor in the transfer decision, the fact that accounts were transferred to younger employees is "a rather unremarkable fact." *Thomasian, 2010 U.S. Dist. LEXIS 24911, 2010 WL 1032653, at *6*.

This is particularly so when the evidence actually shows that Ms. McLachlan and Ms. Paczowski had an incentive to keep the accounts under their management. Their pay was based in part on the revenue targets of the people they supervised. (Intercall's SOF ¶ 27.) As Ms. Paczkowski and Ms. Stinson's email exchange organizing the transfer of the accounts makes clear, the majority of the transferred accounts were outside Ms. Paczkowski and Ms. McLachlan's territory. Thus, it harmed, not helped them, to transfer a substantial amount of work out of their area of supervision.

Ms. Malloy also asserts that she was more highly compensated than the younger sales consultants to whom the accounts were transferred, implying that Intercall transferred the accounts to avoid paying her more money. But, as noted above, for an age

discrimination claim, *age* must be the motivating factor, not other, perhaps correlative **[*42]** factors, such as salaries. See *Broaddus, 145 F.3d at 1287* (citing *Hazen, 507 U.S. at 611*).

Based on these facts, the Court finds that Ms. Malloy has not demonstrated that a genuine issue of material fact exists as to whether the decision to transfer the majority of her non-local accounts in December 2005 while she was on extended medical leave was motivated by discrimination based on her age or that it is reasonable to otherwise infer that Intercall's reasons for the transfer were pretextual. On the contrary, the undisputed evidence indicates that age was not a factor in the decision.

## 2. Training

Ms. Malloy also argues that Intercall discriminated against her based on her age by "requiring [her] to train the younger, less qualified sales consultants before transferring her accounts." Ms. Malloy states that "Intercall engaged in a scheme to use Plaintiff as a resource to train its inexperienced, younger sales force." (Malloy's Opp'n, at 23.) Intercall asserts that the "training" was simply information sharing about accounts that were being transferred.

To support her position, Ms. Malloy cites to this Court's decision in Ferruggia v. Sharp Electronics Corporation, which held that a showing that **[*43]** a "plaintiff [was] asked to train younger replacement was evidence of age discrimination." *No. 05-5992, 2009 U.S. Dist. LEXIS 51188, 2009 WL 1704262, at *5 (D.2009 U.S. Dist. LEXIS 51188N.J. June 18, 2009)*. But, Ms. Malloy misunderstands the *Ferruggia* holding. Being required to train younger works is not in itself evidence of pretext. In Ferruggia, the employer had claimed that the plaintiff's employment was terminated because his position was *redundant*. Id. In finding a fact issue on pretext, this Court noted that the fact that the plaintiff was required to train the very employee who assumed his responsibilities, was inconsistent with the employer's redundancy argument. Id.

Here, Intercall transferred the accounts to the local offices where the companies being serviced were located, in line with its clear business model. The fact that it asked Ms. Malloy to provide information to the new sales personnel servicing those accounts in order for them to understand the account's service history and operation does nothing to undercut its proffered reason for the transfer. Intercall stated its belief, consistent with it general business model, that the accounts could be better serviced by local representatives. It wanted those representatives to **[*44]** have past information about the accounts. Ms. Malloy has offered no evidence that employees in similar situations, who have had accounts transferred to other sales personnel, were not required to share account information with the new sales personnel servicing the account. (See Intercall's SOF ¶ 65.)

## 3. Failure to Provide New Acquisition Accounts

Ms. Malloy next argues that Intercall discriminated against her based on age because Ms. Paczkowski did not assign her any of the new acquisition accounts in October 2005. It is undisputed that all of the other sales personnel under Ms. Paczkowski, except Ms. Malloy, received something from the acquisitions. It is also undisputed that all of the other sales consultants who reported to Ms. Paczkowski at that time were younger that Ms. Malloy. However, Ms. Packzowki has stated that she did not give Ms. Malloy any of the acquisition accounts because of the size and nature of her revenue base and her belief that Ms. Malloy needed to focus on growing those accounts.

Ms. Malloy argues that she has presented evidence of pretext, pointing to Mr. Dunne's October 2005 email. She argues that at the time Ms. Paczkowski assigned the new accounts, "Intercall **[*45]** had already determined that it was going to transfer the majority (ultimately 78%) of Plaintiff's accounts." (Malloy's Opp'n, at 25.) Thus, Ms. Malloy argues that Ms. Paczkowski's reason that, she believed Ms. Malloy had a large revenue base and need to focus on growing those accounts is implausible, and, therefore, an inference of *age* discrimination is proper. The Court disagrees. As noted above, Mr. Dunne plainly did not direct the transfer of Ms. Malloy's accounts in October 2005. And, Ms. Paczkowski specifically requested additional time to see how the accounts performed before committing to any transfer, which was agreed to by Mr. Dunne. Thus, at the time Ms. Paczkowski made the decision to not assign Ms. Malloy any of the new accounts, the evidence supports, not contradicts her proffered reason.

Finally, Ms. Malloy has not presented any evidence that a younger person with a similar size and type (national servicing required) of revenue base would have been given additional accounts. As noted above, there was no one similarly situated because Ms. Malloy had specifically requested to be treated differently than other employees.

## 4. Designated Territory

Ms. Malloy argues that she was **[*46]** not assigned a "territory" until long after she was hired, that the territory she was ultimately assigned was "bogus," and that another, younger sales personnel was also placed in her territory without her knowledge. She asserts that all of these actions were the result of discrimination based on her age. It is undisputed that "most of the other sales consultants on [Ms.] Paczkowski's sales team were assigned geographic territories." (Intercall's Reply SOF ¶ 24.) It is also undisputed that Ms. Malloy was not assigned a *geographic* territory until September 2006, when she was assigned Western Connecticut. It is further undisputed that Intercall assigned another sales associate to this region in late 2006.

As Intercall notes, Ms. Malloy cannot have it both ways. After she began working under Ms. Paczkowski, Ms. Malloy was not assigned a geographic territory because she requested and was allowed to retain the majority of her ECI account base which was located throughout the country. It is undisputed that this base of business was large. Thus, it was Ms. Malloy's choice not to be initially assigned a *geographic* territory. Additionally, Intercall has presented evidence that, while all personnel **[*47]** had some type of territory, it was not always a designated *geographic* territory. Ms. Paczkowski testified that one member of her team, "Robyn Louridas, was not assigned a geographic territory but instead was assigned a list of accounts." (Id. (citing Ms. Paczkowski's deposition).)

It is also undisputed that Ms. Malloy could not have immediately been assigned a geographic territory in place of her ECI accounts that were transferred in December 2005. She was out of the office at that time on medical leave and did not return until mid-February 2006. And, Ms. Malloy admits that "by the time she requested a geographic territory in March 2006, most territories had been assigned to other members of the team." (Intercall's SOF, ¶47.)

Ms. Malloy was assigned a geographic territory in September 2005. Her claim that the territory was "bogus" is not supported by any evidence other than her broad statements that the telephone numbers she was given to prospect were a "joke." (Malloy Opp'n, at 29.) Such a claim is actually undermined by the undisputed fact that Intercall assigned another person to the territory later in the year. Additionally, Ms. Malloy also has not submitted any evidence that placement **[*48]** of the other sales associate in her territory interfered with her ability to generate business. In fact, she testified that she was not even aware that another person was

operating in the territory; their paths only crossed at a holiday party, not out in the field.

Also, although Ms. Malloy asserts that assigning another person to her territory supports her discrimination claim, she has provided no evidence that territories are always serviced only by one Intercall sales personnel. In fact, Ms. Paczkowski testified that two sales consultants were assigned to South Jersey. (Intercall's Reply SOF ¶ 24 (citing Ms. Paczkowski's deposition).) Mr. Dunne also testified that, while generally one sales consultant is responsible for generating revenue within a specific geographic territory, there have been exceptions made "when the market isn't being well covered with territory activity or when no revenue is being generated." (Intercall's SOF ¶ 48 (quoting Dunne's deposition).) In short, Ms. Malloy has submitted no evidence whatsoever that age played any role in these decisions.

### 5. PIN and Termination

Finally, Ms. Malloy argues that Intercall discriminated against her by placing her on a PIN and, **[*49]** then, terminating her. Ms. Malloy does not argue that younger people with her performance would not have been put on a PIN or that younger employees with her performance would not have been terminated. Rather, she argues that Intercall's discrimination against her in the handling of her accounts put her in a position which ensured her poor performance. Thus, Ms. Malloy's arguments related to the PIN and termination are inter-related with her other allegations of discrimination. Because the Court has already found that Ms. Malloy has failed to establish that Intercall's proffered reasons regarding its actions related to her accounts were pre-textual for discrimination, it also finds that Ms. Malloy has failed to establish that Intercall placed her on a PIN and terminated her for discriminatory reasons.

Intercall argues that Ms. Malloy's claim does not make sense. It states:

> [T]o believe Plaintiff's theory, one must assume that Dunne, McLachlan and Paczkowski hired Plaintiff for her large account base, paid Plaintiff one of the highest salaries for sales consultants at Intercall for almost two years and then stripped Plaintiff of her accounts [while she out on extended and unexpected medical **[*50]** leave] and transferred them to younger workers, all with the intent of ultimately terminating Plaintiff's employment, and all because of her age.

2010 U.S. Dist. LEXIS 136808, *50

(Intercall's Summ J. Br., at 25.) The Court agrees with Intercall that Ms. Malloy's theory is unsupported by the evidence; she has not come forward with evidence creating a genuine issue of material fact that she was discriminated by Intercall because of her *age*. As noted at the beginning of this section, Ms. Malloy was retained by Mr. Dunne to work for Intercall when she was fifty-seven years old. Despite being an at-will employee who could be terminated at any time, Intercall employed her at a high salary for two years. Ultimately, it was Mr. Dunne who also terminated her.

Ms. Malloy has simply presented no evidence, beyond her speculation, that *age* played any role in the decisions leading up to her PIN and termination. Such a basis is insufficient to raise a question of pretext. The evidence before the Court is to the contrary. This is not to say that Intercall's decisions were sound or reasonable. But, that is not an evaluation the Court has engaged in or must make. The inquiry is simply whether there is any evidence from which a fact finder **[*51]** could determine that Intercall's decisions were based on Ms. Malloy's *age* and not some other factor. The Court finds that there is not. For these reasons, the Court grants Intercall's motion for summary judgment for Ms. Malloy's NJLAD age discrimination claim.

## C. Retaliation

On January 11, 2007, a Saturday Night Live video clip about sexual harassment was broadcast by Intercall's Boston sales office via video conference. Ms. Malloy watched the video on her computer. She found it in appropriate and offensive. She complained to Ms. Paczkowski about the video. About two weeks later, on January 23, 2007, Ms. Malloy was terminated. Ms. Malloy claims that she was terminated in retaliation for her complaint. (Am. Compl. ¶ 49-53.)

NJLAD makes it unlawful "[f]or any person to take reprisals against [another] person because that person has opposed any practices or acts forbidden under [the NJLAD] . . . ." *N.J. Stat. Ann. § 10:5-12(d)*. In order to set forth a prima facie case of unlawful retaliation under the NJLAD, a plaintiff "must show: (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected **[*52]** activity and the adverse employment action." *Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)*. Intercall argues that Ms. Malloy's retaliation claim fails because she has not established a causal connection between her January

11, 2007 complaint and her termination. Intercall asserts that the decision to terminate Ms. Malloy's employment was made prior to the January 11 airing of the video clip.

