James J. Panzini, Esq. (Bar ID: 022101990)
Pooja Bhutani (Bar ID: 169592016)
**JACKSON LEWIS P.C.**
766 Shrewsbury Avenue
East Tower, Suite 101
Tinton Falls, New Jersey 07724
T: 732-532-6148
F: 732-842-0301
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RESHMA ABELL, | : |
| | : Civil Action No.: |
| Plaintiff, | : 2:18-cv-16509 (MCA) (AME) |
| | : |
| v. | : |
| | : **ORAL ARGUMENT REQUESTED** |
| PACIRA PHARMACEUTICALS, INC., DAVE STACK, individually and in his capacity as Chief Executive Officer of PACIRA PHARMACEUTICALS, INC., and RICH KAHR, PETER MURPHY, DENNIS McLOUGHLIN, PAUL CIAVOLELLA, GLENN REISER, JOYCE DAVIS AND MATT LEHMANN, in their capacities as employees of PACIRA PHARMACEUTICALS, INC., | : : : : : : : : : : |
| | : |
| Defendants. | : |

---

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

Of Counsel:
    James J. Panzini, Esq.

On the Brief:
    James J. Panzini, Esq.
    Pooja Bhutani, Esq

**STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE ISSUES EXIST**

Defendants Pacira Pharmaceuticals, Inc. ("Pacira" or "the Company"), Richard Kahr, Peter Murphy, and Glenn Reiser (collectively as "Defendants"), by and through their attorneys, Jackson Lewis P.C., respectfully submit the following statement of material facts as to which there are no genuine disputed issues pursuant to *Fed. R. Civ. P.* 56 in support of its motion for summary judgment.  Plaintiff Reshma Abell's ("Plaintiff") sworn deposition testimony will be accepted as true *solely* for the purpose of this Motion for Summary Judgment.

**I.**     **Introduction**

1.     Pacira Pharmaceuticals, Inc. is a specialty pharmaceutical company that makes a non-opioid analgesic for post-surgical pain management known as Exparel, and other related non-opioid pain management products. (Certification of Richard Kahr, ¶ 2 ("Kahr Cert.")).

2.     On November 28, 2018, Plaintiff filed a Five Count Complaint in the United States District Court, District of New Jersey against Pacira, and individuals, Dave Stack, Rich Kahr, Peter Murphy, Dennis McLoughlin, Paul Ciavolella, Glenn Reiser, Joyce Davis, and Matt Lehmann, alleging: (1) sex discrimination under the New Jersey Law Against Discrimination ("NJLAD"); (2) sexual harassment hostile work environment under the NJLAD; (3) retaliation under the NJLAD; (4) retaliation under the New Jersey Conscientious Employee Protection Act, and; (5) retaliation under the Dodd Frank Wall Street Reform and Consumer Protection Act ("Dodd Frank Act.").  (Plaintiff's Complaint attached as Exhibit 1 to the Certification of James J. Panzini, Esq., (referred to herein as the "Panzini Cert.")).

3.     During the course of motion practice, Plaintiff voluntarily dismissed Count Five of her Complaint alleging claims of retaliation under the Dodd Frank Act.  The Court, in its order

following the motion to dismiss on July 31, 2019, confirmed the voluntarily dismissal of this count. (July 31, 2019 Court Order, p. 2, n. 3 [ECF No. 37] attached as Exhibit 2 to Panzini Cert.).

4.      In its Order on Defendants' motion to dismiss, the Court dismissed: Defendants Stack, McLoughlin, Ciavolella, Davis, and Lehmann from Count 1 for sex discrimination under the LAD; all individual Defendants from Count 2 for sexual harassment hostile work environment; Defendants McLoughlin, Ciavolella, Davis, and Lehmann from Count 3 for retaliation under the LAD; and Defendants Stack, David, and Lehmann for Count 4 for retaliation under CEPA. (Exhibit 2, Court Order, at pps. 7-8).

5.      Thus, following the Court's order on Defendants' motion to dismiss,  the Court held that the following claims remained: Count 1 for sex discrimination under the LAD against Pacira, Kahr, Murphy, and Reiser; Count 2 for sexual harassment hostile work environment under the LAD against Pacira; Count 3 for retaliation under the NJLAD against Pacira, Kahr, Murphy, and Reiser, and; Count 4 for retaliation under CEPA against Pacira, Kahr, Murphy, Reiser, Ciavolella, and McLoughlin. (Exhibit 2, Court Order, at pps. 7-8).

6.      Prior to the filing of the instant motion, Plaintiff voluntarily dismissed all claims against individual Defendants McLoughlin and Ciavolella. (Voluntary Stipulation of Dismissal [ECF No. 80] attached as Exhibit 3 to Panzini Cert.]

7.      As such, the remaining claims in this lawsuit are: (1) sex discrimination under the LAD against Pacira, Kahr, Murphy and Reiser; (2) sexual harassment hostile work environment under the LAD against Pacira; (3) retaliation under the LAD against Pacira, Kahr, Murphy and Reiser, and; (4) retaliation under CEPA against Pacira, Kahr, Murphy and Reiser. (Panzini Cert., ¶ 6).

8.      Kahr began working for Pacira in 2014. (Kahr Deposition Transcript ("Kahr Dep.") at 55:12-13 attached as Exhibit 4 to Panzini Cert.).   During Plaintiff's employment through present, Kahr has held the title of Vice President of Human Resources.  (Exhibit 4, Kahr Dep., at 55:24-56:1).  Kahr did not hire Plaintiff.  (Exhibit 4, Kahr Dep., at 54:7-9).

