Jason A. Stewart, Esq.    (BAR ID # 324322019)
Neal Brickman, Esq. (*Pro Hac Vice*)
The Law Offices of Neal Brickman, P.C.
420 Lexington Avenue, Suite 2440
New York, New York 10170
(212) 986-6840
Jason@Brickmanlaw.com
Neal@Brickmanlaw.com
*Attorneys for Plaintiff Reshma Abell*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------X
RESHMA ABELL,

                     Plaintiff,                Civ. Action No.
     -against-                             2:18-cv-16509-MCA-AME

PACIRA PHARMACEUTICALS, INC.,
DAVE STACK, individually and in his
capacity as Chief Executive Officer of
PACIRA PHARMACEUTICALS, INC.,
and RICH KAHR, PETER MURPHY,
DENNIS McLOUGHLIN, PAUL
CIAVOLELLA, GLENN REISER, JOYCE
DAVIS, and MATT LEHMANN, in their
capacities as employees of PACIRA
PHARMACEUTICALS, INC.

                     Defendants.
---------------------------------------------------------X

**PLAINTIFF'S RESPONSE TO DEFENDANTS' CORRECTED**
**STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Reshma Abell ("Abell" or "the Plaintiff"), by and through her attorneys, The Law Offices of Neal Brickman, P.C., respectfully submit the following response to Defendants' Corrected Statement of Material Facts pursuant to *Fed. R. Civ. P.* 56 and Local Civ. Rule 56.1 (a) in opposition to Defendants' motion for summary judgment. As noted by Defendants' moving papers, Plaintiff Reshma Abell's ("Plaintiff") sworn deposition testimony ***must*** be accepted as true for the purpose of this Motion for Summary Judgment.

1

**I.      Introduction**

      1.      Admitted.

      2.      Admitted.

      3.      Admitted.

      4.      Admitted.

      5.      Admitted.

      6.      Admitted.

      7.      Admitted.

      8.      Admitted.

      9.      Admitted.

      10.     Admitted.

      11.     Admitted.

      12.     Admitted.

      13.     Admitted.

**II.     Pacira's Policies Prohibit Discrimination, Harassment, and Retaliation, and It Sets Forth Clear Complaint Reporting Procedures**

      14.     Admitted insofar as this paragraph accurately paraphrases what is written in the Pacira Employment Handbook. However, Plaintiff denies that Pacira or its senior management adhered to the anti-discriminatory and anti-retaliation policies in the Handbook and Pacira's Code of Conduct.

      15.     Admitted.

      16.     Admitted.

      17.     Admitted.

      18.     Admitted.

19. Admitted.

20. Admitted.

21. Admitted.

### III. Plaintiff's General Employment Background with Pacira

22. Admitted.

23. Admitted, except that Plaintiff also testified concerning her peers that she and the other SAS "all kept in touch depending on what was going on in different parts of the country" and that other SAS would call her and ask technical questions. (Certification of Jason A. Stewart ("Stewart Cert."), Exhibit 2, Abell Dep., at 114:11-115:12). Furthermore, throughout 2017, as part of the Director of Post-Op Pain Management pilot program, Plaintiff was tasked with traveling into the regional territory of other SAS's to do in the field training with various SAS reps and did so no less than six times during that year. (Certification of Reshma Abell, ¶ 3 ("Abell Cert.")).

24. Admitted.

25. Admitted to the extent that practically speaking Mr. Kahr or other HR personnel would need to be involved in the process of creating a new position and that the Chief Executive Officer of Pacira must review the job position and give it a "final sign off." However, the Plaintiff testified that her supervisors told her the position of Director of Post-Op Pain Management would be made a permanent position upon proof that the pilot program was successful through evidence of increased sales at the end of 2017—which it was--and that the promotion, once signed off upon, would be made retroactive as of January 2, 2018. (Stewart Cert., Exhibit 2, Abell Dep., 130:20-132:23).

26. Admitted.

27. Admitted, except that Plaintiff testified that it was her understanding that the position was an officially approved position as of January 2, 2018. (Stewart Cert., Exhibit 2, Abell Dep., 135:10-23).

