James J. Panzini, Esq. (Bar ID: 022101990)
Pooja Bhutani (Bar ID: 169592016)
**JACKSON LEWIS P.C.**
766 Shrewsbury Avenue
East Tower, Suite 101
Tinton Falls, New Jersey 07724
T: 732-532-6148
F: 732-842-0301
*Attorneys for Defendants*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RESHMA ABELL, | : | |
| | : | Civil Action No.: |
| Plaintiff, | : | 2:18-cv-16509 (MCA) (AME) |
| | : | |
| v. | : | |
| | : | **DECLARATION OF JAMES J. PANZINI IN** |
| PACIRA PHARMACEUTICALS, INC., | : | **SUPPORT OF DEFENDANTS' REPLY BRIEF** |
| DAVE STACK, individually and in his | : | |
| capacity as Chief Executive Officer of | : | |
| PACIRA PHARMACEUTICALS, INC., | : | |
| and RICH KAHR, PETER MURPHY, | : | |
| DENNIS McLOUGHLIN, PAUL | : | |
| CIAVOLELLA, GLENN REISER, JOYCE | : | |
| DAVIS AND MATT LEHMANN, in their | : | |
| capacities as employees of PACIRA | : | |
| PHARMACEUTICALS, INC., | : | |
| | : | |
| Defendants. | : | |

**James J. Panzini**, of full age, declares as follows:

1. I am an attorney at law in the State of New Jersey and a principal with the law firm of Jackson Lewis P.C. I am one of the attorneys charged with the responsibility of defending this matter on behalf of Defendants Pacira Pharmaceuticals, Inc. ("Pacira" or "the Company"), Richard Kahr, Peter Murphy, and Glenn Reiser (collectively as "Defendants"), and I am fully familiar with the facts set forth herein.

2. I make this Declaration in further support of Defendants' motion for summary judgment dismissing the Complaint of Plaintiff Reshma Abell ("Plaintiff"), in its entirety, with prejudice, as a matter of law and based on the undisputed material facts in the record. In particular, I make this Declaration to place before the Court certain materials necessary for the resolution of Defendant's summary judgment motion as part of Defendants' reply brief.

3. A true and correct copy of additional excerpts of Plaintiff Reshma Abell's deposition transcript cited in Defendants' Reply Statement of Facts ("Defendants' Reply Statement of Facts") which is being filed contemporaneously herewith, is attached hereto as Exhibit 22.

4. A true and correct copy of additional excerpts of Richard Kahr's deposition transcript cited in Defendants' Reply Statement of Facts is attached hereto as Exhibit 23.

5. A true and correct copy of additional excerpts of Seth Whaley's deposition transcript cited in Defendants' Reply Statement of Facts is attached hereto as Exhibit 24.

I declare that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

/s/ *James J. Panzini*
James J. Panzini

Date: August 9, 2021

4845-9052-7221, v. 1

# EXHIBIT 22

Page 234

1 the middle so you can grab it from front side or the
2 back side. There were people passing by, yes, plenty
3 of people.
4    Q.    Did Mike hold it up with the screen
5 facing away from him so Roxanne could see it?
6    A.    Yes.
7    Q.    And other people may have seen it?
8    A.    Yes, there's people behind us and people
9 behind Roxanne as well.
10   Q.    But no one else said anything to you --
11   A.    No, it was quick. It was less than
12 probably five seconds.
13   Q.    Had you ever shown any Kamasutra related
14 website drawings to anyone else in Pacira?
15   A.    No.
16   Q.    And you indicated that you didn't find
17 it offensive, did you say it's part of your religion?
18   A.    Yes, it's part of Hinduism.
19   Q.    And you have to pardon my ignorance,
20 what exactly, how is that?
21   A.    It's part of like old scriptures text
22 where it comes from. It's part of written texts
23 about sexual positions and how it could be beneficial
24 to your partner and what emotional way, what physical
25 way and to reach the higher intelligence and/or

