## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RESHMA ABELL, | : | |
| | : | |
| Plaintiff, | : | Case No.: |
| | : | 18-cv-16509 (MCA) (AME) |
| v. | : | |
| | : | Hon. Madeline C. Arleo, U.S.D.J. |
| PACIRA PHARMACEUTICALS, INC., | : | |
| DAVE STACK, individually and in his | : | **CIVIL ACTION** |
| capacity as Chief Executive Officer of | : | |
| PACIRA PHARMACEUTICALS, INC., | : | **FINAL PRETRIAL ORDER** |
| and RICH KAHR, PETER MURPHY, | : | |
| DENNIS McLOUGHLIN, PAUL | : | |
| CIAVOLELLA, GLENN REISER, JOYCE | : | |
| DAVIS AND MATT LEHMANN, in their | : | |
| capacities as employees of PACIRA | : | |
| PHARMACEUTICALS, INC., | : | |
| | : | |
| Defendants. | : | |

This matter having come before the Court for a pretrial conference pursuant to Fed. R. Civ. P. 16; Neal Brickman, Esq. and Jason Stewart, Esq. of The Law Offices of Neal Brickman, P.C. having appeared for PLAINTIFF RESHMA ABELL, and John K. Bennett, James J. Panzini, Esq. and Pooja Bhutani, Esq. of Jackson Lewis, P.C. having appeared for the remaining DEFENDANTS, PACIRA PHARMACEUTICALS, INC. ("Pacira") and RICHARD KAHR; and counsel all having been notified that:

(1)    A jury trial in this matter has been scheduled before the Honorable Madeline C. Arleo, U.S.D.J. on **July 10, 2023.**

(2)    the pretrial submissions detailed in ¶¶ 4, 21 and 22[1] below are to be submitted no later than **May 26, 2023**, **forty-five (45) days prior to trial** (or as otherwise ordered by the Court), or they will be deemed waived; and

(3)    the following Final Pretrial Order is hereby entered:

---

[1] The Court's template "Proposed Final Pre-Trial Order" referred to these paragraph numbers as ¶¶ 2, 18, and 19. However, this appeared to be a typographical error as the paragraphs referencing submission due dates of "45 days prior to trial" were ¶¶ 4, 20, and 21.

1.    **JURISDICTION -** [The parties shall identify the basis for the Court's jurisdiction.]

Pursuant to 28 U.S.C. § 1332, there is diversity jurisdiction as the matter involves an amount of controversy in excess of $75,000.00 and constitutes a controversy between citizens of different states: Plaintiff is, and has been, both upon the filing of her Complaint through present, a resident of the State of New York; Defendant Pacira, is and has been, both upon the filing of Plaintiff's Complaint through present, incorporated in the State of Delaware, with its principal place of business in the State of New Jersey; and Defendant Kahr, is and has been, both upon the filing of Plaintiff's Complaint through present, a resident of the State of New Jersey.

Pursuant to 28 U.S.C. § 1391(b), venue of this action in the District of New Jersey is proper because a substantial part of the alleged events or omissions giving rise to the Plaintiff's claims occurred within the District of New Jersey in Parsippany, New Jersey where Defendant Pacira (Plaintiff's former employer) is headquartered.

2.    **NATURE OF THE ACTION -** [The parties shall provide a brief description of the nature and background of the action.]

Plaintiff's Complaint contained five causes of action against ten defendants alleging: (1) sex discrimination under the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 to 10:5-49 ("NJLAD"); (2) sexual harassment hostile work environment under the NJLAD; (3) retaliation under the NJLAD; (4) retaliation under the New Jersey Conscientious Employee Protection Act, N.J.S.A. §§ 34:19-1 to 34:19-8; and (5) retaliation under the Dodd Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78-u-6(h)(1)(B)(i), against Pacira, Dave Stack, Rich Kahr, Peter Murphy, Dennis McLoughlin, Paul Ciavolella, Glenn Reiser, Joyce Davis, and Matt Lehmann.

Following motion practice in the form of a Motion to Dismiss and a separate Motion for Summary Judgment, and Plaintiff's own voluntary dismissals, Plaintiff has one remaining claim against two defendants to be tried: retaliation under the NJLAD against Defendants Pacira and Vice President of Human Resources ("HR"), Rich Kahr.  In summary, Plaintiff alleges that she was terminated on March 14, 2018 in retaliation for reporting gender-based harassment which she alleges occurred during a National Sales Meeting in February of 2018.

3.    *PATENT INFRINGEMENT SUITS ONLY* **- THE PARTIES' CONTENTIONS**

This matter is not a patent infringement suit, and as such, this section is Not Applicable.

4. **<u>PENDING/CONTEMPLATED MOTIONS/TRIAL BRIEFS</u>** - Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or the calendar. Also set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position. NOTE: ALL PRE-TRIAL MOTIONS INCLUDING *<u>DAUBERT</u>* AND *IN <u>LIMINE</u>* MOTIONS SHALL BE FULLY BRIEFED AND FILED **NO LATER THAN FORTY-FIVE (45) DAYS PRIOR TO TRIAL**

A.    **Plaintiff's Contemplated Motions/Trial Briefs:**

There are no pending or contemplated dispositive motions (they have already been made and ruled on) and there are no pending or contemplated motions addressed to discovery on the calendar.

1.    Motion in Limine to preclude the use of certain proposed exhibits and witnesses identified by Defendant, including but not limited to Exhibits 8-17 of the Defendants' exhibit list on the grounds of relevancy as the exhibits pertain to irrelevant earlier in time communications which pre-date the issues at controversy and which have no relation to the purported reason for Plaintiff's termination, Exhibits 29, 34 and 35 of the Defendants' exhibit list as those exhibit each contain inadmissible hearsay and witness Lance Noble;

(i)    Motion in Limine to permit out-of-state witness Steven Huddy to testify at trial via a video conferencing platform (i.e. Zoom, Webex, MS Teams, etc.);

(ii)    Motion in Limine to Bar Defendants from Introducing Certain Evidence, Including:

1)    Documents containing hearsay statements attributed to current or former PACIRA employees regarding Reshma Abell and the occurrences prior to, at, or following the National Sales Meeting, including specifically "Kahr's Investigative Notes" exchanged multiple times in discovery but in the first instance as PACIRA000071-97.

2)    Any testimony which describes the Kamasutra related content which Reshma Abell received on her cell phone during the National Sales Meeting as "pornography."

3)    Any testimony, by any witness, concerning statements made to or about Lance Noble.

(iii)    Plaintiff contemplates submitting a Trial Brief.

**B.      Defendants' Contemplated Motions/Trial Briefs:**

Defendants intend to file motions *in limine* to preclude certain evidence and/or testimony at trial on the following topics within 45 days of the trial date, unless otherwise directed by the Court:

(1)     Motion to preclude the use of certain proposed exhibits and witnesses identified by Plaintiff, including but not limited to: Plaintiff's exhibit Nos. 3-15, 17-21, 23-37, 53-55, and 69, and; Plaintiff's proposed witnesses, Christy Schaffer and Ronald Kerna.

(2)     Motion to limit the testimony of Plaintiff's proposed witness, Leslie Hyman, to her knowledge regarding: Plaintiff's employment history, performance, and claims of a future promotion; Pacira's processes regarding promotions; the February 2018 NSM incidents at TopGolf and relating to the Kama Sutra, as well as any Human Resources investigation regarding same, and; any personnel decisions concerning Plaintiff.

(3)     Motion to preclude and/or limit the introduction of any evidence relating to any claims that are not the subject of Plaintiff's complaint and/or any discovery conducted as of the date of this order, including but not limited to Plaintiff's allegations that Defendants subjected her to continued retaliation by acquiring Flexion Therapeutics, Inc. and/or Myoscience, Inc./Iovera which resulted in job losses/lost wages to Plaintiff

(4)     Motion to preclude and/or limit Plaintiff's claim for lost wages due to: her re-employment in a comparable position; Plaintiff's subsequent job loss being too attenuated for Defendants to be liable for any continuing damages, and/or; Plaintiff's failure to reasonably mitigate damages following the job loss

(5)     Motion to preclude and/or limit the introduction of any evidence relating to Plaintiff's dismissed claims and/or factual background relating to same

(6)     Motion to preclude and/or limit Plaintiff's reference to the Kama Sutra being "religious" or related to her "national origin," "ethnicity," "race," "heritage," or "culture" as she has not asserted any claim for religious, race, or national origin discrimination

(7)     Motion to preclude and/or limit the introduction of any evidence that Pacira acquired Plaintiff's subsequent employer

(8)     Motion to preclude and/or limit Plaintiff's claim for emotional distress damages

(9)     Motion to preclude and/or limit Plaintiff's claim for punitive damages

Defendants also anticipate filing a trial brief and motion for a directed verdict at the close of Plaintiff's case.

4

5.   **STIPULATION OF FACTS -** [Set forth in numbered paragraphs all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties.]

    A.                    **Procedural History**

        1.      On November 28, 2018, Plaintiff filed a Five Count Complaint in the United States District Court, District of New Jersey against Pacira, and individuals, Dave Stack, Rich Kahr, Peter Murphy, Dennis McLoughlin, Paul Ciavolella, Glenn Reiser, Joyce Davis, and Matt Lehmann, alleging: (1) sex discrimination under the NJLAD; (2) sexual harassment hostile work environment under the NJLAD; (3) retaliation under the NJLAD; (4) retaliation under the New Jersey Conscientious Employee Protection Act, and; (5) retaliation under the Dodd Frank Wall Street Reform and Consumer Protection Act.

        2.      Plaintiff's remaining claim sounds in retaliation under the NJLAD against Pacira and Rich Kahr.

    B.                    **Factual Background**

        3.      Pacira Pharmaceuticals, Inc. is a specialty pharmaceutical company that makes a non-opioid analgesic for post-surgical pain management known as Exparel, and other related non-opioid pain management products.

        4.      Plaintiff began working for Pacira as a Surgical Account Specialist in April 2014.

        5.      In 2016, Plaintiff was promoted to the role of Senior Surgical Account Specialist. Senior Surgical Account Specialist, or "SSAS". Plaintiff's territory was part of the Northeast, specifically, New York City and Westchester County, New York.

        6.      Plaintiff successfully performed the sales component of her role as SSAS.

        7.      In or around February 2017, Plaintiff presented the concept for a new position titled Director of Post-Op Pain Management to Reiser and Murphy. Reiser and Murphy agreed to allow Plaintiff to perform the proposed duties of this role as a "pilot" and later access the viability of the position.

        8.      In order for a new position to be created at Pacira, Kahr or other HR personnel would be required to be involved in the process. Specifically, if a manager seeks approval for a new position, a job description would need to be created, a requisition with the job description would need to be attached and submitted through a review process for

approval by all successive managerial levels, Kahr, and the Chief Executive Officer ("CEO").

9.     In order for a new position to be created at Pacira, the CEO of Pacira was required to review the new job position and give it a "final sign off" in order for the role to be formally approved.

10.     Pacira's CEO, David Stack, never "signed off" on or approved the proposed Director of Post-Op Pain Management position.  The CEO's approval is required for any new job position to be created.

11.     Pacira's CEO Dave Stack was never presented with the opportunity to formally approve the newly created position of Director of Post-Op Pain Management.

12.     Kahr began working for Pacira in 2014. During Plaintiff's employment with Pacira through present, Kahr has held the title of Vice President of Human Resources. Kahr did not hire Plaintiff.

13.     The VP of Human Resources, Kahr, had never been contacted regarding the Director of Post-Op Pain Management position, and he had never been presented with a job requisition, salary requirements or job description for this proposed position.

14.     Murphy worked for Pacira from January 20, 2014 to January 24, 2020. During Plaintiff's employment, Murphy held the title of Northeast Regional Manager from January 20, 2014 to January 24, 2017, and Area Sales Manager, East from January 25, 2017 to July 17, 2017.  Murphy was part of the hiring process for Plaintiff and was one of her supervisors.