The parties spend a substantial amount of time disputing whether the *final* decision to terminate Ms. Malloy was made on January 8, prior to broadcast of the video, or after the broadcast. The Court finds that this dispute is not central to resolving Ms. Malloy's retaliation claim; even if the final decision to terminate Ms. Malloy was made after January 11, she has still failed to establish a causal link between her complaint and her termination. For this claim, she must come forward with some evidence that her termination was related to her *complaint*.

It is undisputed that McLachlan contacted human resources in October 2006 to see if Ms. Malloy could be part of an upcoming reduction in force. (Intercall's Reply, at 8 n.10.) It is also undisputed that Intercall put Ms. Malloy on a PIN in late **[*53]** November 2006. It is further undisputed that on January 8, 2007 Mr. Dunne, who ultimately was responsible for terminating Plaintiff, agreed with the recommendation from human resources that she be terminated. Whether or not Ms. Paczkowski wanted to give Ms. Malloy more time to improve, Mr. Dunne had agreed on January 8 that Ms. Malloy could be terminated.

Additionally, Ms. Malloy has not submitted any evidence that Intercall responded negatively to her complaint. Ms. Paczkowski responded immediately to the complaint and apologized to Plaintiff, and the manager responsible for broadcasting the clip was reprimanded. Thus, Plaintiff has pointed to no facts supporting her claim that she was terminated in retaliation for her complaint other than merely pointing to the fact that she complained and was terminated approximately two weeks later.

"[T]he mere fact that [an] adverse employment action occurs after [the protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two." *Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)* (quoting *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)*). Thus, "[o]nly **[*54]** where the facts of the particular case are so 'unusually suggestive of retaliatory motive' may temporal proximity, on its own, support an inference of causation." *Young, 385 N.J. Super. 448, 897 A.2d 1063, 1073 (N.J. Supp. App. Div. 2005)* (quoting Krouse). Where temporal proximity is not unusually suggestive, a plaintiff must establish the

causal link through other evidence. See *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000)*. Here, given all the surrounding circumstances, the timing of the termination is not "unusually suggestive of a retaliatory motive." Other than the fact that her actual termination occurred after broadcast of the video, there are no facts to suggest that the termination was related to her complaint. Intercall's motion for summary judgment for Plaintiff's retaliation claim is granted.

### D. Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. See *Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 544 A.2d 857, 863 (1988)*. The Third Circuit has stated: "It is extremely rare to find conduct **[*55]** in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988)*; see also *Bishop, 864 F. Supp 416, 427 (D.N.J. 1994)*(stating that the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."). At the summary judgment stage, if a plaintiff fails to make a sufficient showing regarding an essential element of her case upon which he or she will bear the burden of proof at trial, summary judgment must be granted. Thus, a court must determine if the conduct complained of is sufficiently extreme and outrageous to allow it to go to a jury.

In Cox, the defendant terminated the plaintiff's employment the day he returned from work following triple bypass surgery. The Third Circuit found that the defendant knew that plaintiff's recovery was incomplete, knew that plaintiff's medical and disability benefits may be affected, likely knew that the termination "endanger[ed] his chances **[*56]** of collecting medical and disability benefits" and likely knew that the termination would hurt his chances of finding alternative employment. *861 F.2d at 395*. Nevertheless, the Cox court held that, even if defendant dismissed the plaintiff with an improper motive, its actions did "not appear to rise to the level of outrageousness" required. *Id. at 396*.

On the other hand, in Leang v. Jersey City Board of Education, relied on by Ms. Malloy, the New Jersey

Supreme Court permitted an IIED claim to go to the jury where a teacher submitted facts supporting her claim that her employer publicly humiliated her. *198 N.J. 557, 969 A.2d 1097, 1115 (N.J. 2009)*. In Leang, the plaintiff was a Cambodian who had suffered under government authorities prior to coming to the United States. Her employer was aware of this and of her resulting fear of governmental authorities. Id. Her employer was also aware of her non-violent beliefs. Id. Ms. Leang alleged that in revenge for rejecting sexual advances of a co-worker, she was falsely accused of threatening the lives of her students, arrested, led from the school by the authorities, and treated in a publicly humiliating manner designed to take advantage of her fear of government **[*57]** authorities. *Id. at 1104, 1115*. The court held that this conduct was sufficiently outrageous to proceed to the jury.

Here, Ms. Malloy summarizes her IIED claim as:

> Plaintiff has alleged and demonstrated that Intercall's outrageous conduct was a continuous pattern, which included the following: treating Plaintiff differently than the other younger members of the sales force by only providing them with assistance, territories and new acquisition accounts; not providing Plaintiff with adequate means of monitoring her accounts, systematically stripping Plaintiff of her multi-million dollar accounts; in engaging in a scheme to use Plaintiff as a resource and humiliating her by requiring her to train its inexperienced, younger sales force; simultaneously and surreptitiously assigning a consultant in Plaintiff's bogus territory; wrongfully placing Plaintiff on probation for a contrived "failure to perform" and wrongfully terminating Plaintiff for her alleged "failure to perform."

(Malloy's Opp'n, at 40.) Ms. Malloy essentially complains of how her work was assigned and managed. She has not even alleged that any derogatory remarks were made to her. The Court disagrees with her that Intercall's **[*58]** conduct is comparable to that in Leang, where the plaintiff claimed she was set up to be falsely arrested and publicly humiliated and terrified. The conduct identified by Ms. Malloy above describes, perhaps, an unpleasant working environment; it does not "rise to the level of outrageousness" required. If such allegations were sufficient to survive summary judgment, every employee who had been passed over for promotion or who was given work that they did not like or felt was beneath them would have a triable IIED claim. IIED claims, however, are for exceptional conduct

that stands outside the "bounds of decency." Intercall's motion for summary judgment as to this claim is granted.

## IV. OTHER MOTIONS

Intercall also presently moves to strike Ms. Malloy's experts, Dr. Crain and Dr. Levison. Because the found has found that summary judgment in favor of Intercall is appropriate regardless of the causation and damage calculation issues addressed by these experts, resolution of these motions is unnecessary. They are denied as moot.

## V. CONCLUSION

For the reasons set forth above, Ms. Malloy's motion for partial summary judgment on her breach of contract claim is denied. Intercall's motion for summary **[*59]** judgment on all claims is granted. An appropriate Order accompanies this Opinion.

DATE: December 28, 2010

/s/ Jose L. Linares

JOSE L. LINARES,

UNITED STATES DISTRICT JUDGE

 Neutral
As of: April 29, 2021 6:37 PM Z

## *Shinn v. FedEx Freight, Inc.*

United States District Court for the District of New Jersey

December 6, 2016, Decided; December 7, 2016, Filed

Civ. No. 16-777 (NLH/KMW)

**Reporter**
2016 U.S. Dist. LEXIS 169037 *; 2016 WL 7130911

STANLEY SHINN and PAUL ELLIS, Plaintiffs, v. FEDEX FREIGHT, INC., Defendant.

**Subsequent History:** Summary judgment granted by *Shinn v. FedEx Freight, Inc., 2018 U.S. Dist. LEXIS 152455 (D.N.J., Sept. 7, 2018)*

## Core Terms

fired, Amend, motion to dismiss, alleges, retaliation, break room, counts, confrontation, participating, reasons, hostile work environment claim, sexual orientation, preempted, uttered, driver

**Counsel:** [*1] For Plaintiffs: Graham F. Baird, Esq., LAW OFFICES OF ERIC A. SHORE, P.C., Philadelphia, Pennsylvania.

For Defendant: David S. Fryman, Esq., Amy L. Bashore, Esq., Steven D. Millman, Esq., BALLARD SPAHR LLP, Cherry Hill, New Jersey.

**Judges:** NOEL L. HILLMAN, United States District Judge.

**Opinion by:** NOEL L. HILLMAN

## Opinion

**HILLMAN**, District Judge

This is an employment retaliation suit brought by Plaintiffs Stanley Shinn and Paul Ellis, both former drivers for Defendant FedEx Freight ("FedEx"). FedEx presently moves to dismiss six of the seven counts of the Amended Complaint. For the reasons set forth herein, the Motion will be granted in part, denied in part, and denied as moot in part.

I.

### A. Plaintiff Shinn

Shinn was hired by FedEx as a driver in 2003. (Amend. Compl. ¶ 10) He was fired on May 21, 2015. (Id. ¶ 26) Shinn alleges that he was fired for two unlawful reasons.

First, Shinn alleges that he was fired in retaliation for participating in an investigation into a confrontation in a break room involving Plaintiffs Shin and Ellis on the one hand, and another driver, Steven Buckley, on the other. (Amend. Compl. ¶¶ 19-25)

According to the Amended Complaint, on April 29, 2015, Buckley allegedly walked into the break room [*2] and said to Plaintiffs, "'hey you two union fags, you couple of Facebook fags,'" (Amend. Compl. ¶¶ 19-20) to which "Shin replied, 'you want to go outside and talk about who is a fag?'" (Id. ¶ 22) The Amended Complaint does not allege what happened next, although the Amended Complaint does state that "at no time did Shin or Beckley get into any physical altercation." (Id. ¶ 29)

FedEx allegedly "initiated an investigation" into the

2016 U.S. Dist. LEXIS 169037, *2

incident, and both Plaintiffs were interviewed as to what happened. (Amend. Compl. ¶ 24) Shinn was fired less than a month after the incident. FedEx allegedly "took no action whatsoever against Buckley." (Amend. Compl. ¶ 27) Second, Shinn alleges he was fired for participating in union organizing activities in 2014. Specifically, the Amended Complaint alleges that both Shinn and Plaintiff Ellis advocated for unionizing, and then subsequently signed affidavits in support of the Teamster's unfair labor practice charge against FedEx filed with the NLRB. (Amend. Compl. ¶ 12-17)

**B. Plaintiff Ellis**

Ellis was hired as a driver in 2004. (Amend. Compl. ¶ 8) He was fired on July 9, 2015. (Id. ¶ 34) Ellis alleges he was fired for three unlawful reasons. In addition to **[*3]** the two reasons described above -- participating in the investigation into the Shinn-Buckley break room confrontation (Amend. Compl. ¶ 38), and unionizing activities (Id. ¶ 39) -- Ellis alleges that he was fired in retaliation for using leave time authorized by the *Family Medical Leave Act*. (Id. ¶ 37)

Specifically, Ellis allegedly took a medical leave day on May 22, 2015 (Amend. Compl. ¶ 30), and was informed by another driver later that same day that Ellis had been assigned a particularly "distressing and oppressive" delivery assignment. (Id. ¶ 32) Ellis was fired a little over a month later.

The Amended Complaint asserts the following counts: (1) "Title VII retaliation"; (2) "Title VII hostile work environment"; (3) violation of the *New Jersey Constitution, Article 1, paragraph 19*; (4) violation of *New Jersey's Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 et seq.*; (5) violation of *Family Medical Leave Act (FMLA), 29 U.S.C. § 2615* (asserted by Plaintiff Ellis only); (6) violation of New Jersey's Law Against Discrimination (LAD), *N.J.S.A. 10:5-1 et seq.*; and (7) "wrongful termination under New Jersey common law."[1]

FedEx moves to dismiss all claims except Plaintiff Ellis' FMLA claim.

---

[1] The Court has subject matter jurisdiction pursuant to *28 U.S.C. §§ 1331* (federal question), 1332 (diversity of citizenship) and 1367 (supplemental jurisdiction). Plaintiffs are citizens of New Jersey. Defendant is a citizen of Tennessee and Delaware. The amount in controversy is alleged to exceed $150,000.

**II.**

When considering a motion to dismiss a complaint for failure to state a claim upon which relief **[*4]** can be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005)*. It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*.