9.      Murphy worked for Pacira from January 20, 2014 to January 24, 2020.  (Kahr Cert., at ¶ 3).  During Plaintiff's employment, Murphy held the title of Northeast Regional Manager from January 20, 2014 to January 24, 2017, and Area Sales Manager, East from January 25, 2017 to July 17, 2017 (Id.).  Murphy was part of the hiring process for Plaintiff. (Relevant Excerpts of Murphy's Deposition Transcript ("Murphy Dep."), at 14:4-16:11 attached as Exhibit 5 to Panzini Cert.).

10.     At the time of Plaintiff's termination, Murphy held the role of Vice President, Sales. (Organizational Chart bearing bates numbers Pacira 000104, 000108, 000109, 000110, attached as Exhibit 6 to Panzini Cert.).  In this capacity, Murphy was a third level manager to Plaintiff. (Id. at Pacira 000104).

11.     During Plaintiff's employment, Reiser worked for Pacira in the roles of National Accounts Director from August 19, 2013 to August 28, 2015, Regional Business Director, Northeast, from December 5, 2016 to May 4, 2017, and Area Sales Director, East from May 5, 2017 to present. (Kahr Cert., at ¶ 4).

12.     At the time of Plaintiff's termination, Reiser held the role of Area Sales Director, East. (Exhibit 6, Organizational Chart, at Pacira 000104).  In this capacity, Reiser was a second level manager to Plaintiff; Plaintiff did not report directly to Reiser. (Relevant excerpts of Reiser's Deposition Transcript ("Reiser Dep."), at 10:19-11:2 attached as Exhibit 7 to Panzini Cert.).

13.     At the time of Plaintiff's termination, she reported directly to Roxanne Doherty who held the title of Regional Business Director. (Exhibit 6, Organizational Chart, at Pacira 000109).

## II.    Pacira's Policies Prohibit Discrimination, Harassment, and Retaliation, and It Sets Forth Clear Complaint Reporting Procedures

14.     Pacira is an Equal Employment Opportunity employer, and it has established policies which prohibit all forms of unlawful discrimination and retaliation in its Handbook and its Code of Conduct. (Relevant excerpts of Pacira's Employment Handbook identified as Pacira 000290, 000292-000294 attached as Exhibit 8 to Panzini Cert.).

15.     Additionally, Pacira's policies promote employees to report any violations of the Handbook or Code of Conduct, compliance rules, or ethics, including complaints of compliance issues, ethics, sexual harassment, discrimination, and retaliation. (Exhibit 8, Employment Handbook, pages identified as Pacira 000290, 000292-000294). The Handbook specifically permits employees to make anonymous complaints, provides instructions regarding who an employee may complain to, as well as provides a hotline phone number and two email addresses for complaints to be made. (Id., at Pacira 000291).

16.     Further, the policies designate more specific procedures regarding complaints of sexual or other harassment. (Id., at Pacira 000290 and 000292). The policies are also clear that retaliation for the making of any complaints is prohibited. (Id.).  Additionally, the policy states that an employee's "failure to report complains of unlawful harassment hampers the company's ability to take necessary steps to remedy such situations." (Id., at Pacira 000292).

17.     Further, Pacira regularly conducted trainings on the topics of its general handbook, anti-harassment, equal employment opportunity, the code of conduct and business conduct, sexual

harassment awareness, and the obligation for all employees to report adverse events. (Plaintiff's Training Records identified as Pacira 000029-32 attached as Exhibit 9 to Panzini Cert.).

18.     Indeed, Plaintiff attended trainings on the topics of the "Obligation of All Employees to Report Adverse Events," "Sexual Harassment Awareness for Employees," "Sexual Harassment Awareness for Managers," "Harassment in the Workplace," "Pacira – General Employee Handbook," and "Pacira's Code of Business Conduct and Ethics" in May 2014, July 2014, October 2014, May 2015, June 2015, September 2016, July 2017, October 2017, and December 2017. (Exhibit 9, Training Records, Pacira 000029-32).

19.     Plaintiff admitted she received the handbook, she was aware of reporting procedures, and attended trainings on the policies in the handbook, sexual harassment, harassment in the workplace, and the code of business conduct and ethics. (Relevant excerpts of Plaintiff's Deposition Transcript ("Abell Dep."), at 78:2-12, 93:18-94:9, 99:2-100:4, 101:9-102:6, 104:24-105:24, 106:15-107:1, attached as Exhibit 10 to Panzini Cert.).

20.     Plaintiff also testified that she is aware of the policy prohibiting retaliation, (Abell Dep. 79:1-3), and she understands what is offensive in the workplace because she attended the classes on sexual harassment. (Exhibit 10, Abell Dep., at 219:10-11).

21.     In or around February 5, 2018, approximately one week before the 2018 National Sales Meeting ("NSM"), Pacira also hosted a Sensitivity Training on the topics of harassment and its consequences, employer responsibilities, preventing harassment, responding to harassment, and liability to its managers. (Sensitivity Training identified as Pacira 001453-1543 attached as Exhibit 11 to Panzini Cert.).  Kahr facilitated this training to managers which included Matt Lehmann, Glenn Reiser, Peter Murphy, Robert Rock, Roxanne Doherty, and Dennis McLoughlin. (Id. at Pacira 001453).

### III.    Plaintiff's General Employment Background with Pacira

22.    Plaintiff began working for Pacira as a Surgical Account Specialist (Exhibit 10, Abell Dep., 10:6-7) in April 2014 (Abell Dep., at 40:25-41:5).  In 2016, (Id., at 126:8-15), Plaintiff was promoted to the role of Senior Surgical Account Specialist (Id., at 123:2-9).  Senior Surgical Account Specialist, or "SSAS" was the position Plaintiff officially held at the time of her termination. (Id., at 125:17-19).  Plaintiff's territory was part of the Northeast, specifically, New York City and Westchester, New York. (Exhibit 10, Abell Dep., at 110:13-15; Exhibit 6, Organizational Chart, at Pacira 000109).