28. Admitted.

29. Admitted as to the fact that Plaintiff met with Murphy and Reiser on the first day of Pacira's NSM, before any events commenced and that during that meeting after Plaintiff asked why no announcement had been made about her promotion, however, it was only then that she learned that Dave Stack's signature was still required for her promotion to be made official. She left that meeting understanding that Murphy "had to get Dave's signature" and that he planned to do so at the meeting. (Stewart Cert., Exhibit 2, Abell Dep., 137:18-138:6). Plaintiff otherwise denies that Reiser and Murphy made the statements set forth in this paragraph. (Abell Cert, ¶ 7). Plaintiff testified that "the meeting we had before the national sales meeting started is, 'why haven't you received the signature yet, we're in February now.'" (Stewart Cert., Exhibit 2, Abell Dep., 136:8-21).

30. Plaintiff denies that she was reported to HR for engaging in a verbal altercation with Rob Rock [at TopGolf], rather Reiser testified that he reported to HR that "there was an incident between Reshma and Rob…at a Top Golf event, that they had words in front of people and there was some sort of argument." (Stewart Cert., Exhibit 5, Reiser Dep., 109:25-110:5). Reiser further testified that he felt that Rob Rock treated Abell disrespectfully and that Rob Rock wrongfully engaged in and propelled the argument. (Stewart Cert., Exhibit 5, Reiser Dep., 120:23-122:15). Plaintiff admits that Murphy, in his testimony, attributed the reason why he never sought an audience with Pacira's CEO during the NSM concerning a sign off on Abell's promotion was because of the TopGolf occurrence. (Stewart Cert., Exhibit 4, Murphy Dep., 174:22-175:13).

4

**IV.     Plaintiff's Claims of Disparate Treatment Based on Gender**

   31.   Admitted.

   32.   Admitted.

**V.      Plaintiff's Claims of "Sexual Harassment"**

   33.   Admitted.

   34.   Admitted.

   35.   Admitted that Plaintiff was uncomfortable during the portion of her deposition which asked her to provide specific names and the details of occurrences where she was sexually harassed and sexually assaulted by her former co-workers, but ultimately, she disclosed multiple instances of improper sexual conduct by multiple male employees of Pacira.

   36.   Admitted that Plaintiff was uncomfortable during the portion of her deposition which asked her to provide specific names and the details of occurrences where she was sexually harassed and sexually assaulted by her former co-workers, but ultimately, she disclosed multiple instances of improper sexual conduct by multiple male employees of Pacira.

   37.   Admitted that Plaintiff testified that at the NSM in 2016, one male colleague, Brandon Christenson, touched her back and made comments to her about her appearance. (Stewart Cert., Exhibit 2, Abell Dep., 58:17-59:10, 60:8-22, 66:24-67:6).

   38.   Admitted.

   39.   Admitted that Plaintiff testified that in 2016, another male colleague, Justin Sherrod, touched her a "little too low" when greeting her with a hug "every now and then". (Stewart Cert., Exhibit 2, Abell Dep.,67:11-18, 67:8-68:11) and that she identified Sherrod as making the "joke", at an unidentified time, that "the reason she was so successful" was because she had romantic or sexualrelationships with her clients. (Stewart Cert., Exhibit 2, Abell Dep., at 213:10-25).

5

    40.    Admitted.

    41.    Admitted.

    42.    Admitted.

    43.    Admitted.

    44.    Admitted that when asked whether Plaintiff knew that the company had a policy prohibiting any form of retaliation against individuals, who in good faith, report unwelcome conduct or who cooperate in the investigation of such reports in accordance with this policy," Plaintiff stated: "yes." (Stewart Cert., Exhibit 2, Abell Dep., 78:17-79:3). However, Plaintiff further testified that she was "100 percent sure [she] would be retaliated against" if she made complaints "because some of the people who had sexually harassed say other employees they were still there" and that her supervisor Murphy told her "do not ever call or cross paths with complaints to HR." (Stewart Cert., Exhibit 2, Abell Dep., 79:4-80:6).

    45.    Admitted.

**VI.**    **Plaintiff's Alleged Complaints about Gender Discrimination under the LAD**

    46.    Admitted that Plaintiff's Complaint alleges that Defendants retaliated against her for complaining about gender discrimination. (Complaint, ¶¶ 105-107 attached as Exhibit 1 to Stewart Cert). Plaintiff further admits that her Complaint sets forth allegations that she was subjected to discriminatory, improper, and hostile behavior at the hands of Pacira Regional Sales Director (of another region) Robert Rock when he *inter alia* informed her that she could not attend a TopGolf event planned at the NSM because it was a "guy's thing" and that he made "other sexist comments"). (Id., ¶ 43). Plaintiff further testified that she had received permission to attend that TopGolf event from Pacira Regional Sales Director Gio Vendemia and that upon attending the event, she was accosted by and screamed at by Rob Rock in front of several of her co-workers. (Stewart Cert., Exhibit 2, Abell Dep. 162:21-164:13).