Page 235

1 higher way to be spiritual, how you can be spiritual
2 without having the physical form because it's not
3 a -- we believe in reincarnation. So your soul goes
4 to a different body each time. So it's not about the
5 body itself but to reach the higher self on a
6 spiritual level.
7    Q.    So then you were contacted a second time
8 by Rich Kahr I believe?
9    A.    No, not on the 13th. This was the next
10 morning, March 14, 8:00 a.m.
11   Q.    And that's when you were terminated?
12   A.    Yes.
13   Q.    And that's the recording you provided to
14 counsel?
15   A.    Yes.
16   Q.    On the complaint go to page 13,
17 paragraph 65.
18   A.    Okay.
19   Q.    I'll just read the paragraph. Prior to
20 this phone call there were no warnings, discussions
21 of a performance plan, probation or other steps
22 taken. Abell was summarily terminated based on these
23 vague and conclusory allegations for alleged conduct
24 that, had a man engaged in the same or similar
25 behavior, would have gone unnoticed in Abell's

Page 236

1 workplace.
2         When you say you were terminated for
3 vague and conclusionary allegations, what are you
4 referring to?
5    A.    Well, vague because one, they didn't
6 know anything about this, right? And I'm not the one
7 who showed it to Roxanne or anybody else. Mike never
8 got reprimanded for it. I am not the one who even
9 put it in front of anybody's face. I was honest from
10 the beginning when Rich Kahr asked me did it happen,
11 I told him all the truth. I fear nothing and I fear
12 no one. Nobody said anything about Mike, do you see
13 what I mean? No one said anything about Dave. So
14 it's just this had never happened before, there's no
15 pattern of it.
16   Q.    Are you aware if anyone complained to HR
17 about Mike or Dave regarding this incident?
18   A.    No. Again, they're men, yeah, they're
19 my friends but no. Plus they didn't have a target on
20 their back and weren't going for director of some
21 position that bothered Rob Rock. Had it been them
22 going for that Rob Rock would have been fine with
23 that.
24   Q.    Are you saying that Rob Rock had
25 something to do with the reporting of the Kamasutra

Page 237

1 matter?
2    A.    I don't know. I'm not saying that he
3 did, what I'm trying to say is that because this was
4 already put on my back when they investigated Rob
5 Rock the day they did, and again, I did not report
6 him someone else did, or the whole incident. But
7 then to open up this whole investigation on me as a
8 retaliation, do you see what I mean? They pick and
9 choose what they want to read into. So if there were
10 other complaints about me before that I'm unaware of,
11 then make me aware. Rich never did. Because I asked
12 him is there a pattern? Have you ever heard anything
13 about me like this before? He said no, it's an
14 isolated incident.
15   Q.    Just in particular where it says
16 terminated by these vague allegations, what were
17 vague about the allegations?
18   A.    A couple people saw when walking by --
19 I'm sorry, because when we had the statement he
20 wouldn't give me any straight answers. Vague as in a
21 couple people saw this when walking by. And they
22 took offense to it. Can you tell me how they were
23 offended? Visually? Okay, but why, I don't
24 understand why. Because it was pornographic? We
25 don't have a zero tolerance policy here. At Pfizer

Veritext Legal Solutions
800-227-8440                                              973-410-4040

Page 274

1   Q.   So are you aware that they're close
2  personal friends?
3   A.   Yes.
4   Q.   And how are you aware of that?
5   A.   Because he told me that.
6   Q.   He used those exact words?
7   A.   Yeah, we're very close friends.
8   Q.   Did he tell you how long he's known Mr.
9  Stack?
10  A.   He did but I don't remember. He had
11  told me that at one point.
12  Q.   Did he expound into whether they're
13  social friends, vacation together?
14  A.   They're social friends that I knew. As
15  far as vacationing, that I don't know the intimate
16  details.
17  Q.   So is it your position that Dr.
18  Kronenfeld is, based on his relationship with David
19  Stack, has done anything inappropriate or wrong in
20  his managing of Pacira?
21  A.   Dr. Kronenfeld?
22  Q.   Yes.
23  A.   Did I see that he has, no, I feel that
24  because they're really close friends there are times
25  when Dave has not made proper decisions, that

Page 275

1  executive team or stuff that, you know, they agreed
2  with or disagreed with and they let him continue to
3  build on and go on, you know, do the things that he
4  did because he had a temper. So a lot of times they
5  didn't want to piss him off, just like everyone kind
6  of walked on eggshells. I didn't have that concern,
7  I had no issues with Dave. I can go and say what I
8  want but I wasn't allowed to by my superiors. So
9  Mark and I would meet without anybody's knowledge
10  because we weren't allowed to meet because Pete,
11  Dennis, Glenn, they forbid had me from meeting with
12  him because they knew he was fond of me. And he also
13  spoke highly of me at their meeting or whatever the
14  conversation was. He never disclosed it because he's
15  a board member and he's not to disclose that. But we
16  were friends as well. So I never told my bosses
17  because again, being a woman and all these other
18  things that's how they see it. Any time I go see him
19  I have to bring them in with me. And that wasn't
20  always possible. I respect his position, his
21  knowledge, he's an intelligent, very intelligent man,
22  very respectful.
23  Q.   Who are you referring to?
24  A.   Dr. Kronenfeld.
25  Q.   So is it your position that any of the