15.     At the time of Plaintiff's termination, Murphy held the role of Vice President, Sales.  In this capacity, Murphy was a third level manager to Plaintiff; Plaintiff did not report directly to Murphy.

16.     Murphy was aware of Reshma Abell's development plan and planned to present the proposed new position of Director of Post-Op Pain Management for Dave Stack's consideration to further the approval process for the role.

17.     During Plaintiff's employment, Reiser worked for Pacira in the roles of National Accounts Director from August 19, 2013 to August 28, 2015, Regional Business Director, Northeast, from December 5, 2016 to May 4, 2017, and Area Sales Director, East from May 5, 2017 to present.

6

18.     At the time of Plaintiff's termination, Reiser held the role of Area Sales Director, East.  In this capacity, Reiser was a second level manager to Plaintiff; Plaintiff did not report directly to Reiser.

19.     Reiser was aware of Reshma Abell's development plan and had knowledge of the proposed new position of Director of Post-Op Pain Management which was being considered for Plaintiff.

20.     At the time of Plaintiff's termination, she reported directly to Roxanne Doherty who held the title of Regional Business Director.

21.     Dennis McLoughlin was the Executive Director of Alliances at the time of Plaintiff's termination in February 2018.  In this role, McLoughlin was a fourth level manager of Plaintiff.

22.     Dennis McLoughlin became the Chief Commercial Officer for Pacira in August 2018, and he continues to hold this title to date.

## C.     **Pacira's Policies**

23.     Pacira has established policies which state that it is an Equal Employment Opportunity Employer and prohibits all forms of unlawful discrimination and retaliation in its Handbook and its Code of Conduct.

24.     Additionally, Pacira's policies promote employees to report any violations of the Handbook or Code of Conduct, compliance rules, or ethics, including complaints of compliance issues, ethics, sexual harassment, discrimination, and retaliation. The Handbook specifically permits employees to make anonymous complaints, provides instructions regarding who an employee may complain to, as well a hotline phone number and two email addresses for complaints to be made.

25.     Further, the policies designate more specific procedures regarding complaints of sexual or other harassment.  The policies are also clear that retaliation for the making of any complaints is prohibited. Additionally, the policies state that an employee's "[f]ailure to report complaints of unlawful harassment hampers the company's ability to take necessary steps to remedy such situations."

26.     Further, Pacira regularly conducted trainings on the topics of its general handbook, anti-harassment, equal employment opportunity, the code of conduct and business conduct, sexual harassment awareness, and the obligation for all employees to report adverse events.

27.     Indeed, Plaintiff attended trainings on the topics of the "Obligation of All Employees to Report Adverse Events," "Sexual Harassment Awareness for Employees," "Sexual Harassment Awareness for Managers," "Harassment in the Workplace," "Pacira – General Employee Handbook," and "Pacira's Code of Business Conduct and Ethics" in May 2014, July 2014, October 2014, May 2015, June 2015, September 2016, July 2017, October 2017, and December 2017.

28.     Plaintiff admitted she received the handbook, she was aware of reporting procedures and the policy prohibiting retaliation, and she attended trainings on the policies in the handbook.

29.     In or around February 5, 2018, approximately one week before the 2018 National Sales Meeting ("NSM"), Pacira also hosted a Sensitivity Training on the topics of harassment and its consequences, employer responsibilities, preventing harassment, responding to harassment, and liability to its managers.  Kahr facilitated this training to managers which included Matt Lehmann, Glenn Reiser, Peter Murphy, Robert Rock, Roxanne Doherty, and Dennis McLoughlin.

D.     **Pacira's 2018 National Sales Meeting and The TopGolf Incident**

30.     Pacira holds a NSM once annually. These meetings were previously held in different cities, they last two to three days, and several departments within Pacira, including the field team, marketing team, medical affairs and sales operations, attend.

31.     Pacira's NSM typically occurs at a hotel or conference center, and there are several events planned throughout the two-to-three days.  An itinerary is circulated which includes a schedule of meetings, lunch, and dinner events.  Some of the meetings are mandatory, and others are optional.  Additionally, managers often use the opportunity of having all sales team members together to host in-person, team-building events.

32.     The February 2018 NSM occurred from Sunday, February 11, 2018 to Thursday, February 15, 2018 in Orlando, Florida.

33.     One of the events scheduled during the 2018 National Sales Meeting was an "optional" Women's Leadership Initiative dinner meeting on the evening on February 13, 2018.

34.     On the same evening as the Women's Leadership Dinner, February 13, 2018, two regional managers, Gio Vendemia and Robert Rock, planned a team-building outing at TopGolf.

35.     Plaintiff was not expressly invited to the TopGolf event.

36.      At the TopGolf event, Plaintiff and Rock got into a "yelling match" where both she and Rock raised their voices at each other.

37.     Following the verbal disagreement, Reiser reported the incident to Peter Murphy and HR.  Murphy also reported the incident to HR.

38.     Rock also reported the incident to Chief Operating Officer Scott Braunstein and Senior Vice President Matt Lehmann, who in turn reported it to Kahr on February 15, 2018 and February 20, 2018.

**E.     Pacira's Human Resources Investigation**

39.     Following the TopGolf incident with Mr. Rock, Plaintiff did not individually contact HR to report the incident or make a complaint, but she was interviewed as part of the investigation that Kahr commenced after receiving reports about the incident from others.

40.     In response to the multiple reports received from others regarding the TopGolf incident between Plaintiff and Robert Rock, and given the senior level of Robert Rock who was involved in the incident, Kahr determined he should personally conduct the investigation into the incident that transpired at the TopGolf event between Robert Rock and Plaintiff.

41.     On February 17, 2018, Kahr contacted Rock via e-mail to set up time to discuss the TopGolf incident that he reported.

42.     In response to the email on February 17, 2018, Rock forwarded notes to Kahr which Rock prepared in advance of their scheduled telephone meeting for later that week.

43.     On February 20, 2018, Reiser emailed Kahr stating that he had additional information to report regarding Rock and Plaintiff that he may not have mentioned during their call on Friday, February 16, 2018.

44.     Kahr's investigation notes reflect that he conducted interviews with Plaintiff, Rock, Gio Vendemia, Pat Nolan, Isaac Smolko, Steve Huddy, and Abell's direct supervisor, Roxanne Doherty.

45.     During Plaintiff's March 13, 2018 telephone call with Kahr, Plaintiff acknowledged she viewed Kama Sutra related content on her cell phone during a break between group meetings at the NSM.

**F.      Plaintiff's Protected Activity under the NJLAD**

46.     During Plaintiff's interview with Kahr on February 21, 2018, she stated that Rock informed her before the TopGolf event that she could not attend because it was a "guy's thing" and a "boy's night out."  She stated she assumed Rock had been joking as she had already received permission from the other host, Vendemia, to attend. Notwithstanding, prior to and while at TopGolf, Rock made her feel unwelcome. She further stated she "never played the 'woman card' and wasn't sure if [Rock's behavior] was a guy thing or a Rob [Rock] thing," and she later stated she felt unwelcome at the event due to Rob Rock's conduct and "because she was a woman."  She also stated that both she and Rob Rock may have used profanity during their heated exchange at the TopGolf event.

47.     On February 22, 2018, an Account Manager from the Southeast region, Seth Whaley, emailed Kahr seeking to have a phone conversation with him.

48.     Following these interviews, on March 13, 2018, Kahr spoke with Plaintiff again.  During this conversation, Kahr told Plaintiff that the investigation into the TopGolf incident concluded, and while he felt Rock and Plaintiff's interactions at TopGolf were a distraction, Pacira would not be implementing disciplinary action.  He also informed Plaintiff that there had been reports from NSM attendees that she viewed content related to the Kama Sutra during a break from a meeting at the NSM which displayed sexual content and made others uncomfortable.  He then asked Plaintiff to respond to these claims, and she admitted that at least two people saw the Kama Sutra related content on her phone.

49.     During the March 13, 2018 meeting, Plaintiff also asked Kahr if she could apologize to the people who may have been offended and who allegedly complained to HR about the Kama Sutra images. She also offered to show Kahr the Kama Sutra related content.  Kahr declined to provide her the identities of who complained to HR and declined looking at the Kama Sutra related content.

**G.      Robert Rock and Plaintiff's Termination**

50.     Kahr terminated Rock on March 13, 2018.

51.     Kahr terminated Plaintiff on March 14, 2018 by phone.

52.     Murphy had been present during this conversation with Plaintiff, and Plaintiff recorded this conversation.  During the conversation, Kahr informed Plaintiff that

HR concluded the review of the facts concerning Plaintiff viewing "inappropriate" material at the NSM, and they concluded that "this was unacceptable conduct and behavior that [they] cannot support at Pacira, and as a result, [her] employment was being terminated effective [March 14, 2018]."

53.      Prior to Kahr's investigation conducted in February 2018 concerning the TopGolf incident between Rock and Plaintiff, Kahr does not recall ever meeting with or speaking with Plaintiff, knowing her personally, or interacting with her.

6.      **STIPULATIONS REGARDING TRIAL PROCEDURES** - [The parties shall identify stipulations regarding trial procedures (e.g., exchange of demonstratives, disclosure of deposition designations and objections, etc.)]

The parties have not identified any trial procedure stipulations at this time.

7.      **JUDICIAL NOTICE**[2]

A.      **Plaintiff's Requests for Judicial Notice**

-      **Plaintiff requests that the Court take judicial notice of the following facts:**

The *Kama Sutra* (properly called Kamasutram meaning "threads of pleasure"), is an ancient Indian text widely considered to be the standard work on love in Sanskrit literature. A portion of the work deals with human sexual behavior.

-      **Defendants object to the taking of judicial notice for the following reasons:**

Defendants object to Plaintiff's request for judicial notice of the foregoing statement as it's the subject of one of Defendants' anticipated motions *in limine*.

B.      **Defendants' Requests for Judicial Notice**
-      **Defendants request that the Court take judicial notice of the following facts:**

The *Kama Sutra* illustrates images of people engaged in various sexual positions.

-      **Plaintiff objects to the taking of judicial notice for the following reasons:**

Plaintiff objects to Defendant's request for judicial notice of the foregoing statement as, the statement characterizing the Kama Sutra as being a book that illustrates images of people engaged in various sexual position is an attempt to over

---

[2] The Court's template Joint Pre-Trial Order referred to the sections for "JUDICIAL NOTICE" in duplicate.  The parties have eliminated the duplicate sections for the Court's convenience and created subsections "A" and "B" for "Plaintiff's Requests for Judicial Notice" and "Defendants' Request for Judicial Notice," respectively, for the Court's ease of reference.

simplify and sexualize an important cultural text, having the Court take judicial notice of this fact bereft of context is prejudicial.

8.   **PLAINTIFF'S CONTESTED FACTS** - [Plaintiff must state contested facts separately for each Defendant. Proof shall be limited at trial to the contested facts set forth below. Failure to set forth any contested facts shall be deemed a waiver thereof.]

**A.     Plaintiff intends to prove the following contested facts with regard to liability:**

1.      Plaintiff was subjected to a toxic workplace culture which consisted of frequent unwanted and unwarranted sexual comments and was subjected to unwelcomed sexual touching.

2.      Plaintiff was a star-performer at Pacira who generated sales that far exceeded her peers.

3.      Plaintiff was a top sales performer and she routinely exceeded her quotas. She was repeatedly rewarded and acknowledged for her outstanding sales results.

4.      Male employees at Pacira were held to a different standard than women employees, especially with respect to workplace conduct.

5.      Plaintiff was instructed by her supervisors, and specifically by Peter Murphy, to stay off of the radar of Human Resources or otherwise she would face negative consequences.