Under the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts that serve as a basis for the claim. *Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977)*. However, "the Federal Rules of Civil Procedure . . . do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 149-50 n.3, 104 S. Ct. 1723, 80 L. Ed. 2d 196 (1984)* (quotation and citation omitted).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'" *Bell Atlantic v. Twombly, 550 U.S. 544, 563 n.8, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (quoting *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974))*; see also *Ashcroft v. Iqbal, 556 U.S. 662, 684, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)*("*Iqbal* . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before *Twombly*.").

**III.**

**A. The New Jersey Constitution count (Count III)**

In response **[*5]** to the instant Motion to Dismiss, Plaintiffs state in their brief that "Plaintiffs voluntarily withdraw Count III of their Amended Complaint." (Opposition Brief, p. 13, Docket #24-1) The Court expects that Plaintiffs will promptly file the appropriate Notice of Dismissal pursuant to *Fed. R. Civ. P.*

*41(a)(1)(A)(i)*.

FedEx's Motion to Dismiss Count III will be denied as moot.

### B. The Title VII counts (Counts I and II)

FedEx moves to dismiss the Title VII claims asserting that Plaintiffs failed to exhaust their EEOC administrative remedies. In opposition, Plaintiffs argue that they "filed NLRB complaints against FedEx," and therefore "[t]o force Plaintiffs to re-file the identical charge or claims with the EEOC would be wasteful [and] unduly burdensome." (Opposition Brief, p. 13, Docket #24-1)

Plaintiffs' argument fails. The statute requires EEOC exhaustion, *see 42 U.S.C. § 2000e-5(f)(1)*; the Court cannot excuse the statutory requirement. FedEx's Motion to Dismiss the Title VII claims will be granted.

### C. The CEPA count (Count IV)

Plaintiffs assert that FedEx violated CEPA when it fired Plaintiffs allegedly in retaliation for "participating in the NLRB charging process and investigation." (Amend. Compl. ¶ 69) FedEx argues this claim is preempted by the **[*6]** *National Labor Relations Act*. The Court agrees.

A CEPA claim will be preempted by the NLRA when it presents a question that would be within the jurisdiction of the NLRB. *Puglia v. Elk Pipeline, Inc., 226 N.J. 258, 289, 141 A.3d 1187 (2016)*(" The concern animating federal preemption . . . is one of primary jurisdiction. . . . The critical inquiry is thus whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the Labor Board.")(internal citation and quotation omitted). Such analysis is rather simple in this case because not only were Plaintiffs' claims within the NLRB's jurisdiction, those claims were "fully investigated and considered" by the NLRB, and then dismissed based on "insufficient evidence." (Amend. Compl. Ex. B)

Indeed, the NLRB has held that firing an employee for participating in a Board investigation violates *Section 8(a)(4)* of the Act. *Caterpillar, Inc., 322 NLRB 674 (1996)*; *Pillsbury Chem. Oil Co., 317 NLRB 261 (1995)*. Thus, it is clear that Plaintiffs' CEPA claims, which are based on the allegation that they were fired in retaliation

for participating in a Board investigation, are preempted.

Plaintiffs argue in conclusory fashion that their CEPA claims fall within the "local interest" exception to preemption because CEPA is a broad remedial **[*7]** statute intended to effectuate important social goals. This argument fails. "The 'critical inquiry' in the 'local interest' cases 'is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the NLRB.'" *Londono v. ABM Janitorial Servs., 2014 U.S. Dist. LEXIS 172475 (D.N.J. Dec. 12, 2014)*(quoting *Sears v. San Diego Cnty. Dist. Council of Carpenters, 436 U.S. 180, 197, 98 S. Ct. 1745, 56 L. Ed. 2d 209 (1978))*. Thus, the local interest exception does not apply. FedEx's Motion to Dismiss the CEPA count will be granted.

### D. The NJ LAD count (Count VI)--retaliation

FedEx argues that the NJ LAD counts is simply a "repackaging" of the CEPA claim, and therefore the NJ LAD claim is also preempted by the NLRA, and should be dismissed in its entirety. The Court does not reach this issue, however, because Plaintiffs' LAD claim -- to the extent it is based on the allegation that they were fired in retaliation for union activity or participation in an NLRB investigation -- fails simply because the LAD does not protect union membership or support.

The statute protects against discrimination on the basis of "race, creed, color, national origin, ancestry, age, marital status, civil union status, **[*8]** domestic partnership status, affectional or sexual orientation, genetic information, pregnancy, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer." *N.J.S.A. § 10:5-12*. Participation in union activities or union membership does not fall within the statute.

Sexual orientation, however, does. To the extent Plaintiffs' claims are based on the allegations that they were fired because of their perceived sexual orientation, or their participation in an investigation into whether another employee was harassing Plaintiffs on the basis of their perceived sexual orientation, the claims are not

2016 U.S. Dist. LEXIS 169037, *8

preempted by the NLRA and are actionable under the NJ LAD.

FedEx's Motion to Dismiss the NJ LAD count will be granted insofar as the count is based on alleged union activity or participation in an NLRB investigation, and will be denied insofar as the count is based on Plaintiffs' alleged participation in the investigation of the **[*9]** Shinn-Buckley break room confrontation.

### E. The NJ LAD count (Count VI)--hostile work environment

To the extent that the NJ LAD count also asserts a hostile work environment claim, FedEx argues the claim fails because there are insufficient allegations to support a plausible conclusion that FedEx's actions were severe or pervasive. The Court agrees.

The Amended Complaint alleges a single confrontation, in a break room, where a single co-worker allegedly uttered a derogatory term concerning Plaintiffs' perceived sexual orientation.

In opposition, Plaintiffs rely on *Taylor v. Metzger*, where the New Jersey Supreme Court stated that "a single utterance of an epithet can, under certain circumstances, create a hostile work environment." *152 N.J. 490, 501-03, 706 A.2d 685 (1998)*. *Taylor* is distinguishable from this case however, because the person who uttered the epithet in *Taylor* was a supervisor, whereas Buckley is alleged to have been a coworker. Several other courts have distinguished *Taylor* on this basis. *See Nuness v. Simon & Schuster, Inc., 2016 U.S. Dist. LEXIS 159315 (D.N.J. Nov. 17, 2016)*(Simandle, Chief District Judge)("The facts of the *Taylor* case can be distinguished from the facts in the present matter. While the insult at issue here was clearly a racist slur and directed at the plaintiff, it was not uttered **[*10]** by a supervisor like in *Taylor*, but by a co-worker."); *Bagley v. W.J. Maloney Plumbing, 2014 U.S. Dist. LEXIS 185309 (D. Ariz. Feb. 10, 2014)*("*Taylor* is factually distinguishable in that the racially offensive comment was made by the highest ranking official in the county sheriff's office."); *Shaw v. FedEX Corp., 2012 N.J. Super. Unpub. LEXIS 1872 (App. Div. July 20, 2012)*("We reject plaintiff's argument that her circumstances were similar to those of the plaintiff in *Taylor*, where the county sheriff, in front of a high ranking undersheriff, referred to the plaintiff, an African-American sheriff's officer, by a very insulting racial slur and, later, berated her for feeling insulted. As the Supreme Court noted, when the chief executive of

the organization utters an unambiguously demeaning racial slur in front of another high ranking supervisor, the one severely insulting comment could be found to signal pervasive workplace racial hostility. In contrast, Hicks was plaintiff's co-worker, with no power to alter the terms of employment or the workplace.")(citations and quotations omitted); *Shain v. Hel Ltd., 2012 N.J. Super. Unpub. LEXIS 454 (App. Div. Mar. 2, 2012)* ("Unlike in *Taylor*, the discriminatory comment was not made by plaintiff's ultimate supervisor.").

Accordingly, FedEx's Motion to Dismiss the hostile work environment claim will be granted. However, if Plaintiffs wish to supplement the current allegations supporting **[*11]** their hostile work environment claims, they may file a Second Amended Complaint within 30 days.

### F. The common law wrongful termination claim (Count VII)

FedEx argues that the common law wrongful termination count should be dismissed because it is coterminous with the statutory claims asserted. The cases upon which FedEx relies, however, are decisions made at summary judgment. The Court declines to dismiss this count at the pleadings stage; alternate pleading is expressly allowed by the Federal Rules of Civil Procedure. *See Fed. R. Civ. P. 8(d)*. FedEx's Motion to Dismiss the wrongful termination count will be denied.

### IV.

For the foregoing reasons, Defendants' Motion to Dismiss will be denied as moot as to Count III. The Motion will be granted as to Counts I, II, and IV. The Motion will be denied as to Count VII. As to Count VI, the NJ LAD count, the motion will be granted as to the hostile work environment claim however, Plaintiffs will be granted leave to amend; the motion will be denied insofar as the count is based on Plaintiffs' alleged participation in the investigation of the Shinn-Buckley break room confrontation; and the motion will be granted in all other respects.

An appropriate order accompanies **[*12]** this opinion.

Dated: December 6, 2016

At Camden, New Jersey

2016 U.S. Dist. LEXIS 169037, *12

/s/ Noel L. Hillman

NOEL L. HILLMAN, U.S.D.J.


**ORDER**

For the reasons expressed in the Opinion entered on this date,

IT IS on this 6th day of December, 2016,

ORDERED that the motion [Doc. No. 22] to dismiss filed by Defendant shall be, and the same hereby is, **DENIED AS MOOT** as to Count III, **GRANTED** as to Counts I, II, and IV, **DENIED** as to Count VII; and it is further

ORDERD that the motion [Doc. No. 22] shall be, and the same hereby is, **GRANTED** as to the NJ LAD hostile work environment claim (Count VI); however, Plaintiffs shall be, and the same hereby are **GRANTED LEAVE TO AMEND** this claim within 30 days, **DENIED** as to the NJ LAD count (Count VI) insofar as the count is based on Plaintiffs' alleged participation in the investigation of the Shinn-Buckley break room confrontation, and **GRANTED** as to the NJ LAD count in all other respects.

/s/ Noel L. Hillman

NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey

---

**End of Document**

Pooja Bhutani

No *Shepard's* Signal™
As of: April 29, 2021 6:38 PM Z

## *Pizarro v. Int'l Paper Co.*

United States District Court for the District of New Jersey

March 3, 2020, Decided; March 3, 2020, Filed

CIVIL ACTION NO. 19-5081

**Reporter**
2020 U.S. Dist. LEXIS 36760 *; 2020 WL 1032341

MICHAEL PIZARRO v. INTERNATIONAL PAPER COMPANY

## Core Terms

termination, retaliation, temporal proximity, summary judgment, retaliation claim, football game, requesting, undisputed, reasons, attend, flight, protected activity, causal, scheduled, animus, posts

**Counsel:** **[*1]** For MICHAEL PIZARRO, Plaintiff: SAMUEL A. DION, LEAD ATTORNEY, DION & GOLDBERGER, ESQS., PHILADELPHIA, PA.

For INTERNATIONAL PAPER COMPANY, Defendant: DWAYNE FRANKLIN STANLEY, LEAD ATTORNEY, HUSCH BLACKWELL, LLP, ST. LOUIS, MO.

**Judges:** Harvey Bartle III, J.

**Opinion by:** Harvey Bartle III

## Opinion

MEMORANDUM

Bartle, J.

Plaintiff Michael Pizarro ("Pizarro") brings this action against defendant International Paper Company ("International Paper") for violation of *the Family and Medical Leave Act of 1993* ("FMLA"), *29 U.S.C. § 2601*. Pizarro asserts two claims against International Paper under the FMLA: (1) interference, and (2) retaliation. Before the court is the motion of defendant for summary judgment under *Rule 56 of the Federal Rules of Civil Procedure*.