23.    During Plaintiff's employment with Pacira, she was considered a "field rep." (Exhibit 10, Abell Dep., at 110:5-6).  Plaintiff was not required to report to a specific office; her work was primarily performed off-site, in the "field." (Id., at 110:1-14).  As a result, Plaintiff typically only met her peers during national or regional meetings a few times per year. (Id., at 110:5-11).

24.    In or around February 2017, Plaintiff presented the concept for a new job position titled Director of Post-Op Pain Management to Reiser and Murphy (Email identified as Pacira 001008 attached as Exhibit 12 to Panzini Cert; Exhibit 10, Abell Dep., at 143:1-5; Exhibit 5, Murphy Dep., at 24:21-14, 26:4-12; Exhibit 7, Reiser Dep., at 30:10-19, 33:13-16).  Reiser and Murphy agreed to allow Plaintiff to perform the proposed duties of this role as a "pilot." (Exhibit 5, Murphy Dep., at 26:13-16; Exhibit 7, Reiser Dep., at 33:21-23).

25.    In order for a new position to be created at Pacira, Kahr or other HR personnel would be involved in the process. (Exhibit 4, Kahr Dep., at 248:3-6).  Specifically, if a manager seeks approval for a new position, a job description would need to be created, a requisition with the job description would need to be attached and submitted through a review process for approval

by all successive managerial levels, Kahr, and the CEO. (Exhibit 4, Kahr Dep., at 60:12-61:12, 248:3-22; Exhibit 5, Murphy Dep., 126:17-127:20; Exhibit 7, Reiser Dep., 28:9-29:7, 34:11-14, 39:16-40:22, 87:18-89:8, 92:3-6).  Indeed, the Chief Executive Officer of Pacira must review the job position and give it a "final sign off."  (Kahr Dep., at 61:2-12; Exhibit 10, Abell Dep., at 136:4-7, 139:8-12, 145:22-146:23; Exhibit 5, Murphy Dep., at 126:17-127:20; Exhibit 7, Reiser Dep., at 28:9-29:7, 34:11-14, 39:16-40:22, 92:3-6).

26.     Pacira's CEO, David Stack, never "signed off" on the proposed Director of Post-Op Pain Management position, (Exhibit 10, Abell Dep., 136:4-7, 145:22-146:2).  The CEO's approval is required for any new job position to be created. (Exhibit 4, Kahr Dep., at 61:2-12; Exhibit 10, Abell Dep., at 136:4-7, 139:8-12, 145:22-146:23).

27.     The VP of Human Resources, Kahr, had never been contacted regarding the Director of Post-Op Pain Management position, and he had never been presented with a job requisition or job description for this proposed position. (Exhibit 4, Kahr Dep., at 248:3-22).

28.     Dennis McLoughlin, who was the Executive Director of Alliances at the time of Plaintiff's termination in February 2018 (McLoughlin Deposition Transcript ("McLoughlin Dep."), at 114:15-22 attached as Exhibit 13 to Panzini Cert.).  In this role, McLoughlin was a fourth level manager of Plaintiff. (Kahr Cert., at ¶ 5).  McLoughlin had never even heard of the job title, "Director of Post-Op Pain Management," or been involved in any conversation pertaining to the formation of this position or Plaintiff's promotion to a director level. (Exhibit 13, McLoughlin Dep., at 178:15-179:1).

29.     On the first day of Pacira's NSM, before any events commenced, Murphy and Reiser met with Plaintiff.  Reiser "encouraged Plaintiff to show her best at this meeting, so attend all – everything that she is supposed to, get there on time, be engaged, be positive [because] she

was very much on display given that she on the cusp of (sic) this new opportunity." (Exhibit 7, Reiser Dep., at 90:16-91:24).  Murphy advised "you need to do everything you can [at the NSM] to demonstrate and show that you are a leader, and you are capable of staying out of the fray, staying out of the bar, because you're now asking to be a leader of the company. . . pay attention in the breakouts.  Be a leader in the breakouts.  Don't get yourself in trouble, don't drink, and don't get in fights, and that'll set you up for, you know, a very good potential of, you know, sitting down with Dave. And we gave her that advice extremely sternly. . ." (Exhibit 5, Murphy Dep., at 149:16-22, 150:8-18).

30.    After Plaintiff had been reported to HR for allegedly engaging in a verbal altercation with Rob Rock [at Topgolf], Murphy confirmed that the idea of Plaintiff's promotion was the "last thing" he was going to propose to Pacira's CEO during the NSM. (Exhibit 5, Murphy Dep., at 174:22-175:13).

## IV.    Plaintiff's Claims of Disparate Treatment Based on Gender

31.    Plaintiff alleges that the male employee Rock, with whom she had a verbal disagreement with at the NSM and for which HR conducted an investigation, was not subjected to an adverse employment action. (Exhibit 1, ¶¶ 56-57; Exhibit 10, Abell Dep., at 289:12-15).  She claims Rock resigned, but she was terminated after HR conducted a "bogus" investigation into her. (Id.).

32.    Plaintiff also alleges that Pacira terminated her for behavior that would not have resulted in termination if a male engaged in the same conduct. (Exhibit 1, ¶ 65).