6

### VII. Plaintiff's Alleged Complaints about "Business Irregularities" under CEPA

47. Admitted.

48. Admitted.

49. Admitted.

50. Admitted.

51. Admitted.

### VIII. Pacira's 2018 National Sales Meeting

52. Admitted.

53. Admitted.

54. Admitted.

#### a. Women's Leadership Event

55. Admitted.

56. Admitted.

57. Admitted.

58. Admitted only to the extent that Defendants produced an invitation list that shows 74 out of the 83 invitees responded that they would be attending. (Stewart Cert., Exhibit 7, Women's Leadership dinner RSVP list, identified as Pacira 000068-70).

59. Admitted, except that Plaintiff testified that Reiser expressed to her that he believed she was required to attend the Women's Leadership dinner. (Stewart Cert., Exhibit 2, Abell Dep., 158:16-24).

#### b. TopGolf

60. Admitted

61. Admitted to the extent that it is understood that there was an event contract for a

certain number of participants. (Stewart Cert., Exhibit 8, TopGolf event contract, identified as Pacira 001643-001648). However, Plaintiff testified that she was told by Gio Vendemia that "anybody can attend…the only thing is you have to pay for you because we already paid for ours." (Stewart Cert., Exhibit 2, Abell Dep., 161:12:24).

62. Admitted that the Plaintiff was not expressly invited to attend the TopGolf event. However, Plaintiff testified that she was told by Gio Vendemia that "anybody can attend…the only thing is you have to pay for you because we already paid for ours." (Stewart Cert., Exhibit 2, Abell Dep., 161:12:24).

63. Admitted that at the TopGolf event, Plaintiff and Rock got into a verbal disagreement and that Plaintiff described it ending in a "yelling match" and that both Plaintiff and Rock raised their voices at each other. (Stewart Cert., Exhibit 2, Abell Dep., 169:20-170:4).

64. Admitted that Reiser testified that he did not personally witness the entire verbal disagreement between Plaintiff and Robert Rock, but only "walked in and the words—most of the words had already occurred" and that he gathered information from those present, which lead Reiser to believe that Rob Rock could have handled the situation better. (Stewart Cert., Exhibit 5, Reiser Dep., 121:10-122:4).

65. Admitted.

66. Admitted that Rock sent a series of emails concerning the incident to Chief Operating Officer Scott Braunstein and Senior Vice President Matt Lehmann and that Mr. Lehman in turn reported that to Kahr on February 15, 2018, and February 20, 2018. (Stewart Cert., Exhibit 9, Braunstein email report, identified as Pacira 001256).

67. Admitted.

## IX.   The Human Resources Investigation

68.   Admitted that there were multiple reports received by HR regarding the TopGolf incident, and that Kahr determined it was appropriate for him to personally conduct the investigation into the incident that transpired at the TopGolf event between Rob Rock and Plaintiff. (Stewart Cert., Exhibit 3, Kahr Dep. 169:6-22).

69.   Admitted.

70.   Admitted that in response to the email on February 17, 2018, Rock forwarded notes to Kahr which Rock prepared in advance of their scheduled telephone meeting for later that week. (Stewart Cert., Exhibit 10, Email between Rock and Kahr re. HR interview identified as Pacira 000089-90). It is further admitted that Rock's notes included, in addition to content concerning the recent TopGolf incident, slanderous unrelated allegations culled together by Rock from his direct reports against the Plaintiff. (Id.).

71.   Admitted.

72.   Admitted that Kahr's purported investigation consisted of Kahr selectively interviewing the Plaintiff, Rock, Gio Vendemia, Pat Nolan, Isaac Smolko, Steve Huddy, and Abell Roxanne Doherty[1].

73.   Admitted.

74.   Plaintiff denies the truthfulness of the statements attributed to Rob Rock and admits only that the following statements are those reflected within the discovery produced by Defendants that is said to be Kahr's "interview notes." (Abell Cert., ¶¶ 8-12). Plaintiff does not admit any of the following as being true, however Plaintiff admits that Kahr's interview notes indicate that during Rock's interview on February 21, 2018, he denied making any gender-based remark to

---

[1] The investigation notes indicate that Roxeanne Brady, not Roxeanne Doherty was interviewed, an apparent typographical error.