Page 276

1  board members ever took inappropriate action based on
2  the fact that they were friends with Mr. Stack?
3   A.   Well, there were times -- this is again,
4  this was to be remained in the room but I'll just
5  give you just a little, not all of it. There were
6  times there were decisions that, you know, the CEO is
7  there and board is there to keep everything in check
8  so that we don't again, tank the company or do
9  certain things and no one once gave me a satisfactory
10  answers as far as compliance. I was always worried
11  like I'm going to have no job the next day. So my
12  whole concern was every time I addressed it it's like
13  fall in line, you're a woman, you're a woman, fall in
14  line. I asked for compliance issues, fall in line,
15  asked to go see Dr. Kronenfeld, no, fall in line.
16  It's like constantly getting slapped all the time for
17  asking legitimate questions, where is this grant
18  going, why aren't we reporting the white space, why
19  aren't we doing this or that? Do you see what I men?
20  No one gave me a satisfactory answer as to -- or even
21  investigate it, any of those issues that I brought
22  up. So there were way too many gray areas over those
23  four years, not one. So I mean, you asked earlier do
24  I know where it's listed or not, no, but I know the
25  difference between right and wrong. I also know the

Page 277

1  difference between black and white and gray and there
2  are a lot of grays here and no answers.
3   Q.   And is it your position that you
4  couldn't get those answers because of the board of
5  directors and senior executives being friends of
6  David Stack?
7   A.   That and also everybody is fearful of
8  Dave. It's not like a hidden fact, everybody is
9  terrified of Dave. I on the other hand, I think
10  similarly to how he thinks and I have no issues
11  addressing anything that he would like to discuss
12  with me. I have no problem because for me this is a
13  lot more personal than anybody else. For me, just
14  like Dave, Exparel was my baby, this was going to go
15  to places, this was going to fly to Mars. So for me
16  and Dave we looked at the world as a macro not as a
17  micro, that's why I was never afraid of him. I had
18  no problem addressing whatever discussing what we
19  did. And that's why I did as well as I did because I
20  want to take it to a different level. And if I'm
21  going to have that respect I'm going to have to speak
22  in their own languages, call people out on their
23  stuff. If you don't call people out you cannot just
24  be a CEO, CFO, COO and not call people's stuff out if
25  you're always afraid. And these people always afraid

70 (Pages 274 - 277)

Page 282

1  questioned they would have received answers. But no
2  one asked those questions and the stock price went
3  from $126 back down to 29 or in the 30s because of
4  the DOJ investigation. It destroyed our stock.
5      Q.   And what makes you say if a man asked
6  those questions he would get answers?
7      A.   Reason why is because not a single man
8  was ever told to keep it quiet. I said to Pete, I
9  would always question Pete or Dan, I was like, if I
10 wasn't a woman, if I wasn't a girl and if I wasn't a
11 female, would you have treated me the same way?
12 That's not the point. No, that is the point. If
13 Isaac asked that question, you'd take him out for
14 beers. I ask the question and you tell me to shut
15 it. And that's the language they use. So do you see
16 what I mean? You go out and smooth things over with
17 the boys because it's a boys club. I don't know what
18 they discuss or ask or not ask. Whenever they had
19 questions they were all afraid, they come to me.
20 That's when I send that -- because I complained for
21 two consecutive years to Pete Murphy as well as
22 Dennis about the comp plan, the discrepancies and all
23 these other things. They didn't do anything. Nobody
24 addressed it. I was close enough to Jim to say okay,
25 this is not coming from a bad place but look at how