6.      Prior to her termination, Plaintiff was never the subject of any Human Resources investigation(s).

7.      Reshma Abell was taught that there was an industry code that dictated a female should not report sexual harassment and that women should either accept and embrace the inappropriate conduct of their male co-workers or otherwise reject the advances, but never to report it.

8.      Plaintiff's unparalleled success at Pacira was a by-product of her tremendous effort and dedication to her work. She was acknowledged to be a prolific producer and a  rising star in the Company.

9.      While Plaintiff never embraced the inappropriate sexual conduct of her male co-workers, her success at Pacira, she was aided, in part, by her refusing to make complaints of harassment against her male co-workers and by staying off of the radar of the Human Resources department.

10.     Dennis McLoughlin, Peter Murphy and Glenn Reiser all received promotions and ascended within Pacira, in part, as a result of Reshma Abell's exceptional sales performance.

11.     Peter Murphy and Glenn Reiser worked with Reshma Abell to create her development plan and to put her pilot program in place.

12.     The purpose of the pilot program was to share Reshma Abell's successful sales techniques nationwide and to create a proof of concept for a newly envisioned role.

13.     Peter Murphy and Glenn Reiser told Reshma Abell that if her pilot program was a success, she would be placed into a newly created national role with the title of Director of Post-Op Pain Management.

14.     The pilot program was initially intended to last for three to six months.

15.     Reshma Abell did not receive additional compensation for the extra work and travel which the pilot program entailed.

16.     Reshma Abell successfully rolled out and executed her pilot program across nine months making visits to several regions and working with multiple sales representatives, yielding positive results from her efforts.

17.     For the period of time beginning approximately nine months prior to her termination, Plaintiff was given permission to spearhead, and executed a nationwide "pilot program" pursuant to a Development Plan which was composed with the input of her second level and third level managers and which, if successful, would have resulted in her appointment to a newly created position entitled Director of Post-Op Pain Management.

18.     It was not unusual or uncommon for Human Resources to learn of a contemplated Sales position and/or promotion until such time that it had already been approved by upper management.

19.     Reshma Abell held conference calls with both East and West Coast sales representatives to discuss her pilot program.

20.     Reshma Abell presented on her successes and her pilot program to top management at an "Ali Baba" meeting.

21.     Reshma Abell was told that her position of Director of Post-Op Pain Management was approved and required only a final sign off from Pacira's CEO Dave Stack.

22.     Reshma Abell was told that her promotion to Director of Post-Op Pain Management was going to be announced prior to or at the 2018 NSM.

23.     Upon arriving at the 2018 NSM, Reshma Abell confronted Peter Murphy and Glenn Reiser to ask why the promotion had not been announced.

24.     Reshma Abell was told by Peter Murphy that he planned to approach CEO Dave Stack about the position during the NSM and that she should be ready should he need to pull her into a meeting to speak to her successes with the pilot program.

25.     Reshma Abell was told that it was possible that the announcement of her promotion could be made during the 2018 NSM.

26.     As Director of Post-Op Pain Management, Reshma Abell would have had several regional sales representatives under her direct report.

27.     Reshma Abell discussed with Peter Murphy recruiting regional sales representatives to work under her in her new role while at the 2018 NSM.

28.     The reason Reshma Abell sought to attend the Top Golf event in February 2018 was to discuss her new position as Director of Post-Op Pain Management with various managers and sales representatives and to further obtain clearance and feedback to proceed with her recruitment efforts.

29.     The Top Golf event was not limited solely to the members of the two regions lead by Rob Rock and Gio Valdemia.

30.     Reshma Abell was told by Gio Vendemia that anybody can attend the Top Golf event and that the only thing is that she would have to pay for herself.

31.     Plaintiff sought and obtained permission to attend the TopGolf event from Gio Vendemia.

32.     The Top Golf event attendees included male members of Reshma Abell's region.

33.     No female other than Reshma Abell was invited to, or attended, the Top Golf event.

34.     The contract for the Top Golf event provided for additional guests to be added on a per guest basis.

35.     Reshma obtained permission to attend and volunteered to pay her own expenses at, the TopGolf event.

36.     Rob Rock confronted Reshma Abell in an aggressive and hostile manner when she advised him that she was attending the Top Golf event.

37.     Rob Rock sought to intimidate and humiliate Reshma Abell through his words, conduct and actions prior to and while at the Top Golf event.

38.     Rob Rock displayed aggressive body language, came within Reshma Abell's personal space and raised his voice in a menacing manner during a several minute long conflict that took place at the Top Golf event.

39.     During that interaction Rob Rock said that Reshma Abell should be attending the women's meeting and that she should not be at the Top  Golf event because it was a  "guy's event."

40.     Reshma Abell responded to Rob Rock's  conduct by standing her ground and yelling back at him, including using profanity. She did so as a means of protecting herself.

41.     Following the confrontation, Reshma Abell was humiliated and embarrassed.  She was physically shaking and was brought to tears by the incident.

42.     There were multiple witnesses to the confrontation at the Top Golf event.

43.     Glenn Reiser was at the Top Golf event at the time of the incident or otherwise arrived shortly thereafter.

44.     Either shortly after the incident, or upon learning of the incident, Glenn Reisser left the Top Golf event in an effort to distance himself from what had occurred.

45.     After returning from the Top Golf event, Plaintiff told her supervisor Roxeanne Doherty about everything that had transpired between Rob Rock and her at the Top Golf event.

46.     Subsequent to the Top Golf event, Plaintiff had discussions with Peter Murphy and Glenn Reiser about what transpired at the Top Golf event.

47.      Subsequent to the Top Golf event, Plaintiff had a telephone conversation with Rich Kahr about what transpired at the Top Golf event.

48.     Richard Kahr did not speak with all of the witnesses to the Top Golf event incident identified by Plaintiff.

49.     The 2018 NSM agenda set forth an anticipated schedule of events and other relevant information for the attendees of the meeting. Included within the agenda is a reference to a Women's Leadership Meeting which was scheduled to take place on February 15, 2018.

50.     Reshma Abell was sent multiple email invitations asking her to confirm if she would be attending the Women's Leadership Meeting. The hyperlink within the email to "decline" the invitation was not functional, and Plaintiff had to call someone to decline the invitation.

51.     All of the women at the NSM were invited to the Women's Leadership Meeting and nearly all attended except for Reshma Abell.

52.     Kristen Williamson was involved in putting together and leading the Women's Leadership Meeting.

53.     During the hostile interaction between Rob Rock and Reshma Abell, Plaintiff was told that she should be at the Women's Leadership Meeting.

54.     On the evening of the Top Golf incident reports were made by Glenn Reiser to Leslie Hyman and Richard Kahr about what had transpired.

55.     On the evening of the Top Golf incident, Rob Rock sent out a series of text messages and emails to various members of the Pacira leadership characterizing what transpired at the TopGolf event and making disparaging remarks about Reshma Abell, included among Rob Rock's missives was the notion that Reshma Abell had showed Pacira employee's a Kama Sutra app on her cell phone.

56.     The morning after the Top Golf incident Rob Rock spoke with Kristen Williams and Matt Lehmann about what transpired and attempted to disparage her and characterize what transpired in a manner that made Reshma Abell look like the bad actor.

57.     Richard Kahr undertook a purported investigation into what transpired at the Top Golf event.

58.     Richard Kahr either intentionally conducted a flawed investigation or otherwise lacked the skills and ability to conduct a meaningful investigation into what occurred at the Top Golf Event.

59.     Richard Kahr undertook a purported investigation into what transpired at the Top Golf event.

60.     Richard Kahr turned his purported investigation into a search to find a reason to fire Reshma Abell. Richard Kahr asked his interviewees and witnesses to the incident flawed and biased questions and/or twisted their words to arrive at his pre-determined outcome.

61.     Richard Kahr's investigation was faulty, incomplete and was manipulated to arrive at a pre-determined outcome, specifically an outcome that would result in Reshma Abell being terminated.

62.     Richard Kahr failed to uphold his ethical obligations as an Human Resources professional.

63.     Richard Kahr had a history of unethical behavior.

64.     Richard Kahr set forth on a course to arrive at a pre-determined outcome which would result in Reshma Abell's termination.

65.     Pacira and Richard Kahr had a history of discriminating against women and especially against women above a certain age.

66.     Richard Kahr did not speak with all of the individual's present at the Top Golf event.

67.     Richard Kahr did not accurately record the information he learned about what transpired at the Top Golf event.

68.     Richard Kahr injected a false narrative into the results of his purported investigation that he was told by multiple people that Reshma Abell had shown inappropriate and offensive conduct to multiple Pacira employees while at the 2018 NSM.

69.     Richard Kahr asked Reshma Abell if she had viewed any Kamasutra related content on her cell phone while at the 2018 NSM, to which Reshma Abell answered honestly that she had received an unsolicited text message which contained cartoon figures depicting iconography which is contained in the Kama Sutra.

70.     Reshma Abell admitted to receiving an unsolicited text message from a client which contained content related to viewing the Kamasutra—specifically a cartoon.

She received this content via text message while at the NSM and admitted to opening the text message and viewing the content, not knowing what was being sent.

71.     Richard Kahr had and seemingly still has no meaningful understanding as to what the Kama Sutra is.

72.     The Kama Sutra is an ancient Hindu text on sexuality, eroticism and emotion fulfillment in life. The Kama Sutra is neither exclusively nor predominantly a sex manual on sex positions, but rather was written as a guide to the art of living well, the nature of love, finding a life partner, maintaining one's love life, and other aspects pertaining to pleasure-oriented faculties of human life.

73.     The message which Plaintiff received and viewed at the 2018 NSM was a cartoon which depicted Kama Sutra related content.

74.     The reason given for Plaintiff's termination, that she viewed and showed inappropriate sexual content at the 2018 NSM, is and always has been a pre-text. She was fired in retaliation for making complaints about her mistreatment and the gender based harassment she suffered at the hands of Rob Rock. The idea that Plaintiff was fired because she viewed a cartoon image on her cell phone, is without merit and is not credible.

75.     Plaintiff's termination was discriminatory in that she was targeted for her gender and she was treated differently and less favorably than a male would have been. She was a victim of gender-based harassment and because HR learned that she made complaints about that, they developed a pre-text to fire her.

76.     Pacira had no legitimate business reason to terminate Reshma Abell.

77.     There was nothing graphic or offensive about the cartoon image which Reshma Abell received and viewed during the 2018 NSM.

78.     Richard Kahr refused to view the cartoon image which was allegedly "offensive" material which Reshma Abell  received and viewed during the 2018 NSM.

79.     Reshma Abell did not voluntarily show anyone the cartoon image which was allegedly "offensive" material at the 2018 NSM.

80.     The only individuals at the 2018 NSM who saw the cartoon image on Reshma Abell's cell phone which was allegedly "offensive" material were Dave Heritage, Mike Massacottee and Roxeanne Dougherty.

18

81.    Mike Massacottee looked over Reshma Abell's shoulder and asked "what is that" while she was opening the unsolicited text message which contained the Kamasutra related cartoon image. Mike Massacottee proceeded to take Reshma Abell's phone out of her hand and he showed Dave Heritage the cartoon image. Mike Massacottee then reached her arm out in the direction Roxeanne Dougherty who was walking by and said to Roxeanne, you need to see this.

82.    Roxeanne Dougherty waived her arm dismissively and told Mike Massacotte to knock it off. Reshma Abell took her phone back and put it away.

83.    The entire encounter from when Reshma Abell opened the unsolicited text message until when she took her phone back and put it away was very short in time.

84.    Roxeanne Dougherty never expressed any concern of being offended by the content on Reshma Abell's cell phone to Reshma Abell or to anyone else.

85.    Mike Massacotte never expressed any concern of being offended by the content on Reshma Abell's cell phone to Reshma Abell or to anyone else.