I

Under *Rule 56 of the Federal Rules of Civil Procedure*, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; see also *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. *Id. at 252*. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position **[*2]** will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Id.*

In addition, *Rule 56(e)(2)* provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by *Rule 56(c)*, the court may . . . consider the fact undisputed for the purposes of the motion." *Fed. R. Civ. P. 56(e)(2)*. In making a summary judgment determination, we view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor. See *In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004)*. The court may not, however, make credibility determinations or weigh the evidence in considering motions for

summary judgment. See *Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*.

II

The following facts are undisputed. International Paper is a producer of paper, fiber-based packaging products, and pulp for tissue and personal hygiene products. Pizarro is now a former employee of International Paper's Barrington, New Jersey facility, where he began working in September 1997. Most recently, Pizarro worked as a "Die Cut" Machine Operator and was a member of the United Steelworkers Union.

In 2002, Pizarro was diagnosed with type 2 diabetes. Pizarro also suffers from neuropathy, which results in pain and swelling of the feet. **[*3]** As a machine operator, Pizarro spent a substantial majority of his time on his feet while working. Pizarro's diabetic neuropathy occasionally flared up and caused increased pain in his feet due to increased swelling. As a result, he could not stand for extended periods of time.

Following his diagnosis, Pizarro requested intermittent FMLA leave to manage his pain. International Paper approved his requests for FMLA leave each subsequent year for 17 years without any documented issues. International Paper's company policy required Pizarro to call a third-party call-line to state that he would be missing work because of FMLA reasons. Pizarro generally called at least one hour prior to start of his scheduled shift to inform International Paper of his absence from work.

Pizarro was scheduled to work from 3:00 a.m. to 3:00 p.m. EST on Saturday, December 8, 2018. Unbeknownst to International Paper, Pizarro also had plans to attend a Dallas Cowboys-Philadelphia Eagles football game in Arlington, Texas the next day on Sunday, December 9. Pizarro and his wife purchased tickets to attend the game in November 2018 and made the appropriate flight and hotel reservations. Pizarro's flight to Texas was **[*4]** scheduled to leave from Philadelphia at 8:25 p.m. on Saturday, December 8. At 12:43 a.m. on Saturday, two hours before his shift was to begin, Pizarro called the third-party line and reported that he was taking FMLA leave because he was "sick" and would not be coming to work.

Pizarro boarded his flight on time and landed in Texas with his wife on Saturday night. The next day, Pizarro arrived at the football game two hours early to tailgate with friends. He stayed at the stadium for over three

hours until the game ended, and was on his feet for approximately fifty percent of the game. After the game, Pizarro walked approximately a half-mile to a convention center. During his deposition, Pizarro testified that he did not start "feeling better" on Saturday and that his leg pain did not go away during the game on Sunday. Throughout their time in Texas, Pizarro and his wife made several posts on Facebook that were visible to his friends and followers on the website.

Pizarro's return flight from Dallas to Philadelphia was scheduled to leave at 6:00 a.m. CST on Monday, December 10. Pizarro was scheduled to start work on the same day at 3:00 p.m. EST. At 4:45 a.m. CST, Pizarro texted a coworker **[*5]** stating, "[f]light delayed in Texas, dont [sic] know how long for, just a heads up." At 5:34 a.m. CST, Pizarro called the third-party line and reported that he was taking FMLA leave because he was "sick" and did not report to work on December 10.

A supervisor at International Paperwork was a friend of Pizarro on Facebook. The supervisor was aware that Pizarro had called off over the weekend and believed that Pizarro's Facebook posts about the football game showed that he was improperly using FMLA leave. The supervisor forwarded the Facebook posts to management and human resources. The supervisor later learned about Pizarro's text message to his co-worker, which also solidified his belief that Pizarro was misusing his FMLA leave. He subsequently notified management about the text message.

Keith Fisher ("Fisher"), a site manager, also believed that Pizarro had informed a different shift supervisor earlier in the week that he planned to call off from work on Saturday, December 8, 2018. Fisher personally saw a note from the shift supervisor that stated, "Mike P. Call out Saturday." Fisher believed the turn of events to be suspicious and investigated the matter. Pizarro returned to work **[*6]** the next day, on Tuesday, December 11, 2018, with souvenir cups from the football game for his co-workers and worked a full shift without any incident.

The following day, on Wednesday, December 12, 2018, Pizarro was summoned to a meeting with management, human resources, and a union representative. At this meeting, Pizarro was asked about his trip to Texas. Pizarro refused to confirm that he had traveled to Texas but instead responded, "who told you this information?" He further stated that he had a doctor's note for his missed days of work. The doctor's note stated, "[patient] seen by me. Please excuse for 2 days Saturday x Monday 12/8 - 12/10." The note was dated December 8,

2018. Pizarro admits that he asked his doctor for the note after the fact on December 11 during a pre-scheduled, routine appointment and that the note was mistakenly dated. Pizarro further testified that he requested the doctor's note "[j]ust in case a situation aroused [sic], and just to get a doctor's note, just to try to cover myself just in case." Pizarro was suspended pending further investigation. Pizarro deleted his Facebook posts about the football game immediately after he was suspended.

Wayne Parker, **[*7]** the general manager at Pizzaro's workplace, and Fisher considered the use of FMLA leave to attend a football game to be a terminable offense. International Paper's Shop Rules and Regulations state "[t]he falsifying of personnel records," and "[t]he falsifying of any company reports, records, or other information" are "intolerable offenses" that will result in immediate termination of employment. Pizarro confirmed being aware of and having access to the Shop Rules and Regulations.

Based on its investigation, Parker believed that Pizarro called off from work on December 8, 2018 to get ready for his trip to Texas, not for legitimate FMLA reasons. Fisher believed that Pizarro called off from work on December 10, 2018 for similar fraudulent purposes, including because of the flight delay.

On December 13, 2018, based on its investigation and all available evidence, International Paper, through Parker and Fisher, determined that Pizarro violated its policies regarding falsifying company reports and terminated Pizarro's employment.

III

FMLA claims are commonly brought under a theory of either interference or retaliation. Callison *v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir.2005)*. An FMLA interference claim arises under *29 U.S.C. § 2615(a)(1)*, which makes it "unlawful **[*8]** for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. An FMLA retaliation claim arises under *29 U.S.C. § 2615(a)(2)*, which makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.

Plaintiff is not guaranteed an "automatic right to claim interference where, as here, the claim is so clearly redundant to the retaliation claim." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 598 F. App'x 109, 113 (3d Cir.*

*2015)*. The difference in burdens of proof alone will not allow plaintiff to go forward with an interference claim that is "in form and substance . . . a claim for retaliation." *Id. 114*

We find that Pizarro's FMLA interference claim is duplicative of his retaliation claim. The factual underpinnings of Pizarro's interference claim is premised on the same allegations as the retaliation claim, that is he was unlawfully terminated for taking FMLA leave. Indeed, Pizarro's complaint includes only one single count ("Violations of the FMLA") which details both an interference and a retaliation claim based on the same factual allegations. We will not consider his interference claim separately from his retaliation claim. They **[*9]** rise or fall together.

IV

We turn to plaintiff's claim that his termination was a form of retaliation for requesting FMLA leave. To defeat summary judgment on his retaliation claim under the FMLA, Pizarro must satisfy the three-step burden-shifting inquiry laid out in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. First, Pizarro must state a prima facie claim. To do so, Pizarro must allege that: (1) he engaged in protected activity by requesting FMLA leave; (2) he suffered an adverse decision; and (3) the adverse decision was causally related to his request for leave. *Simons v. Bos. Sci., 765 F. App'x 773, 778 (3d Cir. 2019)*. Second, once a plaintiff produces evidence of a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id. at 777*. Third, if the employer can come forward with a legitimate, non-discriminatory reason for terminating the plaintiff, then the burden shifts back to the plaintiff to establish that the "proffered reason [is] merely a pretext for discrimination." Id.

It is undisputed that plaintiff meets the first two prongs of the *McDonnell Douglas* test to state a claim under the FMLA. Plaintiff engaged in a protected activity by requesting and using his FMLA leave and suffered **[*10]** an adverse action through his termination. The dispute here concerns the causal requirement. To defeat summary judgment, plaintiff must point to evidence sufficient to create an inference that a causal link exists between his FMLA leave and his termination. See *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000)*. To establish causation, plaintiff must show: "either (1) an unusually suggestive temporal proximity between the protected

2020 U.S. Dist. LEXIS 36760, *10

activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)*. In addition to these two primary methods, inconsistencies or discrepancies in the employer's reasons for terminating the employee may be enough to support an inference of causation. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)*. After reviewing the record, we conclude that Pizarro failed to come forward with any evidence to establish causation.

First, we measure temporal proximity from the initial date on which the litigant engaged in his protected activity. *Blakney v. City of Philadelphia, 559 Fed. Appx. 183, 186 (3d Cir. 2014)*. A close temporal proximity between a protected activity and an adverse act may support an inference of causal relationship where the timing is unusually suggestive. *Ward v. Ingersoll-Rand Co., 688 Fed. Appx. 104, 110 (3d Cir. 2017)*. Where the temporal proximity is not unusually suggestive, the appropriate test is "timing plus **[*11]** other evidence." *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)*.

The protected activity, which is the request for FMLA leave on December 8, 2018 and December 10, 2018, is certainly close enough to the adverse act, that is termination of employment on December 13, 2018. However, the temporal proximity between Pizarro's decision to take leave and his subsequent termination is insufficient to establish a causal connection in light of his history of requesting FMLA leave. Pizarro was first approved for FMLA leave 17 years ago. International Paper consistently granted his requests without any issue over the years thereafter until his termination. International Paper only decided to terminate Pizarro's employment after management became aware of misconduct that it believed violated the company's policies. Accordingly, the undisputed facts do not provide evidence of the temporal proximity rising to the level suggestive of retaliation.

Second, in the absence of an unusually suggestive temporal proximity, Pizarro must show evidence that International Paper "engaged in a pattern of antagonism in the intervening period." *Capps v. Mondelez Glob. LLC, 847 F.3d 144 (3d Cir. 2017)*. Pizarro asserts that animus can be inferred because: (1) temporal proximity between his call-offs from work and his discharge **[*12]** shows retaliatory behavior; (2) management did not know about Pizarro's physical condition on the days he called out for FMLA, and therefore, the termination was

wrongful; and (3) a regional general manager stated in an email that "these guys are killing our other employees." Pizarro asserts that "these guys" is a negative label referring to workers who take FMLA and therefore shows retaliatory intent. We disagree.

As discussed above, the temporal proximity between Pizarro's decision to take leave and his subsequent termination is insufficient to establish animus rising to the level suggestive of retaliation. Moreover, we note that an employer's decision to terminate an employee for FMLA abuse will likely occur in close temporal proximity to the time when the abuse is discovered. Such a termination without additional evidence is not enough to show animus. Next, management's lack of knowledge about Pizarro's specific illness is irrelevant to our retaliation analysis. While decisionmakers did not have access to Pizarro's medical diagnosis, this factual assertion does not suggest that the decision to terminate Pizarro's employment was driven by animus. To discredit a proffered reason, **[*13]** Pizarro "cannot simply show that the employer's decision was wrong or mistaken but must demonstrate . . . that the employer was actually not motivated by its proffered nondiscriminatory reason." *Parker v. Verizon Pennsylvania, Inc., 309 F. App'x 551, 556 (3d Cir. 2009)*. Lastly, it is undisputed that the regional general manager was not a decisionmaker in the termination process. There is no evidence that suggests the one-time remark was indicative of management's attitude towards those seeking FMLA leave at the company. Stray remarks or statements by non-decisionmakers do not establish retaliation. *Fakete v. Aetna, Inc., 308 F.3d 335, 338 n.2 (3d Cir. 2002)*.