## V.   Plaintiff's Claims of "Sexual Harassment"

33.     Plaintiff alleges that it was "business as usual" for Plaintiff to hear comments that she was only successful because she had romantic relations with clients, and she was "regularly the recipient of sexually charged comments, jokes, and innuendo." (Exhibit 1, ¶¶ 19, 22).[1]

34.     During Plaintiff's deposition, she stated that she did not feel comfortable disclosing the names of who she claims sexually harassed her during her employment with Pacira or providing examples of the conduct (Exhibit 10, Abell Dep., at 55:3-56:8).

35.     On one occasion when asked for names of who sexually harassed her, Plaintiff requested to change the subject stating "let's leave it for now." (Exhibit 10, Abell Dep., at 58:3-4).

36.     Plaintiff stated she "remember[ed]" all of the names of people at Pacira who sexually harassed her. (Exhibit 10, Abell Dep., at 58:1).  However, when asked to detail any other instances of sexual harassment Plaintiff alleged to have endured at Pacira, and Plaintiff's counsel suggested to Plaintiff that now was her opportunity to explain the basis of her claims so that it was clear for Defendants, the court, and the jury, Plaintiff declined to do so. (Exhibit 10, Abell Dep., at 63:1-65:22).  Indeed, on three occasions when asked to share details of her claims of sexual harassment, she stated, "not at this time." (Exhibit 10, Abell Dep., at 65:14-21, 66:9-14).

37.     Plaintiff ultimately stated that at the NSM in 2016, one male colleague, Brandon Christenson, touched her back and made comments to her about her appearance.  (Exhibit 10,

---

[1] These underlying facts are not "undisputed" by Defendants.  However, Defendants acknowledge that Plaintiff testified as to these occurrences.  Thus, for purposes of the instant motion only and conducting a summary judgment analysis in the light most favorable to Plaintiff, Defendants take these allegations as "true."  Defendants reserve all rights to dispute these allegations if any claim proceeds past summary judgment to trial.

Abell Dep., at 58:17-59:10, 60:8-22, 66:24-67:9).  When asked if there were any other instances

with Christenson, she stated "no." (Exhibit 10, Abell Dep., at 61:7-9).[2]

38.     Plaintiff admitted that she never reported the above-described conduct by

Christenson to HR, to any other employee, to her supervisor or manager, the VP of HR, or any HR

person.  Specifically, the testimony on this topic is as follows:

> Q:     Did you ultimately report this to HR?
> A:     No.
> Q:     Did you report to any other employee at Pacira?
> A:     No.
> Q:     You didn't report it to your supervisor or manager
> A:     No.
> Q:     How about the vice-president of human resources?
> A:     No.
> Q:     And you indicated no human resources person?
> A:     No.

(Exhibit 10, Abell Dep., at 61:9-61:23).

39.     Plaintiff also stated that in 2016, another male colleague, Justin Sherrod, touched

her a "little too low" when greeting her with a hug "every now and then". (Exhibit 10, Abell Dep.,

at 67:11-18, 67:8-68:11).   Additionally, she identified Sherrod as making the "joke", at an

unidentified time, that "the reason she was so successful" was because she had romantic or sexual

relationships with her clients.[3] (Exhibit 10, Abell Dep., at 213:10-24).

---

[2] These underlying facts are not "undisputed" by Defendants.  However, Defendants acknowledge that Plaintiff testified as to these occurrences.  Thus, for purposes of the instant motion only and conducting a summary judgment analysis in the light most favorable to Plaintiff, Defendants take these allegations as "true."  Defendants reserve all rights to dispute these allegations if any claim proceeds past summary judgment to trial.

[3] These underlying facts are not "undisputed" by Defendants.  However, Defendants acknowledge that Plaintiff testified as to these occurrences.  Thus, for purposes of the instant motion only and conducting a summary judgment analysis in the light most favorable to Plaintiff, Defendants take these allegations as "true."  Defendants reserve all rights to dispute these allegations if any claim proceeds past summary judgment to trial.

40.     Plaintiff admitted that she did not report any instance of sexual harassment during her employment with Pacira.  (Exhibit 10, Abell Dep., at 72:9-11). Specifically, when asked:

> Q:     Just so we're clear, you never reported any sexual harassment about yourself.
>
> A:     No.

(Abell Dep., 72:9-11).

41.     During Plaintiff's employment, Christenson and Sherrod held the title of Surgical Sales Associate, or "SAS". (Exhibit 10, Abell Dep., at 57:1-11).  Christenson and Sherrod worked in the Midwest and Southeast regions, respectively. (Kahr Cert., at ¶ 6; Exhibit 6, Organizational Chart, at Pacira 000108, 000110).

42.     When asked whether Plaintiff had been aware of policies which states that complaints of sexual harassment would be investigated promptly," and "failure to report complains of unlawful harassment hampers the company's ability to take necessary steps to remedy such situations," Plaintiff stated "yes." (Exhibit 10, Abell Dep., at 78:2-12; see also Exhibit 8, Employee Handbook, at Pacira 000292).

43.     When asked whether Plaintiff  "realize[d] [that] when [she] chose not to record these incidents of sexual harassment that the company couldn't do anything to help you," Plaintiff stated: "yes." (Exhibit 10, Abell Dep., at 78:13-16; see also Exhibit 8, Employee Handbook, at Pacira 000292).

44.     When asked whether Plaintiff knew that the company had a policy prohibiting any form of retaliation against individuals, who in good faith, report unwelcome conduct or who cooperate in the investigation of such reports in accordance with this policy," Plaintiff stated: "yes." (Exhibit 10, Abell Dep., at 78:17-79:3; see also Exhibit 8, Employee Handbook, at Pacira 000292).

45.     Additionally, Plaintiff specifically stated: "I am not seeking compensation for people touching me or not reporting them. . . it was my choice to stay quiet." (Exhibit 10, Abell Dep., at 63:19-24).