9

Plaintiff and acknowledged that he only asked her if she planned on attending the Women's Leadership Dinner. (Id.). It is further admitted that the interview notes indicate that, prior to the TopGolf event, Rock informed Plaintiff that she could not come because reservations were already booked, and it was a "closed" group. (Id.), that he also shared that a male colleague asked Rock if he could attend the TopGolf outing, and Rock declined permission to him for the same reason and that Rock admitted that he should not have abruptly resigned without informing his direct supervisor,and his behavior in leaving was an emotional reaction. (Id.).

75. Denied. Plaintiff admits only that she did not want to see Rob Rock be punished as a result of the TopGolf occurrence but denies that Kahr made a fair inquiry into whether there was gender or sex discrimination and that his investigation was admittedly clouded by the fact that he was not "looking into that". (Id.). Kahr specifically testified that his inquiry was "more around confirming and being able to get some facts around what had alleged to have happened between the two of them that was considered inappropriate conduct down at the national sales meeting." Kahr felt that knowing who was attending the TopGolf event was not a priority. (Stewart Cert., Exhibit 3, Kahr Dep., 189:18-190:3). Khar testified that looking into whether or not Reshma's gender played any part in the conflict between Rob and Reshma was not part of Kahr's investigation. (Stewart Cert., Exhibit 3, Kahr Dep., at 190:4-8). The exact testimony was as follows:

> Q: Was part of your investigation looking into whether or not Reshma's gender played any part in the conflict between Rob and Reshma?
>
> A: No.
> (Stewart Cert., Exhibit 3, Kahr Dep., at 190:4-8).

10

### a. Complaints about Plaintiff Viewing the Kama Sutra at the 2018 National Sales Meeting

76. Plaintiff denies the truthfulness of the various statements attributed to Rob Rock, Whaley, Huddy and Doherty by Kahr and denies that Kahr's "investigation notes" should be afforded any evidentiary weight given that they are a by-product of a sham investigation designed to fabricate a pre-text for her termination. (Abell Cert., ¶ 12). Plaintiff further denies that complaints were made by Whaley, Huddy, and Doherty, and if they were made, it is further denied that any such complaints included true and credible first-hand accounts of any inappropriate conduct by the Plaintiff, or any inappropriate images being displayed by the Plaintiff such to make those individuals to feel uncomfortable. (Id.)

77. Admitted.

78. These allegations are denied as Plaintiff submits that Seth Whaley's testimony is untrue and fabricated for the purposes of this litigation. (Abell Cert., ¶ 12). It is admitted, that despite these statements being untrue, that Whaley has testified that after the TopGolf occurrence, he contacted Kahr and reported that during a break following a meeting at the NSM, Plaintiff, in a passing moment lasting no longer than thirty seconds, showed him and Brian Wiley images depicting cartoon iconography of characters in various positions of the Kama Sutra. (Stewart Cert., Exhibit 6, Whaley Dep., 29:1-14, 36:20-37:1). It is admitted that Whaley testified that Plaintiff's conduct was offensive and made him uncomfortable, and it would have been "inappropriate if any female or male showed me that in a business setting." Plaintiff denies ever meeting Seth Whaley or Brian Wiley, showing them the Kama Sutra imagery which she received on her cell phone or making any comments to them about the images or about sex. (Abell Cert., ¶¶ 12, 13).

79. Plaintiff denies the truthfulness of the statements attributed to Steven Huddy in this paragraph as contained within Kahr's interview notes and admits only that the statements

referenced in this paragraph are those reflected within the discovery produced by Defendants that is said to be Kahr's "interview notes." (Abell Cert., ¶ 12). Plaintiff denies showing Steven Huddy the Kama Sutra imagery which was received via an unsolicited text message from a Pacira client to her cell phone via WhatsApp, any other Kama Sutra imagery or any imagery that in any way pertained to sex. She further denies making any comments to him, at all, about any such images or about sex. (Abell Cert., ¶ 14-16).

80. Plaintiff denies the truthfulness of the statements attributed to Huddy in this paragraph as contained and admits only that the statements referenced in this paragraph are those reflected within the discovery produced by Defendants that is said to be Kahr's "interview notes." (Abell Cert., ¶ 12). Plaintiff further denies that when she accompanied Huddy in his sales territory to a restaurant, that the restaurant manager threatened to remove them from the restaurant due to Plaintiff's excessive cursing. Plaintiff testified during her deposition concerning this incident explaining that while out to dinner with Huddy and an outside sales representative, she was caused to leave the restaurant because the Plaintiff became suddenly nauseous and was about to throw up because of something she ate. When they exited the restaurant, the Plaintiff was caused to vomit, and the outside sales rep took her back to her hotel room. (Stewart Cert., Exhibit 2, Abell Dep., 210:4-211:16 and Abell Cert. ¶ 17).