Page 283

1  we're being cheated? He didn't even know about it.
2  But look, he fixed it immediately because he did the
3  right thing. Just like if Dave knew you do the right
4  thing. But they put all those road blocks in the
5  middle, middle management and fire people for
6  whatever causes or not causes and nobody wants to
7  take the blame or explain. Only women are being
8  terminated left and right but people like Alexi are
9  floating by.
10     Q.   Paragraph 84: Abell reported these
11 irregularities, which she believed were securities
12 law and/or ethical violations, at various times
13 between at least May 2014 and her termination on
14 March 14, 2018, to the following individuals: Chief
15 Financial Officer and President James Scibetta,
16 Kronenfeld. What and when did you report to Mr.
17 Scibetta?
18     A.   It was when I sent that e-mail and also
19 in our trips that we went on, I was like well, I'm
20 not seeing it. But he's the kind of person who would
21 address it, right? Not directly to me just like when
22 I complain about the comp plan, he addressed it. But
23 you shouldn't have to live in fear constantly and
24 Mike was like why would you do that, why did you go
25 over my head? I didn't, I offered you 18

Page 284

1  opportunities to fix it. In the last 24 months. You
2  didn't do anything about it. And now I'm having
3  people who trust me in this organization, all the
4  sales reps and people that see me in the leadership
5  role, because if I'm going to give you one problem
6  I'm going to give you three solutions. And I did
7  that for Jim Scibetta and it was easy enough. For
8  any superior, it makes their job easier if you come
9  in with the complaints all the time, that's grand,
10 but what do you want from me? I will give you
11 solutions. And that's why Jim responded properly.
12     Q.   So when did you go to Mr. Scibetta?
13     A.   It was 2016, July, June 30th I think.
14     Q.   And you complained about the
15 compensation?
16     A.   Comp plan, how we're being treated
17 unfairly and I forget what the e-mail said but you
18 have that.
19     Q.   Were you fearful of being terminated
20 when you made that complaint?
21     A.   Absolutely.
22     Q.   But were you terminated when you made
23 that complaint?
24     A.   Nope, because I didn't let Dennis read
25 this e-mail, I had Pete read it and Isaac, Crystal

Page 285

1  Rowe (phonetic) read it. I said what do you think?
2  Well, it was nice knowing you. I said that's fine,
3  that's why I'm going to send this on June 30th at
4  least I can get my commission for the two quarters
5  and I'm prepared for that because enough is enough.
6      Q.   How about Kronenfeld, when did you
7  complain to him?
8      A.   It's not so much about complaining, I
9  was more like conversations we would have or whatever
10 over those four years that we had in the hallway or
11 here or there. He would ask me about the pulse, I
12 was like the moral is very low. So and so in this
13 area, I wouldn't give him names. I would just say
14 some reps in south they lost moral completely because
15 they did this to the comp plan or mistreated him this
16 way and now they're golfing or fishing or hanging out
17 with the kids or going to the pool. And he's like
18 oh, my God, that is bad. I'm like yeah, that is bad.
19 You need to do something, need to address this. So
20 it was like little things like that. It was not
21 specifically in details or the meetings were always
22 meant for us to have a meeting, I would run into him
23 in the hospital because he's in our account.
24     Q.   Do you consider yourself a spokesperson
25 for the SAS's?

# EXHIBIT 23

Page 186

1   A   Correct.
2   Q   You spoke with Roxanne Brady?
3   A   Correct, and Gio.
4   Q   And Gio. In addition to those
5   five individuals, did you speak with anybody
6   else?
7   A   I do not believe so, no.
8   Q   Were anybody else's names
9   offered in the course of your investigation as
10  potential witnesses?
11  A   There were other names that were
12  thrown out as possibly standing around when some
13  of the interaction happened between the two but
14  nobody was 100 percent certain that anybody, you
15  know, witnessed everything, so it was a decision
16  about who the most likely people are that would
17  have something to contribute to the -- the issue.
18  Q   And did you come to any findings
19  with respect to the incident that happened
20  surrounding the Top Golf event?
21  A   Only that the story line and
22  positions that Reshma and Rob had were completely
23  opposite from one another and very little of what
24  they voiced to me could be corroborated by anyone
25  else. After talking to all those people that I

Page 187

1   talked to, very few things were confirmed outside
2   of the fact that Reshma wanted to go to the Top
3   Golf event, got into a taxi, went over with some
4   folks to it, interacted with people that were
5   there, nobody seemed to have ever been present
6   when Reshma and Rob had, you know, a conflict
7   with one another.
8   Q   And was it your understanding
9   that there was words exchanged between Rob and
10  Reshma at the Top Golf event?
11  A   Yes. Now, that was again
12  alleged. Certainly, you know, Reshma's view is
13  that Rob did not treat her appropriately there
14  and was inappropriate in how he addressed her.
15  Likewise as well as the hotel too, so I mean that
16  was very clear.
17      Rob's version was completely
18  different and no one could, like I said, backup,
19  you know, enough of what had been communicated to
20  me for me to draw conclusions outside of the fact
21  that they had conflict that was apparent to
22  anybody but nobody really knew what they were
23  saying and, you know, anything specific that
24  would backup what they had to say.
25  Q   And was it your understanding