86.    Dave Heritage never expressed any concern of being offended by the content on Reshma Abell's cell phone to Reshma Abell or to anyone else.

87.    Reshma Abell never knowingly or willingly showed her cellphone or anything on her cell phone to Steve Huddy during the 2018 NSM.

88.    Steve Huddy never expressed any concern of being offended by the content on Reshma Abell's cell phone to Reshma Abell or to anyone else.

89.    Reshma Abell never knowingly or willingly showed her cellphone or anything on her cell phone to Seth Whaley during the 2018 NSM.

90.    Seth Whaley never expressed any concern of being offended by the content on Reshma Abell's cell phone to Reshma Abell or to anyone else.

91.    Reshma Abell never admitted to viewing offensive content on her cell phone during the 2018 NSM.

92.    Reshma Abell did not believe the Kama Sutra related cartoon image was offensive.

93.    Reshma Abell never admitted to showing people offensive content on her cell phone during the 2018 NSM.

94.     Reshma Abell when confronted by Richard Kahr about whether she showed anyone the Kama Sutra content at the 2018 NSM indicated that there were two people standing next to her when she viewed the content.

95.     Richard Kahr told Reshma Abell that individuals were offended by her viewing the material at the 2018 NSM, but refused to disclose who those offended individuals were.

96.     As a means to putting this issue behind her, Reshma Abell offered to apologize to anyone who may have been offended.

97.     Richard Kahr twisted Reshma Abell's words and claimed that she admitted to showing inappropriate sexual content to Pacira employees at the 2018 NSM, as a pretextual basis to arrive at his pre-determined outcome to terminate her employment with Pacira.

98.     Plaintiff alleges that her protected activity was reporting gender based harassment and gender discrimination which occurred on the evening of February 15, 2018 both to her supervisors and during an HR investigation interview conducted by Richard Kahr beginning on or around February 21, 2018 wherein Plaintiff reported that the Regional Sales Director of Pacira's Southeast region, Robert Rock, screamed at her, humiliated her, and informed her that—because she was a woman-- she should not  be attending the  TopGolf event which he planned, because it was a "guy's thing" and his making other sexist and harassing comments, including that she should  be attending the "women's meeting."

99.     Plaintiff claims that by, among other things, failing to educate himself on the allegedly "offensive" material and the context in which it was received and by furthermore, denying Plaintiff's requests for more information and her offer to provide more information, Richard Kahr conducted a flawed investigation.

100.     Richard Kahr came to a pre-determined outcome to terminate Reshma Abell because she made complaints about Rob Rock's conduct.

101.     Following the Top Golf event Rob Rock left the 2018 NSM without telling anyone, expressing in his missive emails that he was effectively quitting.

102.     Rob Rock was called back to the 2018 NSM after leaving in the early hours of the morning.

103.    After he quit and left the meeting Rob Rock was told to "stick around" and he was permitted to withdraw his resignation.

104.    Ultimately Rob Rock was fired, however the messaging around his exit was unclear and it was suggested that he had resigned to explore other opportunities.

105.    Kristen Williams was not involved in the decision to terminate Rob Rock.

106.    Kristen Williams was involved in the decision to terminate Reshma Abell.

107.    The decision to terminate Reshma Abell was motivated in part by her choosing not to attend the Women's Leadership Meeting.

108.    Rob Rock received a severance offer and payment following his termination.

109.    Reshma Abell was stripped of her stock awards and was not offered any severance package or financial remuneration after her termination.

110.    Following her termination Reshma Abell sought to mitigate her damages by pursuing employment with other similar pharmaceutical and/or medical device companies.

111.    Reshma Abell was hired to work for Flexion Therapeutics.

112.    Pacira acquired Flexion Therapeutics following Reshma Abell being hired there.

113.    Pacira insisted that Reshma Abell be laid off after its acquisition of Flexion Therapuetics.

114.    Reshma Abell was deprived her promised severance package that was negotiated with Flexion Therapuetics before the Pacira acquisition as further retaliation for refusing to drop the instant lawsuit.

115.    Following her termination from Pacira Plaintiff had a job opportunity with Myoscience/Iovera.

116.    Pacira acquired Myoscience/Iovera and immediately thereafter Plaintiff's job opportunity was withdrawn.

117.    Pacira interfered with Plaintiff's efforts to mitigate her damages and with Plaintiff's employment opportunities at least two entities, Myoscience/Iovera and Flexion.

21

**B.** **Plaintiff intends to prove the following contested facts with regard to damages - [**This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages.]

1. Plaintiff was a high earner at Pacira, she had received one promotion and was on track for a series of further promotions, including the imminent promotion to Director of Post-Op Pain Management, which was intended to serve as a steppingstone to the C-suite.

2. Plaintiff had dedicated herself to Pacira and had intentions of climbing the corporate ranks and remaining with the company until her retirement.

3. Several of Reshma Abell's supervisors had received promotions owing to her exceptional and unprecedented sales results.

4. Reshma Abell was promised a Director level position which would afford her a path to the C-suite.

5. Reshma Abell was told that her promotion to the Director level position would be retroactive to the beginning of 2018 and that it would be announced once CEO approval was obtained.

6. Reshma Abell's career was ruined by her termination from Pacira.

7. Reshma Abell has been unable to find similar and equivalent employment since her termination from Pacira.

8. Reshma Abell being terminated by Pacira has impacted her ability to find a job.

9. Reshma Abell has made significant efforts to mitigate her damages and has sought numerous employment opportunities through various means and channels.

10. When Reshma Abell did find gainful employment with Flexion Therapeutics, it was interfered with by Pacira in retaliation for the instant lawsuit.

11. Pacira acquired Flexion Therapeutics and promptly terminated Reshma Abell.

12. Reshma Abell's promised severance package negotiated with Flexion Therapeutics was interfered with by Pacira in retaliation for the instant lawsuit.

13. Reshma Abell has sustained significant economic loss as a result of her termination from Pacira.

14. The compensatory damages sustained by the Plaintiff can be calculated and estimated using the Economic Appraisal prepared by Plaintiff's expert economist, Kristin Kucsma.

15. Pacira's wrongful conduct towards Reshma Abell was willful and intentional and should be punished in the form of punitive damages.

16. Plaintiff engaged in numerous ongoing and continuing conversations with various recruiters and industry contacts in connection with her efforts to mitigate her damages.

17. Pacira interfered with Plaintiff's efforts to mitigate her damages and with Plaintiff's employment opportunities at least two entities, Myoscience/Iovera and Flexion.

9. **DEFENDANT'S CONTESTED FACTS** - [Stated separately for each plaintiff. Proof shall be limited at trial to the contested facts set forth below. Failure to set forth any contested facts shall be deemed a waiver thereof.]

**A. Defendants intend to prove the following contested facts with regard to liability:**

1. Plaintiff had knowledge of what is offensive in the workplace due in part to having attended harassment trainings during her employment with Pacira.

2. McLoughlin had never even heard of the job title, "Director of Post-Op Pain Management," or been involved in any conversation pertaining to the formation of this position or Plaintiff's promotion to a director level.

3. The purpose of the Women's Leadership dinner was meant to encourage women leaders within the organization.

4. Plaintiff did not want to attend the Women's Leadership dinner because it was indoors, and she did not want to spend the evening indoors after a full-day of attending other indoor meetings.

5. The TopGolf outing was restricted to a limited number of participants as there was an event contract with TopGolf for eighteen attendees.

6. The TopGolf outing organized by Robert Rock and Gio Vendemia was planned to be a team-building event for their respective sales regions and upper management who oversaw the regions.

7.      During Rock's interview with Mr. Kahr on or about February 21, 2018, he denied making any gender-based remark to Plaintiff and acknowledged that he only asked her if she planned on attending the Women's Leadership Dinner.  He stated that prior to the TopGolf event, Plaintiff asked if she could come.  He informed her "no" because reservations were already booked, and it was a "closed" group.  He also informed another male colleague that he could not attend the TopGolf outing for the same reason. Additionally, Rock took accountability to Kahr for his unprofessional conduct at the NSM, explaining that he had an "emotional reaction."

8.      Plaintiff cannot establish that she engaged in protected activity. Mr. Kahr did not get the sense during Plaintiff's interview that she had been complaining about gender or sex discrimination; he viewed her complaint to be based on Mr. Rock behaving unprofessionally as a manager.  Ms. Abell likewise stated she was not playing the "woman card."

9.      During the course of Kahr's investigation into the TopGolf incident, there were multiple reports about Plaintiff viewing sexually inappropriate images on her phone during one of the breakout meetings at the National Sales Meeting (from Robert Rock, Seth Whaley, Steven Huddy, and Roxanne Doherty).

10.     Whaley and Kahr spoke on or about February 23, 2018.   During this conversation, Whaley reported that during a break following a meeting at the NSM, Plaintiff showed him and Brian Wiley sexually inappropriate images of the Kama Sutra which depicted different positions of people engaged in sex in various sexual positions. Along with it, Plaintiff stated this was how she "gets through these meetings" and that "[her people] invented the [Kama Sutra]."   Whaley testified that Plaintiff's conduct was offensive and made him uncomfortable, and it would have been "inappropriate if any female or male showed me that in a business setting."

11.     During Huddy's interview with Kahr on February 26, 2018, Huddy reported he did not witness the exchange between Rock and Plaintiff at TopGolf.  However, in response to Kahr asking Huddy if he had anything else to share, Huddy reported that during one of the breaks following a meeting at the NSM, Plaintiff showed him provocative sexual images of the Kama Sutra which depicted different positions of people having sex, and she stated "[her people] invented the [Kama Sutra]." He felt this was very inappropriate and made him, as well as "others in the group," feel very uncomfortable.

12.     The HR notes reflecting the conversation between Kahr and Doherty demarcated "Pacira - 000082" contains a typographical error.   The document states "Roxanne Brady" but should state "Roxanne Doherty."

13.     During Doherty's interview with Kahr on February 28, 2018, Doherty shared that Plaintiff was crying following the incident at TopGolf claiming that she had been made to feel unwelcome. However, in response to Kahr asking if she had anything else to share, Doherty reported that during one of the breaks following a meeting at the NSM, Plaintiff showed her a sexually oriented website called Kama Sutra.  In response, Doherty informed Plaintiff that she should focus on the meeting and close down the website.  She also expressed that Plaintiff was a "distraction" to others, a "challenge to manage," and she was a potential issue for her and the company due to Plaintiff's lack of professionalism and foul language.

14.     During the March 13, 2018 meeting with Kahr, Plaintiff admitted to viewing the Kama Sutra at the NSM which confirmed the other reports made about her conduct.

15.     Additionally, Plaintiff testified that she could tell her manager, Roxanne Doherty, who also saw the sexual Kama Sutra graphics "was uncomfortable."  When Plaintiff was asked if she could understand how some would find it offensive, Plaintiff stated "of course."  Plaintiff also admitted she made some comment regarding "her people" inventing the Kama Sutra.

16.     During the investigation or any meeting between Plaintiff and Kahr, Plaintiff did not ever report that Mike Massicotte and Dave Heritage took her phone while she was viewing the Kama Sutra and showed it to others.

17.     Following the investigation, Kahr concluded that he could not corroborate the details of the verbal exchange between Rock and Plaintiff at TopGolf, and while some discipline could be considered, he did not feel that that incident in particular warranted termination for either.

18.     Kahr made the decision to terminate Rock and Plaintiff on March 13, 2018 and March 14, 2018, respectively, after discussing the decision internally with the legal department.

19.     However, Kahr also concluded that during the course of the investigation, he learned additional information which warranted the termination of Rock and Plaintiff. Specifically, Rock abruptly resigned his position and left the NSM after his verbal disagreement with Plaintiff; Mr. Kahr felt this conduct was unprofessional and unbefitting of a manager and therefore warranted termination.  After discussing this decision internally

25

with the legal department, Kahr terminated Rock on March 13, 2018. This decision was made notwithstanding the fact that Rock did not have any prior disciplinary history.