Third, the record as a whole is devoid of evidence showing inconsistencies or discrepancies in International Paper's reasoning for terminating Pizarro's employment. International Paper has consistently stated its belief that Pizarro fraudulently used FMLA leave to prepare to attend a football game in Texas and because his return flight was delayed. It is well established that an employer is permitted to discipline an employee for conduct that violates its policies, and such conduct cannot be the basis for a retaliation claim without evidence to the contrary. *Capps v. Mondelez Glob. LLC, 847 F.3d 144 (3d Cir. 2017)*.

Finally, Pizarro asserts that causation can be proved through the "mixed motive approach." "An employee **[*14]** who claims retaliation and seeks to proceed under a mixed-motive approach must show that his or her use of FMLA leave was 'a negative factor' in

the employer's adverse employment action." *Egan v. Delaware River Port Auth., 851 F.3d 263, 272 (3d Cir. 2017).* We find that Pizarro has failed to produce any evidence that his legitimate use of FMLA was a factor in International Paper's decision to terminate his employment.

Pizarro has not presented any credible evidence showing retaliatory animus or antagonism from International Paper. In contrast, until his termination, Pizarro never complained about the way he was treated and claims to have "loved" working for International Paper. Pizarro admits that on occasions when his absence from work would be questioned, management would work with him to demonstrate that his absences were for legitimate FMLA purposes. Prior to his termination, International Paper never disciplined, demoted, or retaliated against Pizarro for requesting or taking FMLA leave. Moreover, International Paper never prevented plaintiff from adhering to his doctor's orders or following his medical treatment. International Paper terminated Pizarro's employment only after learning about activity that it considered suspicious and evaluating **[*15]** the evidence from its investigation.

Even assuming that Pizarro had satisfied his prima facie case, International Paper has pointed to a legitimate, nonretaliatory business reason for his termination, that is its honest belief that Pizarro falsified company information to fraudulently take FMLA leave. Our Court of Appeals has held that "an employer's honest belief that its employee was misusing FMLA leave can defeat an FMLA retaliation claim." See *Capps, 847 F.3d at 147.* If defendant is able to provide such a reason, the burden of production shifts back to Pizarro to produce evidence that the proffered reason is merely a pretext for actual discrimination. See *Fuentes v. Perskie, 32 F.3d 759, 763-64 (3d Cir. 1994).* To show pretext, plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Id. at 764.*

The record in this matter is devoid of any evidence of pretext. In contrast, the undisputed facts actually support International Paper's honest belief that Pizarro misused his FMLA leave. It is undisputed that: (1) International **[*16]** Paper accommodated Pizarro's request for FMLA leave for 17 years without any retaliation; (2) there is no evidence that International Paper retaliated against any one of its employees for requesting FMLA leave; (3) Pizarro requested FMLA leave the day before and after he attended a football game in Texas; (4) Pizarro called off from work, seeking FMLA leave less than an hour after he texted a co-worker that his flight was delayed; (5) when questioned, Pizarro refused to confirm that he attended a game in Texas; and (6) Pizarro deleted Facebook posts showing he was at the football game immediately after he was suspended. The record is simply devoid of any evidence to create a genuine dispute of material fact regarding whether the reasons offered by International Paper for his termination were pretextual.

In sum, it cannot be reasonably disputed that Pizarro was lying to his employer that he was ill and could not work, all the while he was travelling to Texas and attending the Cowboys-Eagles game with significant physical activity in the process. Accordingly, this court will grant the motion of defendant for summary judgment as to Pizarro's claims for retaliation under FMLA.

ORDER

AND NOW, **[*17]** this 3rd day of March, 2020, for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that this motion of defendant for summary judgment (Doc. # 48) is GRANTED.

BY THE COURT:

/s/ Harvey Bartle III

J.

ORDER

AND NOW, this 3rd day of March, 2020, for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that summary judgment is entered in favor of defendant International Paper Company and against plaintiff Michael Pizarro.

BY THE COURT:

/s/ Harvey Bartle III

J.

*End of Document*

 Caution
As of: April 29, 2021 6:41 PM Z

## *Scott v. Schindler Elevator Corp.*

United States District Court for the District of New Jersey

May 2, 2019, Decided; May 3, 2019, Filed

Civil No. 17-2869 (NLH/KMW)

**Reporter**
2019 U.S. Dist. LEXIS 74774 *; 2019 WL 1976417

THEODORE R. SCOTT, Plaintiff, v. SCHINDLER
ELEVATOR CORPORATION, DAVE DURANT, KYLE
RAINWATER, JOE ZEILMAN, JOHN & JANE DOES 1-
10, and ABC & XYZ CORPORATIONS, Defendants.

**Subsequent History:** Reconsideration granted by, in
part, Reconsideration denied by, in part *Scott v.
Schindler Elevator Corp., 2019 U.S. Dist. LEXIS 136548
(D.N.J., Aug. 13, 2019)*

## Core Terms

Seal, right-to-sue, motion to dismiss, common law claim,
allegations, terminated, parties, leave to amend,
preempted, jugs, wrongful termination claim, cause of
action, statutorily, asserting, argues, amend, breach of
contract claim, administrative remedy, company vehicle,
federal court, state actor, workplace, appears, exhaust,
grounds, hostile, Pled, constitutional claim, wrongful
termination, aiding and abetting

**Counsel: [*1]** For Theodore R. Scott., Plaintiff:
MARCIA Y. PHILLIPS, MARCIA Y. PHILLIPS, ESQ.
LLM & ASSOC., PHILADELPHIA, PA.

For Schindler Elevator Corporation, Dave Durant, Kyle
Rainwater, and Joe Zeilman., Defendants: GREGORY
T. ALVAREZ, ROBERT J. CINO, JACKSON LEWIS
P.C., MORRISTOWN, NJ; TIMOTHY MICHAEL
MCCARTHY, JACKSON LEWIS P.C., PHILADELPHIA,
PA.

**Judges:** NOEL L. HILLMAN, UNITED STATES
DISTRICT JUDGE.

**Opinion by:** NOEL L. HILLMAN

## Opinion

**HILLMAN**, District Judge

This case concerns various federal and state
employment discrimination claims, as well as state
common law claims, relating to the termination of
Plaintiff's employment with Defendants. Currently before
the Court is Defendants' Motion to Dismiss the Second
Amended Complaint ("Motion to Dismiss") and Plaintiff's
opposition, as well as various letters relating to a
release allegedly signed by Plaintiff. Also before the
Court is Defendants' Motion to Seal and Plaintiff's
request for leave to amend and to strike. For the
reasons that follow, this Court will grant Defendants'
Motion to Dismiss, in part, and deny it, in part; grant, in
part, and deny, in part, Defendants' Motion to Seal;
deny, without prejudice, Plaintiff's requests to strike and
for leave to amend.

## BACKGROUND [*2]

This Court takes its facts from Plaintiff's Second
Amended Complaint ("SAC"). Plaintiff is Theodore R.
Scott, an African-American over the age of forty who
was an employee of Defendant Schindler Elevator
Corporation ("Schindler") for over twenty-two years.
Defendants Dave Durant, a superintendent, Kyle
Rainwater, a district manager, and Joe Zeilman, a

district service manager (collectively, "Individual Defendants"), were also involved in Plaintiff's employment at Schindler.

In 1989, Plaintiff was hired by Defendant Schindler to work as an elevator mechanic. During that time, it appears that Plaintiff worked in New Jersey. In 2011, Defendant Schindler is alleged to have laid off Plaintiff due to lack of work. Thereafter, Plaintiff filed a civil rights complaint against Defendant Schindler before the New Jersey Department of Civil Rights ("NJDCR"). Plaintiff claimed that he was not laid off due to lack of work, but due to discrimination on the basis of his race and age. Those claims, according to Plaintiff, were settled. (Pl.'s SAC ¶ 33.) After settling the claims, Defendant Schindler rehired Plaintiff. Plaintiff "work[ed] briefly in New Jersey." (Pl.'s SAC ¶ 9.) Then, according to Plaintiff, [*3] he was transferred to "The Mellon Bank Center building located at 1735 market Street, Philadelphia Pennsylvania." (Pl.'s SAC ¶ 10.) He worked there for eighteen months before he was terminated.

The events giving rise to the current claims center around two areas: access to a company vehicle and access to water.[1] Plaintiff was informed at some point during his time with Defendant Schindler that he was eligible to apply for a company van, which was used to transport specialized tools and supplies to worksites. Notably, in Pennsylvania, union rules required elevator mechanics to use a company vehicle to transport this equipment. A company vehicle was not required in New Jersey. A company vehicle was coveted by mechanics because it represented an opportunity for increased earnings. Plaintiff requested a company vehicle, but was denied. Plaintiff claims he was the only person of his seniority without one (who had requested one) and that those who had company vehicles were (1) white and (2) sometimes with less seniority than Plaintiff.

As for access to water, when Plaintiff started work in Philadelphia the building contained water fountains. But, these were removed by building management [*4] and a water cooler was placed in Defendant Schindler's onsite office. Although Defendant Schindler provided the water cooler, it did not provide any water. Without water, Plaintiff asked a building employee where he could get a water jug. The employee led Plaintiff to believe he could

take water jugs from a storage area in the building. Plaintiff took those water jugs and used them — and so did other onsite Schindler employees. Plaintiff estimates this occurred between one and five times.

On May 29, 2014, Plaintiff was told to report to Defendant Schindler's main office in Moorestown, New Jersey. When he arrived, he was confronted by Individual Defendants and he was told that he had been seen stealing water jugs. Plaintiff admitted he had replaced a water jug in the manner indicated supra, and it was only then that he realized the water jugs were not for him to take. Plaintiff offered to pay for the water jugs. Without further investigation, Defendant Schindler fired Plaintiff, reasoning that Plaintiff's comments, supra, were an admission of theft and that theft violated its zero-tolerance policy. Plaintiff alleges that he was treated differently than those who were not African-Americans [*5] and that, in doing so, Defendant Schindler did not follow its progressive discipline policy. Those individuals were given warnings or transferred, but rarely fired.

Thereafter, Plaintiff filed discrimination charges before the NJDCR and the Equal Employment Opportunity Commission ("EEOC") on July 16, 2014. After 250 days of investigation, Plaintiff withdrew all claims on March 23, 2015. Defendant Schindler allegedly appeared in the administrative action and fully participated. Plaintiff received a notice of his right to sue from NJDCR, but never received — and has never received — a notice of a right to sue from the EEOC. Plaintiff "was told by the Director of NJDCR that it would not be forthcoming from the EEOC agency because the later [sic] did not investigate the claim." (Pl.'s SAC ¶ 25.)

In May 2016, Plaintiff initially filed a complaint in the New Jersey Superior Court, Law Division, Camden County which was dismissed. It was reinstated on April 6, 2017. Defendant Schindler removed the renewed case to this Court on April 26, 2017. Defendant Schindler answered this complaint on May 16, 2017. Discovery began. Plaintiff moved for leave to amend on December 15, 2017. After full briefing, [*6] Magistrate Judge Karen M. Williams granted in part and denied in part Plaintiff's first Motion for Leave to Amend on May 23, 2018. Plaintiff filed a second Motion for Leave to Amend on June 29, 2018 and Plaintiff filed his First Amended Complaint on June 30, 2018. Defendant Schindler filed its Motion to Dismiss Plaintiff's First Amended Complaint on July 30, 2018.

Thereafter, Judge Williams granted Plaintiff's second

---

[1] It is unclear, but Plaintiff may also claim that his assignment to Philadelphia was discriminatory. Philadelphia, to Plaintiff, was inconvenient, did not pay as well, and restricted his opportunities to attend service calls because he was denied a company vehicle (discussed infra).