## VI.     Plaintiff's Alleged Complaints about Gender Discrimination under the LAD

46.     In Plaintiff's Complaint, she alleges Defendants retaliated against her for complaining about gender discrimination. (Exhibit 1, Complaint, at ¶¶ 105-107).   Plaintiff's Complaint implies that the behavior she took issue with was Regional Sales Director (of another region) Robert Rock informing her that she could not attend a Topgolf event planned at the NSM because it was a "guy's thing" and making "other sexist comments). (Id., at ¶ 43).  When Plaintiff attended the event anyway, she had a "yelling match" with Rock which other attendees at the event (not Plaintiff) reported to HR. (Id., at ¶ 44-45, 48).

## VII.     Plaintiff's Alleged Complaints about "Business Irregularities" under CEPA

47.     In Plaintiff's Complaint, she alleges she complained of several business irregularities pertaining to the issuance of grants, how sales within "White Space" accounts (those which are not designated to a certain sales associate or particular sales territory) are reported, unspecified compliance issues pertaining to Medical Affairs-personnel (a non-sales role), nepotism, and Pacira's stock prices. (Exhibit 1, Complaint, at ¶¶ 67-85).

48.     The only "law" listed in Plaintiff's Complaint that Plaintiff claimed in good faith to have been violated was the Dodd Frank Act. (Exhibit 1, Complaint, at ¶¶ 113, 118).  Plaintiff withdrew her claim for violations of the Dodd Frank Act which were separately alleged as Count 5, and the Court confirmed this in its Order on Defendants' motion to dismiss. (Exhibit 2, Court Order, at pps. 7-8).

49.    In Plaintiff's deposition testimony, the only "law, rule, regulation, or mandate of public policy" that Plaintiff identified was the Sunshine Act. (Exhibit 10, Abell Dep., at 266:4).

50.    Specifically, when explaining her generalized disappointment that clinical, non-sales Medical Affairs personnel were invited to a Company-sponsored trip awarded to high performers, Plaintiff stated that she believed non-sales staff attending this trip was a "gray area" of the "Sunshine Act." (Exhibit 10, Abell Dep., at 266:1-10).

51.    Plaintiff did not expand on any details of what the Sunshine Act entails or requires nor who she reported these alleged issues to, or when.  Additionally, she did not claim to have made a good faith complaint about any good faith belief about the violations of the Sunshine Act, only that she asked for "explanations" of why clinical staff could attend Company-sponsored trips. (Exhibit 10, Abell Dep., at 263:22-23; 270:14-15).

**VIII.    Pacira's 2018 National Sales Meeting**

52.    Pacira holds a NSM once annually. (Exhibit 10, Abell Dep., at 62:8-22; Exhibit 13, McLoughlin Dep., at 111:25-112:25).  These meetings were previously held in different cities, they last two to three days, and several departments within Pacira, including the field team, marketing team, medical affairs, sales operations, attend. (Exhibit 13, McLoughlin Dep., at 112:12-113:21).

53.    Pacira's NSM typically occurs at a hotel or conference center, and there are several events planned throughout the two-to-three days.  An itinerary is circulated which includes a schedule of meetings, lunch, and dinner events.  Some of the meetings are mandatory, and others are optional.  Additionally, managers often use the opportunity of having all sales team members together to host in-person, team-building events for their specific regions or teams. (Kahr Cert., at ¶ 7).

54.     The February 2018 NSM occurred from Sunday, February 11, 2018 to Thursday, February 15, 2018 in Orlando, Florida. (2018 NSM Itinerary identified as bates no. Pacira 001546-53 attached as Exhibit 14 to Panzini Cert.)

**a.      Women's Leadership Event**

55.     One of the events scheduled during the 2018 National Sales Meeting was a Women's Leadership Initiative dinner meeting on the evening of February 13, 2018 (Women's Leadership dinner e-mail invitation identified as Pacira 001226, 001230-31 attached to Kahr Cert., at ¶ 13, Exhibit B).

56.     The purpose of the dinner was meant to encourage women leaders within the organization. (Exhibit 10, Abell Dep., at 149:24-150:5).

57.     The Women's Leadership dinner was optional. (Kahr Cert., at ¶ 13, Exhibit B); Exhibit 10, Abell Dep., at 150:6-9; Exhibit 5, Murphy Dep., at 154:1-24; Exhibit 7, Reiser Dep., at 94:2-13; Exhibit 13, McLoughlin Dep., at 117:13-15).

58.     Several women who were invited to attend cancelled their attendance and/or declined the invitation. (Women's Leadership dinner RSVP list identified as Pacira 000069-70 attached as Exhibit 15 to Panzini Cert).

59.     Neither Murphy, Reiser, or Kahr expressed any concern about Plaintiff's plans to attend or not attend the Women's Leadership dinner. (Exhibit 5, Murphy Dep., at 154:12-24; Exhibit 7, Reiser Dep., at 94:2-13; Exhibit 4, Kahr Dep., at 191:20-192:1).

**a.      Topgolf**

60.     On the same evening as the Women's Leadership Dinner, February 13, 2018, two regional managers, Gio Vendemia and Robert Rock, planned a joint team-building outing at

Topgolf for their respective regions. (Exhibit 10, Abell Dep., at 159:25-160:12; Exhibit 5, Murphy Dep., at 156:1-157:10, 157:19-158:11; Exhibit 7, Reiser Dep., at 95:9-97:25).

61.     The Topgolf outing was restricted to a limited number of participants as there was an event contract with Topgolf for eighteen attendees. (Topgolf event contract identified as Pacira 001643-001658 attached to Kahr Cert., at ¶ 14, Exhibit C).; Exhibit 7, Reiser Dep., at 97:15-20).