81. Plaintiff denies the truthfulness of the statements attributed to Doherty in this paragraph and admits only that the statements referenced in this paragraph are those reflected within the discovery produced by Defendants that is said to be Kahr's "interview notes." (Abell Cert., ¶ 19-23). Plaintiff admits that she confided in Doherty following the TopGolf occurrence claiming that she had been made to feel unwelcome by Rob Rock. Plaintiff denies that Doherty was caused to see any cartoon Kama Sutra imagery that was sent to Plaintiff's cell phone, and if Doherty did see any such imagery Plaintiff denies that she was the party responsible for showing that material to

Doherty. (Abell Cert., ¶ 19-23 and Stewart Cert., Exhibit 2, Abell Dep., 223:14:25). Plaintiff admits that Doherty's response to being shown Plaintiff's phone by Plaintiff's male co-worker Mike Massicotte was to say, "You guys stop it, I don't want to see this stuff, you guys are crazy and then she walked away." (Id). Plaintiff denies that Doherty was in any way offended by this content. (Id). Plaintiff further denies that she was, or that Doherty stated that Plaintiff was a "distraction" to others, a "challenge to manage," and that Plaintiff was a potential issue for her and the company due to Plaintiff's lack of professionalism and foul language. (Id).

82.     Plaintiff admits that on March 13, 2018, Kahr contacted Plaintiff for a second time and that during this conversation, Kahr told Plaintiff that the investigation into the TopGolf incident had concluded. Plaintiff admits that she was told that Kahr felt that Rock and Plaintiff's interactions at TopGolf was a distraction, but that Pacira would not be implementing any disciplinary action. Plaintiff denies that Kahr received reports from multiple people that she viewed the Kama Sutra during a break from a meeting at the NSM which displayed sexual content and made others uncomfortable. Plaintiff admits that she received an unsolicited text message from a Pacira client to her cell phone via WhatsApp and that the message contained a link to a website depicting cartoon imagery of Kama Sutra positions. She further admits that she viewed this message not knowing what it was and only momentarily while on a break during the NSM. Plaintiff further admits that she showed her phone which was displaying the message, when asked to do so by her male colleagues Mike Massicotte and Dave Heritage who were standing immediately adjacent to her when she checked the message. These individuals took turns handling Plaintiff's cell phone and at one point offered to a passing Doherty, "Roxeanne, you need to see this" reaching out the phone so she could see the screen. The entire encounter lasted less than two minutes. Plaintiff denies that any individual who saw the contents displayed on her phone was made to feel uncomfortable in any way. Plaintiff admits that she provided the exact detailed account of what transpired as set forth herein to Kahr in

13

response to his inquiry. Plaintiff admits to having opened and viewed the message, but she denies that she made any admission which confirmed any report made by Huddy, Whaley, or Doherty. (Stewart Cert., Exhibit 2, Abell Dep., at 14:8-10, 16:22-25, 219:3-6).

83. Plaintiff admits that during the March 13, 2018, telephone meeting, that she asked Kahr if she could apologize to anyone who may have been offended and/or complained to HR about the Kama Sutra images, and she offered to provide Kahr with a link to view the images so as to provide him context to the inoffensive nature of the content. (Stewart Cert., Exhibit 2, Abell Dep., 14:13-22). Plaintiff further admits that Kahr declined to provide her the identities of who complained to HR and refused to view the purportedly offensive content. Plaintiff admits that Kahr's investigation into her conduct was both "vague" and "conclusory" and part of the failures of Kahr's investigation was his refusing to identify to Plaintiff who made allegations against her and his refusal to review the allegedly "offensive" content depicting cartoon characters images depicting various positions of the Kama Sutra. (Stewart Cert., Exhibit 2, Abell Dep., 237:15-240:4).

84. Plaintiff denies the allegation in this paragraph as it fails to provide the full context of the quote. As to the comment about Doherty being uncomfortable, Plaintiff was asked if she at some point caused for her phone to be closed, in response she stated that when Doherty waved her hand at the phone and said, "you guys are crazy", that Plaintiff perceived it was Doherty's way of saying that from a cultural standpoint she might not be comfortable with the material, the question and answer actually stated as follows:

Q: Did you have a conversation with Roxy about it?