Page 188

1   that Glen Riser was physically present at the Top
2   Golf event on the evening that the words were
3   exchanged?
4   A   No, that wasn't -- if he was, I
5   don't recall. If he was, he wasn't present when
6   the two of them were having a discussion.
7   Q   Did you ever come to learn the
8   names of all the individuals that were present at
9   the Top Golf event?
10  A   Well, there was quite a few
11  people there so no, I mean I think, you know,
12  that was -- there were a number of people there
13  from Gio's region and Rob's region but, you know,
14  my interest was primarily just talking -- I
15  didn't want to talk to everybody in the sales
16  organization, I wanted to talk to people that
17  might have some incite around what transpired
18  between the two.
19  Q   Did you understand the Top Golf
20  event to be a corporate event?
21  A   No, I did not understand that to
22  be the case.
23  Q   Was it a corporate sponsored
24  event?
25  A   Well, I guess it depends on how

Page 189

1   you define a corporate sponsored event. It was
2   two Region Directors that chose to have a social
3   event because it was technically with the women's
4   event happening that night, it was a night off
5   for everybody. So they just planned a social
6   event for their two regions, they went over
7   there, it wasn't everybody in the sales
8   organization, all the other guys in the sales
9   organization didn't get invited to that, it was
10  only those two region guys that had most of their
11  teams there, that's my understanding, based on
12  talking to both Gio and to Rob.
13  Q   Do you know if there were other
14  individuals aside from members of their regions
15  that were present?
16  A   I don't know with 100 percent
17  certainty, no.
18  Q   Was that a part of your inquiry?
19  A   No, no. I mean my inquiry was
20  more around confirming and being able to get some
21  facts around what had alleged to have happened
22  between the two of them that was considered
23  inappropriate conduct down at the national sales
24  meeting, you know, knowing who was at Top Golf
25  wasn't necessarily my first priority. It was who

Page 198

1  disturbed by an incident that happened at the
2  national sales meeting on a break and basically
3  proceeded to articulate the fact that on a break
4  Reshma pulled out her phone, opened up the Kama
5  Sutra website and shared it with a number of
6  people at the meeting.
7       Q    And was this the first time you
8  were aware of the allegation that Reshma shared
9  material concerning Kama Sutra at the national
10 sales meeting?
11      A    That's correct.
12      Q    You had not heard of that from
13 any other source prior to hearing it from Steve
14 Huddy?
15      A    That's correct.
16      Q    Other than Steve Huddy, did you
17 hear it from any other individual?
18      A    I did.
19      Q    Who else?
20      A    Roxanne Brady -- not Roxanne --
21 what was Roxanne's last name?  There was another
22 Roxanne in our headquarter's office.
23      Q    Are you referring to Roxanne
24 Doherty?
25      A    Roxanne Doherty, yes.

Page 199

1       Q    Within the investigative notes
2  there is certain indication that a phone call was
3  conducted with an individual Roxanne Brady.  Is
4  that a --
5       A    That's a typo.  It's Roxanne
6  Doherty.
7       Q    So is there more than one
8  Roxanne within the Pacira organization?
9       A    Yeah, there is an admin in the
10 headquarter's office.
11      Q    So contained in the
12 investigatory notes, any reference made to
13 Roxanne Brady would have been likely a typo or --
14      A    No, it was Roxanne Doherty.
15      Q    Okay.  But where it says on the
16 investigative report, Roxanne Brady, that's
17 incorrect in terms --
18      A    That is incorrect, yes.
19      Q    And what is it that Roxanne
20 Doherty told you during the course of your
21 conversation with her?
22      A    Very similar to what Steve Huddy
23 said, when I asked her the question at the end,
24 whether there is anything beyond what we had
25 talked about regarding the incident that happened