20.     Defendants did not engage in any retaliatory conduct and had a legitimate business reason for Plaintiff's termination. Further, Plaintiff is unable to prove that Defendants' legitimate business reason is pretextual.  To that end, during the course of the investigation, Kahr also learned from multiple witnesses, and Plaintiff herself, that at the NSM, Plaintiff showed individuals the Kama Sutra which contained different positions of people having sex, and some of the witnesses shared that her conduct was inappropriate and offensive.  Plaintiff's conduct of showing an inappropriate website which made others uncomfortable was not something Pacira's culture could support, and it constituted an egregious violation of values and anti-harassment policies.  Therefore, Plaintiff's behavior in showing images of the Kama Sutra during the NSM warranted termination; this decision was made notwithstanding the fact that Plaintiff did not have any written disciplinary history.

21.     Plaintiff cannot establish causation between any purported protected activity and the legitimate, business reason for her termination.  The decision to terminate Plaintiff occurred after Defendants learned of Plaintiff's inappropriate conduct which multiple employees reported and which Plaintiff herself confirmed. This presents a superseding, intervening event which caused the adverse action and negates any possible connection to her alleged whistleblowing activity.

22.     Pacira's decision to terminate Plaintiff and Rock was in compliance with its policies, and Pacira encourages proper reporting of complaints, the opposite of an "animus" as Plaintiff claims.  Indeed, Pacira regularly promotes and trains its employees on equal employment policies and anti-retaliation. Even at the time of Plaintiff's termination when she asked if she could raise issues about numerous other things that she admitted she never asserted in the past, Kahr encouraged her to do so.  However, she did not ever make any such report.

23.     Kahr did not aid and abet any unlawful conduct by Pacira, and he is not individually liable for any retaliation under the NJLAD.

B.     **Defendants intend to prove the following contested facts with regard to damages -** [This statement must include the factual basis for each defense against plaintiff's claims for damages.]

1.     There was no certainty or likelihood of a future promotion of Plaintiff to the role of Director of Post-Op Pain Management, or any other role.  It is undisputed that the Director of Post-Op Pain Management role did not otherwise exist at Pacira, and it still

does not exist at Pacira.  For any new role to be implemented, it requires a job description, as well as management, HR, and CEO approval.  There had been discussions with Plaintiff about a possible promotion to the role of Director of Post-Op Pain Management.  However, this was in the "pilot stage," and it did not ever receive the necessary approval to be finalized.

2.      The likelihood of any future promotion to Plaintiff was eliminated after her behavior at the NSM following her behavior at the NSM.  Indeed, just before the NSM, Plaintiff's managers, Murphy and Reiser, met with Plaintiff to sternly warn her that if she expected a future promotion, she should "show her best at [the] meeting," "demonstrate and show that [she was] a leader, and [she was] capable of staying out of the fray." Specifically, Reiser "encouraged Plaintiff to show her best at this meeting, so attend all – everything that she is supposed to, get there on time, be engaged, be positive [because] she was very much on display given that she on the cusp of (sic) this new opportunity." Murphy advised Plaintiff: "you need to do everything you can [at the NSM] to demonstrate and show that you are a leader, and you are capable of staying out of the fray, staying out of the bar, because you're now asking to be a leader of the company. . . pay attention in the breakouts.  Be a leader in the breakouts.  Don't get yourself in trouble, don't drink, and don't get in fights, and that'll set you up for, you know, a very good potential of, you know, sitting down with Dave. And we gave her that advice extremely sternly. . ." After Plaintiff had been reported to HR for allegedly engaging in a verbal altercation with Rob Rock [at TopGolf], Murphy confirmed that the idea of Plaintiff's promotion was the "last thing" he was going to propose to Pacira's CEO.

3.      As Plaintiff cannot establish liability on behalf of Defendants for the reasons described above, Plaintiff is not entitled to any compensatory damages.

4.      Plaintiff failed to meet her duty to mitigate her damages.

5.      As Plaintiff cannot establish liability on behalf of Defendants for the reasons described above, or that Defendants engaged in any egregious, wanton, and willful conduct, Plaintiff is not entitled to punitive damages.

6.      If a jury were to find Defendants liable for any compensatory damages, Plaintiff's damages as asserted by her expert should be limited because it is speculative in nature, and she cannot establish that: (1) she would have received the promotion to the Director of Post-Op Pain Management role (which never existed within Pacira); (2) she would have received the promotion to the Chief Commercial Officer role (which has remained filled), or; (3) or any damages relating to her claim that she would have received two promotions if still employed by Pacira.

7.      If a jury were to find Defendants liable for any compensatory damages, Plaintiff's resignation from two subsequent employers (Zipline Medical and Livanova USA in September 2018) limits such liability.

8.      If a jury were to find Defendants liable for any compensatory damages, Plaintiff's subsequent re-employment to a comparable position (with Flexion Therapeutics in May 2019) limits such liability.

9.      If a jury were to find Defendants liable for any compensatory damages and do not limit any such liability, Plaintiff failed to meet her duty to mitigate her damages in securing any comparable subsequent employment following her separation from Flexion Therapeutics in January 2022.

10.      If Plaintiff's claims of continued retaliation are permitted to be introduced at this late stage of the litigation and subsequently, at trial, Plaintiff cannot prove that any continued retaliation occurred and/or that Defendants are liable for any compensatory damages resulting from any job loss or rescinded job offer from Flexion and/or Myoscience.

10.      **PLAINTIFF'S WITNESSES** - [Aside from those called for impeachment purposes, only the witnesses whose names and addresses are listed below will be permitted to testify at trial. Indicate whether the witness is expected to testify live or by deposition.]

**A.      On liability, plaintiff intends to call the following witnesses who will testify in accordance with the <u>following summaries:</u>**

1.      Reshma Abell. Plaintiff will testify to the contested facts listed above, including her employment with and ascendancy at Pacira, the occurrences leading up to and which transpired at the 2018 NSM, the incident which occurred at the TopGolf event, her communications and reports about the TopGolf incident made following the incident, the communications which occurred leading up to termination.

2.      Richard Kahr will testify to his role in conducting a purported investigation into the occurrences which transpired at the 2018 NSM, including the incident which occurred at the TopGolf event and the information he purportedly learned about Plaintiff during that investigation (i.e. that she viewed Kamasutra related content on her cell phone) and his role with respect to terminating Plaintiff. Richard Kahr is expected to testify about his background and history as an HR professional, his qualifications, his history of HR practice, his history of discriminating against women and related subject matter. In addition, Richard Kahr is the Corporate Designee pursuant to FRCP 30(b)(6), as such he will testify as to all topics and issues identified as topics in the subpoena dated September 18, 2020.

3.    Dennis McLoughlin will testify to Plaintiff's employment with and ascendancy at Pacira, including her outstanding performance.

4.    Glenn Reiser will testify to Plaintiff's employment with and ascendancy at Pacira, the occurrences leading up to and which transpired at the 2018 NSM, the incident which occurred at the TopGolf event, his communications and reports about the TopGolf incident made following the incident.

5.    Peter Murphy to Plaintiff's employment with and ascendancy at Pacira, the occurrences leading up to and which transpired at the 2018 NSM, the incident which occurred at the TopGolf event, his communications and reports about the TopGolf incident made following the incident, the communications which occurred leading up to Plaintiff's termination.

6.    Steve Huddy is expected to testify as to his interactions and dealings with Plaintiff during her employment with Pacira, his knowledge of any occurrences and/or interactions with Plaintiff before, during and after the 2018 NSM, the incident which occurred at the TopGolf event, his communications and reports about the TopGolf incident made to Human Resources following the incident and his communications concerning the allegation that Plaintiff shared inappropriate Kamasutra content while at the NSM.

7.    Dave Heritage is expected to testify as to his interactions and dealings with Plaintiff during her employment with Pacira, his knowledge of any occurrences and/or interactions with Plaintiff before, during and after the 2018 NSM, the incident which occurred at the TopGolf event and his knowledge concerning the allegation that Plaintiff shared inappropriate Kamasutra content while at the NSM.

8.    Mike Massicotte is expected to testify as to his interactions and dealings with Plaintiff during her employment with Pacira, his knowledge of any occurrences and/or interactions with Plaintiff before, during and after the 2018 NSM, the incident which occurred at the TopGolf event and his knowledge concerning the allegation that Plaintiff shared inappropriate Kamasutra content while at the NSM.

9.    Leslie Hyman is expected to testify about her knowledge of Pacira's Human Resources processes and procedures, her knowledge as to Richard Kahr's competency as an Human Resources professional, her knowledge regarding any occurrences and/or interactions involving Plaintiff before, during and after the 2018 NSM, her knowledge of what was reported to her regarding the incident which occurred at the TopGolf event and her knowledge concerning the allegation that Plaintiff shared inappropriate Kamasutra content while at the NSM.

10.     Rob Rock is expected to testify as to his interactions and dealings with Plaintiff during her employment with Pacira, his knowledge of any occurrences and/or interactions with Plaintiff before, during and after the 2018 NSM, the incident which occurred at the TopGolf event and his knowledge concerning the allegation that Plaintiff shared inappropriate Kamasutra content while at the NSM. He is further expected to testify as to the terms upon which his employment with Pacira came to an end.

11.     Seth Whaley is expected to testify as to his interactions and dealings with Plaintiff during her employment with Pacira, his knowledge of any occurrences and/or interactions with Plaintiff before, during and after the 2018 NSM and his knowledge concerning the allegation that Plaintiff shared inappropriate Kamasutra content while at the NSM.

12.     Christy Schaeffer is expected to testify as to her experience as a Pacira employee and her experience of being discriminated and retaliated against by Pacira and Pacira's HR department.

13.     Ronald Kerna is expected to testify as to his interactions and dealings with Plaintiff during her employment with Pacira.

14.     Plaintiff further reserves it's right to call any witness identified as by Defendants and any such witnesses that are necessary for the purposes of impeachment or whose necessity was not otherwise foreseeable.

**B.     On damages, plaintiff intends to call the following witnesses who will testify in accordance with the <u>following summaries</u>:**

1.     Reshma Abell. Plaintiff will testify to the contested facts detailed above. She will further testify to her damages, her lost income and lost stock incentive awards, the negative impact her termination from Pacira has had to her career and her well-being and as to Pacira's continuing  retaliation as against her following her termination.

2.     Dennis  McLoughlin will testify to his ascendency at Pacira and the compensation which he has received following his series of promotions.

3.     <u>See</u> experts identified in Section 12.

**C.     Defendants object to the following witnesses for the reasons stated:**

Defendants object to the introduction of Christy Schaeffer and Ronald Kerna on the basis of relevancy.  Neither appear to be offered for reasons related to any existing cause of action currently before the Court.

11.   **DEFENDANTS' WITNESSES** - [Aside from those called for impeachment purposes, only the witnesses whose names and addresses are listed below will be permitted to testify at trial. Indicate whether the witness is expected to testify live or by deposition.]

**A.      On liability, Defendants intend to call the following witnesses who will testify in accordance with the <u>following summaries:</u>**

1.      Plaintiff Reshma Abell may be contacted through counsel for Plaintiff, Neal Brickman and Jason Stewart of the Law Offices of Neal Brickman (contact info. below in Section 22).  She is expected to testify as to the alleged facts which comprise her retaliation claim against Defendants, her behavior at the NSM involving the Top Golf incident and the Kama Sutra incident, her participation in HR's investigation, and details concerning her termination from Pacira.

2.      Defendant Richard Kahr may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22).  He is expected to testify as to Pacira's equal opportunity employment policies and training, HR investigation he conducted into the Top Golf incident, the reports he received concerning Plaintiff's behavior at the NSM related to the Kama Sutra incident, and the decision to terminate Plaintiff from Pacira.