2019 U.S. Dist. LEXIS 74774, *6

Motion for Leave to Amend on August 13, 2018. Plaintiff filed his SAC on August 20, 2018. The SAC contains seven counts: (1) for retaliation under federal and state discrimination laws and the federal and New Jersey constitutions; (2) for creation of a hostile work environment and retaliation (the basis in law is unclear); (3) for discrimination against Plaintiff on the basis of age under the *Age Discrimination in Employment Act* ("ADEA"); (4) for wrongful termination (the basis in law is unclear); (5) for racial discrimination, under the New Jersey Law Against Discrimination ("NJLAD") and federal and state constitutions; (6) for New Jersey common law breach of contract; and (7) "wrongful discharge as a result of negligent investigation" (the basis in law is unclear).

It **[*7]** is the SAC which is the subject of Defendants' (here including both Defendant Schindler and Individual Defendants) Motion to Dismiss presently before the Court, and filed on September 7, 2018. Plaintiff opposed Defendants' Motion to Dismiss. Defendants filed a reply on October 9, 2018, under seal. Attached to that reply is a document entitled "Negotiated Settlement Agreement and General Release" (the "Release"), which was purportedly signed by the parties in June 2012 and concerns the first charge of discrimination brought by Plaintiff after he was laid off in 2011. It is this document that is the subject of Defendants' Motion to Seal, filed on October 23, 2018, Plaintiff's November 3, 2018 letter requesting the Court to strike this document from the record, and various other letters filed by both parties. As all of these matters have been fully briefed by the parties, they are ripe for adjudication.

## ANALYSIS

### A. Subject Matter Jurisdiction

This Court has subject matter jurisdiction over the case pursuant to *28 U.S.C. §§ 1331* and *1367*.

### B. Motion to Dismiss Standard

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, a court must accept **[*8]** all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005)*. It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*.

"While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (alteration in original) (citations omitted) (first citing *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*; *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994)*; and then citing *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)*).

> To determine the sufficiency of a complaint, a court must take three steps. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011)* (alterations in original) (citations omitted) (quoting **[*9]** *Ashcroft v. Iqbal, 556 U.S. 662, 664, 675, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*). A court may "generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014)* (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)*).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *Twombly, 550 U.S. at 563 n.8* (quoting *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*; see also *Iqbal, 556 U.S. at 684* ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); *Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)* ("Iqbal . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before Twombly."). "A motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to relief

2019 U.S. Dist. LEXIS 74774, *9

that is plausible on its face.'" *Malleus, 641 F.3d at 563* (quoting *Twombly, 550 U.S. at 570*).

### C. Defendants' Motion to Dismiss

Defendants make several arguments[2] in their Motion to Dismiss. First, Defendants argue that the NJLAD does not apply to the set of facts presented by this case because Plaintiff worked in Pennsylvania, not New Jersey. Second, Defendants argue that Plaintiff has failed to exhaust his ADEA claim. Third, Defendants argue that Plaintiff has failed to exhaust his Title VII claims. Fourth, Defendants argue Plaintiff **[*10]** cannot bring state or federal constitutional claims because Defendants are not state actors. Fifth, Defendants argue Plaintiff has failed to adequately allege a *42 U.S.C. § 1981* claim. Sixth, Defendants argue Plaintiff's New Jersey and Pennsylvania common law claims are statutorily preempted by NJLAD and the *Pennsylvania Human Relations Act* ("PHRA"). Seventh, Defendants argue Plaintiff has failed to adequately allege a breach of contract claim. Eighth, and finally, Defendants argue any claims dismissed against Defendant Schindler must also be dismissed against Individual Defendants. The Court will address each argument in turn.

#### a. Whether NJLAD Applies

The threshold issue for the NJLAD claims is simply stated: may Plaintiff seek relief under it or not. The arguments of the parties can also be stated quite simply: Defendants argue that Plaintiff worked in Pennsylvania at the time of the alleged discriminatory conduct while Plaintiff argues discriminatory conduct was ongoing — stemming back pre-2011 — and occurred mostly while he was in New Jersey, with the final termination occurring only after he worked in Pennsylvania briefly. But, the facts are slightly more complicated than the parties indicate.

 **[*11]** It is best to start with the undisputed facts. In 1989, Plaintiff was hired by Defendant as an elevator mechanic. He was laid off, allegedly for lack of work, in 2011. Thereafter, Plaintiff filed a civil rights complaint. Before the civil rights complaint reached state or federal court, Defendant rehired Plaintiff. Plaintiff alleged that "Defendant settled that claim." (Pl.'s SAC ¶ 33.) Both of these events occurred at some point in 2012. Plaintiff

may have worked briefly in a New Jersey casino, apparently for just a couple of weeks,[3] and then spent the next eighteen months in Philadelphia, Pennsylvania working at a building at 1735 Market Street. On May 29, 2014, Plaintiff was "told to report to [Defendant]'s main office in Moorestown[,] New Jersey" and was terminated for alleged "theft of a water jug." (Pl.'s SAC ¶ 17.)

There are also significant disputed facts, which complicate the legal analysis here. The most important disputed facts relate to the Release, purportedly signed in June 2012. Defendants assert this was signed by Plaintiff in June 2012 and that it means, for this case, that any allegations pre-2011 have been waived and cannot be considered. The legal implications of this **[*12]** fact is central to Defendants' argument, as presented. Plaintiff asserts, through his opposition brief and in a separate letter[4] to the Court, that he never signed the Release and that he has waived no rights. Plaintiff also seems to assert there were discovery violations and that, even if Plaintiff had signed the release, it is of no legal significance.

Of course, the Court agrees, "[t]he law of the state of the employee's workplace applies to claims arising from his employment because the state has an 'unusually strong interest in applying its own law to employment contracts involving work in [its] state.'" *Satz v. Taipina, No. 01-cv-5921 (JBS), 2003 U.S. Dist. LEXIS 27237, at *45 (D.N.J. Apr. 15, 2003)*, aff'd, 122 F. App'x 598 (3d Cir. 2005) (quoting *Shamley v. I.T.T. Corp., 869 F.2d 167, 172 (2d Cir. 1989))* (emphasis added, second alteration in original). Neither the state of the employee's residence (here, New Jersey) or the state of the employer's headquarters (again, New Jersey) factors into the analysis. *Id. at *46*. Nor does it matter that the

---

[2] While this Court will address every argument made by Defendant, the Court notes it will not do so in the order presented by Defendant.

[3] The Court does note for the record that Plaintiff's SAC does not contain a specific allegation about his brief tenure in a New Jersey casino sometime in 2012. Defendants rightly point this out, but it appears the SAC makes an oblique reference. (Pl.'s SAC ¶ 9 (". . . who was working briefly in New Jersey at the onset of his discrimination claims against defendant.").)

[4] Plaintiff's filing of letters in this manner is inappropriate. Not only does Plaintiff's opposition brief not properly follow the Local Civil Rules of Procedure in terms of spacing and font, Plaintiff has also chosen to file a letter instead of a motion. If Plaintiff wishes to file a sur-reply, Plaintiff should consult the Local Rules and do as they instruct. If Plaintiff wishes to file an objection or motion to strike, Plaintiff should consult the Local and Federal Rules and do as they instruct. However, for the sake of completeness, the Court will consider these filings (and Defendants' responses).

2019 U.S. Dist. LEXIS 74774, *12

decision to terminate Plaintiff emanated from or was told to Plaintiff in New Jersey. See *Albert v. DRS Techs., Inc., No. 10-3886, 2011 U.S. Dist. LEXIS 55320, at *5-6 (D.N.J. May 23, 2011)* (holding that, even if the decision to terminate emanated from New Jersey, this alleged discriminatory conduct was not enough to allow application of NJLAD when the plaintiff did not work in New Jersey).

But, **[*13]** disregarding those facts which this Court finds legally irrelevant — Plaintiff's residence, Defendant Schindler's headquarters, and where the decision to terminate was made or occurred — the Court cannot dismiss the NJLAD claims. Reading Plaintiff's SAC in the light most favorable to Plaintiff, the SAC does appear to allege Defendant's discriminatory conduct pre-dated 2011 and continued through Plaintiff's time in Pennsylvania. (Pl.'s SAC ¶¶ 9, 10, 12, 26, 31, 34, 38, 59.) Thus, whether that conduct should or should not be considered by the Court in determining the application of NJLAD could tip the scales in favor of either Plaintiff or Defendants.

The question of whether the pre-2011 conduct may be considered depends entirely — according to Defendants — upon whether the release was executed by Plaintiff and the legal ramifications of that execution. Plaintiff disputes that he ever signed the release and also presents argument as to why — even if he signed it — it should have no legal significance upon this case. This is a question of law where the facts matter, and those facts are disputed. While it may be improbable that Plaintiff did not sign the release, it is neither implausible **[*14]** nor impossible. Because that is the case, the Court finds, considering the current procedural posture of the case and the factual assertions of both parties in the SAC, briefs, letters, and attachments, it must deny Defendants' motion to dismiss on this point. However, if after appropriate discovery the undisputed facts support Defendants' argument that Plaintiff may only assert claims arising from his Philadelphia workplace Defendants may move for summary judgment on Plaintiff's NJLAD claims.

b. Whether Plaintiff Failed to Exhaust the ADEA Claim

Defendants argue that Plaintiff's ADEA claim must be dismissed for failure to exhaust administrative remedies. Defendants specifically argues that Plaintiff cannot bring an ADEA claim in federal court without first filing a charge with the EEOC. Plaintiff admits that he "did not explicitly specify age discrimination upon his 2014 claim" before the EEOC. (Pl.'s Opp'n Br. 14.) Plaintiff thereafter argues that

[b]ecause defendant in this case continued to discriminate against the plaintiff and because a right-to-sue letter is not required, plaintiff is not required to refile an administrative complaint alleging age discrimination. Plaintiff has thus **[*15]** exhausted all administrative remedies with regard to the ADEA claim.

(Pl.'s Opp'n Br. 14.) In other words, Plaintiff presents two arguments: (1) because the actions are a continuing violation related to a previously filed administrative complaint there is no need to re-file and (2) a right-to-sue letter is not required by the ADEA to file a claim in federal court.

Defendants are correct and Plaintiff has not presented any argument to the contrary. Generally, a plaintiff asserting an ADEA claim "must file a charge with the EEOC within 180 days of the alleged employment action." *Marina Wood v. Kaplan Props., No. 09-1941 (JLL), 2009 U.S. Dist. LEXIS 89834, at *7 (D.N.J. Sept. 29, 2009)* (citing *29 U.S.C. § 626(d)*). Because Plaintiff brought the claims in New Jersey, that deadline is "extended to 300 days." Id.; *Hildebrand v. Allegheny Cty., 757 F.3d 99, 111 (3d Cir. 2014)* (citing *29 U.S.C. §§ 626(d)(2)* & *633(b)*; *Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000)*). The Third Circuit has termed this a "condition precedent to filing suit under the ADEA." *Hildebrand, 757 F.3d at 111* (citing *Seredinski v. Clifton Precision Prods. Co., Div. of Litton Sys., Inc., 776 F.2d 56, 64 (3d Cir. 1985)*).

Plaintiff's first argument fails based on its own reasoning. While Plaintiff may not be required to refile if he was asserting the same claim a second time, the Plaintiff is not doing so in this case. The Court notes Plaintiff would like the Court to consider the previous actions of Defendants in determining the merits of Plaintiff's instant claim. Even if the Court did so here, Plaintiff's **[*16]** claim is categorically different. Plaintiff is alleging a new adverse action under new circumstances. To allow Plaintiff to subvert the administrative process in this way, which is statutorily prescribed by Congress to encourage mediation and settlement in lieu of litigation, would open an unintended loophole in the law. The Court will not do so here.