62.     Plaintiff was not invited to the Topgolf event. (Exhibit 10, Abell Dep., at 158:16-18).

63.     At the Topgolf event, Plaintiff and Rock got into a verbal disagreement. (Exhibit 5, Murphy Dep., at 158:12-23; Reiser email reporting incident at Topgolf identified as Pacira 000096 attached as Exhibit 16 to Panzini Cert.).  Plaintiff described it as a "yelling match," (Exhibit 1, Complaint at ¶ 45) where both she and Rock raised their voices at each other (Exhibit 10, Abell Dep., at 169:24-170:1).

64.     Though Reiser did not personally witness the verbal disagreement between Plaintiff and Robert Rock, he was at the event and made aware of it. (Complaint, ¶ 46; Exhibit 7, Reiser Dep., at 100:12-19).

65.     Following the verbal disagreement, Reiser reported the incident to Peter Murphy and HR, (Exhibit 1, Complaint, at ¶ 50; Exhibit 4, Kahr Dep., at 166:20-169:22; Exhibit 10, Abell Dep., at 176:22-23; Exhibit 5, Murphy Dep., at 158:12-159:14; Exhibit 16 to Panzini Cert., Reiser email report, at Pacira 001339).  Murphy also reported the incident to HR. (Exhibit 4, Kahr Dep., at 167:4-14; Exhibit 5, Murphy Dep., at 196:11-12.).

66.     Rock also reported the incident to Chief Operating Officer Scott Braunstein and Senior Vice President Matt Lehmann, who in turn reported it to Kahr on February 15, 2018 and February 20, 2018.  (Exhibit 17 to Panzini Cert., Braunstein email report, at Pacira 001256).

67.     Following the Topgolf incident, Rock left the National Sales Meeting and "resigned." (Exhibit 16, Reiser second email report, at Pacira 001338).  Rock later returned and admitted this had been an emotional reaction. (Rock HR Interview Notes identified as Pacira 000075-76 attached to Kahr Cert., at ¶ 12, Exhibit A).

## IX.     **The Human Resources Investigation**

68.     In response to the multiple reports received regarding the Topgolf incident, and given the senior level of Robert Rock who was involved in the verbal altercation at Topgolf, Kahr determined he should personally conduct the investigation into the incident that transpired at the Topgolf event between Robert Rock and Plaintiff. (Exhibit 4, Kahr Dep., at 169:8-22).

69.     On February 17, 2018, Kahr contacted Rock via e-mail to set up time to discuss the Topgolf incident that he reported. (Email between Rock and Kahr re. HR interview, identified as Pacira 000088, attached as Exhibit 18 to Panzini Cert.).

70.     In response to the email on February 17, 2018, Rock forwarded notes to Kahr which Rock prepared in advance of their scheduled telephone meeting for later that week. (Email between Rock and Kahr re. HR interview, identified as Pacira 000089-90, attached as Exhibit 18 to Panzini Cert.).  In addition to the recent Topgolf incident, Rock's notes detailed a series of inappropriate interactions that he and/or his direct reports had with Plaintiff. (Id.).

71.     On February 20, 2018, Reiser emailed Kahr stating that he had additional information to report regarding Rock and Plaintiff that he may not have mentioned during their call on Friday, February 16, 2018. (Exhibit 16, Reiser second email report, at Pacira 001338). Specifically, Reiser informed Kahr that Rock never reported the Topgolf incident to him directly even though Reiser was Rock's direct supervisor, and Rock left the National Sales Meeting without

advising Reiser. (Id.).  Reiser also reported that he had learned from Chris Borsa that Lance Noble complained about Plaintiff using sexually explicit language at the National Sales Meeting. (Id.).

72.     During the course of the investigation, Kahr interviewed Plaintiff, Rock, Gio Vendemia, and several others who Plaintiff named as witnesses during her interview with HR, including Pat Nolan, Isaac Smolko, Steve Huddy, and Abell's direct supervisor, Roxanne Doherty[4]. (HR Interview Notes identified as Pacira 000071-86 attached to Kahr Cert., at ¶ 12, Exhibit A).

73.     During Plaintiff's interview with Kahr on February 21, 2018, she stated that Rock informed her before the Topgolf event that she could not attend because it was a "boy's night out." (Id., at Pacira 000071-73).  She stated she assumed Rock had been joking, received permission from the other host, Vendemia, to attend, and prior to and while at Topgolf, Rock made her feel unwelcome. (Id.).  She further stated she "never played the 'woman card' and wasn't sure if [Rock's behavior] was a guy thing or a Rob [Rock] thing," and she later stated she felt unwelcome "because she was a woman." (Id.).  She also admitted that she may have used profanity when speaking to Rock at the Topgolf event, and she was frustrated that she felt obligated to go to the Women's Leadership dinner because it was indoors and she did not want to spend the evening indoors after a full-day of attending other indoor meetings. (Id.).

74.     During Rock's interview on February 21, 2018, he denied making any gender based remark to Plaintiff and acknowledged that he only asked her if she planned on attending the Women's Leadership Dinner. (Id. at, Pacira 000074-76).  Prior to the Topgolf event, Rock informed Plaintiff that she could not come because reservations were already booked, and it was

---

[4] The HR notes reflecting the conversation between Kahr and Doherty contains a typographical error.  The document states "Roxanne Brady" but should state "Roxanne Doherty." (Kahr Cert., at ¶ 12).

a "closed" group. (Id.).  He also shared that a male colleague asked Rock if he could attend the Topgolf outing, and Rock declined permission to him for the same reason. (Id.).  Additionally, Rock admitted that he should not have abruptly resigned without informing his direct supervisor, and his behavior in leaving was an emotional reaction. (Id.).