A: No, because she didn't bring it up and I'm not the one who showed it. Why would I have a conversation? Grant it, it was my phone and he took it from me but I didn't say here Mike, show it to her or stick it in her face. I know how culturally people can be uneducated. I'm sensitive to culture, I knew this would not be perceived from her body language that it won't be perceived the way my perception was So I knew of knew she was uncomfortable. Not that she was offended, [but] that's why I took the phone away. I know how I get when I'm uncomfortable. (Stewart Cert., Exhibit 2, Abell Dep., 229:20-230:8 & Abell Cert. 19-23).

14

As for the comment regarding Plaintiff being asked if she could understand how some would find it offensive, Plaintiff was asked a series of questions about why she was willing to apologize about to whoever may have been offended, among the series of questions she was asked:

> Q: So you didn't find the website to be offensive?
> A: And I still don't, no, it's cultural for me and I don't flaunt it, for the record.
>
> Q: Did you understand how some would find it offensive?
> A: Of Course, that's why I offered to apologize immediately the second I was made aware I offered. I wasn't given that opportunity.
> …
> Q: And then once you closed the website, when's the next time you were made aware that it was an issue?
> A: I was never made aware of any of this until March 13, the first time I heard of this was on March 13.th.
>
> Q: And that's when Rich Kahr spoke to you?
> A: Yes.
> (Stewart Cert., Exhibit 2, Abell Dep., 231:3-232:23).

## X.     Rock's and Plaintiff's Termination

85.     Plaintiff denies the truthfulness as all claims concerning Kahr's sham investigation, or its disingenuous findings or conclusion, all of which were designed solely to fabricate a pretext for her termination. (Abell Cert. ¶24).

86.     Plaintiff denies the truthfulness as to all claims concerning Kahr's sham investigation, or its disingenuous findings or conclusion, all of which were designed solely to fabricate a pretext for her termination. (Abell Cert. ¶24). However, Plaintiff admits that during the course of this litigation Defendants have maintained that Rob Rock was fired after he was allowed to withdraw his resignation. Plaintiff further admits that during the course of this litigation Defendants exchanged a letter from an attorney on behalf of Rob Rock whereby he asserts that he was wrongfully terminated, and that he threatened litigation if he was not provided a severance package—no subsequent litigation is known to have followed that letter. (Stewart Cert. 11, identified as Pacira 002289)

87. Plaintiff denies that there was any candor or integrity to Kahr's sham investigation, or its disingenuous findings or conclusion, all of which were designed solely to fabricate a pretext for her termination. (Abell Cert. ¶24).

88. Plaintiff denies that there was any candor or integrity to Kahr's sham investigation, or its disingenuous findings or conclusion, all of which were designed solely to fabricate a pretext for her termination. Plaintiff denies "showing" any individuals the Kama Sutra images which were contained within a message received to her cell phone. Plaintiff denies that her conduct was inappropriate in anyway, denies showing an inappropriate website which made others uncomfortable and denies violating Pacira's values and anti-harassment policies. (Abell Cert. ¶¶ 10, 24).

89. Plaintiff denies that there was any candor or integrity to Kahr's sham investigation, or its disingenuous findings or conclusion, all of which were designed solely to fabricate a pretext for her termination. However, Plaintiff admits that Kahr testified during his deposition that he discussed the matter internally with the legal department and that Kahr terminated Plaintiff on March 14, 2018, by phone. (Abell Cert. ¶24).

90. Plaintiff admits that Murphy was on the line during the March 14, 2018, telephone conversation with Plaintiff, and that Plaintiff recorded this conversation. Plaintiff further admits that during the conversation, Kahr informed Plaintiff that HR concluded the review of the facts concerning Plaintiff viewing an inappropriate at the NSM, and they concluded that "this was unacceptable conduct and behavior that [they] cannot support at Pacira, and as a result, [her] employment was being terminated effective [March 14, 2018]." (Stewart Cert., Exhibit 12, HR Investigation Notes, identified as Pacira 000071-86, and Termination Meeting Recording referenced in Stewart Cert.,at ¶ 23).

91. Admitted.

92. Admitted.

        Respectfully submitted,

        The Law Offices of Neal Brickman
        Attorneys for Plaintiff
        420 Lexington Avenue, Suite 2440
        New York, New York 10170
        (212) 986-6840

By:   */s/ Jason A. Stewart*
      Jason A. Stewart (Bar ID: 304522019)
      Neal Brickman (*Admitted Pro Hac Vice*)

Dated: New York, New York
       July 9, 2021