Page 200

1  between Rob and Reshma, she said yes, she wanted
2  to make me aware that there was an incident with
3  Reshma during a break where Reshma again had her
4  phone open to a website called Kama Sutra, and
5  that there were a number of sales reps around her
6  and she told her when she walked over there that
7  it was inappropriate for her to be doing that, to
8  shut it down and to go back to the meeting.
9       Q    Did Roxanne Doherty tell you
10 that she was made to feel uncomfortable by this
11 material?
12      A    Yes, yes.
13           MR. PANZINI:  You have to let
14 him finish his question.
15      A    Yes, yup.
16      Q    Did she use those exact words,
17 that she was made to feel uncomfortable?
18      A    She felt it was inappropriate.
19 I can't remember whether -- if it made her feel
20 uncomfortable, I would have to go back and look
21 at my notes specifically.
22      Q    Did Steve Huddy use the specific
23 words that he was made to feel uncomfortable?
24      A    Yes.
25      Q    And that you recall?

Page 201

1       A    Yes.
2       Q    Other than the discussions of --
3  with Steve Huddy and Roxanne Brady, were you
4  caused to learn about this material that Reshma
5  purportedly showed by anybody else?
6       A    No, only from my followup
7  conversation with Reshma.
8       Q    Do you recall the sequence and
9  timing in how long in time it was from when you
10 first spoke with Rob and Reshma to when you spoke
11 with Steve Huddy?
12      A    Matter of a day or two.  I mean
13 a couple of the fact finding meetings may have
14 carried over to early the following week, I can't
15 recall timing without looking at the notes.
16      Q    Do you recall what you learned
17 from speaking with Isaac Smolko concerning the
18 events that transpired at the Top Golf event?
19      A    Do I recall what, I'm sorry?
20      Q    What it is that you learned from
21 the discussion with Isaac Smolko?
22      A    Not much, Isaac didn't have any
23 -- anything to share that was at all pertinent
24 and could, you know, provide any bearing on
25 whether there was or there wasn't a conflict

Page 202

1 between the two.
2    Q    And with respect to the
3 information offered to you by Steve Huddy
4 concerning the Kama Sutra, that was offered to
5 you unsolicited?
6    A    Yes.
7    Q    Following your being made aware
8 of the -- of this information by Steve Huddy, did
9 you perform any due diligence to research what
10 the Kama Sutra, what the Kama Sutra is?
11    A    No, only what I was told.
12    Q    What were you told about the
13 Kama Sutra?
14    A    That it was supposedly a site
15 with figures in -- in inappropriate sexual
16 positions and what have you, but it was sexual in
17 orientation and inappropriate.
18    Q    Did you undertake any
19 investigation to learn if there was any cultural
20 or religious significance between behind the Kama
21 Sutra?
22    A    No.
23    Q    In the course of any discussions
24 with Reshma, did she raise with you the issue
25 that the Kama Sutra was cultural and religious in

Page 203

1 nature?
2    A    She did.
3    Q    And after she raised that issue
4 to you, did you then do any independent research
5 to look into what the Kama Sutra meant in terms
6 of that cultural relevance?
7    A    No.
8    Q    And do you understand the
9 religious significance of the Kama Sutra?
10       MR. PANZINI:  Objection to form.
11 Go ahead if you know.
12    A    You know, I don't know how to
13 answer that question.
14    Q    Well, what do you understand the
15 Kama Sutra to be?
16    A    An inappropriate site to be
17 showing at a national sales meeting to other
18 colleagues.
19    Q    Did you ever view the materials
20 that were purportedly shown at the national sales
21 meeting?
22    A    No.
23    Q    Were you ever -- did you ever
24 ask to see what was being shown?
25    A    No.

Page 204

1    Q    Were you ever offered the
2 opportunity to be shown, to see what was being
3 shown at the meeting?
4    A    No.
5    Q    Had you been offered the
6 opportunity to review these materials, would you
7 have undertaken that?
8    A    Probably not, no.
9    Q    Why not?
10    A    I felt there was no need for
11 that to be the case.
12    Q    How could you possibly deem
13 whether or not something is appropriate or not
14 having not look at the source of the material?
15    A    Go ahead.
16       MR. PANZINI:  You got to let him
17 finish and then you got to let me.  Don't
18 anticipate the end of the question.  I'll object
19 to the form but go ahead and answer.
20    A    So finish.
21    Q    I'll ask again.  How could you
22 make a determination about whether or not the
23 material was objectionable, offensive or
24 inappropriate without actually viewing it
25 yourself?