3.      Peter Murphy may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22).  He is expected to testify as to his knowledge of Pacira's equal opportunity employment policies and training, Plaintiff's behavior and conduct generally, including her behavior at the NSM involving the TopGolf incident, reports made concerning Plaintiff's behavior at the NSM involving the Kama Sutra incident, information about the logistics of the NSM itinerary and TopGolf event, and the decision to terminate Plaintiff from Pacira.

4.      Glenn Reiser may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22).  He is expected to testify as to his knowledge of Pacira's equal opportunity employment policies and training, Plaintiff's behavior and conduct generally, including her behavior at the NSM involving the TopGolf incident, reports made concerning Plaintiff's behavior at the NSM involving the Kama Sutra incident, information about the logistics of the NSM itinerary and TopGolf event, and the decision to terminate Plaintiff from Pacira.

5.      Roxanne Doherty may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22).  She is expected to testify as to her knowledge of Pacira's equal opportunity employment policies and training, Plaintiff's behavior and conduct generally, including her behavior at the NSM involving the TopGolf incident and Kama Sutra

incident, her participation in the HR investigation conducted by Kahr including reports about Plaintiff's behavior at the NSM involving the Kama Sutra incident, and the decision to terminate Plaintiff from Pacira.

6.      Leslie Hyman's last known contact information is as follows: 7 Grandin Terrace, Annandale, New Jersey 08801.  She is expected to testify as to his knowledge of Pacira's equal opportunity employment policies and training, Plaintiff's behavior and conduct generally, including her behavior at the NSM involving the TopGolf incident, and reports made concerning Plaintiff's behavior at the NSM.

7.      Dennis McLoughlin may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22).  He is expected to testify as to his knowledge of Pacira's equal opportunity employment policies and training, and Plaintiff's behavior and conduct generally.

8.      Gio Vendemia may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22).  He is expected to testify as to information about the logistics of the TopGolf event, and Plaintiff's behavior and conduct generally, including her behavior at the NSM.

9.      Robert Rock's last known contact information is as follows: 10130 Bishop Lake Road West, Jacksonville, Florida 32256.  He is expected to testify as to Plaintiff's behavior and conduct generally, including her behavior at the NSM involving the TopGolf incident and Kama Sutra incident, his participation in the HR investigation conducted by Kahr, including reports about Plaintiff's behavior at the NSM involving the Kama Sutra incidents, the details relating to his separation from Pacira, and his threatened claims against Pacira concerning Plaintiff's conduct at the NSM.

10.      Seth Whaley may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22).  He is expected to testify as to his knowledge of Plaintiff's behavior and conduct generally, including her behavior at the NSM involving the TopGolf incident and Kama Sutra incident, and his participation in the HR investigation conducted by Kahr including reports about Plaintiff's behavior at the NSM involving the Kama Sutra incident.

11.      Steve Huddy's last known contact information is as follows: 2210 Milner Way, Mobile, Alabama 36695.  He is expected to testify as to his knowledge of Plaintiff's behavior and conduct generally, including her behavior at the NSM involving the TopGolf incident and Kama Sutra incident, and his participation in the HR investigation conducted

by Kahr including reports about Plaintiff's behavior at the NSM involving the Kama Sutra incident.

12.     Brian Wiley's last known contact information is as follows: 12208 Mcintosh Road, Thonotosassa, Florida 33592. He is expected to testify as to his knowledge of Plaintiff's behavior and conduct generally, including her behavior at the NSM involving the TopGolf incident and Kama Sutra incident.

13.     James Maccarelli may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22). He is expected to testify as to his knowledge of Plaintiff's behavior and conduct generally, including her behavior at the NSM involving the TopGolf incident and Kama Sutra incident.

14.     David Heritage may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22). He is expected to testify as to his knowledge as well as his and Plaintiff's involvement of the Kama Sutra incident at the NSM.

15.     Michael Massicotte may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22). He is expected to testify as to his knowledge as well as his and Plaintiff's involvement of the Kama Sutra incident at the NSM.

16.     Lance Noble may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22). He is expected to testify as to his knowledge of Plaintiff's behavior and conduct generally, including his interactions with Plaintiff at the NSM.

17.     Isaac Smolko may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22). He is expected to testify as to his knowledge of Plaintiff's behavior and conduct generally, including his interactions with Plaintiff at the NSM.

18.     Defendants further reserve their right to call any witness identified by Plaintiff and any such witnesses that are necessary for the purposes of impeachment or whose necessity was not otherwise foreseeable.

**B.**     **On damages, Defendants intend to call the following witnesses who will testify in accordance with the <u>following summaries</u>:**

1.     Plaintiff Reshma Abell may be contacted through counsel for Plaintiff, Neal Brickman and Jason Stewart of the Law Offices of Neal Brickman (contact info. below in Section 22).  She is expected to testify as to her earnings from her employment with Pacira, the alleged "promised promotion" to the role of "Director of Post-Op Pain Management," and her belief that she would be entitled to future promotions, her employment history and wages, and her efforts to mitigate damages.

2.     Defendant Richard Kahr may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22).  He is expected to testify as to Pacira's policies and practices concerning promotions and the creation of any new role within the organization, and his knowledge of any promotional opportunity or job creation for Plaintiff during her employment with Pacira.

3.     Peter Murphy may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22).  He is expected to testify as to Pacira's policies and practices concerning promotions and the creation of any new role within the organization, and his discussions concerning a pilot program and potential future promotion for Plaintiff to the role of "Director of Post-Op Pain Management."

4.     Glenn Reiser may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22).  He is expected to testify as to Pacira's policies and practices concerning promotions and the creation of any new role within the organization, and his discussions concerning a pilot program and potential future promotion for Plaintiff to the role of "Director of Post-Op Pain Management."

5.     Dennis McLoughlin may be contacted through counsel for Defendants, John K. Bennett, James J. Panzini, and Pooja Bhutani of Jackson Lewis, P.C. (contact info. below in Section 22).  He is expected to testify as to his employment history and experience, including titles held within Pacira, as well as Pacira's policies and practices concerning promotions and the creation of any new role within the organization relating to Plaintiff.

6.     <u>See</u> experts identified in Section 12.

7.      Defendants further reserve their right to call any witness identified by Plaintiff and any such witnesses that are necessary for the purposes of impeachment or whose necessity was not otherwise foreseeable

**C.      Plaintiff objects to the following witnesses for the reasons stated:**

Plaintiff objects to Defendant listing Lance Noble as a witness in this case. Mr. Noble was not disclosed at any point in time during this litigation. Mr. Noble's name only appeared in a single written document which contains certain hearsay statements attributable to Rob Rock. There is, accordingly, no basis for Lance Noble to testify and any testimony from or about Mr. Noble will be more prejudicial than probative.

12.      **EXPERT AND SPECIALIZED LAY OPINION WITNESSES** - [No expert or specialized lay opinion witness offering scientific, technical, or other specialized knowledge will be permitted to testify at trial unless listed below. A summary of the expert's qualifications and a copy of his/her report must be provided for the Court's review at the pretrial conference. Said summary shall be read into the record at the time he/she takes the stand, and no opposing counsel shall be permitted to question his/her qualifications unless the basis of the objection is set forth herein.]

**A.      Plaintiff's expert and specialized lay opinion witnesses are:**

**Economic Expert:**
Kristin Kuczma, M.A.
Sobel Tinari Economics Group

**B.      Defendants' objections to the qualifications of plaintiff's experts and specialized lay opinion witnesses are:**

Defendants do not object to the qualifications of Plaintiff's expert.

**C.      Defendants' expert and specialized lay opinion witnesses are:**

**Economic Expert:**
Chad Staller JD, MBA, MAC, CVA
Stephen M. Dripps
The Center for Forensic Economic Studies

**D.      Plaintiff's objections to the qualifications of Defendants' experts and specialized lay opinion witnesses are:**

Plaintiff does not object to the foregoing witness.

13.      **PLAINTIFF'S DEPOSITIONS** - [List, by page and line, all deposition testimony to be offered into evidence. All irrelevant and redundant matters and all colloquy among counsel must

be eliminated, unless ruled relevant. Deposition testimony to be used solely for impeachment purposes need not be listed.]

**A.** **On liability, Plaintiff intends to read into evidence the following:**

Plaintiff intends to call all witnesses to give live testimony and/or virtual live testimony during the trial.  After the trial date is scheduled, if Defendants determine that there are witnesses that are unavailable to testify either live or virtually, Plaintiff reserves the right to update and supplement this section.

**B.** **On damages, Plaintiff intends to read into evidence the following:**

Plaintiff intends to call all witnesses to give live testimony and/or virtual live testimony during the trial.  After the trial date is scheduled, if Defendants determine that there are witnesses that are unavailable to testify either live or virtually, Plaintiff reserves the right to update and supplement this section.

**C.** **Defendants object to the deposition testimony set forth above for the reasons stated:**

Not applicable as Plaintiff did not identify any deposition testimony to be read into evidence.  Defendants reserve the right to assert objections if depositions are later identified and presented by Plaintiff to be read in at trial.

14.    **DEFENDANTS' DEPOSITIONS** - [List, by page and line, all deposition testimony to be offered into evidence. All irrelevant and redundant matters and all colloquy among counsel must be eliminated, unless ruled relevant. Deposition testimony to be used solely for impeachment purposes need not be listed.]

**A.** **On liability, Defendants intend to read into evidence the following:**

Defendants intend to call all witnesses to give live testimony during the trial.  After the trial date is scheduled, if Defendants determine that there are witnesses that are unavailable to testify live, Defendants reserve the right to update this section.

**B.** **On damages, Defendants intend intends to read into evidence the following:**

Defendants intend to call all witnesses to give live testimony during the trial.  After the trial date is scheduled, if Defendants determine that there are witnesses that are unavailable to testify live, Defendants reserve the right to update this section.

**C.** **Plaintiff objects to the deposition testimony set forth above for the reasons stated:**

36

Not applicable as Defendant did not identify any deposition testimony to be read into evidence. Plaintiffs the right to assert objections if depositions are later identified and presented by Defendant to be read in at trial.

15. **PLAINTIFF'S EXHIBITS** - [Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made.]