Plaintiff's second argument is a red herring. Whether Plaintiff needs a right-to-sue letter is irrelevant, as Plaintiff never specified an age discrimination claim in his administrative complaint, which is a requirement separate and apart from the right-to-sue letter. Thus, the Court will dismiss Plaintiff's ADEA claim, with prejudice, for failure to exhaust administrative remedies.

2019 U.S. Dist. LEXIS 74774, *16

c. Whether Plaintiff Failed to Exhaust the Title VII Claims

Defendants argue the Title VII claims brought by Plaintiff must be dismissed for failure to exhaust administrative remedies — specifically a failure to receive a right-to-sue letter.[5] Plaintiff argues he may proceed absent a right-to-sue letter because, as long as he was entitled to it, it need not be in his possession before he files a complaint. Essentially, Plaintiff argues he had the right to sue [*17] in state or federal court once the specified time period had elapsed from the time of the filing of his administrative complaint with the EEOC.

Plaintiff states he dual-filed a complaint with the NJDCR and the EEOC on July 15, 2014. However, "[o]n March 23, 2015, 251[6] days later, Plaintiff withdrew his complaint and requested a right-to-sue and was issued a Right-to-sue letter by the NJDCR. . . . The State informed him that it was all he needed. Plaintiff counsel also requested a right-to-sue from the EEOC . . . ." (Pl.'s Opp'n Br. 12.) Regardless of what an individual at the NJDCR may have said to him, Plaintiff does not dispute that he withdrew his EEOC claims. (Pl.'s Opp'n Br. 12.) Plaintiff also does not dispute that he has never received a right-to-sue letter. (Pl.'s SAC ¶ 25 ("[Plaintiff] did not receive a notice of right to sue from EEOC. He was told by the Director of NJDCR that it would not be forthcoming from the EEOC agency because the later [sic] did not investigate the claim.").) Defendants argue the withdrawal of Plaintiff's claims before the EEOC means he will not receive a right-to-sue letter and therefore cannot, as a matter of law, bring a Title VII claim in federal [*18] court.

The case law is clear. As explained in Schwinge v. Deptford Township Board of Education:

A plaintiff must exhaust those remedies by obtaining a right-to-sue letter before she may file a complaint in court. Ditzel v. Univ. of Med. & Dentistry, 962 F. Supp. 595, 602-03 (D.N.J. 1997)

[5] Defendant also argues that the May 23, 2018 Order of Magistrate Judge Williams already addressed this issue. It did so in part. But, it did not address the exact issue now presented to the Court concerning the allegations made in the SAC because those issues were not before it. Thus, while this Court is guided by that Order, it must decide issues not presented to Judge Williams.

[6] Although of no legal significance here, the Court notes Plaintiff's SAC states it was 250, not 251 days. (Pl.'s SAC ¶ 25.)

(citing 42 U.S.C. § 2000e-5). Thus, a claimant who voluntarily withdraws her administrative charge of discrimination before obtaining a right-to-sue letter fails to exhaust administrative remedies and may not sue in court. See Brundage v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Local #401, No. 00-4549, 2007 U.S. Dist. LEXIS 81036, at *33 (E.D. Pa. Oct. 24, 2007) . . . .

No. 09-5964 (RBK/JS), 2011 U.S. Dist. LEXIS 16610, at *14 (D.N.J. Feb. 17, 2011). This is undoubtedly the case here, so the Court must dismiss Plaintiff's Title VII claims in their entirety.

While Plaintiff is correct that a litigant lacking a right-to-sue letter who is otherwise entitled to one has exhausted administrative remedies, Plaintiff has failed to show he was entitled to a right-to-sue letter. This narrow exception is meant to allow litigants to proceed to federal court even when the EEOC may be slow in completing its obligations. As shown by the case law above, one is not entitled to a right-to-sue letter if one has withdrawn his claim before receiving a right-to-sue letter.

Accordingly, this Court will dismiss all Title VII claims to the extent they [*19] are asserted in Plaintiff's SAC, with prejudice. Specifically, the Court finds they have been asserted in Count II. As a result, this Court will not consider Defendants' argument concerning whether those same claims are adequately pled. (Def.'s Mot. for Summ. J. 15-18.)

d. Whether Plaintiff Has Adequately Pled Federal and State Constitutional Claims

Defendants argue that Plaintiff's state and federal constitutional claims, asserted in Counts I and V, must be dismissed because Defendants are not state actors. Defendants argue that the law demands dismissal whether the claim is based on federal, New Jersey, or Pennsylvania law. Plaintiff provides no argument in opposition to Defendants' assertion.

It appears in Count I that Plaintiff is claiming, in part, a violation of the federal and New Jersey constitutional rights for retaliatory and racial discrimination. (Pl.'s SAC ¶ 28.) Under what provisions of these constitutions Plaintiff claims rights or alleges violations is unclear. In Count V, it is clear that Plaintiff is asserting Defendants have violated his federal and state constitutional rights — here the states being Pennsylvania and New Jersey - under an equal protection clause theory. (Pl.'s SAC ¶ 56.)

2019 U.S. Dist. LEXIS 74774, *19

**[\*20]** To the extent Plaintiff attempts under Counts I or V to assert a federal, Pennsylvania, or New Jersey constitutional claim, the Court must dismiss those claims. Defendants are correct that both New Jersey and federal law require a state actor for such a claim. *Caldwell v. KFC Corp., 958 F. Supp. 962, 966 (D.N.J. 1997)* (citing *Robinson v. Cahill, 62 N.J. 473, 303 A.2d 273, 282 (N.J. 1973); State v. Schmid, 84 N.J. 535, 423 A.2d 615, 628 (N.J. 1980))*. Because Defendant Schindler is undeniably a private company and Individual Defendants private actors, they cannot be considered state actors under New Jersey or federal law. Id. Defendants also address Pennsylvania law in a footnote. (Defs.' Mot. for Summ. J. 19, n.9.) To the extent Plaintiff also asserts a Pennsylvania constitutional claim, it must be denied for the same reason: there was no state actor here. *Maylie v. Nat'l R.R. Passenger Corp., 411 Pa. Super. 199, 601 A.2d 308, 313 (Pa. Super. Ct. 1991)* ("The provisions of the Constitution do not reach the acts of purely private actors."). Accordingly, this Court will dismiss all constitutional claims in Counts I and V requiring a state actor, with prejudice.

e. Whether Plaintiff Has Adequately Pled a Claim Under *42 U.S.C. § 1981*

In Plaintiff's opposition, Plaintiff asserts he has adequately alleged a *§ 1981* claim. Defendants assert he has not, stating that the SAC contains no *§ 1981* cause of action. Of note, Defendants state Plaintiff attempted to assert a *§ 1981* cause of action in a proposed complaint that was rejected by Judge Williams and that the complaint filed, the SAC, does not contain that claim. (Compare ECF Nos. 45 and 53.) The Court finds that Plaintiff has thus not asserted a *§ 1981* claim, as in the rejected complaint he has a count specifically for *§ 1981* and in the SAC he does not. The Court finds this even though Plaintiff references "1981" at a few points in the SAC. (See Pl.'s SAC ¶¶ 9, 42.) Those references appear **[\*21]** to be a result of poor editing rather than careful consideration. In other words, it does not appear that Plaintiff meant to assert a *§ 1981* claim.

But, that does not mean Plaintiff may not or cannot assert one. "When used as parallel bases for relief or companion remedies, Title VII and *42 U.S.C. §§ 1981* and *1983* require the same elements for their causes of action and courts incorporate the same standards when assessing the employment discrimination claims." *Behrens v. Rutgers Univ., No. 94-cv-358 (JBS), 1996 U.S. Dist. LEXIS 22311, at \*13 (D.N.J. Mar. 29, 1996)* (citing *Whiting v. Jackson State Univ., 616 F.2d 116,*

*121 (5th Cir. 1980); Boutros v. Canton Reg'l Transit Auth., 997 F.2d 198, 202 (6th Cir. 1993))*. And, as has long been the case, Title VII and NJLAD are analyzed identically, or nearly so. Id. (citations omitted). Thus, because the NJLAD claims have not been attacked on their substance, a *§ 1981* could theoretically be asserted.

For that reason, this Court will grant Defendants' Motion to Dismiss on these grounds, but notes Plaintiff may move for leave to amend and add a *§ 1981* claim.

f. Whether Plaintiff's New Jersey Common Law Claims Are Statutorily Preempted

Defendants argue Plaintiff's common law claims must be dismissed because they are statutorily preempted and are artificial causes of action[7]. According to Defendants, because the common law claims are based on the same facts and request the same relief as **[\*22]** the state statutory causes of action, they are preempted. Plaintiff does not respond to this particular argument. Instead, Plaintiff argues he has stated a claim for negligent investigation because he has asserted a claim for hostile workplace. There are two claims, one for wrongful termination and the other for wrongful termination as a result of negligent investigation. Defendants address these claims jointly, first under New Jersey law and then under Pennsylvania law. The Court will do the same here.

Before it does so, the Court will examine the wrongful termination claims. The first wrongful termination claim, asserted in Count IV of the SAC, appears to be based upon discrimination. There, Plaintiff states that his "request for increased responsibility and benefits that were comparable to his level of seniority and in comparison, to his white coworkers was met with disapproval and retaliation." (Pl.'s SAC ¶ 53.) The Court construes these allegations as claiming wrongful termination either on the basis of race or by retaliation. Both of these bases are claimed in the SAC under the NJLAD.

The second wrongful termination claim, asserted in Count VII, appears to also be based upon discrimination. **[\*23]** There, Plaintiff claims his

---

[7] Defendants also allege that the negligent investigation claim is "an artificial cause of action." Under New Jersey law, the basis for dismissal is not that it is not a recognized cause of action, but that it is statutorily preempted. Thus, the Court will only address this particular argument to the extent it applies in Pennsylvania.

Pooja Bhutani

termination was "based upon a 'false allegation.'" (Pl.'s SAC ¶ 72.) Although the allegations are not a model of clarity, Plaintiff is more detailed in briefing. There, Plaintiff states that his "wrongful termination in conjunction with the ongoing differential treatment are sufficient to meet the standard for a Hostile Workplace claim" when discussing whether he has "allege[d] sufficient facts to support a claim of negligent investigation and hence a claim of hostile workplace." (Pl.'s Opp'n Br. 24, 26.) Based on those statements, the Court finds Count VII is based upon a hostile workplace claim.

First, Defendants argue that both the wrongful termination claims must be dismissed because they are statutorily preempted by New Jersey law. The law in this District holds that no "supplementary common law cause[s] of action" is allowed "where the NJLAD provides a remedy for the wrong." *Butler v. Sherman, 755 F. Supp. 1259, 1265 (D.N.J. 1990)*. On that basis, the court in Butler dismissed a "common law claim of wrongful discharge on racial discrimination grounds." *Id. at 1263-65*.[8]

Second, Defendants argue that both the wrongful termination claims must be dismissed because they are statutorily preempted by Pennsylvania law. Because the **[*24]** PHRA provides a statutory remedy for the wrongful termination claims brought by Plaintiff, the "common law action designed to redress the same injury is rendered superfluous." *Vega Pacheco v. Kazi Foods of N.J., Inc., No. 03-cv-2186, 2004 U.S. Dist. LEXIS 11280, at *18 (D.N.J. Apr. 7, 2004)* (quoting *McGovern v. Jack D'S, Inc., NO. 03-cv-5547, 2004 U.S. Dist. LEXIS 1985, at *22 (E.D. Pa. Feb. 3, 2004))*. See also *Clay v. Advanced Comput. Applications, 522 Pa. 86, 559 A.2d 917, 918 (Pa. 1989)* ("[T]he PHRA provides a statutory remedy that precludes assertion of a common law tort action for wrongful discharge based upon discrimination."). In that case, the Court dismissed a negligence claim on preemption grounds. *Id. at *16-18*.