75.     Mr. Kahr did not get the sense during Plaintiff's interview that she had been complaining about gender or sex discrimination; he viewed her complaint to be based more so on Mr. Rock behaving unprofessionally as a manager. (Exhibit 4, Kahr Dep., at 190:15-191:13).  Ms. Abell likewise stated she was not playing the "woman card." (Kahr Cert., HR Interview Notes identified as Pacira 000071-73 at ¶ 12, Exhibit A).

### a.     Complaints about Plaintiff Viewing the Kama Sutra at the 2018 National Sales Meeting

76.     During the course of Kahr's investigation into the Topgolf incident, there were four complaints about Plaintiff viewing sexually inappropriate images on her phone during one of the breakout meetings at the National Sales Meeting (from Robert Rock, Seth Whaley, Steven Huddy, and Roxanne Doherty). (Kahr Cert., HR Interview Notes identified as Pacira 000074-76 at ¶ 12, Exhibit A; Whaley Declaration identified as Pacira 000425-26 attached as Exhibit 19 to Panzini Cert.; Huddy Interview Notes, Pacira 000074-76; Doherty Interview Notes, Pacira 000081-82). Three of these complaints, from Whaley, Huddy, and Doherty, included first-hand accounts of the inappropriate images. (Kahr Cert., HR Interview Notes identified as Pacira 000081-82 at ¶ 12, Exhibit A; Exhibit 19, Whaley Decl., Pacira 000425-26; Exhibit 10, Abell Dep., at 228:16-19, 229:7-14; Deposition Transcript of Seth Whaley ("Whaley Dep."), at 28:12-34:5, 34:21-35:2, 41:9-25, 42:22-43:23 attached as Exhibit 20 to Panzini Cert.).

77.    On February 22, 2018, an Account Manager from the Southeast region, Seth Whaley, emailed Kahr seeking to have a phone conversation with him. (Email from Whaley to Kahr identified as Pacira 002290 attached to Kahr Cert., at ¶ 15, Exhibit D).

78.    Whaley and Kahr spoke on or about February 23, 2018. (Id).   During this conversation, Whaley reported that during a break following a meeting at the National Sales Meeting, Plaintiff showed him and Brian Wiley sexually inappropriate images of the Kama Sutra which depicted different positions of people engaged in sex in various sexual positions. (Exhibit 19, Whaley Decl., at Pacira 000425-26); Exhibit 20, Whaley Dep., at 28:12-34:5, 34:21-35:2, 41:9-25, 42:22-43:23).   Along with it, Plaintiff stated this was how she "gets through these meetings" (Exhibit 19, Whaley Decl., at Pacira 000425-26; Exhibit 20, Whaley Dep., at 33:3-4), and that "[her people] invented the [Kama Sutra]." (Exhibit 19, Whaley Decl., at Pacira 000425-26; Exhibit 20, Whaley Dep., at 37:2-6).   Whaley testified that Plaintiff's conduct was offensive and made him uncomfortable, and it would have inappropriate "if any female or male showed me that in a business setting" (Exhibit 19, Whaley Decl., at Pacira 000425-26; Exhibit 20, Whaley Dep., at 37:20-38:5).

79.    During Huddy's interview with Kahr on February 26, 2018, Huddy reported he did not witness the exchange between Rock and Plaintiff at Topgolf.   (Huddy HR Interview Notes identified as Pacira 000081 attached to Kahr Cert., at ¶ 12, Exhibit A).   However, in response to Kahr asking Huddy if he had anything else to share, Huddy reported that during one of the breaks following a meeting at the NSM, Plaintiff showed him provocative sexual images of the Kama Sutra which depicted different positions of people having sex, and she stated "[her people] invented the [Kama Sutra]." (Id.).   He felt this was very inappropriate and made him, as well as "others in the group," feel very uncomfortable. (Id.).

80.     Huddy also reported that when Plaintiff accompanied him in his sales territory to a restaurant, the restaurant manager threatened to remove them from the restaurant due to Plaintiff's excessive cursing. (Id.).

81.     During Doherty's interview with Kahr on February 28, 2018, Doherty shared that Plaintiff was crying following the incident at Topgolf claiming that she had been made to feel unwelcome. (Doherty HR Interview Notes identified as Pacira 000082 attached to Kahr Cert., at ¶ 12, Exhibit A).  However, in response to Kahr asking if she had anything else to share, Doherty reported that during one of the breaks following a meeting at the National Sales Meeting, Plaintiff showed her a sexually oriented website called Kama Sutra. (Id.).  In response, Doherty informed Plaintiff that she should focus on the meeting and close down the website. (Id.).  She also expressed that Plaintiff was a "distraction" to others, a "challenge to manage," and she was a potential issue for her and the company due to Plaintiff's lack of professionalism and foul language. (Id.; Exhibit 4, Kahr Dep., at 232:11-18).

82.     Following these interviews, on March 13, 2018, Kahr spoke with Plaintiff again. (HR Interview Notes identified as Pacira 000084 attached to Kahr Cert., at ¶ 12, Exhibit A). During this conversation, Kahr told Plaintiff that the investigation into the Topgolf incident concluded, and while he felt Rock and Plaintiff's interactions at Topgolf were a distraction, Pacira would not be implementing disciplinary action. (Id.).   However, he informed Plaintiff that there had been reports from multiple people that she viewed the Kama Sutra during a break from a meeting at the NSM which displayed sexual content and made others uncomfortable. (Id.).  He then asked Plaintiff to respond to these claims, and she admitted that she opened the website and recalled showing it to at least two people. (Id.).  Plaintiff admitted to viewing the Kama Sutra at the NSM,

confirming the reports of Huddy, Whaley, and Doherty. (Id.; see also Exhibit 10, Abell Dep., at 14:8-10, 16:22-25, 219:3-6).