Page 205

1    A    Because I am reacting to what
2 people told me at the meeting.  That they
3 witnessed the site, it showed this, of people,
4 figures in inappropriate positions, sexual
5 positions and it made them very uncomfortable.
6    Q    Specifically you are referring
7 to Steve Huddy.  Correct?
8    A    And Roxanne.
9    Q    Well, you told me earlier you
10 don't recall whether or not it made Roxanne
11 uncomfortable, you just thought that she
12 mentioned it seemed inappropriate.  So it was
13 only Steve Huddy that told you he was
14 uncomfortable by it.  Is that correct?
15    A    Well, again, I would have to
16 refer to my notes, you are asking me to confirm
17 stuff without actually seeing what I wrote.  You
18 got the benefit of looking what I wrote right
19 now.
20    Q    Well, sir, you told me at the
21 beginning of the deposition that in preparation
22 for the deposition that you reviewed these notes.
23 Is that correct?
24    A    Not word for word but yes.
25    Q    You also told me that you

Page 214

```
 1  reported directly to Rob Rock?
 2      A     No.
 3      Q     Why not?
 4      A     Because by the time I had talked
 5  to Rob and/or Steve Huddy and Roxanne and
 6  followed up with Reshma, she confirmed that it
 7  happened, it was irrelevant.
 8           In my conversation with Reshma,
 9  you look at the notes, there was not a dispute
10  about whether she did it or didn't do it, I
11  didn't need to talk to other people.  She had
12  confirmed that to me.  There was no -- there was
13  no issue in dispute.
14      Q     Did Reshma -- withdrawn.
15           Is it your testimony here today
16  that Reshma admitted to you showing Steve Huddy
17  Kama Sutra material on her cell phone?
18      A     She admitted showing Kama Sutra
19  to others at the meeting, she didn't get into who
20  specifically she showed it to.  I didn't talk to
21  her about names and she didn't talk to me about
22  names but when I confronted her on it, she did
23  not hesitate in confirming that she did.
24      Q     And when she confirmed that she
25  showed this material, did she offer you context
```

Page 215

```
 1  upon which this material was viewed on her phone?
 2      A     She did.
 3      Q     And what was the context that
 4  was offered?
 5      A     She basically said that her
 6  rational was that it was -- you know, she didn't
 7  have it open for very long, there wasn't very
 8  many people there, it was not a big deal, it
 9  wasn't a distraction and for that reason she
10  didn't think, you know, it should be, you know, a
11  serious issue.
12      Q     Did she also explain to you the
13  religious significance that the Kama Sutra plays?
14      A     I don't think she explained that
15  in that sense, no.
16      Q     When was the issue of the Kama
17  Sutra material first discussed with Reshma?
18      A     After I had had my conversations
19  with Steve and Roxanne.
20      Q     How many calls -- withdrawn.
21           In the course of your
22  investigation, did you conduct calls with Reshma
23  Abell?
24      A     I did.
25      Q     How many calls did you conduct
```

Page 216

```
 1  with Reshma able?
 2      A     I think there was three
 3  different calls, there was the initial one to get
 4  her side of what transpired with the conflict,
 5  there was the one to tell her that a decision had
 6  been reached around the conflict, that we were --
 7  based on us not being able to verify, you know,
 8  either way that there was a disciplinary issue
 9  that was -- that the company was going to put
10  that case behind us and drop the case, and then
11  the third one was to make her aware of the fact
12  that the Kama Sutra issued had been surfaced to
13  my attention and get her reaction to it and
14  that's when she divulged that she acknowledged
15  it, she didn't dispute it.  She tried to
16  rationalize it.
17      Q     Did you raise the issue of the
18  Kama Sutra material with Reshma during the first
19  telephone conversation you had with her?
20      A     No.
21      Q     Why not?
22      A     Because I wasn't aware of it at
23  the time.  You know, when I talked to her about
24  the issue with her and Rob, no, that hadn't come
25  up until after I talked to her and Rob and was
```