    **A.**    **Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each exhibit):**

| Ex. # | Bates # | Description | Date |
|---|---|---|---|
| Ex. 1 | PACIRA 000008-9 | Reshma Abell Resume | 2014 |
| Ex. 2 | PACIRA 000001-3 | Reshma/Pacira Employment Terms | April 10, 2014 |
| Ex. 3 | PACIRA 000478 | Email exchange between Dennis McLoughlin to Abell "Game changer" | November 3, 2014 |
| Ex. 4 | PACIRA 001631 | 2014 Merit Increase from Peter Murphy to Reshma | January 12, 2015 |
| Ex. 5 | ABELL 45 | Appreciation Letter from Dennis McLoughlin to Abell for hard work | January 21, 2015 |
| Ex. 6 | ABELL 15 | Email of recognition from Dennis McLoughlin to East Area Top Performers | June 10, 2015 |
| Ex. 7 | PACIRA 001368 | Email from Dennis McLoughlin to Big East Top Performers; Abell placed at #1 | July 5, 2015 |
| Ex. 8 | ABELL 29-30 | Email from Dennis McLoughlin Congratulating Northeast for #1 in the Nation for Volume Increase through Oct. 2015 | Approx. Oct 2015 |
| Ex. 9 | PACIRA 000048 | Pacira 2015 Annual Performance Review | EOY 2015 |
| Ex. 10 | PACIRA 000039 | Pacira 2016 Mid-Year Performance Review | Approx. June 30, 2016 |
| Ex. 11 | PACIRA 001633 | Pacira Salary Adjustment | October 24, 2016 |
| Ex. 12 | PACIRA 000855-6 | Email exchange between Glenn Reiser and Dennis McLoughlin lauding Abell's Field Coaching report | December 09, 2016 |
| Ex. 13 | PACIRA 000033-8 | 2016 Annual Performance Review | Approx. Dec. 16, 2016 |

| Ex. 14 | PACIRA 001005 | "Merit Increases and Promotions" Email from Glenn Reiser to Reshma Abell | February 16, 2017 |
| Ex. 15 | PACIRA 000971 | Compensation Statement/Promotion to Senior Surgical Account Specialist | February 13, 2017 |
| Ex. 16 | PACIRA 001008 | Proposal plan for Soft Tissue Growth from Reshma Abell to Peter Murphy and Glenn Reiser | February 17, 2017 |
| Ex. 17 | PACIRA 001081 | Email from Glenn Reiser to Reshma Abell "2017 Development Plan" | April 18, 2017 |
| Ex. 18 | PACIRA 001972-5 | Abell June 2017 Expense Report | June, 2017 |
| Ex. 19 | PACIRA 001088-9 | ST/TAP Accelerator - Email from Glenn Reiser | June 28, 2017 |
| Ex. 20 | PACIRA 001856-8 | Abell July 2017 Expense Report | July 2017 |
| Ex. 21 | PACIRA 000040-7 | 2017 Mid Year Review by Glenn Reiser | August 4, 2017 |
| Ex. 22 | PACIRA 001932-4 | Abell August 2017 Expense Report | August 20, 2017 |
| Ex. 23 | PACIRA 001139 | AliBaba TAP pilot program presentation – Email from Abell to Peter Murphy & Glenn Reiser | August 20, 2017 |
| Ex. 24 | PACIRA 001136 | Meeting Call Email to Review Abell's AliBaba Presentation | August 21, 2017 |
| Ex. 25 | PACIRA 000102-3 | Email exchange from Dave Stack to Abell thanking her for Ali Baba presentation | August 24, 2017 |
| Ex. 26 | PACIRA 001920-3 | Abell August 2017 Travel & Expense Report | August 27, 2017 |
| Ex. 27 | PACIRA 001176 | Ali-Baba Follow-up Call Scheduling | Before Sept. 1, 2017 |
| Ex. 28 | PACIRA 001899-1901 | Abell September 2017 Expense Report | September 10, 2017 |
| Ex. 29 | PACIRA 001860-2 | Abell October 2017 Expense Report | October 08, 2017 |
| Ex. 30 | PACIRA 001436-7 | Email exchange from Abell to Reiser for updated "2017 development Plan" | October 27, 2017 |
| Ex. 31 | PACIRA 001202 | East RD Weekly Call Scheduling Email on 2017 Development Plan | October 27, 2017 |
| Ex. 32 | PACIRA 001213 | "Tap Clarification" email from Murphy to Lehmann | December 21, 2017 |
| Ex. 33 | PACIRA 001555 | Compensation Statement Letter – Salary Increase based off 2017 performance | January 8, 2018 |

| Ex. 34 | PACIRA 001635 | Abell Regular Pay History | 2014-2017 |
| Ex. 35 | PACIRA 000049-57 | 2017 Annual Review | January 12, 2018 |
| Ex. 36 | PACIRA 001741-3 | Abell January 2018 Expense Report | January 2018 |
| Ex. 37 | PACIRA 001732-4 | Abell January 2018 Expense Report | January 2018 |
| Ex. 38 | PACIRA 001438-46 | Business Plan for PostOp pain management Dept. | February 4, 2018 |
| Ex. 39 | PACIRA 001238-43 | Email Thread with Rob Rock, Glenn Reisser and Peter Murphy re: Reshma Abell | February 7, 2018 |
| Ex. 40 | PACIRA 001546-53 | 2018 Pacira National Meeting Invitation Email | February 7, 2018 |
| Ex. 41 | PACIRA 001447--51 | Multiple Emails re: Women's Leadership Dinner | January 16-25, 2018 |
| Ex. 42 | PACIRA 000068-70 | Pacira 2018 Women's Leadership Dinner Invitee List | February, 2018 |
| Ex. 43 | PACIRA 002283 | Pacira 2018 Women's Leadership Dinner Attendance List | February, 2018 |
| Ex. 44 | PACIRA 001642-9 | Vendemia, Giovanni P.: February 8-15 Expense Report (TopGolf) | February 8, 2018 |
| Ex. 45 | PACIRA 001650-8 | Rock, Robert: Expense Report (TopGolf) | February 16, 2018 |
| Ex. 46 | | D's Response to First Set of Interog's | January 22, 2020 |
| Ex. 47 | PACIRA000104-114 | Pacira Org Charts | |
| Ex. 48 | PACIRA001336 | Incident at National Meeting | February 15, 2018 |
| Ex. 49 | PACIRA001256 | Email from Scott Braunstein to Rich Kahr / Peter Murphy re: Rob Rock | February 15, 2018 |
| Ex. 50 | PACIRA001261-2 | Email from Matt Lehmann to Rich Kahr re: Incident | February 20, 2018 |
| Ex. 51 | PACIRA001338-9 | Email Exchange Glenn Reiser to Rich Kahr re: Incident | February 20, 2018 |
| Ex. 52 | PACIRA001263-5 | Email Rob Rock to Matt Lehmann re: Call with Rich Kahr (with notes) | February 20, 2018 |
| Ex. 53 | PACIRA001691-4 | Abell, Reshma: February 18, 2018 Expense Report | February 18, 2018 |
| Ex. 54 | PACIRA001675-7 | Abell, Reshma: February 28, 2018 Expense Report | February 28, 2018 |
| Ex. 55 | PACIRA001678-82 | Abell, Reshma: March 2018 Expense Report | March 2018 |
| Ex. 56 | PACIRA001273-5 | Email from Rob Rock to Peter Murphy/Rich Kahr (with notes) | March 12, 2018 |

| Ex. 57 | PACIRA001281 | Email from Matt Lehmann to Rich Kahr re Notes from Rob Rock | March 13, 2018 |
| Ex. 58 | PACIRA002286-9 | Demand Letter from Counsel for Rob Rock | April 13, 2018 |
| Ex. 59 | PACIRA001636 | Email from Rich Kahr to Management re: Harassment Training | January 1, 2018 |
| Ex. 60 | PACIRA001637-41 | Sexual Harassment Training Sign-in Sheet | January 30, 2018 |
| Ex. 61 | PACIRA001453-001543 | Sensitivity Training Email and Slide Show | February 6, 2018 |
| Ex. 62 | | Notice of Deposition Pursuant to Rule 30(b)(6) | September 18, 2020 |
| Ex. 63 | PACIRA000217-282 | Pacira Employee Handbook, January 2017 | January 2017 |
| Ex. 64 | | Plaintiff's Expert Report, including any subsequent/updated reports prepared for trial | |
| Ex. 65 | | Defendants' Expert Report, including any subsequent/updated reports prepared for trial | |
| Ex. 66 | | Any documents relied upon by experts | |
| Ex. 67 | | Plaintiff's prior employment records | |
| Ex. 68 | | Continuing Supplemental Productions Regarding Loss Mitigation and Plaintiff's Updated Financial Status | |
| Ex. 69 | | Documents related to Flexion termination and refusal to offer/pay severance | |

Plaintiff further reserves it's right to introduce into evidence any document identified as an exhibit or otherwise introduced by Defendants and any such documents that are necessary for the purposes of impeachment or whose use was not otherwise foreseeable.

**B.**     **Defendants object to the introduction of plaintiff's exhibits (set forth number of exhibit and grounds for objection):**

Defendants object to the introduction of Plaintiff's exhibit Nos. 3-15, 17, 19, 21, 23-25, 27, 30-35 relating to Plaintiff's performance on the basis of relevance.  Defendants have stipulated to Plaintiff's success in her sales performance during her tenure with Pacira and such information is subject to a motion in *limine* ruling.

Defendants object to the introduction of Plaintiff's exhibit Nos. 18, 20, 22, 26, 28-29, 36-37, 53-55 relating to Plaintiff's expense report on the basis of relevance.  Plaintiff's expense reports have no bearing on any matter currently before the Court and such information is subject to a motion in *limine* ruling.

Defendants object to the introduction of Plaintiff's exhibit No. 69 relating to Plaintiff's separation from Flexion and severance offer on the basis that: such exhibits have no bearing on any matter or claim currently before the Court; this information has not been exchanged during any discovery conducted in this case as of the date of this order; the introduction of this information is prejudicial and not relevant, and; this information is subject to a motion in *limine* ruling.

16.    **DEFENDANTS' EXHIBITS** -

[Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made.]

    **A.    Defendants intend to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each exhibit)[3]:**

| No. | Description |
|-----|-------------|
| 1 | Plaintiff's Complaint (ECF No. 1) |
| 2 | Plaintiff's Personnel File with Pacira (Pacira 000001-67) |
| 3 | Pacira's Organizational Chart (Pacira 000104, 000108-10) |
| 4 | Pacira's Employment Handbook (Pacira 000217-000282) |
| 5 | Plaintiff's Training Records (Pacira 000029-32) |
| 6 | 2/5/2018 Pacira's Sensitivity Training emails and materials (Pacira 001453-1543) |
| 7 | 1/17/2018 Pacira's Sexual Harassment Training emails and sign-in sheets (Pacira 001636-1641) |
| 8 | 11/7/14 Emails between Dennis McLoughlin, Peter Murphy, and David Kaplan re. BI recap (Pacira 000483-484) |
| 9 | 1/15/2015 Emails between Christina Shafer and Peter Murphy re. favor (Pacira 000493) |
| 10 | 2/26/15 Emails between Plaintiff and Peter Whang re. Feb 12 venue (Pacira 001599-1600) |
| 11 | 3/24/15 Emails between John Park, Dennis McLoughlin, and David Kaplan re. "drama vortex" (Pacira 000534) |
| 12 | 6/17/15 Emails between Plaintiff and Peter Murphy re. Regional mtg info (Pacira 001452) |

---

[3] The proposed exhibits listed herein are subject to revision following the Court's orders on the motions *in limine* identified *supra* in Section 4.