Moreover, it appears Defendants are also correct that — even if these claims were not preempted —

Pennsylvania law does not recognize the wrongful discharge claims asserted by Plaintiff. Pennsylvania only permits wrongful discharge claims under the following circumstances:

> "An employer (1) cannot require an employee to commit a crime [and fire the employee for refusing to do so], (2) cannot prevent an employee from complying with a statutorily imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute."

*Fraser v Nationwide Mut. Ins. Co., 352 F.3d 107, 111 (3d Cir. 2003)* (quoting *Hennessy v. Santiago, 708 A.2d 1269, 1273 (Pa. Super. Ct. 1998))* (alterations in original). Plaintiff's wrongful termination claims do not fall within any of these three categories.

**[*25]** Accordingly, for the reasons stated supra, the Court will dismiss the New Jersey common law claims and the Pennsylvania common law claims, with prejudice. Based on the Court's ruling supra concerning the NJLAD claims, it is improper at this time to allow those common law claims to proceed. If the Court later determines NJLAD is inapplicable to this case, Plaintiff's common law claims would fall on the same basis in that Plaintiff's claims arise from alleged discrimination in Pennsylvania, presumably beyond the reach of New Jersey common law.

Alternatively, if the Court allows the NJLAD claims to proceed, any common law claims based on New Jersey law are pre-empted. The Pennsylvania common law claims, on the other hand, are clearly not recognized and thus do not state a cause of action no matter whether the claims in this case arise under Pennsylvania or New Jersey law. In other words, regardless of whether the PHRA is applicable, these claims are not cognizable.

g. Whether Plaintiff Has Adequately Pled a New Jersey Breach of Contract Claim

Defendants argue Plaintiff has failed to adequately allege a breach of contract claim under New Jersey common law. Defendants argue that the combination of the facts that (1) Plaintiff was an at-will employee, (2) Plaintiff has failed to point to a contract, and (3) that unfair discipline **[*26]** is legally insufficient to state a breach of contract claim requires this Court to dismiss it. Plaintiff argues because he was a part of a union, he had an express contract and that the employee manual in concert with the implied covenant of good faith and fair dealing are enough to constitute a breach of contract claim here.

---

[8] Additionally, under New Jersey law, an "action in negligence against an employer is barred by *New Jersey Workers Compensation Act*." *Silvestre v. Bell Atl. Corp., 973 F. Supp. 475, 486 (D.N.J. 1997)*. This presents an alternate basis under New Jersey law under which Plaintiff's common law claims here may be preempted.

2019 U.S. Dist. LEXIS 74774, *26

Before addressing Defendants' argument, it is important to describe what Plaintiff's SAC actually alleges. Plaintiff's SAC bases the breach of contract claim on Defendant Schindler's "policies and/or its practices regarding the terms of his employment and the implementation of those policies with respect to him and his co-workers." (Pl.'s SAC ¶ 62.) Nowhere in Plaintiff's SAC — at least nowhere this Court can find — does Plaintiff allege that he was a union employee with an express contract. Reading Plaintiff's SAC in a light most favorable to Plaintiff only allows this Court to find Plaintiff is basing his breach of contract claim upon the employee manual. Moreover, the only "contract" Plaintiff attaches to his brief are Defendant Schindler's employment policies. (Pl.'s Opp'n Br., Ex. E.) Thus, this Court will not consider whether there was an express union contract [*27] that was breached.

Plaintiff's breach of contract claim, as pled, fails. It appears Plaintiff's claim is that Defendant Schindler's policy created an implied contract which Defendant Schindler thereafter breached. This type of claim, an exception to the general presumption of at-will employment in New Jersey, was first recognized in *Woolley v. Hoffmann-La Roche, 99 N.J. 284, 491 A.2d 1257 (N.J. 1985)*. But, the right is narrowly circumscribed. New Jersey's Supreme Court held that, only when there is no "clear and prominent disclaimer" that "an implied promise contained in an employment manual that an employee will be fired only for cause" is enforceable in a breach of contract action. *Id. at 1258*.

A necessary pre-requisite for a so-called Woolley claim is that a plaintiff has pointed to "'some provision or language in the employment manual that guarantees the employee will not be terminated except for good cause.'" *Bell v. KA Indus. Servs., LLC, 567 F. Supp. 2d 701, 710 (D.N.J. 2008)* (quoting *Doll v. Port Auth. Trans-Hudson Corp., 92 F. Supp. 2d 416, 423 (D.N.J. 2000)*). Plaintiff has failed, in both the SAC and his briefing, to point to any provision which requires good cause for termination. Moreover, the progressive discipline policy that is the basis of Plaintiff's claim specifically states "[n]o statement in this program is intended as a contractual commitment or obligation of the Company to any individual [*28] employee or group of employees." (Pl.'s Opp'n Br., Ex. E 95.) Accordingly, this Court will dismiss Plaintiff's Woolley claim, with prejudice.

h. Whether Plaintiff Has Adequately Pled Claims Against Individuals

Finally, Defendants moves on two separate grounds to dismiss claims, to the extent asserted, against the Individual Defendants. First, Defendants argue that to the extent this Court dismisses claims against Defendant Schindler, the Court should also dismiss claims against Individual Defendants. Second, Defendants argue that Plaintiff has not alleged NJLAD claims against Individual Defendants because Plaintiff has not alleged a claim of aiding and abetting. Plaintiff does not offer any argument in opposition.

Because the grounds for dismissal of the claims against Defendant Schindler are neither based on its legal status (a corporation) nor on its actions, this Court will dismiss all claims dismissed against Defendant Schindler on the same grounds and with the same affect against Individual Defendants.

The Court also finds that Plaintiff has not alleged an aiding and abetting claim against any of the Individual Defendants. The only mechanism available to a plaintiff to assert individual [*29] liability for a supervisor "for acts of discrimination or for creating or maintaining a hostile environment" is aiding and abetting. *Cicchetti v. Morris Cty. Sheriff's Office, 194 N.J. 563, 947 A.2d 626, 645 (N.J. 2008)* (citing *N.J. STAT. ANN. 10:5-12(e)*). But, not once in Plaintiff's SAC does he mention "aiding and abetting" nor does he mention Individual Defendants besides naming them as parties and stating they terminated him, falsely, for theft. (Pl.'s SAC ¶¶ 4-6, 17.) These allegations do not suffice to meet the three elements required of an aiding and abetting claim. See *Cicchetti, 947 A. 2d at 645* (requiring (1) a wrongful act which causes injury, (2) general awareness of role in illegal activity at the time of assistance, and (3) knowing and substantial assistance). Accordingly, this Court will dismiss this claim, without prejudice. Plaintiff may move for leave to amend at any appropriate time to add this claim.[9]

**D. Defendants' Motion to Seal**

Defendants request this Court to permanently seal docket item 68-2, the Release. Plaintiff has filed opposition, through multiple letters, essentially stating he will not consent to the sealing because he disputes the authenticity of the document. Plaintiff does not object to the sealing of this document except on those limited grounds.

_____

[9] The Court will not address Defendants argument concerning *Federal Rule of Civil Procedure 15(c)* as it appears all claims against Individual Defendants have been dismissed. At this time, this argument will be denied, without prejudice, as moot.

2019 U.S. Dist. LEXIS 74774, *29

Defendants have shown how its Motion to **[*30]** Seal satisfies *Local Rule 5.3(c)*. First, the document to be sealed is purportedly a confidential settlement agreement and release. Second, the alleged parties to the release, assuming its authenticity, both agreed to maintain its confidentiality. Thus, each party allegedly has a private contractual interest in its continued confidentiality. Third, the serious injury that would result would allegedly be breach of the release by the parties. Fourth, a less restrictive means — including redaction — is unavailable because, allegedly, the parties are contractually obligated to maintain the entire document in confidence. Thus, Defendants have satisfied *Local Rule 5.3(c)*.

Even so, Defendants satisfy *Local Rule 5.3(c)* only if the document is authentic. Accordingly, while the Court awaits a possible determination of this document's authenticity, it will remain under seal. To permanently seal it would attest to its authenticity just as unsealing it would attest to its inauthenticity. The Court is not able to rule on this issue at this time. Thus, the Court will maintain the document under temporary seal. If the Court later determines the document is not genuine, Plaintiff may make an appropriate motion to unseal it. Similarly, Defendant may make **[*31]** a motion to permanently seal it if the Court finds it genuine. For those reasons, this Court will grant Defendant's Motion to Seal, in part, and deny it, in part.

### E. Plaintiff's Request to Strike

Plaintiff has also requested, in a document entitled "Letter Memorandum in Opposition to Defendant's Introduction of a Purported Waiver as Evidence" that this Court strike the release from the record. The basis for Plaintiff's Motion to Strike is that the release is fraudulent. Since discovery is not yet complete on this issue and the parties have wholly divergent views of the issue, the Court will not grant Plaintiff's request to strike the release as Plaintiff's factual basis is deficient. The Court will deny Plaintiff's request, without prejudice. As with the Motion to Seal, if Plaintiff hereafter acquires a sufficient basis it may re-file a Motion to Strike at any appropriate time.

### F. Plaintiff's Request for Leave to Amend

Plaintiff has requested leave to amend. While the Court recognizes that leave to amend shall be freely given and that it is particularly applicable to civil rights cases, the

Court has dismissed most claims challenged with prejudice. Amendment of those claims would be futile. **[*32]** Some claims were dismissed without prejudice, but are contingent upon a possible future decision of the Court or Plaintiff's ability to properly plead them. Thus, at this time, the Court will deny Plaintiff's request for leave to amend, without prejudice. If Plaintiff determines that filing a motion for leave to amend is appropriate under the Local and Federal Rules, Plaintiff may do so at that time.

### CONCLUSION

For the foregoing reasons, the Court will grant, in part, and deny, in part, Defendant's Motion to Dismiss; will grant Defendant's Motion to Seal, in part and deny it, in part; will deny, without prejudice, Plaintiff's request to strike and for further leave to amend. Plaintiff may make a separate motion to strike or for leave to amend at any appropriate time and it will be considered in due course.

An appropriate Order will be entered.

Date: May 2, 2019

At Camden, New Jersey

/s/ Noel L. Hillman

NOEL L. HILLMAN, U.S.D.J.

### ORDER

### HILLMAN, District Judge

For the reasons expressed in the Court's Opinion filed today,

IT IS on this 2nd day of May, 2019

**ORDERED** that Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint [61] is hereby **GRANTED, IN PART**, and **DENIED, IN PART;** and it is **[*33]** further

**ORDERED** that Defendants' Motion to Seal [69] is hereby **GRANTED, IN PART**, and **DENIED, IN PART**; and it is further

**ORDERED** that the Clerk shall temporarily **SEAL** docket entry 68-2; and it is further

**ORDERED** that Plaintiff's request for leave to amend the Second Amended Complaint [66] is hereby **DENIED, WITHOUT PREJUDICE**; and it is further

2019 U.S. Dist. LEXIS 74774, *33

**ORDERED** that Plaintiff's request to strike [70] docket entry 68-2 is hereby **DENIED, WITHOUT PREJUDICE**.

At Camden, New Jersey

/s/ Noel L. Hillman

NOEL L. HILLMAN, U.S.D.J.

---

**End of Document**