83.     During the March 13, 2018 meeting, Plaintiff also asked Kahr if she could apologize to the people who may have been offended and complained to HR about the Kama Sutra images, and whether Kahr would like to see the images. (Exhibit 10, Abell Dep., at 14:13-22). Kahr declined to provide her the identities of who complained to HR and looking at the Kama Sutra graphics. (Id).  Plaintiff claims that by denying these requests, Kahr conducted a "vague" and "conclusory" investigation. (Exhibit 10, Abell Dep., 237:15-240:4).

84.     Additionally, Plaintiff testified that she could tell her manager, Roxanne Doherty, who also saw the sexual Kama Sutra graphics "was uncomfortable." (Exhibit 10, Abell Dep., at 230:5-6), and when asked if she could understand how some would find it offensive, Plaintiff stated "of course." (Exhibit 10, Abell Dep., at 231:19-21).  Plaintiff also admitted she made some comment regarding "her people" inventing the Kama Sutra. (Exhibit 10, Abell Dep., at 232:6-8).

## X.     <u>Rock's and Plaintiff's Termination</u>

85.     Following the investigation, Kahr concluded that he could not corroborate the details of the exchange between Rock and Plaintiff at Topgolf, and while some discipline could be considered, he did not feel that the incident warranted termination for either. (Exhibit 4, Kahr Dep., at 239:5-19; (HR Termination Notes identified as Pacira 000083-84 attached to Kahr Cert., at ¶ 12, Exhibit A.).

86.     However, Kahr also concluded that during the course of the investigation, he learned additional information which warranted termination of Rock and Plaintiff.  Specifically, Rock abruptly resigning his position and leaving the National Sales Meeting after his verbal disagreement with Plaintiff was unprofessional and unbefitting of a manager and warranted

termination. (Id.; see also Exhibit 4, Kahr Dep., at 239:20-240:6).  After discussing this decision internally with the legal department, Kahr terminated Rock on March 13, 2018. (Exhibit 4, Kahr Dep., at 240:7-18; HR Termination Notes identified as Pacira 000083-84 attached to Kahr Cert., at ¶ 12, Exhibit A.).  This decision was made notwithstanding the fact that Rock did not have any prior disciplinary history. (Kahr Cert., ¶ 9).

87.     During the course of the Topgolf investigation, Kahr also learned from multiple witnesses, and Plaintiff herself, that at the NSM, Plaintiff showed individuals the Kama Sutra which contained different positions of people having sex, and the witnesses complained that Plaintiff's behavior was inappropriate and offensive. (HR Termination Notes identified as Pacira 000086, attached to Kahr Cert., at ¶ 12, Exhibit A; Exhibit 4, Kahr Dep., at 227:11-20, 230:13-231:2).  Plaintiff's conduct of showing an inappropriate website which made others uncomfortable was not something Pacira's culture could support, and it constituted an egregious violation of values and anti-harassment policies. (Exhibit 10, Abell Dep., at 230:17-231:2; Recording of Plaintiff's Termination Meeting to be provided to Chambers via USB and email and referred to as Exhibit 22).

88.     After discussing this decision internally with the legal department, Kahr terminated Plaintiff on March 14, 2018 by phone. (HR Termination Notes identified as Pacira 000086, attached to Kahr Cert., at ¶ 12, Exhibit A; Exhibit 4, Kahr Dep., at 226:23-227:10).

89.      Murphy had been present during this conversation with Plaintiff, and Plaintiff recorded this conversation. (HR Termination Notes identified as Pacira 000086, attached to Kahr Cert., at ¶ 12, Exhibit A; Exhibit 21, Termination Meeting Recording referenced in Panzini Cert., at ¶ 24).  During the conversation, Kahr informed Plaintiff that HR concluded the review of the facts concerning Plaintiff viewing an inappropriate at the NSM, and they concluded that "this was

unacceptable conduct and behavior that [they] cannot support at Pacira, and as a result, [her] employment was being terminated effective [March 14, 2018]." (<u>Id</u>.).

90.     After Plaintiff was terminated, and during the termination meeting, Plaintiff stated "there are so many other inappropriate things" going on in the company that Kahr may not know, and she asked Kahr whether she may submit an email outlining those issues. (Exhibit 21, Termination Recording).  Kahr explained he can only address things that are brought to HR's attention, and he encouraged Plaintiff to bring forth those issues. (<u>Id</u>.).  Plaintiff never did so. (Kahr Cert., ¶ 11).

91.     At the time of Plaintiff's termination, Kahr did not have any knowledge of Plaintiff making any complaints about Medical Affairs personnel attending any company-sponsored trip or alleged violations of the Sunshine Act. (Kahr Cert., ¶ 10).

92.     Indeed, prior to Kahr's investigation conducted in February 2018 concerning the TopGolf incident between Rock and Plaintiff, Kahr does not recall ever meeting with or speaking with Plaintiff, knowing her personally, or interacting with her. (Kahr Cert., ¶ 8)  Even as of the date of this filing, Kahr does not recall ever meeting Plaintiff.  (<u>Id</u>.).

Respectfully submitted,

JACKSON LEWIS P.C.
766 Shrewsbury Avenue
East Tower, Suite 101
Tinton Falls, New Jersey 07724
T: 732-532-6148
F: 732-842-0301

By: <u>/s/ *James J. Panzini*</u>
James J. Panzini
Pooja Bhutani

Dated: May 7, 2021