Page 217

```
 1  doing the fact finding with others that it
 2  happened in the second conversation.
 3      Q     Can you mark that as Plaintiff's
 4  47, please.
 5           (Whereupon, Exhibit 47, Email
 6  dated February 11, 2018 from Cecilia Ross is
 7  received and marked for Identification by the
 8  reporter.)
 9           I'd like to show you what's been
10  marked as Plaintiff's 47, these are documents,
11  three pages Bate stamped Pacira126, 127 -- sorry,
12  1266, 1267 and 1268.  Do you recognize what's
13  been marked here as Plaintiff's 47 today?
14      A     Yeah, this was the first
15  conversation I had with Reshma.
16      Q     Who is Cecilia Ross?
17      A     Who is Cecilia Ross?  She is an
18  admin in headquarters.
19      Q     Can you explain to me why the
20  message was sent from Cecilia Ross to you
21  containing an attachment of these notes?
22      A     I don't know.
23      Q     Turning your attention to the
24  second page of the exhibit Pacira1267, is this
25  the investigatory notes that you prepared
```

# EXHIBIT 24

Page 46

1  A. You know, at some point they were in a --
2  this was prior to my time at Pacira, but they were
3  in a car together and -- or they were together and
4  there was a few people -- it was Isaac, Reshma and
5  a couple other people and she made some sort of
6  remark about Isaac's wife and said, Well, she has
7  this but your dick is mine.
8  Q. This was recounted to you by Isaac?
9  A. Yes.
10 Q. And this occurred prior to your employment
11 with Pacira?
12 A. Yes.
13 Q. So this was --
14 A. I believe so, yeah.
15 Q. This was Steve -- this was Isaac Smolko's
16 secondhand recounting of some event occurring
17 between him and Reshma?
18 A. Correct.
19 Q. And what about when you related the
20 information to Justin Sherrod, what, if anything,
21 did he say?
22 A. I don't remember.
23 Q. And what about when you relayed the
24 information to Rob Rock? What, if anything, did
25 he say?

Page 47

1  A. He said something along the lines of,
2  Well, maybe that should be something that you
3  would tell HR.
4  Q. And Rob's commentary to that effect, did
5  that precede your reaching out to Rich Kahr at HR?
6  A. It did.
7  Q. Did Rob encourage you to reach out to HR?
8  A. No. He just mentioned it at that time.
9  Q. And was that before or after there had
10 been a -- the Top Golf event and what happened
11 between Rob and Reshma?
12 A. It was after.
13 Q. With respect to the comments that Isaac
14 Smolko made, was there some implication there that
15 there was inappropriate sexual conduct between
16 Isaac and Reshma in the past?
17 A. No, I didn't take it that way.
18 Q. So what if -- what did you take that
19 commentary from Isaac to mean?
20 A. Just another example of Reshma being
21 sexually inappropriate in the workplace.
22 Q. So you took it to be nothing more -- well,
23 you took it to be words?
24    MR. PANZINI: Object to form.
25    You can answer.

Page 48

1  A. I mean, I took it as being pretty
2  offensive. I mean, if it would have been me in
3  that car, I would have been really offended by it,
4  considering he's married and has kids.
5  Q. (By Mr. Stewart) And when you told Steve
6  Huddy that you had been shown this content, did he
7  make any statements to the effect that he had seen
8  or he had been shown similar content by Reshma?
9  A. I don't recall. I don't remember.
10 Q. Did you ever have any conversations with
11 Steve Huddy about Reshma and about what
12 transpired?
13 A. I mean, he -- I told him that I had gone
14 to HR and told them about what had happened.
15 Q. And what did he offer in response to that?
16 A. He didn't -- I don't recall what he said.
17 Q. At some point in time were you asked to
18 sign a written declaration in connection with this
19 case?
20 A. I don't remember.
21 Q. You don't remember being asked to sign a
22 written declaration?
23 A. Well, I remember -- if you're referring
24 to, like, my statement that -- to counsel that I
25 had to -- that they wrote and then I signed, then

Page 49

1  yes.
2  Q. So that's what I'm talking about.
3  A. Oh, yes.
4  Q. There's a document that's entitled
5  "Declaration" which you signed under the penalty
6  of perjury dated December 19 of 2019. Do you
7  recall signing that?
8  A. Yes.
9  Q. And what was the circumstances that gave
10 rise to signing that document?
11 A. They reached out to me and needed me to
12 basically give them my official statement. And
13 they wrote it up and sent it to me. And I looked
14 it over, made sure it was correct, and signed it.
15 Q. And the document that was sent to you, did
16 you make any substantive changes or corrections to
17 what was sent to you?
18 A. I don't remember.
19 Q. How was the document sent to you? Was it
20 sent to you by email or by fax or some other
21 means?
22 A. By email.
23 Q. Do you recall if it was a Word document or
24 a PDF document or something else?
25 A. I don't.

13 (Pages 46 to 49)