Additionally, in accordance with Plaintiff's continuing discovery obligations, Defendants are still awaiting the production of documents by Plaintiff relating to her earnings to date and mitigation information.  Defendants reserve the right to include any additional documents produced by Plaintiff or any third parties to whom such information has also been requested from the date of this order through the trial date.

| 13 | 6/2015-6/2017 Various messages from Reshma Abell to David Kaplan, Peter Murphy, Dennis McLoughlin, and Glenn Reiser relaying thanks (Pacira 000099, 000763, 001008, 001603-05) |
|---|---|
| 14 | 8/20/2015 Email from Plaintiff to David Kaplan re. NY territory (Pacira 000609-11) |
| 15 | 4/19/16 Letter to Plaintiff from Peter Murphy re. Veeva call activity deficiencies (Pacira 000754) |
| 16 | 6/30/2016 Email from Plaintiff to James Scibetta, Peter Murphy, Dennis McLoughlin re. Equity Grant (Pacira 001321-1324) |
| 17 | 6/30/2016-7/4/2016 Emails between Dennis McLoughlin and Peter Murphy re. Equity Grant (Pacira 000768-776) |
| 18 | 6/28/2017 Emails between Glenn Reiser, Reshma Abell, Dave Stack, Peter Murphy re. Development: Reshma Abell – ST/TAP Accelerator – Next Ali Baba Opportunity (Pacira 001433-35) |
| 19 | 1/2018 Women's Leadership dinner e-mail invitation (Pacira 001226, 001230-31) |
| 20 | 2/2018 NSM Itinerary (Pacira 001546-53) |
| 21 | 2/2018 TopGolf Contract and Expense Reports (Pacira 001643-58) |
| 22 | 2/2018 Women's Leadership Dinner RSVP list (Pacira 000068-70) |
| 23 | 2/6/2018 Emails between Robert Rock, Peter Murphy, and Glenn Reiser re. Meeting question (Pacira 0001232-43) |
| 24 | 2/9/2018 Emails between Plaintiff and Robert Rock re. Miami Breast surgery conference (Pacira 0001629-30) |
| 25 | 2/2018 Various emails with Rich Kahr concerning incident at TopGolf (Pacira 000087-96, Pacira 001256, Pacira 001336-43) |
| 27 | 2/2018-3/2018 Emails from Rock re. HR interview and Notes (Pacira 000088-90, Pacira 1273-1275) |
| 28 | 2/22/18 Email from Whaley to Kahr re. Quick call tomorrow (Pacira 002291-92) |
| 29 | 2/21/18-3/14/18 Kahr's HR Interview Notes (Pacira 000071-86) |
| 30 | 3/14/18 Plaintiff's Termination Recording and Meeting Invite (Pacira 001280) |
| 31 | 3/14/18 Text thread between Peter Murphy and Rich Kahr relaying message from Steven Abell (Pacira 000097) |
| 32 | 3/13/18 Emails between Matt Lehmann, Rich Kahr, Kristen Williams, Peter Murphy, and Rob Rock re. termination (Pacira 001281-1288) |

| 33 | 4/13/18 Robert Rock Demand Letter from counsel to Kristen Williams (Pacira 002287-92) |
|----|----|
| 34 | 12/18/19 Whaley Declaration (Pacira 000425-26; 002283-85) |
| 35 | 3/12/15 Email from Plaintiff to Steven Abell re. Outstanding Debt (Pacira 001570-71) |
| 36 | 6/29/16 Emails between Isaac Smolko, Plaintiff, and Steve Abell re. Final draft (Pacira 000764-67) |
| 37 | 8/24/2017 Email from Steven Abell to Plaintiff re. Ali Baba (Pacira 001161) |
| 38 | Plaintiff's Expert Report, including any subsequent/updated reports prepared for trial |
| 39 | Defendants' Expert Report, including any subsequent/updated reports prepared for trial |
| 40 | Plaintiff's responses to Defendants' First Set of Interrogatories |
| 41 | Any documents relied upon by experts |
| 42 | Any supplemental documents produced by Plaintiff concerning her mitigation and updated financial status |
| 43 | Plaintiff's prior employment records (Livanova 0001-84; Stryker 0001-7) |
| 44 | Any documents produced by any third-party served with an authorization and/or subpoena in connection with this matter after the date of the foregoing order |
| 45 | Any public filings made by any party via Pacer in connection with this matter |

**B.    Plaintiff objects to the introduction of defendant's exhibits (set forth number of exhibit and grounds for objection):**

2.     Plaintiff objects to Exhibits 8-17 of the Defendants' exhibit list on the grounds of relevancy as the exhibits pertain to irrelevant earlier in time communications which pre-date the issues at controversy and which have no relation to the purported reason for Plaintiff's termination.

3.     Plaintiff objects to Exhibit 29 of the Defendants' exhibit list as the exhibit contains inadmissible hearsay.

4.     Plaintiff objects to Exhibit 34 of the Defendants' exhibit list as the exhibit contains inadmissible hearsay.

5.     Plaintiff objects to Exhibit 35 of the Defendants' exhibit list as the exhibit bears no relevance to the issues of this litigation.

[COPIES OF EXHIBITS ARE TO BE MADE FOR OPPOSING COUNSEL, AND (3) THREE BENCH BOOKS OF EXHIBITS ARE TO BE DELIVERED TO THE JUDGE IN ACCORDANCE WITH "JUDGE ESTHER SALAS' GENERAL PRETRIAL AND TRIAL PROCEDURES."][4]

17.     **PLAINTIFF'S LEGAL ISSUES** - [Any issue not listed shall be deemed waived.]

    A.     Whether Defendants violated the NJLAD;
    B.     Whether Plaintiff was subjected to illegal gender discrimination under the NJLAD;
    C.     Whether Plaintiff was  subjected to illegal retaliation under the NJLAD;
    D.     Whether the reason articulated by Defendants for Plaintiff's termination was pretextual or false;
    E.     Wheter or not Defendant Kahr is individually liable for gender discrimination and/or retaliation under the NJLAD;
    F.     Whether Pacira's continuing conduct and actions taken against Reshma Abell following Pacira's acquisition of Flexion Therapeutics constituting further retaliation under the NJLAD;
    G.     Whether, and to what amount, Plaintiff is entitled to compensatory damages;
    H.     Whether, and to what amount, Plaintiff is entitled to punitive damages;

18.     **DEFENDANTS' LEGAL ISSUES** - [Any issue not listed shall be deemed waived.]

    A.     Whether or not Plaintiff can establish a *prima facie* case for retaliation under the NJLAD;
    B.     Whether or not Plaintiff can establish that she engaged in protected activity known to the decisionmakers of her termination;
    C.     Whether or not Plaintiff can establish that Defendants' articulated reason for termination is pretextual;
    D.     Whether or not Defendant Kahr is individually liable for retaliation under the NJLAD;
    E.     Whether or not Plaintiff is entitled to compensatory damages, and if so, whether or not Plaintiff's claims of two future promotions should be included in her claim for damages;
    F.     Whether or not Plaintiff is entitled to punitive damages;
    G.     Whether or not Plaintiff's subsequent re-employment to a comparable position limits Defendants' liability for any compensatory damages, and;
    H.     Whether or not Plaintiff proved her duty to mitigate damages.

19.     **MISCELLANEOUS** - [The parties must indicate any other matters that require action by, or should be brought to the attention of, the Court.]

---

[4] It is our understanding that Judge Arleo refers to Judge Salas' General Pretrial and Trial Procedures.

The parties do not have any other matters to address with the Court at this juncture.

20.   **JURY TRIALS** - [Litigants should send to Chambers two (2) courtesy copies of the following materials. Submissions should be tabbed and spiral bound (not Velo-bound). The materials should also be sent to the Court on a disc in Microsoft Word format. These materials are due no later than forty-five (45) days prior to trial (or as otherwise ordered by the Court). For clarification on the below, the parties are required to consult Part 11.1.1-4 of "Judge Esther Salas' General Pretrial and Trial Procedures."][5]

     A.    Each side shall submit to the Court and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2, with citations to authorities and arguments in support of its position on all disputed issues of law.

     B.    The parties are required to confer and submit a combined draft of the proposed jury instructions, including columns indicating disagreements.

     C.    Any hypothetical questions to be put to an expert witness on direct examination shall be submitted to the Court and to opposing counsel.

     D.    Counsel shall jointly submit to the Court a single set of proposed *voir dire* questions as to which the parties are in agreement, not to exceed 30 questions. Parties must also identify any disputed questions in column format.

     E.    Counsel shall jointly submit to the Court a single proposed special verdict sheet.

     F.    The parties shall prepare a joint trial exhibit list containing a description of all exhibits. The list shall be divided into three columns: the first column will identify the exhibit; the second column will state the opponent's objection and contain a short statement citing the relevant rule and/or concept that supports the objection; the third column will contain the proponent's rationale for admissibility. The exhibits themselves are to be pre-marked and must include exhibit stickers. Additionally, the parties must prepare three copies of the bench book containing the exhibits that they expect to use.

     G.    The parties shall identify any equitable, legal, or other issues that they contend should be decided by the Court, through a bench trial or otherwise.

21.   **NON-JURY TRIALS** - [The following materials should be submitted to the Court in the same manner as materials for jury trials, listed above. The materials must be submitted no later than forty-five (45) days prior to trial or as otherwise ordered by the Court]:

     A.    Each side shall submit to the Court and opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2 with citation to authorities and arguments in support of its position on all disputed issues of law.

---

[5] It is our understanding that Judge Arleo refers to Judge Salas' General Pretrial and Trial Procedures.

B.       Following a non jury trial, proposed findings of fact and conclusions of law must be submitted to the Court within one week of the close of trial (or as otherwise ordered by t Court). Submitting litigants must include specific reference to testimonial or documentary evidence in support of the proposals.

C.        If any hypothetical questions are to be put to an expert witness on direct examination, they shall be submitted to the Court and opposing counsel.

This matter is subject to a jury trial, and as such, this section is Not Applicable.

22.      **TRIAL COUNSEL** - [Each party shall identify the names, law firms, addresses, telephone numbers, and email addresses for the attorneys who will try the case on behalf of that party.]

| **ATTORNEYS FOR PLAINTIFF** | **ATTORNEYS FOR DEFENDANTS** |
|---|---|
| Neal Brickman, Esq. | John K. Bennett, Esq. |
| Jason A. Stewart, Esq. | James J. Panzini, Esq. |
| THE LAW OFFICES OF NEAL BRICKMAN, P.C. | Pooja Bhutani, Esq. |
| The GrayBar Building | JACKSON LEWIS, P.C. |
| 420 Lexington Avenue, Suite 2811 | 766 Shrewsbury Avenue, Suite 101 |
| New York, New York 10170 | Tinton Falls, New Jersey 07724 |

**Contact Information –**                                   **Contact Information –**

Phone Number:                                              Phone Numbers:
(212) 986-6840                                             John K. Bennett - (908) 795-5129
                                                           James J. Panzini - (732) 945-6025
Email Addresses:                                           Pooja Bhutani - (732) 945-6022
Neal Brickman - Neal@brickmanlaw.com
Jason Stewart - Jason@brickmanlaw.com                      Email Addresses:
                                                           John K. Bennett - John.Bennett@jacksonlewis.com
                                                           James J. Panzini - James.Panzini@jacksonlewis.com
                                                           Pooja Bhutani – Pooja.Bhutani@jacksonlewis.com

23.      **BIFURCATION** - [If any party intends to request phasing, bifurcation, or other procedure concerning the trial length or ordering of evidence, that party shall include any such request herein and explain the basis for the request.]

Plaintiff requests that all testimony and legal issues be heard and be put to the jury in a single proceeding with no phasing or bifurcation.

Defendants request to bifurcate the issue of punitive damages.

24.     **ESTIMATED LENGTH OF TRIAL** - [Each party shall specify the number of hours that it contends is appropriate for each party for each of the following: (a) *voir dire;* (b) opening statements; (c) presentation of evidence for liability; (d) presentation of evidence for damages; (e) closing arguments.]

A.     **Plaintiff's Length of Trial Estimates**
   (a) *Voir Dire:* 1 to 2 days
   (b) Opening Statements: No more than 4 hours
   (c) Presentation of Evidence for Liability: 5 to 6 days
   (d) Presentation of Evidence for Damages: 1 to 2 days
   (e) Closing Arguments: No more than 4 hours

B.     **Defendants' Length of Trial Estimates**
   (a) *Voir Dire:* 1 to 2 days
   (b) Opening Statements: No more than 4 hours
   (c) Presentation of Evidence for Liability: 6 to 7 days
   (d) Presentation of Evidence for Damages: 2-3 days
   (e) Closing Arguments: No more than 4 hours

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT WERE THE AMENDMENT DISALLOWED. THE COURT MAY FROM TIME TO TIME SCHEDULE CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE REQUEST OF COUNSEL.

*s/ Jason A. Stewart*
Neal Brickman, Esq.
Jason A. Stewart, Esq.
**THE LAW OFFICES OF**
**NEAL BRICKMAN, P.C.**
*Attorneys for Plaintiff*

*s/ James J. Panzini*
John K. Bennett, Esq.
James J. Panzini, Esq.
Pooja Bhutani, Esq.
**JACKSON LEWIS, P.C.**
*Attorneys for Defendants*

*/s/ André M. Espinosa*
The Honorable Andre M. Espinosa
United States Magistrate Judge

Dated: May 9, 2023